# IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| SONJA ROSS | ) |
| | ) |
|        **Plaintiff/Intervenor.** | ) |
| | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) |
| **CRAIG ALEXANDER,** | ) |
| | )    **CIVIL ACTION** |
|        **Cross-Defendant/Plaintiff,** | )    **FILE NO.: 21A03275** |
| | ) |
| **and** | )    <u>**JURY TRIAL DEMANDED**</u> |
| | ) |
| **DELTA AIR LINES, INC., EDWARD** | ) |
| **BASTIAN, RAHUL SAMANT, MATTHEW** | ) |
| **MUTA, DARRELL HASKIN, DAVID SMITH** | ) |
| **DAVID BURTON, CORPORATE DOES 1** | ) |
| **TO 5, AND JOHN DOES 1 TO 10, MABA** | ) |
| **HOLDINGS, LLC, DARREN** | ) |
| **SUMMERVILLE, KEENAN NIX,** | ) |
| **MORGAN AND  MORGAN, P.A.,** | ) |
| **SHEILA ALEXANDER,** | ) |
| **AND MICHAEL RAFI,** | ) |
| | ) |
|        **Defendants.** | ) |

## <u>PLAINTIFF'S/INTERVENOR'S ORIGINAL COMPLAINT</u>

NOW COMES, Plaintiff/Intervenor Sonja Ross (formerly, "Williams") by and through her

counsel, and brings this action against Cross-Defendant/Plaintiff Craig Alexander and Defendants

Delta Air Lines, Inc., Edward Bastian, Rahul Samant, Matthew Muta, Darrell Haskin, David Smith

David Burton, Corporate Does 1 to 5, and John Does 1 to 10 (collectively, the "Delta Defendants"),

for their violations of the Georgia Trade Secrets Act ("GTSA"), together with Defendants MABA

Holdings, LLC, Darren Summerville, Keenan Nix, Morgan and Morgan, P.A., Sheila Alexander,

and Michael Rafi for their conspiracy and fraudulent conduct in intentionally misrepresenting the

facts in this case in an effort to misappropriate Mrs. Ross's aviation communications applications

STATE COURT OF
DEKALB COUNTY, GA.
6/25/2024 3:01 PM
E-FILED
BY: Patricia Nesbitt

1

QrewLogg, QAviation, and/or QrewLive (together, "QrewLive"), among other unlawful behavior in this lawsuit, and alleges as follows:

**NATURE OF THE ACTION**

1.       Craig Alexander is a liar.[1] Sonja Ross created and owns "QrewLive" and its underlying proprietary data. But Mr. Alexander's lies do not change the fact that he and Delta and their agents have misappropriated Mrs. Ross's trade secrets by unlawfully using the application QrewLive in connection with Delta's "Family Flight Communication."

2.       Specifically, this action primarily arises from Mr. Alexander and the Delta Defendants' misappropriation of Mrs. Ross's trade secrets under the Georgia Trade Secrets Act, ("GTSA"), O.C.G.A. §§ 10-1-760 *et seq*., concerning the origin/inception, creation, ownership, and use of Mrs. Ross's digital application QrewLive and its underlying proprietary information, and regarding the attempted and failed sale and misappropriation of QrewLive by Craig Alexander to the Delta Defendants, which has caused and will continue to cause Mrs. Ross significant harm, among other violations of Georgia State law.

3.       Mr. Alexander's conduct in this case is conniving at best and criminal at worst. Such conduct is emblematic of the behavior Mrs. Ross experienced from Mr. Alexander beginning in 2010 when Mrs. Ross and Mr. Alexander were in a romantic relationship, and through 2011 and 2012, when she created and developed her application QrewLive, and which continues today.

4.       Indeed, Mr. Alexander's claims against the Delta Defendants are built and hinge upon a threshold lie: that Mr. Alexander—a self-admitted career pilot—ever possessed the knowledge, skills, or wherewithal to have ideated, designed, or developed such an app as QrewLive or its later iteration, Family Flight Communication. Indeed, discovery in this matter has

---

[1] *See* Order for Sanc., p.3 Fn. 3.

revealed that Mr. Alexander; his wife, Sheila Alexander; and prior counsels, Dan Summerville, Keenan Nix, and Morgan and Morgan, P.A. fabricated the origin story of QrewLive in an effort to continue to conceal the identity of QrewLive's true creator, owner, and developer: Sonja Ross.

5.    In reality, Mrs. Ross—an award-winning digital application developer and entrepreneur—ideated, created, designed, and developed QrewLive and its predecessor applications beginning in 2011 and 2012 after extensive research, including conversations with aviation industry participants, like her then-romantic partner and father of her minor child, Mr. Alexander, in 2010.

6.    Because Mr. Alexander touted his proximity to Delta executives, including Delta's then-CEO Richard Anderson, and after much pressure from Mr. Alexander, Mrs. Ross, authorized Mr. Alexander to act as her agent in shopping and promoting the novel technologies and capabilities of her application QrewLive to Delta for license and/or purchase. In doing so, Mrs. Ross agreed, as creator and owner of QrewLive and as principal, to allow Mr. Alexander to act as her agent for the sole purpose of brokering a sale/license of her creation to Delta.  In exchange, Mr. Alexander provided his "connections" to Delta and nominal contributions to Mrs. Ross's company to shop QrewLive to Delta, and **if successful**, Mrs. Ross agreed to pay a commission to Mr. Alexander as agent as much as 50%-70% of said proceeds.[2]  That is, Mrs. Ross agreed to compensate Mr. Alexander via a contingency interest in the proceeds from the sale of QrewLive to Delta, **if and only if**, Mr. Alexander was successful in procuring such a sale as her agent based on his purported superior knowledge of Delta.

7.    Further, and in the alternative, if necessary, Mrs. Ross and Mr. Alexander's conduct in combining Mrs. Ross's creation and ownership of QrewLive and Mr. Alexander's purported

---

[2] *See* Def. Mot. for Term. Sanc. at p. 9.

industry connections for the specific purpose of securing the sale of QrewLive to Delta may also be considered a partnership.

8.      In either event, Mrs. Ross has never explicitly or implicitly conveyed ownership rights or other property rights in QrewLive and its underlying proprietary information to Mr. Alexander or Delta, or anyone else. In reality, Mr. Alexander at all times acted as Mrs. Ross's agent and/or partner during his interactions with Delta.  Mrs. Ross hereby incorporates all allegations of Mr. Alexander's meetings with the Delta Defendants as her own as Mr. Alexander's principal and/or partner.[3]  Of course, Mrs. Ross expressly denies any and all claims that Mr. Alexander owns or created QrewLive or its underlying proprietary data.

9.      Mr. Alexander breached his fiduciary duty to Mrs. Ross when he failed to disclose the true nature of his relationship with Mrs. Ross to Delta and vice versa.

10.     Mrs. Ross even created an NDA to be utilized in conversations between Mr. Alexander and Delta, in an effort to further protect her ownership interest in QrewLive. Upon information and belief, this is the very NDA offered to Delta by Mr. Alexander but rejected in favor of a version provided by Delta and signed by Mr. Alexander as an agent of Mrs. Ross or in the alternative as her partner.

11.     Unbeknownst to both Mrs. Ross and Delta, from the start of his interactions with Delta, Mr. Alexander paraded the underlying propriety information buttressing QrewLive to Delta as his own and failed to disclose the existence of Mrs. Ross, the mother of his minor child.

