# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| IN RE:<br><br>SONJA NICOLE WILLIAMS,<br><br>Debtor. | CASE NO. 19-56304<br><br>**CHAPTER 7** |
|---|---|

## DELTA AIR LINES, INC'S OPPOSITION TO MOTION FOR SANCTIONS FOR WILLFUL VIOLATION OF THE AUTOMATIC STAY

Delta Air Lines, Inc. ("Delta") hereby opposes Debtor Sonja Ross's ("Debtor") Motion for Sanctions for Willful Violation of the Automatic Stay Against Delta Air Lines, Inc. and Craig Alexander (Docket No. 229) (the "Motion" or "Mot.").

## INTRODUCTION

After failing to disclose any alleged claims against Delta in her 2019 bankruptcy case, Debtor filed her Intervention Complaint on June 25, 2024 in the State Court of DeKalb County (the "State Court") asserting claims based on Delta's alleged misappropriation of an application known as "QrewLive." Debtor's claims have now been dismissed twice by the State Court, but she refuses to accept these holdings. Instead, Debtor, now proceeding *pro se* (after at least three sets of lawyers have withdrawn as her counsel), has filed numerous spurious pleadings in this Court and clogged the State Court docket with convoluted and facially false motions seeking to "void" the lawsuit pending in State Court and for sanctions for alleged stay violations under 11 U.S.C. § 362(a).

Setting aside the harassing and vexatious nature of Debtor's Motion, her Motion fails for at least five reasons. *First*, and most fundamentally, Delta has not sued anyone, let alone Debtor, in connection with Craig Alexander's ("Alexander") lawsuit against Delta in State Court (the "State Court Action"). Delta has made no effort to collect any debt from Debtor whatsoever.

Indeed, Debtor was not even a party to the State Court Action until *she* moved to intervene *after* her bankruptcy case closed. *Second*, Delta never interacted with Debtor (much less even know who Debtor was) until February 2023 when Alexander disclosed her identity in response to discovery requests in the State Court Action. Thus, Delta could not have had knowledge—actual or constructive—of Debtor's bankruptcy proceeding when Alexander filed the State Court Action. *Third*, Delta has never attempted to obtain possession of QrewLive or exercise control over QrewLive. Alexander filed the State Court Action on July 12, 2021, and Debtor's bankruptcy case closed on August 26, 2021. During that month, Delta filed notices of appearance and a motion for an extension of time to respond to Alexander's Complaint. None of these actions amount to Delta attempting to take possession or control of QrewLive. Moreover, the automatic stay did not, and does not, prevent Delta from defending itself against Alexander's meritless lawsuit. *Fourth,* Debtor failed to disclose the existence of any potential claims and causes of action she held in her personal capacity against Delta in her bankruptcy case. Thus, even assuming there had been a stay violation (there was not), such a "violation" would have been the result of her own failure to disclose. Therefore, any resulting prejudice to Debtor—and there is none—is of her own making. *Fifth*, again assuming there had been a stay violation, none of the damages Debtor seeks properly result from a stay violation or are recoverable under 11 U.S.C. § 362(k).

      The futility of Debtor's Motion is underscored by the meritless nature of Debtor's (now dismissed) State Court claims against Delta. Debtor—without standing to do so—sued Delta for allegedly misappropriating her trade secret and for violating a non-disclosure agreement between Delta and Alexander. Critically, however, Debtor does not (and cannot) allege that she ever met or even corresponded with Delta or that she executed any agreement with Delta. To the contrary, she affirmatively alleges that Alexander concealed her existence from Delta and that she never met

2

with anyone at Delta. Nonetheless, Debtor brought claims against Delta in the State Court and continues to harass Delta with convoluted motions in both the State Court and this Court. The Court should not condone Debtor's conduct and should deny the Motion.

## BACKGROUND

**I.     Craig Alexander Files a Lawsuit Against Delta in July 2021.**

On July 12, 2021, Alexander filed the State Court Action against Delta and several current and former employees and executives, including its chief executive officer and chief information officer, for violation of the Georgia Trade Secrets Act ("GTSA") based on the alleged misappropriation of a text messaging idea, QrewLive. *See* Ex. A, Alexander State Court Compl. Alexander is a Delta pilot who claims he came up with an idea for a group "text messaging system" for the flight crew "to communicate more efficiently with [f]light operations." *Id.* ¶ 44. From February 2014 to September 2016, Alexander repeatedly attempted to pitch his QrewLive idea to Delta employees. On August 22, 2016, before his final meeting with Delta, Alexander, on behalf of his company, MABA Holdings LLC ("MABA Holdings"), and Delta entered into a Mutual Confidentiality Agreement (the "NDA"), obligating both parties to protect the other party's "Confidential Information." Delta ultimately informed Alexander that it was not interested in moving forward with QrewLive.