12.     Simultaneously, and tellingly, however, Mr. Alexander relied on Mrs. Ross for answers to technical questions and blind-copied her on nearly all emails with Delta, including emails with the Delta Defendants and other executives, and containing Delta's IT plans, so that

---

[3] *See* Alexander Compl. at ¶¶ 42-84.

she could provide meaningful feedback and allow Mr. Alexander to speak intelligently about QrewLive and its underlying proprietary information.  And in each meeting attended by or otherwise participated in by Mr. Alexander, he represented Mrs. Ross and her interest as owner of QrewLive, either as her agent or partner.

13.    Since that time, Mr. Alexander's behavior has descended to unlimited character assaults on Delta executives and Mrs. Ross and other matters, which are beneath this Court. Suffice it to say, however, that Mr. Alexander has gone to great lengths in a brash attempt to silence the truth in this matter through conduct, including criminal witness tampering; character assaults; and threats to disrupt the custodial arrangement between his minor child and her mother, Mrs. Ross, if Mrs. Ross refuses to perjure herself before this Court and convey false ownership to Mr. Alexander.

14.    Notwithstanding, however, Mrs. Ross, as the true owner of QrewLive, maintains valid claims against Mr. Alexander, the Delta Defendants, and their agents for the conduct described herein, including, importantly, trade secrets violations.

15.    Mr. Alexander's own counsel admits that Mr. Alexander did not create QrewLive.[4] Indeed, Mr. Alexander's own lawsuit admits that he "**identified an opportunity** to streamline communication between airline crew schedulers, dispatchers, and crewmembers regarding schedule changes as well as allowing employee-to-employee direct communication without the sharing of cell phone numbers."[5] Tellingly, Mr. Alexander indicates that he did not create, but instead only **identified** an opportunity; this is the opportunity ideated, created, and developed as QrewLive by Mrs. Ross.

16.    Mr. Alexander makes subtle references to Mrs. Ross throughout his recitation of the facts, including stating that he had "**been working with his partners** to come up with a

---

[4] *See* Defs.' Mot. for Term. Sanc. at pp. 8-9.
[5] *See* Alexander's Compl. at ¶ 51 (emphasis added).

solution" to the flight personnel communication challenges permeating the industry.[6] Said partners are Mrs. Ross, the principal and owner of QrewLive, and by stating, "…**we** are bringing together all of the essential communication elements of operating a flight from point A to point B and placing them in an all-in-one toolkit."[7] The "We" referred to must include Mrs. Ross.[8]

17.    In fact, ironically, Mr. Alexander's own pleadings assert that "Delta has never been a Company that develops cutting-edge technology for flight operations 'in-house,' as opposed to purchasing it from third-party vendors," while simultaneously ignoring the fact that Mr. Alexander himself has never been a person or pilot that develops cutting-edge technology for flight operations or for any other purpose at all.[9] In reality, Mrs. Ross is the only party to this suit who is regularly in the business of creating and developing cutting-edge technology for business operations, including flight and/or transportation operations, thus further demonstrating Mrs. Ross's ownership of QrewLive and the underlying proprietary information unlawfully misappropriated by Mr. Alexander and the Delta Defendants.

18.    At all relevant times alleged in this lawsuit, Mr. Alexander was supposed to act in good faith on behalf of Mrs. Ross, either as her agent or partner. As discussed herein, Mr. Alexander failed to act in good faith in connection with his conduct in this lawsuit and his and Delta Defendant's misappropriation of Mrs. Ross's invention, QrewLive, among other unlawful behavior.

### THE PARTIES

19.    Plaintiff/Intervenor Sonja Ross is a citizen and resident of the State of Georgia. Mrs. Ross is an award-winning head digital designer and producer, responsible for creating and

---

[6] *See* Alexander's Compl. at ¶ 56.
[7] *Id.* at ¶ 44.
[8] *Id.*
[9] *Id.* at ¶ 35.

launching award-winning marketing campaigns, delivering high-quality product designs, web platforms, digital applications, and executing large-scale live events around the country earning her numerous accolades. For over 13 years, Ross has been a staple as a featured keynote speaker for many organizations, such as Microsoft and Georgia Tech.

20. Cross-Defendant and Plaintiff Craig Alexander is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 185 Wynfield Way, Atlanta, Georgia, 30331.

21. Defendant Delta Air Lines, Inc. is a Delaware corporation with its headquarters, primary operations, and principal place of business, located in the State of Georgia, at 1030 Delta Boulevard, Department 982, Atlanta, Georgia, 30354. Delta Air Lines, Inc., is registered to do business in Georgia and may be served with process and executed summons via its Registered Agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Gwinnett County, Georgia, 30092.

22. Defendant Edward Bastian is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 2424 Thurleston Lane, Duluth, Georgia, 30097.

23. Defendant Rahul Samant is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 270 17th Street NW, Unit 4301, Atlanta, Georgia, 30363.

24. Defendant Matthew Muta is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 13750 Birmingham Highway, Milton, Georgia, 30004.

25.     Defendant Darrell Haskin is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 216 Hammock Bay Drive, Fayetteville, Georgia, 30215.

26.     Defendant David Smith is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 1415 Vernon Ridge Close, Dunwoody, Georgia, 30338.

27.     Defendant David Burton is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 5114 Thousand Oaks Place, Kennesaw, Georgia, 30152.

28.     Defendants Corporate Does 1 to 5 are entities that were responsible in whole or in part, or who conspired with those who were, for the theft, actions, and misconduct alleged in this Complaint, and whose identities remain unknown to Sonja Ross.

29.     Defendants John Does 1 to 5 are individuals who were responsible in whole or in part, or who conspired with those who were, for the theft, actions, and misconduct alleged in this Complaint, and whose identities remain unknown to Sonja Ross.

30.     Defendant MABA Holdings, LLC, is a Limited Liability Company registered to do business in both Louisiana and Ohio and may be served with process and executed summons at 19 Summerlin Drive, LaPlace, Louisiana, 70068, and 7366 Riverby Road, Cincinnati, Ohio, 45255.

31.     Defendant Sheila Alexander is a citizen and resident of the State of Georgia. She resides and may be served with process and executed summons at 185 Wynfield Way, Atlanta, Georgia, 30331.

32.     Defendant Darren Summerville is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 566 Harold Ave. NE, Atlanta, Georgia, 30307.

33.     Defendant Keenan Nix is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 2233 Peachtree Rd. NE, Atlanta, Georgia 303309.

34.     Defendant Morgan and Morgan, P.A. is a law firm with offices in the State of Georgia and may be served with process and executed summons at 191 Peachtree St. NE, Suite 4200, Atlanta, Georgia 30303.

35.     Defendant Michael Rafi is a citizen and resident of the State of Georgia. He resides and may be served with process and executed summons at 1001 Clifton Rd. NE, Atlanta, Georgia 30307.

### JURISDICTION AND VENUE

36.     Mr. Alexander and all Defendants, and Plaintiff/Intervenors Ross, are subject to the jurisdiction of this Court because all Parties either reside or are involved in the same transaction or occurrence with a Defendant who resides or maintains their principal place of business within the State of Georgia.

37.     Venue for all Parties is proper in this Court pursuant to Ga. Const. art. VI, § 2, VI, and Ga. Code Ann. §§ 14-2-510, 9-10-93.

### STATEMENT OF FACTS

38.     The truth of the origins of QrewLive is that Mrs. Ross had been working to develop communications solutions for the transportation industry generally when she began developing

QrewLive as a solution for aviation-based communications. Mr. Alexander and the Delta Defendants and their agents would later misappropriate this solution.