Delta subsequently launched a new digital platform called "Flight Family Communication" ("FFC") in 2018. Alexander alleges FFC "is a carbon copy, knock-off" of QrewLive, *id.* ¶ 87, which Delta vigorously disputes.

**II.    Debtor Moves to Intervene in April 2024.**

Nowhere in Alexander's Complaint does he reference Debtor or her purported involvement in developing QrewLive. Indeed, Delta did not know of her existence until February 8, 2023, when Alexander identified Debtor in his responses to Delta's First Set of Interrogatories as someone who

3

"helped draft some of the early design mock ups for QrewLive before her consulting contract was terminated sometime in late 2014 or early 2015." *See* Ex. B, Alexander's Interrog. Res. at 4. On March 22, 2023, Delta served Debtor with a nonparty request for discovery to which Debtor responded on June 20, 2023 with audio files of recorded conversations between Debtor and Alexander and Debtor and Alexander's former lawyer. These recorded conversations revealed that Debtor and Alexander share a child together and that Debtor claims an interest in QrewLive.

Debtor did not move to intervene in the State Court Action until April 12, 2024. The Court granted her motion to intervene on June 24, 2024, and she filed her Intervention Complaint on June 25, 2024. *See* Docket No. 217-1. Intervenor spends the bulk of her Intervention Complaint airing her grievances against Alexander and reiterating her ownership interest in QrewLive. *See id.* ¶ 1 (alleging she "created and owns 'QrewLive' and its underlying proprietary data"); *id.* ¶ 3 (alleging Alexander's "conduct in this case is conniving at best and criminal at worst," and that it is "emblematic" of what she experienced during her relationship with Alexander).

Debtor alleges she "ideated, created, designed, and developed QrewLive and its predecessor applications beginning in 2011 and 2012" after discussing the airline industry with Alexander. *Id.* ¶ 5. She purportedly authorized Alexander "to act as her agent in shopping and promoting the novel technologies and capabilities of her application QrewLive to Delta for license and/or purchase" because Alexander "touted his proximity to Delta executives[.]" *Id.* ¶ 6. She alternatively claims that she and Alexander formed a partnership for the specific purpose of selling QrewLive to Delta. *Id.* ¶ 8.

As to Delta, Debtor simply "incorporates all allegations of Mr. Alexander's meeting with the Delta Defendants as her own." *Id.* ¶¶ 8–9. She acknowledges that she never met with Delta and that Alexander did not "disclose the true nature of his relationship with Mrs. Ross to Delta." *Id.*

4

Thus, Debtor affirmatively alleges that Delta never knew of her existence. Based on these allegations, Debtor asserted claims against Delta for (1) misappropriation of trade secrets under the GTSA (Count II); (2) theft and conversion (Count V); (3) civil conspiracy to commit theft and conversion (Count VI); (4) breach of the NDA (Count VII); (5) exemplary damages under the GTSA (Count X); (6) punitive damages under O.C.G.A. § 51-12-5.1 (Count XI); and attorneys' fees under the GTSA (Count XII).

### III.     The State Court Dismisses Debtor's Claims Against Delta.

On July 25, 2024, Delta moved to dismiss the Intervention Complaint. The State Court heard argument on October 3, 2024 and announced its intention to enter an order dismissing Debtor's claims as to Delta. On November 19, 2024, the State Court entered an order dismissing Debtor's claims against Delta with prejudice. *See* Ex. C, Nov. 19, 2024 MTD Order. As to Debtor's GTSA, theft and conversion, and civil conspiracy to commit theft and conversion claims, the State Court found those claims were time barred based on a February 2015 email from Debtor to Alexander where Debtor threatened to send Alexander and Delta a cease-and-desist letter based on the alleged misappropriation of QrewLive.[1] *Id.* at 6. The State Court further dismissed with prejudice Debtor's breach of contract claim because Debtor was not a signatory to the NDA nor was she an intended or third party beneficiary to it. *Id.* at 8–10. Debtor's remaining claims are not independent causes of action and thus failed with the underlying causes of action. *Id.* at 11.