39.     As evidence of this fact, Mrs. Ross has recently become the subject of threats and a character assault in open court by Mr. Alexander and his former counsel in an effort to intimidate her and manipulate her potential testimony in this matter.  This is because Mrs. Ross's testimony reveals that Mr. Alexander is not the creator of QrewLive or its later iteration, Family Flight Communication. Prior to this lawsuit and subsequent schemes by Mr. Alexander to misrepresent the true origins of QrewLive, Mrs. Ross was led to believe by Mr. Alexander that QrewLive was dead on arrival and wholly rejected by Delta.  Mrs. Ross discovered Mr. Alexander and the Delta Defendant's misappropriation of her invention QrewLive only several months after the filing of Mr. Alexander's lawsuit in July of 2021, and was shocked by the allegations contained therein.

## A.  MRS. ROSS INVENTS QREWLIVE BASED ON HER EXPERIENCE LAUNCHING SIMILAR TRANSPORTATION COMMUNICATIONS SOLUTIONS, INCLUDING APPLICATIONS.

40.     Mrs. Ross is an award-winning digital entrepreneur with a track record of developing large-scale websites and digital technologies, including mobile and desktop applications for transportation communications.

41.     Mrs. Ross and Mr. Alexander were in a romantic relationship beginning sometime in 2010. Mrs. Ross and Mr. Alexander share a minor child from that relationship.

42.     During the beginning of their relationship, Mrs. Ross was hard at work creating digital solutions for communication breakdowns in the transportation industry and developing "a GPS location-based device that also had an analytical dashboard that allowed [truck] fleets to communicate with each other."[10] So, when her then-romantic partner, Mr. Alexander, mentioned

---

[10] *See* Defs.' Mot. for Term. Sanc. at p. 8.

communication breakdowns within the aviation industry, and at his job at Delta, the solution was obvious to Mrs. Ross: build QrewLive.

43.     Between 2010 and 2012, Mrs. Ross set out to expand her transportation communications solutions to the aviation transportation industry by modifying and building upon her pre-existing experience launching transportation communication solutions and conducting extensive research to create aviation-specific communications applications, which ultimately culminated into QrewLive.

44.     Mrs. Ross produced initial sketches and wireframes demonstrating the functionality and viability of QrewLive in 2012. Between 2012 and early 2014, Mrs. Ross conceptualized and labored to create "QAviation," a three-part interface system containing (1) "QTalk", (2) "QCentral," and (3) "QDirect." The three components had three distinct features that could also be combined and utilized as one service: "QAviation." A PowerPoint presentation, prepared on December 2, 2013, showcases Mrs. Ross's vision for her app, QrewLive, which featured its three components: QTalk, QCentral, and QDirect.

45.     Mrs. Ross continued refining her creation and through 2014 when Mr. Alexander began attempting to sell and/or license QrewLive on her behalf.

**B.  MRS. ROSS ATTEMPTS TO SELL OR LICENSE QREWLIVE TO DELTA VIA MR. ALEXANDER AS HER AGENT AND/OR PARTNER.**

46.     Because of Mr. Alexander's purported proximity to and influence with Delta executives, he convinced Mrs. Ross to allow him to attempt to broker a sale and/or licensure of QrewLive to Delta as her agent. In return, Mrs. Ross, as principal, agreed to pay Mr. Alexander a commission of 50-70% of the proceeds of such a sale **if** such a sale actually occurred.[11]

---

[11] *See* Alexander Compl. at ¶¶ 42-84.

47.     Alternatively, Mrs. Ross and Mr. Alexander's conduct in agreeing to unite Mrs. Ross's expertise in digital and mobile application development, including the creation and development of QrewLive, with Mr. Alexander's purported connections with Delta (along with other nominal investments) for the purpose of selling QrewLive to Delta constitutes a partnership under Georgia law.

48.     In either event, Mrs. Ross never sold, licensed, or otherwise granted property or ownership interest in QrewLive or in the underlying proprietary information of any of Mrs. Ross's transportation communication solutions to Mr. Alexander, Delta, or anyone else.  Indeed, Mrs. Ross consistently has maintained that she has and retains all intellectual property rights in and to QrewLive and her other transportation communication solutions.

**C. MRS. ROSS DEVELOPS QREWLIVE AFTER DELTA'S EXPRESSED INTEREST; AND MRS. ROSS DIRECTS AND COACHES MR. ALEXANDER'S TECHNICAL KNOWLEDGE, INFORMATION AND UPDATES FOR DELTA.**

49.     After conceptualizing her work, and developing and producing initial sketches, wireframes, and PowerPoint presentations demonstrating the functionality and viability of QrewLive, Mrs. Ross provided Mr. Alexander with copies of the same.  Mrs. Ross also spent considerable time coaching and preparing Mr. Alexander for meetings and other interactions with the Delta Defendants.

50.     While operating as Mrs. Ross's agent and/or partner for the sale of QrewLive to Delta, Mr. Alexander engaged in numerous meetings and exchanges with Delta executives in an effort to sell Mrs. Ross's creation, QrewLive, between 2014 and 2017. Specifically, in February 2014, Mr. Alexander, while piloting for Delta, met with the Chief Executive Officer of Delta at the time, Richard Anderson, to pitch Ross's QrewLive application as a product for Delta's purchase or license. Following this meeting, Alexander enthusiastically reported to Ross the details of the

encounter and Delta's interest in her creation, QrewLive. Mr. Alexander also communicated to Mrs. Ross that Delta wanted her to deliver a prototype of QrewLive.

51.    Accordingly, on or about March 27, 2014, Mrs. Ross and Mr. Alexander further agreed to continue their principal and agency relationship and/or partnership regarding the sale or license of QrewLive to Delta.  In doing so, Mr. Alexander convinced Mrs. Ross that he could use his preexisting "holding company," MABA Holdings, LLC ("MABA"), to promote QrewLive to Delta and that any business dealings regarding QrewLive would be handled via MABA.  That is, at all times, Mr. Alexander, either individually or together with his company, MABA, had the authority to enter into contracts on behalf of Mrs. Ross in connection with QrewLive as her agent and/or partner—but not to steal her QrewLive trade secrets or fail to disclose Mrs. Ross's existence and ownership to Delta. Accordingly, the non-disclosure agreement ("NDA") signed by Mr. Alexander and/or MABA was signed on Mrs. Ross's behalf.

52.    Through the aforementioned conduct, Mr. Alexander and/or MABA held themselves out as Mrs. Ross's agent and/or partner in connection with the attempted sale or license of QrewLive to Delta. Mr. Alexander and/or MABA did not create QrewLive but instead were engaged to sell the application to Delta, given Alexander's purported access to Delta executives like Richard Anderson and Theresa Wise.

53.    Despite Mrs. Ross's continued work with Mr. Alexander to promote QrewLive to Delta, including teaching Mr. Alexander how to utilize and operate the technology so he could effectively pitch a product he did not create and technology that he could not understand to Delta, unbeknownst to Mrs. Ross, Mr. Alexander failed to disclose Mrs. Ross's existence to Delta.

54.    As conversations with Delta progressed via email and moved to in-person meetings, Mrs. Ross was either sent emails by Mr. Alexander directly or bcc'd on the emails with Delta

employees. During those communications with Delta, Mr. Alexander continuously requested Mrs. Ross's assessment and feedback to discuss QrewLive with Delta intelligently and respond to Delta's inquiries.