On November 12, 2024, before the State Court entered its order dismissing Debtor's claims against Delta, Debtor terminated her second set of lawyers, hired a new lawyer, and filed an

---

[1] In the audio recordings produced by Debtor in response to Delta's nonparty document requests, Debtor references the February 2015 email. The Intervention Complaint references the audio recordings and cites to the transcripts of the same such that the State Court found that the February 2015 email are incorporated by reference in the Intervention Complaint and could be considered on a motion to dismiss. Alternatively, the State Court found Debtor's claims were time barred based on Delta's public announcement of FFC in November 2018.

5

Amended Intervention Complaint.[2] *See* Ex. D, Am. Intervention Compl. The Amended Intervention Complaint is virtually identical to the Intervention Complaint but adds two claims against Delta—for quantum meruit and breach of contract damages as third-party or intended beneficiary. The State Court clarified that Debtor's claims against Delta that are duplicative of the claims in her original Intervention Complaint remain dismissed but invited Delta to file a motion to dismiss the new claims in the Amended Intervention Complaint. *See* Ex. E, Nov. 21, 2024 Clarification Order. On December 20, 2024, the State Court dismissed Debtor's claims as to all parties based on lack of standing. *See* Ex. F, Dec. 20, 2024 MTD Order. In support of her opposition to Alexander's motion to dismiss, Debtor submitted an affidavit that her company, Skyvier, Inc. ("Skyvier"), owned QrewLive. *Id.* Thus, the State Court determined Debtor does not have standing to pursue her claims in her individual capacity. *Id.*

**IV.     Debtor Files a Chapter 13 Petition in April 2019.**

Unbeknownst to Delta, on April 23, 2019, Debtor filed a voluntary petition under Chapter 13 of Title 11 of the United States Code. *See* Docket No. 1. On December 10, 2019, at Debtor's request, her case was converted to a case under Chapter 7. *See* Docket No. 91. Debtor did not list QrewLive or any potential claims against Delta in her initial schedules, *see* Docket No. 1, or in her amended schedules, *see* Docket Nos. 33 and 105. On November 4, 2020, the Court discharged Debtor. *See* Docket No. 183. On August 26, 2021, after the Chapter 7 trustee administered the estate (including Debtor's ownership interests in multiple entities), the Court closed this case. *See* Docket No. 215.

---

[2] Michael Rafi represented Debtor when responding to Delta's nonparty discovery request. Debtor terminated Mr. Rafi and hired Anozie, LLP to represent her in filing the motion to intervene. She terminated Anozie, LLP shortly after the State Court announced its intention to dismiss Debtor's claims against Delta and hired Kimberly Copeland. Ms. Copeland withdrew following the announcement by the State Court of its intention to dismiss Debtor's claims against Alexander, MABA Holdings, and Alexander's wife, Sheila Alexander.

6

On November 6, 2024, having been informed by Debtor's former bankruptcy counsel of the State Court Action, the United States Trustee moved to reopen this case, arguing Debtor's claims against Delta are property of Debtor's estate that can only be administered by this case being reopened and that a Chapter 7 trustee may be able to prevail on Debtor's claims notwithstanding Debtor's inability to do so. Docket No. 222. This Court granted the motion to reopen on December 13, 2024, Docket No. 224, and appointed an interim successor Chapter 7 trustee on December 18, Docket No. 226.

Since this Court reopened this case, Debtor, now proceeding *pro se* in both this case and the State Court Action, has filed six motions in this case and the State Court Action. Among these is Debtor's instant Motion for Sanctions for Willful Violation of the Automatic Stay Against Delta Air Lines, Inc. and Craig Alexander.[3] Debtor seeks sanctions against Delta in the form of compensatory damages, legal costs and fees, injunctive relief, and punitive damages based on Delta's *defense* of Alexander's State Court Action, which she claims violated the automatic stay provision of 11 U.S.C. § 362(a). For the reasons stated herein, Debtor's Motion should be denied.