55.     Conversations between Mrs. Ross, Mr. Alexander, and Delta continued through 2016. Then suddenly, despite what Mr. Alexander led Mrs. Ross to believe was strong interest in QrewLive by Delta, in 2017, Mr. Alexander informed Mrs. Ross that "Delta had lost interest and had gone silent."[12] Despite being disappointed by the failed sale of her creation and losing millions by declining typical client projects during QrewLive's development, Mrs. Ross was happy to close the chapter of her life involving Mr. Alexander, who was prone to exaggerations, manipulations, and lies throughout their business and personal relationship, including previously attempting to misappropriate Mrs. Ross's intellectual property.

### D.  MR. ALEXANDER AND DELTA MISAPPROPRIATE QREWLIVE.

56.     Unbeknownst to Mrs. Ross, in 2018, Delta premiered its own internal application Family Flight Communication, which was so strikingly similar to QrewLive that even Mr. Alexander—a layperson in technology and application development—took notice of the misappropriation and filed suit against Delta on July 21, 2021.

57.     Mrs. Ross learned of the lawsuit several months later.  To Mrs. Ross's shock, however, Mr. Alexander's lawsuit alleged that he and his now wife, not Mrs. Ross, created the proprietary information underlying Delta's Family Flight Communication. This, however, has proven untruthful. Indeed, discovery in the lawsuit shows Mrs. Ross' involvement and creation of the underlying proprietary information and Mr. Alexander's intentional attempt to conceal the truth.

---

[12] *See* Alexander Compl. at ¶¶ 79-80.

58.    Notwithstanding, Delta misappropriated and raided QrewLive's proprietary information by utilizing this information for the "creation" of its own app, Family Flight Communication, only a few short months after rejecting QrewLive as presented to Delta by Mr. Alexander on Mrs. Ross's behalf as her agent and/or partner.

59.    This information was protected and guarded as secret by Mrs. Ross, who took care to ensure that her idea was not divulged to others or the public at large. Mrs. Ross even prepared a non-disclosure agreement for Mr. Alexander to utilize should he need to discuss the ideas or information with Delta. Upon information and belief, this is the same Non-Disclosure Agreement (the "NDA") referenced by Mr. Alexander and rejected by Delta in favor of a Delta prepared NDA later executed on Ross's behalf by Mr. Alexander and/or MABA as Ross's agent and/or partner.[13] Mrs. Ross did not disclose said information to others except for Mr. Alexander. Delta would not have misappropriated QrewLive if it did not value the application, just as Mrs. Ross did.  Indeed, Delta knew QrewLive's proprietary information would enable it to not only save money but make money as well.

60.    Even if the Delta Defendants did not know that QrewLive's valuable proprietary information was being improperly divulged by Mr. Alexander to them by his apparent misrepresentations that he owned QrewLive, the disclosure of QrewLive's proprietary information **after** the signing of the NDA between Delta and Mr. Alexander (who at all times acted as an agent and/or partner promoting the proprietary information of Mrs. Ross) was enough to have made the Delta Defendants aware that the needed information it used to build its app, Family Flight Communication, was acquired under circumstances giving rise to a duty to maintain secrecy.

---

[13] *See* Alexander Compl. at ¶ 70.

61.     The information exchanged about QrewLive that makes it valuable occurred after the signing of the NDA for QrewLive's potential sale to Delta, meaning that nothing was ever given to Delta for it to use on its own accord and at its own whim, but rather to enable it to make a purchasing decision about QrewLive.

62.     Yet, despite Delta being made aware that QrewLive is not owned by Mr. Alexander and is instead owned by Mrs. Ross, Delta continues to use Family Flight Communication and QrewLive's underlying proprietary information without any plan or attempt to compensate Mrs. Ross for her ownership interest.

63.     Mrs. Ross hereby alleges and incorporates by reference all facts, including meetings and disclosure of information by Mr. Alexander to Delta, which include the disclosure of QrewLive information as misappropriated by Mr. Alexander and then by Delta and its agents as its Family Flight Communications as her own claims as alleged in Mr. Alexander's lawsuit because Mr. Alexander was at all times acting as Mrs. Ross's agent and/or partner in connection with the same.[14] Of course, however, Mrs. Ross refutes and denies the totality of the QrewLive origin story presented to this Court by Mr. Alexander, including Mr. Alexander's alleged "eureka" moment and the contrived narrative involving Mr. Alexander creating QrewLive with his wife, which Mr. Alexander and his prior counsel acknowledge as false.[15]

64.     Indeed, Mrs. Ross's ownership and involvement in QrewLive is so material to this lawsuit that discovery in this matter was bound to reveal the truth: Mrs. Ross created and owns QrewLive and its underlying proprietary information.

---

[14] *See* Alexander Compl. at ¶ 42-84.
[15] *See* Defs.' Mot. for Term. Sanc. at pp. 8-9.

**E.  DELTA SERVES MRS. ROSS WITH REQUEST FOR PRODUCTION OF DOCUMENTS.**

65.     On March 22, 2023, Delta served Mrs. Ross and her company, ShockTheory, DLV

Inc. ("ShockTheory"), with Nonparty Requests for Production of Documents.

66.     On March 24, 2023, Mr. Alexander and his former counsel, Keenan Nix, contacted

Mrs. Ross in an attempt to bribe her into agreeing with their fabrication of the origins and

ownership of QrewLive.  When that did not work, Messrs. Alexander and Nix threatened to impede

upon the custodial relationship of Mrs. Ross and her minor child shared with Mr. Alexander.[16] Mr.

Nix also offered to retain counsel for Mrs. Ross to assist her in responding to Delta's discovery

requests. Sensing that Messrs. Alexander and Nix had nefarious intentions, Mrs. Ross recorded the

conversations and declined Mr. Nix's offers.

**F.  SHEILA ALEXANDER CONSPIRES WITH MESSRS. ALEXANDER, SUMMERVILLE AND NIX, AND
MORGAN AND MORGAN, P.A. IN AN EFFORT TO CONCEAL MRS. ROSS'S INTERESTS, AND TO
SECURE AND OBTAIN A PAYOUT THROUGH THE MISAPPROPRIATION OF MRS. ROSS'S
QREWLIVE APPLICATION.**

67.     Mrs. Ross's instincts were correct, and as recorded calls produced in this lawsuit

demonstrate, Messers. Alexander and Nix, individually and as a partner of Morgan and Morgan,

P.A., have admitted to fabricating the origin story presented to this Court in concert with and in

furtherance of Mr. Alexander's scheme to misappropriate Mrs. Ross's intellectual property. Upon

information and belief, Sheila Alexander either directly participated in, or had knowledge of, and

was complicit in, the false origin story presented to the court, which falsified her involvement in

this lawsuit by alleging she took part in the creation or ideation of this application when she in fact

did not.