## ARGUMENT AND CITATION TO AUTHORITY

Section 362(a) of the Bankruptcy Code sets forth the contours of the automatic stay. *See* 11 U.S.C. § 362(a). The automatic stay prohibits, in relevant part, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *See id.* § 362(a)(3). Section 362(k) further provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs

---

[3] Debtor's certification of service states, under penalty of perjury, that she mailed and/or electronically mailed the Motion on December 16, 2024. Counsel for Delta did not receive this Motion via electronic mail, nor has Delta's counsel received it by first-class mail, postage prepaid. Debtor filed this Motion electronically on December 18, 2024, and Delta became aware of it by checking the bankruptcy court docket. Delta reserves all rights with respect such lack of notice, including raising any further arguments on due process grounds and seeking appropriate sanctions for making false filings with this Court.

7

and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *See id.* § 362(k)(1).

"A willful violation of the automatic stay occurs when the creditor knew of the automatic stay and intended the actions that constituted the violation." *In re Hamby*, 646 B.R. 865, 873 (Bankr. N.D. Ga. 2022); *see also Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1555 (11th Cir. 1996) (same). Critically, "[t]he debtor has the burden of providing the creditor with actual notice" of the bankruptcy and the attendant automatic stay. *In re Spinner*, 398 B.R. 84, 95 (Bankr. N.D. Ga. 2008). A debtor asserting a willful stay violation under § 362(k) must establish by a preponderance of the evidence that the creditor's actions were willful. *Id.* at 94–95.

Debtor's Motion should be denied. *First*, the automatic stay does not apply to the State Court Action because Debtor was not a party to the litigation nor is Delta a creditor seeking recovery from Debtor. *Second*, Delta did not become aware of Debtor's existence until February 2023 and thus did not have constructive or actual knowledge of Debtor's bankruptcy case. *Third*, even if the automatic stay applied (it does not), Delta took no action in violation of it. *Fourth*, Debtor failed to disclose her potential claims against Delta such that any prejudice she has suffered is of her own doing. *Finally*, Debtor has not been damaged by any violation of the automatic stay.

I. **THE AUTOMATIC STAY DOES NOT APPLY TO THE STATE COURT ACTION.**

Debtor broadly interprets § 362(a) as requiring "creditors and other parties [to] obtain express court approval before acting in any way that interferes with the property of the estate or the debtor's rights." Mot. at 13. The automatic stay provision has two important effects: (1) it freezes the debtor's estate at the time of the filing without allowing the possibility of various proceedings in different courts to affect its value, *see In re Sparks*, 181 B.R. 341, 344 (Bankr. N.D. Ill. 1995); and (2) it gives the debtor a "breathing spell" to be relieved from pressures from its creditors, *see In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994). In other words, the automatic stay

8

applies to cases involving a creditor seeking to collect money from a debtor or enforcing a judgment or lien against a debtor. The State Court Action does not fit any of the circumstances described in § 362(a). When initiated, Debtor was not a party to the State Court Action. Indeed, this Court had already discharged Debtor from her bankruptcy case, which closed shortly after Alexander initiated the State Court Action. Just as important, neither Delta nor Alexander sought to collect money from Debtor or to enforce a judgment or lien against her by way of the State Court Action. Thus, the automatic stay did not—and does not—apply to the State Court Action.

## II.   DELTA DID NOT HAVE ACTUAL KNOWLEDGE OF DEBTOR'S BANKRUPTCY PROCEEDINGS.

Even assuming the automatic stay provision applies (it does not), Delta could not have violated it where Delta had no knowledge of Debtor's existence, much less her bankruptcy case. Debtor contends Delta had constructive or actual knowledge of her bankruptcy case because: (i) Delta executed an NDA concerning QrewLive with Alexander on behalf of MABA Holdings; and (2) Debtor included QrewLive in her bankruptcy schedules, which were publicly available. Mot. at 16. Neither of these imputes constructive or actual knowledge of Debtor's bankruptcy case on Delta, and the second contention is patently false—and sanctionable.

Delta's execution of an NDA with Alexander in August 2016 in no way put it on notice—constructive or otherwise—of Debtor's April 2019 bankruptcy petition. Debtor was not a party to that NDA nor is she referenced in the NDA. Even if she were, it is difficult to comprehend how an NDA executed almost three years prior to the initiation of Debtor's bankruptcy case somehow put Delta on notice of a yet-to-be-filed bankruptcy case—particularly when Debtor never provided Delta actual notice of her bankruptcy case. Indeed, Debtor affirmatively alleges in her Intervention Complaint that Delta not only did not know who she was but that Alexander *concealed* her

9

existence from Delta yet argues in this Motion that the NDA should have put Delta on notice of *her* bankruptcy. That is nonsense.