68.     Sheila Alexander conspired with Messrs. Alexander, Summerville and Nix, and

Morgan and Morgan, P.A. in an effort to conceal Mrs. Ross's interests and to secure and obtain a

---

[16] *See* Defs.' Mot. for Term. Sanc. at pp. 2-3.

payout through the misappropriation of Mrs. Ross's QrewLive application. Specifically, Sheila Alexander conspired with Messrs. Alexander, Summerville and Nix, and Morgan and Morgan, P.A. to conjure up the lie that she inspired Mr. Alexander's "eureka" moment by complaining about "repeatedly being hung up on every time she called Delta's Crew Scheduling" after a random event disrupted flight operations.[17] This allegation was a lie, and after Mrs. Ross confronted Mr. Nix about it, he admitted the same by explaining that the "eureka" moment was created to tell a better (albeit false) story of a pilot husband and flight attendant wife creating an idea for the airline for which they worked. Specifically, Mr. Nix stated, "[Mrs. Alexander's] a flight attendant, and that story was just merely meant to illustrate a point. And I may have made more of it . . . .Right. As a story, as a moment, because we like to tell stories."[18] The "we" referred to by Mr. Nix as those who "like to tell stories" includes Sheila Alexander, Messrs. Alexander, Summerville, and Nix and Morgan and Morgan, P.A.

69.    Importantly, Messrs. Alexander and Nix also embrace and do not dispute Mrs. Ross's vital role in the genesis and creation of QrewLive, stating that "[He] maintained that Craig has always maintained that you had a great creative role in this."[19] Despite this Messrs. Alexander, Nix,  and Summerville and Morgan and Morgan, P.A., together with Sheila Alexander, continue to misrepresent the truth to this Court.  Messers. Alexander and Nix also continued to pressure Mrs. Ross to spoliate discoverable information in this case and even offered to retain counsel for Mrs. Ross in furtherance of the same.

---

[17] *See* Alexander Compl. at ¶ 16.
[18] *See* Defs.' Mot. for Term. Sanc. at p. 8.
[19] *See* Defs.' Mot. for Term. Sanc. at pp. 8-9.

### G.  MRS. ROSS RETAINS AND LATER TERMINATES MICHAEL RAFI AS COUNSEL.

70.    Because of the nefarious conduct described above, Mrs. Ross retained counsel, Michael Rafi, to represent her interests relating to her application QrewLive and its underlying proprietary information. Specifically, Ross retained Mr. Rafi to appropriately (1) respond to Defendant Delta's discovery requests and (2) intervene in this action. Mr. Rafi did neither.

71.    Instead, upon information and belief, Mr. Rafi collaborated with Mr. Alexander's counsel to further Mr. Alexander's lies before this Court.  Specifically, Mr. Rafi conspired with Mr. Alexander's initial counsel, Darren Summerville, along with Mr. Nix and Morgan and Morgan, P.A., to produce a limited production that would preserve Mr. Alexander's narrative rather than admit the truths established by Mrs. Ross's evidence in this matter.

72.    Upon information and belief, Mr. Rafi obtained redacted discovery documents from Mr. Alexander and his counsel and produced those obtained documents to Delta in lieu of the production of Mrs. Ross's actual documents. Following this "production," Mr. Rafi ceased responding to Mrs. Ross's inquiries and following client instructions, such as moving to intervene in this action, as retained to do.  Mr. Rafi's conduct was so egregious that even Delta made note of its concern that "Plaintiff and his prior counsel may have improperly interfered with [Mrs. Ross's] production."[20]

73.    Because of this, on October 30, 2023, Mrs. Ross terminated Mr. Rafi as counsel and notified this Court and Delta of the same. On or around January 26, 2024, Mrs. Ross also contacted Delta to inform them of the extent of her former counsel, Mr. Rafi's, misconduct, and informed Delta that she was working diligently to find new counsel to represent her in this matter and protect her interest.

---

[20] *See* Defs.' Mot. for Term. Sanc. at p. 20.

**H. DELTA MOVES FOR TERMINATING SANCTIONS AGAINST MR. ALEXANDER BASED ON MESSRS. ALEXANDER AND NIX'S ATTEMPTS TO CONVINCE HER TO LIE TO THIS COURT.**

74.     On February 8, 2024, Delta filed a Motion for Terminating Sanctions to dismiss Mr. Alexander's lawsuit based on criminal witness tampering as evidenced by Mrs. Ross's produced recordings of her March 24, 2023, conferences with Messrs. Alexander and Nix demonstrating that Mrs. Ross refused to allow them to manipulate her testimony. On March 8, 2024, this Court found that Mr. Alexander's conduct was in bad faith and granted Delta's Motion, and sanctioned Mr. Alexander by dismissing with prejudice his claims for attorney's fees and punitive damages.

75.     In doing so, this Court also noted that "[Mrs. Ross] is a material witness who seems to have been present for QrewLive's inception and worked with Plaintiff at certain times during its development."[21]And that if "indeed there was an agreement between the parties regarding sharing in the ownership of the application, this could have significant impact on [Mr. Alexander's] claims."[22] And that the "importance of [Mrs. Ross's] testimony regarding her share of QrewLive is clear from Plaintiff imploring [Mrs. Ross] not to reveal said testimony."[23]

76.     This Court's instincts are correct, and Mr. Alexander and his coconspirators have purposely concealed the depths of Mrs. Ross's creation and ownership of QrewLive in an effort to extinguish her rights to her intellectual property and trade secrets.  Because of Mrs. Sheila Alexander and Messrs. Alexander, Summerville, Rafi and Nix and Morgan and Morgan, P.A.'s continued conspiracy to defraud Mrs. Ross and misappropriate her intellectual property and trade secrets in connection with QrewLive, and the Delta Defendant's refusal to cease and desist and/or

---

[21] *See* Order for Sanc. At p. 5.
[22] *Id.*
[23] *Id.*

compensate Mrs. Ross for their misappropriation in connection with QrewLive, Mrs. Ross was forced to intervene in the instant lawsuit to protect her interests.

### I.    MRS. ROSS INTERVENES TO PROTECT HER INTEREST IN THIS LAWSUIT.

77.    On March 22, 2024, Mrs. Ross sent Delta a Cease and Desist and Demand Letter demanding that Delta cease its unlawful misappropriation of QrewLive and demanding monetary compensation for Delta's unlawful use of QrewLive proprietary information.  Mrs. Ross also notified Delta of its intention to intervene in the instant lawsuit based on the facts detailed herein.

78.    On March 23, 2024, Mr. Alexander contacted Mrs. Ross's adult son, Jon Fant, to invite him out on Mr. Alexander's new yacht and ask him to perjure himself before this Court by again fabricating the origins and ownership of QrewLive in yet another desperate attempt by Mr. Alexander to misappropriate the application and its underlying proprietary information. Of course, Mrs. Ross's son rejected Mr. Alexander's offer to lie against his own mother in exchange for a trip on Mr. Alexander's luxury boat, or for anything for that matter.  Upon information and belief, Mr. Alexander continues to contact third parties with the intent to deter them from testifying freely, fully, and truthfully in this case so that he can continue to perpetuate a fraud in this Court.

79.     Indeed, Mr. Alexander continues contacting persons, like Mrs. Ross's son, in an attempt to bribe them in exchange for fabricated testimony against Mrs. Ross and her creation, QrewLive, in an effort to continue misappropriating Mrs. Ross's work as his own.

80.    On April 12, 2024, Mrs. Ross filed her Motion to Intervene in this lawsuit to protect her interest and obtain retribution for the theft of QrewLive and its underlying proprietary information because without doing so there is a significant risk of Mrs. Ross losing her interest in the proceeds and gains of QrewLive, a trade secret misappropriated by both Mr. Alexander and the Delta Defendants, and neither could adequately represent Ross's conflicting interests in this matter.

81. For reasons elaborated above, both Mr. Alexander and Delta and their agents have harmed Mrs. Ross, and she is entitled to relief within the jurisdictional limitations of this Court as a result.