Debtor's suggestion that the filing of her bankruptcy case alone somehow put Delta on notice of it is nonsensical. Delta did not become aware of Debtor until February 2023, well after this Court discharged Debtor and closed her bankruptcy case. Debtor did nothing to inform the State Court or Delta of her pending bankruptcy case, and Delta cannot be expected to be aware of every bankruptcy case ever filed. *Spinner*, 398 B.R. at 95 (holding "debtor has the burden of providing the creditor with actual notice" of the bankruptcy and attendant automatic stay). Indeed, Delta was not aware of Debtor's purported claims until she moved to intervene on April 12, 2024.

Importantly, Debtor represents in the Motion that she explicitly listed QrewLive as an asset in her initial or amended schedules. Mot. at 5. This is demonstrably false. *See* Docket Nos. 1, 33, and 105. Indeed, this Court reopened the bankruptcy case *because* Debtor failed to include QrewLive and her claims against Delta in her schedules. *See* Docket No. 224 at 2, 4–5. Thus, Delta did not have notice—constructive or actual—of Debtor's bankruptcy case or any automatic stay. For this additional reason, Debtor's Motion should be denied.

**III.    DELTA DID NOT ATTEMPT TO OBTAIN POSSESSION OF OR EXERCISE CONTROL OVER DEBTOR'S ESTATE.**

Delta has not, at any time, attempted to obtain possession of QrewLive or exercise control over it. And Debtor's assertions to the contrary are unavailing. She contends Delta violated the automatic stay by: (1) "actively facilitat[ing] or fail[ing] to intervene in this litigation," enabling "Alexander to assert control over estate property"; (2) developing and deploying FFC, which "incorporated key features and functionalities derived directly from QrewLive"; and (3) failing to seek authorization from this Court "to litigate, develop, or use QrewLive" during the pendency of Debtor's bankruptcy case. Mot. at 10. None constitute a violation of the automatic stay by Delta.

10

Delta did not "actively facilitate[]" the State Court Action.[4] Alexander filed a lawsuit ***against*** Delta, and Delta simply defended itself (and its current and former employees) against Alexander's meritless claims. Notably, during the month in which both the State Court Action and Debtor's bankruptcy case were pending, the only action Delta took in the State Court Action was to file notices of appearance and seek an extension of its deadline to respond to Alexander's Complaint. Delta did not move to dismiss until November 1, 2021, *after* this Court closed Debtor's bankruptcy case on August 26, 2021. Docket No. 215. And even if Delta had done more than file notices of appearance, the automatic stay does not prevent Delta from defending claims brought against it regardless of who initiated them. Indeed, Delta would be entitled to defend itself from these claims without violating the automatic stay had Debtor, the Chapter 7 trustee, or Alexander brought them. *See Matter of Patel*, 642 B.R. 187, 197 (Bankr. N.D. Ga. 2022) ("[S]omeone defending a suit brought by the debtor does not risk violation of § 362(a)(3) by filing a motion to dismiss the suit, though his resistance may burden rights asserted by the bankrupt.") (internal quotations omitted) (quoting *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1473 (D.C. Cir. 1991)).

Now—after having her claims dismissed twice by the State Court—Debtor attempts to repackage her State Court Action claims by arguing that Delta's development and deployment of FFC constitutes a violation of the automatic stay. But Delta did not become aware of Debtor's existence until February 2023 when Alexander disclosed her in response to Delta's interrogatory requests served in the State Court Action. Delta never met with Debtor about QrewLive such that it could not have misappropriated QrewLive from her. Delta's launch of FFC also did not interfere

---

[4] Debtor also argues nonsensically that Delta violated the automatic stay by "fail[ing] to intervene in this litigation[.]" Mot. at 10. Debtor seems to suggest Delta should have intervened in Debtor's bankruptcy case. Setting aside that Delta had no knowledge of Debtor's existence or purported involvement with Alexander until February 2023 and only recently learned of her 2019 bankruptcy case—making intervention in the bankruptcy case that closed in 2021 an impossibility—Delta was under no obligation to intervene in Debtor's bankruptcy case.