**COUNT I**
**TRADE SECRET MISAPPROPRIATION UNDER O.C.G.A. §§ 10-1-760, *et seq*.**
**(AGAINST MR. CRAIG ALEXANDER, MABA HOLDINGS, KEENAN NIX, MORGAN AND MORGAN,
SHEILA ALEXANDER, DARREN SUMMERVILLE AND MICHAEL RAFI)**

82. Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

83. Mrs. Ross owns QrewLive and its underlying proprietary information. QrewLive and its underlying proprietary information and intellectual property, including, but not limited to, the relevant information regarding the text messaging component, and other communications features of QrewLive, constitute a trade secret as defined under the GTSA, O.C.G.A. §§ 10-1-760 *et seq*.

84. QrewLive's underlying proprietary information and intellectual property were not known or readily available to the public. Neither did Mrs. Ross divulge this information to the public nor others besides her former agent and/or partner, Mr. Alexander. Mrs. Ross used reasonable and appropriate efforts under the circumstances to maintain the secrecy and confidentiality of her trade secret, QrewLive, and its underlying proprietary information.

85. Mr. Alexander, MABA, Mr. Nix, Morgan and Morgan, Mrs. Alexander, Mr. Summerville and Michael Rafi effectively stole and mispresented ownership of, and divulged information regarding Mrs. Ross's trade secret, QrewLive and its underlying proprietary information, to Delta, to attempt to profit from Mrs. Ross's creation by selling QrewLive to Delta as a purported trade secret owner as opposed to an agent and/or partner of Mrs. Ross, to solely effectuate the sale of Mrs. Ross's trade secret to Delta unlawfully.

86.    Mr. Alexander, MABA, Mr. Nix, Morgan and Morgan, Mrs. Alexander, Mr. Summerville and Michael Rafi knew, at the time QrewLive's trade secret information was divulged to him, that a duty arose, as an agent and/or partner for the sale of QrewLive on behalf of Mrs. Ross, to maintain his principal's and/or partner's trade secret information as secret. And, Mr. Alexander, in the course of misrepresenting his "ownership interest" in QrewLive's trade secret information to Delta, Mr. Alexander disclosed and/or used Mrs. Ross's trade secret in a way that exceeded his scope of authority as Mrs. Ross's agent and/or partner, and without Ross's consent to do so.

87.    Further, Mr. Alexander, MABA, Mr. Nix, Morgan and Morgan, Mrs. Alexander, Mr. Summerville and Michael Rafi effectively stole and then misrepresented ownership of and divulged information regarding Mrs. Ross's trade secret, QrewLive, and its underlying proprietary information to this Court when he filed his Complaint in his attempt to profit from Delta's misappropriation of Mrs. Ross's trade secret in Delta's "creation" of Family Flight Communication.

88.    Mr. Alexander, MABA, Mr. Nix, Morgan and Morgan, Mrs. Alexander, Mr. Summerville and Michael Rafi's acts of misappropriation have caused Mrs. Ross to sustain monetary damages, loss and injury in an amount to be determined at the time of trial, but in no event less than the actual loss caused by the misappropriation, and the unjust enrichment caused by the misappropriation, which is not taken into account in computing actual loss.

89.    Upon information and belief, Mr. Alexander, MABA, Mr. Nix, Morgan and Morgan, Mrs. Alexander, Mr. Summerville and Michael Rafi have engaged and continue to engage in these acts of misappropriation, knowingly, willfully, and maliciously, so as to justify the assessment of exemplary damages against Mr. Alexander.

90.     Upon information and belief, Mr. Alexander, MABA, Mr. Nix, Morgan and Morgan, Mrs. Alexander, Mr. Summerville, and Michael Rafi have engaged and continue to engage in these acts of misappropriation, knowingly, willfully, and maliciously so as to justify an award of reasonable attorneys' fees to Ross.

<u>**COUNT II**</u>
**TRADE SECRET MISAPPROPRIATION UNDER O.C.G.A. §§ 10-1-760, et seq.**
**(AGAINST DELTA DEFENDANTS)**

91.     Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

92.     Mrs. Ross owns QrewLive and its underlying proprietary information. QrewLive and its underlying proprietary information and intellectual property, including, but not limited to, the relevant information regarding the text messaging component, and other communications features of QrewLive, constitute a trade secret as defined under the GTSA, O.C.G.A. §§ 10-1-760 *et seq.*

93.     QrewLive's underlying proprietary information and intellectual property were not known or readily available to the public. Neither did Mrs. Ross divulge this information to the public nor others besides her former agent and/or partner, Mr. Alexander. Ms. Ross used reasonable and appropriate efforts under the circumstances to maintain the secrecy and confidentiality of her trade secret, QrewLive, and its underlying proprietary information.

94.     At the time of Mrs. Ross's creation of QrewLive, Delta did not have this technology in their possession. And, further, Delta was engaging in conversations to purchase QrewLive due to the value Delta saw in QrewLive's underlying proprietary information and intellectual property.

95.     As stated above, Mr. Alexander effectively stole, then mispresented ownership of, and divulged information regarding Mrs. Ross's trade secret, QrewLive and its underlying

PLAINTIFF'S/INTERVENOR'S ORIGINAL COMPLAINT                                    24

proprietary information, to Delta, to attempt to profit from Mr. Ross's creation by selling QrewLive

to Delta as a purported trade secret owner as opposed to as agent and/or partner of Mrs. Ross, to

effectuate the sale of Mrs. Ross's trade secret to Delta.

96.     Nonetheless, Delta, in turn, used Mrs. Ross's trade secret information, which was

provided to Delta by Mr. Alexander after the signing of an NDA between the Established Parties,

to "create" Delta's own application, Family Flight Communication. A duty to maintain "Mr.

Alexander's" trade secret information as secret arose between the Established Parties when Delta

and Mr. Alexander, who at the time Delta believed was the owner of Mrs. Ross's trade secret

information, executed the NDA prior to sharing QrewLive's proprietary information with Delta.

Despite this duty, Delta used Mr. Ross's trade secret information to "create" its own application,

Family Flight Communication. Again, the subject NDA was signed on Mrs. Ross's behalf as an

undisclosed agent and/or partner of Mr. Alexander and/or MABA, and Mrs. Ross claims all

benefits thereof.

97.     Yet, upon information and belief, despite Delta being made aware that Mrs. Ross's

trade secret information was misrepresented to Delta as owned by Mr. Alexander in Mr.

Alexander's own attempt at misappropriation, Delta continues to use Family Flight

Communication, thereby continuing to misappropriate Mrs. Ross's trade secret information

without any plan or attempt to compensate Mrs. Ross for her ownership interest, or the loss of

potential profits derived from QrewLive's sale to Delta or a similar industry competitor.

98.     Delta's acts of misappropriation have caused Mrs. Ross to sustain monetary

damages, loss, and injury in an amount to be determined at the time of trial, but in no event less

than the actual loss caused by the misappropriation and the unjust enrichment caused by the

misappropriation, which is not taken into account in computing actual loss.

99.    Upon information and belief, the Delta Defendants have engaged and continue to engage in these acts of misappropriation, knowingly, willfully, and maliciously, so as to justify the assessment of exemplary damages against the Delta Defendants.

100.    Upon information and belief, the Delta Defendants have engaged and continue to engage in these acts of misappropriation described above, knowingly, willfully, and maliciously, so as to justify an award of reasonable attorneys' fees to Ross.