11

with Debtor's estate or bankruptcy case. As Debtor admits, Delta launched FFC in April 2018 *before* she filed her bankruptcy petition on April 23, 2019. Even assuming Debtor can demonstrate Delta misappropriated QrewLive (it did not), Delta did not undertake affirmative actions to exercise control over the Debtor's property during the pendency of the bankruptcy case. *See City of Chicago, Illinois v. Fulton*, 592 U.S. 154, 158 (2021) ("[T]he most natural reading of these terms—"stay," "act," and "exercise control"—is that § 362(a)(3) prohibits affirmative acts that would disturb the status quo of estate property as of the time when the bankruptcy petition was filed."). Accordingly, Delta did not violate the automatic stay and was not required to seek authorization from this Court to defend itself against Alexander's State Court Action claims.

### IV. ANY STAY VIOLATION IS DUE TO DEBTOR'S FAILURE TO DISCLOSE HER POTENTIAL CLAIMS AND INTEREST IN QREWLIVE.

Debtor is not entitled to the benefits of the automatic stay where, as here, she failed to disclose her potential claims against Delta and interest in QrewLive in her bankruptcy case. As this Court has already determined, Debtor failed to disclose her potential claims and causes of action against Delta and her personal interest in QrewLive, if any. Docket No. 224 at 2, 4–5. Thus, even if Delta were aware of Debtor's bankruptcy case (it was not), a review of Debtor's initial and amended schedules would not have revealed Debtor's claimed personal interest in QrewLive. In other words, any purported violation of the stay is the result of Debtor's failure to disclose her potential claims against Delta and personal interest in QrewLive. And to the extent Debtor has suffered any prejudice as a result of a purported stay violation (she has not), that prejudice is of her own making due to her failure to disclose the existence of her alleged claims and personal interest in QrewLive—not because of any willful act by Delta.

V.  **DEBTOR HAS NOT SUFFERED ANY DAMAGES AS A RESULT OF ANY ALLEGED STAY VIOLATION.**

Even if Debtor were able to establish Delta willfully violated the stay (she cannot), Debtor's claims further fail because she has not suffered any damages as a result of any purported stay violation. Debtor seeks a laundry list of relief, including relief that falls outside of what she would be entitled to under § 362(k). Specifically, Debtor seeks: (i) legal fees incurred in addressing Delta's unauthorized use of QrewLive; (ii) emotional distress damages for the mental anguish, sleeplessness, anxiety, and reputational harm caused by the stay violation; (iii) damages for the estate's lost licensing opportunities, estimated at $10 million annually; (iv) compensation to the estate of $50 million in avoided development costs resulting in Delta's unauthorized use of QrewLive; and (v) punitive damages to deter future violations of the automatic stay and to reinforce the importance of compliance with bankruptcy law and to uphold the judicial process. Mot. at 24. Debtor also seeks: (i) an injunction prohibiting Delta from continuing the State Court Action without authorization from this Court or from further use, development, or commercialization of QrewLive; (ii) submission of an accounting of all actions taken during the bankruptcy proceedings involving QrewLive, including development efforts, revenues earned, and parties involved; (iii) disclosure of all withheld materials and communications related to QrewLive, litigation efforts, or commercialization attempts; and (iv) restitution to the bankruptcy estate for any damages caused by their unauthorized use and interference. *Id.* at 24–25.

Under § 362(k), upon showing a willful stay violation, Debtor may recover "actual damages, including costs and attorney's fees, and, in appropriate circumstances, . . . punitive damages." *See* 11 U.S.C. § 362(k)(1). "By definition, 'actual damages' are 'real, substantial and just damages, or the amount awarded to a complainant in compensation for his actual and real loss or injury, as opposed to 'nominal' damages and 'punitive' damages.'" *In re Roche,* 361 B.R. 615,

13

624 (Bankr. N.D. Ga. 2005) (quoting *McMillian v. FDIC,* 81 F.3d 1041, 1054 (11th Cir. 1996)). Debtor seeks recovery of far more than actual damages, costs and attorney's fees, and punitive damages. Thus, to the extent the Court finds Delta violated the stay (it did not), the Court should reject Debtor's request for relief for (i) legal fees incurred to address Delta's unauthorized use of QrewLive;[5] (ii) damages resulting from lost licensing opportunities; (iii) compensation for the avoided development costs; (iv) an injunction prohibiting the State Court Action from proceeding; (v) submission by Delta of all actions taken during the bankruptcy proceedings involving QrewLive; (vi) disclosure by Delta of all materials and communications related to QrewLive; and (vii) restitution to the bankruptcy estate for Delta's purported unauthorized use of QrewLive.