### COUNT III
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(AGAINST CRAIG ALEXANDER)**

101.    Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

102.    Mr. Alexander acted improperly and without authority or exceeded his authority or privilege in his attempt to sell Mrs. Ross's QrewLive property to Delta.

103.    Upon information and belief, Mr. Alexander acted purposely, with malice, and with intent to injure Mrs. Ross in her business and future business dealings.

104.    As a direct and proximate result, Mr. Alexander's unauthorized actions have adversely affected Mrs. Ross's current and future advantageous relationships with Delta and other potential airlines by concealing her ownership of QrewLive from Delta and has caused damage to Mrs. Ross, in an amount which will be proved at trial.

### COUNT IV
**CONSPIRACY TO TORTIOUSLY INTERFERE WITH BUSINESS RELATIONS**
**(AGAINST CRAIG ALEXANDER, MABA HOLDINGS, KEENAN NIX, MORGAN AND MORGAN, SHEILA ALEXANDER, DARREN SUMMERVILLE AND MICHAEL RAFI)**

105.    Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

106.    Mr. Alexander acted improperly and without authority or privilege in his attempt to sell Mrs. Ross's QrewLive property to Delta.

107.    Each of the Defendants knew of, induced, participated in and/or benefited from Mr. Alexander's improper acquisition, use, reproduction, distribution, and/or dissemination of Mrs. Ross's QrewLive property to Delta. Defendants conspired and acted together and in concert in wrongfully acquiring, using, reproducing, distributing, disclosing and/or otherwise disseminating Mrs. Ross's QrewLive property to Delta without Mrs. Ross's express or implied consent, including by fabricating and furthering a false origin story of QrewLive for the specific purpose of concealing Mrs. Ross's identity before this Court.

108.    As a direct and proximate result of Defendants' unlawful conspiracy to wrongfully steal Mrs. Ross's QrewLive property, Mrs. Ross has suffered, and is likely to suffer in the future, damages in an amount to be proven at trial.

109.    By conspiring to wrongfully steal Mrs. Ross's QrewLive property, Defendants acted with malice, wantonness, oppression and with a conscious indifference to consequences and/or the specific intent to cause Mrs. Ross harm. Accordingly, to punish, penalize and deter Defendants from engaging in misconduct, Mrs. Ross is entitled to punitive damages in an amount to be determined by a jury.

### COUNT V
**THEFT AND CONVERSION**
**(AGAINST CRAIG ALEXANDER AND DELTA DEFENDANTS)**

110.    Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

111.    By virtue of his agency and/or partner relationship with Mrs. Ross, Mr. Alexander had access to and acquired confidential information, and other property of Mrs. Ross.

112.    During Mr. Alexander's employment with Delta, Delta Defendants obtained access to and acquired confidential information, and other property of Mrs. Ross after signing the NDA between Delta and Mr. Ross, through her agent and/or partner Mr. Alexander.

113.    Mr. Alexander and Delta Defendants have wrongfully converted Mrs. Ross's property by using the property for their own benefit, without permission or authorization from Mrs. Ross, and to the detriment of Mrs. Ross.

114.    By wrongfully misappropriating Mrs. Ross's property, Mr. Alexander and Delta Defendants acted with malice, wantonness, and a conscious indifference to the consequences and/or the specific intent to cause Mrs. Ross harm.

115.    As a direct and proximate result of their wrongful conversion of Mrs. Ross's property, Mr. Alexander and Delta Defendants have been unjustly enriched, and Mrs. Ross has suffered monetary damages in a yet undetermined amount.

116.    By wrongfully converting Mrs. Ross's property, Mr. Alexander and Delta Defendants acted with malice, wantonness, oppression and with a conscious indifference to consequences and/or the specific intent to cause Mrs. Ross harm. Accordingly, to punish, penalize and deter Mr. Alexander and Delta Defendants from engaging in misconduct, Mrs. Ross is entitled to punitive damages in an amount to be determined by a jury.

## COUNT VI
**CONSPIRACY TO COMMIT THEFT AND CONVERSION
(AGAINST CRAIG ALEXANDER AND DELTA DEFENDANTS, MABA HOLDINGS, KEENAN NIX,
MORGAN AND MORGAN, SHEILA ALEXANDER, DARREN SUMMERVILLE AND MICHAEL RAFI)**

117.    Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

118.    Each of the Defendants knew of, induced, participated in and/or benefited from Mrs. Alexander and Delta Defendant's misappropriations of Mrs. Ross's property. Defendants conspired and acted together and in concert in wrongfully converting Mrs. Ross's property.

119.    As a direct and proximate result of Defendants' unlawful conspiracy to wrongfully convert Mrs. Ross's QrewLive property, Mrs. Ross has suffered, and is likely to suffer in the future, damages in an amount to be proven at trial.

120.    By conspiring to wrongfully convert Mrs. Ross's QrewLive property, Defendants acted with malice, wantonness, oppression and with a conscious indifference to consequences and/or the specific intent to cause Mrs. Ross harm. Accordingly, to punish, penalize and deter Defendants from engaging in misconduct, Mrs. Ross is entitled to punitive damages in an amount to be determined by a jury.

### COUNT VII
#### BREACH OF CONTRACT (THE "NDA")
#### (AGAINST DELTA DEFENDANTS)

121.    Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

122.    As outlined above, Mr. Alexander was acting as an agent and/or partner on behalf of Mrs. Ross when Delta entered into the August 2016 NDA; therefore, by operation of the agency relationship, Delta entered into the NDA with the principal and/or partner, Mrs. Ross.  In 2016 Delta, agreed that: "[e]ach receiving party shall not use, exploit, or reproduce such Confidential Information for its own or any other purpose except as reasonably necessary for the performance of the Project and as permitted by this Agreement." Moreover, "[e]ach receiving party shall not provide or make available any of the Confidential Information in any form to any Person other than those Personnel of the receiving party or its Affiliates who have a need to know consistent

with the Project and who are under a written obligation of confidentiality governing the
Confidential Information at least as restrictive as the terms of the Agreement."

123.    On information and belief, the individual Delta Defendants signed the NDA or a
written obligation of confidentiality governing Mrs. Ross's confidential information at least as
restrictive as the terms of the NDA.

124.    Alternatively, even if the individual Delta Defendants did not sign the NDA or a
written obligation of confidentiality at least as restrictive, they were aware of the obligation
required of Delta and of them as Delta's employees.

125.    Delta required the individual Delta Defendants to sign the NDA or a written
obligation of confidentiality at least as restrictive as the terms of the NDA.

126.    Both Delta and the individual Delta Defendants violated and breached the NDA by
(a) failing to protect Mrs. Ross's Confidential Information from disclosure to Persons not
authorized to receive it; (b) failing to protect Mrs. Ross's Confidential Information with reasonable
care; (c) using, exploiting, and reproducing Mrs. Ross's Confidential Information in the creation
of Delta's Flight Family Communication App; and (d) providing or making available Mrs. Ross's
Confidential Information to persons other than those personnel of Delta who had a demonstrable
need to know aligned with the Project and who were under a written obligation of confidentiality
governing the Confidential Information at least as restrictive as the terms of the NDA.