None of these requests relate to actual damages resulting from a stay violation. Instead, they seek to recover the same damages sought by Debtor's State Court Action claims (i.e., damages resulting from Delta's alleged misappropriation of QrewLive, not its purported stay violation) or improper equitable relief. *See In re Copeland*, 441 B.R. 352, 368–69 (Bankr. W.D. Wash. 2010) ("Fees incurred in pursuing the other claims in the state court action are not allowable, as they are not related to the willful stay violations."); *see also* Fed. R. Bankr. P. 7001(g) (stating that "a proceeding to obtain an injunction or other equitable relief" is an adversary proceeding).[6] It is clear that Debtor is merely attempting to rehash her twice-dismissed claims in the form of a meritless stay violation motion.

---

[5] Debtor is now proceeding *pro se* in the State Court Action after engaging three different sets of lawyers. Debtor filed claims against one of her former lawyers, Michael Rafi, but has since voluntarily dismissed those claims. Rafi filed counterclaims for unpaid legal fees, the proceedings for which have been stayed by the State Court.

[6] Though § 105(a) of the Bankruptcy Code provides that bankruptcy courts may issue any "order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code, "[Section] 105(a) alone cannot justify [actions taken by bankruptcy courts] because it serves only to 'carry out' authorities expressly conferred elsewhere in the code." *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2082 n.2 (2024) (internal citations and quotations omitted); *see also* 11 U.S.C. § 105(a). Here, where § 362(k)(1) clearly contemplates only compensatory and, in limited circumstances, punitive damages, Congress did not intend to make other remedies, including equitable remedies, available in the context of a stay violation motion.

14

Debtor also seeks recovery for the "emotional distress" she purportedly suffered for enforcing the automatic stay. "[T]o recover 'actual' damages for emotional distress under § 362(k), [Debtor] must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay." *Lodge v. Kondaur Cap. Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014). Debtor fails to identify any "significant emotional distress" that she has suffered as a result of the purported stay violation. *See* Mot. at 11 (claiming she suffered "severe emotional harm" because of "unauthorized litigation" and "exploitation of her proprietary technology" without more).

Finally, Debtor requests that the Court impose punitive damages to deter future violations of the automatic stay. Punitive damages are only awarded in "appropriate circumstances" involving "egregious, intentional misconduct" or "maliciousness or bad faith" on the part of the violator. *In re Roche,* 361 B.R. at 624 (cleaned up). Those circumstances are not present here, as Delta never knew of Debtor's existence (let alone her bankruptcy proceeding) and did not violate the stay with actual knowledge (or any knowledge at all). Moreover, Debtor requests punitive damages to deter future stay violations. The reopening of this case did not reinstate the automatic stay, and Debtor has not sought its reinstatement. *See In re Burke,* 198 B.R. 412, 416 (Bankr. S.D. Ga. 1996) ("Reopening does not impose the stay of § 362(a)."). Because no stay is in place, there is no risk of future stay violations. Thus, the Court should deny Debtor's Motion for this additional reason.

## **CONCLUSION**

For the reasons stated herein, the Court should deny Debtor's Motion for Sanctions for Willful Violation of the Automatic Stay Against Delta Air Lines, Inc. and Craig Alexander.

15

Respectfully submitted this 30th day of December 2024.

*/s/ Thaddeus D. Wilson*
Thaddeus D. Wilson
Georgia Bar. No. 596008
David L. Balser
Georgia Bar No. 035835
Lawrence A. Slovensky
Georgia Bar No. 653005
**KING & SPALDING LLP**
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
thadwilson@kslaw.com
dbalser@kslaw.com
lslovensky@kslaw.com
Tel: 404-572-4842

*Counsel for Delta Air Lines, Inc.*

16

**CERTIFICATE OF SERVICE**

This is to certify that I have on this day, December 30, 2024, electronically filed the foregoing using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of this document and an accompanying link to this document to the parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program.

*/s/ Thaddeus D. Wilson*
Thaddeus D. Wilson