127.    Under Georgia law, every contract has an implied duty and covenant of good faith
and fair dealing. Under the NDA and confidential course of dealings, Delta and individual Delta
Defendants had a duty and covenant of good faith and fair dealing. Delta and individual Delta
Defendants violated and breached their duties under the NDA by failing to protect Mrs. Ross's
Confidential Information from disclosure to Persons not authorized to receive it; failing to protect

Mrs. Ross's Confidential Information with reasonable care; using, exploiting and reproducing Mrs. Ross's Confidential Information in the creation of the Flight Family Communication app; and providing or making available Mrs. Ross's Confidential Information to persons other than those personnel of Delta who had a demonstrable need to know aligned with the Project and who were under a written obligation of confidentiality governing the Confidential Information at least as restrictive as the terms of the NDA.

128.    The actions of Delta Defendants were to the interests, competitive advantage, economic benefit, and unjust enrichment of Delta Defendants.

129.    The actions of Delta Defendants at all relevant times have been willful, knowing, malicious, and wanton.

130.    As a direct and proximate result of their conspiracy and actions, Delta Defendants have been unjustly enriched and Mrs. Ross has suffered monetary damages in a yet undetermined amount.

<u>**COUNT VIII**</u>
**BREACH OF FIDUCIARY DUTY**
**(AGAINST CRAIG ALEXANDER)**

131.    Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

132.    Mr. Alexander was a fiduciary of Mrs. Ross by virtue of his agency relationship or partnership relationship with Mrs. Ross. Mr. Alexander owed fiduciary duties of good faith and fair dealing to Mrs. Ross.

133.    Mr. Alexander had a duty to avoid engaging in self-dealing, withholding material facts, diverting opportunities to himself, and engaging in other actions that would harm Mrs. Ross.

134.    Mr. Alexander breached his fiduciary duties to Mrs. Ross by repeatedly passing off QrewLive as his property; entering into the NDA with Delta as the principal; and willfully and knowingly converting QrewLive property and using it for Mr. Alexander's own benefit, without Mrs. Ross's knowledge, permission or consent.

135.    Mr. Alexander's illegal and unethical conduct was contrary to Mrs. Ross's interests, done in bad faith for improper purposes, and is not privileged. As a direct and proximate result of his actions, Mr. Alexander has been unjustly enriched, and Mrs. Ross has suffered monetary damages in a yet undetermined amount.

### COUNT IX
**FRAUD**
**(AGAINST CRAIG ALEXANDER)**

136.    Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

137.    Mr. Alexander, knowingly acting as an agent, established an agency and/or partnership relationship with Mrs. Ross to promote and shop QrewLive to Delta.

138.    Upon information and belief, Mr. Alexander conducted himself as an agent and/or partnership, representing Mrs. Ross, with the ultimate goal of stealing Mrs. Ross's creation, QrewLive.

139.    Mr. Alexander fraudulently passed off QrewLive as his sole property, entered into the NDA with Delta falsely acting as the principal, and willfully and knowingly stole QrewLive and used it for Mr. Alexander's own benefit without Mrs. Ross's knowledge, permission, or consent.

140.    Mr. Alexander knew that his actions, misrepresentations, and/or omissions were material and that they were false, misleading, incomplete, deceptive, and deceitful when they were made.

141.    Mr. Alexander engaged in actions, misrepresentations, and/or omissions to deceive and defraud Mrs. Ross.

142.    Mrs. Ross relied, with reasonable justification, on the misrepresentations of Mr. Alexander and allowed Mr. Alexander to act as her agent and/or for the promotion of her property to Delta, leading Mrs. Ross to suffer substantial damages.

143.    As a direct and proximate result of Mr. Alexander's actions, Mr. Alexander has been unjustly enriched, and Mrs. Ross has suffered monetary damages in a yet undetermined amount.

### COUNT X
**EXEMPLARY DAMAGES**
**(AGAINST CRAIG ALEXANDER, DELTA DEFENDANTS, MABA HOLDINGS, KEENAN NIX, MORGAN AND MORGAN, SHEILA ALEXANDER, DARREN SUMMERVILLE AND MICHAEL RAFI)**

144.    Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

145.    Mrs. Ross is entitled to recover exemplary damages as a result of Mr. Alexander, Delta Defendants, MABA, Mr. Nix, Morgan and Morgan, Mrs. Alexander, Mr. Summerville, and Mr. Rafi's willful and malicious misappropriation of Mrs. Ross's app QrewLive pursuant to O.C. G. A. § 10-1-763(b).

146.    Mrs. Ross is entitled to recover exemplary damages as a result of Mr. Alexander's and Delta Defendants, MABA, Mr. Nix, Morgan and Morgan, and Mrs. Alexander's willful and malicious misappropriation of Mrs. Ross's app QrewLive pursuant to O.C. G. A. § 10-1-763(b).

## COUNT XI
### PUNITIVE DAMAGES
### (AGAINST CRAIG ALEXANDER AND DELTA DEFENDANTS MABA HOLDINGS, KEENAN NIX, MORGAN AND MORGAN, SHEILA ALEXANDER, DARREN SUMMERVILLE AND MICHAEL RAFI)

147.    Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

148.    Mr. Alexander, Delta Defendants, MABA, Mr. Nix, Morgan and Morgan, Mrs. Alexander,  Mr. Summerville and Mr. Rafi jointly and severally, have acted maliciously and with intent to harm Mrs. Ross, or with conscious indifference to the consequences of their actions. Consequently, Mrs. Ross is entitled to recover punitive damages from Mr. Alexander, Delta Defendants, MABA, Mr. Nix, Morgan and Morgan, and Mrs. Alexander pursuant to O.C.G.A. § 51-12-5.1 in an amount to be determined at trial.

## COUNT XII
### ATTORNEYS' FEES
### (AGAINST CRAIG ALEXANDER, DELTA DEFENDANTS, MABA HOLDINGS, KEENAN NIX, MORGAN AND MORGAN, SHEILA ALEXANDER, DARREN SUMMERVILLE AND MICHAEL RAFI)

149.    Plaintiff/ Plaintiff/Intervenor Mrs. Ross repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

150.    Mrs. Ross is entitled to recover attorneys' fees and litigation expenses as a result of Mr. Alexander, Delta Defendants, MABA, Mr. Nix, Morgan and Morgan, Mrs. Alexander, Mr. Summerville and Mr. Rafi's willful and malicious misappropriation of QrewLive pursuant to O.C.G.A. § 10-1-764.

### CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Plaintiff/Intervenor Sonja Ross prays and respectfully requests that this Court award Plaintiff/Intervenor Sonja Ross as follows:

(1)    a judgment against Cross Defendant Craig Alexander and all Defendants in an amount to be determined at trial, including for any and all damages;

(2)    award Plaintiff/Intervenor Sonja Ross against Cross Defendant Craig Alexander and all Defendants reasonable attorneys' fees and expenses of litigation incurred in pursuing this Complaint;

(3)    award Plaintiff/Intervenor Sonja Ross against Cross Defendant Craig Alexander and all Defendants of pre-judgment and post-judgment interest as allowed by law; and

(4)    for such other further relief as this Court deems just and proper under the circumstances.

Respectfully Submitted,

**ANOZIE, LLP,**

*/s/ Nnamdi M. Anozie*
Nnamdi M. Anozie
Georgia Bar No. 211407
2385 Godby Road,
P.O. Box 491150,
Atlanta, Georgia, 30349.
T: 210-606-3440
E: nma@anoziellp.com

**COUNSEL FOR
PLAINTIFF/INTERVENOR
SONJA ROSS**

STATE COURT OF
DEKALB COUNTY, GA.
6/25/2024 3:01 PM
E-FILED
BY: Patricia Nesbitt