Filed in U.S. Bankruptcy Court
Northern District of Georgia
Vania S. Allen, Clerk

JAN 0 6 2025    3:43PM

By: _____
Deputy Clerk

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | : | **CASE NO. 19-56304** |
| | : | |
| **SONJA NICOLE WILLIAMS** | : | **CHAPTER 7** |
| | : | |
| Debtor. | : | |

## DEBTOR'S REPLY TO DELTA AIR LINES, INC'S OPPOSITION TO EX PARTE MOTION TO ENFORCE AUTOMATIC STAY AND ENJOIN IMPROPER STATE COURT ACTIONS

## I. INTRODUCTION

Delta Air Lines, Inc.'s opposition (DKT. 240) to the Debtor's Motion to Enforce the Automatic Stay and Enjoin Improper State Court Actions (DKT. 234) underscores its calculated disregard for federal bankruptcy protections and bad-faith conduct in State Court proceedings. Delta's unauthorized use and commercialization of QrewLive—a proprietary communication platform and a critical asset of the Bankruptcy Estate—has caused significant harm to the Debtor, creditors, and the integrity of the bankruptcy process. Additionally, Delta's procedural misconduct in State Court and its misrepresentation of the automatic stay demonstrate a deliberate attempt to evade accountability and circumvent federal jurisdiction.

The automatic stay, codified under 11 U.S.C. § 362(a), is a cornerstone of bankruptcy law designed to protect estate property, provide a breathing spell for debtors, and ensure creditors act within the confines of federal jurisdiction. Delta's actions violated these protections by misappropriating QrewLive-derived features, leveraging procedural mechanisms in State Court, and engaging in coordinated filings to obstruct the Debtor's claims. Specifically:

1. **Procedural Misconduct in State Court**
   Delta exploited procedural mechanisms, including simultaneous filings to delay discovery and undue influence over rulings, to obstruct the Debtor's claims. Delta coordinated with co-defendants to create unnecessary litigation hurdles, filed motions

designed to delay proceedings, and submitted proposed orders adopted verbatim by the State Court—all while disregarding the Bankruptcy Court's exclusive jurisdiction over QrewLive.

2. **Unauthorized Use of QrewLive**

   Delta's development and commercialization of the Flight Family Communication (FFC) platform, which incorporates QrewLive-derived features, constituted acts to "exercise control" over property of the Bankruptcy Estate in direct violation of § 362(a)(3). Evidence demonstrates that Delta used proprietary information obtained from the Debtor's representative and shared these features with third-party developers, including BlueFletch, further diminishing QrewLive's value and exclusivity.

3. **Mischaracterization of the Automatic Stay**

   Delta's opposition rests on a misrepresentation of the scope and applicability of the automatic stay, arguing that its actions were defensive and therefore exempt. However, this argument fails under established case law, which broadly prohibits any act to interfere with estate property or the Bankruptcy Court's jurisdiction.

Delta's actions have caused substantial harm to the Bankruptcy Estate, including lost licensing opportunities valued at $10 million annually and avoided development costs estimated at $50 million. These losses significantly diminish QrewLive's market value and creditor recovery efforts.

This Court must act decisively to enforce the automatic stay, protect estate property, and address Delta's willful violations and procedural misconduct. Specifically, the Debtor respectfully requests that this Court:

- Declare all State Court rulings affecting QrewLive void ab initio as violations of the automatic stay.
- Impose sanctions against Delta for procedural misconduct and bad-faith litigation tactics.
- Award compensatory and punitive damages for the harm caused to the Bankruptcy Estate.
- Issue injunctive relief to prohibit further unauthorized use or commercialization of QrewLive-derived features.

Delta's willful violations of federal bankruptcy law and calculated procedural exploitation require this Court's intervention to uphold the integrity of the Bankruptcy Code, protect estate property, and ensure equitable treatment for all parties.

## II. BACKGROUND

The factual and procedural history surrounding QrewLive, the Debtor's bankruptcy filings, and Delta's actions in State Court provide essential context for the harm caused to the Bankruptcy Estate and the relief sought in this motion.

### A. Development and Proprietary Status of QrewLive

**Debtor's Creation and Innovation**

QrewLive (DKT. 234 Page 114), developed by the Debtor, Sonja Williams, is a proprietary communication platform addressing inefficiencies in aviation operations. It integrates unique features, including:

- **Role-Based Messaging**: Enables tailored communication channels for team coordination.
- **Predictive/User Initiated Task Management**: Automates task allocation based on operational priorities.
- **Advanced Workflow Integration**: Centralizes task management to eliminate operational redundancies.

These transformative functionalities positioned QrewLive as a pioneering tool with significant market value and licensing potential. Originally tied to the Debtor's company, ShockTheory, QrewLive's development reflects the Debtor's innovative approach to solving industry challenges.

**Transfer to the Bankruptcy Estate**

Upon Skyvier's dissolution in August 2018, QrewLive and all associated assets were transferred to the Debtor individually (DKT. 224 Page 3). Following the Debtor's bankruptcy filing, QrewLive became property of the Bankruptcy Estate under 11 U.S.C. § 541(a) December 2018, ensuring its protection and maximizing its value for equitable creditor recovery.

**B. The Debtor's Bankruptcy Filings and Protections**

**Timeline of Key Filings and Protections**

- **2014–2018**: The Debtor filed multiple Chapter 13 bankruptcy petitions, invoking the automatic stay to protect her assets from collection actions.
- **April 23, 2019**: The Debtor converted her bankruptcy case to Chapter 7, ensuring that QrewLive was included in the Bankruptcy Estate.
- **December 13, 2024**: The Bankruptcy Court reopened the case (DKT. 224), reaffirming QrewLive's status as protected estate property and retroactively validating its protections under the automatic stay.

**Impact of the Automatic Stay**

The automatic stay under 11 U.S.C. § 362(a) preserved QrewLive by prohibiting unauthorized actions to exercise control over estate property. These protections were critical to safeguarding QrewLive's value and ensuring it could be maximized for creditor recovery.

**C. Delta's Misappropriation of QrewLive**

**Unauthorized Use of Proprietary Features**

Delta knowingly violated the automatic stay by leveraging QrewLive's proprietary features to develop and commercialize its Flight Family Communication (FFC) platform. Evidence of Delta's unauthorized use includes:

- Delta obtained proprietary QrewLive information during supplier-vendor discussions facilitated by Craig Alexander, acting as the Debtor's agent.
- The FFC platform, launched in 2018, incorporated core functionalities of QrewLive, demonstrating Delta's reliance on its derived features.
- Delta shared QrewLive's proprietary information with third-party developers, including BlueFletch, further compounding harm to the Bankruptcy Estate.

**Financial Harm to the Estate**

Delta's actions caused substantial financial harm, including:

- **Lost Licensing Opportunities**: The Bankruptcy Estate lost an estimated $10 million annually in potential licensing revenues.
- **Avoided Development Costs**: Delta circumvented $50 million in development costs by misappropriating QrewLive's features, gaining an unjust economic advantage at the estate's expense.

## D. Procedural Exploitation in State Court

### Misuse of Procedural Tools

Delta's bad-faith litigation tactics in State Court obstructed the Debtor's claims and undermined the Bankruptcy Estate's protections. Key misconduct includes:

- **Delays Through Simultaneous Filings**: On July 25, 2024, Delta filed a motion to dismiss and an answer simultaneously, triggering a discovery stay under O.C.G.A. § 9-11-12(j) and stalling the Debtor's access to critical evidence.
- **Influence Over Rulings**: The State Court adopted Delta's proposed orders verbatim, including its November 19, 2024 order[1] dismissing the Debtor's claims without substantive consideration of her arguments.
- **Misuse of Evidence**: Delta improperly relied on a 2015 email written during the Debtor's bankruptcy case, despite its irrelevance to QrewLive's ownership and its protected status as estate property.

### Case Law Supporting Misconduct

- **In re Schwartz**, 954 F.2d 569 (9th Cir. 1992): Actions violating the automatic stay are void ab initio, underscoring the exclusive jurisdiction of the Bankruptcy Court over estate property.
- **In re Dyer**, 322 F.3d 1178 (9th Cir. 2003): Sanctions are warranted for procedural misconduct that obstructs creditor recovery efforts and harms the estate.

## E. Harm to the Bankruptcy Estate

### Delta's actions caused irreparable harm to the Bankruptcy Estate, including:

---

[1] *See* Exhibit A: Start Court November 19, 2024 Order, Dismissing Intervenor Partial Claims

- **Diminished Value of QrewLive**: Delta's unauthorized use and commercialization reduced QrewLive's exclusivity and significantly diminished its market value as an estate asset.
- **Lost Licensing Opportunities**: The Bankruptcy Estate was deprived of approximately $10 million annually in licensing revenues due to Delta's unauthorized use.
- **Avoided Development Costs**: Delta avoided $50 million in development costs by leveraging QrewLive's features, directly benefiting at the estate's expense.

**Case Law Supporting Relief**

- **In re Cybergenics Corp.**, 226 F.3d 237 (3d Cir. 2000): Trustees must protect estate property and pursue claims for creditor benefit.
- **In re Teknek, LLC**, 343 B.R. 850 (Bankr. N.D. Ill. 2006): Diminished estate value caused by unauthorized actions warrants court intervention and damages.

**F. Delta's Omission of Sanctions Motion[2] and Order[3] and Reversal on Intervention**

**State Court Sanctions Motion**

Delta filed a sanctions motion in State Court targeting co-defendant Craig Alexander and his counsel. The resulting sanctions order significantly influenced the dismissal of the Debtor's claims, barring critical evidence and limiting her ability to litigate effectively. Despite the sanctions order's centrality, Delta omitted it in its bankruptcy filings, demonstrating a deliberate effort to obscure its procedural misconduct.

**Delta's Reversal on Intervention**

Delta initially acknowledged the Debtor's right to intervene in its May 2024 response. However, after the intervention was granted in June 2024, Delta reversed its position, employing coordinated filings and procedural delays to obstruct the Debtor's claims.

**Impact on the Bankruptcy Estate**

These omissions and reversals reveal Delta's calculated effort to exploit procedural mechanisms, delay litigation, and diminish the Bankruptcy Estate's ability to recover QrewLive's full value.

---

[2] *See* Exhibit B: Delta Filed Motion for Terminating Sanctions Against Alexander.
[3] *See* Exhibit C: State Court Sanctions Order Against Alexander.

**Relevance to Bankruptcy Protections**

Delta's actions interfered with the Bankruptcy Court's exclusive jurisdiction and the Debtor's ability to protect QrewLive, further underscoring its disregard for federal bankruptcy protections.

## III. DELTA'S PROCEDURAL MISCONDUCT IN STATE COURT

Delta Air Lines' actions in State Court demonstrate a calculated effort to exploit procedural mechanisms, delay litigation, and obstruct the Debtor's ability to protect QrewLive and assert her claims. These actions violated the automatic stay under 11 U.S.C. § 362(a), undermined the Bankruptcy Estate, and prejudiced creditor recovery efforts. Key misconduct includes discovery delays, undue influence over rulings, and improper reliance on intrinsic evidence.

**A. Discovery Delays and Coordinated Filings with Extended Stay**

**Simultaneous Filings to Trigger Discovery Stay**

On July 25, 2024, Delta filed its motion to dismiss and answer simultaneously in State Court, invoking O.C.G.A. § 9-11-12(j). This filing triggered an automatic 90-day stay on discovery, intended to prevent unnecessary litigation costs while dispositive motions are pending. However, Delta exploited this mechanism as a procedural tactic to delay litigation and obstruct the Debtor's access to critical evidence necessary to substantiate her claims.

- **Extended Stay by Court**: During the August 15, 2024, status conference, the State Court verbally extended the discovery stay, keeping it in place beyond the statutory 90-day limit while pending rulings on various motions[4].
- **Absence of Formal Order**: The court did not issue a written order formalizing this extension, creating uncertainty and compounding delays in the Debtor's access to critical evidence.

**Extension of the Discovery Stay by the Court**

In addition to the statutory stay, the State Court verbally extended the discovery stay during a status conference on August 15, 2024, pending rulings on multiple motions filed by Delta and its

---

[4] *See* Exhibit D: Email from Debtor's State Court Attorney.

co-defendants. This indefinite stay, implemented without a formal written order, further compounded the delays and obstructed the Debtor's ability to collect essential evidence.

### Delta's Opposition to Debtor's Motion to Stay Proceedings

When the Debtor sought to stay State Court proceedings in light of the bankruptcy protections, Delta opposed her motion, arguing that the automatic stay under **11 U.S.C. § 362(a)** did not apply. Delta's opposition[5] was part of a broader effort to ensure its continued influence over the proceedings while undermining the Debtor's protections as a bankruptcy litigant. Despite the re-opening of the bankruptcy case and the clear inclusion of QrewLive as estate property, the **State Court denied the Debtor's motion to stay**[6] on **December 19, 2024**, citing its misinterpretation of bankruptcy protections.

### Legal Implications:

- **State Court's Error:** The decision failed to recognize the federal preemption of bankruptcy law, allowing the proceedings to impact QrewLive, a protected estate asset.
- **Delta's Strategy:** The opposition and subsequent denial of the motion to stay highlight Delta's calculated disregard for bankruptcy protections in its pursuit of procedural advantage.

### Relevant Case Law

- **In re Dyer, 322 F.3d 1178 (9th Cir. 2003):** Sanctions are appropriate for procedural misconduct that obstructs estate recovery efforts.
- **In re Schwartz, 954 F.2d 569 (9th Cir. 1992):** Actions violating the automatic stay are void ab initio, emphasizing the supremacy of federal bankruptcy protections.
- **In re Gruntz, 202 F.3d 1074 (9th Cir. 2000):** Federal law preempts state court rulings that interfere with estate property.

### Impact on Discovery and Litigation

---

[5] *See* Exhibit E - Deltas Opposition to Debtor Stay in State Court
[6] *See* Exhibit H: Start Court Order, Denying Debtor Stay

The discovery stay—initially imposed by statute and subsequently extended by the State Court—prevented the Debtor from accessing key evidence critical to her claims against Delta, including:

- **Supplier-Vendor Communications:** Documentation showing Delta's unauthorized use of QrewLive during the development of the Flight Family Communication (FFC) platform.
- **Development Records:** Internal records evidencing Delta's reliance on QrewLive's proprietary features.
- **Third-Party Collaborations:** Correspondence with developers like BlueFletch, highlighting Delta's dissemination of QrewLive-derived features.

**Coordinated Filings to Compound Delays**

Delta collaborated with other defendants—including Craig Alexander, Sheila Alexander, and MABA Holdings—to file overlapping motions to dismiss. This coordinated strategy overwhelmed the Debtor with procedural hurdles and compounded delays in the resolution of her claims. The extended discovery stay, coupled with these coordinated filings, reflects a calculated effort by Delta and its co-defendants to obstruct justice and evade accountability.

**Broader Implications**

Delta's procedural exploitation demonstrates a deliberate strategy to delay the litigation and weaken the Debtor's claims. The extended stay created an uneven playing field, allowing Delta to:

- Build its defenses unchallenged.
- Avoid scrutiny of its actions during the critical development and commercialization phases of the FFC platform.

**Case Law Supporting Relief**

1. **In re Dyer, 322 F.3d 1178 (9th Cir. 2003)**: Sanctions are appropriate for procedural misconduct that obstructs estate recovery efforts and harms creditors.

2. **In re Garofalo's Finer Foods, Inc., 186 B.R. 414 (N.D. Ill. 1995)**: Litigation strategies that interfere with estate property violate the automatic stay.

The Court should recognize that:

- The extended stay, while procedurally permissible, was exploited in bad faith by Delta to obstruct discovery and delay litigation.
- Delta's actions have caused substantial harm to the Bankruptcy Estate, warranting sanctions and remedial action to protect estate property and ensure procedural fairness.

## B. Undue Influence Over Rulings

### Adoption of Delta's Proposed Orders

Delta leveraged its resources and influence to secure favorable rulings in State Court. Notably, the State Court adopted Delta's proposed orders verbatim, including its November 19, 2024 order dismissing the Debtor's claims.

### Substantive Deficiencies in Rulings

The verbatim adoption of Delta's proposed orders demonstrated a lack of impartiality and substantive consideration of the Debtor's arguments, including:

- **Third-Party Beneficiary Status**: The Debtor's rightful status under the 2016 Non-Disclosure Agreement (NDA[7]).
- **Georgia's Relate Back Doctrine**: The Debtor's claims should have been preserved as they arose from the same transaction or occurrence.
- **Federal Preemption**: The rulings ignored the Bankruptcy Court's exclusive jurisdiction over QrewLive as estate property.

### Case Law

- **Liteky v. United States**, 510 U.S. 540 (1994): Judicial comments or actions reflecting bias justify corrective measures.

---

[7] *See* Exhibit F: Delta Drafted NDA

- **In re Schwartz**, 954 F.2d 569 (9th Cir. 1992): Actions violating the automatic stay are void ab initio.

## C. Improper Reliance on Evidence

### Mischaracterization of the 2015 Email

Delta improperly relied on a 2015 email written during an active bankruptcy case to question the Debtor's diligence and ownership of QrewLive. The State Court admitted the email despite its irrelevance and its protected status as estate property.

### Errors in Admitting the 2015 Email

- **Irrelevance to Ownership**: The email was not sent to Delta and had no bearing on the substantive ownership of QrewLive.
- **Violation of the Automatic Stay**: The email, created during the Debtor's bankruptcy, was protected under § 362(a). Delta's reliance on this evidence constituted an act to interfere with estate property.
- **Prejudicial Impact**: The admission of the email unfairly prejudiced the Debtor, undermining her ability to litigate her claims.

### Case Law

- **In re Wardrobe**, 559 F.3d 932 (9th Cir. 2009): State court actions impacting estate property during the automatic stay are void.
- **In re Roche**, 361 B.R. 615 (Bankr. N.D. Ga. 2005): The automatic stay prohibits actions that disrupt the administration of estate property.

## D. Harm to the Bankruptcy Estate

Delta's procedural misconduct caused significant harm to the Bankruptcy Estate, including:

- **Diminished Value of QrewLive**: Procedural delays and adverse rulings reduced QrewLive's marketability and licensing potential.
- **Obstruction of Recovery Efforts**: Delta's tactics undermined the Bankruptcy Estate's ability to recover the full value of QrewLive, directly impacting creditor recovery efforts.

**Case Law**

- **In re Cybergenics Corp.**, 226 F.3d 237 (3d Cir. 2000): Trustees must protect estate property and maximize its value for creditors.

The Debtor respectfully requests that the Court:

- **Declare State Court Actions Void Ab Initio**: Recognize that the State Court's rulings, influenced by Delta's misconduct, violated the automatic stay and are void under federal law.
- **Impose Sanctions Against Delta**: Address Delta's procedural misconduct and bad-faith actions to deter future violations.
- **Award Compensatory and Punitive Damages**: Grant damages for the harm caused to the Bankruptcy Estate, including lost licensing opportunities and avoided development costs.
- **Issue Injunctive Relief**: Prohibit Delta from further procedural exploitation and ensure compliance with federal bankruptcy protections.

## IV. DELTA'S MISAPPROPRIATION OF QREWLIVE AND FINANCIAL HARM TO THE BANKRUPTCY ESTATE

Delta Air Lines' unauthorized use and misappropriation of QrewLive—a proprietary communication platform and key asset of the Bankruptcy Estate—constitutes a clear and willful violation of the automatic stay under 11 U.S.C. § 362(a). By leveraging QrewLive's innovative features to develop the Flight Family Communication (FFC) platform and collaborating with third-party developers to commercialize competing solutions, Delta caused significant financial harm to the Bankruptcy Estate and obstructed creditor recovery efforts.

### A. Unauthorized Use and Misappropriation

### Delta's Development of the FFC Platform Using QrewLive Features

Delta utilized QrewLive's proprietary functionalities, including:

- **Role-Based Messaging**: Tailored communication channels for operational teams.

- **Predictive Task Management**: Automated allocation of tasks based on real-time operational priorities.
- **Advanced Workflow Integration**: Centralized coordination of workflows to reduce inefficiencies.

These features were integral to QrewLive's value and were misappropriated by Delta during supplier-vendor discussions facilitated by Craig Alexander, who acted as the Debtor's agent. Despite entering into a 2016 Non-Disclosure Agreement (NDA) explicitly prohibiting the use or dissemination of QrewLive-derived information, Delta proceeded to incorporate these features into its competing FFC platform, launched in 2018.

**Collaboration with Third-Party Developers**

Delta's partnership with third-party developers further compounded the harm caused to the Bankruptcy Estate:

- **BlueFletch's Role**: Delta shared QrewLive's proprietary features with BlueFletch, which subsequently developed an enterprise chat solution incorporating functionalities identical to QrewLive.
- **Breach of NDA**: Delta's collaboration with BlueFletch directly violated the NDA, which explicitly restricted the use and sharing of QrewLive's confidential information.
- **Erosion of QrewLive's Exclusivity**: By enabling BlueFletch to launch a competing solution in 2024, Delta further diminished QrewLive's market exclusivity and value as an estate asset.

**Case Law**

- **In re Schwartz**, 954 F.2d 569 (9th Cir. 1992): Actions interfering with estate property during the automatic stay are void ab initio.
- **In re Roche**, 361 B.R. 615 (Bankr. N.D. Ga. 2005): Willful violations of the automatic stay warrant compensatory and punitive damages.

**B. Financial Harm to the Bankruptcy Estate**

Delta's actions directly undermined creditor recovery efforts by diminishing QrewLive's value and depriving the Bankruptcy Estate of critical financial opportunities.

**Lost Licensing Opportunities**

QrewLive's proprietary features made it highly marketable, with an estimated annual licensing value of $10 million. Delta's unauthorized use of these features precluded the Bankruptcy Estate from pursuing lucrative licensing agreements, depriving creditors of substantial recovery opportunities.

**Avoided Development Costs**

By leveraging QrewLive's functionalities, Delta avoided approximately $50 million in development costs to create the FFC platform. This unjust economic advantage was gained at the direct expense of the Bankruptcy Estate, exacerbating the financial harm caused to creditors.

**Diminished Market Value**

Delta's unauthorized use and collaboration with third-party developers significantly reduced QrewLive's market exclusivity, undermining its overall value as an estate asset. This erosion of exclusivity diminished the Bankruptcy Estate's ability to maximize creditor recovery.

**Case Law**

- **In re Cybergenics Corp.**, 226 F.3d 237 (3d Cir. 2000): Trustees are obligated to protect estate property and pursue claims for creditor benefit.
- **In re Teknek, LLC**, 343 B.R. 850 (Bankr. N.D. Ill. 2006): Actions diminishing estate value caused by unauthorized actions warrant court intervention and damages.

**C. Impact on Creditor Recovery**

Delta's actions caused substantial harm to the Bankruptcy Estate, including:

- **Diminished Value of QrewLive**: Unauthorized use and competing solutions reduced QrewLive's exclusivity and market value.
- **Lost Financial Opportunities**: The Estate lost licensing revenues and development cost recoveries totaling an estimated $60 million.

- **Obstruction of Creditor Recovery**: The financial harm caused by Delta's actions directly impacted the Bankruptcy Estate's ability to satisfy creditor claims.

The Debtor respectfully requests that the Court:

1. **Declare Delta's Actions Violative of the Automatic Stay**: Recognize Delta's unauthorized use of QrewLive and collaboration with third-party developers as willful violations of 11 U.S.C. § 362(a).
2. **Award Damages**: Grant compensatory damages for lost licensing opportunities and avoided development costs, and punitive damages to deter future violations.
3. **Issue Injunctive Relief**: Prohibit Delta from further unauthorized use or commercialization of QrewLive-derived features and mandate the return or destruction of all proprietary materials.

Delta's unauthorized use of QrewLive, collaboration with third-party developers, and obstruction of creditor recovery efforts demand immediate judicial intervention to protect the integrity of the Bankruptcy Estate and uphold the principles of fairness and equity under federal bankruptcy law. Let me know if this section needs further refinement or additions.

## V. DELTA'S MISCHARACTERIZATION OF THE AUTOMATIC STAY

Delta Air Lines' opposition misrepresents the scope, purpose, and applicability of the automatic stay under 11 U.S.C. § 362(a). By arguing that its actions were defensive and outside the stay's purview, Delta fundamentally distorts the broad protections afforded to estate property and its prohibition against interference. Delta's procedural violations, combined with its constructive and actual knowledge of the stay, underscore its willful disregard for federal bankruptcy protections and the harm caused to the Bankruptcy Estate.

### A. Scope and Purpose of the Automatic Stay

The automatic stay is a cornerstone of bankruptcy law, designed to:

1. **Preserve Estate Property**: Prevent unauthorized actions to obtain possession of or exercise control over estate property.

2. **Ensure Orderly Administration**: Provide debtors with a breathing spell and facilitate equitable treatment of creditors.

**Broad Protections Over Estate Property**

- **Inclusion of QrewLive as Estate Property**: QrewLive, as intellectual property, is protected under 11 U.S.C. § 541(a). Its value is central to creditor recovery efforts, and interference with this asset undermines the Bankruptcy Estate's integrity.
- **Delta's Violations**: By developing and commercializing the Flight Family Communication (FFC) platform using QrewLive-derived features, Delta engaged in acts to "exercise control" over estate property, violating § 362(a)(3).

**Case Law**

- **In re Schwartz**, 954 F.2d 569 (9th Cir. 1992): Actions interfering with estate property during the automatic stay are void ab initio, regardless of intent.
- **In re Dyer**, 322 F.3d 1178 (9th Cir. 2003): Sanctions are warranted for willful violations that harm the estate and creditors.

**B. Delta's Knowledge of the Automatic Stay**

Delta's assertion that it lacked knowledge of the Debtor's bankruptcy case until February 2023 is contradicted by overwhelming evidence demonstrating both constructive and actual knowledge.

**Constructive Knowledge**

- **Public Bankruptcy Filings**: Bankruptcy filings are public records. As a sophisticated corporation, Delta had a duty to investigate QrewLive's ownership and legal status, particularly given its supplier-vendor discussions with Craig Alexander.
- **Failure to Investigate**: Delta's failure to investigate or acknowledge public bankruptcy records does not absolve it of its obligations under the automatic stay. Constructive notice suffices when a party has access to information that would prompt a reasonable inquiry.

**Case Law**

- **In re Coastal Alaska Lines, Inc.**, 920 F.2d 1428 (9th Cir. 1990): Constructive notice suffices when a party has access to facts that would prompt a reasonable inquiry.
- **In re Altman**, 254 B.R. 509 (Bankr. D. Conn. 2000): Creditors are presumed to have knowledge of public bankruptcy filings.

**Actual Knowledge**

- **2016 Non-Disclosure Agreement (NDA)**: Delta executed an NDA explicitly acknowledging QrewLive's proprietary nature and the Debtor's ownership. This document alone establishes Delta's actual knowledge of QrewLive's inclusion in the Bankruptcy Estate.
- **Supplier-Vendor Discussions**: Delta's interactions with Craig Alexander further tied QrewLive to the Debtor, providing direct evidence of its awareness of the asset's protected status.

**Case Law**

- **In re Bloom**, 875 F.2d 224 (9th Cir. 1989): Knowledge of estate property triggers an obligation to avoid actions that interfere with its administration.

**C. Procedural Violations**

Delta's actions—including its participation in State Court proceedings and unauthorized use of QrewLive-derived features—constitute willful violations of the automatic stay under § 362(a).

**Participation in State Court Proceedings**

Delta actively engaged in State Court proceedings that directly impacted QrewLive, including:

1. **Submission of Motions and Proposed Orders**: Delta's filings sought to dismiss the Debtor's claims and influenced rulings that interfered with estate property.
2. **Reliance on Intrinsic Evidence**: Delta improperly used a 2015 email written during an active bankruptcy case to challenge the Debtor's claims, violating § 362(a)(3).

**Impact on Estate Property**

These actions disrupted the Bankruptcy Estate's administration of QrewLive, undermining its

value and obstructing creditor recovery efforts. Defensive actions in State Court are not exempt from the automatic stay when they interfere with estate property.

**Case Law**

- **In re Garofalo's Finer Foods, Inc.**, 186 B.R. 414 (N.D. Ill. 1995): Litigation strategies interfering with estate property violate the automatic stay.
- **In re Roche**, 361 B.R. 615 (Bankr. N.D. Ga. 2005): Unauthorized actions involving estate property warrant sanctions and damages.

**Unauthorized Use of Estate Property**

Delta's development and commercialization of the FFC platform using QrewLive-derived features further violated the automatic stay by exercising control over estate property without authorization.

**Case Law**

- **In re Schwartz**, 954 F.2d 569 (9th Cir. 1992): Actions taken in violation of the automatic stay are void ab initio.
- **In re Wardrobe**, 559 F.3d 932 (9th Cir. 2009): Federal law preempts state court actions that impact estate property during the automatic stay.

The Debtor respectfully requests that the Court:

1. **Declare Delta's Actions Violative of the Automatic Stay**: Recognize that Delta's participation in State Court proceedings and unauthorized use of QrewLive constituted willful violations of 11 U.S.C. § 362(a).
2. **Impose Sanctions**: Address Delta's bad-faith actions and procedural violations through sanctions designed to deter future misconduct.
3. **Award Damages**: Grant compensatory and punitive damages for lost licensing opportunities, avoided development costs, and harm to the Bankruptcy Estate.
4. **Issue Injunctive Relief**: Prohibit Delta from further unauthorized use or commercialization of QrewLive-derived features and mandate the return or destruction of all proprietary materials.

Delta's mischaracterization of the automatic stay and its procedural violations highlight its willful disregard for federal bankruptcy protections. The requested relief is necessary to preserve estate property, protect creditor recovery efforts, and uphold the integrity of the Bankruptcy Code.

## VI. REQUEST FOR RELIEF

Delta Air Lines' willful violations of the automatic stay, procedural misconduct in State Court, and unauthorized misappropriation of QrewLive have caused substantial harm to the Bankruptcy Estate, disrupted creditor recovery efforts, and undermined the integrity of federal bankruptcy protections. The Debtor respectfully requests this Court to act decisively to address Delta's actions, protect estate property, and ensure compliance with the Bankruptcy Code.

## 1. Declare State Court Actions Void Ab Initio

Delta's participation in State Court proceedings, including its submission of motions, proposed orders, and reliance on intrinsic evidence, directly interfered with QrewLive as estate property. These actions violated the automatic stay under 11 U.S.C. § 362(a) and federal preemption principles.

- **Relief Requested**: Declare all State Court rulings affecting QrewLive, including the November 19, 2024 dismissal order, void ab initio.
- **Legal Basis**:
  - **In re Schwartz**, 954 F.2d 569 (9th Cir. 1992): Actions violating the automatic stay are void ab initio.
  - **In re Wardrobe**, 559 F.3d 932 (9th Cir. 2009): State court actions impacting estate property during the automatic stay are invalid.

## 2. Award Compensatory Damages

Delta's actions caused direct financial harm to the Bankruptcy Estate, including:

- **Lost Licensing Opportunities**: QrewLive's licensing revenues, conservatively valued at $10 million annually, were lost due to Delta's unauthorized use.

- **Avoided Development Costs**: Delta avoided approximately $50 million in development costs by misappropriating QrewLive's proprietary features.

**Relief Requested**:

- Award compensatory damages to address the financial harm caused by Delta's actions, including lost licensing revenues and avoided development costs.

**Legal Basis**:

- **In re Cybergenics Corp.**, 226 F.3d 237 (3d Cir. 2000): Trustees must protect estate property and pursue claims for creditor recovery.
- **In re Teknek, LLC**, 343 B.R. 850 (Bankr. N.D. Ill. 2006): Diminished estate value caused by unauthorized actions warrants court intervention and damages.

## 3. Impose Punitive Damages and Sanctions

Delta's willful misconduct and bad-faith actions—including its procedural exploitation in State Court, reliance on privileged communications, and intentional omission of the State Court sanctions motion—warrant punitive damages and sanctions to deter future violations.

- **Relief Requested**:
    - Impose punitive damages to hold Delta accountable for its intentional and egregious violations.
    - Sanction Delta for its procedural misconduct and bad-faith actions, including its deliberate omission of the sanctions motion and reversal on intervention.

**Legal Basis**:

- **In re Dyer**, 322 F.3d 1178 (9th Cir. 2003): Sanctions are warranted for procedural misconduct that obstructs estate recovery efforts.
- **In re Bloom**, 875 F.2d 224 (9th Cir. 1989): Willful interference with estate property includes procedural misconduct that hinders the estate's administration.

## 4. Issue Injunctive Relief

Delta's unauthorized use and commercialization of QrewLive-derived features continue to harm the Bankruptcy Estate and its recovery efforts. Immediate injunctive relief is necessary to prevent further violations and protect QrewLive's value.

- **Relief Requested**:
  - Prohibit Delta from further unauthorized use or commercialization of QrewLive-derived features.
  - Mandate the return or destruction of all proprietary materials obtained during supplier-vendor discussions.

**Legal Basis**:

- **In re Roche**, 361 B.R. 615 (Bankr. N.D. Ga. 2005): Injunctive relief is warranted to protect estate property from unauthorized use.
- **In re Coastal Alaska Lines, Inc.**, 920 F.2d 1428 (9th Cir. 1990): Constructive and actual knowledge of estate property imposes obligations to avoid interference.

## 5. Preserve Federal Bankruptcy Protections

Delta's procedural misconduct, including its undue influence over State Court rulings and improper reliance on intrinsic evidence, violated the Bankruptcy Court's exclusive jurisdiction under 28 U.S.C. § 1334(e). To uphold the integrity of federal bankruptcy protections:

- **Relief Requested**:
  - Reinforce the Bankruptcy Court's exclusive jurisdiction over QrewLive as estate property.
  - Ensure all future disputes involving QrewLive are adjudicated within the Bankruptcy Court's jurisdiction.

**Legal Basis**:

- **In re Gruntz**, 202 F.3d 1074 (9th Cir. 2000): Federal law preempts state court jurisdiction over estate property.

- **In re Wardrobe**, 559 F.3d 932 (9th Cir. 2009): State court rulings impacting estate property are void under federal law.

Delta Air Lines' willful violations of the automatic stay, misappropriation of QrewLive, and procedural misconduct in State Court have caused significant harm to the Bankruptcy Estate and disrupted creditor recovery efforts. The requested relief is essential to:

1. Protect QrewLive's value as estate property.
2. Address the financial harm caused to the Bankruptcy Estate.
3. Deter Delta and others from engaging in similar misconduct.

**The Debtor respectfully requests that this Court grant the relief sought to uphold the integrity of federal bankruptcy protections, preserve estate property, and ensure equitable treatment for all parties involved.**

## VII. CLOSING ARGUMENT

The importance of the automatic stay under 11 U.S.C. § 362(a) cannot be overstated—it is a cornerstone of federal bankruptcy law, ensuring that estate property is preserved for equitable distribution among creditors and that debtors are afforded protection from unauthorized interference. Delta Air Lines, Inc.'s actions, including its misappropriation of QrewLive, procedural misconduct in State Court, and deliberate violations of the automatic stay, directly contravene these fundamental principles.

### 1. Preserving the Integrity of Bankruptcy Protections

The automatic stay safeguards estate property, ensures federal jurisdiction over bankruptcy matters, and prevents creditors from circumventing protections. Case law has consistently affirmed these principles:

- **In re Schwartz**, 954 F.2d 569 (9th Cir. 1992): Actions violating the automatic stay are void ab initio, underscoring the inviolability of federal protections.
- **In re Gruntz**, 202 F.3d 1074 (9th Cir. 2000): Federal law preempts state court actions that interfere with bankruptcy estate property, ensuring jurisdictional clarity.

Permitting Delta's actions to stand would erode these protections, embolden future violations, and disrupt the orderly administration of bankruptcy estates nationwide.

## 2. Restoring Equity to the Bankruptcy Estate

Delta's misconduct has caused substantial financial harm to the Bankruptcy Estate:

- **Lost Licensing Opportunities**: Estimated at $10 million annually, these revenues represent critical funds that should have been available for creditor recovery.
- **Avoided Development Costs**: Delta avoided $50 million in costs by misappropriating QrewLive's features, directly benefitting at the expense of the estate.
- **Diminished Market Value**: By undermining QrewLive's exclusivity, Delta reduced its overall marketability, further harming creditor recovery.

The Court has the authority to restore equity to the Bankruptcy Estate:

- **In re Cybergenics Corp.**, 226 F.3d 237 (3d Cir. 2000): Trustees must protect estate property and pursue claims to maximize creditor recovery.
- **In re Teknek, LLC**, 343 B.R. 850 (Bankr. N.D. Ill. 2006): Courts should address harm caused by unauthorized use of estate property through damages and equitable relief.

## 3. Addressing Broader Implications

Delta's actions extend beyond this case, posing risks to the integrity of bankruptcy law and intellectual property protections:

- **Impact on Bankruptcy Law**: Allowing state court actions to interfere with estate property would weaken the automatic stay and undermine public confidence in bankruptcy protections.
- **Precedent for Intellectual Property Misuse**: Without intervention, creditors and debtors alike could face increased challenges in safeguarding proprietary assets from misappropriation during bankruptcy.

By enforcing the automatic stay and granting the requested relief, this Court will reaffirm the fundamental principles of fairness, equity, and accountability.

**4. Relief Requested**

The Debtor respectfully requests that this Court:

1. **Declare State Court Actions Void Ab Initio**: Recognize that Delta's participation in State Court proceedings impacting QrewLive violated the automatic stay and federal jurisdiction.

   ○ **In re Wardrobe**, 559 F.3d 932 (9th Cir. 2009): State court rulings affecting estate property during the automatic stay are void.

2. **Award Compensatory Damages**: Grant $10 million annually for lost licensing revenues and $50 million in avoided development costs, consistent with:

   ○ **Segal v. Rochelle**, 382 U.S. 375 (1966): Trustees are obligated to maximize estate value for creditor recovery.

3. **Impose Punitive Damages and Sanctions**: Address Delta's willful violations and procedural misconduct to deter future abuses, as established in:

   ○ **In re Dyer**, 322 F.3d 1178 (9th Cir. 2003): Sanctions are appropriate for willful violations that harm the estate.

4. **Issue Injunctive Relief**: Prohibit Delta from further unauthorized use or commercialization of QrewLive-derived features, ensuring compliance with:

   ○ **In re Schwartz**, 954 F.2d 569 (9th Cir. 1992): Federal protections must prevent ongoing interference with estate property.

This Court's decision will not only determine the outcome of this case but also set a critical precedent for the protection of estate property and the enforcement of federal bankruptcy law. By upholding the automatic stay, addressing Delta's violations, and granting the requested relief, the Court will reaffirm the fundamental principles of equity, accountability, and jurisdiction that underpin the bankruptcy system.

The Debtor respectfully urges this Court to take decisive action to safeguard the Bankruptcy Estate, protect creditor recovery efforts, and reinforce public confidence in the integrity of bankruptcy law.

Respectfully submitted this 6th day of January, 2024.

*/s/ Sonja Ross*
Sonja Ross (Formerly Williams), Inventor

**Debtor, Acting Pro Se**

Sonja Ross
PO BOX 3920
Alpharetta, GA 30023
T: (210) 960-6898
E: sonja@sonjaross.com

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| IN RE: | : | CASE NO. 19-56304 |
| | : | |
| **SONJA NICOLE WILLIAMS** | : | **CHAPTER 7** |
| | : | |
| **Debtor.** | : | |

**<u>CERTIFICATION OF SERVICE</u>**

I hereby certify that on this 6 day of January, 2025, I served a true and correct copy of the foregoing **MOTION FOR SANCTIONS FOR WILLFUL VIOLATION OF THE AUTOMATIC STAY AGAINST DELTA AIR LINES, INC. AND CRAIG ALEXANDER** via electronic mail to the following parties:

**Willie C. Ellis, Jr.**
Ellis Legal Group LLC

*Attorney for Craig A. Alexander, MABA Holdings, LLC., and Shelia Alexander.*

**Darren Summerville**
Georgia Bar No. 691978
1226 Ponce de Leon Ave.
Atlanta, GA 30306
 T: (770) 635-0030
 F: (770) 635-0029
darren@summervillefirm.com

*Former Attorney for Craig A. Alexander*

**Christine L. Mast**
Georgia Bar No. 461349
**Jacob D. Davis**

**Richard F. Waddington**
Chandler Law LLC
4080 McGinnis Ferry Road,
Building 500, Suite 502
Alpharetta, GA 30005
Email:
richard@chandler-law.net

*Attorney for Mike Rafi*

ANOZIE, LLP,
Nnamdi M. Anozie
Georgia Bar No. 211407
6120 Swiss Avenue #140838
Dallas, Texas, 75214.
 T: 210-606-3440
 E: nma@anoziellp.com

*Former Counsel For Intervenor Sonja Ross*

**Office of the United States Trustee**
Northern District of Georgia
75 Ted Turner Dr
Room 362
Atlanta, GA 30303

**Mary Ida Townson**
United States Trustee
Region 21

**United States Department of Justice**
Office of the United States Trustee
362 Richard Russell Building
75 Ted Turner Drive, SW
Atlanta, Georgia 30303

Georgia Bar No. 382586

303 Peachtree Street,
Suite 4000
Atlanta, GA 30308-3243
(404) 614-7400 (phone)
(855) 889-4588 (fax)
cmast@hpylaw.com
jdavis@hpylaw.com

*Counsel for Defendants*
*Darren Summerville*
*Keenan Nix, Morgan & Morgan*
*Atlanta, PLLC*

Komal Patel, Esq.
Department 981
1030 Delta Boulevard
Atlanta, GA 30354-1989
komal.a.patel@delta.com

*Assistant General Counsel*
*Delta Air Lines, Inc.*

Keenan R.S. Nix, Esq.
Christopher J. Graddock, Esq.
Patrick A. Dawson, Esq.
Morgan & Morgan Atlanta,
PLLC
P.O. Box 57007
Atlanta, GA 30343-1007
knix@forthepeople.com
cgraddock@forthepeople.com
pdawson@forthepeople.com

Lee Wallace, Esq.
The Wallace Law Firm, LLC
6030 River Chase Circle
Atlanta, GA 30328
lee@thewallacelawfirm.com

**Kimberly L. Copeland**
Georgia Bar No. 186783

261 N. Brunswick St,
P.O. Box 1091,
Jesup, Georgia, 31546.
T: 912-530-7317
kim12cope@aol.com

*Former Counsel For*
*Intervenor Sonja Ross*

**Thaddeus D. Wilson**

**David L. Balser**
Georgia Bar No. 035835

**Lawrence A. Slovensky**
Georgia Bar No. 653005

**James M. Brigman**
Georgia Bar No. 254905

**Charles G. Spalding, Jr**.
Georgia Bar No. 411926

KING & SPALDING, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
Telephone: 404-572-4600
Fax: 404-572-5100

thadwilson@kslaw.com
dbalser@kslaw.com
lslovensky@kslaw.com
mbrigman@kslaw.com
cspading@kslaw.com

**Julia C. Barret**t
Georgia Bar No. 354322
KING & SPALDING LLP
500 W. Second Street, Suite
1800
Austin, Texas 78701
Telephone: 512-457-2053

Tel. (404) 331-4488

**Adriano O. Iqbal**
Georgia Bar No. 217122
adriano.o.iqbal@usdoj.go

*Trustee for Bankruptcy*
*Estate of Intervenor Sonja*
*Nicole Williams Ross*

Danielle J Eliot
GA Bar #142243

Law Office of Danielle J
Eliot PC 1001 Weatherstone
Pkwy, Suite 420 Woodstock,
GA 30188
Phone: 770-672-6735
danielle@djelawfirm.com

*Former Counsel For*
*Debtor Sonja Ross*

Fax: 512-457-2100
jbarrett@kslaw.com

**Attorney for**
**Delta Air Lines, Inc.**

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 6 day of January, 2025.

_/s/ Sonja Ross_
Sonja Ross (Formerly Williams), Inventor

Sonja Williams Ross                                     **Debtor, Acting Pro Se**
PO BOX 3920
Alpharetta, GA 30023
T: (210) 960-6898
E: sonja@sonjaross.com

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | **:** | **CASE NO. 19-56304** |
| | **:** | |
| **SONJA NICOLE WILLIAMS** | **:** | **CHAPTER 7** |
| | **:** | |
| **Debtor.** | **:** | |

**<u>EXHIBIT A</u>**

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| SONJA ROSS, | |
| **Plaintiff/Intervenor,** | |
| v. | |
| CRAIG ALEXANDER, | **CIVIL ACTION** |
| **Plaintiff,** | **FILE NO.: 21A03275** |
| and | |
| DELTA AIR LINES, INC.; | **JURY TRIAL DEMANDED** |
| EDWARD BASTIAN; RAHUL | |
| SAMANT; MATTHEW MUTA, | |
| DARRELL HASKIN; DAVID | |
| SMITH; DAVID BURTON; | |
| CORPORATE DOES 1 TO 5; and | |
| JOHN DOES 1 TO 10, MABA | |
| HOLDINGS, LLC, KEENAN NIX, | |
| DARREN SUMMERVILLE, | |
| MORGAN AND MORGAN, P.A., | |
| MICHAEL RAFI AND SHEILA | |
| ALEXANDER, | |
| **Defendants** | |

_____

**ORDER ON DELTA DEFENDANTS' MOTION**
**TO DISMISS INTERVENOR'S COMPLAINT**

This matter came before the Court for a hearing on Defendant Delta Air Lines,

Inc.'s ("Delta") and Defendants Edward Bastian, Rahul Samant, Matthew Muta, Darrell

Haskin, David Smith, and David Burton's (collectively, the "Individual Defendants" and

with Delta, the "Delta Defendants") Motion to Dismiss Intervenor Sonja Ross's

("Intervenor") Complaint. Intervenor's Complaint asserts claims against the Delta

Defendants for (1) misappropriation of trade secrets under the Georgia Trade Secrets Act

("GTSA") (Count II); (2) theft and conversion (Count V); (3) civil conspiracy to commit

STATE COURT OF
DEKALB COUNTY, GA.
11/19/2024 3:12 PM
E-FILED
BY: Patricia Nesbitt

theft and conversion (Count VI); (4) breach of the non-disclosure agreement (Count VII);
(5) exemplary damages under the GTSA (Count X); (6) punitive damages under O.C.G.A.
§ 51-12-5.1 (Count XI); and (7) attorneys' fees under the GTSA (Count XII).

As set forth below, the Court finds that Counts II, V, VI, and XI are barred by the
statute of limitation and thus are dismissed as to all the Delta Defendants. Count VII is
dismissed as to all the Delta Defendants because Intervenor is not a party to the non-
disclosure agreement at issue. Finally, because Counts X nor XII are derivative causes of
action, these claims must fail because the underlying claims fail.

Thus, for the reasons discussed below, the Delta Defendants' Motion to Dismiss is
**GRANTED** and Intervenor's Complaint is **DISMISSED WITH PREJUDICE** as to the
Delta Defendants only.

## FACTUAL BACKGROUND

According to her Complaint, the Intervenor "ideated, created, designed and
developed QrewLive and its predecessor applications beginning in 2011 and 2012" after
discussions with Plaintiff Craig Alexander ("Plaintiff"). Compl. ¶ 5. In 2014, following the
alleged "chance encounter" between Plaintiff and then-Delta Chief Executive Officer,
Richard Anderson, Plaintiff and Intervenor entered into an agreement regarding the sale
or license of QrewLive to Delta. *Id.* ¶¶ 50–51. Specifically, Intervenor alleges that she
authorized Plaintiff "to act as her agent in shopping and promoting the novel technologies
and capabilities of her application, QrewLive, to Delta for license and/or purchase"
because Plaintiff "touted his proximity to Delta executives." Id. ¶ 6. She alternatively
alleges that she and Plaintiff and/or Plaintiff's company, MABA Holdings, LLC ("MABA"),
formed a partnership for the specific purpose of selling QrewLive to Delta. Id. ¶ 8.

As a result, between 2014 and 2017, Intervenor alleges that she worked on developing QrewLive, was blind copied on emails between Plaintiff and some of the Individual Defendants, and was otherwise made aware by Plaintiff of his communications with Delta related to the potential sale of QrewLive. Id. ¶ 12. As to Plaintiff's meetings with Delta and some of the Individual Defendants, Intervenor "incorporates all allegations of [Plaintiff's] meetings with the Delta Defendants as her own." Id. ¶¶ 8–9. She acknowledges, however, that she never met or spoke with the Delta Defendants. Intervenor also alleges that Plaintiff did not "disclose the true nature of his relationship with [Intervenor] to Delta" and that Plaintiff presented QrewLive to Delta as if it were his own and "failed to disclose the existence of [Intervenor]" to the Delta Defendants. Id. ¶ 8–9, 11.

As part of her agency and/or partnership relationship with Plaintiff, Intervenor alleges that she authorized Plaintiff to enter into contracts in connection with QrewLive on her behalf as her agent and/or partner but did not authorize Plaintiff "to steal her QrewLive trade secrets or fail to disclose [Intervenor's] existence and ownership to Delta." Id. ¶ 51. In August 2016, Plaintiff, through MABA, entered into and signed a non-disclosure agreement with Delta relating to QrewLive ("NDA"). Id. ¶ 122. In 2017, Plaintiff informed Intervenor that "Delta has lost interest [in QrewLive] and had gone silent." Id. ¶ 55.

Delta launched an application called Flight Family Communication ("FFC") in 2018, which was designed to improve the speed and efficiency of communications among Delta's flight crews. Id. ¶ 56. Intervenor alleges that "Delta misappropriated and raided QrewLive's proprietary information by utilizing this information for the 'creation of its

own app . . . only a few short months after rejecting QrewLive as presented to Delta by [Plaintiff] on [Intervenor's] behalf as her agent and/or partner." Id. ¶ 58.

On July 12, 2021, Plaintiff filed his complaint against the Delta Defendants alleging a violation of the Georgia Trade Secrets Act and other related claims. On March 22, 2023, after learning via discovery that Intervenor had worked with Plaintiff on QrewLive, Delta served Intervenor and her company with non-party document requests. Id. ¶ 65. In connection with her responses to the Delta Defendants' discovery requests, Intervenor alleges that Plaintiff and his former counsel, Keenan Nix, "attempt[ed] to bribe her into agreeing with their fabrication of the origins and ownership of QrewLive." Id. ¶ 66. Intervenor recorded her conversations with Plaintiff and Mr. Nix and produced three audio recordings of those conversations in response to Delta's document request. Id. ¶ 74.

On April 12, 2024, Intervenor filed her Motion to Intervene. Shortly after the Court granted the Motion to Intervene, she filed her Complaint on June 25, 2024. Intervenor's Complaint references and relies heavily on the transcripts of the recorded conversations with Plaintiff and Mr. Nix as well as the Delta Defendants' October 28, 2023 Motion for Terminating Sanctions. Intervenor asserts claims against the Delta Defendants for (1) misappropriation of trade secrets under the GTSA (Count II); (2) theft and conversion (Count V); (3) civil conspiracy to commit theft and conversion (Count VI); (4) breach of the NDA (Count VII); (5) exemplary damages under the GTSA (Count X); (6) punitive damages under O.C.G.A. § 51-12-5.1 (Count XI); and attorneys' fees under the GTSA (Count XII). The Delta Defendants moved to dismiss Intervenor's claims on July 25, 2024. The Court held oral argument on this motion on October 3, 2024.

## MOTION TO DISMISS STANDARD

Under O.C.G.A. § 9-11-12(b)(6), a trial court may grant a motion to dismiss when "the allegations of the complaint, when construed in the light most favorable to the plaintiff, and with all doubts resolved in the plaintiff's favor, disclose with certainty that the plaintiff would not be entitled to relief under any state of provable facts." Key v. Ga. Dep't of Admin. Servs., 340 Ga. App. 534, 535 (2017) (quoting Sanders v. Trinity Universal Ins. Co., 285 Ga. App. 705, 706 (2007)). In doing so, a court "can consider exhibits attached to and incorporated into the complaint" and "[t]o the extent that there is any discrepancy between the allegations in the complaint and the exhibits attached to it, the exhibits control." See Love v. Fulton Cnty. Bd. of Tax Assessors, 348 Ga. App. 309, 310 (2018) (internal quotation marks omitted) (quoting Racette v. Bank of Am., N.A., 318 Ga. App. 171, 172 (2012)).

"A complaint may be dismissed on motion if clearly without any merit; and this want of merit may consist in an absence of law to support a claim of the sort made, or of facts sufficient to make a good claim, or in the disclosure of some fact which will necessarily defeat the claim." Earl v. Mills, 275 Ga. 503, 504 (2002) (quoting Poole v. City of Atlanta, 117 Ga. App. 432, 434 (1968)). Under Georgia law, when a claim is legally defective such that a plaintiff could not prevail, the claim should be dismissed. See Abramyan v. State, 301 Ga. 308, 311–12 (2017) (affirming dismissal of plaintiffs' state constitutional claims when plaintiffs failed to allege existence of a constitutionally protected interest); see also Earl, 275 Ga. at 504 (complaint may be dismissed based on "absence of law to support a claim of the sort made").

## INTERVENOR'S CLAIMS AGAINST DELTA DEFENDANTS

### A. Counts II, V, and VI: Statute of Limitation

The Court finds that the statutes of limitation bar Intervenor's GTSA claim and the other trade secret-related claims. Under Georgia law, Intervenor's GTSA claim is subject to a five-year statute of limitation. See O.C.G.A. § 10-1-766. The theft and conversion and conspiracy to commit theft and conversion claims are subject to a four-year statute of limitation. See O.C.G.A. § 9-3-32; Lee v. Gore, 221 Ga. App. 632, 635 (1996) (applying statute of limitation for underlying tort to civil conspiracy claim). Intervenor moved to intervene on April 12, 2024. As such, to the extent the statute of limitation period was triggered prior to April 12, 2019 (or April 12, 2020 for the theft and conspiracy claims), her claims are time-barred.

The statute of limitation for a claim of misappropriation of a trade secret begins to run when a plaintiff has "reason to suspect" that her trade secret has been misappropriated. Portex Corp. v. Haldopoulos, 284 Ga. App. 510, 516 (2007); see also HealthPrime, Inc. v. Smith/Packett/Med-Com, LLC, 428 F. App'x 937, 942 (11th Cir. 2011) (applying Georgia law and explaining that conversion action accrues at "the time when the plaintiff could first have maintained her action to a successful result" and that "mere ignorance" does not toll the period); Stewart v. Warner, 257 Ga. App. 322, 323 (2002) (dismissing a conversion claim as time-barred because the statute of limitation started to run on the day when damage was sustained by plaintiffs). Once a party suspects a violation, "the discovery rule mandates that a plaintiff must exercise reasonable diligence to discover any misappropriation of trade secrets." Porex, 284 Ga. App. at 516. When "a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of

matters which would have been revealed by such an investigation." Id. (internal quotation marks and citation omitted).

Here, Intervenor's Complaint cites to the transcripts of the recorded conversations between herself and Mr. Nix throughout. Therefore, this Court can consider the recorded conversations at the motion to dismiss stage. See Trop v. City of Brookhaven, 296 Ga. 85, 87 (2014); Handberry v. Stuckberrey Timberland, Inc., 345 Ga. App. 191, 193 (2018). In the recorded conversations, Intervenor references a February 2015 email where she threatened to send Plaintiff and Delta a cease-and-desist relating to QrewLive. Therefore, at a minimum, as of February 2015, Intervenor had a suspicion of misappropriation, and thus a duty to investigate her claims against the Delta Defendants, which would trigger the statute of limitation period. See Phillips v. AWH Corp., 363 F.3d 1207, 1215 (Fed. Cir. 2004), reh'g en banc granted, judgment vacated, 376 F.3d 1382 (Fed. Cir. 2004), on reh'g en banc, 415 F.3d 1303 (Fed. Cir. 2005) (statute of limitation triggered where the plaintiff sent letters "indicat[ing] with particularity the technology that he believed" was being misappropriated); see also Epstein v. C.R. Bard, Inc., 460 F.3d 183, 188 (1st Cir. 2006) (similar).

Moreover, Delta publicly announced the launch of FFC in late 2018. See, e.g., Darren Murph, "This New App is Enabling More Delta Flights to Depart on Time", The Points Guy (Nov. 20, 2018), https://thepointsguy.com/news/this-new-app-is-enabling-more-delta-flights-to-depart-on-time/; Noah Long, "How Delta Is Improving Its Operations With A New App", Pulse 2.0, (Nov. 25, 2018), https://pulse2.com/delta-flight-family-communication/. These publications separately put Intervenor on notice of her GTSA, theft, and conspiracy claims, triggering the duty to exercise reasonable diligence. As Intervenor alleges, FFC is "so strikingly similar to QrewLive that even

[Plaintiff]—a layperson in technology and application development—took notice of the misappropriation and filed suit against Delta on July 21, 2021 [sic]," Compl. ¶ 56. Such an allegation makes clear that Intervenor would have been able to discover the purported misappropriation had she "exercise[d] reasonable diligence" once she was on notice of Delta's development of FFC. See Evans v. Kimberly-Clark/HuggiesTM, No. 1:08-CV-1678-TWT, 2008 WL 2986253, at *1–2 (N.D. Ga. July 31, 2008) (dismissing plaintiff's GTSA claim as time-barred because plaintiff saw an advertisement regarding the alleged misappropriation in 2001 but waited until 2008 to file her claim); see also FlexWage Sols. LLC v. Ceridian HCM Holding Inc., No. N23C-04-086, 2024 WL 2132620, at *7 (Del. Sup. Ct. May 13, 2024) (dismissing plaintiff's trade secret misappropriation claim as time-barred because defendant's public announcements demonstrated "clear warning signs of misappropriation").

As such, the Delta Defendants' motion to dismiss Intervenor's GTSA (Count II), theft and conversion (Count V), and conspiracy to commit theft and conversion (Count VI) claims as time barred is **GRANTED**.

### B. Count VII: Breach of Contract

Intervenor also alleges a claim against the Delta Defendants for breach of the August 2016 NDA between MABA and Delta. Intervenor quotes the NDA in her Complaint and incorporates by reference Plaintiff's Complaint, which includes excerpted pictures of the NDA, including the signature page. Therefore, this Court can consider the NDA at the motion to dismiss stage. See Trop, supra. (approving trial court's consideration of an agreement attached to either the answer to the complaint or response to the motion to dismiss); Handberry, supra (same).

- 8 -

The language of the NDA pledges that Delta – through its agents or employees – cannot use, exploit or reproduce Plaintiff's QrewLive idea unless authorized by MABA. Because the NDA was drafted by Delta, any ambiguities are construed against it. Kennedy v. Brand Banking Co., 245 Ga. 196, 197 (1980) ("It is well settled that where construction of a contract is doubtful, it is to be construed most strongly against the party who prepared it." (internal quotations and citations omitted)). It is undisputed that, from the face of the NDA, Intervenor is not a signatory. The Delta Defendants argue that Intervenor's breach of contract claim against the Delta Defendants should be dismissed because Intervenor is not a party to the NDA.

In arguing against dismissal, Intervenor makes two alternative contentions regarding her participation in the NDA agreement: 1) Plaintiff was acting as her agent or partner when he signed the NDA; and 2) Plaintiff and Intervenor were partners/joint owners of MABA. Intervenor claims that because Plaintiff acted as Intervenor's agent, she was a party to the NDA with Delta. Alternatively, Intervenor claims that when Plaintiff signed the NDA on behalf of MABA, Intervenor was included as a party to the agreement as Plaintiff's partner in MABA.

It is well-settled that only the parties to a contract have standing to sue for a breach of that contract. See O.C.G.A. § 9-2-20. The doctrine of privity of contract requires that only parties to a contract may bring suit to enforce it. Level One Contact v. BJL Enterprises, 305 Ga. App. 78, 80 (2010). The NDA at issue in this matter names only two parties to the contract: Delta and MABA Holdings. Intervenor argues that the mention of "Personnel" and "Affiliates" in the contract indicates an expectation that the parties may have agents, partners, or other business relationships with unnamed persons. However, the NDA, in mentioning "personnel" and "affiliates" does not state that these entities have

rights under the contract. Instead, the NDA merely acknowledges that the signatories may need to disclose confidential information to their partners, agents, or employees, and that these disclosures will not constitute a breach of the NDA. Def. Ex A ¶ 4. Furthermore, the language of the contract also prohibits the parties from assigning their rights or obligations to any other party under the contract without first obtaining written permission from the other party. Def. Ex. A ¶12. Thus, even if Plaintiff and Intervenor were in fact partners or Plaintiff secretly served as Intervenor's agent, the contract gives Intervenor no rights and no obligations. See Davis v. Southside Mfg. Co., 110 Ga. 782, 787 (1900)("[T]he defendant's single contract with parties known to it … could not, without its consent, be split into separate contracts with unknown parties.").

Although Intervenor did not raise this theory in her Complaint, in arguing against dismissal, she also contends she has standing to sue as a third-party beneficiary to the NDA. However, a third-party beneficiary can enforce a contract only "if it clearly appears from the contract that it was intended for [her] benefit." Dominic v. Eurocar Classics, 310 Ga. App. 825, 828 (internal quotation marks omitted) (quoting Kaesemeyer v. Angiogenix, Inc., 278 Ga. App. 434, 437 (2006)). Intervenor is not referenced anywhere in the NDA either explicitly or implicitly. As such, there is no indication that the NDA was intended for her benefit. Moreover, because Delta was unaware of Intervenor's existence, Delta could not have intended the NDA to benefit Intervenor.

Therefore, the Delta Defendants' motion to dismiss Intervenor's breach of contract claim (Count VII) is **GRANTED.**

### C. Counts X, XI, XII: Independent Causes of Action

The Court dismisses Intervenor's claims for exemplary damages under the GTSA (Count X), punitive damages under O.C.G.A. § 51-12-5.1 (Count XI), and attorneys' fees (Count XII) because they are not independent causes of actions.[1] See Capital Inventory, Inc. v. Green, No. 1:20-CV-3224-LMM, 2021 WL 9938794, at *7 (N.D. Ga. June 15, 2021) (GTSA does not provide a standalone cause of action for attorneys' fees); Massey v. Kelly, Inc., 742 F. Supp. 1156, 1158 (N.D. Ga. 1990) ("[T]he Georgia statute for punitive damages is not grounds for an independent cause of action."). Because Intervenor's substantive claims fail, so do her claims for exemplary damages, punitive damages, and attorneys' fees. Ellis v. Gallof, 220 Ga. App. 518 (1996) ("[P]laintiff must prevail on their basic cause of action in order to obtain litigation expenses . . . ." (internal quotations omitted) (quoting Barnett v. Morrow, 196 Ga. App. 201, 203 (1990))); APAC-Southeast, Inc. v. Coastal Caisson Corp., 514 F. Supp. 2d 1373, 1381, 1381 (N.D. Ga. 2007) ("Punitive damages may be awarded under [the Georgia statute for punitive damages] only if the plaintiff prevails on an underlying tort claim." (citing Flynn v. Allstate Ins. Co., 268 Ga. App. 222 (2004)).

The Delta Defendants' motion to dismiss Intervenor's claims for exemplary damages under the GTSA (Count X), punitive damages under O.C.G.A. § 51-12-5.1 (Count XI), and attorneys' fees (Count XII) is **GRANTED**.

---

[1] Intervenor's claim for punitive damages is preempted under the GTSA, as stated previously, but it fails for the separate reason that it is not an independent cause of action.

**IT IS SO ORDERED** that:

1.    Delta Defendants' motion to dismiss is **GRANTED**; and

2.    Intervenor's Complaint is **DISMISSED** as to the Delta Defendants with

prejudice and without leave to amend.


This 19th day of November, 2024.


_____
      Hon. Kimberly K. Anderson
      State Court of DeKalb County


STATE COURT OF
DEKALB COUNTY, GA.
11/19/2024 3:12 PM
E-FILED
BY: Patricia Nesbitt

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE:                              :        **CASE NO. 19-56304**

                                    :

**SONJA NICOLE WILLIAMS**           :        **CHAPTER 7**

                                    :

      Debtor.                     :

**<u>EXHIBIT B</u>**

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **CRAIG ALEXANDER,**<br><br>          **Plaintiff**<br>**v.**<br><br>**DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10,**<br><br>          **Defendants.** | **CIVIL ACTION**<br>**FILE NO.: 21A03275**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

---

### DEFENDANTS' MOTION FOR TERMINATING SANCTIONS OR, IN THE ALTERNATIVE, TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE

For the reasons set forth in the accompanying memorandum of law and supporting exhibits, Defendants Delta Air Lines, Inc., Edward Bastian, Rahul Samant, Matthew Muta, Darrell Haskin, David Smith, and David Burton (collectively "Delta") respectfully request that the Court dismiss Plaintiff's Complaint with prejudice as a sanction, or, in the alternative, order that the crime-fraud exception to the attorney-client privilege has been established with respect to communications between Plaintiff and his former counsel and order Plaintiff to fully respond to Delta's Requests. At a minimum, Delta requests that the Court conduct an *in camera* review of the email referenced in Exhibit 1 to the withdrawal motion and compel Plaintiff to produce that email.

Respectfully submitted, this 27th day of October, 2023.

/s/ David L. Balser
David L. Balser
Georgia Bar No. 035835
Lawrence A. Slovensky
Georgia Bar No. 653005
James M. Brigman
Georgia Bar No. 254905
Charles G. Spalding, Jr.
Georgia Bar No. 411926
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521
Telephone:  404-572-4600
Fax:  404-572-5100
dbalser@kslaw.com
lslovensky@kslaw.com
mbrigman@kslaw.com
cspalding@kslaw.com

Julia C. Barrett
Georgia Bar No. 354322
**KING & SPALDING LLP**
500 W. Second Street, Suite 1800
Austin, Texas 78701
Telephone:  512-457-2053
Fax:  512-457-2100
jbarrett@kslaw.com

*Counsel for Defendants*

STATE COURT OF
DEKALB COUNTY, GA.
10/27/2023 6:45 PM
E-FILED
BY: Kelly Johnson

# IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **CRAIG ALEXANDER,** | **CIVIL ACTION** |
| | **FILE NO.: 21A03275** |
| **Plaintiff** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10,** | |
| **Defendants.** | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR TERMINATING SANCTIONS OR, IN THE ALTERNATIVE, TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE

STATE COURT OF
DEKALB COUNTY, GA.
10/27/2023 6:45 PM
E-FILED
BY: Kelly Johnson

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................5

I.      The Recordings ....................................................................................................5

      A.      March 24, 2023 recording between Ms. Williams and Plaintiff titled
           "032423 – Craig A Asking Me To Lose Documents" .............................6

      B.      March 24, 2023 recording between Ms. Williams and Mr. Nix titled
           "032423 – Keenan Nix Introduction" .......................................................7

      C.      March 30, 2023 recording between Ms. Williams and Mr. Nix titled
           "033023 Keenan Nix Face To Face Meeting" ........................................7

      D.      *The true origins of QrewLive and Ms. Williams's claimed 30% ownership*
           *interest* ......................................................................................................7

      E.      *Mr. Nix's promise of compensation for Ms. Williams's desired testimony.* ..........10

      F.      *Mr. Nix threatens Ms. Williams's relationship with her daughter if she*
           *does not testify as directed.* ...................................................................11

II.     Delta's Discovery Requests ...............................................................................12

ARGUMENT AND CITATION TO AUTHORITY ......................................................13

I.      The Court Should Dismiss this Case with Prejudice ........................................14

      A.      Plaintiff and his counsel illegally interfered with Ms. Williams' testimony. ........14

      B.      Plaintiff's and his counsel's illegal conduct warrants terminating
           sanctions .....................................................................................................16

II.     The Crime-Fraud Exception Nullifies Plaintiffs' Assertion of Attorney-Client Privilege as
      to Delta's Discovery Requests. ..........................................................................19

      A.      Delta is entitled to discover the communications between Plaintiff and his
           former counsel regarding their illegal witness tampering .......................21

      B.      Delta is entitled to discovery regarding Plaintiff's fabricated allegations
           regarding the origins of QrewLive ..........................................................21

CONCLUSION ...............................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Family Life Assurance Co. of Columbus v. Intervoice, Inc. ("AFLAC")*,
2010 WL 3000238 (M.D. Ga. 2010)........................................................................22

*Bishop v. White*,
No. 16-C-6040, 2023 WL 35157 (N.D. Ill. Jan. 4, 2023).......................................17

*Christenbury v. Locke Lord Bissell & Liddell, LLP*,
285 F.R.D. 675 (N.D. Ga. 2012)............................................................................19

*Dentistry for Children of Georgia v. Foster*,
362 Ga. App. 217, 867 S.E.2d 617 (2022), *cert. denied* (Oct. 4, 2022) .................18

*In re E.I. DuPont De Nemours & Co.-Benlate Litig.*,
99 F.3d 363 (11th Cir. 1996) .................................................................................21

*Georgia v. Trump, et al.*,
No. 23-SC-188947 (Aug. 14, 2023 Fulton Cnty. Sup. Ct.) ....................................15

*Hernandez v. Franco Am. Baking Co.*,
No. 3:20-CV-00628-LRH-WGC, 2021 WL 6498256 (D. Nev. Sept. 3, 2021).......................17

*JTR Enterprises, LLC v. Columbian Emeralds*,
697 F. App'x 976 (11th Cir. 2017) ....................................................................21, 22

*McKesson HBOC, Inc. v. Adler*,
254 Ga. App. 500 (2002) ...................................................................................22, 23

*Portman v. Zipperer*,
350 Ga. App. 180 (2019) .......................................................................................18

*Ramirez v. T&H Lemont, Inc.*,
845 F.3d 772 (7th Cir. 2016) ............................................................................16, 17

*Rose v. Commercial Factors of Atlanta, Inc.*,
262 Ga. App. 528 (2003) ..................................................................................19, 21

*S. Guar. Ins. Co. of Ga. v. Ash*,
192 Ga. App. 24, 383 S.E.2d 579 (1989).................................................................20

*Secrease v. Western & Southern Life Ins. Co.*,
800 F.3d 397 (7th Cir. 2015) ............................................................................16, 17

*Stern v. O'Quinn*,
  253 F.R.D. 663 (S.D. Fla. 2008) ..........................................................................23

*Stolle v. State Farm Mut. Auto. Ins. Co.*,
  206 Ga. App. 235 (1991) ...................................................................................18

*Sullivan v. State*,
  327 Ga. App. 815 (2014) ...................................................................................21

*Tindall v. H & S Homes, LLC*,
  757 F. Supp. 2d 1339 (M.D. Ga. 2011) ............................................................20

*Torres v. Wells Fargo Bank*,
  No. CV 17-9305-DMG, 2019 WL 8012686 (C.D. Cal. Dec. 17, 2019).............17

*United States v. Cleckler*,
  265 F. App'x 850 (11th Cir. 2008) ....................................................................19

*United States v. Shotts*,
  145 F.3d 1289 (11th Cir. 1998) ....................................................................14, 15

*Wood v. Archbold Medical Center, Inc.*,
  No. 7:07–CV–109, 2009 WL 3063392 (M.D. Ga. Sept. 17, 2009)....................23

*Young v. Office of U.S. Senate Sergeant at Arms*,
  217 F.R.D. 61 (D.D.C. 2003)............................................................................17

**Statutes**

O.C.G.A. § 9-11-37...............................................................................................18

O.C.G.A. § 15-1-3...........................................................................................17, 18

O.C.G.A. § 16-10-93.............................................................................13, 14, 18, 20

## INTRODUCTION

In three audio recordings produced by non-party Sonja Williams on June 20, 2023 (the "Recordings"), Plaintiff Craig Alexander ("Plaintiff") and his former counsel, Keenan Nix, admit that they fabricated the origin and ownership story of Plaintiff's QrewLive idea—the purported text messaging application that is at the center of Plaintiff's billion dollar claims against Delta Air Lines, Inc. ("Delta") and six current or former Delta employees, including Chief Executive Officer Edward Bastian and Chief Information Officer Rahul Samant. Worse still, the Recordings—which presumably triggered the subsequent rapid withdrawal by Plaintiff's former team of lawyers six days later—reveal clear violations of Georgia's witness tampering statute far surpassing the threshold of *prima facie* evidence necessary for application of the crime-fraud exception to the attorney-client privilege. Both Plaintiff and Mr. Nix can be heard urging Ms. Williams to change her testimony—through implied monetary benefits and veiled threats—with the goal of ensuring that Plaintiff's fabricated narrative "rings true." Plaintiff's conduct represents a grave violation of the law and an attempted subversion of the Court's fundamental truth-seeking function. The revelation of Plaintiff's witness tampering underscores the prejudice Delta and the individual defendants have endured by being forced to defend against highly publicized allegations of significant misconduct based on a false narrative for over two years. The Court should not tolerate this egregious misconduct.

The Recordings reveal that Plaintiff approached Ms. Williams, Plaintiff's ex-girlfriend and mother of one of his children, in late March 2023 and pressured her to "lose documents" and withhold her testimony about the origins of and her ownership interest in QrewLive. Plaintiff told Ms. Williams that her testimony would "tank" his case by destroying his carefully crafted (false) narrative about the genesis of QrewLive as alleged in his Complaint: that Plaintiff had a "eureka"

moment after he and his wife, a Delta flight attendant, discussed problems they experienced using telephones to communicate with Delta's Crew Scheduling unit. Ms. Williams flatly refutes this narrative and Plaintiff's alleged sole ownership of the so-called "idea" of communicating by text— both in contemporaneous emails with Plaintiff that she produced and during the recorded phone call in which Plaintiff pressured her to change her story.

Unsuccessful in his attempt to convince Ms. Williams to lie, Plaintiff then directed Ms. Williams to talk with Mr. Nix. Over the course of a 34-minute telephone call and a subsequent 2.5-hour long lunch meeting, Mr. Nix applied his own forms of pressure to persuade Ms. Williams to alter her testimony and hew to the false narrative set forth in the Complaint. In doing so, Mr. Nix made at least one promise and at least one threat. Both are extremely problematic.

The promise was a cash payment. As Mr. Nix put it, any ultimate payment to Ms. Williams for her alleged interest in QrewLive was "contingent upon telling a story that makes sense." *See* Ex. C (Tr. of 033023 Keenan Nix Face to Face Meeting) at 116:24-117:15.[1] In other words, you won't get paid if we don't win. And the "story that makes sense," according to Plaintiff and Mr. Nix, is that of a Delta pilot, "who has the stripes and the bars and the hat and the employment relationship," coming up with the QrewLive idea with his wife, a Delta flight attendant. *Id.* at 120:22-25. Ms. Williams's inconvenient truthful testimony that she was a co-creator and has a 30% ownership interest in QrewLive would ruin the "story" and any potential payout she might get.

---

[1]    Delta had the Recordings transcribed and attaches a copy of those transcriptions as Exhibits A, B, and C. Delta has also provided the Recordings, including shorter excerpts of the Recordings, to the Court via a secured file transfer portal and via a Notice of Filing Audio Recordings attaching an encrypted flash drive. While long, Delta encourages the Court to listen to the Recordings.

The threat was more sinister. Plaintiff and Ms. Williams share a daughter together, S.[2] As Mr. Nix put it to Ms. Williams:

> [S] is in the middle. Where is Sonja landing, right, is all that really matters at this point. And that's why I said to you, I know that you understand what Delta is about to do. ***You don't necessarily understand what Craig is prepared to do. But I'm in the middle here with [S]***, and I will mediate that in a way that has integrity and reflects the ongoing conversations I believe needs to be had about what's right and what's fair." *Id.* at 94:16-95:1 (emphasis added).
>
> . . .
>
> This is the only thing that's going to get us to a solution. ***Her name is [S]***. *Id.* at 118:11-14.

The Recordings are "smoking gun" evidence that Plaintiff and his former counsel Mr. Nix violated Georgia's criminal witness tampering statute by attempting to coerce Ms. Williams to testify falsely to best fit their invented narrative alleged in the Complaint. The Court can and should impose terminating sanctions based on this outrageous misconduct.

While the *prima facie* evidence of these violations is plain from the Recordings themselves, Delta also served written discovery requests—*i.e.*, interrogatories, requests for production of documents, and requests for admission—to uncover more details regarding this misconduct. These requests sought further information about communications between Plaintiff and his former counsel relating to the Recordings. In discovery responses served on October 21, 2023, (one day after the deadline), Plaintiff admits to having at least one oral conversation with Mr. Nix relating to their conversations with Ms. Williams but objected to disclosing the details of that conversation based on the attorney-client privilege. Plaintiff also withheld at least one document involving his former counsel's withdrawal based on the attorney-client privilege. Otherwise, Plaintiff's vague

---

[2] Plaintiff's and Ms. Williams's daughter is a minor and referred to using her first initial ("S") throughout the Motion. Delta has also redacted references to Plaintiff's and Ms. Williams's daughter in the transcriptions attached as Exhibits A, B, and C.

objections and responses to Delta's remaining discovery requests make it unclear if he is withholding other information based on his attorney-client objections in violation of this Court's Standing Order regarding the specificity required for objections.

While the Court does not need to address the issues presented by Plaintiff's deficient responses to Delta's discovery requests because the criminal misconduct revealed by the Recordings requires dismissal as to all defendants, under the circumstances here, the crime-fraud exception to the attorney-client privilege applies to this information. Accordingly, to the extent the Court does not order the immediate dismissal of this case as to all defendants as a sanction for Plaintiff's misconduct, the Court should enter a finding that the crime-fraud exception to the attorney-client privilege applies to communications between Plaintiff and his former counsel regarding communications with Ms. Williams and compel Plaintiff to provide all responsive information to Delta. At a minimum, Delta requests that the Court conduct an *in camera* review of the email referenced in Exhibit 1 to Plaintiff's former counsel's motion to withdraw, which Plaintiff has logged and refused to produce, and then compel Plaintiff to produce that email. Should the case proceed, these issues are also certain to arise in Plaintiff's deposition, and it behooves all parties for the Court to provide clarity on the extent to which the attorney-client privilege applies to the communications Delta seeks to discover.

Delta accordingly requests immediate dismissal as to all defendants based on the criminal misconduct of Plaintiff and his former counsel, who knowingly sought over $1 billion from Delta and the individual defendants based upon a fabricated set of facts and sought to perpetrate their lies through illegal witness tampering. At minimum, the Court should grant Delta's alternative motion to compel because the crime-fraud exception applies, and Plaintiff cannot hide behind the attorney-client privilege to shield the extent of his criminal conduct and fraud on the court.

- 4 -

# BACKGROUND

## I.    THE RECORDINGS

Ms. Williams was identified by Plaintiff in discovery as a "personal friend and contract consultant of Plaintiff's conceptualization of the forerunner to his QrewLive communications platform (a/k/a MobCrew)" who "helped draft some of the early mock ups for QrewLive before her consulting contract was terminated sometime in late 2014 or early 2015." *See* Ex. D at 4 (Pl.'s Res. & Objs. to Delta's First Interrog.). On March 22, 2023, Delta served Ms. Williams and her company, ShockTheory, DLV Inc. ("ShockTheory"), with Nonparty Requests for Production of Documents. *See* Ex. E (Delta's Nonparty Requests for Production to Sonja Williams and ShockTheory). On June 20, 2023, Ms. Williams produced twenty-one documents—many of which are simply a reproduction (down to the Bates number) of those produced by Plaintiff—and three audio recordings: (1) a March 24, 2023[3] recording between Ms. Williams and Plaintiff titled "032423 – Craig A Asking Me To Lose Documents" (Transcription attached hereto as Ex. A); (2) a March 24, 2023 recording between Ms. Williams and Mr. Nix, titled "032423 – Keenan Nix Introduction" (Transcription attached hereto as Ex. B); and (3) a March 30, 2023 recording between Ms. Williams and Mr. Nix titled "033023 Keenan Nix Face To Face Meeting" (Transcription attached hereto as Ex. C) (collectively, the "Recordings"). On June 26, 2023, all of Plaintiff's former counsel, including Mr. Nix, moved to withdraw from the case, and the Court granted that motion on July 7, 2023.

The highlights of the Recordings, as relevant to the instant motion, are as follows.

---

[3]    The dates of the Recordings are ascertained from Ms. Williams's file names for each of the Recordings. Plaintiff has confirmed in his responses to Delta's Discovery Requests that he had a conversation with Ms. Williams on March 24, which is evidenced by Ms. Williams's Recordings. *See* Ex. I (Pl.'s Res. & Objs. to Delta's Interrog. No. 31).

### A.    March 24, 2023 recording between Ms. Williams and Plaintiff titled "032423 – Craig A Asking Me To Lose Documents"

The first Recording reflects a partial March 24, 2023 phone conversation between Ms. Williams and Plaintiff regarding Ms. Williams's claimed 30% ownership in QrewLive:

WILLIAMS: "Where is my 30 percent?"

ALEXANDER: "There is no 30 percent, Sonja."

WILLIAMS: "I don't know what you're talking about. I remember 30 percent. There's 30 percent in these emails I have."

ALEXANDER: "There is no 30 percent. There is -- I don't have any emails that -"

WILLIAMS: "We've got emails. I've got emails."

*See* Ex. A (Tr. of 032423 – Craig A Asking Me To Lose Documents) at 2:3-21. Plaintiff implores Ms. Williams to stop asserting a 30% interest in QrewLive because she is "going to wind up tanking this case and nobody gets anything." *Id.* at 3:6-8 ("Listen, if you want to claim you own 30 percent, doesn't matter whether or not you're right or wrong, hear me on this. It doesn't matter if you're right or wrong. If you claim you own 30 percent, you are going to wind up tanking this case and nobody gets anything."); *id.* at 3:21-23 ("But I implore you, do not ever say anything like that to anyone. You will completely tank the case."); *id.* at 4:11-12 ("Whatever they [the lawyers] say, go with it.").

Plaintiff ends the conversation by again imploring Ms. Williams to speak with his lawyers, and Ms. Williams agrees. *See id.* at 10:17-22 ("Have your people call me and then we'll go from there. I hear what you're saying in terms of if I say anything about my 30 percent, it will tank your case. Let me talk to your people, let me hear what they've got to say and we'll go from there.").

**B.    March 24, 2023 recording between Ms. Williams and Mr. Nix titled "032423 – Keenan Nix Introduction"**

Later that same day, on behalf of Plaintiff, Mr. Nix called Ms. Williams to set up a lunch with her. *See* Ex. B (Tr. of 032423 – Keenan Nix Introduction) at 15:7-12 ("[L]et me take you to lunch at the Commerce Club in downtown Atlanta, which is right in my building, and then we can really, really chop it up and get to the nitty gritty of what this is all about and how we should be responding."). Mr. Nix told Ms. Williams that Delta's "goal" was "to make a mockery" of Ms. Williams and her "family." *Id.* at 16:20-25; *see also id.* at 14:17-23 ("They're [Delta] just trying to divide and conquer, and we're not going to let that happen from our perspective, and we hope you would understand the importance – is Delta Sonja Williams – is Delta Sonja Williams' friend? Hardly. Do they care about Sonja Williams? I think not.").

**C.    March 30, 2023 recording between Ms. Williams and Mr. Nix titled "033023 Keenan Nix Face To Face Meeting"**

Ms. Williams and Mr. Nix met for lunch at the Commerce Club on March 30, 2023, for approximately two-and-a-half hours. Their conversation can be broken down into three topics: (1) the true origins of QrewLive and Ms. Williams's claimed 30% ownership interest; (2) promises that Ms. Williams could benefit from the lawsuit if she were to provide Plaintiff's desired testimony; and (3) how Ms. Williams's decision not to testify in compliance with Plaintiff's narrative would impact her daughter with Plaintiff.

**D.    *The true origins of QrewLive and Ms. Williams's claimed 30% ownership interest***

Mr. Nix's conversation with Ms. Williams lays bare that the story Plaintiff tells in the Complaint about the origins of QrewLive is knowingly fabricated. In particular, the Complaint describes a "eureka" moment in April 2013 in which Plaintiff's wife and Delta flight attendant Sheila Alexander complained "about repeatedly being hung up on every time she called Delta's

Crew Scheduling during" periods of irregular operations. Compl. ¶ 16. According to the Complaint, Plaintiff then "thought 'what if' we could just text Crew Scheduling instead of waiting for hours for them to answer a telephone call." *Id.* Allegedly, in that moment, QrewLive was born. *Id.*

Ms. Williams, on the other hand, explains that she and Plaintiff came up with the idea of QrewLive, and that Ms. Alexander had nothing to do with it. *See* Ex. C (Tr. of 033023 Keenan Nix Face to Face Meeting) at 18:20-21:4 (explaining that on their first date, Plaintiff told Ms. Williams about a flight incident where he could not contact anyone by phone, and she asked him "why don't we have digital communication so that they could actually understand who's in trouble?"). Ms. Williams explains to Mr. Nix that, at that time, she was working on "a GPS location-based device that also had an analytical dashboard that allowed [truck] fleets to communicate with each other." *Id.* at 19:7-10. So, the solution was obvious to her, and she helped Plaintiff create what they called "QrewLog, which was a derivative" of the application she had been working on, Track Log. *Id.* at 29:24-25. That idea turned into MobCrew, which Ms. Williams renamed to QrewLive. *Id.* 30:13-24 (explaining that Plaintiff had a prototype for [Mob]Crew that was horrible); *id.* 32:21-22 ("I hated the name, so I changed the name.").

After Ms. Williams explained that she found the Complaint's "eureka" moment "greatly offensive because conversations were starting back in 2010," *id.* at 77:4-7, Mr. Nix explains to her that the story of the "eureka" moment was created to tell a better story of a pilot husband and flight attendant wife creating an idea for the airline for which they worked. *Id.* at 76:6-16 ("[S]he's a flight attendant, and that story was just merely meant to illustrate a point. And I may have made more of it . . . . Right. As a story, as a moment, because we like to tell stories."). Mr. Nix embraces Ms. Williams's creative contribution to the QrewLive idea and does not dispute that she played a

role in its creation. *Id.* 57:21-23 ("So I have maintained that Craig has always maintained that you had a great creative role in this.").

In addition to disputing the true origins of QrewLive, Ms. Williams repeatedly reminds Mr. Nix that she claims a 30% ownership interest in QrewLive and that her interest is reflected in emails with Plaintiff. *Id.* 101:4-14 ("Matter of fact, and we talk about - - and this was years ago. I said, listen, I'm going to take 30 percent of this . . . . I still have intellectual property here, and we could talk about that too, but in the end of the day, the dispute between Craig and I is very real."); *id.* at 136:9-11 ("I told Craig he owes me 30 percent of this. That's in those emails and you saw it."); *id.* at 137:13-21 (explaining she only has a 30% ownership and not a 50% ownership because of Plaintiff's knowledge about Delta's needs as an airline). In fact, those emails, which Mr. Nix admits to seeing, *id.* at 136:9-12 (WILLIAMS: "I told Craig he owes me 30 percent of this. That's in those emails and you saw it." NIX: "Yes, I've seen those."), are among documents Plaintiff purportedly told Ms. Williams to "lose" as indicated by the file name of the audio recording of Ms. Williams's conversation with Plaintiff and her conversation with Mr. Nix, *see id.* at 128:20-129:3 ("Listen, man, Craig had already asked me to – let me just say how he said it. If you lost documents, I wouldn't be mad at you. Of course I would not lose any documents, Craig, we're not going to do that.").[4]

While recognizing Ms. Williams's contribution to and interest in QrewLive, Mr. Nix—like Plaintiff—implores Ms. Williams to let him "control the narrative that gets us from point A to

---

[4]  The transcript indicates that Ms. Williams rejected this alleged suggestion by Plaintiff to "lose documents." *See* Ex. C (Tr. of 033023 Keenan Nix Face to Face Meeting) at 129:1-3 ("We're not ever going to lose documents. So for you to even call me and say this to me is a problem for me."). Moreover, the audio recording between Ms. Williams and Plaintiff begins in the middle of their conversation, so any statement by Plaintiff about losing documents is not included in the Recordings. Plaintiff denies that he told Ms. Williams that he "wouldn't be mad" if she lost documents. *See* Ex. J (Pl.'s Res. to Delta's RFA No. 3).

point B," *id.* at 90:19-20, because the case cannot be "historic . . . with an alternative narrative

from Sonja Williams," *id.* at 109:7-12. In other words, Plaintiff cannot succeed in his lawsuit

against Delta if Ms. Williams does not conform to the "story that makes sense." As Mr. Nix put it:

> I would like to proceed with the understanding that you've been heard. I know what
> you expect. I'm not saying it's unreasonable or inaccurate. I'm saying it's not a part
> of our current narrative. It would be very distracting if expressed in exactly those
> terms, and I don't think that's in anyone's best interest.

*Id.* at 95:12-18. Mr. Nix explains the false allegations in the Complaint by arguing that Plaintiff

simply has a better story than Ms. Williams "[b]ecause he is the one who has the stripes and the

bars and the hat and the employment relationship, and he made the introduction, and he was at all

the meetings." *Id.* at 120:22-25. According to Mr. Nix, Ms. Williams and her claimed 30% interest

is "a very big distraction, and it's a distraction that I think imperils the whole thing." *Id.* at 121:4-

6.

### E.    *Mr. Nix's promise of compensation for Ms. Williams's desired testimony.*

Throughout their conversation, Ms. Williams is clear in her position that she owns 30% of

QrewLive and should receive a portion of the proceeds of this lawsuit. *Id.* at 116:17-20 ("So let's

just say you win this case, right? History is made, I then have to file a lawsuit against Craig to

secure my interest and recoup my money."). Mr. Nix then explains to Ms. Williams that there will

be a payout but that it rises and falls with the proper story:

WILLIAMS: But in the end of the day, if there's going to be –

NIX: Well, there is going to be. This is not free.

WILLIAMS: Well, nobody can promise anything.

NIX: No, of course not.

WILLIAMS: The outcome.

NIX: Of course not.

WILLIAMS: Because it could be very different.

NIX: Of course not. It is –

WILLIAMS: So all I'm saying if there's going to be –

NIX: It is contingent as the day is long, and contingent upon telling a story that makes sense.

*Id.* at 116:24-117:15. Though Mr. Nix's language is often coy, his message is clear: "[S]mart people don't cut off their nose to spite their face, and **they don't need a promise in writing in order to understand the lay of the land**." *Id.* 111:1-4.

**F.**      ***Mr. Nix threatens Ms. Williams's relationship with her daughter if she does not testify as directed.***

As part of his campaign to convince Ms. Williams to allow Mr. Nix to "control the narrative that gets us from point A to point B," *id.* at 90:18-22, Mr. Nix repeatedly references the child that Ms. Williams and Plaintiff share, S. Mr. Nix understands that Ms. Williams believes that Plaintiff has used S as a pawn in his disputes with Ms. Williams in the past. For example, during their lunch meeting, Ms. Williams explained to Mr. Nix how Plaintiff brought a custody battle against her to distract her from the issues relating to QrewLive. *See id.* at 55:7-24 (explaining that after Plaintiff got Ms. Williams put in jail and stole her QrewLive documents, he sued for custody as a distraction). With this in mind—and to combat Ms. Williams's potential testimony that she has a 30% ownership interest in QrewLive—Mr. Nix argues to Ms. Williams that her decision on how to provide testimony in response to questions from Delta's counsel will impact S's welfare:

NIX: "So let's start. The captain doesn't care a damn. Delta doesn't care damn about you. Right? And so who sits in the middle, right? Right, and that would leave [S]. Right? And so the question is, where is Sonja going to weigh in[.]" *Id.* at 93:12-18.

NIX: "But [S] is in the middle. Where is Sonja landing, right, is all that really matters at this point. And that's why I said to you, I know that you understand what Delta is about to do. ***You don't necessarily understand what Craig is prepared to do. But I'm in the middle here with [S], and I will mediate that in a way that has integrity and reflects the ongoing***

- 11 -

***conversations I believe needs to be had about what's right and what's fair.*** *Id.* at 94:16-95:1 (emphasis added).

NIX: "No, listen. Listen. This is the only thing that's going to get us to a solution. Her name is [S]. You're ignoring something." *Id.* at 118:11-14.

## II.    DELTA'S DISCOVERY REQUESTS

On July 11, 2023, Delta served Requests for Admission ("RFAs"), Requests for Production of Documents ("RFPs"), and Interrogatories ("ROGs") (collectively, the "Requests") on Plaintiff that, among other things, seek certain communications between Plaintiff and his former counsel about (1) Plaintiff's conversation with Ms. Williams and (2) conversations between Mr. Nix and Ms. Williams. *See* Exs. F-H (Delta's Requests). On September 28 and October 21 (a day after the due date established during the October 6, 2023 status conference), Plaintiff responded to those Requests.

In its interrogatories to Plaintiff, Delta asked Plaintiff to identify and describe with detail every conversation Plaintiff had with his former counsel relating to (1) Ms. Williams's responses to Delta's Nonparty Requests for Production or (2) her role as a witness in the case. Ex. I (Pl.'s Res. & Objs. to Interrog. No. 32). After objecting on attorney-client privilege grounds, "Plaintiff states he did not have conversations with, written or oral, with [sic] his former counsel relating to Sonja Williams' response to Delta's Requests for Production." *Id.* However, Plaintiff did not deny that he had conversations with his former counsel about Ms. Williams's role as a witness in this case more generally. Moreover, Plaintiff admits in response to Delta's RFAs that he and Mr. Nix discussed Plaintiff's March 24, 2023 phone call with Ms. Williams and Mr. Nix's March 30, 2023 2.5-hour lunch meeting with Ms. Williams. *See* Ex. J (Pl.'s Res. & Objs. to to RFA Nos. 4 & 6). Delta accordingly assumes Plaintiff and his former counsel discussed Ms. Williams's role as a witness in the case, but Plaintiff refuses to provide that information on the grounds that such

communications are protected by the attorney-client privilege. *See* Ex. I (Pl.'s Res. & Objs. to Delta's Interrog. No. 32).

In response to Delta's RFPs, Plaintiff objects on the grounds that the information sought is protected by the attorney-client privilege and specifically refuses to produce the email referenced in Exhibit 1 to the Motion to Withdraw as Counsel of Record for Plaintiff filed on June 26, 2023, on those grounds. Ex. K (Pl.'s Res. & Objs. to RFP No. 56). Plaintiff's responses otherwise fail to comply with this Court's Standing Order, which requires that "[a] party who objects to a discovery request but then responds to the request must indicate whether the response is complete. For example, in response to an interrogatory, a party is not permitted to raise objections and then state, 'Subject to these objections and without waiving them, the response is as follows' unless the party expressly indicates whether additional information would have been included in the response but for the objections(s)." Standing Order at 4-5. Plaintiff does not state if his responses are complete or if he is withholding responsive information that he contends is privileged, making it unclear as to whether Plaintiff is withholding additional responsive communications on the basis of his objections.

## ARGUMENT AND CITATION TO AUTHORITY

Plaintiff's and Mr. Nix's conduct strikes at the very heart of the judicial system. The Recordings reveal that Plaintiff and Mr. Nix fabricated the allegations in the Complaint and attempted to improperly influence Ms. Williams's testimony, which risked derailing Plaintiff's false narrative. This Court should not countenance Plaintiff's attempted subversion of its truth-seeking function. As explained below, the Court has the inherent authority to dismiss this case with prejudice, and it should do so.

In the alternative, the Court should order that Plaintiff's conduct has triggered the crime-fraud exception to the attorney-client privilege and order him to fully respond to Delta's discovery requests. Plaintiff's attorney-client privilege objections are not a proper basis for withholding the discovery Delta seeks for two independent reasons. *First,* the requested information relates to Plaintiff's scheme to improperly influence Ms. Williams's testimony in violation of O.C.G.A. § 16-10-93(b)(1). As such, the information sought is subject to the crime-fraud exception to the attorney-client privilege. *Second*, the information relates to perpetration of fraud on the Court as to the true origins and ownership of QrewLive, which also triggers the crime-fraud exception.

## I.      THE COURT SHOULD DISMISS THIS CASE WITH PREJUDICE

### A.      Plaintiff and his counsel illegally interfered with Ms. Williams' testimony.

As set forth above, the Recordings reveal a deliberate effort to coerce Ms. Williams to lie about her involvement in the development of QrewLive in violation of O.C.G.A. § 16-10-93(b)(1)(A). Under Georgia law, "[i]t shall be unlawful for any person knowingly to use intimidation, physical force, or threats; to persuade another person by means of corruption or to attempt to do so; or to engage in misleading conduct toward another person with intent to" influence the testimony of any person or cause any person to withhold testimony or documents. O.C.G.A. § 16-10-93(b)(1)(A)-(B)(i). Under the federal witness tampering statute, which closely resembles Georgia's statute, a person is guilty of "corrupt persuasion" if he is "motivated by an improper purpose." *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998). In *Shotts*, the Eleventh Circuit found that the defendant "acted knowingly and dishonestly with the specific intent to subvert or undermine the integrity or truth-seeking ability of an investigation by a federal law enforcement officer," and that the witness's testimony that defendant told her to just not say anything was sufficient to support a reasonable inference that defendant was attempting with an improper motive to persuade the witness not to talk to law enforcement. *Id.* at 1301.

- 14 -

More recently, a grand jury indicted Harrison Floyd in Fulton County Superior Court for violating O.C.G.A. § 16-10-93(b)(1)(A) because, "on or about the 4th day of January 2021, [he] knowingly and unlawfully engaged in misleading conduct toward Ruby Freeman, a Fulton County, Georgia, election worker, by stating that she needed protection and by purporting to offer her help, with intent to influence her testimony in an official proceeding in Fulton County, Georgia, concerning events at State Farm Arena in the November 3, 2020, presidential election in Georgia." *See Georgia v. Trump*, *et al.*, No. 23-SC-188947, at 89 (Aug. 14, 2023 Fulton Cnty. Sup. Ct.).

Plaintiff and Mr. Nix have "acted knowingly and dishonestly with the specific intent to subvert or undermine the integrity or truth-seeking ability" of the discovery process by imploring Ms. Williams to not testify as to her 30% ownership in QrewLive because doing so would "tank" the case. Ex. A (Tr. of 032423 – Craig A Asking Me To Lose Documents) at 3:11-23; Ex. C (Tr. of 033023 Keenan Nix Face to Face Meeting) at 95:14-19; *id.* at 112:11-24. Plaintiff and Mr. Nix both appear to acknowledge that Ms. Williams played a role in coming up with the QrewLive idea. While they may contend that Ms. Williams's claimed 30% ownership interest is not supported by tangible evidence (despite Plaintiff's purported statement to Ms. Williams that he "would not be mad if she lost" that tangible evidence), their view of "the truth" does not justify their repeated efforts to persuade Ms. Williams to not testify as to her claimed ownership interest. As the Eleventh Circuit explained in *Shotts*, civil discovery is a truth-seeking process that aids in uncovering the facts through both written discovery and oral testimony. Ms. Williams repeatedly claims a 30% interest in QrewLive and references emails that memorialize the same; Plaintiff and Mr. Nix's attempt to influence that testimony is a clear attempt to undermine the truth-seeking ability of discovery.

The Recordings also indicate that Mr. Nix, while acting as an agent of Plaintiff, promised payment to Ms. Williams and threatened the well-being of Ms. Williams's daughter with Plaintiff if Ms. Williams did not hew to Plaintiff's fabricated story about the origins of—and his sole ownership interest in—the QrewLive idea. While Mr. Nix's promises of payment to Ms. Williams are artfully conveyed, he clearly tells Ms. Williams that any payment is "contingent upon telling a story that makes sense." *See* Ex. C (Tr. of 033023 Keenan Nix Face to Face Meeting) at 116:24-117:15. And Mr. Nix repeatedly makes clear that the narrative he and Plaintiff tell in the Complaint—i.e., the "eureka" moment described in the Complaint—is the "story that makes sense." Any testimony by Ms. Williams as to her claimed 30% ownership interest in QrewLive "imperils the whole thing," and no one gets paid. *Id.* at 121:4-6.

Mr. Nix further used Ms. Williams's daughter as a pawn to remind her of the potential consequences if she fails to testify in a manner that comports with Plaintiff's narrative. *See id.* at 93:12-18; *id.* at 94:16-95:1; *id.* at 118:11-14. Mr. Nix repeatedly tells Ms. Williams that she must choose between Delta and Plaintiff, and that she is not thinking about the most important piece of that choice: S. Even more egregiously, Mr. Nix raises the concept of S being "in the middle" after Ms. Williams confided in Mr. Nix regarding Plaintiff's perceived use of S as leverage in a prior dispute between Ms. Williams and Plaintiff. In telling Ms. Williams, "***[y]ou don't necessarily understand what Craig is prepared to do***," Mr. Nix attempts to use Ms. Williams's daughter, and threats about what Plaintiff "is prepared to do" with respect to Ms. Williams's daughter, to convince her to testify in a manner that comports with the false narrative Plaintiff has been asserting throughout the litigation.

### B.    Plaintiff's and his counsel's illegal conduct warrants terminating sanctions.

Witness tampering "is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction." *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 782 (7th Cir.

2016). "[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system." *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015). "If successful, the effort produces an unjust result," and "[e]ven if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly." *Id.* "[C]ourts generally have an interest in both punishing a party's dishonesty and deterring others who might consider similar misconduct." *Id.*

Pursuant to O.C.G.A. § 15-1-3, this Court has inherent authority to police the conduct of litigants and counsel, including the power to issue case-terminating sanctions. Delta has not located any Georgia authorities dismissing a complaint based on witness tampering, but courts around the country regularly employ this sanction when presented with attempts to tamper with witness testimony. For example, in *Torres v. Wells Fargo Bank*, No. CV 17-9305-DMG (RAOx), 2019 WL 8012686 (C.D. Cal. Dec. 17, 2019), the court dismissed a plaintiff's claims with prejudice after the plaintiff threatened "financial and employment harm in retaliation for, and in response to, perceived unfavorable deposition testimony." *Id.* at *5. The court concluded that this conduct was "sufficiently egregious sanctionable conduct that requires the dismissal of [plaintiff's] claim." *Id.*; *see also Ramirez*, 845 F.3d at 782 (affirming district court dismissal of plaintiff's claims with prejudice after plaintiff offered witness money in exchange for favorable testimony); *Secrease*, 800 F.3d at 402 (affirming dismissal with prejudice where the plaintiff submitted falsified evidence and lied to the court); *Young v. Office of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 67 (D.D.C. 2003) (dismissing complaint where the plaintiff attempted to bribe a witness to testify falsely in support of her claims); *Bishop v. White*, No. 16-C-6040, 2023 WL 35157, at *13 (N.D. Ill. Jan. 4, 2023) (dismissing complaint with prejudice where the plaintiff offered to pay witness in exchange

- 17 -

for recanting his testimony); *Hernandez v. Franco Am. Baking Co.*, No. 3:20-CV-00628-LRH-WGC, 2021 WL 6498256, at *6 (D. Nev. Sept. 3, 2021), *report and recommendation adopted*, No. 3:20-CV-00628-LRH-WGC, 2021 WL 6064008 (D. Nev. Dec. 21, 2021), *judgment entered*, No. 3:20-CV-00628-LRH-CSD, 2022 WL 2659022 (D. Nev. June 21, 2022) (dismissing complaint with prejudice where the plaintiff offered money to witnesses in exchange for favorable testimony).

And Georgia courts have imposed case terminating sanctions for far less egregious conduct. *See Dentistry for Children of Georgia v. Foster*, 362 Ga. App. 217, 867 S.E.2d 617, 620 (2022), *cert. denied* (Oct. 4, 2022) (affirming trial court's dismissal of case as sanction for the defendants' failure to respond to four discovery requests where they were aware of the discovery requests to which they failed to respond and did not assert that their failure to respond was accidental); *see also Portman v. Zipperer*, 350 Ga. App. 180, 183 (2019) (affirming trial court's order dismiss the plaintiff's complaint as sanction for the plaintiff's failure to appear for his deposition); *Stolle v. State Farm Mut. Auto. Ins. Co.,* 206 Ga. App. 235, 236–37 (1991) (affirming dismissal of the complaint as a sanction where the plaintiff failed to respond to any discovery requests and he and his attorney failed to appear at a hearing on the defendant's motion to compel and for sanctions).[5]

The Recordings show that Plaintiff and Mr. Nix indisputably threatened Ms. Williams and her daughter and promised her monetary benefits to attempt to get Ms. Williams to change her testimony. Nothing about their conduct was accidental. They intentionally attempted to improperly

---

[5]    These cases were dismissed pursuant to O.C.G.A. § 9-11-37, which requires a showing of willfulness. *See Stolle*, 206 Ga. App. at 236; *see also Portman*, 350 Ga. App. at 183. The Court's inherent authority under O.C.G.A. § 15-1-3 requires no particular standard of proof; however, even under the willfulness standard required by O.C.G.A. § 9-11-37, Plaintiff's Complaint should be dismissed. Plaintiff and Mr. Nix acted intentionally in attempting to coerce Ms. Williams into testifying falsely to support their fabricated narrative.

influence Ms. Williams's testimony in violation of O.C.G.A. § 16-10-93(b)(1)(A). Plaintiff and

Mr. Nix employed this Court's machinery to abuse Delta and its employees by concocting a false

narrative and threatening and cajoling Ms. Williams (and her daughter) to play along. Had Plaintiff

and Mr. Nix succeeded in their efforts, Delta and the individual defendants could have faced

significant liability predicated upon a fabricated set of facts. Only because Ms. Williams recorded

and produced the conversations did this egregious (and illegal) conduct come to light. This Court

should punish Plaintiff and Mr. Nix's deceit and witness tampering by dismissing the case with

prejudice.

## II.   THE CRIME-FRAUD EXCEPTION NULLIFIES PLAINTIFFS' ASSERTION OF ATTORNEY-CLIENT PRIVILEGE AS TO DELTA'S DISCOVERY REQUESTS.

"The crime-fraud exception provides that the attorney-client and work product privileges

do not protect communications which contemplate crimes, fraud, or perjury." *Christenbury v.*

*Locke Lord Bissell & Liddell, LLP*, 285 F.R.D. 675, 686 (N.D. Ga. 2012) (applying Georgia law).

The applicability of the crime-fraud exception "depends upon whether a *prima facie* case has been

made that the communication was made in furtherance of an illegal or fraudulent activity." *Rose*

*v. Commercial Factors of Atlanta, Inc.*, 262 Ga. App. 528, 529–30 (2003). The evidence need not

be conclusive—"[p]*rima facie* evidence is that which, on its face, is good and sufficient to establish

a given fact." *Id.* (quoting *In re Hall Cnty. Grand Jury Proceedings*, 175 Ga. App. 349, 349

(1985)). To make a *prima facie* showing requires only "a showing of evidence that, if believed by

a trier of fact, would establish the elements of some violation that was ongoing or about to be

committed." *United States v. Cleckler,* 265 F. App'x 850, 853 (11th Cir. 2008). "[W]hen *prima*

*facie* 'evidence is supplied [by the discovering party], the seal of secrecy is broken.'" *Rose*, 262

Ga. App. at 530 (quoting *In re Hall Cnty. Grand Jury Proceedings*, 175 Ga. App. at 352).

If the case is not terminated, Delta asks the Court to compel Plaintiff to produce communications relating to Plaintiff's and Mr. Nix's scheme to improperly influence Ms. Williams's testimony and to perpetrate fraud on the Court by misrepresenting the origins of QrewLive and its true ownership based on the application of the crime-fraud exception. Plaintiff admits to having at least one oral conversation with Mr. Nix relating to their conversations with Ms. Williams but has objected to disclosing the details of that conversation based on the attorney-client privilege. Plaintiff should be ordered to supplement his responses to fully disclose the details of that discussion. Plaintiff is also withholding at least one document involving his former counsel's withdrawal, which is referenced in Exhibit 1 to the Plaintiff's former counsel's motion to withdraw, based on the attorney-client privilege. Plaintiff should be compelled to produce this document (and any other documents Plaintiff is withholding), or in the alternative the Court should order an *in camera* review of its contents. [6]

In light of Plaintiff's vague objections and responses (which violate this Court's Standing Order regarding the specificity required for objections), Plaintiff should be ordered to supplement his responses to disclose whether there is any additional information regarding his discussions with Mr. Nix that has not been produced. And to allow Delta a fair opportunity to probe the veracity of Plaintiff's claims about his lack of responsive documents in deposition, the Court should find that

---

[6]    Under Georgia law, "[t]he standard for showing that attorney-client communications should be reviewed *in camera* is not a stringent one," and a "lesser evidentiary showing is needed to trigger *in camera* review than is required to ultimately overcome the privilege." *Tindall v. H & S Homes, LLC*, 757 F. Supp. 2d 1339, 1352 (M.D. Ga. 2011). "*In camera* proceedings are appropriate, for example, when the underlying facts demonstrating the existence of the privilege may be presented only by revealing the very information [to the court that is] sought to be protected by the privilege." *S. Guar. Ins. Co. of Ga. v. Ash*, 192 Ga. App. 24, 28, 383 S.E.2d 579, 584 (1989) (internal quotation marks omitted). In the context of the crime fraud analysis, "to warrant an *in camera* review of attorney-client communications the party opposing privilege need only make a preliminary showing that the communication was made in furtherance of illegal or fraudulent activity." *Tindall*, 757 F. Supp. at 1352 (internal quotation marks omitted).

the crime-fraud exception bars invocation of the attorney-client privilege with respect to these issues.

**A.      Delta is entitled to discover the communications between Plaintiff and his former counsel regarding their illegal witness tampering.**

For the reasons stated above, *supra* at 14-16, the Recordings constitute *prima facie* evidence of witness tampering in violation of O.C.G.A. § 16-10-93(b)(1)(A). Georgia courts have found far less egregious conduct to constitute *prima facie* evidence of criminal conduct or a fraudulent scheme. *See Rose*, 262 Ga. App. at 530 (the crime-fraud exception applied because the deposition testimony wherein the deponent "admit[ted] that the defendants submitted fake invoices and related delivery documents to [the plaintiff] to obtain funds" "constituted prima facie evidence of the existence of a fraudulent scheme"); *see also Sullivan v. State*, 327 Ga. App. 815, 818 (2014) (the defendant's violation of Georgia's witness tampering statute was clear where a third party "made repeated contact with the victim at [defendant's] behest (which included offers of a monetary payout to the victim in exchange for dropping the charges), and the complained-of statements related to continuation of the plan [defendant] willingly undertook with" the third party).

Consequently, the Recordings establish a *prima facie* case of attempted witness tampering, the crime-fraud exception applies, and Delta is entitled to the requested discovery.

**B.      Delta is entitled to discovery regarding Plaintiff's fabricated allegations regarding the origins of QrewLive.**

Not only have Plaintiff and Mr. Nix engaged in witness tampering, but they have also engaged in defrauding the Court by inaccurately pleading how Plaintiff came up with the idea for QrewLive (the alleged "eureka" moment between Plaintiff and his wife, *see* Compl. ¶ 16), *see* Ex. C (Tr. of 033023 Keenan Nix Face to Face Meeting) at 76:6-13. Where a party has engaged in defrauding the court, the crime-fraud exception applies. *See JTR Enterprises, LLC v. Columbian*

*Emeralds*, 697 F. App'x 976, 988 (11th Cir. 2017) ("There can be no serious dispute with the court's finding of a 'massive fraud of the court' such that "the district court had more than sufficient basis to invoke the crime-fraud exception."); *see also In re E.I. DuPont De Nemours & Co.-Benlate Litig.*, 99 F.3d 363, 367 (11th Cir. 1996) ("Every district court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.") (internal quotation marks omitted) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).

For example, in *JTR Enterprises*, JTR Enterprises, LLC ("JTR") brought an admiralty action seeking title to emeralds allegedly discovered in international waters by JTR's president. *JTR*, 697 F. App'x at 978. During discovery, it became clear that the discovery of the ancient stones was fake and that JTR, its president, and others "had deliberately attempted to defraud the court throughout the admiralty litigation." *Id.* at 979. This fraud on the court provided a sufficient basis to reveal the attorney-client communications in connection with a motion for sanctions against the president of JTR. *Id.*

Like in *JTR,* the Recordings reveal a deliberate attempt by Plaintiff and Mr. Nix to defraud the Court. As to the "eureka" moment described in Plaintiff's Complaint, Mr. Nix admits to Ms. Williams that he created the narrative because it is a better story than the truth. *See* Ex. C (Tr. of 033023 Keenan Nix Face to Face Meeting) at 76:6-13 ("[S]he's a flight attendant, and that story was just merely meant to illustrate a point. And I may have made more of it -- . . . As a story, as a moment, because we like to tell stories."). The story that a Delta pilot and his wife came up with an idea for their airline is false as made clear by Mr. Nix's own statements on the Recordings. *Id.*

Such fraudulent misrepresentations by Plaintiff and Mr. Nix are additional reason for application of the crime-fraud exception to the attorney-client privilege.[7]

**<u>CONCLUSION</u>**

For the reasons set forth above, Delta respectfully requests that the Court dismiss the case with prejudice as to all defendants as a sanction, or, in the alternative, order that the crime-fraud exception to the attorney-client privilege has been established with respect to communications between Plaintiff and his former counsel and order Plaintiff to fully respond to Delta's Requests. At a minimum, Delta respectfully requests that the Court conduct an *in camera* review of the email referenced in Exhibit 1 to the withdrawal motion and compel Plaintiff to produce that email.

---

[7]    Plaintiff's assertion of the attorney-client privilege is also improper because he waived that privilege by voluntarily disclosing his former counsel's legal opinions and conclusions to Ms. Williams. *McKesson HBOC, Inc. v. Adler*, 254 Ga. App. 500, 504 (2002) (the attorney client privilege is "readily waived by disclosure to a third party"). During Plaintiff's phone call with Ms. Williams, he explains that it is important that she not testify that she has a 30% ownership in QrewLive because that would "get [the case] tossed out of court." Ex. A (Tr. of 032423 – Craig A Asking Me To Lose Documents) at 3:2-23. In these statements, Plaintiff reveals counsel's legal conclusions regarding the impact of Ms. Williams's claim of an ownership interest in QrewLive. In doing so, Plaintiff has waived the attorney-client privilege as it relates to conversations on the same topic. *American Family Life Assurance Co. of Columbus v. Intervoice, Inc. ("AFLAC")*, 2010 WL 3000238, at *1 (M.D. Ga. 2010) (applying Georgia law) (attorney client privilege waived by voluntarily disclosing the opinions of counsel to third parties "because the heart of the communication, the conclusion, was disclosed"). Plaintiff similarly waived the protection afforded by the attorney work product doctrine by enabling an adversary to gain access to the protected information. *Wood v. Archbold Medical Center, Inc.*, No. 7:07–CV–109, 2009 WL 3063392, *2 (M.D. Ga. Sept. 17, 2009) ("The fundamental issue in this case is whether a party waives the work product privilege by disclosing work product to an adversary. The simple answer to this question is yes."); *see also McKesson*, 254 Ga. App. at 503 ("Most courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the information."). Moreover, Delta gained access to the information as evidenced by the production of the Recordings. *Stern v. O'Quinn*, 253 F.R.D. 663, 678 (S.D. Fla. 2008) ("[I]t is significant that [the plaintiff] did, in fact, learn much of the information disclosed.").

Respectfully submitted, this 27th day of October, 2023.


/s/ David L. Balser
David L. Balser
Georgia Bar No. 035835
Lawrence A. Slovensky
Georgia Bar No. 653005
James M. Brigman
Georgia Bar No. 254905
Charles G. Spalding, Jr.
Georgia Bar No. 411926
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521
Telephone:  404-572-4600
Fax:  404-572-5100
dbalser@kslaw.com
lslovensky@kslaw.com
mbrigman@kslaw.com
cspalding@kslaw.com

Julia C. Barrett
Georgia Bar No. 354322
**KING & SPALDING LLP**
500 W. Second Street, Suite 1800
Austin, Texas 78701
Telephone:  512-457-2053
Fax:  512-457-2100
jbarrett@kslaw.com

*Counsel for Defendants*

STATE COURT OF
DEKALB COUNTY, GA.
10/27/2023 6:45 PM
E-FILED
BY: Kelly Johnson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served via the Court's e-filing service, which will automatically email a copy of the foregoing to all counsel of record.

<u>*/s/ David L. Balser*</u>
David L. Balser
Georgia Bar No. 035835

# EXHIBIT A

032423-CraigA-AskingMeToLose Documents          June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 1

1              IN THE STATE COURT OF DEKALB COUNTY

2                      STATE OF GEORGIA

3

4    CRAIG ALEXANDER,              )

5            Plaintiff,            )

6    v.                           )

7    DELTA AIR LINES, INC.; RAHUL  )    CIVIL ACTION

8    EDWARD BASTIAN; RAHUL SAMANT; )    FILE No. 21-A-

9    MATTHEW MUTA; DARRELL HASKIN; )    03275-2

10   DAVID SMITH; DAVID BURTON;    )

11   CORPORATE DOES 1 TO 5; and    )

12   JOHN DOES TO 10,              )

13           Defendants.           )

14   -------------------------------------------------

15

16                   Transcript of

17       032423-CraigA-AskingMeToLoseDocuments

18

19

20

21

22

23

24

25

Page 2

```
 1       0:00:00
 2       SONJA WILLIAMS:  You know, when we
 3  originally talked about it, and all of a sudden
 4  you saying that's disappearing, that's a problem,
 5  Craig.
 6       CRAIG ALEXANDER:  That's what?
 7       SONJA WILLIAMS:  It's just a problem.
 8       CRAIG ALEXANDER:  What's the problem?
 9       SONJA WILLIAMS:  Where is my 30
10  percent?
11       CRAIG ALEXANDER:  There is no 30
12  percent, Sonja.
13       SONJA WILLIAMS:  I don't know what
14  you're talking about.  I remember 30 percent.
15  There's 30 percent in these emails I have.
16       CRAIG ALEXANDER:  There is no 30
17  percent.  There is -- I don't have any emails
18  that --
19       SONJA WILLIAMS:  We've got emails.
20  I've got emails.  So let's just -- I don't know.
21  I've got emails.
22       CRAIG ALEXANDER:  I will say this --
23       SONJA WILLIAMS:  You can -- you can --
24  you can (indiscernible) if you want --
25       CRAIG ALEXANDER:  Listen, listen --
```

Page 3

```
 1       SONJA WILLIAMS:  What?
 2       CRAIG ALEXANDER:  Listen, if you want
 3  to claim you own 30 percent, doesn't matter
 4  whether or not you're right or wrong, hear me on
 5  this.  It doesn't matter if you're right or
 6  wrong.  If you claim you own 30 percent, you are
 7  going to wind up tanking this case and nobody
 8  gets anything.  Understand that, because what
 9  Delta is trying to do is muddy the damn waters.
10       0:01:03
11       CRAIG ALEXANDER:  We've got these guys
12  hook, line and goddamn sinker and they're trying
13  to muddy the waters.  And if they're able to make
14  the claim that, hey, multiple people own this
15  property, then they're not bringing suit and this
16  suit is null and void.  It will get tossed out of
17  court.  That's the risk you are running when you
18  say things like that.  Keep that in mind.  And
19  that's why I'm encouraging you to talk to these
20  attorneys before you say stuff like that.  Don't
21  listen to me.  Talk to the attorneys.  But I
22  implore you, do not ever say anything like that
23  to anyone.  You will completely tank the case.
24       SONJA WILLIAMS:  Well, give me --
25       CRAIG ALEXANDER:  Because that's how
```

Page 4

```
 1  they're going to do it.
 2       SONJA WILLIAMS:  Give your people my
 3  information.
 4       CRAIG ALEXANDER:  I don't have to.
 5  Yeah, I will.  They're going to -- they're going
 6  to go with those documents.  I'll let them know
 7  and I'll have them get in contact with you.  Have
 8  a frank discussion with them.
 9       0:02:02
10       SONJA WILLIAMS:  I will.
11       CRAIG ALEXANDER:  Whatever they say, go
12  with it.
13       SONJA WILLIAMS:  I will.
14       CRAIG ALEXANDER:  Yeah.
15       SONJA WILLIAMS:  I mean, I'll have a
16  discussion with them.  Let me clarify.  I'll have
17  a discussion with them.
18       CRAIG ALEXANDER:  Yeah.  These are some
19  very smart people you're working with and they
20  know exactly -- they know the law up, down the
21  sideways and if I have learned anything going
22  through this process, what I thought I knew about
23  the law got completely tossed out the goddamn
24  window because these guys know how to manipulate
25  a freaking story.  Not just my guys, the guys on
```

Page 5

```
 1  the Delta side of the table.
 2       SONJA WILLIAMS:  I'm sure, but --
 3       CRAIG ALEXANDER:  They are really
 4  trying to manipulate --
 5       SONJA WILLIAMS:  I'm sure.  But I
 6  totally --
 7       CRAIG ALEXANDER:  They're trying to
 8  manipulate the --
 9       SONJA WILLIAMS:  I totally understand
10  intellectual property laws.  Trust me.  All of my
11  lawsuit has been about that and I've won every
12  last one of them.  So I hear what you're saying
13  and I'm certainly interested in speaking with
14  your folks and then we'll go from there.
15       CRAIG ALEXANDER:  Okay.
16       0:03:01
17       SONJA WILLIAMS:  But I totally
18  understand my rights as it comes -- as it relates
19  to intellectual property.
20       CRAIG ALEXANDER:  Yeah.  So --
21       SONJA WILLIAMS:  I haven't been
22  developing technology for no reason over the last
23  25 years.
24       CRAIG ALEXANDER:  Yeah, and these guys
25  have been trying -- they had a bombshell unloaded
```

2 (Pages 2 - 5)

0324 Current - As Part V 7 for 323 Documents                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 6

1 on them over the last few weeks and they are
2 scrambling.
3        SONJA WILLIAMS:  What does that -- what
4 does that look like?
5        CRAIG ALEXANDER:  Go back to the filing
6 in the RPD.  They're going to put it in their
7 complaint and everything.  They're going to give
8 you all the paperwork, everything what it's
9 about.
10        SONJA WILLIAMS:  But what was the --
11 but in summary, what was the bombshell about?
12        CRAIG ALEXANDER:  Well, that's what I'm
13 trying to explain to you.  Part of their defense,
14 one of their main defenses was QrewLive was
15 nothing more than an idea.  It wasn't anything
16 substantive.
17        SONJA WILLIAMS:  That's bull --
18        CRAIG ALEXANDER:  It was nothing more
19 than an idea.
20        SONJA WILLIAMS:  Now you and I know
21 that's bullshit.
22        CRAIG ALEXANDER:  And it didn't amount
23 to anything more than a Georgia -- it did not
24 amount to a Georgia trade secret.
25        SONJA WILLIAMS:  That is bullshit.

Page 7

1        CRAIG ALEXANDER:  That's according to
2 them.
3        SONJA WILLIAMS:  The whole thing was --
4        CRAIG ALEXANDER:  -- bullshit.
5        SONJA WILLIAMS:  Okay.
6        0:04:02
7        CRAIG ALEXANDER:  That's how they were
8 trying to get the stuff tossed out.  Now here's
9 what happened.  They went to their people, the
10 people that were involved in the meetings with me
11 and asked them what happened.  And I can tell
12 you, these guys were hemming and hawing and
13 saying, oh, he didn't have much, we don't really
14 remember him, he did that as an idea, because
15 that's what they told the attorney.  Okay.  What
16 they did not realize and what they have recently
17 found out, that it was a lot more than just an
18 idea.  It was complete designs and everything
19 that I had SOLTECH draw up.  But it also turned
20 out I had functional prototypes that I had other
21 guys go out and develop for me.  I had functional
22 prototypes in the meeting.  Okay.  This is huge.
23 I mean, I had a whole bunch of stuff when I went
24 to these meetings and these (indiscernible) --
25        SONJA WILLIAMS:  I remember the

Page 8

1 prototype I did as well.  So I understand.  I
2 have prototypes as well.
3        CRAIG ALEXANDER:  That's not a --
4 that's not a prototype.  That was a --
5        SONJA WILLIAMS:  Well, it was all my
6 ideas on the thing.  And I did prototype, but
7 it's just me and you.  You start fucking around
8 and, you know, I wasn't going to give it to you.
9 So then you went out and did whatever you were
10 going to do.
11        0:05:05
12        CRAIG ALEXANDER:  I didn't have a
13 prototype.
14        SONJA WILLIAMS:  You may not have the
15 exact prototype you saw, but you had a prototype.
16 But go ahead.
17        CRAIG ALEXANDER:  I didn't know I had a
18 prototype.
19        SONJA WILLIAMS:  Okay.  Anyway --
20        CRAIG ALEXANDER:  In any case, what
21 they saw and what they alluded to in their own
22 email, they said they saw the app on the iPad.
23 They had that in their email.  They thought I had
24 forgotten about it, and they --
25        SONJA WILLIAMS:  And remember they were

Page 9

1 going to --
2        CRAIG ALEXANDER:  -- saw it on the iPad.
3        SONJA WILLIAMS:  And remember they were
4 going to do a gap analysis on the whole platform?
5        CRAIG ALEXANDER:  Yeah.
6        SONJA WILLIAMS:  Remember that?
7        CRAIG ALEXANDER:  Yeah.  But they're
8 doing a gap analysis.
9        SONJA WILLIAMS:  So what do they mean
10 they didn't see it?  Huh?
11        CRAIG ALEXANDER:  Well, turned out the
12 attorney thought this was just some ephemeral
13 idea --
14        SONJA WILLIAMS:  Okay.  I got him on
15 mute.  So Delta was subpoenaing -- is trying to
16 subpoena me because of this app.
17        CRAIG ALEXANDER:  -- like I just made
18 an idea for them, for a product.  And now they're
19 coming to grips with the fact that I brought a
20 real product model into the room and I had
21 prototypes and everything else.
22        SONJA WILLIAMS:  He's calling me
23 telling I don't want you (indiscernible) get
24 everything.
25        CRAIG ALEXANDER:  So now they're going

3 (Pages 6 - 9)

Page 10

1 back to all the people that were involved in the
2 development of the prototypes.
3       0:06:01
4       SONJA WILLIAMS: Well, that's what he
5 said. But that's not true.
6       CRAIG ALEXANDER: There were multiple
7 different versions of QrewLive. You worked on
8 one of them.
9       SONJA WILLIAMS: Well, I worked on the
10 original.
11       CRAIG ALEXANDER: (indiscernible)
12       SONJA WILLIAMS: I worked -- well,
13 obviously it was the original one, but we'll
14 leave that alone. So here's what I want to do.
15       CRAIG ALEXANDER: (indiscernible)
16       SONJA WILLIAMS: Here's what we're
17 going to do. Have your people call me and then
18 we'll go from there. I hear what you're saying
19 in terms of if I say anything about my 30
20 percent, it will tank your case. Let me talk to
21 your people, let me hear what they've got to say
22 and we'll go from there. In the meantime, we
23 continue to successfully coparent and keep things
24 moving; is that fair?
25       CRAIG ALEXANDER: I'll let them know.

Page 11

1       SONJA WILLIAMS: All righty. Because
2 clearly, is this why you called? Fine. So I'm
3 cool. So let your people know.
4       CRAIG ALEXANDER: (indiscernible) the
5 reason.
6       SONJA WILLIAMS: Okay. All right.
7 Well, it's cool. Well, let me jump. I need to
8 take (indiscernible) lifetime, and I have her
9 there on Friday.
10       CRAIG ALEXANDER: Okay.
11       SONJA WILLIAMS: Okay.
12       0:07:00
13       CRAIG ALEXANDER: All right.
14       SONJA WILLIAMS: All right. Bye.
15       CRAIG ALEXANDER: Bye.
16       SONJA WILLIAMS: No, you didn't,
17 because I got all paperwork that said I got 30
18 percent and what he said was and I recorded this
19 shit (indiscernible) he was like, listen, Delta
20 is trying to figure out a way to say that he
21 doesn't own the IP. So if I come in and I say I
22 own it, then they're charged in court. He
23 doesn't even own it. She does. And then his
24 whole case is tanked --
25       MALE 1: You need something from him

Page 12

1 still, so --
2       SONJA WILLIAMS: So no, so what I'm
3 going to do is I have a law firm that was really
4 literally waiting on me to be served by Delta for
5 me to intervene into the case. And I'm like, so
6 as long as we've got a piece of paper saying that
7 I'm going to get my 30 percent, it's all in the
8 pocket and I ain't got nothing to say.
9       MALE 1: Indeed.
10       0:08:00
11       SONJA WILLIAMS: Right? This is to sue
12 them for a billion dollars and they just told on
13 themselves. I can't believe some folks' comment.
14 He wants me -- so he's calling me saying, hey,
15 I'm going to pay for your attorney for you. No
16 the fuck you ain't. And that attorney that he
17 hires for me will be working closely with their
18 attorney. No, we're not doing that. I got my
19 own attorney.
20       MALE 1: Right.
21       SONJA WILLIAMS: Then he go say, well,
22 I thought you said you ain't had no money, so you
23 ain't got to pay. Bitch, I ain't stupid. Do you
24 know any fucking lawyer in town who is not in
25 conflict with Delta will take this case? I don't

Page 13

1 need no money for that.
2       MALE 1: Okay.
3       SONJA WILLIAMS: So anyway, I just,
4 nigga, no. And I got witnesses.
5       0:09:00
6       SONJA WILLIAMS: Subpoena.
7       0:10:00
8       0:11:00
9       0:12:00
10       SONJA WILLIAMS: Hey. You're upset?
11 Can you hear me? First of all, sorry about the
12 whole thing, child. I've been knee deep in doing
13 (indiscernible) totally slipped my damn mind. I
14 would love -- definitely be there. So okay, see
15 the text. So okay, so this nigga calls me this
16 afternoon and says, hey, you're going to be
17 getting a subpoena from Delta. If you just
18 happen to get everything we talked about on the
19 app, that probably be in my best interest. Huh?
20 Nigga, no, he said, okay, then next I'm going to
21 (indiscernible) then he go say I'm going to
22 assign you attorney an attorney, right? And that
23 attorney is going to work with our attorneys, and
24 that way you ain't got to pay for it. I said I'm
25 good. I said, but I want my 30 percent.

4 (Pages 10 - 13)

Page 14

```
1     0:13:01
2         SONJA WILLIAMS: Oh, okay. Okay. So I
3  don't -- so I shouldn't go and kind of go with
4  the whole -- my own set of attorneys, the people
5  who have been waiting on the subpoena. Well, you
6  know, obviously he's saying -- and I got it on
7  recording too. Huh? So he's basically saying if
8  I go in saying that I own the IP, then their
9  response to the judge to try to get the case
10 dismissed or take it is he doesn't even own the
11 IP that he's talking about.
12     0:14:08
13        SONJA WILLIAMS: Okay, great. That's
14 what I need to understand. Right. So I think
15 that he was just trying to tell me that because
16 he doesn't want me to say that, which I'm clearly
17 going to say that and I'm going to produce my
18 prototype for it, which is different from his,
19 because when we fell out, I refused to give it to
20 him. But then he went to another company to get
21 a little makeshift shit done, right? And, you
22 know, I'm like, look, shit, that shit started
23 with me. This is my first one. You did your
24 prototype after you and I fell out. So it
25 doesn't negate the fact that these are still my
```

Page 15

```
1  motherfucking ideas. That's what I'm thinking.
2     0:15:01
3         SONJA WILLIAMS: Okay. So there's no
4  fear of saying -- because clearly it's such a big
5  case and they survived, you know, the dismissal,
6  right? And they survived it really in their
7  favor in terms of what the judge said. Right.
8  So they -- and then apparently, through discovery
9  and all this, it was a bombshell email that
10 popped up that basically one of their higher up
11 people is admitting inside of the email that they
12 saw his prototype during a time of which they had
13 no prototype. They had no idea, that they saw
14 his prototype on an iPad. So that's supposed to
15 be a bombshell revelation because they were
16 saying that they never saw it. And then here
17 comes this email from Delta and one of their
18 people saying, well, yeah, we did see it. It was
19 on the iPad.
20     0:16:00
21        SONJA WILLIAMS: You know what I mean?
22 So, you know -- yeah. It sounds like they got a
23 real problem. But then he's saying, okay, and
24 with this bombshell information, I go in saying
25 that, hey, you know, I own it. I was like
```

Page 16

```
1  (indiscernible) 30 percent. You still own the
2  other 70 percent. I agree with that. I can't
3  even say he was -- honestly, it wasn't even that
4  way. He said, I had an idea and I turned it into
5  what it is. You understand what I'm saying? So
6  it wasn't even that. I totally expanded it.
7  Okay, I got you.
8     0:17:00
9         SONJA WILLIAMS: Right. Actually, no,
10 that's true. That's not true because what
11 happened was how he came up with it was this. He
12 came home one day and his fingers was messed up
13 and he was -- because he was trying to get the
14 hatch open in the middle of the floor.
15     0:18:03
16        SONJA WILLIAMS Like, imagine a pilot,
17 you're in fucking mid-flight circling the
18 airport. You're in mid-flight, the pilot comes
19 down and tries to open up the hatch in order to
20 push down the wheel, right, to land. But they
21 couldn't get nobody on the phone, so they could
22 never land and tell these people they got a
23 problem. I'm like, well, why are y'all -- why
24 you can't get nobody on the phone? It's like,
25 well, they're on the analog system. Well, why
```

Page 17

```
1  y'all not going to text messages system? I mean,
2  shit works just fine, right? So if there's a
3  problem in the air, we could bounce it off
4  satellite. It could kind of be like Morse Code
5  where nobody else could know, but we don't know
6  what planes have. I said, y'all don't have
7  anything like that in place? He said no. He's
8  like, oh, shit. And we got up and we started
9  working on it. Right. All that other bullshit
10 he's talking about, I'm like, what are you
11 talking about?
12     0:19:00
13        SONJA WILLIAMS: Oh. Oh. So what you
14 mean? Settle it or tank it? Oh, okay. Oh,
15 damn. Like settle in Delta's favor or in his
16 favor?
17        AUTOMATED VOICE: I can't connect to
18 the Wi-Fi network.
19        SONJA WILLIAMS: Oh, that's what I
20 thought.
21        AUTOMATED VOICE: You can find setup
22 instructions in the help section of your Alexa
23 app.
24        SONJA WILLIAMS: Right. Oh, that's so
25 fucked up. Okay. Glad I talked to you. Well, I
```

5 (Pages 14 - 17)

0324-ID_Craig_-_Ashanti_phone_call_box_Documents              June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 18

1  tell you (indiscernible) these motherfuckers we
2  going to have another conversation?  So tonight I
3  got to dig up, you know, all the work or recreate
4  it.
5          0:20:00
6          SONJA WILLIAMS:  Right, and pull my
7  story together.  Okay.  And I agree that 70
8  percent of it is his.  So it doesn't matter what
9  the idea was.  I did agree to if I do this,
10  you're going to pay -- I'm going to get 30
11  percent, but you're going to have to pay for the
12  prototype to be developed.  That's going to be 20
13  grand, right?  Because he's going to try to say,
14  well, I paid the 20 grand part.  No, the fuck you
15  didn't.  Unless I signed off on my IP, you don't
16  even get to get to keep the prototype because I
17  never gave you a written agreement saying that I
18  transferred my intellectual property over to you.
19          0:21:03
20          SONJA WILLIAMS:  Okay.  So get your
21  story straight.  Oh, okay.  Okay.  All right.
22  Well, look, let's -- okay.  That's -- okay.  All
23  right.  So I hear what you're saying.  Damn, I
24  would have tanked their shit completely.
25  Tailspin to try to figure it out.  All right.  So

Page 19

1  before I meet up, what you and I do is I want to
2  just kind of probably sit down with you and just
3  kind of talk through it before I meet with these
4  motherfuckers, right, to make sure we got the
5  basis covered, right, because ultimately, we just
6  want a piece of paper notarized saying that 30
7  percent of this is whatever that is, right?  And
8  then maybe they also -- I mean, I don't know if I
9  need to be added to the case, you know what I'm
10  saying, as a plaintiff.
11          0:22:05
12          SONJA WILLIAMS:  I don't feel like it's
13  really necessary.  But he will have to get a
14  piece of paper from me giving him rights to the
15  30 percent that I do got.  Do you understand what
16  I'm saying?  No, you got -- well, you got to
17  actually -- well, for any -- okay.  Okay.
18          0:23:00
19          SONJA WILLIAMS:  Right.  Okay.  Right,
20  right, right.  We're good, right.  Right.
21          0:24:00
22          SONJA WILLIAMS:  Well, he got -- he got
23  -- God, this is so fucking embarrassing.  It's so
24  embarrassing because they got all the emails that
25  I was, right, you know, cussing his ass out.

Page 20

1  Like, fuck you, bitch.  I was like, God.  Right.
2  I was like, nigga, they got all the emails.  It
3  does.  It does.  I was like -- and there's an
4  email in there specifically that says, do not
5  fuck with my IP address, my intellectual
6  property.  It actually says all of that.  Right.
7  Okay.  All right.  Well, we'll -- you know, all
8  right.  So I'm going to keep working on this
9  shit.
10          0:25:02
11          SONJA WILLIAMS:  I'm trying to get this
12  damn prototype done.  So I'm going to keep
13  working on it.  But he just called me and said
14  they had just got my information today, so I
15  should be expecting, you know, to be served at
16  some point here in the near future.  I just
17  thought this nigga was interesting.  He's going
18  to call me talking about, hey, use my lawyers.
19  And now, based on what you're saying, it could be
20  more conducive for me to use it because I'm not
21  really trying to pay nobody.  I ain't trying to
22  get the motherfucker to be like let me get 50
23  percent of your 30 percent.  Right.  There's a --
24  right.  He said there's going to be a different
25  lawyer that can work in conjunction with their

Page 21

1  lawyers, right, but it would be my own lawyer.
2  Okay.  I just don't want his lawyers, period,
3  because I don't -- I ain't trying to -- I need a
4  lawyer that's going to be like, let me protect my
5  client's best interest.
6          0:26:00
7          SONJA WILLIAMS:  You know, and although
8  them motherfuckers is bound by -- have a
9  fiduciary duty to me, I don't know.  I need
10  somebody I know got a fiduciary duty, not a damn
11  piece of paper or a law degree because it's a
12  billion dollars.  Niggas start twisting the
13  truth.  Okay.  Okay.  Okay.  Call me back.  Bye.
14          0:26:40
15
16
17
18
19
20
21
22
23
24
25

6 (Pages 18 - 21)

0324B3 - Craig - Ashley - VMS.-1 of Case Documents          June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 22

```
 1        C E R T I F I C A T I O N
 2
 3   I, Sonya Ledanski Hyde, certify that the
 4   foregoing transcript is a true and accurate
 5   record of the proceedings.
 6
 7
 8   Sonya S. Ledanski Hyde
 9   _____
10
11   Veritext Legal Solutions
12   330 Old Country Road
13   Suite 300
14   Mineola, NY 11501
15
16   Date:    June 27, 2023
17
18
19
20
21
22
23
24
25
```

7 (Page 22)

0324232, CraigVsDelta - Assigned Loose Documents                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[032423 - circling]**                                             Page 1

| **0** |
| --- |

**032423**  1:17
**03275-2**  1:9

| **1** |
| --- |

**1**  1:11 11:25
  12:9,20 13:2
**10**  1:12
**11501**  22:14
**12151**  22:8

| **2** |
| --- |

**20**  18:12,14
**2023**  22:16
**21**  1:8
**25**  5:23
**27**  22:16

| **3** |
| --- |

**30**  2:9,11,14,15
  2:16 3:3,6
  10:19 11:17
  12:7 13:25
  16:1 18:10
  19:6,15 20:23
**300**  22:13
**330**  22:12

| **5** |
| --- |

**5**  1:11
**50**  20:22

| **7** |
| --- |

**70**  16:2 18:7

| **a** |
| --- |

**able**  3:13

**accurate**  22:4
**action**  1:7
**actually**  16:9
  19:17 20:6
**added**  19:9
**address**  20:5
**admitting**
  15:11
**afternoon**
  13:16
**agree**  16:2 18:7
  18:9
**agreement**
  18:17
**ahead**  8:16
**ain't**  12:8,16,22
  12:23,23 13:24
  20:21 21:3
**air**  1:7 17:3
**airport**  16:18
**alexa**  17:22
**alexander**  1:4
  2:6,8,11,16,22
  2:25 3:2,11,25
  4:4,11,14,18
  5:3,7,15,20,24
  6:5,12,18,22
  7:1,4,7 8:3,12
  8:17,20 9:2,5,7
  9:11,17,25
  10:6,11,15,25
  11:4,10,13,15
**alluded**  8:21
**amount**  6:22,24

**analog**  16:25
**analysis**  9:4,8
**anyway**  8:19
  13:3
**app**  8:22 9:16
  13:19 17:23
**apparently**
  15:8
**asked**  7:11
**askingmetolo...**
  1:17
**ass**  19:25
**assign**  13:22
**attorney**  7:15
  9:12 12:15,16
  12:18,19 13:22
  13:22,23
**attorneys**  3:20
  3:21 13:23
  14:4
**automated**
  17:17,21

| **b** |
| --- |

**back**  6:5 10:1
  21:13
**based**  20:19
**basically**  14:7
  15:10
**basis**  19:5
**bastian**  1:8
**believe**  12:13
**best**  13:19 21:5
**big**  15:4
**billion**  12:12
  21:12

**bitch**  12:23
  20:1
**bombshell**  5:25
  6:11 15:9,15
  15:24
**bounce**  17:3
**bound**  21:8
**bringing**  3:15
**brought**  9:19
**bull**  6:17
**bullshit**  6:21,25
  7:4 17:9
**bunch**  7:23
**burton**  1:10
**bye**  11:14,15
  21:13

| **c** |
| --- |

**c**  22:1,1
**call**  10:17
  20:18 21:13
**called**  11:2
  20:13
**calling**  9:22
  12:14
**calls**  13:15
**case**  3:7,23
  8:20 10:20
  11:24 12:5,25
  14:9 15:5 19:9
**certainly**  5:13
**certify**  22:3
**charged**  11:22
**child**  13:12
**circling**  16:17

0324 Document - As Versa Video Game Documents                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[civil - fingers]**                                                        Page 2

| | | | |
|---|---|---|---|
| **civil** 1:7 | **court** 1:1 3:17 | 15:17 | 20:4 |
| **claim** 3:3,6,14 | 11:22 | **delta's** 17:15 | **emails** 2:15,17 |
| **clarify** 4:16 | **covered** 19:5 | **designs** 7:18 | 2:19,20,21 |
| **clearly** 11:2 | **craig** 1:4 2:5,6 | **develop** 7:21 | 19:24 20:2 |
| 14:16 15:4 | 2:8,11,16,22,25 | **developed** | **embarrassing** |
| **client's** 21:5 | 3:2,11,25 4:4 | 18:12 | 19:23,24 |
| **closely** 12:17 | 4:11,14,18 5:3 | **developing** | **encouraging** |
| **code** 17:4 | 5:7,15,20,24 | 5:22 | 3:19 |
| **come** 11:21 | 6:5,12,18,22 | **development** | **ephemeral** 9:12 |
| **comes** 5:18 | 7:1,4,7 8:3,12 | 10:2 | **exact** 8:15 |
| 15:17 16:18 | 8:17,20 9:2,5,7 | **different** 10:7 | **exactly** 4:20 |
| **coming** 9:19 | 9:11,17,25 | 14:18 20:24 | **expanded** 16:6 |
| **comment** 12:13 | 10:6,11,15,25 | **dig** 18:3 | **expecting** |
| **company** 14:20 | 11:4,10,13,15 | **disappearing** | 20:15 |
| **complaint** 6:7 | **craiga** 1:17 | 2:4 | **explain** 6:13 |
| **complete** 7:18 | **cussing** 19:25 | **discovery** 15:8 | |
| **completely** | **d** | **discussion** 4:8 | **f** |
| 3:23 4:23 | | 4:16,17 | **f** 22:1 |
| 18:24 | **damn** 3:9 13:13 | **dismissal** 15:5 | **fact** 9:19 14:25 |
| **conducive** | 17:15 18:23 | **dismissed** | **fair** 10:24 |
| 20:20 | 20:12 21:10 | 14:10 | **favor** 15:7 |
| **conflict** 12:25 | **darrell** 1:9 | **documents** 4:6 | 17:15,16 |
| **conjunction** | **date** 22:16 | **doing** 9:8 12:18 | **fear** 15:4 |
| 20:25 | **david** 1:10,10 | 13:12 | **feel** 19:12 |
| **connect** 17:17 | **day** 16:12 | **dollars** 12:12 | **fell** 14:19,24 |
| **contact** 4:7 | **deep** 13:12 | 21:12 | **fi** 17:18 |
| **continue** 10:23 | **defendants** | **don't** 2:17,20 | **fiduciary** 21:9 |
| **conversation** | 1:13 | 9:23 14:3 21:3 | 21:10 |
| 18:2 | **defense** 6:13 | **draw** 7:19 | **figure** 11:20 |
| **cool** 11:3,7 | **defenses** 6:14 | **duty** 21:9,10 | 18:25 |
| **coparent** 10:23 | **definitely** 13:14 | **e** | **file** 1:8 |
| **corporate** 1:11 | **degree** 21:11 | | **filing** 6:5 |
| **country** 22:12 | **dekalb** 1:1 | **e** 22:1 | **find** 17:21 |
| **county** 1:1 | **delta** 1:7 3:9 | **edward** 1:8 | **fine** 11:2 17:2 |
| | 5:1 9:15 11:19 | **email** 8:22,23 | **fingers** 16:12 |
| | 12:4,25 13:17 | 15:9,11,17 | |

0324 Current - Asbury Mary Testimony Documents                June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[firm - know]**                                                                    Page 3

| | | | |
|---|---|---|---|
| **firm** 12:3 | 15:24 | **hemming** 7:12 | 20:5 |
| **first** 13:11 | **god** 19:23 20:1 | **hey** 3:14 12:14 | **interest** 13:19 |
| 14:23 | **goddamn** 3:12 | 13:10,16 15:25 | 21:5 |
| **flight** 16:17,18 | 4:23 | 20:18 | **interested** 5:13 |
| **floor** 16:14 | **going** 3:7 4:1,5 | **higher** 15:10 | **interesting** |
| **folks** 5:14 | 4:5,21 6:6,7 | **hires** 12:17 | 20:17 |
| 12:13 | 8:8,10 9:1,4,25 | **home** 16:12 | **intervene** 12:5 |
| **foregoing** 22:4 | 10:17 12:3,7 | **honestly** 16:3 | **involved** 7:10 |
| **forgotten** 8:24 | 12:15 13:16,20 | **hook** 3:12 | 10:1 |
| **found** 7:17 | 13:21,23 14:17 | **huge** 7:22 | **ip** 11:21 14:8 |
| **frank** 4:8 | 14:17 17:1 | **huh** 9:10 13:19 | 14:11 18:15 |
| **freaking** 4:25 | 18:2,10,10,11 | 14:7 | 20:5 |
| **friday** 11:9 | 18:12,13 20:8 | **hyde** 22:3 | **ipad** 8:22 9:2 |
| **fuck** 12:16 | 20:12,17,24 | | 15:14,19 |
| 18:14 20:1,5 | 21:4 | **i** | |
| **fucked** 17:25 | **good** 13:25 | **idea** 6:15,19 | **j** |
| **fucking** 8:7 | 19:20 | 7:14,18 9:13 | **john** 1:12 |
| 12:24 16:17 | **grand** 18:13,14 | 9:18 15:13 | **judge** 14:9 15:7 |
| 19:23 | **great** 14:13 | 16:4 18:9 | **jump** 11:7 |
| **functional** 7:20 | **grips** 9:19 | **ideas** 8:6 15:1 | **june** 22:16 |
| 7:21 | **guys** 3:11 4:24 | **imagine** 16:16 | |
| **future** 20:16 | 4:25,25 5:24 | **implore** 3:22 | **k** |
| **g** | 7:12,21 | **indiscernible** | **keep** 3:18 10:23 |
| **gap** 9:4,8 | **h** | 2:24 7:24 9:23 | 18:16 20:8,12 |
| **georgia** 1:2 | **happen** 13:18 | 10:11,15 11:4 | **kind** 14:3 17:4 |
| 6:23,24 | **happened** 7:9 | 11:8,19 13:13 | 19:2,3 |
| **getting** 13:17 | 7:11 16:11 | 13:21 16:1 | **knee** 13:12 |
| **give** 3:24 4:2 | **haskin** 1:9 | 18:1 | **knew** 4:22 |
| 6:7 8:8 14:19 | **hatch** 16:14,19 | **information** | **know** 2:2,13,20 |
| **giving** 19:14 | **hawing** 7:12 | 4:3 15:24 | 4:6,20,20,24 |
| **glad** 17:25 | **hear** 3:4 5:12 | 20:14 | 6:20 8:8,17 |
| **go** 4:6,11 5:14 | 10:18,21 13:11 | **inside** 15:11 | 10:25 11:3 |
| 6:5 7:21 8:16 | 18:23 | **instructions** | 12:24 14:6,22 |
| 10:18,22 12:21 | **help** 17:22 | 17:22 | 15:5,21,22,25 |
| 13:21 14:3,3,8 | | **intellectual** | 17:5,5 18:3 |
| | | 5:10,19 18:18 | 19:8,9,25 20:7 |

Case 19-56304-sms   Doc 243   Filed 01/06/25   Entered 01/07/25 09:21:46   Desc Main
Document - Ashley Meeks Documents

0324-0100103 Transcript - Vol I of I

June 23, 2023

Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[know - percent]

Page 4

20:15 21:7,9
21:10

**l**

**land** 16:20,22
**law** 4:20,23
  12:3 21:11
**laws** 5:10
**lawsuit** 5:11
**lawyer** 12:24
  20:25 21:1,4
**lawyers** 20:18
  21:1,2
**learned** 4:21
**leave** 10:14
**ledanski** 22:3
**legal** 22:11
**lifetime** 11:8
**line** 3:12
**lines** 1:7
**listen** 2:25,25
  3:2,21 11:19
**literally** 12:4
**little** 14:21
**long** 12:6
**look** 6:4 14:22
  18:22
**lot** 7:17
**love** 13:14

**m**

**made** 9:17
**main** 6:14
**make** 3:13 19:4
**makeshift**
  14:21

**male** 11:25
  12:9,20 13:2
**manipulate**
  4:24 5:4,8
**matter** 3:3,5
  18:8
**matthew** 1:9
**mean** 4:15 7:23
  9:9 15:21 17:1
  17:14 19:8
**meet** 19:1,3
**meeting** 7:22
**meetings** 7:10
  7:24
**messages** 17:1
**messed** 16:12
**mid** 16:17,18
**middle** 16:14
**mind** 3:18
  13:13
**mineola** 22:14
**model** 9:20
**money** 12:22
  13:1
**morse** 17:4
**motherfucker**
  20:22
**motherfuckers**
  18:1 19:4 21:8
**motherfucking**
  15:1
**moving** 10:24
**muddy** 3:9,13
**multiple** 3:14
  10:6

**muta** 1:9
**mute** 9:15

**n**

**n** 22:1
**near** 20:16
**necessary**
  19:13
**need** 11:7,25
  13:1 14:14
  19:9 21:3,9
**negate** 14:25
**network** 17:18
**never** 15:16
  16:22 18:17
**nigga** 13:4,15
  13:20 20:2,17
**niggas** 21:12
**notarized** 19:6
**null** 3:16
**ny** 22:14

**o**

**o** 22:1
**obviously**
  10:13 14:6
**oh** 7:13 14:2
  17:8,13,13,14
  17:14,19,24
  18:21
**okay** 5:15 7:5
  7:15,22 8:19
  9:14 11:6,10
  11:11 13:2,14
  13:15,20 14:2
  14:2,13 15:3

15:23 16:7
  17:14,25 18:7
  18:20,21,21,22
  18:22 19:17,17
  19:19 20:7
  21:2,13,13,13
**old** 22:12
**open** 16:14,19
**order** 16:19
**original** 10:10
  10:13
**originally** 2:3
**own** 3:3,6,14
  8:21 11:21,22
  11:23 12:19
  14:4,8,10
  15:25 16:1
  21:1

**p**

**paid** 18:14
**paper** 12:6 19:6
  19:14 21:11
**paperwork** 6:8
  11:17
**part** 6:13 18:14
**pay** 12:15,23
  13:24 18:10,11
  20:21
**people** 3:14 4:2
  4:19 7:9,10
  10:1,17,21
  11:3 14:4
  15:11,18 16:22
**percent** 2:10,12
  2:14,15,17 3:3

3:6 10:20
11:18 12:7
13:25 16:1,2
18:8,11 19:7
19:15 20:23,23
**period** 21:2
**phone** 16:21,24
**piece** 12:6 19:6
19:14 21:11
**pilot** 16:16,18
**place** 17:7
**plaintiff** 1:5
19:10
**planes** 17:6
**platform** 9:4
**pocket** 12:8
**point** 20:16
**popped** 15:10
**probably** 13:19
19:2
**problem** 2:4,7
2:8 15:23
16:23 17:3
**proceedings**
22:5
**process** 4:22
**produce** 14:17
**product** 9:18
9:20
**property** 3:15
5:10,19 18:18
20:6
**protect** 21:4
**prototype** 8:1,4
8:6,13,15,15,18

14:18,24 15:12
15:13,14 18:12
18:16 20:12
**prototypes**
7:20,22 8:2
9:21 10:2
**pull** 18:6
**push** 16:20
**put** 6:6

**q**

**qrewlive** 6:14
10:7

**r**

**r** 22:1
**rahul** 1:7,8
**real** 9:20 15:23
**realize** 7:16
**really** 5:3 7:13
12:3 15:6
19:13 20:21
**reason** 5:22
11:5
**recently** 7:16
**record** 22:5
**recorded** 11:18
**recording** 14:7
**recreate** 18:3
**refused** 14:19
**relates** 5:18
**remember** 2:14
7:14,25 8:25
9:3,6
**response** 14:9

**revelation**
15:15
**right** 3:4,5 11:6
11:13,14 12:11
12:20 13:22
14:14,21 15:6
15:7 16:9,20
17:2,9,24 18:6
18:13,21,23,25
19:4,5,7,19,19
19:20,20,20,20
19:25 20:1,6,7
20:8,23,24
21:1
**rights** 5:18
19:14
**righty** 11:1
**risk** 3:17
**road** 22:12
**room** 9:20
**rpd** 6:6
**running** 3:17

**s**

**samant** 1:8
**satellite** 17:4
**saw** 8:15,21,22
9:2 15:12,13
15:16
**saying** 2:4 5:12
7:13 10:18
12:6,14 14:6,7
14:8 15:4,16
15:18,23,24
16:5 18:17,23
19:6,10,16

20:19
**says** 13:16 20:4
20:6
**scrambling** 6:2
**secret** 6:24
**section** 17:22
**see** 9:10 13:14
15:18
**served** 12:4
20:15
**set** 14:4
**settle** 17:14,15
**setup** 17:21
**shit** 11:19
14:21,22 17:2
17:8 18:24
20:9
**side** 5:1
**sideways** 4:21
**signature** 22:8
**signed** 18:15
**sinker** 3:12
**sit** 19:2
**slipped** 13:13
**smart** 4:19
**smith** 1:10
**soltech** 7:19
**solutions** 22:11
**somebody**
21:10
**sonja** 2:2,7,9
2:12,13,19,23
3:1,24 4:2,10
4:13,15 5:2,5,9
5:17,21 6:3,10

0324 Current - Asphalt - Met/ 32 se Documents                                     June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[sonja - want]**                                                                Page 6

6:17,20,25 7:3
7:5,25 8:5,14
8:19,25 9:3,6,9
9:14,22 10:4,9
10:12,16 11:1
11:6,11,14,16
12:2,11,21
13:3,6,10 14:2
14:13 15:3,21
16:9,16 17:13
17:19,24 18:6
18:20 19:12,19
19:22 20:11
21:7
**sonya** 22:3
**sorry** 13:11
**sounds** 15:22
**speaking** 5:13
**specifically**
20:4
**start** 8:7 21:12
**started** 14:22
17:8
**state** 1:1,2
**story** 4:25 18:7
18:21
**straight** 18:21
**stuff** 3:20 7:8
7:23
**stupid** 12:23
**subpoena** 9:16
13:6,17 14:5
**subpoenaing**
9:15

**substantive**
6:16
**successfully**
10:23
**sudden** 2:3
**sue** 12:11
**suit** 3:15,16
**suite** 22:13
**summary** 6:11
**supposed** 15:14
**sure** 5:2,5 19:4
**survived** 15:5,6
**system** 16:25
17:1

**t**

**t** 22:1,1
**table** 5:1
**tailspin** 18:25
**take** 11:8 12:25
14:10
**talk** 3:19,21
10:20 19:3
**talked** 2:3
13:18 17:25
**talking** 2:14
14:11 17:10,11
20:18
**tank** 3:23 10:20
17:14
**tanked** 11:24
18:24
**tanking** 3:7
**technology**
5:22

**tell** 7:11 14:15
16:22 18:1
**telling** 9:23
**terms** 10:19
15:7
**text** 13:15 17:1
**thing** 7:3 8:6
13:12
**things** 3:18
10:23
**think** 14:14
**thinking** 15:1
**thought** 4:22
8:23 9:12
12:22 17:20
20:17
**time** 15:12
**today** 20:14
**together** 18:7
**told** 7:15 12:12
**tonight** 18:2
**tossed** 3:16
4:23 7:8
**totally** 5:6,9,17
13:13 16:6
**town** 12:24
**trade** 6:24
**transcript** 1:16
22:4
**transferred**
18:18
**tries** 16:19
**true** 10:5 16:10
16:10 22:4

**trust** 5:10
**truth** 21:13
**try** 14:9 18:13
18:25
**trying** 3:9,12
5:4,7,25 6:13
7:8 9:15 11:20
14:15 16:13
20:11,21,21
21:3
**turned** 7:19
9:11 16:4
**twisting** 21:12

**u**

**ultimately** 19:5
**understand** 3:8
5:9,18 8:1
14:14 16:5
19:15
**unloaded** 5:25
**upset** 13:10
**use** 20:18,20

**v**

**v** 1:6
**veritext** 22:11
**versions** 10:7
**voice** 17:17,21
**void** 3:16

**w**

**waiting** 12:4
14:5
**want** 2:24 3:2
9:23 10:14
13:25 14:16

0324 Current - Asbestos Case Documents                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[want - years]                                                        Page 7

19:1,6 21:2
**wants** 12:14
**waters** 3:9,13
**way** 11:20
  13:24 16:4
**we've** 2:19 3:11
  12:6
**weeks** 6:1
**went** 7:9,23 8:9
  14:20
**wheel** 16:20
**wi** 17:18
**williams** 2:2,7
  2:9,13,19,23
  3:1,24 4:2,10
  4:13,15 5:2,5,9
  5:17,21 6:3,10
  6:17,20,25 7:3
  7:5,25 8:5,14
  8:19,25 9:3,6,9
  9:14,22 10:4,9
  10:12,16 11:1
  11:6,11,14,16
  12:2,11,21
  13:3,6,10 14:2
  14:13 15:3,21
  16:9,16 17:13
  17:19,24 18:6
  18:20 19:12,19
  19:22 20:11
  21:7
**wind** 3:7
**window** 4:24
**witnesses** 13:4

**won** 5:11
**work** 13:23
  18:3 20:25
**worked** 10:7,9
  10:12
**working** 4:19
  12:17 17:9
  20:8,13
**works** 17:2
**written** 18:17
**wrong** 3:4,6

**y**

**y'all** 16:23 17:1
  17:6
**yeah** 4:5,14,18
  5:20,24 9:5,7
  15:18,22
**years** 5:23

# EXHIBIT B

032423-KeenanNix-Introduction                              June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 1

```
 1              IN THE STATE COURT OF DEKALB COUNTY

 2                      STATE OF GEORGIA

 3

 4    CRAIG ALEXANDER,               )

 5           Plaintiff,              )

 6    v.                             )

 7    DELTA AIR LINES, INC.; RAHUL   )    CIVIL ACTION

 8    EDWARD BASTIAN; RAHUL SAMANT;  )    FILE No. 21-A-

 9    MATTHEW MUTA; DARRELL HASKIN;  )    03275-2

10    DAVID SMITH; DAVID BURTON;     )

11    CORPORATE DOES 1 TO 5; and     )

12    JOHN DOES TO 10,               )

13           Defendants.             )

14    -------------------------------------------------

15

16                    Transcript of

17           032423-KeenanNix-Introduction

18

19

20

21

22

23

24

25
```

Page 2

1    0:00:00
2    KEENAN NIX: -- Nix. K-E-E-N-A-N, Nix,
3    N as in Nancy-I-X. Is now a good time to chat?
4    SONJA WILLIAMS: Sure, go right ahead.
5    KEENAN NIX: Yes. So Craig Alexander
6    forwarded you, I think, a copy of a notice and
7    subpoena from Delta Airlines --
8    SONJA WILLIAMS: I did not get that --
9    KEENAN NIX: -- directed to you as a
10   third party. Okay. Well, I have it and I can
11   forward it to you, but it is a legal document,
12   and they are sending that to you as a non-party
13   witness who has been identified in discovery as a
14   person with knowledge of some of the facts and
15   circumstances surrounding Mr. Alexander's case.
16   And I'm happy to put all that in context for you,
17   but I asked him to give you a heads-up. It
18   wasn't a surprise to us. We knew it was not a
19   matter of whether, it was just a matter of when.
20   And they sent it last Friday. That gives you 30
21   days to legally respond. And we are more than
22   willing to assist you in that process and wanted
23   to just start by introducing myself.
24   0:01:00
25   KEENAN NIX: If you give me an email

Page 3

1    address, I'll forward the document to you as soon
2    as we hang up. And if you have time next week,
3    I'd love to meet you and talk through with you
4    for context just what this case is all about.
5    SONJA WILLIAMS: Oh, okay. All right.
6    So it's Sonja, S-O-N-J-A, at Sonja, S-O-N-J-A,
7    the letter N as in Nancy, williams.com,
8    sonja@sonjanwilliams.com.
9    KEENAN NIX: Okay. Let me repeat it.
10   Sonja, S-O-N-J-A, at Sonja, S-O-N-J-A, N as in
11   Nancy, williams.com.
12   SONJA WILLIAMS: Yes.
13   KEENAN NIX: Okay. I'm going to send
14   that. I'm just going to hit forward --
15   SONJA WILLIAMS: Okay.
16   KEENAN NIX: -- and send you the
17   document which was served on all of the parties
18   to the lawsuit. It should be coming to you
19   because they sent it via certified mail, Federal
20   Express, whatever transmission, mail service they
21   used. It'll be reflected on there. But it's
22   coming.
23   0:02:00
24   KEENAN NIX: And then once that lands
25   and you actually receive it, the legal

Page 4

1    requirement for responding is 30 days. Now we've
2    already been through this exercise with one
3    nonparty prior to you. Her name is Sandy Sauers.
4    She, too, was identified in discovery. They did
5    the same thing with her.
6    SONJA WILLIAMS: I know Sandy.
7    KEENAN NIX: And what we did in that
8    case --
9    SONJA WILLIAMS: Okay.
10   KEENAN NIX: Yes, I know you do. And
11   what we did in that case was the same thing we're
12   prepared to do with you. We got Ms. Sandy a
13   lawyer, and a lawyer worked with Ms. Sandy to
14   compile the documents responsive to the request,
15   make production and all that was taken care of.
16   We don't intend for this to be an inconvenience
17   or a distraction or an expense for you. Of
18   course, you can hire your own lawyer, right? And
19   you're more than welcome to do so. They directed
20   the document request to you individually and
21   Shock Therapy (sic), I believe, as a corporation.
22   But it is a legal document. Sometimes folks who
23   don't have much experience with litigation don't
24   really understand what these legalese mean, what
25   these timeframes mean.

Page 5

1    0:03:03
2    KEENAN NIX: And we're here to help and
3    consult. And so I'm going to forward it to you.
4    You'll have the weekend to review it. If you
5    could just check in with me by phone or response
6    email, I'll give you all my contact information,
7    I'd love to meet you next week and give you the
8    context for all of this because I think that's
9    very important as well.
10   SONJA WILLIAMS: Okay.
11   KEENAN NIX: Do you have any questions
12   I can answer for you, or are you good?
13   SONJA WILLIAMS: So what exactly are
14   you -- what's your end goal here with me?
15   KEENAN NIX: It's not an end goal.
16   It's to help you comply with a legal process that
17   if you ignored, they would likely go to the court
18   and request a motion to compel a response and try
19   to get sanctions against you. So my first goal
20   is to --
21   SONJA WILLIAMS: Let me -- hold on,
22   Kenneth. Let me just stop you right there. Let
23   me stop you right there because I think you know
24   who I am, and I do think you -- and I think you
25   understand --

Veritext Legal Solutions
800.808.4958                                          770.343.9696

Page 6

1      KEENAN NIX:  Yes, I do know who you
2  are.
3      SONJA WILLIAMS:  I think you understand
4  the severity of the relationship that I have with
5  Mr. Alexander.
6      0:04:00
7      SONJA WILLIAMS:  But I also think --
8      KEENAN NIX:  So let me just -- let me
9  just -- let me just answer that.  I don't know
10  about the nature of your relationship with Craig,
11  except that you and he share a child together,
12  but we've not spent much time talking about the
13  nitty gritty details involving that.  But I have
14  seen 11,000 documents that Captain Alexander has
15  produced, many of which talked about a lot of
16  your personal relationship.  So I'm aware of some
17  of the history, but it's not something he and I
18  have spent a lot of time talking about, frankly,
19  because it's not directly relevant to why he
20  hired me.  Right?  But don't think I don't have
21  the context and I don't have the history, but he
22  and I haven't spent not one minute talking about
23  the details of that because it's really not
24  important for why he hired me.  But I've seen
25  every document and many of those documents

Page 7

1  contained very personal and something I would
2  call intimate --
3      SONJA WILLIAMS:  Right.  Okay.  Well,
4  let's just -- so let's just -- then let's just
5  stick with what the facts are in my position.
6  Okay.
7      0:05:00
8      SONJA WILLIAMS:  Let me give you a high
9  level 30,000-foot view.
10      KEENAN NIX:  Okay.
11      SONJA WILLIAMS:  I have been through
12  several intellectual property cases in my
13  lifetime.
14      KEENAN NIX:  Great.  That's good.
15      SONJA WILLIAMS:  I have owned a
16  technology company for the last 25 years.  Okay.
17  I am considered an expert at what I do in
18  developing applications for various situations.
19  Okay?  And if it were not for me, you and I
20  probably would not be talking nor would Craig be
21  talking to you.  And so given that and reading
22  the complaint that has been published, I do take
23  issues with a lot of things that were said in
24  that complaint.  You know, it is a fact that they
25  stole the idea.  It is a fact that he presented

Page 8

1  it to Delta with Sandy being a part of that
2  meeting.
3      0:06:03
4      SONJA WILLIAMS:  But I take issue with
5  him solo coming up with the idea.  It would be
6  virtually impossible to come up with that idea,
7  not having any experience whatsoever.  And as an
8  individual that was in a relationship at the time
9  with Mr. Alexander, I take issue with the fact
10  that he has indicated that he and his now wife
11  came up with the idea of which neither know
12  anything about technology.
13      KEENAN NIX:  Yes.  Yes.  That's not --
14  that's not --
15      SONJA WILLIAMS:  So with that being
16  said --
17      KEENAN NIX:  Ms. Sonja --
18      SONJA WILLIAMS:  I did receive the
19  information.  Listen, I received the information
20  from Delta.  I do understand my time at which to
21  respond.
22      KEENAN NIX:  So you already have it
23  from them?  I don't need to forward it to you?
24      SONJA WILLIAMS:  No.  I don't.  No.
25  No.  We kind of -- so because I've kind of been

Page 9

1  through this before, it's kind of weird that --
2  you know how lawyers contact you.  So I ended up
3  having a lawyer to contact me saying that it was
4  out there because I guess they filed the
5  certificate, the certificate indicating that they
6  have served me.
7      0:07:07
8      SONJA WILLIAMS:  But I have not gotten
9  --
10      KEENAN NIX:  Yes.
11      SONJA WILLIAMS:  I have not gotten
12  served at all.
13      KEENAN NIX:  Okay.  I'm waiting for it.
14  I'm waiting for it.
15      SONJA WILLIAMS:  But I anticipate being
16  properly served at some point, and my address has
17  changed.  So that is primarily the reason why.
18  But if they also --
19      KEENAN NIX:  Well, probably.
20      SONJA WILLIAMS:  Right.  They included
21  my company and I don't know if we updated our
22  registered agent information, they may have sent
23  it there, then obviously I will certainly comply
24  with the timeframe.
25      KEENAN NIX:  Well, I'm looking at it.

3 (Pages 6 - 9)

Craig Keenan Nix Deposition                                          June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 10

1  I'm looking at it right here, and I'll tell you
2  exactly where it came.
3       SONJA WILLIAMS:  Well, it went to 3295.
4  We recently moved my office from there.  So --
5       KEENAN NIX:  Yeah.  So they directed it
6  to you, and they did send it via certified mail,
7  Sonja Williams, 3295 River Exchange Drive, Suite
8  560, Norcross, Georgia 30092 is where the letter
9  is addressed to.
10      0:08:05
11      SONJA WILLIAMS:  Okay.  Now did they
12 make reference to me as an individual or as me as
13 an individual and a company?
14      KEENAN NIX:  Both.  Both.
15      SONJA WILLIAMS:  Okay.  So there's two
16 entities.
17      KEENAN NIX:  Both.
18      SONJA WILLIAMS:  Okay.
19      KEENAN NIX:  Both, and the nonparty
20 request for production of document is directed to
21 you as an individual, and then they send a
22 separate one to Shock Therapy DLV Inc., (sic) and
23 the document is addressed to both.  So what they
24 have done is cover all of -- attempt to cover all
25 of their bases since when we identified you, we

Page 11

1  identified you as an individual who was doing
2  business as Shock Therapy at the time you were
3  consulting with Mr. Alexander.
4       SONJA WILLIAMS:  I was a consultant.
5       KEENAN NIX:  So -- so --
6       SONJA WILLIAMS:  There was a point in
7  time when we were providing some consulting
8  services, but there were other deals made, so
9  we'll cover that later.
10      0:09:07
11      KEENAN NIX:  Yes.  So you asked the
12 question, what is the object here?  It's very
13 simple.  They've sent this document request to
14 you, which will cover all of the potential
15 connections that you have individually and as a
16 company to Mr. Alexander as it relates to the
17 development of this QrewLive idea, and you have
18 30 days to respond.  And the goal for us is to
19 help you do that if you need help and, if you
20 don't need help, to give you some context within
21 which to respond that I think would be helpful
22 and useful for you to have since it was not a
23 surprise to us that they sent this notice.  We've
24 been anticipating it for a long time because we
25 knew they would know of your involvement from

Page 12

1  what we shared with them from Mr. Alexander, and
2  we identified you ourselves.  They sent you a
3  copy of our discovery responses where we first
4  identified you as a person with knowledge,
5  because we were aware of that, and that was our
6  duty under the law.
7       0:10:06
8       KEENAN NIX:  So big picture, though, I
9  know exactly why they're sending you this request
10 and why they will soon thereafter make a request
11 to depose you.  And the short and long of it is
12 they would love for you to create issues in the
13 case and try to create enmity between you and Mr.
14 Alexander and make a mockery of your family
15 relationship and all of the intimate details that
16 they know about, having seen some of the emails
17 that related to QrewLive but also related to his
18 personal relationship with you.  And I will tell
19 you, we redacted all of that information.  And
20 we're in front of the court right now on a motion
21 to compel by Delta complaining that we redacted
22 personal information that dealt with your family,
23 your daughter, your relationship with Mr.
24 Alexander because it has absolutely nothing to do
25 with this lawsuit.

Page 13

1       0:11:04
2       KEENAN NIX:  And they're trying to make
3  it a mockery.  And we are going to let the court
4  see the documents, right?  Because they have a
5  right to look at the documents without the
6  redactions that we made.  But the redactions only
7  pertain to personal business because we're not
8  letting this become a mockery and a sideshow.
9       SONJA WILLIAMS:  Yeah.  I absolutely --
10      KEENAN NIX:  We (indiscernible) --
11      SONJA WILLIAMS:  I absolutely agree.
12 And I believe the court should definitely say it
13 has nothing to do with why we're there.
14      KEENAN NIX:  Well, they will.  They
15 will.  But the reason why it has to be
16 coordinated, Ms. Sonja, is because many of the
17 emails, as you know, right, they have two
18 sources.  If one person sends, somebody else
19 receives.  Okay?  So if we've redacted them on
20 the sending end and then you don't redact them on
21 the receiving end, right, then they've got access
22 to the information which they never should have
23 seen.  That's why a coordinated approach is the
24 better part of wisdom here, right?  Otherwise,
25 right, we've just wasted our time because there's

4 (Pages 10 - 13)

Craig Keenan Nix 30(b)(6) Deduction                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

---

Page 14

1 two people that have access, arguably, to both
2 sides of those documents, and somebody has to
3 send it. Somebody has to receive it.
4      0:12:00
5      KEENAN NIX: If both parties don't
6 redact the confidential, private information,
7 then they have access to it, which is what they
8 want. Okay. We can help do that because we
9 helped do the first response. We can help with
10 the second response. Now we don't do that
11 directly. We do it, right, by making legal
12 counsel available to you that can work with us in
13 a coordinated fashion. So we're hand in glove,
14 tongue in groove. Okay, But the point of the
15 matter is I know what they're up to, and I know
16 you're a very bright woman, and I think you know
17 what they're up to. Okay. They're just trying
18 to divide and conquer, and we're not going to let
19 that happen from our perspective, and we hope you
20 would understand the importance -- is Delta Sonja
21 Williams -- is Delta Sonja Williams' friend?
22 Hardly. Do they care about Sonja Williams? I
23 think not. And yet they're now knocking on your
24 door, and they're doing so in a very aggressive
25 manner, and they will be soon noticing your

Page 15

1 deposition. And it's simple to coordinate our
2 approach here.
3      0:12:59
4      KEENAN NIX: And that's why I simply
5 said I'm going to forward it to you, let you see
6 the nature and scope of what they're after, and
7 then we sit down face to face next week, let me
8 take you to lunch at the Commerce Club in
9 downtown Atlanta, which is right in my building,
10 and then we can really, really chop it up and get
11 to the nitty gritty of what this is all about and
12 how we should be responding. And I'm happy and
13 honored to do that and answer any questions that
14 you have. And I just want you to know, I do know
15 who you are, and I don't know the personal
16 details, but I know you're the mother of Ms.
17 S█████. I've met Ms. S█████. I know who she is.
18 Right? And I know you've had a relationship with
19 Captain Alexander, and he is my client. And I
20 respect who you are, what you bring to the table
21 and your contributions to this exercise. There
22 isn't any arguing about that where I'm concerned.
23 But I have been working in the case for two
24 years, and I'm very familiar with what happened
25 here at every angle.

Page 16

1      0:14:00
2      KEENAN NIX: And there will I'm certain
3 be some details that you want to share with me
4 that I will learn from you that are relevant.
5 And I'm very open to that because while I have
6 seen everything that Captain Alexander has in his
7 possession, and we've already produced that, all
8 20,000 pages of it to Delta, I've also got
9 150,000 pages from Delta, right, in their
10 interactions with Captain Alexander that we are
11 working through on a daily basis because this is
12 -- high stakes litigation would be an
13 understatement. And we've got 10 lawyers working
14 on our side of the equation. They've got 20 on
15 theirs. Okay? And we're wearing their ass out,
16 and we won't stop until we're done, right? And
17 these things, right, are just their futile effort
18 to avoid, right, responsibility for something
19 that we already know we can prove, and we don't
20 have any doubt about that. And so what is their
21 goal, 10,000 feet? You asked the question. To
22 make a mockery of you, to make a mockery of your
23 family, to make a mockery of your relationship,
24 right, and to create a lot of distracting issues
25 that have nothing to do with the truth.

Page 17

1      0:15:04
2      KEENAN NIX: So either we will
3 cooperate with them and let them do that, or we
4 won't. And I suggest to you that we shouldn't,
5 right? But either way, it won't affect the
6 outcome of the case, right? Because I know what
7 this case is about, and it causes me no
8 trepidation or anxiety whatsoever. It's just a
9 matter of playing between the lines. And they
10 don't play between the lines nor do they play
11 fair. Okay? And they would like to make you
12 look like a fool, make him look like a fool and
13 put all your business out there in the street,
14 right? Including your relationship with your
15 daughter, all the discourse you had in these
16 conversations about your children, and then all
17 this salacious stuff about boyfriends and this
18 and that. They just want to make everybody look
19 like a fool. Okay? And that's what we're
20 pushing back on, and we are confident we're going
21 to win.
22      0:15:56
23      KEENAN NIX: See, we produced to them
24 20,000 documents, but we didn't let them see a
25 single document that had anything to do with you,

5 (Pages 14 - 17)

Page 18

1  your relationship with your daughter, your
2  children or anything like that because that
3  didn't have anything to do with why we sued them.
4      SONJA WILLIAMS:  Absolutely.  But if
5  you produce --
6      KEENAN NIX:  And so --
7      SONJA WILLIAMS:  If you produce
8  anything remotely that he may have had, then
9  you've produced things that he and I personally
10 have created.  Does that make sense to you?
11     KEENAN NIX:  Yes, of course.  Of
12 course.
13     SONJA WILLIAMS:  Okay.
14     KEENAN NIX:  Of course.  I mean, I know
15 what your role is, Ms. Sonja, and I'm interested
16 in hearing your perspective on all of that,
17 right?  And what I'm saying to you is I have
18 everything.  We've produced everything.  Do you
19 understand?  There's no gamesmanship here, right?
20 Everything in this day and age of the digital day
21 and age is preserved.  Okay?  And Captain
22 Alexander is no different than you, me or anybody
23 else.  We have digital devices.  Those devices
24 have been produced.  We have electronic e-
25 discovery personnel that are on our payroll that

Page 19

1  are working with us in this document-intensive
2  case involving years of transactions and
3  communications.  And we have produced them all --
4      SONJA WILLIAMS:  Awesome.
5      KEENAN NIX:  And we have hidden none.
6      SONJA WILLIAMS:  Awesome.
7      0:17:00
8      KEENAN NIX:  But what we did do -- what
9  we did do is redact all of the information that
10 was personal in nature and had nothing to do with
11 this application or his transactions with Delta.
12 And much of that they are rabidly interested in
13 discovering, right, because it is salacious, it
14 is personal, some of it embarrassing and they
15 want to turn this into a sideshow and make a
16 mockery of the individuals involved so that their
17 character is tainted by irrelevant matters,
18 right, that nobody should be having any business
19 in.  Not me.  I do, because I saw because we
20 can't determine what is relevant and what's not
21 relevant until we look at it all, okay?  But we
22 did so with objectivity and integrity, and if it
23 was personal, we kept it personal.  And if you
24 say you want to challenge it --
25     SONJA WILLIAMS:  Well, let me -- let me

Page 20

1  just say I appreciate that.  On behalf of myself
2  and my daughter, we appreciate that.
3      0:18:04
4      KEENAN NIX:  Yes, ma'am.  And we met
5  with them just today for two hours where they
6  pushed back and said, we're not satisfied with
7  that, and we will likely be filing a motion with
8  the court asking for an in camera review of all
9  of that material to determine whether or not the
10 redactions were appropriate.  And I said, have at
11 it.  We'll be there, okay, because unless a court
12 order drops, you'll never set eyes on it.  Okay?
13 And the reason being is because we are
14 experienced enough to know what's relevant and
15 what's not relevant.  Okay?  And conversations
16 between a husband or a father and a mother about
17 child custody issues and interpersonal
18 relationships has no bearing on whether or not
19 the Delta Corporation violated a breach of
20 confidentiality agreement and took unfair license
21 and liberty to intellectual property in the
22 creation of a counterfeit product called Flight
23 Family Communication, which we know they did.
24     0:19:00
25     KEENAN NIX:  Okay.  That's why we sued

Page 21

1  their ass.  And that's what we have the right to
2  do discovery about on both sides.  But we don't
3  have any business to poke around in Captain
4  Alexander's private life and get into the inter-
5  workings of his relationship with his baby's
6  mother, right, because that's what they know,
7  right, that much of what was said in the heat of
8  many of those emotions was personal and should
9  remain personal.  Right?  And when it's not
10 personal, it becomes a very distracting sideshow.
11 That's their agenda, okay?  Right?  Now, as it
12 relates to the underlying issues in the case, of
13 course you have a role that's very important
14 because Captain Alexander understands how the
15 creative process works, nor has he ever suggested
16 that the creation of an application that had
17 great value to Delta, which they stole, was the
18 result of his labor ingenuity, creativity,
19 intellectual capacity alone.
20     0:20:01
21     KEENAN NIX:  He knows that, everybody
22 knows that.  Okay.  We've got lots of people that
23 we've identified, as you'll see in the discovery
24 response that they provided to you, it's right in
25 here.  Everything that they sent you is right in

6 (Pages 18 - 21)

Page 22

1 this email. In other words, they served us a
2 courtesy copy of the filings, right, that they
3 made with the court and that were served on you.
4 So everything that you will eventually get by
5 mail is in this email, including a copy of the
6 complaint, a copy of the discovery responses
7 where we identified you in this lawsuit as a
8 person who has knowledge and then their document
9 requests to you and to your company, as well as a
10 confidentiality agreement which you would have to
11 acknowledge and sign in connection with your work
12 in the case because all of the people do because
13 there are confidential issues involved. But
14 everything is right there. And we got a courtesy
15 copy. And I'm hitting forward to you and I'll
16 put my email address. You'll have it. And then
17 I'll put my office and cell number. You'll have
18 that then.
19      0:21:02
20      KEENAN NIX: And it's my hope that
21 early next week, Ms. Sonja, you can come down and
22 meet me face to face and I give you the context,
23 right, that I think would be important to you
24 after you have a chance to see what it is they're
25 expecting of you. And then I'll talk with you

Page 23

1 about a proposal for how we would move forward in
2 a way that's convenient for you, doesn't cost you
3 any money, right? You don't have to retain your
4 own lawyer, though you are perfectly capable and
5 able to do so. But they don't work for free, and
6 we don't want this to cost you any money
7 financially. We also know there's great value in
8 presenting a united front where the lawyers that
9 you're working with understand what our goals and
10 objectives are and everybody is working together
11 to stay on the same page. But having said that,
12 Ms. Sonja, you are more than welcome to hire your
13 own lawyer. You are more than welcome to bring
14 your lawyer to meet me with you. It doesn't
15 matter. I mean, you are the boss, and I respect
16 you greatly.
17      0:22:03
18      KEENAN NIX: Of course you'll see who I
19 am in my signature page, and you can Google out
20 and go look and see who we are. But just by way
21 of background, I met Captain Alexander because I
22 have a yacht on the same dock where he spends
23 some time with his family at Lake Lanier.
24      SONJA WILLIAMS: Oh, I met you. I met
25 you. We came -- I met you. We were out there.

Page 24

1      KEENAN NIX: Yes, you did.
2      SONJA WILLIAMS: Yeah.
3      KEENAN NIX: Yes, and I remember that.
4 And I said hello to your daughter. I remember
5 the day you came out there.
6      SONJA WILLIAMS: Absolutely.
7      KEENAN NIX: Right, and I was the
8 first. My dock sits right at the end where you
9 come down --
10      SONJA WILLIAMS: I remember.
11      KEENAN NIX: -- and you said hello to
12 me and I waved at you too, and I knew exactly who
13 you were. Right? And that was the one
14 encounter. And I'm glad you brought that back to
15 my remembrance. I do remember it. But, of
16 course, right, I've met little S⬛ 10 times,
17 okay.
18      SONJA WILLIAMS: Absolutely.
19      KEENAN NIX: Because she's very
20 frequently out there, and she's a sweet young
21 girl.
22      0:23:00
23      KEENAN NIX: And she actually taught me
24 some new dance steps at one of those last parties
25 where we had out there, where we bring a band out

Page 25

1 there, and everybody just enjoys our family time
2 together. And you've done a great job raising
3 your sweet S⬛. And we've had the privilege
4 of meeting. And so it was that chance occasion
5 of being dock mates that led me to a very
6 innocuous conversation that didn't mean anything
7 that ultimately resulted in this representation.
8 And it was very simple. I had bought a very new
9 and unfamiliar experience, and I'm a lawyer. I'm
10 not very technically inclined. And I had this
11 new yacht, and I didn't even know how to work the
12 electronics panel to turn the television on. And
13 I had met Captain Alexander, right, and he
14 volunteered to come onto my yacht and help me
15 with a question that I had about how to handle a
16 problem I was having with my television and the
17 electronics panel and getting all that to work.
18      0:24:08
19      KEENAN NIX: And I was frustrated, and
20 he could see my frustration, and I said, how'd
21 you get so good at this shit, right, because it's
22 all Greek to me, okay? It makes no sense to me.
23 Right? And very complicated, and I'm very
24 frustrated. You pay a half a million dollars for
25 a damn boat, and you can't even get the TV to

7 (Pages 22 - 25)

Page 26

1  come on.  So he just kind of said, kind of a tech
2  nerd.  Always have been.
3          SONJA WILLIAMS:  Yeah.  He's -- well,
4  he's definitely book smart.  So that's cool.
5          KEENAN NIX:  Yes, and he said to me, he
6  said, I'm just a tech nerd.  And then he said
7  this, actually developed an application for my
8  company.  They stole it.  But that's another
9  story.  You know Craig with his little dry sense
10  of humor, and I didn't even know what it meant.
11  I didn't even respond.  He didn't even know I was
12  a lawyer.  He just said that as a little aside,
13  and I didn't forget it.  And then, of course,
14  over time, we got to know each other.  And I
15  think he may have learned that I was a lawyer and
16  a successful one.
17          0:25:02
18          KEENAN NIX:  And at some point he had a
19  question, as his case was ticking towards the
20  statute of limitations, and the lawyers that he
21  had were doing nothing with it.  And he had a
22  question, right?  And I said, look, you're my
23  dock mate now and my neighbor.  I don't know much
24  about those facts, but if it's important to you
25  and you think the time is short, right, then out

Page 27

1  of courtesy to you, I would invite you to come
2  sit down with me and give you a thoughtful
3  overview of what has taken place, and I'll tell
4  you whether or not I think I can help you.  And
5  as it turns out, Ms. Sonja, I felt like the story
6  offended something in my well refined sense --
7          SONJA WILLIAMS:  Oh, absolutely.  They
8  no doubt stole it.  So they know that.
9          KEENAN NIX:  -- sensibility around
10  justice.  And I said, let's look a little bit
11  closer.  Okay, and then I brought some of my
12  smartest colleagues, and we sat around the table
13  and we vetted this thing and tried our best to
14  find a reason not to pursue it.
15          0:26:02
16          KEENAN NIX:  And with all of our minds
17  collectively arrayed around all of the core
18  operative facts, we came to the conclusion they
19  stole this damn thing and we can prove it.
20          SONJA WILLIAMS:  They did.
21          KEENAN NIX:  And so we filed the
22  lawsuit, and we're now two years in.  They filed
23  a big motion to dismiss.  They got the biggest
24  law firm in the city called King & Spalding.
25  They got 20 lawyers, right?  And round one, they

Page 28

1  filed a motion to dismiss saying it doesn't even
2  belong in a court of law, right, because there's
3  nothing here, really, to even talk about.
4  Denied.  Okay.  And then the court ordered them
5  for a year's worth of discovery.  And we're just
6  starting that process, and we're about a quarter
7  of the way through.  And I've been doing this for
8  30 years.  When I send you my background, you'll
9  be able to see who we are and what we've done,
10  but we ain't lost much, and we don't plan on
11  losing this one.  And I'm saying to you, we're
12  right about it.
13          0:27:03
14          KEENAN NIX:  Now, ultimately, where
15  this ends up, a jury and a court will decide.
16  But I already know that what we alleged they did,
17  we're right about, and I can prove it.  And we're
18  well on our way to doing exactly that.  And the
19  promise I made to Captain Alexander is there's no
20  guarantees regarding the outcome.  But I said, we
21  will not be outworked, we will not be outsmarted
22  and we will not be outspent.  Okay?  So we're all
23  in.  And I believe we're right.  And I'm
24  committed to doing whatever is necessary to prove
25  it.  Okay?  And if we are right, they took

Page 29

1  something very valuable from Captain Craig
2  Alexander.  And now where do you fit into all of
3  that?  Well, you were a part of the early
4  conversations.  We know that.  And there are more
5  details that you're going to educate me about.
6          0:28:01
7          KEENAN NIX:  You've said that on a
8  couple of occasions.  I'm more than willing to
9  let you do exactly that.  And then I will talk
10  with you about that big context with what --
11          SONJA WILLIAMS:  I myself was not a --
12  let me just be clear.  He did pay ShockTheory,
13  but I myself is a different entity.  So I just
14  want to make that clear.
15          KEENAN NIX:  Yes.  Okay.  So yes, I
16  mean, I don't mean to -- when I speak about you,
17  I'm just talking generally.
18          SONJA WILLIAMS:  Got it.
19          KEENAN NIX:  You're listening very
20  carefully, and I'm glad you are.  Right?  I'm
21  just talking generally and I know when I say
22  you, I'm talking about you, I'm talking about
23  ShockTheory, I'm talking about the fact that you
24  were right there from the beginning.  Right?  You
25  know what Craig has said to me?  He said, Keenan,

8 (Pages 26 - 29)

Page 30

1 Sonja is one of the smartest people that I know.
2 And she absolutely was right there at the
3 beginning of this creative process as we put
4 together the early iterations of what became
5 QrewLive.
6        0:29:01
7        KEENAN NIX: No doubt about that. And
8 unfortunately, because of our history, the
9 working relationship wasn't as smooth or as
10 productive as I wanted it to be. And eventually
11 it came to an end, right? But it wasn't because
12 she wasn't smart, and it wasn't because, right,
13 she didn't have a role on this team that was very
14 valuable. Right? She's smart. Period. End of
15 story. We just got sideways in our personal
16 life, and that just made it difficult to do
17 business together. Now, I'm 60 years old, ma'am,
18 in September. I've been around life a little
19 bit. I've been a lawyer for 30 years.
20        SONJA WILLIAMS: Okay.
21        KEENAN NIX: Okay. So when a man says
22 that, I understand that, I understand that that
23 can get complicated. Okay, and you start
24 introducing -- I understand it. I get it. Okay.
25 And so we didn't have any more questions about

Page 31

1 that, right? Okay, thank you for that.
2        0:30:00
3        KEENAN NIX: Because I was seeing the
4 tone at times in some of the information that he
5 had produced that we were getting ready to
6 produce to the other side. And I asked him,
7 what's that all about? Well, what it's all about
8 is, right, we got sideways. The relationship
9 didn't work out. We had a child together, and
10 there were obviously relationship issues
11 abounding, and it made the personal -- the
12 personal relationship made the working
13 relationship complicated, and it wasn't
14 sustainable. But never hear me to say that she's
15 not smart, that she wasn't helpful and that I
16 didn't identify for her a role on this team in
17 the eat a process very early on, because I did,
18 and she had all the goods. This is what she
19 does. This is what she knows. And I wish it
20 would have worked out better, and I wish it would
21 have been smoother. But some things you just
22 can't change. And I said, I get it, all right?
23 We moved on.
24        0:31:00
25        KEENAN NIX: But I said to him, right,

Page 32

1 mark my words, when Delta gets the production of
2 your documents and they start sniffing around,
3 they will come knocking on Ms. Williams' door.
4 Okay? And here they are, one month into
5 discovery, doing exactly that, right, and
6 bitching and complaining about the fact that we
7 sent them a bunch of documents that documented
8 your role as well as your relationship. And many
9 of them had big block marks that were totally
10 redacted, not because we anything to hide, but
11 because all that's personal and totally
12 irrelevant. And they didn't like that. And so
13 now they're pushing back. And the first step in
14 that was this document request. The second step
15 is going to be their request to notice your
16 deposition, to talk with you face to face in a
17 question and answer session. And if you've been
18 around business for a while, and especially
19 litigation, you know what a deposition is. Okay,
20 well, that's step two.
21        0:31:57
22        KEENAN NIX: Okay, and at the end of
23 the day, it should not accomplish them anything
24 if we're disciplined and we stay on message and
25 we ask ourselves the question, right, what does

Page 33

1 Delta really think about me? And what are they
2 trying to accomplish through my participation? I
3 already told you, make this thing a sideshow and
4 take the jury's eye off the ball and impugn your
5 character, Mr. Alexander's character and
6 introduce a lot of noise, right, that takes
7 people's eye of the real ball, right? Ms.
8 Sonja, in all fairness, there's a lot of noise
9 coming out a lot of those documents, right, that
10 we had to produce, right, that was discouring
11 you all's relationship. There's a lot of noise.
12        SONJA WILLIAMS: It is. It was.
13        KEENAN NIX: Okay, and they would have
14 to be deaf not to hear it. Okay, and are they
15 interested? Of course they are because it's a
16 distraction. But if we are disciplined, that's
17 all it ever becomes. Right? And I asked Craig
18 one question.
19        0:33:01
20        KEENAN NIX: I said, Craig, you've told
21 me one thing about Ms. Sonja. She's smart. I
22 said, okay, well, if she's smart and she
23 understands the big picture lay of the land, she
24 ain't going to cut off her nose to spite her
25 face. Okay. So if she's smart, she'll --

9 (Pages 30 - 33)

03:43:34  Keenan Nix Deposition                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 34

1        SONJA WILLIAMS:  I like you Keenan,
2  okay?  Okay?
3        KEENAN NIX:  That's it.
4        SONJA WILLIAMS:  I hear you.
5        KEENAN NIX:  And if you come meet with
6  -- and if you come meet with me next week, I'll
7  tell you the 411.
8        SONJA WILLIAMS:  All right.  You know
9  what?
10        KEENAN NIX:  Okay, and let you know
11  exactly what this is about.
12        SONJA WILLIAMS:  You know what?  I
13  appreciate this call.  I'm definitely going to
14  come and meet you.
15        KEENAN NIX:  All right.  Thank you.
16  Well I won't --
17        SONJA WILLIAMS:  Because I will be
18  honest with you.  At first, I wasn't -- I was not
19  even going to do it.  But I appreciate your call
20  and I appreciate your candor, right, and I feel
21  good about it, so absolutely.
22        KEENAN NIX:  Thank you.
23        SONJA WILLIAMS:  Absolutely.
24        KEENAN NIX:  I'm hitting send right
25  now, and if you have any questions, you let me

Page 35

1  know and I'll be here at your beck and call next
2  week.  Peace.
3        SONJA WILLIAMS:  All right.  Sounds
4  good.  Have a great day.  Bye-bye.
5        KEENAN NIX:  Bye-bye.
6        0:33:55
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 36

1        C E R T I F I C A T I O N
2
3  I, Sonya Ledanski Hyde, certify that the
4  foregoing transcript is a true and accurate
5  record of the proceedings.
6
7
8  Sonya L. Ledanski Hyde
9  _____
10
11  Veritext Legal Solutions
12  330 Old Country Road
13  Suite 300
14  Mineola, NY 11501
15
16  Date:    June 27, 2023
17
18
19
20
21
22
23
24
25

10 (Pages 34 - 36)

Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

03243 - Kenan N. Torok - direct examination                    June 23, 2023

[& - background]                                                        Page 1

| & | 4 | agent 9:22 | applications |
| --- | --- | --- | --- |
| **&** 27:24 | **411** 34:7 | **aggressive** 14:24 | 7:18 |
| **0** | **5** | **agree** 13:11 | **appreciate** 20:1 |
| **032423** 1:17 | **5** 1:11 | **agreement** 20:2 34:13,19 |
| **03275-2** 1:9 | **560** 10:8 | 20:20 22:10 | 34:20 |

**agent** 9:22
**aggressive** 14:24
**agree** 13:11
**agreement** 20:20 22:10
**ahead** 2:4
**ain't** 28:10 33:24
**air** 1:7
**airlines** 2:7
**airlines** 2:7
**alexander** 1:4 2:5 6:5,14 8:9 11:3,16 12:1 12:14,24 15:19 16:6,10 18:22 21:14 23:21 25:13 28:19 29:2
**alexander's** 2:15 21:4 33:5
**all's** 33:11
**alleged** 28:16
**angle** 15:25
**answer** 5:12 6:9 15:13 32:17
**anticipate** 9:15
**anticipating** 11:24
**anxiety** 17:8
**anybody** 18:22
**application** 19:11 21:16 26:7

**applications** 7:18
**appreciate** 20:1 20:2 34:13,19 34:20
**approach** 13:23 15:2
**appropriate** 20:10
**arguably** 14:1
**arguing** 15:22
**arrayed** 27:17
**aside** 26:12
**asked** 2:17 11:11 16:21 31:6 33:17
**asking** 20:8
**ass** 16:15 21:1
**assist** 2:22
**atlanta** 15:9
**attempt** 10:24
**available** 14:12
**avoid** 16:18
**aware** 6:16 12:5
**awesome** 19:4 19:6

**b**

**baby's** 21:5
**back** 17:20 20:6 24:14 32:13
**background** 23:21 28:8

**1**

**1** 1:11
**10** 1:12 16:13 24:16
**10,000** 16:21
**11,000** 6:14
**11501** 36:14
**12151** 36:8
**150,000** 16:9

**2**

**20** 16:14 27:25
**20,000** 16:8 17:24
**2023** 36:16
**21** 1:8
**25** 7:16
**27** 36:16

**3**

**30** 2:20 4:1 11:18 28:8 30:19
**30,000** 7:9
**300** 36:13
**30092** 10:8
**3295** 10:3,7
**330** 36:12

**6**

**60** 30:17

**a**

**able** 23:5 28:9
**abounding** 31:11
**absolutely** 12:24 13:9,11 18:4 24:6,18 27:7 30:2 34:21,23
**access** 13:21 14:1,7
**accomplish** 32:23 33:2
**accurate** 36:4
**acknowledge** 22:11
**action** 1:7
**actually** 3:25 24:23 26:7
**address** 3:1 9:16 22:16
**addressed** 10:9 10:23
**affect** 17:5
**age** 18:20,21
**agenda** 21:11

32431 - Kemper Nationa Section   June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[ball - confidentiality]**                                                Page 2

| | | | |
|---|---|---|---|
| **ball** 33:4,7 | **building** 15:9 | **certainly** 9:23 | **coming** 3:18,22 |
| **band** 24:25 | **bunch** 32:7 | **certificate** 9:5,5 | 8:5 33:9 |
| **bases** 10:25 | **burton** 1:10 | **certified** 3:19 | **commerce** 15:8 |
| **basis** 16:11 | **business** 11:2 | 10:6 | **committed** |
| **bastian** 1:8 | 13:7 17:13 | **certify** 36:3 | 28:24 |
| **bearing** 20:18 | 19:18 21:3 | **challenge** 19:24 | **communication** |
| **beck** 35:1 | 30:17 32:18 | **chance** 22:24 | 20:23 |
| **beginning** | **bye** 35:4,4,5,5 | 25:4 | **communicati...** |
| 29:24 30:3 | | **change** 31:22 | 19:3 |
| **behalf** 20:1 | **c** | **changed** 9:17 | **company** 7:16 |
| **believe** 4:21 | **c** 36:1,1 | **character** | 9:21 10:13 |
| 13:12 28:23 | **call** 7:2 34:13 | 19:17 33:5,5 | 11:16 22:9 |
| **belong** 28:2 | 34:19 35:1 | **chat** 2:3 | 26:8 |
| **best** 27:13 | **called** 20:22 | **check** 5:5 | **compel** 5:18 |
| **better** 13:24 | 27:24 | **child** 6:11 | 12:21 |
| 31:20 | **camera** 20:8 | 20:17 31:9 | **compile** 4:14 |
| **big** 12:8 27:23 | **candor** 34:20 | **children** 17:16 | **complaining** |
| 29:10 32:9 | **capable** 23:4 | 18:2 | 12:21 32:6 |
| 33:23 | **capacity** 21:19 | **chop** 15:10 | **complaint** 7:22 |
| **biggest** 27:23 | **captain** 6:14 | **circumstances** | 7:24 22:6 |
| **bit** 27:10 30:19 | 15:19 16:6,10 | 2:15 | **complicated** |
| **bitching** 32:6 | 18:21 21:3,14 | **city** 27:24 | 25:23 30:23 |
| **block** 32:9 | 23:21 25:13 | **civil** 1:7 | 31:13 |
| **boat** 25:25 | 28:19 29:1 | **clear** 29:12,14 | **comply** 5:16 |
| **book** 26:4 | **care** 4:15 14:22 | **client** 15:19 | 9:23 |
| **boss** 23:15 | **carefully** 29:20 | **closer** 27:11 | **concerned** |
| **bought** 25:8 | **case** 2:15 3:4 | **club** 15:8 | 15:22 |
| **boyfriends** | 4:8,11 12:13 | **colleagues** | **conclusion** |
| 17:17 | 15:23 17:6,7 | 27:12 | 27:18 |
| **breach** 20:19 | 19:2 21:12 | **collectively** | **confident** 17:20 |
| **bright** 14:16 | 22:12 26:19 | 27:17 | **confidential** |
| **bring** 15:20 | **cases** 7:12 | **come** 8:6 22:21 | 14:6 22:13 |
| 23:13 24:25 | **causes** 17:7 | 24:9 25:14 | **confidentiality** |
| **brought** 24:14 | **cell** 22:17 | 26:1 27:1 32:3 | 20:20 22:10 |
| 27:11 | **certain** 16:2 | 34:5,6,14 | |

C34R1 - Kennedy Nunez Section June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[connection - discovery] Page 3

| | | | |
|---|---|---|---|
| **connection** 22:11 | **core** 27:17 | **creativity** 21:18 | **denied** 28:4 |
| **connections** 11:15 | **corporate** 1:11 | **custody** 20:17 | **depose** 12:11 |
| **conquer** 14:18 | **corporation** 4:21 20:19 | **cut** 33:24 | **deposition** 15:1 32:16,19 |
| **considered** 7:17 | **cost** 23:2,6 | **d** | **details** 6:13,23 12:15 15:16 |
| **consult** 5:3 | **counsel** 14:12 | **daily** 16:11 | 16:3 29:5 |
| **consultant** 11:4 | **counterfeit** 20:22 | **damn** 25:25 27:19 | **determine** 19:20 20:9 |
| **consulting** 11:3 11:7 | **country** 36:12 | **dance** 24:24 | **developed** 26:7 |
| **contact** 5:6 9:2 9:3 | **county** 1:1 | **darrell** 1:9 | **developing** 7:18 |
| **contained** 7:1 | **couple** 29:8 | **date** 36:16 | **development** 11:17 |
| **context** 2:16 3:4 5:8 6:21 11:20 22:22 29:10 | **course** 4:18 18:11,12,14 21:13 23:18 24:16 26:13 33:15 | **daughter** 12:23 17:15 18:1 20:2 24:4 | **devices** 18:23 18:23 |
| | **court** 1:1 5:17 12:20 13:3,12 20:8,11 22:3 28:2,4,15 | **david** 1:10,10 | **different** 18:22 29:13 |
| **contributions** 15:21 | | **day** 18:20,20 24:5 32:23 35:4 | **difficult** 30:16 |
| **convenient** 23:2 | **courtesy** 22:2 22:14 27:1 | **days** 2:21 4:1 11:18 | **digital** 18:20,23 |
| **conversation** 25:6 | **cover** 10:24,24 11:9,14 | **deaf** 33:14 | **directed** 2:9 4:19 10:5,20 |
| **conversations** 17:16 20:15 29:4 | **craig** 1:4 2:5 6:10 7:20 26:9 29:1,25 33:17 33:20 | **deals** 11:8 | **directly** 6:19 14:11 |
| **cool** 26:4 | | **dealt** 12:22 | **disciplined** 32:24 33:16 |
| **cooperate** 17:3 | **create** 12:12,13 16:24 | **decide** 28:15 | **discourse** 17:15 |
| **coordinate** 15:1 | **created** 18:10 | **defendants** 1:13 | **discoursing** 33:10 |
| **coordinated** 13:16,23 14:13 | **creation** 20:22 21:16 | **definitely** 13:12 26:4 34:13 | **discovering** 19:13 |
| **copy** 2:6 12:3 22:2,5,6,15 | **creative** 21:15 30:3 | **dekalb** 1:1 | **discovery** 2:13 4:4 12:3 18:25 21:2,23 22:6 28:5 32:5 |
| | | **delta** 1:7 2:7 8:1,20 12:21 14:20,21 16:8 16:9 19:11 20:19 21:17 32:1 33:1 | |

Case 19-56304-sms    Doc 243    Filed 01/06/25    Entered 01/07/25 09:21:46    Desc Main
Document    Page 103 of 321

23133 - Kenneth Newman Cation    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[dismiss - foregoing]    Page 4

**dismiss** 27:23
28:1
**distracting**
16:24 21:10
**distraction**
4:17 33:16
**divide** 14:18
**dlv** 10:22
**dock** 23:22
24:8 25:5
26:23
**document** 2:11
3:1,17 4:20,22
6:25 10:20,23
11:13 17:25
19:1 22:8
32:14
**documented**
32:7
**documents**
4:14 6:14,25
13:4,5 14:2
17:24 32:2,7
33:9
**doing** 11:1
14:24 26:21
28:7,18,24
32:5
**dollars** 25:24
**don't** 8:23,24
**door** 14:24
32:3
**doubt** 16:20
27:8 30:7

**downtown** 15:9
**drive** 10:7
**drops** 20:12
**dry** 26:9
**duty** 12:6

### e

**e** 2:2,2 18:24
36:1
**early** 22:21
29:3 30:4
31:17
**eat** 31:17
**educate** 29:5
**edward** 1:8
**effort** 16:17
**either** 17:2,5
**electronic**
18:24
**electronics**
25:12,17
**email** 2:25 5:6
22:1,5,16
**emails** 12:16
13:17
**embarrassing**
19:14
**emotions** 21:8
**encounter**
24:14
**ended** 9:2
**ends** 28:15
**enjoys** 25:1
**enmity** 12:13
**entities** 10:16

**entity** 29:13
**equation** 16:14
**especially**
32:18
**eventually** 22:4
30:10
**everybody**
17:18 21:21
23:10 25:1
**exactly** 5:13
10:2 12:9
24:12 28:18
29:9 32:5
34:11
**except** 6:11
**exchange** 10:7
**exercise** 4:2
15:21
**expecting**
22:25
**expense** 4:17
**experience** 4:23
8:7 25:9
**experienced**
20:14
**expert** 7:17
**express** 3:20
**eye** 33:4,7
**eyes** 20:12

### f

**f** 36:1
**face** 15:7,7
22:22,22 32:16
32:16 33:25

**fact** 7:24,25 8:9
29:23 32:6
**facts** 2:14 7:5
26:24 27:18
**fair** 17:11
**fairness** 33:8
**familiar** 15:24
**family** 12:14,22
16:23 20:23
23:23 25:1
**fashion** 14:13
**father** 20:16
**federal** 3:19
**feel** 34:20
**feet** 16:21
**felt** 27:5
**file** 1:8
**filed** 9:4 27:21
27:22 28:1
**filing** 20:7
**filings** 22:2
**financially** 23:7
**find** 27:14
**firm** 27:24
**first** 5:19 12:3
14:9 24:8
32:13 34:18
**fit** 29:2
**flight** 20:22
**folks** 4:22
**fool** 17:12,12
17:19
**foot** 7:9
**foregoing** 36:4

02433 - Kenneth Alexander - Bosch Section                                   June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[forget - individual]                                                        Page 5

**forget**  26:13
**forward**  2:11
  3:1,14 5:3 8:23
  15:5 22:15
  23:1
**forwarded**  2:6
**frankly**  6:18
**free**  23:5
**frequently**
  24:20
**friday**  2:20
**friend**  14:21
**front**  12:20
  23:8
**frustrated**
  25:19,24
**frustration**
  25:20
**futile**  16:17

**g**

**gamesmanship**
  18:19
**generally**  29:17
  29:21
**georgia**  1:2
  10:8
**getting**  25:17
  31:5
**girl**  24:21
**give**  2:17,25 5:6
  5:7 7:8 11:20
  22:22 27:2
**given**  7:21
**gives**  2:20

**glad**  24:14
  29:20
**glove**  14:13
**go**  2:4 5:17
  23:20
**goal**  5:14,15,19
  11:18 16:21
**goals**  23:9
**going**  3:13,14
  5:3 13:3 14:18
  15:5 17:20
  29:5 32:15
  33:24 34:13,19
**good**  2:3 5:12
  7:14 25:21
  34:21 35:4
**goods**  31:18
**google**  23:19
**gotten**  9:8,11
**great**  7:14
  21:17 23:7
  25:2 35:4
**greatly**  23:16
**greek**  25:22
**gritty**  6:13
  15:11
**groove**  14:14
**guarantees**
  28:20
**guess**  9:4

**h**

**half**  25:24
**hand**  14:13
**handle**  25:15

**hang**  3:2
**happen**  14:19
**happened**
  15:24
**happy**  2:16
  15:12
**haskin**  1:9
**heads**  2:17
**hear**  31:14
  33:14 34:4
**hearing**  18:16
**heat**  21:7
**hello**  24:4,11
**help**  5:2,16
  11:19,19,20
  14:8,9 25:14
  27:4
**helped**  14:9
**helpful**  11:21
  31:15
**hidden**  19:5
**hide**  32:10
**high**  7:8 16:12
**hire**  4:18 23:12
**hired**  6:20,24
**history**  6:17,21
  30:8
**hit**  3:14
**hitting**  22:15
  34:24
**hold**  5:21
**honest**  34:18
**honored**  15:13
**hope**  14:19
  22:20

**hours**  20:5
**how'd**  25:20
**humor**  26:10
**husband**  20:16
**hyde**  36:3

**i**

**idea**  7:25 8:5,6
  8:11 11:17
**identified**  2:13
  4:4 10:25 11:1
  12:2,4 21:23
  22:7
**identify**  31:16
**ignored**  5:17
**importance**
  14:20
**important**  5:9
  6:24 21:13
  22:23 26:24
**impossible**  8:6
**impugn**  33:4
**inclined**  25:10
**included**  9:20
**including**  17:14
  22:5
**inconvenience**
  4:16
**indicated**  8:10
**indicating**  9:5
**indiscernible**
  13:10
**individual**  8:8
  10:12,13,21
  11:1

Q3:33 - Kennan Nicholson Cook
June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[individually - legal]                                                          Page 6

**individually**
 4:20 11:15
**individuals**
 19:16
**information**
 5:6 8:19,19
 9:22 12:19,22
 13:22 14:6
 19:9 31:4
**ingenuity** 21:18
**innocuous** 25:6
**integrity** 19:22
**intellectual**
 7:12 20:21
 21:19
**intend** 4:16
**intensive** 19:1
**inter** 21:4
**interactions**
 16:10
**interested**
 18:15 19:12
 33:15
**interpersonal**
 20:17
**intimate** 7:2
 12:15
**introduce** 33:6
**introducing**
 2:23 30:24
**introduction**
 1:17
**invite** 27:1
**involved** 19:16
 22:13

**involvement**
 11:25
**involving** 6:13
 19:2
**irrelevant**
 19:17 32:12
**issue** 8:4,9
**issues** 7:23
 12:12 16:24
 20:17 21:12
 22:13 31:10
**it'll** 3:21
**iterations** 30:4

**j**

**j** 3:6,6,10,10
**job** 25:2
**john** 1:12
**june** 36:16
**jury** 28:15
**jury's** 33:4
**justice** 27:10

**k**

**k** 2:2
**keenan** 2:2,5,9
 2:25 3:9,13,16
 3:24 4:7,10 5:2
 5:11,15 6:1,8
 7:10,14 8:13
 8:17,22 9:10
 9:13,19,25
 10:5,14,17,19
 11:5,11 12:8
 13:2,10,14
 14:5 15:4 16:2

17:2,23 18:6
18:11,14 19:5
19:8 20:4,25
21:21 22:20
23:18 24:1,3,7
24:11,19,23
25:19 26:5,18
27:9,16,21
28:14 29:7,15
29:19,25 30:7
30:21 31:3,25
32:22 33:13,20
34:1,3,5,10,15
34:22,24 35:5
**keenannix** 1:17
**kenneth** 5:22
**kept** 19:23
**kind** 8:25,25
 9:1 26:1,1
**king** 27:24
**knew** 2:18
 11:25 24:12
**knocking** 14:23
 32:3
**know** 4:6,10
 5:23 6:1,9 7:24
 8:11 9:2,21
 11:25 12:9,16
 13:17 14:15,15
 14:16 15:14,14
 15:15,16,17,18
 16:19 17:6
 18:14 20:14,23
 21:6 23:7
 25:11 26:9,10

26:11,14,23
27:8 28:16
29:4,21,25
30:1 32:19
34:8,10,12
35:1
**knowledge**
 2:14 12:4 22:8
**knows** 21:21,22
 31:19

**l**

**labor** 21:18
**lake** 23:23
**land** 33:23
**lands** 3:24
**lanier** 23:23
**law** 12:6 27:24
 28:2
**lawsuit** 3:18
 12:25 22:7
 27:22
**lawyer** 4:13,13
 4:18 9:3 23:4
 23:13,14 25:9
 26:12,15 30:19
**lawyers** 9:2
 16:13 23:8
 26:20 27:25
**lay** 33:23
**learn** 16:4
**learned** 26:15
**led** 25:5
**ledanski** 36:3
**legal** 2:11 3:25
 4:22 5:16

Craig - Kennan Nixon transcription
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[legal - nix]**

Page 7

14:11 36:11
**legalese** 4:24
**legally** 2:21
**letter** 3:7 10:8
**letting** 13:8
**level** 7:9
**liberty** 20:21
**license** 20:20
**life** 21:4 30:16
 30:18
**lifetime** 7:13
**likely** 5:17 20:7
**limitations**
 26:20
**lines** 1:7 17:9
 17:10
**listen** 8:19
**listening** 29:19
**litigation** 4:23
 16:12 32:19
**little** 24:16 26:9
 26:12 27:10
 30:18
**long** 11:24
 12:11
**look** 13:5 17:12
 17:12,18 19:21
 23:20 26:22
 27:10
**looking** 9:25
 10:1
**losing** 28:11
**lost** 28:10
**lot** 6:15,18 7:23
 16:24 33:6,8,9

33:11
**lots** 21:22
**love** 3:3 5:7
 12:12
**lunch** 15:8

**m**

**ma'am** 20:4
 30:17
**made** 11:8 13:6
 22:3 28:19
 30:16 31:11,12
**mail** 3:19,20
 10:6 22:5
**make** 4:15
 10:12 12:10,14
 13:2 16:22,22
 16:23 17:11,12
 17:18 18:10
 19:15 29:14
 33:3
**makes** 25:22
**making** 14:11
**man** 30:21
**manner** 14:25
**mark** 32:1
**marks** 32:9
**mate** 26:23
**material** 20:9
**mates** 25:5
**matter** 2:19,19
 14:15 17:9
 23:15
**matters** 19:17
**matthew** 1:9

**mean** 4:24,25
 18:14 23:15
 25:6 29:16,16
**meant** 26:10
**meet** 3:3 5:7
 22:22 23:14
 34:5,6,14
**meeting** 8:2
 25:4
**message** 32:24
**met** 15:17 20:4
 23:21,24,24,25
 24:16 25:13
**million** 25:24
**minds** 27:16
**mineola** 36:14
**minute** 6:22
**mockery** 12:14
 13:3,8 16:22
 16:22,23 19:16
**money** 23:3,6
**month** 32:4
**mother** 15:16
 20:16 21:6
**motion** 5:18
 12:20 20:7
 27:23 28:1
**move** 23:1
**moved** 10:4
 31:23
**muta** 1:9

**n**

**n** 2:2,2,3 3:6,6
 3:7,10,10,10
 36:1

**name** 4:3
**nancy** 2:3 3:7
 3:11
**nature** 6:10
 15:6 19:10
**necessary**
 28:24
**need** 8:23 11:19
 11:20
**neighbor** 26:23
**neither** 8:11
**nerd** 26:2,6
**never** 13:22
 20:12 31:14
**new** 24:24 25:8
 25:11
**nitty** 6:13
 15:11
**nix** 2:2,2,2,5,9
 2:25 3:9,13,16
 3:24 4:7,10 5:2
 5:11,15 6:1,8
 7:10,14 8:13
 8:17,22 9:10
 9:13,19,25
 10:5,14,17,19
 11:5,11 12:8
 13:2,10,14
 14:5 15:4 16:2
 17:2,23 18:6
 18:11,14 19:5
 19:8 20:4,25
 21:21 22:20
 23:18 24:1,3,7
 24:11,19,23

03433 - Kennard N. Inrogion

June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[nix - proceedings]

Page 8

25:19 26:5,18
27:9,16,21
28:14 29:7,15
29:19 30:7,21
31:3,25 32:22
33:13,20 34:3
34:5,10,15,22
34:24 35:5
**noise** 33:6,8,11
**non** 2:12
**nonparty** 4:3
  10:19
**norcross** 10:8
**nose** 33:24
**notice** 2:6
  11:23 32:15
**noticing** 14:25
**number** 22:17
**ny** 36:14

**o**

**o** 3:6,6,10,10
  36:1
**object** 11:12
**objectives**
  23:10
**objectivity**
  19:22
**obviously** 9:23
  31:10
**occasion** 25:4
**occasions** 29:8
**offended** 27:6
**office** 10:4
  22:17

**oh** 3:5 23:24
  27:7
**okay** 2:10 3:5,9
  3:13,15 4:9
  5:10 7:3,6,10
  7:16,19 9:13
  10:11,15,18
  13:19 14:8,14
  14:17 16:15
  17:11,19 18:13
  18:21 19:21
  20:11,12,15,25
  21:11,22 24:17
  25:22 27:11
  28:4,22,25
  29:15 30:20,21
  30:23,24 31:1
  32:4,19,22
  33:13,14,22,25
  34:2,2,10
**old** 30:17 36:12
**once** 3:24
**open** 16:5
**operative** 27:18
**order** 20:12
**ordered** 28:4
**outcome** 17:6
  28:20
**outsmarted**
  28:21
**outspent** 28:22
**outworked**
  28:21
**overview** 27:3

**own** 4:18 23:4
  23:13
**owned** 7:15

**p**

**page** 23:11,19
**pages** 16:8,9
**panel** 25:12,17
**part** 8:1 13:24
  29:3
**participation**
  33:2
**parties** 3:17
  14:5 24:24
**party** 2:10,12
**pay** 25:24
  29:12
**payroll** 18:25
**peace** 35:2
**people** 14:1
  21:22 22:12
  30:1
**people's** 33:7
**perfectly** 23:4
**period** 30:14
**person** 2:14
  12:4 13:18
  22:8
**personal** 6:16
  7:1 12:18,22
  13:7 15:15
  19:10,14,23,23
  21:8,9,10
  30:15 31:11,12
  32:11

**personally** 18:9
**personnel**
  18:25
**perspective**
  14:19 18:16
**pertain** 13:7
**phone** 5:5
**picture** 12:8
  33:23
**place** 27:3
**plaintiff** 1:5
**plan** 28:10
**play** 17:10,10
**playing** 17:9
**point** 9:16 11:6
  14:14 26:18
**poke** 21:3
**position** 7:5
**possession** 16:7
**potential** 11:14
**prepared** 4:12
**presented** 7:25
**presenting** 23:8
**preserved**
  18:21
**primarily** 9:17
**prior** 4:3
**private** 14:6
  21:4
**privilege** 25:3
**probably** 7:20
  9:19
**problem** 25:16
**proceedings**
  36:5

Case 19-56304-sms   Doc 243   Filed 01/06/25   Entered 01/07/25 09:21:46   Desc Main
Document   Page 108 of 321

32433 - Kenneth Nugent Section                                June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[process - right]                                                        Page 9

| process | q | redacted 12:19 | repeat 3:9 |
|---|---|---|---|
| process  2:22 | **q** | redacted  12:19 | repeat  3:9 |
| 5:16 21:15 | qrewlive  11:17 | 12:21 13:19 | representation |
| 28:6 30:3 | 12:17 30:5 | 32:10 | 25:7 |
| 31:17 | quarter  28:6 | redactions  13:6 | request  4:14,20 |
| produce  18:5,7 | question  11:12 | 13:6 20:10 | 5:18 10:20 |
| 31:6 33:10 | 16:21 25:15 | reference  10:12 | 11:13 12:9,10 |
| produced  6:15 | 26:19,22 32:17 | refined  27:6 | 32:14,15 |
| 16:7 17:23 | 32:25 33:18 | reflected  3:21 | requests  22:9 |
| 18:9,18,24 | questions  5:11 | regarding | requirement |
| 19:3 31:5 | 15:13 30:25 | 28:20 | 4:1 |
| product  20:22 | 34:25 | registered  9:22 | respect  15:20 |
| production | **r** | related  12:17 | 23:15 |
| 4:15 10:20 | | 12:17 | respond  2:21 |
| 32:1 | r  36:1 | relates  11:16 | 8:21 11:18,21 |
| productive | rabidly  19:12 | 21:12 | 26:11 |
| 30:10 | rahul  1:7,8 | relationship | responding  4:1 |
| promise  28:19 | raising  25:2 | 6:4,10,16 8:8 | 15:12 |
| properly  9:16 | reading  7:21 | 12:15,18,23 | response  5:5,18 |
| property  7:12 | ready  31:5 | 15:18 16:23 | 14:9,10 21:24 |
| 20:21 | real  33:7 | 17:14 18:1 | responses  12:3 |
| proposal  23:1 | really  4:24 6:23 | 21:5 30:9 31:8 | 22:6 |
| prove  16:19 | 15:10,10 28:3 | 31:10,12,13 | responsibility |
| 27:19 28:17,24 | 33:1 | 32:8 33:11 | 16:18 |
| provided  21:24 | reason  9:17 | relationships | responsive  4:14 |
| providing  11:7 | 13:15 20:13 | 20:18 | result  21:18 |
| published  7:22 | 27:14 | relevant  6:19 | resulted  25:7 |
| pursue  27:14 | receive  3:25 | 16:4 19:20,21 | retain  23:3 |
| pushed  20:6 | 8:18 14:3 | 20:14,15 | review  5:4 20:8 |
| pushing  17:20 | received  8:19 | remain  21:9 | right  2:4 3:5 |
| 32:13 | receives  13:19 | remember  24:3 | 4:18 5:22,23 |
| put  2:16 17:13 | receiving  13:21 | 24:4,10,15 | 6:20 7:3 9:20 |
| 22:16,17 30:3 | recently  10:4 | remembrance | 10:1 12:20 |
| | record  36:5 | 24:15 | 13:4,5,17,21,24 |
| | redact  13:20 | remotely  18:8 | 13:25 14:11 |
| | 14:6 19:9 | | 15:9,18 16:9 |

Case 19-56304-sms Doc 243 Filed 01/06/25 Entered 01/07/25 09:21:46 Desc Main
Document Page 109 of 321
23433 - Kemper Investigation

June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[right - sonja]                                                                Page 10

16:16,17,18,24
17:5,6,14
18:17,19 19:13
19:18 21:1,6,7
21:9,11,24,25
22:2,14,23
23:3 24:7,8,13
24:16 25:13,21
25:23 26:22,25
27:25 28:2,12
28:17,23,25
29:20,24,24
30:2,11,12,14
31:1,8,22,25
32:5,25 33:6,7
33:9,10,17
34:8,15,20,24
35:3
**river** 10:7
**road** 36:12
**role** 18:15
  21:13 30:13
  31:16 32:8
**round** 27:25

**s**

**s** 3:6,6,10,10
**salacious** 17:17
  19:13
**samant** 1:8
**sanctions** 5:19
**sandy** 4:3,6,12
  4:13 8:1
**sat** 27:12
**satisfied** 20:6

**sauers** 4:3
**saw** 19:19
**saying** 9:3
  18:17 28:1,11
**says** 30:21
**scope** 15:6
**second** 14:10
  32:14
**see** 13:4 15:5
  17:23,24 21:23
  22:24 23:18,20
  25:20 28:9
**seeing** 31:3
**seen** 6:14,24
  12:16 13:23
  16:6
**send** 3:13,16
  10:6,21 14:3
  28:8 34:24
**sending** 2:12
  12:9 13:20
**sends** 13:18
**sense** 18:10
  25:22 26:9
  27:6
**sensibility** 27:9
**sent** 2:20 3:19
  9:22 11:13,23
  12:2 21:25
  32:7
**separate** 10:22
**september**
  30:18
**served** 3:17 9:6
  9:12,16 22:1,3

**service** 3:20
**services** 11:8
**session** 32:17
**set** 20:12
**several** 7:12
**severity** 6:4
**share** 6:11 16:3
**shared** 12:1
**she'll** 33:25
**shit** 25:21
**shock** 4:21
  10:22 11:2
**shocktheory**
  29:12,23
**short** 12:11
  26:25
**sic** 4:21 10:22
**side** 16:14 31:6
**sides** 14:2 21:2
**sideshow** 13:8
  19:15 21:10
  33:3
**sideways** 30:15
  31:8
**sign** 22:11
**signature** 23:19
  36:8
**simple** 11:13
  15:1 25:8
**simply** 15:4
**single** 17:25
**sit** 15:7 27:2
**sits** 24:8
**situations** 7:18

**s**        25:3
**s**        15:17,17
  24:16
**smart** 26:4
  30:12,14 31:15
  33:21,22,25
**smartest** 27:12
  30:1
**smith** 1:10
**smooth** 30:9
**smoother** 31:21
**sniffing** 32:2
**solo** 8:5
**solutions** 36:11
**somebody**
  13:18 14:2,3
**sonja** 2:4,8 3:5
  3:6,6,8,10,10
  3:12,15 4:6,9
  5:10,13,21 6:3
  6:7 7:3,8,11,15
  8:4,15,17,18,24
  9:8,11,15,20
  10:3,7,11,15,18
  11:4,6 13:9,11
  13:16 14:20,21
  14:22 18:4,7
  18:13,15 19:4
  19:6,25 22:21
  23:12,24 24:2
  24:6,10,18
  26:3 27:5,7,20
  29:11,18 30:1
  30:20 33:8,12
  33:21 34:1,4,8

Case 19-56304-sms   Doc 243   Filed 01/06/25   Entered 01/07/25 09:21:46   Desc Main
Document - Kenan Nix Transcription   Page 11 of 322
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

June 23, 2023

[sonja - turn]

Page 11

34:12,17,23
35:3
**sonjanwillia...**
3:8
**sonya** 36:3
**soon** 3:1 12:10
14:25
**sounds** 35:3
**sources** 13:18
**spalding** 27:24
**speak** 29:16
**spends** 23:22
**spent** 6:12,18
6:22
**spite** 33:24
**stakes** 16:12
**start** 2:23
30:23 32:2
**starting** 28:6
**state** 1:1,2
**statute** 26:20
**stay** 23:11
32:24
**step** 32:13,14
32:20
**steps** 24:24
**stick** 7:5
**stole** 7:25 21:17
26:8 27:8,19
**stop** 5:22,23
16:16
**story** 26:9 27:5
30:15
**street** 17:13

**stuff** 17:17
**subpoena** 2:7
**successful**
26:16
**sued** 18:3 20:25
**suggest** 17:4
**suggested**
21:15
**suite** 10:7
36:13
**sure** 2:4
**surprise** 2:18
11:23
**surrounding**
2:15
**sustainable**
31:14
**sweet** 24:20
25:3

### t

**t** 36:1,1
**table** 15:20
27:12
**tainted** 19:17
**take** 7:22 8:4,9
15:8 33:4
**taken** 4:15 27:3
**takes** 33:6
**talk** 3:3 22:25
28:3 29:9
32:16
**talked** 6:15
**talking** 6:12,18
6:22 7:20,21
29:17,21,22,22

29:23
**taught** 24:23
**team** 30:13
31:16
**tech** 26:1,6
**technically**
25:10
**technology**
7:16 8:12
**television** 25:12
25:16
**tell** 10:1 12:18
27:3 34:7
**thank** 31:1
34:15,22
**theirs** 16:15
**therapy** 4:21
10:22 11:2
**thing** 4:5,11
27:13,19 33:3
33:21
**things** 7:23
16:17 18:9
31:21
**think** 2:6 5:8
5:23,24,24 6:3
6:7,20 11:21
14:16,23 22:23
26:15,25 27:4
33:1
**third** 2:10
**thoughtful** 27:2
**ticking** 26:19
**time** 2:3 3:2
6:12,18 8:8,20

11:2,7,24
13:25 23:23
25:1 26:14,25
**timeframe** 9:24
**timeframes**
4:25
**times** 24:16
31:4
**today** 20:5
**together** 6:11
23:10 25:2
30:4,17 31:9
**told** 33:3,20
**tone** 31:4
**tongue** 14:14
**took** 20:20
28:25
**totally** 32:9,11
**towards** 26:19
**transactions**
19:2,11
**transcript** 1:16
36:4
**transmission**
3:20
**trepidation**
17:8
**tried** 27:13
**true** 36:4
**truth** 16:25
**try** 5:18 12:13
**trying** 13:2
14:17 33:2
**turn** 19:15
25:12

Q3422 - Kempe N-11 - Section

June 23, 2023

Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[turns - young]                                                                    Page 12

**turns** 27:5
**tv** 25:25
**two** 10:15
    13:17 14:1
    15:23 20:5
    27:22 32:20

**u**

**ultimately** 25:7
    28:14
**under** 12:6
**underlying**
    21:12
**understand**
    4:24 5:25 6:3
    8:20 14:20
    18:19 23:9
    30:22,22,24
**understands**
    21:14 33:23
**understatement**
    16:13
**unfair** 20:20
**unfamiliar**
    25:9
**unfortunately**
    30:8
**united** 23:8
**updated** 9:21
**used** 3:21
**useful** 11:22

**v**

**v** 1:6
**valuable** 29:1
    30:14

**value** 21:17
    23:7
**various** 7:18
**veritext** 36:11
**vetted** 27:13
**view** 7:9
**violated** 20:19
**virtually** 8:6
**volunteered**
    25:14

**w**

**waiting** 9:13,14
**want** 14:8
    15:14 16:3
    17:18 19:15,24
    23:6 29:14
**wanted** 2:22
    30:10
**wasted** 13:25
**waved** 24:12
**way** 17:5 23:2
    23:20 28:7,18
**we've** 4:1 6:12
    11:23 13:19,25
    16:7,13 18:18
    21:22,23 25:3
    28:9
**wearing** 16:15
**week** 3:2 5:7
    15:7 22:21
    34:6 35:2
**weekend** 5:4
**weird** 9:1
**welcome** 4:19
    23:12,13

**went** 10:3
**whatsoever** 8:7
    17:8
**wife** 8:10
**williams** 2:4,8
    3:5,12,15 4:6,9
    5:10,13,21 6:3
    6:7 7:3,8,11,15
    8:4,15,18,24
    9:8,11,15,20
    10:3,7,11,15,18
    11:4,6 13:9,11
    14:21,21,22
    18:4,7,13 19:4
    19:6,25 23:24
    24:2,6,10,18
    26:3 27:7,20
    29:11,18 30:20
    32:3 33:12
    34:1,4,8,12,17
    34:23 35:3
**williams.com**
    3:7
**williams.com.**
    3:11
**willing** 2:22
    29:8
**win** 17:21
**wisdom** 13:24
**wish** 31:19,20
**witness** 2:13
**woman** 14:16
**words** 22:1
    32:1

**work** 14:12
    22:11 23:5
    25:11,17 31:9
**worked** 4:13
    31:20
**working** 15:23
    16:11,13 19:1
    23:9,10 30:9
    31:12
**workings** 21:5
**works** 21:15
**worth** 28:5

**x**

**x** 2:3

**y**

**yacht** 23:22
    25:11,14
**yeah** 10:5 13:9
    24:2 26:3
**year's** 28:5
**years** 7:16
    15:24 19:2
    27:22 28:8
    30:17,19
**young** 24:20

# EXHIBIT C

033023-KeenanNix-FaceToFace Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 1

```
 1              IN THE STATE COURT OF DEKALB COUNTY

 2                      STATE OF GEORGIA

 3

 4    CRAIG ALEXANDER,               )

 5             Plaintiff,            )

 6    v.                             )

 7    DELTA AIR LINES, INC.; RAHUL   )    CIVIL ACTION

 8    EDWARD BASTIAN; RAHUL SAMANT;  )    FILE No. 21-A-

 9    MATTHEW MUTA; DARRELL HASKIN;  )    03275-2

10    DAVID SMITH; DAVID BURTON;     )

11    CORPORATE DOES 1 TO 5; and     )

12    JOHN DOES TO 10,               )

13             Defendants.           )

14    -------------------------------------------------

15

16                     Transcript of

17           033023-KeenanNix-FaceToFaceMeeting

18

19

20

21

22

23

24

25
```

Page 2

1        0:00:00
2        FEMALE 1:  Mr. Nix, how are you?
3        KEENAN NIX:  Caroline, how are you?
4        FEMALE 1:  I'm good.  I'm -- it's going
5   to be two?
6        KEENAN NIX:  Yes, just us two.
7        FEMALE 1:  Just the two.  All right.
8   Give me a second.  Okay.  Get a window table.  Do
9   that, or I have this one over here.
10       KEENAN NIX:  That'll be perfect.
11       FEMALE 1:  Okay.  Just come on in.
12       KEENAN NIX:  Thank you.  How are you
13  today?
14       FEMALE 2:  Good, how are you?
15       FEMALE 1:  Here we go.
16       KEENAN NIX:  Thank you.
17       SONJA WILLIAMS:  Absolutely.
18       KEENAN NIX:  So Sonja, it's so nice to
19  meet you.
20       SONJA WILLIAMS:  Same here.  Same here.
21  Thank you for entertaining me today.
22       KEENAN NIX:  My pleasure.  Where did
23  you drive from?
24       SONJA WILLIAMS:  I live in Duluth.  St.
25  Marlowe.

Page 3

1        KEENAN NIX:  Okay.  Yes, yes.  I know
2   exactly where it is.  Yes, and did you come down
3   400?
4        SONJA WILLIAMS:  No, I came up 85.  I'm
5   in St. Marlowe, so it's more so 85 is closer.
6        KEENAN NIX:  So my pleasure to meet
7   you.
8        SONJA WILLIAMS:  Thank you.
9        0:01:02
10       KEENAN NIX:  I've met your sweet
11  daughter, S█████.  We have spent some time
12  together.  She loves to dance.
13       SONJA WILLIAMS:  She does, yes.
14       KEENAN NIX:  When they have those --
15  when they have those little parties, she and my
16  wife are out there cutting the rug all the time
17  because she likes to dance, even though she's my
18  age.  But that girl loves to dance.  And she's
19  out.  So S█████ and Danielle are out there
20  cutting the rug, leading the charge.
21       SONJA WILLIAMS:  Absolutely.
22       KEENAN NIX:  And I've enjoyed getting
23  to know her.  And we meet today because I happen
24  to represent Captain Alexander.  Now that's a
25  privilege of mine.  I've been doing this for 30

Page 4

1   years.  I don't know if you've had a chance to
2   look at my bio to see what we do, but all I do is
3   represent folks who are catastrophically injured
4   or killed in civil lawsuits for money damages.
5   We've been doing that for 30 years and doing it
6   very successfully.  I'm not a business litigation
7   attorney, okay?  But I know right from wrong.
8   And when I spoke with Captain Alexander, I knew
9   in a minute that what these folks did was wrong.
10  I also knew I had the skill set to prove it.
11       0:02:01
12       KEENAN NIX:  And we began to do a
13  deeper dive into what happened here.  And it rang
14  very familiar with me because I deal with a lot
15  of corporations, even in my work on behalf of
16  folks who get injured or killed.  These could be
17  hospitals.  These could be product manufacturers.
18  These could be businesses who operate businesses
19  unsafely.  So we know what a corporate mindset is
20  that is running from the truth.  And these folks
21  have lost their mind.  So we're going to win.
22  And it's going to take some time.  You see me,
23  but I've got 10 people working with me 15 hours a
24  day, around the clock, and we're taking on a
25  veritable giant.  But like David, we've got seven

Page 5

1   smooth stones in our hand, and the giant is
2   coming down.
3        0:03:00
4        KEENAN NIX:  Right?  We're well into
5   this.  Right?  We're two and a half years into
6   this litigation.  They've already filed a motion
7   to dismiss, which was denied.  Right?  They've
8   got one more shot to escape a jury.  It's called
9   a motion for summary judgment, which they're
10  going to file after the close of all of the
11  evidence.  And we know what that motion is going
12  to require them to prove, and they can't prove
13  it.  So we're going to get to a jury and, they'll
14  never let these facts get in front of a jury
15  because what they did to Captain Alexander was
16  absolutely shameful.  No corporation should act
17  like that, especially not with someone who's been
18  employed with them for 20 years, who delivered to
19  them a solution on a silver platter that was a
20  gamechanger.  So that's really what this is all
21  about.  Now we've already identified a universe
22  of people that have some knowledge, and you are
23  one of them.  You are like number six on the
24  list, and they're just going right down the list.
25       0:03:58

2 (Pages 2 - 5)

03:03, Kennan Business Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 6

1       KEENAN NIX:  The reason why I was
2 slightly late is because there's another
3 gentleman that Craig hired, right, to help him
4 mobilize and put together a business development
5 strategy after Delta left him at the altar, all
6 dressed up and no place to go, right, to try to
7 get out to some of these other airlines.  But by
8 that time, he was broke.  He was a whisper away
9 from bankruptcy and really didn't have the
10 resources to regroup and mobilize and pursue
11 other business strategies.  And so this Joe
12 Mayfield really was on the tail end of that thing
13 and trying to forge solutions that were really
14 not possible because he was out of steam, he was
15 out of gas.  Right?  He was running on fumes.
16 Okay?  And so -- but they're checking the box.
17 And so he called me, literally, at 12:50,
18 returned my call because they sent him a
19 subpoena, just like you.  He's out of state.  And
20 so I just wanted to get him oriented and stop his
21 head from exploding because when laypeople get
22 subpoenas like this and they don't have a lot of
23 experience dealing with litigation.  Thank you,
24 sir.  What's your name?
25       MALE 1:  Ramsay.

Page 7

1       KEENAN NIX:  Thank you, Ramsay.  I
2 appreciate it.
3       0:05:00
4       MALE 1:  Are you guys good with water
5 for now?
6       KEENAN NIX:  I am, but my guest might.
7       SONJA WILLIAMS:  I am as well.
8 Actually, can I have a Coke, please?
9       MALE 1:  Sure thing.
10       SONJA WILLIAMS:  Light ice on that.
11       KEENAN NIX:  And everything on this
12 menu is good.  I know what I want, so I'm going
13 to give you time to look at it.
14       SONJA WILLIAMS:  I'm going to do shrimp
15 and grits, please.  Tomatoes don't come in that,
16 do it?
17       MALE 1:  Tomatoes don't come in that.
18       SONJA WILLIAMS:  All right.  Great.
19 I'll take the shrimp and grits.
20       MALE 1:  (indiscernible).
21       KEENAN NIX:  I'm having that Caesar
22 salad with chicken, please.  Blackened.
23       SONJA WILLIAMS:  Thank you.
24       MALE 1:  Blackened chicken.
25       KEENAN NIX:  That's it.

Page 8

1       MALE 1:  Shrimp and grits.
2       SONJA WILLIAMS:  Thank you.
3       MALE 1:  Coke.  Can I get your member
4 number, please?
5       KEENAN NIX:  Yes.  N0080.
6       MALE 1:  Got you.  I'll be right back
7 with that.
8       KEENAN NIX:  You're welcome.
9       SONJA WILLIAMS:  And thank you for
10 this.  I appreciate it.
11       KEENAN NIX:  Oh, of course.  So where
12 you fit in is very interesting because we gave
13 them 13,000 pages of documents, everything since
14 2013 all the way up through the present date,
15 right, out of all of Craig's devices.  He has two
16 cell phones and he has, as you know, a laptop.
17 Right?
18       0:06:00
19       KEENAN NIX:  And all of that
20 information was harvested by an e-discovery firm
21 that works with us, put in the cloud, preserved,
22 produced, provided to Delta's army of lawyers,
23 and they've read every word.  Now a lot of that
24 contained very personal emails with you and some
25 others that we had to produce because they were

Page 9

1 relevant because in some of those emails, they
2 weren't just dealing with personal things.  They
3 would also be dealing with business things.  It
4 just happens in life that sometimes we have
5 relationships that contain both business and
6 personal purposes.  Yours was one.  So we
7 redacted everything that's personal.  That means
8 we sent them the document, but we put black lines
9 and blocks over all of that information, and we
10 did it with integrity.  We didn't hide anything.
11 But if it was personal business and designed to
12 do nothing but embarrass and distract, that has
13 no arguable relevance, we did that.
14       0:07:06
15       KEENAN NIX:  We also did -- what you do
16 in this case is you tell them we're redacting the
17 documents because the information is irrelevant.
18 And you have the right to challenge that by
19 asking the court to look at the unredacted
20 document and decide whether or not we were honest
21 about that.  And so they're likely going to do
22 that.  But because we were honest, we know we're
23 going to win.  Right?  But it is worthwhile
24 coordinating how you respond because if we have
25 redacted documents that were between you and

3 (Pages 6 - 9)

03-23-... Keenan Nix - A Face-To-Face Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 10

1  Craig and you produce the documents in an
2  unredacted fashion, then they've already seen and
3  gotten access to the information.  So you really
4  want to make certain that what you do harmonizes
5  with what we've already done so that they don't
6  get unintended access to information which they
7  intend to manipulate, abuse, sensationalize and
8  use to distract.
9       0:08:09
10      KEENAN NIX:  So that is why a
11  coordinated approach, Ms. Sonja, would be helpful
12  here.  And yet we know that when these subpoenas
13  come requiring folks to take time investing and
14  doing these things the right way, that it's good
15  to have a lawyer to do that with you because if
16  you don't do it right, right, then they can bring
17  you before the court because you were sent a
18  subpoena, right, and then try to hold you in
19  contempt, right, because there's a right way to
20  do it and there's a wrong way to do it.  You
21  don't do it the right way, right, then they can
22  go ask the court for relief and sanctions.  Okay?
23  And so we want to avoid all that.
24      0:08:53
25      KEENAN NIX:  And so what I'm proposing

Page 11

1  is that you let us provide you a lawyer who will
2  work with you to respond, comply with all the
3  requirements of Georgia law, redact the documents
4  appropriately to prevent the unintended
5  disclosure of any confidential private
6  information and then give them everything else
7  they're entitled to because we don't have
8  anything to hide.  And because no lawyers work
9  for free, right, right, and we know that Captain
10 Alexander's burden shouldn't be putting folks to
11 unintended -- shouldn't be putting folks to out
12 of pocket expense, that is not their burden.  The
13 lawyer that will work with you will not be making
14 that demand of you and just serving in that
15 capacity, right, and giving you all the guidance
16 and help that you need, and that's not us.  That
17 gives you the independence of not being working -
18 - of not working with us.
19      0:10:01
20      KEENAN NIX:  So that's helpful.  Now
21 that's the background.  That's the lay of the
22 land.  That's what we propose.  Now I'm going to
23 be done because I'm sure you have some things you
24 want to tell me that I need to know.  And I want
25 you to have your opportunity to tell me your

Page 12

1  story.  Let me answer any questions that you
2  might have.  I'm an open book.  Right?  I'll
3  share with you whatever it is you need to know
4  and do that to honor your taking the time to be
5  with me today and giving me this opportunity to
6  coordinate a response that I think has integrity.
7  So Ms. Sonja, have at it.
8       SONJA WILLIAMS:  If you read the
9  emails, you understand the relationship between
10 myself and Craig.
11      KEENAN NIX:  I read them.
12      SONJA WILLIAMS:  Okay, and it's also my
13 understanding that you understand what my
14 background is.
15      0:11:00
16      KEENAN NIX:  Yes, I do.
17      SONJA WILLIAMS:  I've been doing this
18 before I met Craig.
19      KEENAN NIX:  Yes.
20      SONJA WILLIAMS:  I put out technology
21 before I met Craig, and in my eyes, there's no
22 new technology.  Okay, and it's interesting that
23 you say that his documents go back to 2013
24 because it really should go back further than
25 that because mine do.  So I came today to simply

Page 13

1  hear you out.
2       KEENAN NIX:  Good.
3       SONJA WILLIAMS:  You know, and I think
4  it's fair.  I think up until now, Craig and I
5  have had a pretty decent what I like to consider
6  co-parenting relationship --
7       KEENAN NIX:  Yes.
8       SONJA WILLIAMS:  -- you know, in part
9  because it's helpful for me because I'm dealing
10 with another app that I'm doing that solves -- if
11 we would have had the app, he and I probably
12 wouldn't have the problems that we've gone
13 through.  So let me just make sure.  So what
14 you're hoping for is that I turn over the emails
15 from 2013 until --
16      0:12:05
17      KEENAN NIX:  No, I'm not -- I don't
18 even know what you have.  But what I'm saying is
19 a subpoena came to you.
20      SONJA WILLIAMS:  It did.
21      KEENAN NIX:  It had all those questions
22 in there, right?  And you have a responsibility
23 now under the law to comply.
24      SONJA WILLIAMS:  I do.
25      KEENAN NIX:  So yeah, I mean, I'm not

4 (Pages 10 - 13)

03.2023_Keenan Nix_First Trustee Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 14

1  wanting anything.  I'm saying that's the law.  So
2  it's not optional.  And I'm here to say, right,
3  that's also not something that laypeople do every
4  day.  So having a lawyer to counsel you as to how
5  to go about doing it is a tremendous advantage
6  because then it gets done right.  So, for
7  instance, what I'm saying is, depending upon
8  where these documents are housed, right, you're a
9  business person.  It didn't just come to Sonja
10  Williams.  It came to ShockTherapy (sic).  Okay?
11      SONJA WILLIAMS:  Theory.
12      KEENAN NIX:  Therapy.  Theory.  Excuse
13  me.  ShockTheory.
14      0:13:04
15      KEENAN NIX:  So that's two entities,
16  right, involving multiple devices, right?  And we
17  have a firm that we work with called Meta-e
18  Discovery, right, and they are an e-discovery
19  firm that is experienced in harvesting data from
20  devices that contain the information that they
21  seek because we are well beyond the days where
22  people put stuff in drawers and manila folders,
23  and that's just not the way the world works.
24  That's how it used to be.  But mostly what we
25  have that's relevant to those requests is

Page 15

1  maintained in a digital format and it's stored
2  someplace electronically.  And so that's one
3  thing.  But you may also be a person who writes
4  handwritten notes, and you may have a folder with
5  some of those things.
6      0:14:01
7      KEENAN NIX:  And so it's all relevant.
8  But bottom line is we harvest it, we respond and
9  then the purpose of having a lawyer is because to
10  the extent some of those things cause you concern
11  because you know this is outside the scope of
12  what it is that they need to know because it's
13  really personal, then the lawyer helps you make
14  the decisions about what gets redacted, how it
15  gets redacted and then everything is buttoned up
16  the right way.  So, yes, my interest is in you
17  being able to do it correctly and having a lawyer
18  to help you do that because it's not something
19  that laypeople do every day and then doing it in
20  a timely manner and keeping this thing moving
21  because where they're going to go next is they're
22  going to request your deposition.  Okay.  That's
23  a formal sit down question and answer like this,
24  which would be much more important and for the
25  same purpose, right, you will want to be

Page 16

1  represented by counsel who prepares you in
2  context.
3      0:15:00
4      KEENAN NIX:  And that's the most
5  appropriate thing.  Right?
6      SONJA WILLIAMS:  Absolutely.
7      KEENAN NIX:  So that's next.  It all
8  starts with discovery, documents.  They review
9  them, decide who they want to talk to and follow
10  up with and then we sit down face to face, and we
11  have those deposition sessions.  Now it's also
12  important to understand that there is a story
13  here and how disciplined you are as we tell the
14  story is very important.
15      SONJA WILLIAMS:  I understand.
16      KEENAN NIX:  And that's the reason why,
17  down the line, you having representation will
18  enable us to make certain that you're adequately
19  prepared without us doing the preparing.
20      SONJA WILLIAMS:  Absolutely.
21      KEENAN NIX:  Why?  Because I represent
22  Captain Alexander, you understand, and we want
23  you to have the objectivity that comes along with
24  your integrity, your character.  Right?
25      0:15:58

Page 17

1      KEENAN NIX:  And so I won't be -- my
2  role here today is to make certain you understand
3  how to comply with a legal subpoena, to let you
4  know that there's a mechanism in place to get you
5  representation where you can do that right and
6  not financially harm you.  Right?  And then for
7  any purpose down the line, you'll also have
8  access to that same counsel who can guide you,
9  prepare you for depositions, which are surely
10  going to come because there are certain people in
11  this case that I can predict, based on my
12  experience, they will not let alone, and you're
13  one of them.  Why?  Because they see the
14  potential to create fault lines and divide and
15  conquer.  And the reason why they see that
16  potential and issued you the second subpoena is
17  because they saw the nature of some of those
18  communications, even in things that were not
19  redacted.
20      0:17:00
21      KEENAN NIX:  And they know that your
22  relationship with Captain Alexander, right, has
23  some tension in it.  And if that could be
24  leveraged to their advantage, they will seek to
25  do that in any way possible.  So you are on their

5 (Pages 14 - 17)

03.2023 Keenan Nix - First Date Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 18

1  radar.  You're never going to not be on the
2  radar.  And I'm not saying that that's dishonest
3  or unfair because what we said was you were one
4  of the original design consultants.
5          SONJA WILLIAMS:  I am the original
6  creator of the idea.
7          KEENAN NIX:  Okay.
8          SONJA WILLIAMS:  Let's just start there
9  first.
10          KEENAN NIX:  So tell me what you mean
11  when you say that.
12          SONJA WILLIAMS:  That means the story
13  that Craig told you on that is not how that
14  happened.
15          KEENAN NIX:  Okay.  Tell me.  Tell me.
16  Tell me.
17          SONJA WILLIAMS:  Craig and I met back
18  in 2010 --
19          KEENAN NIX:  Yes.
20          SONJA WILLIAMS:  Okay, I'd say about
21  September 2010.  And I distinctly remember we
22  were actually on a ship, and it was actually our
23  first date.
24          0:18:00
25          SONJA WILLIAMS:  So I was kind of like,

Page 19

1  okay, that's cool.  I'm going on a cruise on the
2  first date.  So obviously there was a lot of
3  conversations there.  But then when I met him, I
4  was actually in the middle of developing a device
5  that's called Track Log.
6          KEENAN NIX:  Yes.
7          SONJA WILLIAMS:  Track Log is a GPS
8  location-based device that also had an analytical
9  dashboard that allowed fleets to communicate with
10  each other.  Okay.  That was in 2010.  Now
11  obviously this application has potential to do
12  other things, but anyway, on that ship, Craig
13  told me about a story that I found unbelievable.
14  And it was a story of I asked him, are you ever
15  scared that you're going to crash your plane?
16  And I was like, have you ever had an incident?
17  And how did you handle that?  Because Craig, what
18  I came to realize, he didn't really have a whole
19  bunch of empathy, right?
20          0:19:01
21          SONJA WILLIAMS:  Because -- and so what
22  I -- I derived that from him having to stay in
23  control when there's an unlikely event happening,
24  right?
25          KEENAN NIX:  Yes.  Yes.

Page 20

1          SONJA WILLIAMS:  So the story he told
2  me was that they were preparing to land, and
3  whoever, I would say air traffic control, there
4  was an issue with one of the landing gear.  When
5  that landing gear wouldn't come down, the only
6  thing that he could do was go and I guess the
7  landing -- he said the landing gear was in the
8  middle of the row.  So, you know, you've got
9  people there, right?  So he had to lift up the
10  hatch or whatever the case may be to try to push
11  the landing gear down.  Meanwhile, they're
12  circling the airport because they couldn't get
13  anybody on the phone.  I'm like, what do you mean
14  you can't get anybody on the phone?  Like, you
15  know, that seems like a problem.  And I would be
16  freaking out if I'm this person sitting here.
17  He's like, we couldn't get anybody on the phone
18  because of the situation that was going on.
19          0:20:04
20          SONJA WILLIAMS:  So apparently there
21  may have been a storm somewhere else.  And I
22  guess nobody's on the phone, everybody's in line,
23  call waiting or whatever it was, right?  So I
24  said, are you telling me the airlines are on
25  analog, on an analog phone?  And he says, yes.  I

Page 21

1  told him, oh, I could solve that.  I was like,
2  why don't we have digital communication so that
3  they could actually understand who's in trouble?
4  Do you understand what I'm saying?
5          KEENAN NIX:  Of course.
6          SONJA WILLIAMS:  So if they saw -- if
7  they saw who was in trouble --
8          KEENAN NIX:  Thank you.
9          SONJA WILLIAMS:  -- then they would
10  take those calls first.  So if there was a flight
11  that needed to be rerouted somewhere else,
12  whatever the case may be, and other people are on
13  --
14          KEENAN NIX:  Thank you, sir.
15          SONJA WILLIAMS:  -- on the call.
16          KEENAN NIX:  Let me bless it for us.
17  Thank you, Lord, for this food.  Thank you for
18  this time with Ms. Sonja.  Thank you for this
19  opportunity to get to know each other and bless
20  our time together.  In Christ's name we pray.
21  Amen.
22          SONJA WILLIAMS:  Amen.  So I'm like, oh
23  my God, are you serious?
24          KEENAN NIX:  So let me just -- let me
25  just -- let me just -- let me just -- let me just

6 (Pages 18 - 21)

03023 - Keenan Nix - Future of Base Meeting                          June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 22

1 stop you there.  Genius.
2        SONJA WILLIAMS:  No.  It's --
3        KEENAN NIX:  No, listen.  Listen --
4        0:21:00
5        SONJA WILLIAMS:  Like if you see the
6 entire thing --
7        KEENAN NIX:  No, no.  Listen to me.  I
8 already know enough, ma'am, to know your tracking
9 -- I'm tracking with you because when you say,
10 hold on a minute, everything in analog --
11        SONJA WILLIAMS:  Everything in analog.
12        KEENAN NIX:  In the 20th damn century,
13 y'all are stuck in the damn -- age, in analog,
14 phone queues.  What?
15        SONJA WILLIAMS:  But it was almost --
16        KEENAN NIX:  No digital communication.
17        SONJA WILLIAMS:  It was almost
18 unbelievable.
19        KEENAN NIX:  So no, no -- you're --
20 yes.  Yes.  So carry on.  Yes.
21        SONJA WILLIAMS:  So I'm like --
22        KEENAN NIX:  And you're right on the
23 core and crux of the problem.
24        SONJA WILLIAMS:  Right.  But I wasn't
25 quite there because I was still in disbelief that

Page 23

1 these people, as big as they were -- matter of
2 fact, it wasn't even about Delta, it was more
3 about the FAA for me.  Right?  And so I'm sitting
4 here saying, are you telling me no airline does
5 that?  Are you telling me there is no airline
6 that has visual communications, a dashboard to
7 see what planes are in trouble, what the
8 communications is or anything that goes on in the
9 airport and what happens there?  He says, no,
10 we're analog.
11        0:22:01
12        SONJA WILLIAMS:  Even his flight plans
13 were paper.  There's a lot of things going on.
14 So I was like, oh, I've got a solution for that.
15 You know, I said -- I didn't say anything about
16 what Track Log was and we were on a ship at the
17 time.  And at the time, I literally had -- I was
18 designing the analytical dashboard, the
19 communications dashboard for Track Log.  And I
20 was like, we can solve that.
21        KEENAN NIX:  Track Log, though, was for
22 another industry.
23        SONJA WILLIAMS:  Right.  Track Log is
24 for trucking.
25        KEENAN NIX:  Yes.

Page 24

1        SONJA WILLIAMS:  It's for trucking.
2 But what we were trying to solve was the
3 communications for all the trucks, and it comes
4 in one dashboard and how they communicate.
5        KEENAN NIX:  Yes.
6        SONJA WILLIAMS:  Right.  Because just a
7 lot of crazy stuff was going on there.  So I'm
8 like, okay, this is interesting.  So we got home.
9        KEENAN NIX:  What is your degree in?
10        SONJA WILLIAMS:  I have a GED.  Never
11 been to college.
12        KEENAN NIX:  But love technology.
13        SONJA WILLIAMS:  Well, actually, I
14 didn't know that.  I think what happened, I used
15 to drive a forklift.  A forklift.
16        0:23:01
17        KEENAN NIX:  Yes.
18        SONJA WILLIAMS:  And I was working at a
19 company.  I see logistics.  I'm an expert in
20 logistics.
21        KEENAN NIX:  Yes.  Yes.
22        SONJA WILLIAMS:  Okay?
23        KEENAN NIX:  Yes.  Logistics is what
24 starts it.
25        SONJA WILLIAMS:  Yes.  And so on that

Page 25

1 forklift, it just made me understand how this
2 plant worked that I was in.  And so at the time
3 they put me on what they call an SAP project.  I
4 knew nothing about technology.  So a German
5 company taught me.  And so from there, we
6 developed systems that were amazing.  And then
7 they moved me to Atlanta.  Right?  I never really
8 gave up on that.  I just kept creating things for
9 companies that --
10        KEENAN NIX:  Yeah.
11        SONJA WILLIAMS:  And I only had company
12 jobs in my life before starting ShockTheory.  So
13 anyway, everybody always asks me that, like what
14 college.  I don't think you've got to have
15 college.
16        KEENAN NIX:  No.
17        SONJA WILLIAMS:  I think you've just
18 got to understand the need, the problem and
19 understand what could be solved.
20        KEENAN NIX:  No, no.  I didn't ask you
21 about college.
22        0:24:02
23        KEENAN NIX:  I said, what's your
24 educational background?
25        SONJA WILLIAMS:  Oh, my educational

7 (Pages 22 - 25)

03.23.23 - Keenan Nix - Fireside Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 26

1  background.
2      KEENAN NIX:  Yes, yes.  Because I know
3  what you're saying is absolutely true.  Some of
4  the people that add the greatest value in my team
5  downstairs have never been to college.  They
6  don't have a JD behind their name.  They don't
7  need one because they're smart as hell and they
8  are solution-oriented, and they get the job done.
9  But you understood logistics because you've been
10 in situations where businesses have systems,
11 right?  They have inefficiencies and bottlenecks,
12 and you were always on the solution into that.
13 Now how did you develop the prowess, though, to
14 create solutions with technology?
15     SONJA WILLIAMS:  Well, during the SAP
16 project, this was more about shipping and getting
17 the products out on time because we were dealing
18 with carriers that were delivering product --
19     KEENAN NIX:  Sure.
20     SONJA WILLIAMS:  So we were dealing
21 with pesticides, but more importantly, all of it
22 was logistics.
23     0:25:00
24     SONJA WILLIAMS:  so we wanted to match
25 up warehousing with how we moved the product out

Page 27

1  with how fast we were able to create the product
2  and how smoothly everything went.  Well, from
3  that, what we developed literally sped up
4  production by 40 percent.  So at that time I
5  became a growth genius, right?  So I see numbers,
6  I see patterns.  I see those.
7      KEENAN NIX:  Yes.
8      SONJA WILLIAMS:  Then I became an
9  expert at design.  So not necessarily just
10 websites, but dashboards, and little dashboards
11 for watches, wearable technology, all that.  So
12 for me, it's just second nature.  It's not that
13 someone taught me.
14     KEENAN NIX:  Yeah.
15     SONJA WILLIAMS:  They call me when they
16 want to be taught.  So anyway, so I had developed
17 the communications dashboards for this logistics
18 problem that we're having with fleet services.
19     0:26:03
20     SONJA WILLIAMS:  In that conversation,
21 I was like, wow, all right, let's look a little
22 bit more into this.  So we went back and forth
23 with a lot of stories.  So I sketched out some
24 things, we had some conversations about it and he
25 was very excited about it because he did say I

Page 28

1  could tell you all about it from a pilot
2  standpoint.  And that was very important, right,
3  because any logistics that I was coming up with,
4  obviously, is an administration standpoint, what
5  their problems were, how do we get from point A
6  to point b.  Okay.
7      KEENAN NIX:  Yes.  Workflow --
8      SONJA WILLIAMS:  The workflow, exactly.
9      KEENAN NIX:  -- unique to the industry
10 is important.
11     SONJA WILLIAMS:  Exactly.
12     KEENAN NIX:  And he could help you with
13 what we need.  What do we need?
14     SONJA WILLIAMS:  Oh, absolutely.
15     KEENAN NIX:  As pilots, what
16 information needs are important.
17     SONJA WILLIAMS:  Absolutely.
18     KEENAN NIX:  How do we need that
19 information?  Timeliness.  Who are the people
20 that need to be talking to one another?  So how'd
21 that conversation continue?
22     SONJA WILLIAMS:  So around -- let me
23 just jump to the end of --
24     0:27:00
25     KEENAN NIX:  By the way, I don't even

Page 29

1  like shrimp and grits, but that looks so good
2  over there.
3      SONJA WILLIAMS:  It is.
4      KEENAN NIX:  Is it?
5      SONJA WILLIAMS:  It is so amazing.
6      KEENAN NIX:  I mean, look at it.
7      SONJA WILLIAMS:  It's so amazing.  So
8  he and I, at this time, I didn't necessarily
9  email him everything because I was a sketcher.
10     KEENAN NIX:  Yes.
11     SONJA WILLIAMS:  So it's funny when you
12 were saying, well, we've got things on paper.
13 Well, I sketched everything.  When you did
14 drawings and everything, everything was sketched.
15 So that's what we did.  That's what I did here
16 because it was just an idea.  It wasn't anything
17 that, you know, something that we actually
18 thought at the time that we could bring to
19 fruition until later.  Okay?  That's why it was
20 funny when you were saying 2013.  I was like you
21 could kind of go back before that because before
22 I even gave him -- I would say late, maybe 2012,
23 maybe 2012, and I was like, here is -- without
24 Craig, we created what we called QrewLog,
25 QrewLog, which was a derivative of Track Log.

8 (Pages 26 - 29)

03/2023 Keenan Nix - First Fleet Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

---

Page 30

1  Right?  So instead of telling Craig about it, I
2  literally just went down the research path with
3  Craig.
4        0:28:02
5        SONJA WILLIAMS:  Okay.  Then I showed
6  him what it looks like.  That was the end of I
7  would say maybe the fourth quarter of 2012,
8  because it was around the holidays, right?  Then
9  I remember him coming back after the new year,
10 showing me a prototype of the idea.  He called it
11 --
12       KEENAN NIX:  Mock Crew.
13       SONJA WILLIAMS:  Mock Crew.  And I was
14 just like, oh, that's sold.  I was like, no,
15 we've got to fix this.  This is not what I think
16 they want.  Right?  So we had spent two days
17 together talking about what it should do, and
18 then we ended up firing those people because it
19 was horrible.  Then they kind of got into a spat
20 about refunds and all kinds of stuff, right?  But
21 they weren't doing what we needed them to do.
22 But there was somewhat of a prototype that they
23 put together, which I just thought was horrible,
24 right?
25       0:28:02

Page 31

1        SONJA WILLIAMS:  So around this time,
2  I've already developed an application where it
3  wasn't just role-based text messaging and
4  communications.  It was other divisions as well.
5  Right?
6        KEENAN NIX:  So the QrewLive that
7  ultimately evolved did include three things.  It
8  had the role-based chat feature, which is what
9  Delta was most interested in all along.
10       SONJA WILLIAMS:  Absolutely.
11       KEENAN NIX:  And it also had the
12 scheduling piece and but he also was
13 incorporating into it the ability to bring in
14 flight plans and these --
15       SONJA WILLIAMS:  Okay.  What he had
16 first, what he actually put together --
17       KEENAN NIX:  Yes.
18       SONJA WILLIAMS:  -- was actually the
19 scheduling and the flight plans.  It wasn't
20 necessarily built upon the text messages and the
21 communications piece.  Right?  That's the part
22 that I was most interested in because that's what
23 we were doing for fleet, our fleet in
24 communications with Track Log.
25       0:30:02

Page 32

1        KEENAN NIX:  The scheduling?
2        SONJA WILLIAMS:  No, just the
3  communications of how they interact with each
4  other, right?
5        KEENAN NIX:  Yes, yes.  So the chat
6  piece.
7        SONJA WILLIAMS:  So whether it was
8  field or whatever the case may be --
9        KEENAN NIX:  The chat.  The chat piece.
10       SONJA WILLIAMS:  Yes.
11       KEENAN NIX:  Yes, yes.
12       SONJA WILLIAMS:  So anyway, so I said,
13 no, no, we need to do other things.  So we went
14 through a series of conversations and written
15 documentation too.  So he went back to the
16 drawing board and at this time he's like, we've
17 got something and I believe (indiscernible) we
18 have something.  So I'm just kind of thinking
19 back.  So around the first of the year, he comes
20 back, and we talk about it.  We've got something.
21 We've definitely got something.  I hated the
22 name, so I changed the name.  Right?  But we've
23 definitely got something.
24       KEENAN NIX:  Yes.  And Captain
25 Alexander did inform me that the name QrewLive

Page 33

1  came from Sonja.  She actually came up with the
2  name --
3        0:31:02
4        SONJA WILLIAMS:  I didn't like it
5  because I wanted --
6        KEENAN NIX:  -- QrewLive.
7        SONJA WILLIAMS:  -- because I want live
8  communication that was happening on the ground,
9  in the sky, all at one time.  Right?  So I'm like
10 okay --
11       KEENAN NIX:  The way that's evolved,
12 and it's consistent with the product that they
13 stole and built with his stolen truck is real-
14 time communication.
15       SONJA WILLIAMS:  Yeah, absolutely.
16       KEENAN NIX:  On the ground, in sky.
17 That's the term.
18       SONJA WILLIAMS:  Right.
19       KEENAN NIX:  In real time, live.  Live.
20 In real time.
21       SONJA WILLIAMS:  All of it's live, and
22 it should be.  That just should have been, right?
23 Then I became so -- so I got pregnant and had to
24 slow down.  A bunch of things happened in between
25 then.  But anyway, got pregnant.  I was still

9 (Pages 30 - 33)

Page 34

1 running ShockTheory. Okay. Got pregnant. I was
2 seven weeks pregnant when the issues started
3 happening. What happened, we ended up talking
4 about it, we had sketches and everything.
5      0:32:00
6      KEENAN NIX: Tell me, tell me what
7 issues you're referring to, Ms. Sonja.
8      SONJA WILLIAMS: He started cheating
9 with the fight -- the with the flight attendants.
10      KEENAN NIX: Okay. Yes. That's what I
11 wanted to tell me. Remember, real talk.
12 Keep it 100.
13      SONJA WILLIAMS: Oh, man. He was
14 cheating like a mug.
15      KEENAN NIX: Okay.
16      SONJA WILLIAMS: He was screwing
17 everybody.
18      KEENAN NIX: Okay. So I want to know
19 that, right? Because we're not talking code,
20 right?
21      SONJA WILLIAMS: Okay.
22      KEENAN NIX: Because when you say
23 that's when the issues started, I mean issues
24 with who? Issues with Delta? Issues with Sonja?
25 Issues with Sheila? Issues with other people?

Page 35

1 What, just --
2      SONJA WILLIAMS: It wasn't just Sheila.
3 Sheila was a part of it. It wasn't just Sheila.
4 There were other people too as well. Now, mind
5 you (indiscernible) saying this. I develop
6 technology. I develop tracking technology. I
7 know where you are and what you're doing. Okay.
8 So it's just -- let's just say that.
9      KEENAN NIX: No, I know. Look, these
10 details I'm aware of because I've read the
11 emails.
12      SONJA WILLIAMS: Yeah, you read emails.
13 Right.
14      0:32:59
15      KEENAN NIX: Okay, and just so you
16 know, right, I said, Captain, right, without a
17 doubt, you were a philandering fool.
18      SONJA WILLIAMS: Yes, he was.
19      KEENAN NIX: Okay. Now I'm not making
20 any judgments. Right? And I'm saying to you
21 that has the potential to be a huge distraction
22 because it does go to character, right? But --
23      SONJA WILLIAMS: To the jury, right?
24      KEENAN NIX: No. Yes. But what I'm
25 saying is, right, it still doesn't justify what

Page 36

1 they did.
2      SONJA WILLIAMS: No, it doesn't.
3      KEENAN NIX: And it's really not
4 relevant to what they did. Okay?
5      SONJA WILLIAMS: That's true.
6      KEENAN NIX: So we can keep this out.
7 Okay. But understand, Captain, right --
8      SONJA WILLIAMS: Keenan, I still have -
9 - I still have problems with this chick to this
10 day.
11      0:34:00
12      KEENAN NIX: With who?
13      SONJA WILLIAMS: With Sheila, to this
14 day.
15      KEENAN NIX: Yes, I know you do.
16      SONJA WILLIAMS: To this day.
17      KEENAN NIX: I do.
18      SONJA WILLIAMS: To this day.
19      KEENAN NIX: I know you do.
20      SONJA WILLIAMS: And so I'm closer with
21 his father and his stepmom than I am absolutely
22 with Craig due to his decision-making process.
23      KEENAN NIX: I get it. So let me ask
24 you this, Ms. Sonja. You know I can't fix that,
25 right?

Page 37

1      SONJA WILLIAMS: I'm not interested in
2 fixing it.
3      KEENAN NIX: I know that, but listen,
4 I'm not asking you about interested in fixing.
5 I'm just making statements here. Just let me
6 have this little piece for a little bit, right?
7      SONJA WILLIAMS: Okay.
8      KEENAN NIX: Because I know life at
9 times gets a little bit messy, and it doesn't
10 make me blush because I'm going to be 60 in
11 September and I've seen a lot of life.
12      0:35:02
13      SONJA WILLIAMS: But his involvement
14 with me changed the trajectory of where I was
15 going.
16      KEENAN NIX: Okay.
17      SONJA WILLIAMS: Because it sent me to
18 jail. It forced me to file bankruptcy, and it
19 changed who I was.
20      KEENAN NIX: Yes.
21      SONJA WILLIAMS: So all of that's a
22 problem for me.
23      KEENAN NIX: And it should be.
24      SONJA WILLIAMS: All right.
25      KEENAN NIX: I would not take that away

10 (Pages 34 - 37)

03 2023 - Keenan Nix, Craig 's First Five Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 38

1 from you or marginalize it because it was life
2 changing for you and you lived it. It's a part
3 of your story, and it's a painful part.
4          SONJA WILLIAMS: It's not as painful as
5 the fact that someone I --
6          KEENAN NIX: Well if someone steps out
7 of a relationship and acts without honesty and
8 integrity, that --
9          SONJA WILLIAMS: It's a problem --
10          KEENAN NIX: -- in contrary to your
11 expectations, then that is painful.
12          SONJA WILLIAMS: It's a problem.
13          0:36:00
14          KEENAN NIX: Okay, and if the discourse
15 between you after that came to pass ultimately
16 resulted in the kind of animosity that resulted
17 in incarceration and it also distracted you to
18 the point where it caused financial trauma,
19 right, then that's not just okay. Okay. I
20 understand that. And I'm saying to you, I don't
21 bring any judgment to that, but I certainly can
22 empathize. And I'm not also here to pick sides.
23 And I said to the captain, and I said to Sheila,
24 because just like there is energy still there
25 that you acknowledge, it's in every conversation

Page 39

1 I have with her as we try to move forward with
2 focus here. And I've had to address that.
3          0:37:00
4          KEENAN NIX: Okay. So I know it's
5 real, right. And I also know that it doesn't go
6 away because she's not let it go.
7          SONJA WILLIAMS: And I don't -- I don't
8 really understand. I don't necessarily care, but
9 I'm like, girl, you got the ring, we good. In
10 all fairness to Craig and I, we don't necessarily
11 have any conversation like that. Let me drop her
12 off and pick her up. We good. Cool. That's
13 that.
14          KEENAN NIX: Okay. So what I can say
15 to you is she says the same thing that you say in
16 this regard. She says, that woman still makes my
17 life hell. You say she still makes my life hell.
18          SONJA WILLIAMS: No, she doesn't
19 necessarily -- I'm not going to say -- I don't
20 allow her to make myself --
21          KEENAN NIX: Okay. So --
22          SONJA WILLIAMS: The fact that I don't
23 talk to her is her problem. I gave her that
24 opportunity.
25          0:38:02

Page 40

1          KEENAN NIX: So then what I'm saying
2 is, right, but you're saying she still is causing
3 problems to this day.
4          SONJA WILLIAMS: She caused problems
5 because she would deny -- Craig and I -- or just
6 an example. Craig would say, hey, bring S█████
7 over to the house. I said, okay, great. I get
8 there. She's comes out. Oh, no, she's not
9 coming here. Take her back with you. I'm sorry,
10 what? And I'm like I can't hear you. This is
11 not -- this is my husband. I don't care.
12 Between you and Craig, I don't care, my
13 daughter's sitting here and she's listening. Not
14 only that, let me just tell you, my daughter has
15 picked up my talents ever since she was six years
16 old. Ever since she was two, to be honest, she's
17 always had a cell phone. Okay. At around six
18 years old, I had (indiscernible) in the
19 beginning, I wouldn't believe my daughter,
20 actually, when she would say things to me.
21          0:39:02
22          SONJA WILLIAMS: She's six. She would
23 tell me stories. At six years old, you've got a
24 bright little kid telling you stories. And she
25 told me about a story, one incident on a boat, on

Page 41

1 your boat. They had got this boat, but we had
2 things prior to that. But this was the one that
3 said, you know what? No more. She was more of a
4 party person. So she kind of (indiscernible)
5 kids and stuff. But this particular day, she
6 left the kids on the dock by themselves, and
7 S████ was in the water. It just so happened,
8 S████ couldn't really swim. Just so happened,
9 Craig, she said her father came up, saved her in
10 the water, pulled her out of the water and then
11 tried to drown Sheila. I said, you watched this,
12 right? Understand, my daughter may have been
13 seven and we were just doing arts and crafts.
14 And she said, Mommy, can I tell you something? I
15 said, sure. Daddy tried to kill Sheila. What?
16 What are you talking about? I know that's not
17 true. She told me in great detail what that
18 looked like. Not only that, my daughter was
19 recording their conversations.
20          0:40:01
21          SONJA WILLIAMS: Not only just
22 recording, but video conversations that I still
23 have to this day, right? And the number one rule
24 in my house, we're not going to talk about daddy
25 and Sheila because I know psychologically what

11 (Pages 38 - 41)

Page 42

1  that could do to a child when they get older,
2  okay?  And I've often tried to tell Craig, stop
3  having this lady talk ill about me in front of
4  our daughter where she can hear you.  So at this
5  point, S█████ was six years old all the way to
6  maybe she was about nine and recorded their
7  conversations, all the things.  And she would
8  come to me and say, Mama, why does she hate you?
9  Or why is she saying these things about you?  I'm
10 like, I don't know, people just have issues.  So
11 that in itself --
12       KEENAN NIX:  I understand.
13       SONJA WILLIAMS:  -- it's a lot for her
14 to understand.  So I know why she's upset with
15 me.
16       KEENAN NIX:  Does Captain Alexander
17 support you in --
18       SONJA WILLIAMS:  I think he relishes in
19 the fact that he thinks two women are fighting
20 over him, but I'm just not one to that party.
21       0:41:01
22       KEENAN NIX:  So I can't comment on
23 that.
24       SONJA WILLIAMS:  So all I'm saying is
25 that I think he looks at it -- I used to call him

Page 43

1  very evil.  He was a very evil person to me to do
2  what he did.  Not only for that, because when I
3  threatened -- have you all done discovery with
4  Delta?
5        KEENAN NIX:  Of course.
6        SONJA WILLIAMS:  Have you all received
7  that discovery?
8        KEENAN NIX:  You --
9        SONJA WILLIAMS:  No.  Have Delta
10 received -- have you received discovery from
11 Delta?
12       KEENAN NIX:  I have received discovery
13 from Delta, 125,000 pages of it.  So are you
14 referencing anything that you would have sent to
15 Delta?  Because I do know --
16       SONJA WILLIAMS:  Absolutely.
17       KEENAN NIX:  I do know at times you
18 have reached out to Delta directly and I've not
19 seen it yet, but that doesn't mean it's not there
20 because I'm about 50,000 pages into the 125,000.
21       SONJA WILLIAMS:  Okay.  Keep looking.
22       KEENAN NIX:  Right.  Now what are you
23 specifically referencing?  Where you wrote them
24 and told them what?
25       0:42:00

Page 44

1        SONJA WILLIAMS:  Don't fuck with my
2  technology.  If you do, I'm going to come after
3  you.
4        KEENAN NIX:  Tell me when that was
5  sent.  Give me some more context.
6        SONJA WILLIAMS:  I've got to go back
7  and look at the documents.  I have to pull
8  everything.  So I moved my office, so I got to go
9  back and pull everything out of storage.  Imagine
10 that was 2014.
11       KEENAN NIX:  So do you think most of
12 your stuff is in boxes or is it in the cloud?
13       SONJA WILLIAMS:  Oh, everything's
14 definitely in the box.  The cloud was coming on
15 online during that time.
16       KEENAN NIX:  Thank you.  Dessert?
17       SONJA WILLIAMS:  Huh?  What do you
18 have?  I'm not a person that says no.
19       MALE 1:  So we have a carrot cake, a
20 Black Forest cake, a --
21       SONJA WILLIAMS:  What's your favorite?
22       MALE 1:  Out of the (indiscernible)
23 very light, very fresh (indiscernible) --
24       KEENAN NIX:  The Black Forest is what?
25 Chocolate on chocolate?

Page 45

1        MALE 1:  Chocolate with dark cherry --
2        SONJA WILLIAMS:  Give me that one.
3  Give me that one.
4        MALE 1:  All right.  What about for
5  you, sir?
6        0:43:00
7        KEENAN NIX:  I'm going to get -- just
8  bring me an extra fork.  I'll get a bite of hers.
9        MALE 1:  I got you.
10       SONJA WILLIAMS:  So I don't even know
11 what --
12       KEENAN NIX:  No, you were saying -- I
13 was asking you a question.  Is your stuff in
14 boxes or is it in the cloud?
15       SONJA WILLIAMS:  It's in boxes.  It has
16 to be in boxes.
17       KEENAN NIX:  Now where do you keep that
18 stuff?
19       SONJA WILLIAMS:  At my house.  Well,
20 yeah, it's either it's in my garage or in my
21 office in my house.  It's boxes and boxes and
22 boxes.
23       KEENAN NIX:  So you don't have an email
24 server like where you would be able to work with
25 our e people and give them access?  You don't

12 (Pages 42 - 45)

Page 46

1  think you have these emails?
2       SONJA WILLIAMS: Not that because --
3       KEENAN NIX: You didn't send it to
4  Delta in a letter. You emailed them?
5       SONJA WILLIAMS: No, I sent them a
6  certified letter.
7       KEENAN NIX: You did?
8       SONJA WILLIAMS: Yeah.
9       KEENAN NIX: Okay.
10      SONJA WILLIAMS: I had to track it.
11      KEENAN NIX: Okay. So did you email
12  any, like --
13      SONJA WILLIAMS: No, I didn't want to
14  necessarily blow up the deal. I wanted to ensure
15  -- I think at the time I was really -- you said
16  be honest, I was really pissy and did that
17  because at the time, Sheila was calling my phone
18  and stalking me.
19      0:44:02
20      SONJA WILLIAMS: I have a problem with
21  that. She was stalking me on Facebook. I was
22  like, tell this bitch to stop. Why is she -- I
23  told you I'm not interested. And I told you I
24  don't want to talk to you, right? He wants to
25  talk to me because in order to actually do the

Page 47

1  technology, he needed me to do it.
2       KEENAN NIX: Got you.
3       SONJA WILLIAMS: Right. He needed me
4  to flush it through like we were flushing it
5  through and all of that. He was scared because
6  he was having these meetings and things like
7  that.
8       KEENAN NIX: So hold on, let me ask a
9  question, right? I do know the timing of all
10  this.
11      SONJA WILLIAMS: Okay.
12      KEENAN NIX: Right.
13      SONJA WILLIAMS: Ask me why there was a
14  contract.
15      KEENAN NIX: Why is there a contract?
16      SONJA WILLIAMS: Because it was a lot
17  of time and energy put in there. Everything he
18  got, he got before that contract was signed. Let
19  me say that. Everything was developed before
20  that contract was signed. It was a lot of time
21  and energy. Sheila was fucking with me.
22      0:45:02
23      SONJA WILLIAMS: I was like, you're
24  going to -- he normally would give me
25  (indiscernible) anyway. So Craig probably gave

Page 48

1  me $10,000 here, $5,000 here, whatever the case
2  may be. Here, I was like, no, I'll give you a
3  contract. What we actually need to do -- I
4  didn't want to build the actual functioning
5  prototype myself. I was like, what we're going
6  to do is I'm going to hire someone to actually do
7  the functioning prototype. My designs were not
8  functional. My designs were only the layer of
9  the architecture for the prototype.
10      KEENAN NIX: Okay. I understand.
11      SONJA WILLIAMS: So I needed them to
12  take my designs and make it functional.
13      KEENAN NIX: Yes.
14      SONJA WILLIAMS: So I would then need
15  to have outsourced that.
16      KEENAN NIX: I understand.
17      SONJA WILLIAMS: Right. So I was like,
18  Craig, I'll tell you what, we're going to do a
19  contract. And at that time I tried to just be
20  nice because around that time, me and his ex-wife
21  became really good friends, right? And I was
22  just like, let's just quash this and let's see
23  what we could do. But I'm not going to do it
24  without a contract.
25      0:46:00

Page 49

1       SONJA WILLIAMS: Not on the functional
2  prototype, right? So I put all of all the
3  documentation together. I said, Craig, so this
4  is our contract, and I'll hire a company to do
5  the functional prototype because he had already
6  hired someone, paid them (indiscernible), I
7  forgot what their name -- go ahead.
8       MALE 1: So guys, unfortunately they
9  substituted the Black Forest cake for a chocolate
10  cake.
11      SONJA WILLIAMS: That'll work better.
12      MALE 1: All right.
13      SONJA WILLIAMS: (indiscernible) the
14  cherry.
15      KEENAN NIX: Milo Solutions is the
16  same.
17      SONJA WILLIAMS: There you go. It's
18  Milo, right. And so they were terrible, right?
19  So we fired them. Tried to get them. That
20  didn't go well, right? I was going to then
21  outsource it to someone else which is what the
22  money was for. And then I was spending so much
23  time on pulling this thing together. I ended up
24  kind of half and half, using some money for
25  keeping the lights on because I wasn't going to

13 (Pages 46 - 49)

03.2023 - Keenan Nix - Face to Face Meeting                  June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 50

1  meet clients, wasn't doing anything because we
2  were so knee deep in trying to do things light.
3        0:47:02
4        SONJA WILLIAMS:  There was real
5  applications for it.  Not only that, I became
6  passionate about it after the Malaysia plane --
7        KEENAN NIX:  After the what?
8        SONJA WILLIAMS:  The Malaysia plane
9  happened.
10       KEENAN NIX:  Okay.
11       SONJA WILLIAMS:  Remember the plane
12 that was lost --
13       KEENAN NIX:  Yes, yes.  Yes.
14       SONJA WILLIAMS:  I was just like if
15 they couldn't get anybody on air traffic control
16 and they had a text messaging system because
17 (indiscernible) satellite or whatever the case
18 may be, we could have saved that.  So it became a
19 little bit more personal at that point.  But
20 anyway, so on the flip side, I kept doing what I
21 was doing.  I wanted him to pay for the prototype
22 that I was going to outsource, but I did use the
23 money to make sure that the lights were on
24 because I spent so many months prior to that just
25 dealing with them and not actually working on

Page 51

1  other people's project because we knew it was a
2  billion dollar idea.  We knew what we had.  We
3  weren't crazy.  I was going to make him pay for
4  that.
5        0:48:01
6        SONJA WILLIAMS:  More importantly,
7  because he was taking me through all these
8  changes with all these other women, and then he
9  would come back, let's be a family.  Let's do
10 this.  It's almost a psychological thing that it
11 was also tied to.  We could go do a family, we
12 could go off and create all these different
13 technologies.  And at times, I fell for it.  More
14 like text messages, he'll call me and say -- or
15 he'd text me and say Sheila is no longer in the
16 picture.  Can we get back on our project?  Can we
17 do this?  I'm like, okay, I mean, I ain't crazy.
18 I know what the technology is worth, right?  So
19 every now and then, I would jump back on it, and
20 I would jump back off of it, because she would
21 come back around and be like, oh, this is my
22 Craig.  I'm like, bitch, will you just leave me
23 alone.  Whatever it is between you and Craig, it
24 just kept going on.  We never really could get it
25 together, and it was a lot that happened in

Page 52

1  between there.  I remember the night I went to
2  jail, the night I believe he took all of my
3  QrewLive documents from my house.  So Sheila had
4  called me, alerted me that they were in some
5  country.
6        0:49:00
7        SONJA WILLIAMS:  I knew nothing about
8  it.  He had dropped his son off to me.  We were
9  supposed to have done a family thing.  But he was
10 like, I've got to go on a trip, and I'll be back,
11 and then we're going to leave.  I said, okay,
12 great.  But you need -- I need to keep my son.
13 So I have his daughter, and I also have his son.
14 So he drops his son off.  We're there.  Maybe two
15 days later, I get a phone call early in the
16 morning, and Sheila was saying, I'm here with
17 Craig.  And I'm like, what?  I'm like, nigga, you
18 bring your son to me?  You are trotting the world
19 with some chick.  And you bring this stuff to me?
20       KEENAN NIX:  She called you?
21       SONJA WILLIAMS:  She called me.
22       MALE 1:  All right.  Here we are, guys.
23       SONJA WILLIAMS:  Thank you, thank you,
24 thank you.
25       KEENAN NIX:  Thank you, and you can

Page 53

1  bring the check.
2        MALE 1:  Sure thing.
3        SONJA WILLIAMS:  She called me.  And
4  I'm like, what the -- is you stupid?  So he gets
5  back in town, comes straight to my house.  At
6  this point, I'm actually at my office, which was
7  around the corner, but he knew I kept a key in my
8  house.  So he gets to my house and let himself
9  in.  I had already called him and told him, hey,
10 I dropped your son off to S█████ godparents.
11       0:50:01
12       SONJA WILLIAMS:  You need to go over
13 there and pick him up and I never want to see you
14 again, right?  He goes to my house.  And I get an
15 alert on my phone that somebody's in my house.
16 So I'm like -- that fool's in the house.  So I go
17 there.  We fight, and I call the police.  Mind
18 you, this is my (indiscernible) call the police.
19 He has on his Delta unform.  And so police get
20 there, and he had a broken watch.  Police get
21 there.  He tells the police that I scratched him
22 and broke his watch.  The watch was already
23 broken.  I never touched him.  But I did push him
24 out the door to get him out of my house.  They
25 takes me to jail.  What he didn't know is I had a

14 (Pages 50 - 53)

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

03.2023 - Keenan Nix - First Toll Sale Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 54

1  man there.
2       KEENAN NIX:  Had a what?
3       SONJA WILLIAMS:  I had another man
4  there, not a romantic, but this guy was on my
5  west wing.
6       KEENAN NIX:  Yes.
7       SONJA WILLIAMS:  Right.  Craig, this is
8  when I say Craig is a little interesting.  Craig
9  decides that he's going to still lay up in my
10  house when they took me to jail.  Now mind you, I
11  was in jail for three days.  He decides to
12  continue to lay up in my house.
13       0:50:58
14       SONJA WILLIAMS:  But that night, after
15  I get taken to jail, he lays up in my house
16  talking to Sheila on the phone, right?  My friend
17  who I then called, calls the guy that was in the
18  house on a three-way.  And I'm like, hey, is this
19  dude in my house?  He said he's in your room
20  rambling through papers, and he's taking your
21  folders out of your room.  And I was like, go and
22  call the police again to get him out of my house.
23  I am the reason -- this guy didn't even know that
24  I had just went to jail.  My house was extremely
25  big.  So he didn't know that all this commotion

Page 55

1  was going on.  He didn't know until I called him
2  from jail and said, get that dude out of my
3  house.  He said when he went in there, Craig was
4  taking all of my files.  And I was like, okay, so
5  while I'm in jail, Craig then serves me with --
6       KEENAN NIX:  A lawsuit.
7       SONJA WILLIAMS:  No, he serves me with
8  full custody.  Well, yes, a lawsuit, but to take
9  full custody of my child, full custody.
10       0:52:00
11       SONJA WILLIAMS:  Like, did your
12  attorneys tell you that you could get full
13  custody?  Because that's highly unlikely given
14  the circumstances.  But okay, so he serves me the
15  papers.  I totally forget about the fact that he
16  took all the files out of my room.  The lawsuit
17  was really just a distraction.  S███ was three
18  by that time.  It was just a distraction because
19  I was threatening, and that was around the time I
20  sent -- I think it was around that time I sent
21  Delta a cease and desist.  I sent him one too.
22  And so I'm like, okay, somehow we've got to come
23  back together, and since Delta never said
24  anything about it --
25       KEENAN NIX:  Hold on.  Hold on.  I'm

Page 56

1  asking -- I'm asking, Ms. Sonja --
2       0:53:00
3       KEENAN NIX:  I'm asking for your
4  permission to take some notes.
5       SONJA WILLIAMS:  Sure, you can.  I have
6  nothing to hide.
7       KEENAN NIX:  Yes, and I'm going to
8  share it with you after I'm done.  I just want to
9  make note because this letter is -- I'm curious.
10       SONJA WILLIAMS:  Oh, I would say it's
11  integral.
12       KEENAN NIX:  Okay.
13       SONJA WILLIAMS:  There are some things
14  in that.
15       KEENAN NIX:  So a certified letter to
16  Delta.  Go ahead, I'm listening.  And you called
17  it a cease and desist letter.
18       SONJA WILLIAMS:  Yeah.  See, if you've
19  gone through the emails with Craig --
20       KEENAN NIX:  Yes.
21       SONJA WILLIAMS:  You would have seen
22  something like big, bold in red that says cease
23  and desist.  He can't steal my intellectual
24  property.
25       KEENAN NIX:  Yes, I've seen that.  Go

Page 57

1  ahead.
2       SONJA WILLIAMS:  So anyway --
3       0:53:59
4       KEENAN NIX:  And this is at the same
5  time you have been incarcerated.
6       SONJA WILLIAMS:  I don't remember if it
7  was the same time --
8       KEENAN NIX:  And you were served with
9  papers.
10       SONJA WILLIAMS:  I almost think I did
11  that prior.  I can't remember.  I'd have to go
12  back and look, but it might have been -- it was
13  one of the heated moments that Sheila -- it was
14  an aha moment that they had did something stupid,
15  cheating with her or something like that.  But
16  nonetheless, whatever she did to me, it triggered
17  that.  It triggered that.  Like, are you really
18  doing this?  Tell you what, you know, so it was
19  one of those times.  I'll have to go back and
20  find it.
21       KEENAN NIX:  So I have maintained that
22  Craig has always maintained that you had a great
23  creative role in this.
24       SONJA WILLIAMS:  Yeah, but he's also
25  saying that I have no interest.  That is a lie.

15 (Pages 54 - 57)

Page 58

1 I have great interest in it.
2        KEENAN NIX: I haven't gotten there
3 yet.
4        SONJA WILLIAMS: Okay.
5        KEENAN NIX: Maybe that's your
6 conversation, but I'm not there yet. I'm just
7 talking about the relationship that did dissolve
8 in January-ish of 2015.
9        0:55:09
10        KEENAN NIX: Well, the documentation,
11 I'm putting that on the documentation because he
12 sends letters. But if your recollection is
13 different, but it's not important in the big
14 scheme of things. But he has reported and the
15 documentation that I have seen is consistent with
16 the relationship, for all the reasons you've just
17 told me, becoming unworkable. And we know it
18 came to an end because we've got the termination
19 letter, right, that he has produced that Delta is
20 aware of, and whatever timeframe I put in --
21        SONJA WILLIAMS: What termination
22 letter?
23        KEENAN NIX: Where he was terminating
24 the services of ShockTheory, right, and asking,
25 right, relieving you of any further

Page 59

1 responsibilities with respect to --
2        0:56:06
3        SONJA WILLIAMS: Relieving me or he's
4 relieving ShockTheory?
5        KEENAN NIX: ShockTheory obviously is
6 who -- you were contracted to do the work through
7 ShockTheory. Now I'm not being technical.
8        SONJA WILLIAMS: (indiscernible) wasn't
9 contracted out of what was done before he signed
10 the contract with ShockTheory.
11        KEENAN NIX: That's why I'm saying to
12 you -- that's why I'm saying to you I'm not being
13 technical on it, because --
14        SONJA WILLIAMS: Right. He didn't file
15 his lawsuit against ShockTheory and myself, I
16 guess.
17        KEENAN NIX: But what I'm also saying
18 is I'm not being technical like that --
19        SONJA WILLIAMS: Got it.
20        KEENAN NIX: -- because it would be
21 unfair. Right? You all had a relationship,
22 right? And yes, you had a business, but as you
23 pointed out, sometimes the lines aren't clean.
24        SONJA WILLIAMS: They're definitely not
25 clean.

Page 60

1        KEENAN NIX: And can I just say this?
2 He understands that.
3        SONJA WILLIAMS: Are you sure?
4        KEENAN NIX: I'm positive. Because if
5 what you're telling me is true, and I don't know
6 anything from him to dispute it, I use 2013.
7        0:57:07
8        KEENAN NIX: Don't hold me to that in a
9 legal sense. Right? I'm not saying there wasn't
10 a conversation --
11        SONJA WILLIAMS: 2013 is when he
12 decided to do a mockup of a prototype and got the
13 first company involved.
14        KEENAN NIX: Yes, Yes.
15        SONJA WILLIAMS: That is a significant
16 timeframe.
17        KEENAN NIX: Yes, and that is what I
18 was really starting the story. I chose to start
19 the story there. I wasn't meaning to say that
20 there were no conversations or dreaming or vision
21 casting or exchanging of ideas, inspiration,
22 eureka moments before that.
23        SONJA WILLIAMS: Okay.
24        KEENAN NIX: Because if you say we were
25 together for a while and we actually started

Page 61

1 these on our first date, and I can tell you that
2 that's 2010. Right? So it was an evolving
3 thing. Okay. And yes, it got Delta involved
4 around the 2013 timeframe because that's how we
5 know this from the documentation. So he started
6 talking to Delta about a product in 2013.
7        SONJA WILLIAMS: He did.
8        0:58:04
9        KEENAN NIX: It was like May or April.
10        SONJA WILLIAMS: It was.
11        KEENAN NIX: And we've got the
12 documentation I mean, the people on Delta's side,
13 right? The email correspondence, them
14 responding, encouraging him to go build
15 something. Right? Because the idea sounds very
16 promising.
17        SONJA WILLIAMS: Absolutely.
18        KEENAN NIX: And then thereafter we had
19 him reengaging and starting formal conversations
20 about a product called QrewLive in April of 2014,
21 after he had a chance encounter with the CEO on
22 an airline flight in Buenos Aires. And he showed
23 them that prototype --
24        SONJA WILLIAMS: He did.
25        KEENAN NIX: -- he did of Mock Crew.

16 (Pages 58 - 61)

03.2023 Keenan Nix - Fireside Chat Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 62

1  And this was right after that Snowmageddon thing.
2        SONJA WILLIAMS:  He did.
3        KEENAN NIX:  And they said, let's start
4  this conversation now.
5        0:58:59
6        KEENAN NIX:  So then he has this formal
7  meeting in May of 2014 with the CIO.
8        SONJA WILLIAMS:  Not just him.
9        KEENAN NIX:  Yes.  Sandy Sauers was
10 there.
11       SONJA WILLIAMS:  Sandy was there.
12       KEENAN NIX:  They loved what they saw.
13       SONJA WILLIAMS:  Of course.
14       KEENAN NIX:  They scheduled an
15 immediate meeting on July the 10th.  June the
16 10th, which is just two weeks later.
17       SONJA WILLIAMS:  And then we
18 streamlined the app from there.
19       KEENAN NIX:  And that's exactly what
20 happened.  Yes.
21       SONJA WILLIAMS:  Well, out of all the
22 components, they definitely wanted to focus on
23 the --
24       KEENAN NIX:  Chat feature.
25       SONJA WILLIAMS:  Chat feature.  I don't

Page 63

1  think that's all they took, but okay.
2        KEENAN NIX:  You're right about that.
3  That's a fact.  They did create some other
4  applications --
5        SONJA WILLIAMS:  Absolutely.
6        KEENAN NIX:  -- that did have value.
7  But here's where our focus is, right?
8        1:00:00
9        KEENAN NIX:  Just as you predicted, the
10 chat feature revolutionized the way Delta works
11 and brought them into a live digital conversation
12 stream with all the stakeholders, real time,
13 shared awareness, complete operational
14 understanding.  They saw an immediate uptick in
15 on-time performance, their ability to respond to
16 what you were saying, the difficult things that
17 happen when weather gets bad and IROPs.  That's
18 what they call them, irregular operations.  It
19 was a game changer.
20       SONJA WILLIAMS:  Yeah, and then they
21 told --
22       KEENAN NIX:  But let me just say this.
23 Let me just tell you what happened here.  It was
24 always about the chat feature.
25       1:01:04

Page 64

1        SONJA WILLIAMS:  Absolutely.
2        KEENAN NIX:  That's what they were most
3  interested in.  Now, there are some documents
4  right around the time -- they had this, Delta
5  with.  You won't have seen them, but you, Craig
6  and Sandy Sauers were having some battles because
7  Sandy and Craig were trying to focus on just the
8  chat feature, and they were calling it a, quote,
9  "gap analysis."  Right.  And they were actually
10 right, because --
11       SONJA WILLIAMS:  They were right in
12 terms of what?
13       KEENAN NIX:  This concept.  Delta had a
14 need, and they felt that need and vulnerability.
15       1:02:00
16       SONJA WILLIAMS:  Right.  But what he
17 didn't tell you is that the only prototype that I
18 did really create was the chat feature --
19       KEENAN NIX:  The chat feature.
20       SONJA WILLIAMS:  -- from the beginning.
21       KEENAN NIX:  Okay.
22       SONJA WILLIAMS:  Because it made no
23 sense.  I mean, because we had to have been on
24 the inside of Delta and I was -- I'm going to be
25 honest with you.  I was kind of scared

Page 65

1  (indiscernible) if you check his Delta email,
2  right.  Part of me was like, because we did a lot
3  of research prior to that in order to really
4  understand that.  And so riding in the airplane,
5  telling the flight attendants, understanding what
6  the problem was, we already knew that before they
7  said that, so they didn't have that.  So we knew
8  that already.  Okay.
9        KEENAN NIX:  And that was what the
10 focus was.  Let's go after that because that's
11 where they feel vulnerable.  That's where they
12 know they have a need.  And there's nothing
13 currently on their IT roadmap --
14       SONJA WILLIAMS:  That's correct.
15       KEENAN NIX:  -- to meet that need.  So
16 let's just build that.
17       1:03:03
18       KEENAN NIX:  All right.  He was right
19 about it because that's ultimately what they were
20 most interested in and actually took from him
21 after he showed them how he did it.
22       SONJA WILLIAMS:  Okay.
23       KEENAN NIX:  And to your point about
24 what Craig says about who designed what, he's
25 never said --

17 (Pages 62 - 65)

03.2023 Kennan Hue Eric Ball Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 66

1    SONJA WILLIAMS:  No. Craig has said I
2  had nothing to do with it and I own nothing.
3  That is absolutely not true.
4      KEENAN NIX:  So when did he say that?
5      SONJA WILLIAMS:  We had a lot of
6  conversations about it.
7      KEENAN NIX:  Okay, well, I'm asking.
8  Tell me about that because what I'm saying is
9  here's what I'm saying.  I've seen the
10  documentation, right?
11      1:04:00
12      KEENAN NIX:  We have produced your
13  agreement, confidentiality agreements.  Right?
14  The ownership interest is not discussed in any of
15  those documents.  But what I'm saying to you is
16  Craig has never said to me that Sonja --
17      SONJA WILLIAMS:  I'm pretty sure he's
18  thinking it, and I think if you just really told
19  the truth (indiscernible) --
20      KEENAN NIX:  What is the truth?
21      SONJA WILLIAMS:  The truth is his
22  girlfriend had nothing to do with it.
23      KEENAN NIX:  We've never said she had
24  anything to do with this.  And the idea never
25      SONJA WILLIAMS:  And the idea never

Page 67

1  came from her.
2      KEENAN NIX:  No, but -- no.  No, no,
3  no.  So --
4      SONJA WILLIAMS:  And then he didn't pay
5  me to develop the idea of the concept.  He didn't
6  pay me for that.  He paid -- we were going to get
7  a functional prototype done.  They were going to
8  make my design that I had created prior to even
9  paying it functional.
10      1:05:02
11      SONJA WILLIAMS:  That's all that was
12  going to happen.  At that point, I had already
13  mapped out what the thing looks like, how it
14  operates and, more importantly, I already
15  designed the communication tool because in part I
16  already had it.
17      KEENAN NIX:  Because what?
18      SONJA WILLIAMS:  In part, I already had
19  it, based on what I had already -- actually,
20  fuck, it was just a derivative of what I already
21  had.  So it wasn't like it was something new to
22  me.  Do you understand what I'm saying?  And when
23  after the meeting and he came back and indicated
24  that, let's streamline this thing, I was like,
25  no, fool, let's talk about what this really looks

Page 68

1  like for us.  Because Sheila was still contacting
2  me.  She was still making phone calls.  She was
3  still doing all this stupid stuff or would show
4  up, and I can't work with this.  So around -- and
5  you've got his text messages, I would say, June
6  2014.  You will see when he tried to convince me,
7  Sheila is no longer in the picture.  Let's get
8  our project done.  So we got back on it.  It was
9  a lot between that.
10      1:06:05
11      KEENAN NIX:  So to your point, right,
12  Craig has never said to me that Sheila was not
13  involved in the --
14      SONJA WILLIAMS:  That's neither here
15  nor there, to be totally honest with you.
16      KEENAN NIX:  But it is.
17      SONJA WILLIAMS:  Is it?
18      KEENAN NIX:  Yes, because it's
19  important to you.  You've mentioned it to me on a
20  couple of occasions.
21      SONJA WILLIAMS:  It's important to me,
22  but it's not important to the case.
23      KEENAN NIX:  It isn't.  Right.  It's
24  actually a distraction.
25      SONJA WILLIAMS:  Absolutely.

Page 69

1      KEENAN NIX:  So how do you propose that
2  we handle that, Ms. Sonja?  Just talk to me from
3  your stake.  You are a stakeholder here, and I'm
4  telling you -- right.  But listen, listen.
5      1:06:59
6      KEENAN NIX:  Much is at risk because
7  this is Delta we're talking about, and it's a top
8  100 company with a hundred lawyers, right, and
9  they're turning over every stone.  And getting
10  from point A to point B requires that we very
11  skillfully and carefully negotiate a lot of
12  landmines, right, any one of which could blow us
13  up.  But in terms of the core underlying basic
14  case, we're right and they're wrong and I'm
15  saying to you, I have the skill set, the
16  commitment and the team in place to hold them
17  fully accountable.
18      SONJA WILLIAMS:  So what does that mean
19  for me?
20      KEENAN NIX:  Well, it doesn't mean
21  anything for me --
22      SONJA WILLIAMS:  Absolutely.  That's
23  the problem.
24      KEENAN NIX:  -- because I can't promise
25  you anything.  But listen to me.  Listen to me,

18 (Pages 66 - 69)

03.2023_Keenan Nix - Free_State Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 70

1  right?  I can't promise you anything like that.
2  You're a witness in the case, right?  That's
3  suborning perjury.  That's bias.  Okay?
4        SONJA WILLIAMS:  Hey, I'm not asking
5  you to promise me anything.
6        KEENAN NIX:  I know you're not.  I know
7  you're not.
8        SONJA WILLIAMS:  And right now, I'm
9  just a witness.
10        1:08:00
11        KEENAN NIX:  I know you're not, but
12  listen to me.  Right, and I can't because ethics
13  prohibit me.
14        SONJA WILLIAMS:  Absolutely.
15        KEENAN NIX:  And yet I've spoken with
16  Captain Alexander, and he is not your enemy.  And
17  he's not going to say anything in this case that
18  disrespects your contributions or marginalizes
19  the influence that you had on the development of
20  the product.
21        SONJA WILLIAMS:  Keenan, let me just be
22  straight with you.  I don't give a shit about
23  what he thinks about me or what anybody else
24  thinks about me.
25        KEENAN NIX:  Well, you care.

Page 71

1        SONJA WILLIAMS:  I've been developing -
2  - I don't care.  I've been developing technology
3  for -- do you know my enemy hired me and I work
4  for them.  I'm okay with that.  I don't care
5  about that.  I know in the end, all they care
6  about is whatever I delivered, did I deliver it?
7  Did it work?  Whatever the case may be, because
8  it's really black and white, just like that.
9        1:09:00
10        SONJA WILLIAMS:  Whatever he did to me,
11  that I care morally about, whatever it is people
12  think about me, he did a long time ago.  And
13  that's over, right?  I don't care.  And let me
14  just also make sure that I'm clear with you as
15  well.  Money doesn't drive me.  It never has.
16  Technology, I'm passionate about it.  I've always
17  been.
18        KEENAN NIX:  That's clear.  That's why
19  you innovate.
20        SONJA WILLIAMS:  But more importantly,
21  right, I don't allow money to drive my decisions
22  on certain things.  I want you to understand what
23  I'm saying to you.  It doesn't.  I don't care how
24  much money.  I've seen the bottom and I've seen
25  the top, right?  And they all look the same to

Page 72

1  me.  Craig has never made anything easier since
2  the day I decided that I no longer wanted him.
3  He has been without a bone.  He has been evil.
4  He has been a monster.  As you mature over time,
5  you begin to understand.  After his wife died,
6  because I believe he killed her.
7        1:10:00
8        SONJA WILLIAMS:  She died of a brain
9  aneurysm because he drug her through the mud just
10  as well as he drug me through the mud.  And
11  that's how she and I became really close friends.
12  Do you know?  Let me tell just -- let me tell you
13  what he did.  I'm talking about his ex-wife, who
14  I just came to love because she was a good
15  person.  Right.
16        KEENAN NIX:  Is this his son's mother?
17        SONJA WILLIAMS:  Yes, and I said, I
18  will always take care of him.  So me calming down
19  was for the sake of those kids, not because of
20  Craig, not because of Sheila.  One instance in
21  particular, which I think really drove a -- she
22  was trying to get on her feet.  Craig didn't make
23  it easy.  He drug her through the New Orleans
24  courts like nobody's business.  He did me the
25  same way.  And we started sharing information and

Page 73

1  documents and things of that nature.
2        1:11:00
3        SONJA WILLIAMS:  And I remember we made
4  a pact that we're going to always keep the kids
5  together no matter what Craig does.  Okay.  She
6  ended up getting a job with UPS.  UPS had a
7  training that she couldn't miss for 90 days.  She
8  would have been the first flight female pilot to
9  fly a jumbo jet.  It was amazing, right?  But she
10  couldn't miss a day.  She needed somebody to keep
11  her son.  She couldn't risk the son going to
12  Craig's house.  So what did she do?  She calls me
13  because I am the next best thing.  So she brings
14  their son to me.  She goes off when she goes to
15  training.  I am always an advocate for kids
16  communicating with their parents.  And as evil as
17  Craig was, he was really good to the kids.  I
18  would say that, right.  He treats them well.  So
19  he finds out that Craig B. is at my house.  He
20  immediately files a motion.
21        1:12:01
22        SONJA WILLIAMS:  I won't say ex parte.
23  A motion to say that she dropped their son off to
24  a felon's house.  Whether it was true or not, I'm
25  not a felon, but whether it's true or not, that

19 (Pages 70 - 73)

03.8023_Keenan Nix - Free Ear Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 74

1  wasn't the intent.  The intent was to get her
2  fired from UPS.  He's always gotten her fired
3  from every job that she practically went to.
4  This particular instance, it was so methodical.
5  He filed that motion, because of the motion, she
6  had to show up to.  UPS had a policy that in the
7  90 days that you're in this training program,
8  clearly you're flying a jumbo jet.  You've got to
9  be there.  She had to show up to court or she was
10 going to lose her son.  And the only reason he
11 did that was to spite the both of us, and she
12 lost her job.  Now she's back at square one.
13         1:13:00
14         SONJA WILLIAMS:  It's just things like
15 that.  Now Delta was very wrong.  They stole the
16 idea.  Was it Craig's?  No, it was mine.  Whether
17 he changed it, made a derivative of it, whether -
18 - it doesn't matter to me.  I'm not here for the
19 money.  I don't care about the money.  I develop
20 technology for a living, and Sheila didn't make
21 it any easier.  That lady died because she
22 fighting Craig.  She died because every step of
23 the way, she worried Craig was going to take her
24 child.  And I worried too because Craig turned
25 around and did the same thing to me, and we just

Page 75

1  walk.  So I'm not the best person with Craig.  I
2  tolerate him because of my daughter.  You
3  understand what I'm saying?  And by no means
4  would I ever want to see Sheila.  Sheila, she did
5  everything possible so that Craig and I would not
6  have at least a decent co-parenting relationship.
7         1:14:05
8         SONJA WILLIAMS:  She still did it.  She
9  still does it.  It's crazy.  So I don't
10 necessarily care about the money, Keenan.  It's
11 not me.  But what Craig is not going to do, I
12 don't care about credit either.  You're getting
13 money.  I'm getting money because it wasn't your
14 ideal to begin with.  Did I assist?  I did more
15 than assist.  I brought it to life with you.  So
16 you can sit down your fairytale life if you want
17 and pretend that you and your side chick,
18 mistress, wife now came up with this all you want
19 to.
20         KEENAN NIX:  Yes, but why do you think
21 he said --
22         SONJA WILLIAMS:  Because he says it to
23 me.  See, he says one thing to you guys and I
24 have a different take.
25         KEENAN NIX:  No.  I'm saying the

Page 76

1  lawsuit.  You have a copy of the complaint and it
2  doesn't really talk about that like that.  Right?
3  But I can see where if you read it literally, you
4  might think that he is saying that --
5         1:15:04
6         SONJA WILLIAMS:  He said in April 2013,
7  his wife had an idea on a plane.  Why can't we
8  just talk (indiscernible)?  If you met her, then
9  you already know.  She is not that bright.
10        KEENAN NIX:  No, but it wasn't -- it
11 wasn't -- she's a flight attendant, and that
12 story was just merely meant to illustrate a
13 point.  And I may have made more of it --
14        SONJA WILLIAMS:  Okay.
15        KEENAN NIX:  Right.  As a story, as a
16 moment, because we like to tell stories.
17        SONJA WILLIAMS:  Absolutely.
18        KEENAN NIX:  Right.  Right.  Right.
19 So, so but here was the story.  It wasn't like
20 she-she or her had great inspiration, and she has
21 creative talent like what you bring to the table.
22 Not like that.  She's just a flight attendant and
23 there was an IROPs situation, and she was on hold
24 for a long damn time.  That's all true.  Right?
25 And she said, well shit, why can't I just sent

Page 77

1  them a text message.  Right?  That's it.  That
2  doesn't mean that's it.
3         1:15:57
4         KEENAN NIX:  But we use that as a point
5  of departure that in reality, I know you find
6  greatly offensive because conversations were
7  starting back in 2010 I now know.  Okay.  Okay.
8         SONJA WILLIAMS:  And I was thinking in
9  April, he didn't know anything.  So he did
10 enlighten me to some other things because I
11 didn't know that.  I didn't know.
12        KEENAN NIX:  Okay.  So --
13        SONJA WILLIAMS:  Because we got back
14 together --
15        KEENAN NIX:  Yeah.  But that's what I
16 mean to you.  It's messy.
17        SONJA WILLIAMS:  It's so messy.
18        KEENAN NIX:  Okay.  And I'm not happy
19 about that.  So let me just say this.  Let me
20 just say this.  I'm sitting over here, and you
21 have shared with me very candidly, poignantly
22 your truth and experiences, and there are a lot
23 of contradictions and lack of integrity and pain,
24 betrayal, right?
25        1:17:05

20 (Pages 74 - 77)

03.2023, Keenan Nix - FTC Trade Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 78

1    KEENAN NIX: I get that. And I now
2 know it, and I don't doubt any of it. Okay.
3    SONJA WILLIAMS: But it's not what you
4 say. It's what we can prove. Right?
5    KEENAN NIX: No, but it's not that.
6 It's not that. It's not that, right? All of
7 this is true. It's also very distracting. And
8 it's also largely irrelevant to what Delta did
9 with the intellectual property that they were
10 exposed to over a series of meetings in two and a
11 half years, and they just took it like a thief in
12 the damn night.
13    1:17:56
14    KEENAN NIX: Now I agree with you that
15 there's a context for a conversation about where
16 QrewLive came from. Okay? I will also say to
17 you that too in this context is distracting, and
18 --
19    SONJA WILLIAMS: Well, I think it's
20 more of a question of who owns the actual
21 intellectual property. I think that's the real
22 question.
23    KEENAN NIX: Well, so here it is.
24 Let's talk through that because, right, I've seen
25 the documentation and you all were signing

Page 79

1 documents, Ms. Sonja, where you were contracting
2 with him, right? The document speaks --
3    1:19:02
4    SONJA WILLIAMS: My company did
5 contract with him at a certain point in time.
6    KEENAN NIX: The document speaks for
7 itself.
8    SONJA WILLIAMS: It does.
9    KEENAN NIX: Okay. And it talks about
10 QrewLive and your role as a design consultant.
11 And it doesn't say anything about it being
12 limited to the development of a functional
13 prototype. Okay? It just speaks to a consulting
14 arrangement, right, on a project that is broadly
15 defined, right, as the development of an
16 application to meet a need at an airline services
17 organization, right, and you signed a non-
18 compete.
19    SONJA WILLIAMS: I've never signed a
20 non-compete.
21    KEENAN NIX: Yes, it's in the very
22 contract. Right? It's got a paragraph in there.
23 Right? It's not a document that has a separate
24 thing --
25    SONJA WILLIAMS: Right. There's some

Page 80

1 things that are not known to me. I want you to
2 understand this, and if this is where you guys
3 are going, it's perfectly fine with me. I never
4 --
5    KEENAN NIX: No, but we're not going
6 anywhere.
7    SONJA WILLIAMS: I never gave him
8 anything pursuant from that date forward.
9    1:20:00
10    SONJA WILLIAMS: He even filed a
11 lawsuit to that effect.
12    KEENAN NIX: Yes, I'm well aware of the
13 lawsuit.
14    SONJA WILLIAMS: Right, so indicating
15 that I never delivered anything after that.
16    KEENAN NIX: Right.
17    SONJA WILLIAMS: Right. So everything
18 he got was really prior to that. So whether --
19    KEENAN NIX: And what I'm saying -- and
20 what I'm saying --
21    SONJA WILLIAMS: And that contract,
22 it's not retroactive.
23    KEENAN NIX: Listen up.
24    SONJA WILLIAMS: Okay.
25    KEENAN NIX: But what I'm saying to you

Page 81

1 is just in the natural evolution of it, for all
2 candor on both sides, right, afterwards, right,
3 Craig retained an outfit by the name of SOLTECH.
4    SONJA WILLIAMS: I know what he done.
5 Yes.
6    KEENAN NIX: Okay, and SOLTECH was --
7    SONJA WILLIAMS: And they all requested
8 my documents.
9    KEENAN NIX: Who did?
10    SONJA WILLIAMS: SOLTECH, Sandy, all of
11 them.
12    KEENAN NIX: Okay.
13    SONJA WILLIAMS: I have (indiscernible)
14 of that that was created prior to that contract.
15    KEENAN NIX: Yes, but they've produced
16 all their documents, and yours aren't in there.
17 Okay. And what I'm saying to you is --
18    SONJA WILLIAMS: You should go back and
19 look.
20    KEENAN NIX: Pardon?
21    SONJA WILLIAMS: You should go back and
22 look. Y'all should go back and look.
23    KEENAN NIX: No, no, no. They've
24 already -- they've had this.
25    1:21:01

21 (Pages 78 - 81)

03B023_Kennan Page 1 of 821 Rate Meeting                        June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 82

1       KEENAN NIX:  So trust me, just as they
2  were interested in you, they were very interested
3  in SOLTECH.  That's who they got.  That's who
4  they knocked on the door first, right, because
5  they knew through our complaint that SOLTECH was
6  the consultant that moved forward from the June
7  2014 timeframe throughout and were paid literally
8  hundreds of thousands of dollars.  Okay?  So they
9  went on to develop the wireframes, the source
10 code for the functional prototype that was
11 actually stood up at a later point in time.  And
12 what was presented in the final three meetings,
13 two of which were attended by SOLTECH
14 representatives, were all of the work product
15 that they had put forth in this design process,
16 right?
17       1:22:03
18       SONJA WILLIAMS:  Okay.
19       KEENAN NIX:  -- that created custom
20 wireframes, user interface --
21       SONJA WILLIAMS:  Yeah, but based on all
22 of my work.
23       KEENAN NIX:  -- and a functional
24 prototype with source code.
25       SONJA WILLIAMS:  Okay.

Page 83

1       KEENAN NIX:  So where did that get
2  started is what you're asking me.  And I'm saying
3  to you --
4       SONJA WILLIAMS:  I have a copy of
5  SOLTECH's contract and all that, so I understand.
6       KEENAN NIX:  Yes.  So SOLTECH is there
7  as well, right?  And they signed the same
8  contract.  If you've seen the contract, you know,
9  right.  They were working as a --
10       SONJA WILLIAMS:  They were a work for
11 hire.
12       KEENAN NIX:  Yes.
13       SONJA WILLIAMS:  And it explicitly
14 states that they were work for hire.
15       KEENAN NIX:  Yes, and so I'm hearing
16 you say, right, so we are maintaining that
17 QrewLive from the very first meeting was a
18 functional product --
19       1:23:10
20       KEENAN NIX:  -- with what I mean,
21 listen to what I mean by that.  Right.  Mob Crew,
22 we've stood it up.  Just understand, right?  He
23 showed him that on his iPad.  Richard Anderson,
24 in the first meeting.
25       SONJA WILLIAMS:  I remember.

Page 84

1       KEENAN NIX:  Right?  So it is our
2  position, Sonja, you called it a while back,
3  ugly.  It was horrible.  But listen, as a
4  prototype, it was on his iPad, sending messages
5  back and forth, simulating the concept which he
6  had articulated in his mission statement, right,
7  in terms of how we get from analog to digital in
8  one conversation screen.  And this is what it
9  looks like, okay?  Now it's early, but it's a
10 product.  It's got a prototype.  It's powered by
11 source code, and that was before the first
12 meeting, okay?
13       1:24:03
14       KEENAN NIX:  Now that product with Milo
15 Solution may not have been perfect --
16       SONJA WILLIAMS:  But it was working.
17       KEENAN NIX:  Yes, it was.
18       SONJA WILLIAMS:  It was working.
19       KEENAN NIX:  And it was demonstrating a
20 concept --
21       SONJA WILLIAMS:  Absolutely.
22       KEENAN NIX:  -- for them, letting them
23 see what was possible as they were contemplating
24 how to come out of the analog Dark Ages.
25       SONJA WILLIAMS:  Yeah, I don't

Page 85

1  disagree.  Listen, I don't disagree that Delta
2  didn't steal it.
3       KEENAN NIX:  And so, I know.  No, but
4  listen to what I'm saying.  I'm just trying to
5  say it to you, right?  How we talk about these
6  things is very important, right?  Because if you
7  come in and say it was garbage, right, it was
8  horrible.  We didn't like him.  He didn't do a
9  good job.  We had to fire him.  All that, just
10 read, I've already acknowledged that.  They've
11 got the documents, but we don't want to piss on
12 ourselves, right, in the discourse and lose sight
13 of what it actually was.  It was a forerunner.
14 Forerunners are important.
15       SONJA WILLIAMS:  Oh, I absolutely
16 agree.
17       1:25:00
18       KEENAN NIX:  Okay, and it was -- and
19 they -- because here's their defense.  He had an
20 inchoate idea, nothing more.  It could not have
21 informed any of our development plans.  Right?
22 It was just as basic as the day is long.  It was
23 Slack.
24       SONJA WILLIAMS:  But their
25 (indiscernible) --

22 (Pages 82 - 85)

03-2023 Keenan Nix - First Estate Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 86

1  KEENAN NIX: It was Slack.
2  SONJA WILLIAMS: Okay.
3  KEENAN NIX: So nothing remarkable,
4  nothing revolutionary, nothing groundbreaking,
5  had no source code, wasn't even functional
6  prototype. Just an idea and maybe a sketch on a
7  pad. Okay? But that's it. Nothing that
8  constitutes intellectual property and a trade
9  secret, for sure. All right? We pushed back.
10 We've stood up Mob Crew. It can work right now
11 on any device. And we're maintaining that from
12 the word go, it was a functional prototype of a
13 digital application capable of creating a real-
14 time conversation stream amongst stakeholders,
15 which is not anything that Delta had ever
16 conceived and certainly had got had developed at
17 that point in time.
18     1:26:15
19 KEENAN NIX: And they were excited.
20 SONJA WILLIAMS: Okay.
21 KEENAN NIX: Second meeting, show us
22 more, which he did, and then made a commitment to
23 refine to Delta specifications after they told
24 him more about what they were looking for in that
25 regard. Right? That was when you all got

Page 87

1  sideways because you were in the picture, for
2  sure, for those first two meetings in May and
3  June, right? We know from the documentation you
4  all were getting sideways, right? And that's why
5  SOLTECH came in, right, in June. The date was
6  June 26th. Okay.
7  SONJA WILLIAMS: Absolutely.
8      1:27:00
9  KEENAN NIX: Okay, and he signs the
10 contract and they're tasking him. But listen, to
11 your credit, the people that we are talking to,
12 your counterparts at SOLTECH, says Craig was
13 different, Keenan. Sometimes we do have people
14 come to us with just an inchoate idea, just some
15 thoughts, random thoughts about what they want to
16 do and what they're thinking about. No. Craig
17 actually had a fully formed concept. He had a
18 product prototype. Right? He actually had some
19 renderings, mockups, as we call them, right,
20 illustrating the idea. And he was very clear on
21 what he needed and what he wanted, which was to
22 take the next step in preparation for some
23 technical exchange meetings he was going to be
24 having with Delta at the point of sale, right --
25 SONJA WILLIAMS: To try to figure out

Page 88

1  how to integrate into their system.
2  KEENAN NIX: Yes. Yes. And that's
3  what they helped him do. Right? And so I think
4  we are on the same page --
5  SONJA WILLIAMS: Are we?
6      1:28:04
7  KEENAN NIX: Yes, with one regard.
8  Yes, we are, Ms. Sonja. Yes, we are, because
9  I've told you that Craig has never said you were
10 not the primary driving force behind the original
11 conceptualization of this idea that we had. But
12 for you to come into this case and say it was all
13 mine, right, would disserve the interests of
14 justice and it would not even be true because he
15 wouldn't have been having a conversation with you
16 because this is his world. It wasn't your world.
17 He was the pilot. He knew about the needs. Yes?
18 And knew that there was more to be done there.
19     1:29:00
20 KEENAN NIX: Now if he doesn't have the
21 technical background that you have, how does he
22 get to the place where he ends up with something
23 to talk with Delta about without a conversation
24 with you?
25 SONJA WILLIAMS: Well (indiscernible)

Page 89

1  prior to us even signing anything.
2  KEENAN NIX: Right. Right.
3  SONJA WILLIAMS: That's how he gets
4  there.
5  KEENAN NIX: Right, and I'm saying to
6  you, right, why can't that be a collaborative
7  effort? Why does it have to be me or him or him
8  or me?
9  SONJA WILLIAMS: I'm not necessarily --
10 you asked me to be honest with you.
11 KEENAN NIX: Yes.
12 SONJA WILLIAMS: That's what I'm
13 telling you. Right? I'm not necessarily saying
14 I'm out here with a bullhorn saying that. I'm
15 just telling you, you asked me how I feel and I
16 just told you that's where I met. I'm not
17 literally interested in blowing up the case.
18 KEENAN NIX: So then what can I leave
19 you with, given -- and I trust that. What is it
20 that --
21 SONJA WILLIAMS: As long as Sheila
22 don't call me, but --
23 KEENAN NIX: What does Sonja want?
24 SONJA WILLIAMS: I mean, I don't know.
25 I think -- I think --

23 (Pages 86 - 89)

Page 90

1   KEENAN NIX: What does Sonja want?
2   1:30:00
3   SONJA WILLIAMS: You know what? I'm
4   always a fair person, and I just simply want to
5   be fair. Even if I know he isn't and I know he
6   isn't, I will never trust Craig.
7   KEENAN NIX: I'm not asking you to
8   trust Craig. You're talking with me now.
9   SONJA WILLIAMS: And I wouldn't
10   necessarily -- I mean, you know, excuse my --
11   excuse my thought process here. But you're just
12   like a lawyer. So it's not like I'm going to
13   trust you either, right? But also, at the same
14   time, I believe you have great integrity, and a
15   lot of my close, good friends in the city speak
16   very highly of you. And I thought that
17   definitely says something important. So, yeah.
18   KEENAN NIX: So what I would propose,
19   if you trust me, let me -- let me control the
20   narrative that gets us from point A to point B.
21   And it will never require that anyone do violence
22   to the truth.
23   1:31:03
24   KEENAN NIX: But many times, the truth
25   is about nuance and it's about emphasis. And I'm

Page 91

1   saying to you that's the right thing to do here
2   because --
3   SONJA WILLIAMS: Well, the proper
4   narrative. I don't believe this is going to go
5   to trial, do you?
6   KEENAN NIX: So the short answer is
7   absolutely not.
8   SONJA WILLIAMS: So given that.
9   KEENAN NIX: Okay. But we have to beat
10   back that motion. And that is the herculean
11   effort that we're undertaking as we speak. And
12   I'm telling you, we're right and we're going to
13   win. But it will require great discipline with
14   the narrative because it's like threading a
15   needle.
16   1:32:00
17   KEENAN NIX: We've talked about a lot
18   of things today that could get it loose very
19   quickly. And that's why I'm proposing that you
20   let us help you lawyer up. Downstairs in my
21   office is an African American female by the name
22   of Sha Miracle Rankin, who is one of my top
23   lieutenants. And she was president of the
24   Georgia American Association of Black Female
25   Lawyers and I've asked her to identify someone in

Page 92

1   her circle that she trusts that can work with Ms.
2   Sonja to respond to the first priority, which is
3   the discovery request that's been propounded,
4   that 30 days from the date you received it
5   requires a response under law. And this lawyer
6   will work with you as your own independently
7   retained counsel.
8   1:33:00
9   KEENAN NIX: But you will not be
10   responsible for the cost of any of the expense
11   associated with her counsel. And then we have
12   the ability, through her, to communicate directly
13   with you in a way that maintains integrity and
14   preserves the objectivity that is required with
15   any material witness. So we've done that in
16   every instance. Mr. Mayfield has his own lawyer.
17   Sandy Sauers got the same request. She has her
18   own lawyer. And they're all out of our universe,
19   and they're all friendly. And we're all
20   coordinating our approach so that the narrative
21   remains tight. And I'm saying to you, what do we
22   know that's true. Delta doesn't give a damn
23   about Sonja Williams. Delta doesn't --
24   SONJA WILLIAMS: Neither does Craig.
25   KEENAN NIX: Okay.

Page 93

1   SONJA WILLIAMS: Okay.
2   1:34:00
3   KEENAN NIX: Let's start there. Okay.
4   All right. So then where does Sonja -- okay.
5   Delta doesn't care a damn about Sonja Williams,
6   and neither does Craig, Captain Craig Alexander.
7   And given what you have shared with me today, I
8   have no reason to push back on that because my
9   words of affirmation about what he thinks about
10   you and how smart you are, are meaningless.
11   Right? And you've already told me as much, so
12   I'm not going there anymore. Okay. So let's
13   start. The captain doesn't care a damn. Delta
14   doesn't care damn about you. Right? And so who
15   sits in the middle, right? Right, and that would
16   leave S███. Right? And so the question is,
17   where is Sonja going to weigh in -- top of the
18   day, sir.
19   MALE 2: What's up? (indiscernible)
20   SONJA WILLIAMS: Good to see you.
21   Absolutely. Same here. Same here. I'll hit you
22   up.
23   1:35:02
24   KEENAN NIX: Keenan Nix.
25   MALE 2: Keenan Nix.

24 (Pages 90 - 93)

03.2023 - Keenan Nix - First Floor Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 94

1    KEENAN NIX: No problem, and obviously
2 assume you know Braden. This is Miguel
3 Dominguez, one of my partners.
4    SONJA WILLIAMS: Oh, absolutely.
5    MALE 2: We've got to catch back up.
6    SONJA WILLIAMS: Absolutely. I got
7 you. I got you.
8    MALE 2: We've got to catch back up.
9 Yes.
10    KEENAN NIX: Yes. Miguel is one of my
11 proteges downstairs --
12    SONJA WILLIAMS: That's awesome.
13    KEENAN NIX: One of the top up and
14 coming trial lawyers in the city.
15    SONJA WILLIAMS: Oh, wow.
16    KEENAN NIX: But S█████ is in the
17 middle. Where is Sonja landing, right, is all
18 that really matters at this point. And that's
19 why I said to you, I know that you understand
20 what Delta is about to do. You don't necessarily
21 understand what Craig is prepared to do. But I'm
22 in the middle here with S█████, and I will
23 mediate that in a way that has integrity and
24 reflects the ongoing conversations I believe
25 needs to be had about what's right and what's

Page 95

1 fair.
2    1:36:02
3    KEENAN NIX: Now I can't promise you
4 anything, and I'm not.
5    SONJA WILLIAMS: Right. Absolutely.
6    KEENAN NIX: Okay. Because that would
7 be unethical and inappropriate. And I'm saying
8 to you I've heard you. And what you have said to
9 me impacts me in the sense that I know it has
10 been a very difficult arrangement, and it's
11 gracious of you to even be here, given all that
12 water under the bridge. And I would like to
13 proceed with the understanding that you've been
14 heard. I know what you expect. I'm not saying
15 it's unreasonable or inaccurate. I'm saying it's
16 not a part of our current narrative. It would be
17 very distracting if expressed in exactly those
18 terms, and I don't think that's in anyone's best
19 interest.
20    1:37:02
21    KEENAN NIX: Okay, and you have to just
22 decide where you land. Right? I know you don't
23 trust him, but you damn sure shouldn't trust
24 them. Right? And they're coming for you. And
25 you will be under oath after not many days.

Page 96

1 Right? And what you say under oath needs to not
2 only be true, but it needs to be disciplined.
3 And I can help you with that because I know where
4 they're going and I know what they're trying to
5 do, right? Number one, right, much of just the
6 distracting personal stuff, okay, in a case like
7 this, right, becomes very harmful because people
8 are people. They hear certain things. Once that
9 bell is rung, you can't un-ring it in terms of
10 how you feel about that person, even if it has
11 nothing to do with the price of tea in China.
12    1:38:03
13    SONJA WILLIAMS: Yeah, but you've got
14 to understand, what would you do if you got a
15 thief here and a thief here and you're in the
16 middle? To me, it's like choosing between the
17 lesser of two evils.
18    KEENAN NIX: So I don't disagree.
19    SONJA WILLIAMS: That's what this feels
20 like.
21    KEENAN NIX: I don't disagree, Ms.
22 Sonja. I don't disagree.
23    SONJA WILLIAMS: So they both are
24 equally at fault here. Both of them.
25    KEENAN NIX: Well, how is Craig at

Page 97

1 fault? As it relates to your dispute with Delta,
2 how is he at fault? That's why I mean how you
3 talk about these things is very important,
4 because I don't agree with that. Right? As
5 between Delta and him? How's Craig at fault?
6 What did Craig do to harm Delta? How did he --
7    SONJA WILLIAMS: No, no, no. I don't
8 think they -- hold on, no. To me --
9    KEENAN NIX: But that --
10    SONJA WILLIAMS: So you're asking me --
11    KEENAN NIX: No, no, no. I'm not --
12    SONJA WILLIAMS: I'm saying --
13    KEENAN NIX: No, no.
14    SONJA WILLIAMS: -- they're both
15 thieves, if you ask me.
16    KEENAN NIX: Yes, but --
17    SONJA WILLIAMS: Craig is a thief and
18 Delta is a thief.
19    KEENAN NIX: Okay.
20    SONJA WILLIAMS: So you're asking me to
21 choose and you're assuming that --
22    1:39:02
23    KEENAN NIX: So how is -- how is --
24 tell me how Craig is a thief. What did he steal?
25    SONJA WILLIAMS: What do you mean, what

25 (Pages 94 - 97)

Page 98

1 did he steal?
2        KEENAN NIX:  Tell me.
3        SONJA WILLIAMS:  Craig went out and
4 told you all that he developed a technology, the
5 idea, the concept, brought it to life solely on
6 his basis in terms of --
7        KEENAN NIX:  But he never said that.
8        SONJA WILLIAMS:  But this is what he
9 tells me.  He tells you that.
10        KEENAN NIX:  No, but --
11        SONJA WILLIAMS:  He controls a
12 different narrative with you than he controls
13 with me.  Trust me on this.
14        KEENAN NIX:  But no, I'm not -- I can't
15 dispute that.
16        SONJA WILLIAMS:  Okay.  Great.  But I
17 can.
18        KEENAN NIX:  I wouldn't.  But that's
19 not in this case.  That's what I'm trying to say
20 to you.
21        SONJA WILLIAMS:  That's true.  But what
22 you're asking me is what team I'm about to play
23 on is what you're asking me.
24        KEENAN NIX:  No, no.  I am.  My pen is
25 what shaped the allegations in this case, and we

Page 99

1 never have said -- Delta sent you -- Delta sent
2 you our interrogatory responses, which I drafted
3 with my hand and forwarded to you.
4        SONJA WILLIAMS:  I'm not saying -- I'm
5 not saying he's not saying I'm involved.  Clearly
6 I'm involved because from his standpoint, he
7 contracted me to do this for him, and yes, he
8 did.  Nobody's disputing that.
9        1:40:01
10        SONJA WILLIAMS:  But what part of that?
11 It wasn't -- that agreement would definitely
12 cover things that weren't already -- wasn't
13 unknown until we got it.  It had to become known
14 in that agreement.  This stuff that we're talking
15 about was --
16        KEENAN NIX:  Listen to how you talk
17 about it.  Listen to how you talk about it.
18        SONJA WILLIAMS:  I know, and I feel
19 you.
20        KEENAN NIX:  No, but -- no, but you're
21 not hearing me.  Thief are strong words.  You say
22 -- let me repeat it.  Let me repeat it.
23        SONJA WILLIAMS:  If he's telling me
24 that I have no interest --
25        KEENAN NIX:  I didn't say that.

Page 100

1        SONJA WILLIAMS:  No, no, no.  He tells
2 me this.  You don't have to say it.
3        KEENAN NIX:  Okay.  Okay.  Okay.  So --
4        SONJA WILLIAMS:  He's your client.  So
5 he's going to --
6        KEENAN NIX:  So no, but so --
7        SONJA WILLIAMS:  So I'm going on what
8 he's saying, not what you're saying.  I think
9 that you bring a level of legitimacy to his
10 character.
11        KEENAN NIX:  No, but what he said --
12 but what he said -- so --
13        SONJA WILLIAMS:  What he says is that
14 he hired me as a work for hire.  Wasn't.  Right?
15 To do a concept that he brought to me.
16        1:41:05
17        KEENAN NIX:  Okay, and you --
18        SONJA WILLIAMS:  And that's what he
19 says.
20        KEENAN NIX:  And you dispute that.
21        SONJA WILLIAMS:  I'm calling him a flat
22 out liar.  Dispute it?  Are we kidding here.?
23        KEENAN NIX:  All right.  That's
24 important.  Right.  That's important.
25        SONJA WILLIAMS:  And if he hadn't told

Page 101

1 you that that's what I think, that's interesting.
2        KEENAN NIX:  No, I didn't say that.
3 He's told me in many occasions, and --
4        SONJA WILLIAMS:  Matter of fact, and we
5 talked about -- and this was years ago.  I said,
6 listen, I'm going to take 30 percent of this.
7 Right?  And that was way before the contract,
8 because clearly we worked on it way before that.
9 Okay?  But I couldn't take on the functional
10 prototype without paying another vendor.  So he
11 got a standard contract from us that we actually
12 provide to everybody.  However, I probably should
13 have rearranged it, but nonetheless, I still have
14 intellectual property here, and we could talk
15 about that too, but in the end of the day, the
16 dispute between Craig and I is very real.
17        1:42:00
18        1:43:00
19        KEENAN NIX:  Okay.  I'm just --
20        SONJA WILLIAMS:  I don't know that I
21 didn't push back against that notion that I was
22 -- I definitely pushed back.
23        KEENAN NIX:  Yes.
24        SONJA WILLIAMS:  There's nothing in
25 that contract that says I was -- ShockTheory was

26 (Pages 98 - 101)

03/23, Keenan Nix - Final of a.m. Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 102

1 certainly hired for --
2        KEENAN NIX:  No -- no --
3        SONJA WILLIAMS:  -- to bring forth a
4 functional prototypes. Sonja Williams is an
5 individual who had been working with him for a
6 couple of years prior to that was not --
7        KEENAN NIX:  Now you've mentioned --
8 now you've mentioned to me on a couple of
9 occasions a percentage.  Right?  Is that ever
10 documented anywhere in writing?
11        SONJA WILLIAMS:  It's just in our
12 messages, and we were in bed when we talked about
13 it.
14        KEENAN NIX:  Okay.
15        SONJA WILLIAMS:  So it wasn't like --
16 and I had no idea --
17        KEENAN NIX:  All right.
18        SONJA WILLIAMS:  He was my child's
19 father, and I kind of thought we were going to
20 have a life together.
21        KEENAN NIX:  Okay.  So --
22        SONJA WILLIAMS:  So I think conceivably
23 anybody would say --
24        KEENAN NIX:  So that's why I'm saying
25 to you --

Page 103

1        SONJA WILLIAMS:  I don't believe Craig
2 as far as I can see him at this point in time.
3        1:44:01
4        KEENAN NIX:  So how do we move -- I
5 know.
6        SONJA WILLIAMS:  I'm not the lawyer.
7 You are.
8        KEENAN NIX:  I'm saying to you, how do
9 we -- how do we move forward when you're -- I'm
10 hearing you say to me --
11        SONJA WILLIAMS:  Well, we've got a
12 couple of options here.
13        KEENAN NIX:  No, but listen, listen.
14 How do we move forward when I'm hearing you say
15 to me that I don't see his conduct vis-à-vis any
16 different than Delta's conduct --
17        SONJA WILLIAMS:  Absolutely.  That's
18 exactly what I feel.
19        KEENAN NIX:  -- vis-à-vis him.
20        SONJA WILLIAMS:  Exactly.
21        KEENAN NIX:  And that, it blows my mind
22 because that is -- because you just said to me,
23 we shared the same bed, we have a child together.
24 Right?  I know how weird this thing came out of
25 all that.  Right?

Page 104

1        1:45:00
2        KEENAN NIX:  So then how does he become
3 a thief if you know and he knows that you played
4 a great creative role in this?  He said to me,
5 Sonja was as smart --
6        SONJA WILLIAMS:  Keenan, you and I both
7 -- you and I both understand --
8        KEENAN NIX:  And is technically --
9        SONJA WILLIAMS:  -- that giving
10 somebody credit is something different from
11 giving somebody interest --
12        KEENAN NIX:  Okay.
13        SONJA WILLIAMS:  -- or saying that they
14 also own intellectual property.
15        KEENAN NIX:  But the reason why we're
16 saying that Craig owned the intellectual
17 property, right, vis-à-vis everybody else in this
18 universe is because they all signed agreements
19 acknowledging as much.  And you might not have
20 looked at the agreement that you signed with
21 ShockTherapy (sic) --
22        SONJA WILLIAMS:  I did.
23        KEENAN NIX:  But in the middle is a
24 confidentiality provision, which states the same
25 --

Page 105

1        SONJA WILLIAMS:  From that day forward.
2 It's not a retroactive situation.  There's no
3 basis on that.
4        KEENAN NIX:  Okay.  No.  I'm not saying
5 it's retro.  I'm not saying it's retroactive.
6        SONJA WILLIAMS:  It's definitely not
7 retroactive.
8        KEENAN NIX:  But -- but -- but --
9        SONJA WILLIAMS:  There's some things
10 that weren't but already known.  It was very
11 known what we were working on prior to that.  It
12 was my idea.  There was no need for me --
13        1:46:07
14        KEENAN NIX:  Yes.  But the document
15 won't really reflect it that cleanly.
16        SONJA WILLIAMS:  And that's okay.  But
17 I do believe other things will.
18        KEENAN NIX:  Okay, well, tell me what
19 those other things are, because that might be --
20 it starts, like where we are today.  Right?
21 You're going to be producing documents.
22        SONJA WILLIAMS:  I'm going to be
23 producing -- I will produce my documents from
24 2010 on forward.  And I'm ready for that.  I've
25 been ready for that.

27 (Pages 102 - 105)

03.2023_Keenan Nix_Confidential Meeting                          June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 106

1    KEENAN NIX:  And I'm asking you, are
2  you saying to me that there's going to be
3  documents in there where you and Captain
4  Alexander are discussing this in a way that makes
5  it clear that you are the proprietary owner of
6  the concept that's being developed?
7    SONJA WILLIAMS:  I can't say that.  I
8  would need a lawyer to review the information so
9  they can interpret it the way that it needs to be
10  interpreted.
11    KEENAN NIX:  Okay, so, and I'm saying
12  to you, we're making it potentially a battle
13  within a battle --
14    SONJA WILLIAMS:  Absolutely.
15    1:47:01
16    KEENAN NIX:  And I'm saying to you that
17  in and of itself changes the game here because
18  that's not the story that we've told.  You know
19  what a trade secret -- a misappropriation of a
20  trade secret case has as its foundational
21  premise?  That Delta stole something from Captain
22  Alexander that he owned and had a proprietary
23  interest in and they violated it by taking
24  unlawfully.
25    SONJA WILLIAMS:  He certainly is -- he

Page 107

1  certainly is an owner of it.  Absolutely.  I
2  cannot deny that.  Nobody will.
3    KEENAN NIX:  Okay.
4    SONJA WILLIAMS:  He definitely put out
5  cash for it.  But my involvement certainly had
6  the value of cash because he couldn't afford me.
7    KEENAN NIX:  Okay.  But he didn't have
8  to afford you because --
9    SONJA WILLIAMS:  Absolutely.
10    KEENAN NIX:  -- you were making
11  choices.  You all were sleeping in the same bed.
12  You had children together.
13    SONJA WILLIAMS:  Absolutely.
14    KEENAN NIX:  Right.  And so what I'm
15  saying to you, in essence, is he's never denied
16  that.  And you say, but that's credit, that's not
17  interest.  Right.
18    1:48:02
19    KEENAN NIX:  But he's also not said,
20  because he can't in this case, that I'm not the
21  100 percent owner of the software.
22    SONJA WILLIAMS:  I'm not interested in
23  him having to say that.
24    KEENAN NIX:  He can't.  He can't say
25  that.  He can't say that.  So what -- then what -

Page 108

1  - tell me what --
2    SONJA WILLIAMS:  I'm not interested in
3  that.  But what I am interested in --
4    KEENAN NIX:  Tell me.
5    SONJA WILLIAMS:  -- is ensuring that
6  everything is fair when it's all said and done.
7    KEENAN NIX:  Okay.  So how do I ensure
8  that for you?
9    SONJA WILLIAMS:  I don't know.  That's
10  not my thing.
11    KEENAN NIX:  No.  I'm --
12    SONJA WILLIAMS:  I don't know about
13  that.
14    KEENAN NIX:  But I'm telling you that
15  what --
16    SONJA WILLIAMS:  I don't know what that
17  looks like.
18    KEENAN NIX:  I'm telling you.
19    SONJA WILLIAMS:  Because who knows?
20  This case may not go anywhere.  It might go
21  everywhere.  It might be a historical case.  Who
22  knows?
23    KEENAN NIX:  I'm telling you that.  You
24  want me to tell you?
25    SONJA WILLIAMS:  Yeah, sure.  You're

Page 109

1  amazing.  Okay.
2    KEENAN NIX:  I'm going to tell you.
3    SONJA WILLIAMS:  Where are we going?
4  You tell me.  Jesus Christ.
5    KEENAN NIX:  It will go there.
6    SONJA WILLIAMS:  Okay.
7    KEENAN NIX:  It will be historic.  It
8  will right this wrong.
9    1:49:01
10    KEENAN NIX:  But it can never do it
11  with an alternative narrative from Sonja
12  Williams.  I need you, Ms. Sonja --
13    SONJA WILLIAMS:  And I understand that.
14    KEENAN NIX:  -- to walk with me in a
15  tight narrative that keeps the main thing the
16  main thing, not on what Captain Alexander did to
17  you, because he did a lot that I can't justify.
18  And if much of that comes into the fore, I can't
19  even -- I can't expect that a jury will embrace
20  him the way that I want them to because you can't
21  have two villains in a damn story, right?  You've
22  got to have good guys, bad guys and it can't be
23  any overlap between the two.  Good, evil, right,
24  wrong.
25    SONJA WILLIAMS:  Right.

28 (Pages 106 - 109)

03/2023 Keenan Nix - Face to Face Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 110

1      KEENAN NIX:  Okay, and I'm saying to
2  you, as it relates to Delta and Craig, we're
3  right and their damn ass is wrong and I can prove
4  it.  But if you come --
5      SONJA WILLIAMS:  I get that part.
6      1:50:01
7      KEENAN NIX:  But if you come in here
8  and confuse the issue with a lot of character
9  issues, right, that cause them to look at him
10 some kind of way, because character is important
11 when you're matching good versus evil.  They've
12 got to believe in him.  They've got to want him
13 to win, to believe that he's capable of doing
14 what we say he's capable of doing and doing it
15 with integrity.  And all this other stuff
16 obscures all that, and it creates an entirely
17 separate morality play about whether or not he
18 actually stole something from you, to use your
19 words.  Okay?  I'm saying to you, this is a mixed
20 bag that goes nowhere.  Okay?
21     SONJA WILLIAMS:  Yeah.
22     KEENAN NIX:  And so how does that get
23 reconciled?  Here's how.  You've got to decide
24 first between this and this, with this in the
25 middle, where am I going to land?  And I said to

Page 111

1  you the other day, smart people don't cut off
2  their nose to spite their face, and they don't
3  need a promise in writing in order to understand
4  the lay of the land.  Right?
5      1:51:03
6      KEENAN NIX:  That's where trust comes
7  in.  Right?  And where does the trust come?  If
8  you will understand that I am not and I cannot
9  promise you anything because it's unethical and I
10 would never do that, who will you trust to
11 mediate the conversation that has to be had
12 between and do something that, as you say, is
13 fair.  Okay?
14     SONJA WILLIAMS:  I think you're basing
15 the premise on that I actually care about getting
16 paid.  I don't.
17     KEENAN NIX:  I'm not talking about --
18 you keep bringing it up, right?  I have an
19 interest.
20     SONJA WILLIAMS:  But there's going to
21 be an interest --
22     KEENAN NIX:  No, but you keep bringing
23 that up.
24     SONJA WILLIAMS:  He's not going to sell
25 anything of mine and --

Page 112

1      KEENAN NIX:  If you say to me -- if you
2  say to me -- if you say to me I'm not even having
3  a conversation, bringing it up I want to get paid
4  --
5      SONJA WILLIAMS:  I just said I don't
6  want to --
7      KEENAN NIX:  What are you saying then?
8  I asked you what is it that you are saying?  I
9  have a business.  I'm interested in what's fair.
10     1:52:00
11     KEENAN NIX:  Does that have anything to
12 do with money or not?  Okay, if you tell me it
13 doesn't, then we don't have nothing else to talk
14 about.  Right?  Then it's just a matter of
15 whether or not the interest in the middle, you're
16 going to piss that away, right, because you come
17 in here undisciplined, talking about a narrative
18 that itself only satisfies this interest, right,
19 because you have to be careful, right?  Every
20 word matters.  They know here, right?  That's the
21 whole exercise.  A house divided cannot stand.
22 That's a fact.  Okay?  So we have to come
23 together for a greater good, however you define
24 that.  If you can't do it with here and I
25 understand that because you've told me more than

Page 113

1  I wish I ever had to hear about the water that's
2  under the bridge.  The pain, the acrimony, the
3  discord, the betrayal, the vindictiveness, the
4  mean-spiritedness.
5      1:53:05
6      KEENAN NIX:  That's here.  But you've
7  got to focus a place where you can get your mind
8  around moving forward in absolute agreement and
9  unison, okay?  Because anything else is a damn
10 mockery.  Okay?  There's too much at stake.
11     SONJA WILLIAMS:  What's at stake,
12 Keenan?  What's at stake?  What is really at
13 stake here?
14     KEENAN NIX:  Our Fortune 100 company
15 took a game-changing application and software
16 that they had no idea how to build unless it came
17 -- and it didn't come from you.  It came through
18 him.  Now where that came from, we're having this
19 conversation about, but it was Captain Alexander
20 that was the face of that conversation.
21     SONJA WILLIAMS:  Absolutely.  Nobody
22 disagrees with that.
23     KEENAN NIX:  And they stole it like a
24 damn thief in the night.  And they are saving
25 billions of dollars a year.  You just go Google

29 (Pages 110 - 113)

Case 19-56304-sms    Doc 243    Filed 01/06/25    Entered 01/07/25 09:21:46    Desc Main
Document    Page 142 of 321

03.023 Keenan Nix - First Pitch Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 114

1  what happened to Southwest Airlines in December
2  of 2022 --
3         SONJA WILLIAMS:  Absolutely.
4         KEENAN NIX:  -- with a couple of days
5  of cold weather.
6         1:54:01
7         KEENAN NIX:  A billion dollars they
8  were out when they had to cancel 60 flights over
9  successive days.  And you didn't hear a peep
10 about Delta Airlines because they have a software
11 in place called Flight Family Communication, and
12 they credited it for being able to seamlessly
13 operate in the midst of those circumstances.  And
14 it's not just in IROPs.  They had a 65 percent
15 uptick in on-time performance and in their
16 measure of customer satisfaction.  It went
17 through the roof within the month of the software
18 being rolled out.  They call it game-changing,
19 revolutionary, innovative, right, difference-
20 making.  Whatever adjective you want to use.
21 It's the best piece of technology innovation
22 they've seen in a Fortune 100 company in the last
23 50 years.  Okay.  So what is that worth?  I don't
24 know.  But I'm telling you, it's the best thing
25 in their system since sliced bread.  And they

Page 115

1  stole it like a thief in the night.  And I can
2  prove it.
3         1:55:01
4         KEENAN NIX:  And I'll hire the best
5  experts to create an economic damages model based
6  on the value added to them every single day, not
7  just when you have a Snowmageddon.  Right?
8  Because every flight is affected, every day, 365
9  days a week.  And I don't have to use Captain
10 Alexander to brag about it.  They bragged about
11 it for two years until they knew they were going
12 to be in a damn lawsuit.  Right?  And you read
13 the complaint.  So what I'm saying is it is a big
14 deal, but it's a battle every day.  And it's got
15 a small margin of error.  And I feel like I can
16 get us to the other side safely.  But I need you
17 in order to do that.  And I need you as focused
18 and on message as you could possibly be, all
19 consistent with the truth.  T-R-U-T-H, truth.  No
20 manipulation, no prevarication, no lying, no
21 cheating, no stealing.  We'll let all them --
22 we'll let them do all of that.  Okay, because --
23        1:56:02
24        SONJA WILLIAMS:  So here's the problem,
25 right?

Page 116

1         KEENAN NIX:  Where is the problem with
2  --
3         SONJA WILLIAMS:  The problem is here.
4  Obviously, the time is ticking.  And I understand
5  what the timeline is, right, and I understand --
6         KEENAN NIX:  What time is ticking?
7         SONJA WILLIAMS:  The time is ticking
8  for me to respond to them and obviously for us to
9  get together to figure out what is going on.
10        KEENAN NIX:  Yes.  Yes.
11        SONJA WILLIAMS:  The time is ticking.
12        KEENAN NIX:  But don't let time be an
13 issue.
14        SONJA WILLIAMS:  No.  And I'm sure we
15 can get an extension also.  I get it, right?
16        KEENAN NIX:  Yes.
17        SONJA WILLIAMS:  So let's just say you
18 win this case, right?  History is made.  I then
19 have to file a lawsuit against Craig to secure my
20 interest and recoup my money.
21        KEENAN NIX:  So it is about money.
22        SONJA WILLIAMS:  I ain't going to say
23 it's about money because I can walk away and not
24 really give a shit, to be honest with you.  But
25 in the end of the day, if there's going to be --

Page 117

1         KEENAN NIX:  Well, there is going to
2  be.  This is not free.
3         SONJA WILLIAMS:  Well, nobody can
4  promise anything.
5         KEENAN NIX:  No, of course not.
6         SONJA WILLIAMS:  The outcome.
7         KEENAN NIX:  Of course not.
8         SONJA WILLIAMS:  Because it could be
9  very different.
10        KEENAN NIX:  Of course not.  It is --
11        SONJA WILLIAMS:  So all I'm saying if
12 there's going to be --
13        KEENAN NIX:  It is contingent as the
14 day is long, and contingent upon telling a story
15 that makes sense.
16        1:57:04
17        SONJA WILLIAMS:  Absolutely, and I
18 agree with that.
19        KEENAN NIX:  Okay, and what I'm saying
20 --
21        SONJA WILLIAMS:  However, but it makes
22 sense for y'all, not for me.  You understand what
23 I'm saying?
24        KEENAN NIX:  No, no, no, no, no.
25        SONJA WILLIAMS:  Not for me.  Craig has

30 (Pages 114 - 117)

Page 118

1  said as much.  Craig has said as much.
2       KEENAN NIX:  I'm not a part of that.
3       SONJA WILLIAMS:  Okay.
4       KEENAN NIX:  Look, how do you -- you're
5  ignoring something.
6       SONJA WILLIAMS:  What am I ignoring?
7  That I don't have anything in writing?
8       KEENAN NIX:  You're ignoring -- no.  No
9  --
10       SONJA WILLIAMS:  That --
11       KEENAN NIX:  No, listen.  Listen.  This
12  is the only thing that's going to get us to a
13  solution.  Her name is S████  You're ignoring
14  something.
15       SONJA WILLIAMS:  S████ is going to be
16  fine.
17       KEENAN NIX:  Okay, great.
18       SONJA WILLIAMS:  She's going to be
19  fine.
20       KEENAN NIX:  Great.
21       SONJA WILLIAMS:  Whether we do anything
22  or not.
23       KEENAN NIX:  Okay.
24       SONJA WILLIAMS:  So that's not a
25  sticking point for me.

Page 119

1       KEENAN NIX:  So then you don't have any
2  motivation to do anything except blow this damn
3  case up.
4       SONJA WILLIAMS:  No, not really.  I
5  don't necessarily want to do that.
6       KEENAN NIX:  Okay.  Well, then what is
7  your --
8       SONJA WILLIAMS:  They did steal it from
9  him.  He did present it.  There's no doubt about
10  that.  That's not what my argument is here.
11       1:58:02
12       KEENAN NIX:  Yes, yes.  Your argument
13  is -- right, so how you make a case in the middle
14  of his case against Delta, right, that I'm the
15  absolute -- I'm the actual -- I'm the actual
16  genius here that had the product --
17       SONJA WILLIAMS:  No, no.  I don't think
18  that --
19       KEENAN NIX:  Because that's a narrative
20  that is a self-fulfilling prophecy of defeat.
21       SONJA WILLIAMS:  It is.
22       KEENAN NIX:  Okay.  Because that's what
23  you really want to say, right?
24       SONJA WILLIAMS:  What do I want to say?
25       KEENAN NIX:  It ain't his ass that's

Page 120

1  the genius around here.  It's me.  Okay, and he
2  stole it from me.  Okay, and if anybody's
3  entitled to anything, it's me.  Okay?  And I'm
4  saying you come in and this case doesn't have any
5  integrity.  We're just wasting time, right?  And
6  if you felt that way, right, right, maybe there
7  was a conversation you should have been -- maybe
8  you should --
9       SONJA WILLIAMS:  We had a longer
10  conversation.
11       KEENAN NIX:  Maybe you should have gone
12  and found a lawyer.
13       SONJA WILLIAMS:  Craig understood this
14  conversation.
15       KEENAN NIX:  No.  A long time ago,
16  right?  Because if it was you, then you should
17  have got a lawyer and you should have sued them
18  if it was you, okay?  But you didn't.  He has and
19  it's a better story, frankly.
20       1:59:03
21       SONJA WILLIAMS:  It really is.
22       KEENAN NIX:  Okay?  Because he is the
23  one who has the stripes and the bars and the hat
24  and the employment relationship, and he made the
25  introduction, and he was at all the meetings.

Page 121

1  You were at none.  Okay?  They don't even know
2  who you are.  They didn't make you any promises
3  to buy or purchase it or beta test any of it.
4  It's all about him.  Okay?  So you become a very
5  big distraction, and it's a distraction that I
6  think imperils the whole thing.
7       SONJA WILLIAMS:  But it doesn't
8  necessarily blow up your case.
9       KEENAN NIX:  I said it imperils the
10  whole thing.
11       SONJA WILLIAMS:  Okay.
12       KEENAN NIX:  Right?  Because these have
13  to be rifle shot approaches, not buckshot.  Can't
14  throw everything up against the wall and just
15  hope something sticks.  You have to be focused.
16  You have to be disciplined.  You have to have a
17  story that not only is true, it rings true.  And
18  it doesn't have any loose ends.  Right?  No loose
19  ends.  Right?  That's why I'm saying to you we
20  had to have this conversation eventually.
21       2:00:02
22       SONJA WILLIAMS:  Absolutely.
23       KEENAN NIX:  Right, and I'm saying --
24  and I'm saying -- and I'm saying --
25       SONJA WILLIAMS:  Hold on.  I just want

31 (Pages 118 - 121)

03.23.2023 Keenan Sonja Price Meeting                                June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 122

1 to make sure that we're clear too.  It was very
2 intentional for me to come here without a lawyer.
3 It was very intentional for me for not to hire
4 or, let me just say, not to sign --
5         KEENAN NIX:  No, no.  No, I --
6         SONJA WILLIAMS:  -- a retainer
7 agreement with one.  It was very intentional.  It
8 wasn't because I couldn't.
9         KEENAN NIX:  No, I --
10         SONJA WILLIAMS:  But for me --
11         KEENAN NIX:  Look, you could do
12 anything you want.  You're bright, you're
13 resourceful.  Right?  You know what litigation is
14 all about.  You understand what's at stake here.
15 Right?  Look, you've done all your homework.  You
16 know who I am, you know this case is about.
17 There's nothing I'm educating you about.  I'm
18 just talking with you about the straightest path
19 to a just outcome.  And we need Sonja Williams on
20 our side, right?  Not on Delta's side.  And Delta
21 wants you on their side.  Okay, and they want you
22 to be the distraction that what they have -- see,
23 they -- right.
24         2:00:59
25         KEENAN NIX:  Do they have that letter

Page 123

1 in bold letters of red?  Do they -- they already
2 know who you are?  Okay, because, yes, they've
3 got it.  If you ever sent it, they got it.  Let's
4 target her.  Let's see if we can blow -- use her
5 to blow this whole damn thing up, right?  Because
6 they already know about the inkling of what you
7 want to say.  And if that can help them, they're
8 all for it.  Right?  So that's why I frame it the
9 way I did.  You have a hard choice to make, and I
10 can't make that for you.  But you can't be half
11 in and half out, right?  You can't split the baby
12 here.  Right?  You've got to decide.  You've got
13 to choose as it relates to this dispute.  And
14 that's a hard choice.  That's big girl choices.
15 Right?  And you have to focus on what you said.
16 I didn't say that.  Because you're not taking
17 care of her or he's not taking care of her.
18         2:02:01
19         MALE 2:  Pardon me, pardon me.  Just
20 had to say hello.
21         KEENAN NIX:  Yes, sir.  Good to see
22 you.  Peace.  But if all you have to focus on is
23 Craig, well, shit, he screwed you.  I'm not going
24 to find any motivation out of that.  Just angst,
25 sorrow, pain, loss.  What emotion you want to

Page 124

1 fill in the blank?  Okay.  So what can I focus
2 on, right, that helps keep me focused on the
3 bigger picture?
4         SONJA WILLIAMS:  The bigger picture
5 being what?  Craig had a --
6         KEENAN NIX:  Justice.
7         SONJA WILLIAMS:  Oh, shit.  Really?
8         KEENAN NIX:  Yes.  Because what they
9 did, was that wrong?
10         SONJA WILLIAMS:  It was definitely
11 wrong.  Nobody disputes that.
12         KEENAN NIX:  Okay, and --
13         SONJA WILLIAMS:  It was definitely
14 wrong.  And I love your passion about it.  I do.
15         KEENAN NIX:  And I'm not just
16 passionate about it, I can prove it.  I've seen
17 documents that you haven't seen about what they
18 did, right, in such a surreptitious, clandestine,
19 unethical.
20         2:03:06
21         KEENAN NIX:  why do I think it ends
22 well?  Because when a jury sees that, if it's
23 that message alone, and they're having to make
24 choices on that kind of conduct, they'll ring
25 their ass up.  Okay.  So should they be held to

Page 125

1 account?
2         SONJA WILLIAMS:  Absolutely.  I believe
3 so.
4         KEENAN NIX:  Right.  So, and do you
5 have a part of that?  Yes.  And that's why I say
6 to you, because, listen, how often do we get the
7 chance to innovate at that level and move the
8 needle in Fortune 100 companies, right?  And you
9 say, if it's not about money, then what is it
10 about?  Right?  You have to decide if it's about
11 the principle behind the matter, right, and them
12 doing right versus wrong, right, a big company
13 pissing on the little people, taking, like, what
14 they have.
15         2:04:00
16         KEENAN NIX:  I could read you the
17 emails.  They literally said, this guy's smart.
18 He's got great perspectives, good product, but he
19 doesn't have an NDA.  We're free to take anything
20 we want and just use it.  Okay.  What I'm saying
21 to you is contempt, disrespect.  Right?  I'm not
22 here to split hairs about how it actually came to
23 pass.  I submit to you that you had a big role in
24 it and he's never said anything differently.  And
25 I also submit to you that he had a role in it

32 (Pages 122 - 125)

Page 126

1 because he had to because you don't know anything
2 about the airline industry and you hadn't
3 suffered those problems and conundrums. And you
4 hadn't been in the situation where you had to
5 bring down a 747 piece of very expensive
6 equipment with a lot of valuable lives in it and
7 nothing's coming down. And you can't communicate
8 with the operations center about a dilemma. That
9 was what got him thinking about these things and
10 a lot more scenarios that a technology solution
11 and tool could address. Okay. So did he have
12 something to do with it? Yes, he did. Of course
13 he did.
14        2:05:01
15        SONJA WILLIAMS: Absolutely. I'm not
16 saying he --
17        KEENAN NIX: Okay.
18        SONJA WILLIAMS: Let me be clear. I'm
19 not saying -- I couldn't have done it without
20 Craig.
21        KEENAN NIX: Okay, and he couldn't have
22 done it without you.
23        SONJA WILLIAMS: Let's just be clear.
24 Okay, and he just couldn't have done it without
25 me. And that is all I'm saying.

Page 127

1        KEENAN NIX: Okay, and I know that.
2        SONJA WILLIAMS: Okay.
3        KEENAN NIX: And you say to me, but he
4 hadn't told me that. Has he not? Look at what I
5 wrote. Look at what I wrote. He said it in
6 writing, with my help, because he told me it was
7 true. He said, Keenan, Sonja is as technically
8 capable as any consultant that I have ever worked
9 with during the course of this project. We just
10 couldn't get along because we had a lot of other
11 drama going along. Okay? And that's just it.
12 But had it just been about intellect,
13 contributions, solutions, architecture, product
14 development, she's as capable as anybody. Okay,
15 and yet I know that you all were struggling, and
16 I know now why.
17        2:06:00
18        KEENAN NIX: And I'm not saying that
19 was you because he cheated on me and all this. I
20 get all that. But it got sideways and it got
21 ugly and it got distracting and all that shit in
22 this case, Delta is just happy about it because
23 it takes the eye off the ball really in
24 distracting ways that don't have anything to do
25 with the underlying merit of why I brought the

Page 128

1 claim. And I'm just trying to keep this thing
2 between the rails in a responsible way that
3 allows us to get a just result for the conduct
4 that I'm here to rectify. Now, I can't, with
5 this lawsuit, fix everything, okay? And you ask
6 me, that's why I keep going back to what do you
7 want? You tell me, I don't want money. In the
8 next breath, you say, yeah, well, I want what's
9 fair. Well, that sounds to me like you want
10 money and you want what's fair because I had some
11 role in creating this, okay? And none of that's
12 unreasonable. I will make it fair. Well, one
13 thing we can't do is promise you anything,
14 because then you now are blown up.
15        2:07:00
16        KEENAN NIX: You're not even a useful
17 witness, and he gets thrown out of court because
18 he's suborning perjury because they've got it and
19 now he's --
20        SONJA WILLIAMS: Listen, man, Craig has
21 already asked me to -- let me just say how he
22 said it. If you lost documents, I wouldn't be
23 mad at you. Of course I would not lose any
24 documents, Craig, we're not going to do that.
25        KEENAN NIX: Okay. All right.

Page 129

1        SONJA WILLIAMS: We're not ever going
2 to lose documents. So for you to even call me
3 and say this to me is a problem for me.
4        KEENAN NIX: It's a problem for me too.
5        SONJA WILLIAMS: So don't you ever call
6 me and I recorded it, okay? Don't you ever call
7 me and tell me to forget, he wouldn't be mad if I
8 lost documents.
9        KEENAN NIX: Yes.
10        SONJA WILLIAMS: So now you want to
11 call me and say that? What time are you picking
12 up S███? That's where we are. I have a
13 problem with that.
14        2:08:00
15        SONJA WILLIAMS: And I'm really glad I
16 came here today because I do feel like you have
17 integrity. Craig just doesn't. And while he
18 paints his picture like he always has, that he's
19 this upstanding pilot --
20        KEENAN NIX: Well --
21        SONJA WILLIAMS: I just have a whole
22 different narrative.
23        KEENAN NIX: Well, but -- that's --
24        SONJA WILLIAMS: But that doesn't
25 matter here, and I'm cool with that.

33 (Pages 126 - 129)

03.2023_Keenan Nix_Pilot First Base Meeting                                      June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 130

1    KEENAN NIX:  No, but what I'm saying to
2  you is I'm not born yesterday.
3    SONJA WILLIAMS:  Absolutely.
4    KEENAN NIX:  Right.  I've said to my
5  team, right, the image we started with was of
6  Captain Craig Alexander in his pilot uniform and
7  his dress blacks with his hat on and his Delta
8  stripes.  And that's the image that we projected
9  on page one of our complaint for the whole world
10  to see.  And now that we have access to all
11  13,000 pages of his documents, I can tell you
12  that that's not the only Captain Alexander who
13  lives, moves and breathes and has being because
14  we also now know, and you'll soon know, this is
15  my team who's going to be having he is a damn
16  philandering fool.
17    2:09:10
18    KEENAN NIX:  And I don't even like what
19  I saw when I look under the hood and kicked those
20  tires.  But this is not a morality judgment.
21  That's certainly not the criteria by which we get
22  access to the court system through Keenan Nixon,
23  the law firm of Morgan and Morgan.  And so I'm
24  saying to you, right, it is what it is.  He is
25  that guy who brought them a solution on a silver

Page 131

1  platter that changed the game at Delta, and he's
2  also a philandering fool, and we know both.  And
3  because one is not relevant to the other, we must
4  do everything within our power to keep that out
5  of the discussion because it's distracting.  And
6  we have rules of evidence that do not allow that.
7    2:10:00
8    KEENAN NIX:  And so we're not giving
9  them a damn document.  We're redacting every one
10  of them.  And we're more than willing to let the
11  court take a look at it, because she might have
12  to be the ultimate arbiter, but it's not relevant
13  to the claim that we've made that Delta stole his
14  valuable trade secrets.  There's no judge that's
15  going to agree that that's relevant.  How?  What
16  does that have to do with anything?  Who he's
17  poking and when and how and how that impacted
18  some of the other people in his life in terms of
19  betrayal and what they felt about it, how is that
20  relevant?  And even if it had any relevance, it
21  doesn't pass the balancing test because once you
22  hear certain things, it becomes too prejudicial
23  to overcome the potential probative value.  These
24  are balancing tests that courts engage in all
25  around the country all the time because they

Page 132

1  know, right, there's things that are material and
2  there are things that are not.  And even some
3  things that might be questionable if you let them
4  get out there, right, they're too prejudicial.
5  Once you ring the bell, you can't un-ring it.
6  This ain't coming in.  I know that.  Right?  And
7  it's the human condition.
8    2:11:02
9    KEENAN NIX:  In addition to being a
10  lawyer, I'm also a minister of the gospel.  This
11  ring means something.
12    SONJA WILLIAMS:  You should have told
13  me that from the start.
14    KEENAN NIX:  Right.  Thirty-three years
15  married to Ms. Danielle Nixon.
16    SONJA WILLIAMS:  Okay.  Aw.
17    KEENAN NIX:  We've honored those vows.
18    SONJA WILLIAMS:  Great.
19    KEENAN NIX:  Right?  There she is.
20  She's my best friend, okay?
21    SONJA WILLIAMS:  Aw.
22    KEENAN NIX:  And what I'm really saying
23  to you is I have to encounter people in their
24  human kind and condition, and I see things all
25  the time that would make you blush, and yet we

Page 133

1  still work with them, right, and keep our eyes
2  focused on why they came and hired me.  And in
3  that calculus, I can be all in without any
4  equivocation or any dividedness because I'm right
5  about that.  Now, in these other issues, I've
6  told Craig about that.  I've had conversations
7  with Sheila.  Sheila, listen, Sheila, be quiet.
8    SONJA WILLIAMS:  She doesn't listen.
9    2:12:00
10    KEENAN NIX:  Yes, she does.  To me, she
11  does.  Okay?  Because what I'm saying to you is
12  she was making noise.  You're talking about
13  foolishness.  It has nothing to do with what
14  we're doing.  And I'm not really here to have
15  that conversation, okay?  Because I don't have
16  to.  It's not even relevant, and you're not going
17  to persuade me, right?  So why try?  I'm not
18  taking sides on that.  I don't have to, and I'm
19  not.  And I'm not bringing any judgments here
20  either, right?  And so what I'm saying to you is
21  I've got a case that I've got to win, right?  And
22  we're right, and we should win, but I can't win
23  without Sonja Williams' help.  And I don't mean
24  that in the sense of asking you to -- like his
25  stupid ass, asking you to lose the documents.

34 (Pages 130 - 133)

03.23.2023 Keenan Nix – First Cake Meeting                              June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 134

1 That's just stupid. And I have that down because
2 we want to talk about that, okay? Because now
3 you're impugning my -- that lands with me, okay.
4 Because that's not how we do things. That's not
5 how things are done. Okay?
6          2:13:00
7          KEENAN NIX: So when I say I need you,
8 I need your truth with discipline, properly
9 focused on what the objective is and what serves
10 the end, the ends of justice. Right? Coming in
11 here, talking about how big his dick is and who
12 he's hitting and poking, right, and making a
13 mockery of African American men and all our
14 families and all of this stuff that you all were
15 talking about in ways that you would not even be
16 proud of, that you would not want necessarily to
17 be repeated because you were saying some things
18 in emotion and anger and hurt and pain, right?
19 That maybe if you had the chance to recalibrate,
20 you'd say a different way to make the same point
21 because you're a bright and intelligent woman and
22 sometimes, right, that isn't even the most
23 positive, edifying form of communication.
24          SONJA WILLIAMS: But the damage to me
25 has already been done. Do you understand that?

Page 135

1          KEENAN NIX: Yes. Yes.
2          SONJA WILLIAMS: So the damage to me
3 has already been done.
4          KEENAN NIX: Yes.
5          SONJA WILLIAMS: He can't do no more to
6 me than what he already has done. Do we get that
7 part?
8          2:14:03
9          KEENAN NIX: I understand. Yes, sir.
10 And if you could give me a receipt, please.
11          MALE 1: Sure.
12          KEENAN NIX: I appreciate it.
13          SONJA WILLIAMS: You know?
14          KEENAN NIX: I do agree. That's true.
15          SONJA WILLIAMS: You know?
16          KEENAN NIX: Okay. So --
17          SONJA WILLIAMS: So all of that and
18 being a big upstanding man, God, I wish people
19 just missed me with that because once you've seen
20 the bottom, underneath the bottom, none of that
21 moves me.
22          KEENAN NIX: Yes, yes. But you still
23 have a choice to make.
24          SONJA WILLIAMS: I do. I do.
25          KEENAN NIX: Right, and you have --

Page 136

1          SONJA WILLIAMS: And it's just picking
2 the lesser of evils at this point. That's all
3 it is.
4          KEENAN NIX: Yes, and I get that. I
5 get that. Right? But you still have a choice to
6 make. And you also have to be honest with me.
7 Right? And if you do have a financial interest,
8 you need to just say that. Okay.
9          SONJA WILLIAMS: I told Craig he owes
10 me 30 percent of this. That's in those emails
11 and you saw it.
12          KEENAN NIX: Yes, I've seen those.
13          SONJA WILLIAMS: I have told Craig and
14 we have said it over the years.
15          KEENAN NIX: Okay. Now --
16          SONJA WILLIAMS: And whether he has
17 been reluctant to say whatever, I don't care.
18          KEENAN NIX: Right, and so --
19          MALE 1: Here you are, sir.
20          KEENAN NIX: Thank you very much.
21          MALE 1: How was the cake?
22          SONJA WILLIAMS: It was great. Thank
23 you so much. I appreciate it, and I appreciate
24 this. Thank you.
25          2:15:06

Page 137

1          KEENAN NIX: So then that goes to the
2 next question.
3          SONJA WILLIAMS: Okay.
4          KEENAN NIX: When you're asked then,
5 that document will be in front of you, what's the
6 basis of that? How are you going to handle that?
7 These are all the nuances that we have to talk
8 through and --
9          SONJA WILLIAMS: We prepared those
10 things. I mean, the original idea was for to
11 sell it to 800 airlines. It wasn't just Delta.
12          KEENAN NIX: No, I know that.
13          SONJA WILLIAMS: It just so happens
14 that he worked for Delta and especially after he
15 has a chance encounter on his plane with the CEO,
16 we catered it to Delta, right? And because
17 obviously he understands the inner working with
18 that. So it's very significant. Hence my 30
19 percent and not giving me half. Right? So I'm
20 sure they'll ask me about it. And I'm okay
21 with that.
22          KEENAN NIX: One other question.
23          SONJA WILLIAMS: Because, I mean, the
24 truth is, is that we came up with something that
25 we thought was history-making.

35 (Pages 134 - 137)

03-2023   Keenan Nix - Rule 2004 Meeting   June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 138

1    2:16:08
2        KEENAN NIX:  And so let me help you
3    tell the narrative in a way that does not become
4    a distracting sideshow, and it'll be true.  It
5    won't ever be anything not true.  Just what you
6    just said, right?  Okay.  But it's important and
7    we've got some work to do on that because we
8    haven't even gotten to the place of what is the
9    story here, and --
10        SONJA WILLIAMS:  I mean, the story is
11    clear.  What do you mean?  The story is clear.
12    Came up with the technology and in the process of
13    that --
14        KEENAN NIX:  No.  No.  But you're
15    missing it, right?  They're not rolling over and
16    playing games.  There are defenses here.
17        SONJA WILLIAMS:  Absolutely.
18        KEENAN NIX:  They're all layered.
19    Right?  And everyone has to be pushing back with
20    the same narrative and message, right, and you
21    have to understand what those are.
22        2:16:59
23        KEENAN NIX:  And that's why it's going
24    to be important to get with a lawyer that we can
25    communicate to who can then communicate to you in

Page 139

1    confidence because anything that you and I talk
2    about is not confidential.
3        SONJA WILLIAMS:  Absolutely.  And I
4    totally understand that.
5        KEENAN NIX:  Okay.  So this is our last
6    conversation and they'll ask you did you meet Mr.
7    Nix?  Yes, we had lunch, because --
8        SONJA WILLIAMS:  As I will also meet
9    with them, so it's a --
10        KEENAN NIX:  Yes, as you will also meet
11    with them.  You are?
12        SONJA WILLIAMS:  I am.
13        KEENAN NIX:  Do you think that's wise?
14        SONJA WILLIAMS:  Was it wise for me to
15    come here today?  I don't know if you actually
16    heard me.  All I'm telling you is that I see both
17    Craig and Delta as the exact same people.  So
18    what am I to do?  Dance with the lesser of two
19    evils here?  And I can assure you I'm not
20    interested in blowing up Craig's case.  I don't
21    think that I can because they did do that and
22    everything that --
23        2:18:00
24        KEENAN NIX:  Yes, but you don't know
25    the law and you don't know --

Page 140

1        SONJA WILLIAMS:  I don't.  I don't.
2        KEENAN NIX:  And you don't know the
3    game and you don't even know what --
4        SONJA WILLIAMS:  It is a game.
5        KEENAN NIX:  You don't even understand
6    how words matter and how you describe that
7    creates defenses.  And you're sitting down now
8    with Delta and talking to them the same way you
9    do.  I have grave concerns about all of that.
10    But Ms. Sonja, I don't think there's anything
11    else left to say.  I've said it all.  But --
12        SONJA WILLIAMS:  I certainly appreciate
13    the conversation.
14        KEENAN NIX:  The last thing I will say
15    is you're going to have to make a choice and --
16        SONJA WILLIAMS:  Time's ticking.  I get
17    it.
18        KEENAN NIX:  No, it's not that.  It's
19    not that.  I mean it in every sense of the word,
20    right?  I told you before, just five minutes ago,
21    you can't straddle the fence here.  And I'm
22    saying to you if you're sitting down and meeting
23    with Delta the same way you're sitting down and
24    meeting with us, you haven't made a choice and --
25        2:18:57

Page 141

1        SONJA WILLIAMS:  And I never said I
2    made a choice.  So let's just be clear there.  I
3    never said I made a choice in anything.
4        KEENAN NIX:  I know you haven't.  I'm
5    telling you, you haven't.  I know you haven't.
6    But what I'm saying to you is eventually you will
7    have to.
8        SONJA WILLIAMS:  Absolutely.
9        KEENAN NIX:  Okay.
10        SONJA WILLIAMS:  Or it will be made for
11    me.  I got it.
12        KEENAN NIX:  Okay.  So I guess my next
13    question is, do you want any assistance with a
14    lawyer, right, to respond?
15        SONJA WILLIAMS:  I'll get back with you
16    on that.
17        KEENAN NIX:  Okay.  All right.
18        SONJA WILLIAMS:  Is that fair?
19        KEENAN NIX:  Of course.  Of course.  Of
20    course.  Any questions that I haven't answered?
21        SONJA WILLIAMS:  No.  But I certainly
22    appreciate your conversation here today.
23        KEENAN NIX:  My honor.
24        SONJA WILLIAMS:  And your perceived
25    openness.

36 (Pages 138 - 141)

03023 Keenan Nix-Face To Face Meeting                          June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

Page 142

1    KEENAN NIX: My honor.
2    SONJA WILLIAMS: That was great.
3    KEENAN NIX: My honor. Thank you.
4    SONJA WILLIAMS: Thank you.
5    KEENAN NIX: You know how to reach me.
6    SONJA WILLIAMS: Thank you for all of
7  that. Do you have a card on you?
8    KEENAN NIX: I do.
9    SONJA WILLIAMS: (indiscernible) reach
10 out.
11   KEENAN NIX: You're in touch with me.
12 You've got my email.
13   SONJA WILLIAMS: I do. I do.
14   KEENAN NIX: And you've got my cell
15 phone number?
16   SONJA WILLIAMS: Absolutely.
17   KEENAN NIX: That's all that's on the
18 card.
19   SONJA WILLIAMS: Oh, got it. Okay.
20 Great.
21   2:20:00
22   KEENAN NIX: Thank you.
23   SONJA WILLIAMS: Have a great day.
24   KEENAN NIX: Indeed. You've got the
25 parking pass?

Page 143

1    SONJA WILLIAMS: Oh, I gave it to you
2  actually.
3    KEENAN NIX: Did you? Let's see.
4    SONJA WILLIAMS: Hey, sweetie, Mommy's
5  not home yet. Call me.
6    FEMALE 2: Hello.
7    KEENAN NIX: How are you?
8    FEMALE 2: Good, how are you?
9    KEENAN NIX: Well, thank you. Thank
10 you.
11   FEMALE 2: There you go. You're very
12 welcome.
13   KEENAN NIX: I appreciate it.
14   FEMALE 2: Have a good day.
15   SONJA WILLIAMS: Thank you so much.
16   KEENAN NIX: Of course, of course.
17 You're going to be right down the lobby.
18   SONJA WILLIAMS: Okay.
19   KEENAN NIX: And you get into the
20 parking garage. That will get you out.
21   SONJA WILLIAMS: Yes. Yes, yes, yes.
22   KEENAN NIX: And thank you again.
23   2:21:01
24   SONJA WILLIAMS: Is it this side, or it
25 doesn't matter?

Page 144

1    KEENAN NIX: No, no. I'm hitting for
2  the lobby, so it'll be B-1 for you right here.
3    SONJA WILLIAMS: Okay. B-1.
4    KEENAN NIX: Right here, and then I'll
5  take one down. We're on the 47th floor.
6    SONJA WILLIAMS: Oh, okay. So should I
7  be expecting to get a request for documents from
8  you sometime soon?
9    KEENAN NIX: Pardon?
10   SONJA WILLIAMS: Should I expect to be
11 getting a request for documents from you?
12   KEENAN NIX: No, because their request
13 serves the same purpose. I get everything that
14 they get.
15   SONJA WILLIAMS: Got it.
16   KEENAN NIX: And so everything that you
17 have that's relevant to the case, I'll have a
18 copy of the day that they get theirs.
19   SONJA WILLIAMS: Okay.
20   KEENAN NIX: So won't have to do a
21 separate request. Thank you.
22   SONJA WILLIAMS: All right. Have a
23 great day.
24   KEENAN NIX: Bye.
25   2:22:00

Page 145

1    AUTOMATED VOICE: Lobby.
2    2:23:00
3    SONJA WILLIAMS: Thank you.
4    FEMALE 3: You're welcome.
5    AUTOMATED VOICE: P-6, going down.
6    FEMALE 3: Have a good one.
7    SONJA WILLIAMS: You too.
8    MALE 4: And imagine him being a young
9  man. You know, he was in his 20s. He was still
10 in his 20s when he changed his name.
11   MALE 5: Yeah.
12   MALE 4: He was still a young man.
13   MALE 5: Yeah.
14   MALE 4: Imagine what he went through
15 trying to -- because when he --
16   2:24:00
17   SONJA WILLIAMS: Excuse me. How do I
18 get to -- out to the --
19   MALE 5: The garage?
20   SONJA WILLIAMS: To the garage.
21   MALE 4: To your left.
22   SONJA WILLIAMS: Oh okay.
23   MALE 5: At the end of the --
24   MALE 4: All right.
25   SONJA WILLIAMS: Thank you.

37 (Pages 142 - 145)

Page 146

1       MALE 5:  All right, now.
2       MALE 4:  They need to put a sign.
3       SONJA WILLIAMS:  They sure do.
4       MALE 5:  Yeah, we got a --
5       SONJA WILLIAMS:  It ain't big enough.
6  Put the sign right here.
7       MALE 4:  Yeah.
8       SONJA WILLIAMS:  Oh, that motherfucker
9  mad.  What?  Oh, I see you later.  Okay.  I'll
10 get across.
11      MALE 4:  All right.
12      2:25:00
13      SONJA WILLIAMS:  That motherfucker mad
14 as shit.
15      2:25:32
16
17
18
19
20
21
22
23
24
25

Page 147

1       C E R T I F I C A T I O N
2
3  I, Sonya Ledanski Hyde, certify that the
4  foregoing transcript is a true and accurate
5  record of the proceedings.
6
7
8  *Sonya V. Ledanski Hyde*
9  _____
10
11 Veritext Legal Solutions
12 330 Old Country Road
13 Suite 300
14 Mineola, NY 11501
15
16 Date:    June 27, 2023
17
18
19
20
21
22
23
24
25

38 (Pages 146 - 147)

030923 - Kernan - First Creditor Meeting                          June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[03275-2 - actual]                                                   Page 1

| 0 | | 5 | 70:14 76:17 |
|---|---|---|---|

**0**

77:7 105:24

**2012**  29:22,23
30:7
**2013**  8:14
12:23 13:15
29:20 60:6,11
61:4,6 76:6
**2014**  44:10
61:20 62:7
68:6 82:7
**2015**  58:8
**2022**  114:2
**2023**  147:16
**20s**  145:9,10
**20th**  22:12
**21**  1:8
**26th**  87:6
**27**  147:16

**03275-2**  1:9
**033023**  1:17

**1**

**1**  1:11 2:2,4,7
2:11,15 6:25
7:4,9,17,20,24
8:1,3,6 44:19
44:22 45:1,4,9
49:8,12 52:22
53:2 135:11
136:19,21
144:2,3
**10**  1:12 4:23
**10,000**  48:1
**100**  34:12 69:8
107:21 113:14
114:22 125:8
**10th**  62:15,16
**11501**  147:14
**12151**  147:8
**125,000**  43:13
43:20
**12:50**  6:17
**13,000**  8:13
130:11
**15**  4:23

**2**

**2**  2:14 93:19,25
94:5,8 123:19
143:6,8,11,14
**20**  5:18
**2010**  18:18,21
19:10 61:2

**3**

**3**  145:4,6
**30**  3:25 4:5
92:4 101:6
136:10 137:18
**300**  147:13
**330**  147:12
**365**  115:8

**4**

**4**  145:8,12,14
145:21,24
146:2,7,11
**40**  27:4
**400**  3:3
**47th**  144:5

**5**

**5**  1:11 145:11
145:13,19,23
146:1,4
**5,000**  48:1
**50**  114:23
**50,000**  43:20

**6**

**6**  145:5
**60**  37:10 114:8
**65**  114:14

**7**

**747**  126:5

**8**

**800**  137:11
**85**  3:4,5

**9**

**90**  73:7 74:7

**a**

**ability**  31:13
63:15 92:12
**able**  15:17 27:1
45:24 114:12
**absolute**  113:8
119:15
**absolutely**  2:17
3:21 5:16 16:6
16:20 26:3
28:14,17 31:10
33:15 36:21
43:16 61:17
63:5 64:1 66:3
68:25 69:22

70:14 76:17
84:21 85:15
87:7 91:7
93:21 94:4,6
95:5 103:17
106:14 107:1,9
107:13 113:21
114:3 117:17
121:22 125:2
126:15 130:3
138:17 139:3
141:8 142:16
**abuse**  10:7
**access**  10:3,6
17:8 45:25
130:10,22
**account**  125:1
**accountable**
69:17
**accurate**  147:4
**acknowledge**
38:25
**acknowledged**
85:10
**acknowledging**
104:19
**acrimony**
113:2
**act**  5:16
**action**  1:7
**acts**  38:7
**actual**  48:4
78:20 119:15
119:15

03033 - Kennan Mays - First 341 Creditor Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[actually - appreciate]**

**actually** 7:8
18:22,22 19:4
21:3 24:13
29:17 31:16,18
33:1 40:20
46:25 48:3,6
50:25 53:6
60:25 64:9
65:20 67:19
68:24 82:11
85:13 87:17,18
101:11 110:18
111:15 125:22
139:15 143:2
**add** 26:4
**added** 115:6
**addition** 132:9
**address** 39:2
126:11
**adequately**
16:18
**adjective**
114:20
**administration**
28:4
**advantage** 14:5
17:24
**advocate** 73:15
**affected** 115:8
**affirmation**
93:9
**afford** 107:6,8
**african** 91:21
134:13

**age** 3:18 22:13
**ages** 84:24
**ago** 71:12
101:5 120:15
140:20
**agree** 78:14
85:16 97:4
117:18 131:15
135:14
**agreement**
66:13 99:11,14
104:20 113:8
122:7
**agreements**
66:13 104:18
**aha** 57:14
**ahead** 49:7
56:16 57:1
**ain't** 51:17
116:22 119:25
132:6 146:5
**air** 1:7 20:3
50:15
**aires** 61:22
**airline** 23:4,5
61:22 79:16
126:2
**airlines** 6:7
20:24 114:1,10
137:11
**airplane** 65:4
**airport** 20:12
23:9
**alert** 53:15

**alerted** 52:4
**alexander** 1:4
3:24 4:8 5:15
16:22 17:22
32:25 42:16
70:16 93:6
106:4,22
109:16 113:19
115:10 130:6
130:12
**alexander's**
11:10
**allegations**
98:25
**allow** 39:20
71:21 131:6
**allowed** 19:9
**allows** 128:3
**altar** 6:5
**alternative**
109:11
**amazing** 25:6
29:5,7 73:9
109:1
**amen** 21:21,22
**american** 91:21
91:24 134:13
**analog** 20:25
20:25 22:10,11
22:13 23:10
84:7,24
**analysis** 64:9
**analytical** 19:8
23:18

**anderson** 83:23
**aneurysm** 72:9
**anger** 134:18
**angst** 123:24
**animosity**
38:16
**answer** 12:1
15:23 91:6
**answered**
141:20
**anybody** 20:13
20:14,17 50:15
70:23 102:23
127:14
**anybody's**
120:2
**anymore** 93:12
**anyone's** 95:18
**anyway** 19:12
25:13 27:16
32:12 33:25
47:25 50:20
57:2
**app** 13:10,11
62:18
**apparently**
20:20
**application**
19:11 31:2
79:16 86:13
113:15
**applications**
50:5 63:4
**appreciate** 7:2
8:10 135:12

03/23 - Kennan Negara F153 of 321 Meeting                     June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[appreciate - best]                                                          Page 3

| | | **b** | **bars**  120:23 |
|---|---|---|---|
| 136:23,23 | 133:24,25 | | **based**  17:11 |
| 140:12 141:22 | **asks**  25:13 | **b**  28:6 69:10 | 19:8 31:3,8 |
| 143:13 | **ass**  110:3 | 73:19 90:20 | 67:19 82:21 |
| **approach** | 119:25 124:25 | 144:2,3 | 115:5 |
| 10:11 92:20 | 133:25 | **baby**  123:11 | **basic**  69:13 |
| **approaches** | **assist**  75:14,15 | **back**  8:6 12:23 | 85:22 |
| 121:13 | **assistance** | 12:24 18:17 | **basing**  111:14 |
| **appropriate** | 141:13 | 27:22 29:21 | **basis**  98:6 |
| 16:5 | **associated** | 30:9 32:15,19 | 105:3 137:6 |
| **appropriately** | 92:11 | 32:20 40:9 | **bastian**  1:8 |
| 11:4 | **association** | 44:6,9 51:9,16 | **battle**  106:12 |
| **april**  61:9,20 | 91:24 | 51:19,20,21 | 106:13 115:14 |
| 76:6 77:9 | **assume**  94:2 | 52:10 53:5 | **battles**  64:6 |
| **arbiter**  131:12 | **assuming**  97:21 | 55:23 57:12,19 | **beat**  91:9 |
| **architecture** | **assure**  139:19 | 67:23 68:8 | **becoming** |
| 48:9 127:13 | **atlanta**  25:7 | 74:12 77:7,13 | 58:17 |
| **arguable**  9:13 | **attendant** | 81:18,21,22 | **bed**  102:12 |
| **argument** | 76:11,22 | 84:2,5 86:9 | 103:23 107:11 |
| 119:10,12 | **attendants**  34:9 | 91:10 93:8 | **began**  4:12 |
| **army**  8:22 | 65:5 | 94:5,8 101:21 | **beginning** |
| **arrangement** | **attended**  82:13 | 101:22 128:6 | 40:19 64:20 |
| 79:14 95:10 | **attorney**  4:7 | 138:19 141:15 | **behalf**  4:15 |
| **articulated** | **attorneys**  55:12 | **background** | **believe**  32:17 |
| 84:6 | **automated** | 11:21 12:14 | 40:19 52:2 |
| **arts**  41:13 | 145:1,5 | 25:24 26:1 | 72:6 90:14 |
| **asked**  19:14 | **avoid**  10:23 | 88:21 | 91:4 94:24 |
| 89:10,15 91:25 | **aw**  132:16,21 | **bad**  63:17 | 103:1 105:17 |
| 112:8 128:21 | **aware**  35:10 | 109:22 | 110:12,13 |
| 137:4 | 58:20 80:12 | **bag**  110:20 | 125:2 |
| **asking**  9:19 | **awareness** | **balancing** | **bell**  96:9 132:5 |
| 37:4 45:13 | 63:13 | 131:21,24 | **best**  73:13 75:1 |
| 56:1,1,3 58:24 | **awesome**  94:12 | **ball**  127:23 | 95:18 114:21 |
| 66:7 70:4 83:2 | | **bankruptcy**  6:9 | 114:24 115:4 |
| 90:7 97:10,20 | | 37:18 | 132:20 |
| 98:22,23 106:1 | | | |

03/23 Kennan Naylor Emp. Res. Large Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[beta - calling]                                                                  Page 4

| | | | |
|---|---|---|---|
| **beta** 121:3 | **blowing** 89:17 | 134:21 | **business** 4:6 |
| **betrayal** 77:24 | 139:20 | **bring** 10:16 | 6:4,11 9:3,5,11 |
| 113:3 131:19 | **blown** 128:14 | 29:18 31:13 | 14:9 59:22 |
| **better** 49:11 | **blows** 103:21 | 38:21 40:6 | 72:24 112:9 |
| 120:19 | **blush** 37:10 | 45:8 52:18,19 | **businesses** 4:18 |
| **beyond** 14:21 | 132:25 | 53:1 76:21 | 4:18 26:10 |
| **bias** 70:3 | **board** 32:16 | 100:9 102:3 | **buttoned** 15:15 |
| **big** 23:1 54:25 | **boat** 40:25 41:1 | 126:5 | **buy** 121:3 |
| 56:22 58:13 | 41:1 | **bringing** | **bye** 144:24 |
| 115:13 121:5 | **bold** 56:22 | 111:18,22 | |
| 123:14 125:12 | 123:1 | 112:3 133:19 | **c** |
| 125:23 134:11 | **bone** 72:3 | **brings** 73:13 | **c** 147:1,1 |
| 135:18 146:5 | **book** 12:2 | **broadly** 79:14 | **caesar** 7:21 |
| **bigger** 124:3,4 | **born** 130:2 | **broke** 6:8 53:22 | **cake** 44:19,20 |
| **billion** 51:2 | **bottlenecks** | **broken** 53:20 | 49:9,10 136:21 |
| 114:7 | 26:11 | 53:23 | **calculus** 133:3 |
| **billions** 113:25 | **bottom** 15:8 | **brought** 63:11 | **call** 6:18 20:23 |
| **bio** 4:2 | 71:24 135:20 | 75:15 98:5 | 21:15 25:3 |
| **bit** 27:22 37:6,9 | 135:20 | 100:15 127:25 | 27:15 42:25 |
| 50:19 | **box** 6:16 44:14 | 130:25 | 51:14 52:15 |
| **bitch** 46:22 | **boxes** 44:12 | **buckshot** | 53:17,18 54:22 |
| 51:22 | 45:14,15,16,21 | 121:13 | 63:18 87:19 |
| **bite** 45:8 | 45:21,22 | **buenos** 61:22 | 89:22 114:18 |
| **black** 9:8 44:20 | **braden** 94:2 | **build** 48:4 | 129:2,5,6,11 |
| 44:24 49:9 | **brag** 115:10 | 61:14 65:16 | 143:5 |
| 71:8 91:24 | **bragged** 115:10 | 113:16 | **called** 5:8 6:17 |
| **blackened** 7:22 | **brain** 72:8 | **built** 31:20 | 14:17 19:5 |
| 7:24 | **bread** 114:25 | 33:13 | 29:24 30:10 |
| **blacks** 130:7 | **breath** 128:8 | **bullhorn** 89:14 | 52:4,20,21 |
| **blank** 124:1 | **breathes** | **bunch** 19:19 | 53:3,9 54:17 |
| **bless** 21:16,19 | 130:13 | 33:24 | 55:1 56:16 |
| **blocks** 9:9 | **bridge** 95:12 | **burden** 11:10 | 61:20 84:2 |
| **blow** 46:14 | 113:2 | 11:12 | 114:11 |
| 69:12 119:2 | **bright** 40:24 | **burton** 1:10 | **calling** 46:17 |
| 121:8 123:4,5 | 76:9 122:12 | | 64:8 100:21 |

03/23 Kennan Alexander - First Chance Meeting    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[calls - cio]**    Page 5

| | | | |
|---|---|---|---|
| **calls**  21:10 | **carrot**  44:19 | **century**  22:12 | 64:8,18,19 |
| 54:17 68:2 | **carry**  22:20 | **ceo**  61:21 | **cheated**  127:19 |
| 73:12 | **case**  9:16 17:11 | 137:15 | **cheating**  34:8 |
| **calming**  72:18 | 20:10 21:12 | **certain**  10:4 | 34:14 57:15 |
| **cancel**  114:8 | 32:8 48:1 | 16:18 17:2,10 | 115:21 |
| **candidly**  77:21 | 50:17 68:22 | 71:22 79:5 | **check**  53:1 65:1 |
| **candor**  81:2 | 69:14 70:2,17 | 96:8 131:22 | **checking**  6:16 |
| **capable**  86:13 | 71:7 88:12 | **certainly**  38:21 | **cherry**  45:1 |
| 110:13,14 | 89:17 96:6 | 86:16 102:1 | 49:14 |
| 127:8,14 | 98:19,25 | 106:25 107:1,5 | **chick**  36:9 |
| **capacity**  11:15 | 106:20 107:20 | 130:21 140:12 | 52:19 75:17 |
| **captain**  3:24 | 108:20,21 | 141:21 | **chicken**  7:22,24 |
| 4:8 5:15 11:9 | 116:18 119:3 | **certified**  46:6 | **child**  42:1 55:9 |
| 16:22 17:22 | 119:13,14 | 56:15 | 74:24 103:23 |
| 32:24 35:16 | 120:4 121:8 | **certify**  147:3 | **child's**  102:18 |
| 36:7 38:23 | 122:16 127:22 | **challenge**  9:18 | **children** |
| 42:16 70:16 | 133:21 139:20 | **chance**  4:1 | 107:12 |
| 93:6,13 106:3 | 144:17 | 61:21 125:7 | **china**  96:11 |
| 106:21 109:16 | **cash**  107:5,6 | 134:19 137:15 | **chocolate**  44:25 |
| 113:19 115:9 | **casting**  60:21 | **changed**  32:22 | 44:25 45:1 |
| 130:6,12 | **catastrophica...** | 37:14,19 74:17 | 49:9 |
| **card**  142:7,18 | 4:3 | 131:1 145:10 | **choice**  123:9,14 |
| **care**  39:8 40:11 | **catch**  94:5,8 | **changer**  63:19 | 135:23 136:5 |
| 40:12 70:25 | **catered**  137:16 | **changes**  51:8 | 140:15,24 |
| 71:2,4,5,11,13 | **cause**  15:10 | 106:17 | 141:2,3 |
| 71:23 72:18 | 110:9 | **changing**  38:2 | **choices**  107:11 |
| 74:19 75:10,12 | **caused**  38:18 | 113:15 114:18 | 123:14 124:24 |
| 93:5,13,14 | 40:4 | **character** | **choose**  97:21 |
| 111:15 123:17 | **causing**  40:2 | 16:24 35:22 | 123:13 |
| 123:17 136:17 | **cease**  55:21 | 100:10 110:8 | **choosing**  96:16 |
| **careful**  112:19 | 56:17,22 | 110:10 | **chose**  60:18 |
| **carefully**  69:11 | **cell**  8:16 40:17 | **charge**  3:20 | **christ**  109:4 |
| **caroline**  2:3 | 142:14 | **chat**  31:8 32:5 | **christ's**  21:20 |
| **carriers**  26:18 | **center**  126:8 | 32:9,9 62:24 | **cio**  62:7 |
| | | 62:25 63:10,24 | |

03022, Kennan   Maria E.   First To Face Meeting                                June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[circle - contained]                                                            Page 6

| | | | |
|---|---|---|---|
| **circle**  92:1 | **college**  24:11 | **communication** | **conceptualiz...** |
| **circling**  20:12 | 25:14,15,21 | 21:2 22:16 | 88:11 |
| **circumstances** | 26:5 | 33:8,14 67:15 | **concern**  15:10 |
| 55:14 114:13 | **come**  2:11 3:2 | 114:11 134:23 | **concerns**  140:9 |
| **city**  90:15 | 7:15,17 10:13 | **communicati...** | **condition**  132:7 |
| 94:14 | 14:9 17:10 | 17:18 23:6,8 | 132:24 |
| **civil**  1:7 4:4 | 20:5 42:8 44:2 | 23:19 24:3 | **conduct**  103:15 |
| **claim**  128:1 | 51:9,21 55:22 | 27:17 31:4,21 | 103:16 124:24 |
| 131:13 | 84:24 85:7 | 31:24 32:3 | 128:3 |
| **clandestine** | 87:14 88:12 | **companies**  25:9 | **confidence** |
| 124:18 | 110:4,7 111:7 | 125:8 | 139:1 |
| **clean**  59:23,25 | 112:16,22 | **company**  24:19 | **confidential** |
| **cleanly**  105:15 | 113:17 120:4 | 25:5,11 49:4 | 11:5 139:2 |
| **clear**  71:14,18 | 122:2 139:15 | 60:13 69:8 | **confidentiality** |
| 87:20 106:5 | **comes**  16:23 | 79:4 113:14 | 66:13 104:24 |
| 122:1 126:18 | 24:3 32:19 | 114:22 125:12 | **confuse**  110:8 |
| 126:23 138:11 | 40:8 53:5 | **compete**  79:18 | **conquer**  17:15 |
| 138:11 141:2 | 109:18 111:6 | 79:20 | **consider**  13:5 |
| **clearly**  74:8 | **coming**  5:2 | **complaint**  76:1 | **consistent** |
| 99:5 101:8 | 28:3 30:9 40:9 | 82:5 115:13 | 33:12 58:15 |
| **client**  100:4 | 44:14 94:14 | 130:9 | 115:19 |
| **clients**  50:1 | 95:24 126:7 | **complete**  63:13 | **constitutes** |
| **clock**  4:24 | 132:6 134:10 | **comply**  11:2 | 86:8 |
| **close**  5:10 | **comment**  42:22 | 13:23 17:3 | **consultant** |
| 72:11 90:15 | **commitment** | **components** | 79:10 82:6 |
| **closer**  3:5 36:20 | 69:16 86:22 | 62:22 | 127:8 |
| **cloud**  8:21 | **commotion** | **conceivably** | **consultants** |
| 44:12,14 45:14 | 54:25 | 102:22 | 18:4 |
| **code**  34:19 | **communicate** | **conceived** | **consulting** |
| 82:10,24 84:11 | 19:9 24:4 | 86:16 | 79:13 |
| 86:5 | 92:12 126:7 | **concept**  64:13 | **contacting**  68:1 |
| **coke**  7:8 8:3 | 138:25,25 | 67:5 84:5,20 | **contain**  9:5 |
| **cold**  114:5 | **communicating** | 87:17 98:5 | 14:20 |
| **collaborative** | 73:16 | 100:15 106:6 | **contained**  8:24 |
| 89:6 | | | |

Case 19-56304-sms Doc 243 Filed 01/06/25 Entered 01/07/25 09:21:46 Desc Main
Document Page 157 of 321
03033 Kennan Page Rule 2004 Meeting June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[contemplating - craig] Page 7

**contemplating**
84:23
**contempt** 10:19
125:21
**context** 16:2
44:5 78:15,17
**contingent**
117:13,14
**continue** 28:21
54:12
**contract** 47:14
47:15,18,20
48:3,19,24
49:4 59:10
79:5,22 80:21
81:14 83:5,8,8
87:10 101:7,11
101:25
**contracted**
59:6,9 99:7
**contracting**
79:1
**contradictions**
77:23
**contrary** 38:10
**contributions**
70:18 127:13
**control** 19:23
20:3 50:15
90:19
**controls** 98:11
98:12
**conundrums**
126:3

**conversation**
27:20 28:21
38:25 39:11
58:6 60:10
62:4 63:11
78:15 84:8
86:14 88:15,23
111:11 112:3
113:19,20
120:7,10,14
121:20 133:15
139:6 140:13
141:22
**conversations**
19:3 27:24
32:14 41:19,22
42:7 60:20
61:19 66:6
77:6 94:24
133:6
**convince** 68:6
**cool** 19:1 39:12
129:25
**coordinate**
12:6
**coordinated**
10:11
**coordinating**
9:24 92:20
**copy** 76:1 83:4
144:18
**core** 22:23
69:13
**corner** 53:7

**corporate** 1:11
4:19
**corporation**
5:16
**corporations**
4:15
**correct** 65:14
**correctly** 15:17
**corresponden...**
61:13
**cost** 92:10
**counsel** 14:4
16:1 17:8 92:7
92:11
**counterparts**
87:12
**country** 52:5
131:25 147:12
**county** 1:1
**couple** 68:20
102:6,8 103:12
114:4
**course** 8:11
21:5 43:5
62:13 117:5,7
117:10 126:12
127:9 128:23
141:19,19,20
143:16,16
**court** 1:1 9:19
10:17,22 74:9
128:17 130:22
131:11
**courts** 72:24
131:24

**cover** 99:12
**crafts** 41:13
**craig** 1:4 6:3
10:1 12:10,18
12:21 13:4
18:13,17 19:12
19:17 29:24
30:1,3 36:22
39:10 40:5,6
40:12 41:9
42:2 47:25
48:18 49:3
51:22,23 52:17
54:7,8,8 55:3,5
56:19 57:22
64:5,7 65:24
66:1,16 68:12
72:1,20,22
73:5,17,19
74:22,23,24
75:1,5,11 81:3
87:12,16 88:9
90:6,8 92:24
93:6,6 94:21
96:25 97:5,6
97:17,24 98:3
101:16 103:1
104:16 110:2
116:19 117:25
118:1 120:13
123:23 124:5
126:20 128:20
128:24 129:17
130:6 133:6
136:9,13

03.2023_Kennan Piane First 30(b)(6) Meeting                        June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[craig - deliver]                                                        Page 8

| | | | |
|---|---|---|---|
| 139:17 | **custody** 55:8,9 | **data** 14:19 | **december** |
| **craig's** 8:15 | 55:9,13 | **date** 8:14 18:23 | 114:1 |
| 73:12 74:16 | **custom** 82:19 | 19:2 61:1 80:8 | **decent** 13:5 |
| 139:20 | **customer** | 87:5 92:4 | 75:6 |
| **crash** 19:15 | 114:16 | 147:16 | **decide** 9:20 |
| **crazy** 24:7 51:3 | **cut** 111:1 | **daughter** 3:11 | 16:9 95:22 |
| 51:17 75:9 | **cutting** 3:16,20 | 40:14,19 41:12 | 110:23 123:12 |
| **create** 17:14 | | 41:18 42:4 | 125:10 |
| 26:14 27:1 | **d** | 52:13 75:2 | **decided** 60:12 |
| 51:12 63:3 | **daddy** 41:15,24 | **daughter's** | 72:2 |
| 64:18 115:5 | **damage** 134:24 | 40:13 | **decides** 54:9,11 |
| **created** 29:24 | 135:2 | **david** 1:10,10 | **decision** 36:22 |
| 67:8 81:14 | **damages** 4:4 | 4:25 | **decisions** 15:14 |
| 82:19 | 115:5 | **day** 4:24 14:4 | 71:21 |
| **creates** 110:16 | **damn** 22:12,13 | 15:19 36:10,14 | **deep** 50:2 |
| 140:7 | 76:24 78:12 | 36:16,18 40:3 | **deeper** 4:13 |
| **creating** 25:8 | 92:22 93:5,13 | 41:5,23 72:2 | **defeat** 119:20 |
| 86:13 128:11 | 93:14 95:23 | 73:10 85:22 | **defendants** |
| **creative** 57:23 | 109:21 110:3 | 93:18 101:15 | 1:13 |
| 76:21 104:4 | 113:9,24 | 105:1 111:1 | **defense** 85:19 |
| **creator** 18:6 | 115:12 119:2 | 115:6,8,14 | **defenses** |
| **credit** 75:12 | 123:5 130:15 | 116:25 117:14 | 138:16 140:7 |
| 87:11 104:10 | 131:9 | 142:23 143:14 | **define** 112:23 |
| 107:16 | **dance** 3:12,17 | 144:18,23 | **defined** 79:15 |
| **credited** 114:12 | 3:18 139:18 | **days** 14:21 | **definitely** 32:21 |
| **crew** 30:12,13 | **danielle** 3:19 | 30:16 52:15 | 32:23 44:14 |
| 61:25 83:21 | 132:15 | 54:11 73:7 | 59:24 62:22 |
| 86:10 | **dark** 45:1 | 74:7 92:4 | 90:17 99:11 |
| **criteria** 130:21 | 84:24 | 95:25 114:4,9 | 101:22 105:6 |
| **cruise** 19:1 | **darrell** 1:9 | 115:9 | 107:4 124:10 |
| **crux** 22:23 | **dashboard** | **deal** 4:14 46:14 | 124:13 |
| **curious** 56:9 | 19:9 23:6,18 | 115:14 | **degree** 24:9 |
| **current** 95:16 | 23:19 24:4 | **dealing** 6:23 | **dekalb** 1:1 |
| **currently** 65:13 | **dashboards** | 9:2,3 13:9 | **deliver** 71:6 |
| | 27:10,10,17 | 26:17,20 50:25 | |

Case 19-56304-sms Doc 243 Filed 01/06/25 Entered 01/07/25 09:21:46 Desc Main
03/2023 Kennan Page 159 of 321e Meeting
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

June 23, 2023

[delivered - disserve]

Page 9

| | | | |
|---|---|---|---|
| **delivered** 5:18 71:6 80:15 | **deny** 40:5 107:2 | **developing** 19:4 71:1,2 | **disagrees** 113:22 |
| **delivering** 26:18 | **departure** 77:5 | **development** 6:4 70:19 | **disbelief** 22:25 |
| **delta** 1:7 6:5 | **depending** 14:7 | 79:12,15 85:21 | **discipline** 91:13 134:8 |
| 23:2 31:9 | **deposition** 15:22 16:11 | 127:14 | **disciplined** |
| 34:24 43:4,9 | **depositions** 17:9 | **device** 19:4,8 86:11 | 16:13 96:2 121:16 |
| 43:11,13,15,18 | **derivative** | **devices** 8:15 14:16,20 | **disclosure** 11:5 |
| 46:4 53:19 | 29:25 67:20 | **dick** 134:11 | **discord** 113:3 |
| 55:21,23 56:16 | 74:17 | **died** 72:5,8 | **discourse** 38:14 |
| 58:19 61:3,6 | **derived** 19:22 | 74:21,22 | 85:12 |
| 63:10 64:4,13 | **describe** 140:6 | **difference** | **discovery** 8:20 |
| 64:24 65:1 | **design** 18:4 | 114:19 | 14:18,18 16:8 |
| 69:7 74:15 | 27:9 67:8 | **different** 51:12 | 43:3,7,10,12 |
| 78:8 85:1 | 79:10 82:15 | 58:13 75:24 | 92:3 |
| 86:15,23 87:24 | **designed** 9:11 | 87:13 98:12 | **discussed** 66:14 |
| 88:23 92:22,23 | 65:24 67:15 | 103:16 104:10 | **discussing** |
| 93:5,13 94:20 | **designing** | 117:9 129:22 | 106:4 |
| 97:1,5,6,18 | 23:18 | 134:20 | **discussion** |
| 99:1,1 106:21 | **designs** 48:7,8 | **differently** | 131:5 |
| 110:2 114:10 | 48:12 | 125:24 | **dishonest** 18:2 |
| 119:14 122:20 | **desist** 55:21 | **difficult** 63:16 | **dismiss** 5:7 |
| 127:22 130:7 | 56:17,23 | 95:10 | **dispute** 60:6 |
| 131:1,13 | **dessert** 44:16 | **digital** 15:1 | 97:1 98:15 |
| 137:11,14,16 | **detail** 41:17 | 21:2 22:16 | 100:20,22 |
| 139:17 140:8 | **details** 35:10 | 63:11 84:7 | 101:16 123:13 |
| 140:23 | **develop** 26:13 | 86:13 | **disputes** 124:11 |
| **delta's** 8:22 | 35:5,6 67:5 | **dilemma** 126:8 | **disputing** 99:8 |
| 61:12 103:16 | 74:19 82:9 | **directly** 43:18 | **disrespect** |
| 122:20 | **developed** 25:6 | 92:12 | 125:21 |
| **demand** 11:14 | 27:3,16 31:2 | **disagree** 85:1,1 | **disrespects** |
| **demonstrating** | 47:19 86:16 | 96:18,21,22 | 70:18 |
| 84:19 | 98:4 106:6 | | **disserve** 88:13 |
| **denied** 5:7 107:15 | | | |

03/23/2023, Kaman Page Free of Space Meeting                                June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[dissolve - empathize]**                                                          Page 10

| | | | |
|---|---|---|---|
| **dissolve**  58:7 | 12:23 14:8 | **doubt**  35:17 | **easier**  72:1 |
| **distinctly**  18:21 | 16:8 44:7 52:3 | 78:2 119:9 | 74:21 |
| **distract**  9:12 | 64:3 66:15 | **downstairs** | **easy**  72:23 |
| 10:8 | 73:1 79:1 81:8 | 26:5 91:20 | **economic**  115:5 |
| **distracted** | 81:16 85:11 | 94:11 | **edifying**  134:23 |
| 38:17 | 105:21,23 | **drafted**  99:2 | **educating** |
| **distracting** | 106:3 124:17 | **drama**  127:11 | 122:17 |
| 78:7,17 95:17 | 128:22,24 | **drawers**  14:22 | **educational** |
| 96:6 127:21,24 | 129:2,8 130:11 | **drawing**  32:16 | 25:24,25 |
| 131:5 138:4 | 133:25 144:7 | **drawings**  29:14 | **edward**  1:8 |
| **distraction** | 144:11 | **dreaming** | **effect**  80:11 |
| 35:21 55:17,18 | **doing**  3:25 4:5 | 60:20 | **effort**  89:7 |
| 68:24 121:5,5 | 4:5 10:14 | **dress**  130:7 | 91:11 |
| 122:22 | 12:17 13:10 | **dressed**  6:6 | **either**  45:20 |
| **dive**  4:13 | 14:5 15:19 | **drive**  2:23 | 75:12 90:13 |
| **divide**  17:14 | 16:19 30:21 | 24:15 71:15,21 | 133:20 |
| **divided**  112:21 | 31:23 35:7 | **driving**  88:10 | **electronically** |
| **dividedness** | 41:13 50:1,20 | **drop**  39:11 | 15:2 |
| 133:4 | 50:21 57:18 | **dropped**  52:8 | **email**  29:9 |
| **divisions**  31:4 | 68:3 110:13,14 | 53:10 73:23 | 45:23 46:11 |
| **dock**  41:6 | 110:14 125:12 | **drops**  52:14 | 61:13 65:1 |
| **document**  9:8 | 133:14 | **drove**  72:21 | 142:12 |
| 9:20 79:2,6,23 | **dollar**  51:2 | **drown**  41:11 | **emailed**  46:4 |
| 105:14 131:9 | **dollars**  82:8 | **drug**  72:9,10 | **emails**  8:24 9:1 |
| 137:5 | 113:25 114:7 | 72:23 | 12:9 13:14 |
| **documentation** | **dominguez** | **dude**  54:19 | 35:11,12 46:1 |
| 32:15 49:3 | 94:3 | 55:2 | 56:19 125:17 |
| 58:10,11,15 | **don't**  7:17 | **due**  36:22 | 136:10 |
| 61:5,12 66:10 | 42:10 45:10 | **duluth**  2:24 | **embarrass**  9:12 |
| 78:25 87:3 | 57:6 85:1 | | **embrace** |
| **documented** | 108:16 111:16 | **e** | 109:19 |
| 102:10 | 112:5 119:17 | **e**  8:20 14:17,18 | **emotion**  123:25 |
| **documents** | 140:1,1,2 | 45:25 147:1 | 134:18 |
| 8:13 9:17,25 | **door**  53:24 | **early**  52:15 | **empathize** |
| 10:1 11:3 | 82:4 | 84:9 | 38:22 |

03.2023 Kannan May Free of State Meeting                     June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[empathy - fairness]                                          Page 11

| | | | |
|---|---|---|---|
| **empathy** 19:19 | **equally** 96:24 | **exact** 139:17 | **experts** 115:5 |
| **emphasis** 90:25 | **equipment** | **exactly** 3:2 28:8 | **explicitly** 83:13 |
| **employed** 5:18 | 126:6 | 28:11 62:19 | **exploding** 6:21 |
| **employment** | **equivocation** | 95:17 103:18 | **exposed** 78:10 |
| 120:24 | 133:4 | 103:20 | **expressed** |
| **enable** 16:18 | **error** 115:15 | **example** 40:6 | 95:17 |
| **encounter** | **escape** 5:8 | **except** 119:2 | **extension** |
| 61:21 132:23 | **especially** 5:17 | **exchange** 87:23 | 116:15 |
| 137:15 | 137:14 | **exchanging** | **extent** 15:10 |
| **encouraging** | **essence** 107:15 | 60:21 | **extra** 45:8 |
| 61:14 | **ethics** 70:12 | **excited** 27:25 | **extremely** |
| **ended** 30:18 | **eureka** 60:22 | 86:19 | 54:24 |
| 34:3 49:23 | **event** 19:23 | **excuse** 14:12 | **eye** 127:23 |
| 73:6 | **eventually** | 90:10,11 | **eyes** 12:21 |
| **ends** 88:22 | 121:20 141:6 | 145:17 | 133:1 |
| 121:18,19 | **everybody** | **exercise** 112:21 | |
| 124:21 134:10 | 25:13 34:17 | **expect** 95:14 | **f** |
| **enemy** 70:16 | 101:12 104:17 | 109:19 144:10 | |
| 71:3 | **everybody's** | **expectations** | **f** 147:1 |
| **energy** 38:24 | 20:22 | 38:11 | **faa** 23:3 |
| 47:17,21 | **everything's** | **expecting** | **face** 16:10,10 |
| **engage** 131:24 | 44:13 | 144:7 | 111:2 113:20 |
| **enjoyed** 3:22 | **evidence** 5:11 | **expense** 11:12 | **facebook** 46:21 |
| **enlighten** 77:10 | 131:6 | 92:10 | **facetofaceme...** |
| **ensure** 46:14 | **evil** 43:1,1 72:3 | **expensive** | 1:17 |
| 108:7 | 73:16 109:23 | 126:5 | **fact** 23:2 38:5 |
| **ensuring** 108:5 | 110:11 | **experience** 6:23 | 39:22 42:19 |
| **entertaining** | **evils** 96:17 | 17:12 | 55:15 63:3 |
| 2:21 | 136:2 139:19 | **experienced** | 101:4 112:22 |
| **entire** 22:6 | **evolution** 81:1 | 14:19 | **facts** 5:14 |
| **entirely** 110:16 | **evolved** 31:7 | **experiences** | **fair** 13:4 90:4,5 |
| **entities** 14:15 | 33:11 | 77:22 | 95:1 108:6 |
| **entitled** 11:7 | **evolving** 61:2 | **expert** 24:19 | 111:13 112:9 |
| 120:3 | **ex** 48:20 72:13 | 27:9 | 128:9,10,12 |
| | 73:22 | | 141:18 |
| | | | **fairness** 39:10 |

03.2023 Kernan Mays - Fair Force Meeting                              June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[fairytale - formal]**                                                Page 12

| | | | |
|---|---|---|---|
| **fairytale** 75:16 | **field** 32:8 | 83:17,24 84:11 | **folders** 14:22 |
| **familiar** 4:14 | **fight** 34:9 | 87:2 92:2 | 54:21 |
| **families** 134:14 | 53:17 | 110:24 | **folks** 4:3,9,16 |
| **family** 51:9,11 | **fighting** 42:19 | **fit** 8:12 | 4:20 10:13 |
| 52:9 114:11 | 74:22 | **five** 140:20 | 11:10,11 |
| **far** 103:2 | **figure** 87:25 | **fix** 30:15 36:24 | **follow** 16:9 |
| **fashion** 10:2 | 116:9 | 128:5 | **food** 21:17 |
| **fast** 27:1 | **file** 1:8 5:10 | **fixing** 37:2,4 | **fool** 35:17 |
| **father** 36:21 | 37:18 59:14 | **flat** 100:21 | 67:25 130:16 |
| 41:9 102:19 | 116:19 | **fleet** 27:18 | 131:2 |
| **fault** 17:14 | **filed** 5:6 74:5 | 31:23,23 | **fool's** 53:16 |
| 96:24 97:1,2,5 | 80:10 | **fleets** 19:9 | **foolishness** |
| **favorite** 44:21 | **files** 55:4,16 | **flight** 21:10 | 133:13 |
| **feature** 31:8 | 73:20 | 23:12 31:14,19 | **force** 88:10 |
| 62:24,25 63:10 | **fill** 124:1 | 34:9 61:22 | **forced** 37:18 |
| 63:24 64:8,18 | **final** 82:12 | 65:5 73:8 | **fore** 109:18 |
| 64:19 | **financial** 38:18 | 76:11,22 | **foregoing** |
| **feel** 65:11 89:15 | 136:7 | 114:11 115:8 | 147:4 |
| 96:10 99:18 | **financially** 17:6 | **flights** 114:8 | **forerunner** |
| 103:18 115:15 | **find** 57:20 77:5 | **flip** 50:20 | 85:13 |
| 129:16 | 123:24 | **floor** 144:5 | **forerunners** |
| **feels** 96:19 | **finds** 73:19 | **flush** 47:4 | 85:14 |
| **feet** 72:22 | **fine** 80:3 | **flushing** 47:4 | **forest** 44:20,24 |
| **fell** 51:13 | 118:16,19 | **fly** 73:9 | 49:9 |
| **felon** 73:25 | **fire** 85:9 | **flying** 74:8 | **forge** 6:13 |
| **felon's** 73:24 | **fired** 49:19 | **focus** 39:2 | **forget** 55:15 |
| **felt** 64:14 120:6 | 74:2,2 | 62:22 63:7 | 129:7 |
| 131:19 | **firing** 30:18 | 64:7 65:10 | **forgot** 49:7 |
| **female** 2:2,4,7 | **firm** 8:20 14:17 | 113:7 123:15 | **fork** 45:8 |
| 2:11,14,15 | 14:19 130:23 | 123:22 124:1 | **forklift** 24:15 |
| 73:8 91:21,24 | **first** 18:9,23 | **focused** 115:17 | 24:15 25:1 |
| 143:6,8,11,14 | 19:2 21:10 | 121:15 124:2 | **form** 134:23 |
| 145:4,6 | 31:16 32:19 | 133:2 134:9 | **formal** 15:23 |
| **fence** 140:21 | 60:13 61:1 | **folder** 15:4 | 61:19 62:6 |
| | 73:8 82:4 | | |

Case 19-56304-sms   Doc 243   Filed 01/06/25   Entered 01/07/25 09:21:46   Desc Main
Document   Page 163 of 321
03023_Kennan Place Corporate Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[format - going]                                              Page 13

| | | | |
|---|---|---|---|
| **format** 15:1 | **full** 55:8,9,9,12 | **gentleman** 6:3 | 52:10 53:12,16 |
| **formed** 87:17 | **fully** 69:17 | **georgia** 1:2 | 54:21 56:16,25 |
| **forth** 27:22 | 87:17 | 11:3 91:24 | 57:11,19 61:14 |
| 82:15 84:5 | **fumes** 6:15 | **german** 25:4 | 65:10 81:18,21 |
| 102:3 | **functional** 48:8 | **getting** 3:22 | 81:22 86:12 |
| **fortune** 113:14 | 48:12 49:1,5 | 26:16 69:9 | 91:4 108:20,20 |
| 114:22 125:8 | 67:7,9 79:12 | 73:6 75:12,13 | 109:5 113:25 |
| **forward** 39:1 | 82:10,23 83:18 | 87:4 111:15 | 143:11 |
| 80:8 82:6 | 86:5,12 101:9 | 144:11 | **god** 21:23 |
| 103:9,14 105:1 | 102:4 | **giant** 4:25 5:1 | 135:18 |
| 105:24 113:8 | **functioning** | **girl** 3:18 39:9 | **godparents** |
| **forwarded** 99:3 | 48:4,7 | 123:14 | 53:10 |
| **found** 19:13 | **funny** 29:11,20 | **girlfriend** | **goes** 23:8 53:14 |
| 120:12 | **further** 12:24 | 66:22 | 73:14,14 |
| **foundational** | 58:25 | **give** 2:8 7:13 | 110:20 137:1 |
| 106:20 | **g** | 11:6 44:5 45:2 | **going** 2:4 4:21 |
| **fourth** 30:7 | | 45:3,25 47:24 | 4:22 5:10,11 |
| **frame** 123:8 | **game** 63:19 | 48:2 70:22 | 5:13,24 7:12 |
| **frankly** 120:19 | 106:17 113:15 | 92:22 116:24 | 7:14 9:21,23 |
| **freaking** 20:16 | 114:18 131:1 | 135:10 | 11:22 15:21,22 |
| **free** 11:9 117:2 | 140:3,4 | **given** 55:13 | 17:10 18:1 |
| 125:19 | **gamechanger** | 89:19 91:8 | 19:1,15 20:18 |
| **fresh** 44:23 | 5:20 | 93:7 95:11 | 23:13 24:7 |
| **friend** 54:16 | **games** 138:16 | **gives** 11:17 | 37:10,15 39:19 |
| 132:20 | **gap** 64:9 | **giving** 11:15 | 41:24 44:2 |
| **friendly** 92:19 | **garage** 45:20 | 12:5 104:9,11 | 45:7 47:24 |
| **friends** 48:21 | 143:20 145:19 | 131:8 137:19 | 48:5,6,18,23 |
| 72:11 90:15 | 145:20 | **glad** 129:15 | 49:20,25 50:22 |
| **front** 5:14 42:3 | **garbage** 85:7 | **go** 2:15 6:6 | 51:3,24 52:11 |
| 137:5 | **gas** 6:15 | 10:22 12:23,24 | 54:9 55:1 56:7 |
| **fruition** 29:19 | **gear** 20:4,5,7 | 14:5 15:21 | 64:24 67:6,7 |
| **fuck** 44:1 67:20 | 20:11 | 20:6 29:21 | 67:12 70:17 |
| **fucking** 47:21 | **ged** 24:10 | 35:22 39:5,6 | 73:4,11 74:10 |
| **fulfilling** | **genius** 22:1 | 44:6,8 49:7,17 | 74:23 75:11 |
| 119:20 | 27:5 119:16 | 49:20 51:11,12 | 80:3,5 87:23 |
| | 120:1 | | |

03/2023 Kennan Square Facebook Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[going - herculean]**                                              Page 14

| | | | |
|---|---|---|---|
| 90:12 91:4,12 | **gracious** 95:11 | **half** 5:5 49:24 | **hat** 120:23 |
| 93:12,17 96:4 | **grave** 140:9 | 49:24 78:11 | 130:7 |
| 100:5,7 101:6 | **great** 7:18 40:7 | 123:10,11 | **hatch** 20:10 |
| 102:19 105:21 | 41:17 52:12 | 137:19 | **hate** 42:8 |
| 105:22 106:2 | 57:22 58:1 | **hand** 5:1 99:3 | **hated** 32:21 |
| 109:2,3 110:25 | 76:20 90:14 | **handle** 19:17 | **he'll** 51:14 |
| 111:20,24 | 91:13 98:16 | 69:2 137:6 | **head** 6:21 |
| 112:16 115:11 | 104:4 118:17 | **handwritten** | **hear** 13:1 40:10 |
| 116:9,22,25 | 118:20 125:18 | 15:4 | 42:4 96:8 |
| 117:1,12 | 132:18 136:22 | **happen** 3:23 | 113:1 114:9 |
| 118:12,15,18 | 142:2,20,23 | 63:17 67:12 | 131:22 |
| 123:23 127:11 | 144:23 | **happened** 4:13 | **heard** 95:8,14 |
| 128:6,24 129:1 | **greater** 112:23 | 18:14 24:14 | 139:16 |
| 130:15 131:15 | **greatest** 26:4 | 33:24 34:3 | **hearing** 83:15 |
| 133:16 137:6 | **greatly** 77:6 | 41:7,8 50:9 | 99:21 103:10 |
| 138:23 140:15 | **grits** 7:15,19 | 51:25 62:20 | 103:14 |
| 143:17 145:5 | 8:1 29:1 | 63:23 114:1 | **heated** 57:13 |
| **good** 2:4,14 7:4 | **ground** 33:8,16 | **happening** | **held** 124:25 |
| 7:12 10:14 | **groundbreaki...** | 19:23 33:8 | **hell** 26:7 39:17 |
| 13:2 29:1 39:9 | 86:4 | 34:3 | 39:17 |
| 39:12 48:21 | **growth** 27:5 | **happens** 9:4 | **hello** 123:20 |
| 72:14 73:17 | **guess** 20:6,22 | 23:9 137:13 | 143:6 |
| 85:9 90:15 | 59:16 141:12 | **happy** 77:18 | **help** 6:3 11:16 |
| 93:20 109:22 | **guest** 7:6 | 127:22 | 15:18 28:12 |
| 109:23 110:11 | **guidance** 11:15 | **hard** 123:9,14 | 91:20 96:3 |
| 112:23 123:21 | **guide** 17:8 | **harm** 17:6 97:6 | 123:7 127:6 |
| 125:18 143:8 | **guy** 54:4,17,23 | **harmful** 96:7 | 133:23 138:2 |
| 143:14 145:6 | 125:17 130:25 | **harmonizes** | **helped** 88:3 |
| **google** 113:25 | **guys** 7:4 49:8 | 10:4 | **helpful** 10:11 |
| **gospel** 132:10 | 52:22 75:23 | **harvest** 15:8 | 11:20 13:9 |
| **gotten** 10:3 | 80:2 109:22,22 | **harvested** 8:20 | **helps** 15:13 |
| 58:2 74:2 | **h** | **harvesting** | 124:2 |
| 138:8 | **h** 115:19 | 14:19 | **herculean** |
| **gps** 19:7 | **hairs** 125:22 | **haskin** 1:9 | 91:10 |

03-2023 Kernan - Plan Confirmation Hearing Meeting
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.
June 23, 2023

**[hey - indicating]**

Page 15

| | | | |
|---|---|---|---|
| **hey** 40:6 53:9 54:18 70:4 143:4 | 89:10 116:24 136:6 | **hyde** 147:3 | 28:2,10,16 58:13 68:19,21 |
| **hide** 9:10 11:8 56:6 | **honesty** 38:7 | **i** | 68:22 85:6,14 90:17 97:3 |
| **highly** 55:13 90:16 | **honor** 12:4 141:23 142:1,3 | **ice** 7:10 | 100:24,24 110:10 138:6 138:24 |
| **hire** 48:6 49:4 83:11,14 100:14 115:4 122:3 | **honored** 132:17 | **idea** 18:6 29:16 30:10 51:2 61:15 66:25 67:5 74:16 76:7 85:20 86:6 87:14,20 88:11 98:5 102:16 105:12 113:16 137:10 | **importantly** 26:21 51:6 67:14 71:20 |
| **hired** 6:3 49:6 71:3 100:14 102:1 133:2 | **hood** 130:19 | | **impugning** 134:3 |
| | **hope** 121:15 | | **inaccurate** 95:15 |
| | **hoping** 13:14 | | **inappropriate** 95:7 |
| **historic** 109:7 | **horrible** 30:19 30:23 84:3 85:8 | | **incarcerated** 57:5 |
| **historical** 108:21 | **hospitals** 4:17 | **ideal** 75:14 | **incarceration** 38:17 |
| **history** 116:18 137:25 | **hours** 4:23 | **ideas** 60:21 | **inchoate** 85:20 87:14 |
| **hit** 93:21 | **house** 40:7 41:24 45:19,21 52:3 53:5,8,8 53:14,15,16,24 54:10,12,15,18 54:19,22,24 55:3 73:12,19 73:24 112:21 | **identified** 5:21 | **incident** 19:16 40:25 |
| **hitting** 134:12 144:1 | | **identify** 91:25 | **include** 31:7 |
| **hold** 10:18 22:10 47:8 55:25,25 60:8 69:16 76:23 97:8 121:25 | | **ignoring** 118:5 118:6,8,13 | **incorporating** 31:13 |
| | | **illustrate** 76:12 | **independence** 11:17 |
| | **housed** 14:8 | **illustrating** 87:20 | **independently** 92:6 |
| | **how'd** 28:20 | | |
| **holidays** 30:8 | **how's** 97:5 | **image** 130:5,8 | |
| **home** 24:8 143:5 | **huge** 35:21 | **imagine** 44:9 145:8,14 | **indicated** 67:23 |
| **homework** 122:15 | **huh** 44:17 | **immediate** 62:15 63:14 | **indicating** 80:14 |
| **honest** 9:20,22 40:16 46:16 64:25 68:15 | **human** 132:7 132:24 | **immediately** 73:20 | |
| | **hundred** 69:8 | **impacted** 131:17 | |
| | **hundreds** 82:8 | **impacts** 95:9 | |
| | **hurt** 134:18 | **imperils** 121:6 121:9 | |
| | **husband** 40:11 | **important** 15:24 16:12,14 | |

03\. Kuhlman Rule 2004 Examination Meeting          June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[indiscernible - june]**                                      Page 16

| | | | |
|---|---|---|---|
| **indiscernible** | **inside** 64:24 | **interested** 31:9 | **issue** 20:4 |
| 7:20 32:17 | **inspiration** | 31:22 37:1,4 | 110:8 116:13 |
| 35:5 40:18 | 60:21 76:20 | 46:23 64:3 | **issued** 17:16 |
| 41:4 44:22,23 | **instance** 14:7 | 65:20 82:2,2 | **issues** 34:2,7,23 |
| 47:25 49:6,13 | 72:20 74:4 | 89:17 107:22 | 34:23,24,24,25 |
| 50:17 53:18 | 92:16 | 108:2,3 112:9 | 34:25 42:10 |
| 59:8 65:1 | **integral** 56:11 | 139:20 | 110:9 133:5 |
| 66:19 76:8 | **integrate** 88:1 | **interesting** | **it'll** 138:4 144:2 |
| 81:13 85:25 | **integrity** 9:10 | 8:12 12:22 | **j** |
| 88:25 93:19 | 12:6 16:24 | 24:8 54:8 | |
| 142:9 | 38:8 77:23 | 101:1 | **jail** 37:18 52:2 |
| **individual** | 90:14 92:13 | **interests** 88:13 | 53:25 54:10,11 |
| 102:5 | 94:23 110:15 | **interface** 82:20 | 54:15,24 55:2 |
| **industry** 23:22 | 120:5 129:17 | **interpret** 106:9 | 55:5 |
| 28:9 126:2 | **intellect** 127:12 | **interpreted** | **january** 58:8 |
| **inefficiencies** | **intellectual** | 106:10 | **jd** 26:6 |
| 26:11 | 56:23 78:9,21 | **interrogatory** | **jesus** 109:4 |
| **influence** 70:19 | 86:8 101:14 | 99:2 | **jet** 73:9 74:8 |
| **inform** 32:25 | 104:14,16 | **introduction** | **job** 26:8 73:6 |
| **information** | **intelligent** | 120:25 | 74:3,12 85:9 |
| 8:20 9:9,17 | 134:21 | **investing** 10:13 | **jobs** 25:12 |
| 10:3,6 11:6 | **intend** 10:7 | **involved** 60:13 | **joe** 6:11 |
| 14:20 28:16,19 | **intent** 74:1,1 | 61:3 68:13 | **john** 1:12 |
| 72:25 106:8 | **intentional** | 99:5,6 | **judge** 131:14 |
| **informed** 85:21 | 122:2,3,7 | **involvement** | **judgment** 5:9 |
| **injured** 4:3,16 | **interact** 32:3 | 37:13 107:5 | 38:21 130:20 |
| **inkling** 123:6 | **interest** 15:16 | **involving** 14:16 | **judgments** |
| **inner** 137:17 | 57:25 58:1 | **ipad** 83:23 84:4 | 35:20 133:19 |
| **innovate** 71:19 | 66:14 95:19 | **irops** 63:17 | **july** 62:15 |
| 125:7 | 99:24 104:11 | 76:23 114:14 | **jumbo** 73:9 |
| **innovation** | 106:23 107:17 | **irregular** 63:18 | 74:8 |
| 114:21 | 111:19,21 | **irrelevant** 9:17 | **jump** 28:23 |
| **innovative** | 112:15,18 | 78:8 | 51:19,20 |
| 114:19 | 116:20 136:7 | **ish** 58:8 | **june** 62:15 68:5 |
| | | | 82:6 87:3,5,6 |
| | | | 147:16 |

03/23 Keenan Mayor's Office Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[jury - keenan]**                                                    Page 17

| | | | |
|---|---|---|---|
| **jury**  5:8,13,14 | 33:6,11,16,19 | 68:16,18,23 | 101:19,23 |
| 35:23 109:19 | 34:6,10,15,18 | 69:1,6,20,24 | 102:2,7,14,17 |
| 124:22 | 34:22 35:9,15 | 70:6,11,15,21 | 102:21,24 |
| **justice**  88:14 | 35:19,24 36:3 | 70:25 71:18 | 103:4,8,13,19 |
| 124:6 134:10 | 36:6,8,12,15,17 | 72:16 75:10,20 | 103:21 104:2,6 |
| **justify**  35:25 | 36:19,23 37:3 | 75:25 76:10,15 | 104:8,12,15,23 |
| 109:17 | 37:8,16,20,23 | 76:18 77:4,12 | 105:4,8,14,18 |
|   **k**   | 37:25 38:6,10 | 77:15,18 78:1 | 106:1,11,16 |
| | 38:14 39:4,14 | 78:5,14,23 | 107:3,7,10,14 |
| **keenan**  2:3,6 | 39:21 40:1 | 79:6,9,21 80:5 | 107:19,24 |
| 2:10,12,16,18 | 42:12,16,22 | 80:12,16,19,23 | 108:4,7,11,14 |
| 2:22 3:1,6,10 | 43:5,8,12,17,22 | 80:25 81:6,9 | 108:18,23 |
| 3:14,22 4:12 | 44:4,11,16,24 | 81:12,15,20,23 | 109:2,5,7,10,14 |
| 5:4 6:1 7:1,6 | 45:7,12,17,23 | 82:1,19,23 | 110:1,7,22 |
| 7:11,21,25 8:5 | 46:3,7,9,11 | 83:1,6,12,15,20 | 111:6,17,22 |
| 8:8,11,19 9:15 | 47:2,8,12,15 | 84:1,14,17,19 | 112:1,7,11 |
| 10:10,25 11:20 | 48:10,13,16 | 84:22 85:3,18 | 113:6,12,14,23 |
| 12:11,16,19 | 49:15 50:7,10 | 86:1,3,19,21 | 114:4,7 115:4 |
| 13:2,7,17,21,25 | 50:13 52:20,25 | 87:9,13 88:2,7 | 116:1,6,10,12 |
| 14:12,15 15:7 | 54:2,6 55:6,25 | 88:20 89:2,5 | 116:16,21 |
| 16:4,7,16,21 | 56:3,7,12,15,20 | 89:11,18,23 | 117:1,5,7,10,13 |
| 17:1,21 18:7 | 56:25 57:4,8 | 90:1,7,18,24 | 117:19,24 |
| 18:10,15,19 | 57:21 58:2,5 | 91:6,9,17 92:9 | 118:2,4,8,11,17 |
| 19:6,25 21:5,8 | 58:10,23 59:5 | 92:25 93:3,24 | 118:20,23 |
| 21:14,16,24 | 59:11,17,20 | 93:24,25 94:1 | 119:1,6,12,19 |
| 22:3,7,12,16,19 | 60:1,4,8,14,17 | 94:10,13,16 | 119:22,25 |
| 22:22 23:21,25 | 60:24 61:9,11 | 95:3,6,21 | 120:11,15,22 |
| 24:5,9,12,17,21 | 61:18,25 62:3 | 96:18,21,25 | 121:9,12,23 |
| 24:23 25:10,16 | 62:6,9,12,14,19 | 97:9,11,13,16 | 122:5,9,11,25 |
| 25:20,23 26:2 | 62:24 63:2,6,9 | 97:19,23 98:2 | 123:21 124:6,8 |
| 26:19 27:7,14 | 63:22 64:2,13 | 98:7,10,14,18 | 124:12,15,21 |
| 28:7,9,12,15,18 | 64:19,21 65:9 | 98:24 99:16,20 | 125:4,16 |
| 28:25 29:4,6 | 65:15,18,23 | 99:25 100:3,6 | 126:17,21 |
| 29:10 30:12 | 66:4,7,12,20,23 | 100:11,17,20 | 127:1,3,7,18 |
| 31:6,11,17 | 67:2,17 68:11 | 100:23 101:2 | 128:16,25 |
| 32:1,5,9,11,24 | | | |

**[keenan - lawsuit]** Page 18

129:4,9,20,23
130:1,4,18,22
131:8 132:9,14
132:17,19,22
133:10 134:7
135:1,4,9,12,14
135:16,22,25
136:4,12,15,18
136:20 137:1,4
137:12,22
138:2,14,18,23
139:5,10,13,24
140:2,5,14,18
141:4,9,12,17
141:19,23
142:1,3,5,8,11
142:14,17,22
142:24 143:3,7
143:9,13,16,19
143:22 144:1,4
144:9,12,16,20
144:24
**keenannix** 1:17
**keep** 34:12 36:6
43:21 45:17
52:12 73:4,10
111:18,22
124:2 128:1,6
131:4 133:1
**keeping** 15:20
49:25
**keeps** 109:15
**kept** 25:8 50:20
51:24 53:7

**key** 53:7
**kicked** 130:19
**kid** 40:24
**kidding** 100:22
**kids** 41:5,6
72:19 73:4,15
73:17
**kill** 41:15
**killed** 4:4,16
72:6
**kind** 18:25
29:21 30:19
32:18 38:16
41:4 49:24
64:25 102:19
110:10 124:24
132:24
**kinds** 30:20
**knee** 50:2
**knew** 4:8,10
25:4 51:1,2
52:7 53:7 65:6
65:7 82:5
88:17,18
115:11
**knocked** 82:4
**know** 3:1,23
4:1,7,19 5:11
7:12 8:16 9:22
10:12 11:9,24
12:3 13:3,8,18
15:11,12 17:4
17:21 20:8,15
21:19 22:8,8
23:15 24:14

26:2 29:17
34:18 35:7,9
35:16 36:15,19
36:24 37:3,8
39:4,5 41:3,16
41:25 42:10,14
43:15,17 45:10
47:9 51:18
53:25 54:23,25
55:1 57:18
58:17 60:5
61:5 65:12
70:6,6,11 71:3
71:5 72:12
76:9 77:5,7,9
77:11,11 78:2
81:4 83:8 85:3
87:3 89:24
90:3,5,5,10
92:22 94:2,19
95:9,14,22
96:3,4 99:18
101:20 103:5
103:24 104:3
106:18 108:9
108:12,16
112:20 114:24
121:1 122:13
122:16,16
123:2,6 126:1
127:1,15,16
130:14,14
131:2 132:1,6
135:13,15
137:12 139:15

139:24,25
140:2,3 141:4
141:5 142:5
145:9
**knowledge**
5:22
**known** 80:1
99:13 105:10
105:11
**knows** 104:3
108:19,22

**l**

**lack** 77:23
**lady** 42:3 74:21
**land** 11:22 20:2
95:22 110:25
111:4
**landing** 20:4,5
20:7,7,11
94:17
**landmines**
69:12
**lands** 134:3
**laptop** 8:16
**largely** 78:8
**late** 6:2 29:22
**law** 11:3 13:23
14:1 92:5
130:23 139:25
**lawsuit** 55:6,8
55:16 59:15
76:1 80:11,13
115:12 116:19
128:5

03/2023 - Kernan - Pre-Discipline Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[lawsuits - lost]**                                                                    Page 19

| | | | |
|---|---|---|---|
| **lawsuits** 4:4 | 58:19,22 | 84:3 85:1,4 | 28:3 |
| **lawyer** 10:15 | 122:25 | 87:10 99:16,17 | **long** 71:12 |
| 11:1,13 14:4 | **letters** 58:12 | 101:6 103:13 | 76:24 85:22 |
| 15:9,13,17 | 123:1 | 103:13 118:11 | 89:21 117:14 |
| 90:12 91:20 | **letting** 84:22 | 118:11 125:6 | 120:15 |
| 92:5,16,18 | **level** 100:9 | 128:20 133:7,8 | **longer** 51:15 |
| 103:6 106:8 | 125:7 | **listening** 40:13 | 68:7 72:2 |
| 120:12,17 | **leveraged** | 56:16 | 120:9 |
| 122:2 132:10 | 17:24 | **literally** 6:17 | **look** 4:2 7:13 |
| 138:24 141:14 | **liar** 100:22 | 23:17 27:3 | 9:19 27:21 |
| **lawyers** 8:22 | **lie** 57:25 | 30:2 76:3 82:7 | 29:6 35:9 44:7 |
| 11:8 69:8 | **lieutenants** | 89:17 125:17 | 57:12 71:25 |
| 91:25 94:14 | 91:23 | **litigation** 4:6 | 81:19,22,22 |
| **lay** 11:21 54:9 | **life** 9:4 25:12 | 5:6 6:23 | 110:9 118:4 |
| 54:12 111:4 | 37:8,11 38:1 | 122:13 | 122:11,15 |
| **layer** 48:8 | 39:17,17 75:15 | **little** 3:15 27:10 | 127:4,5 130:19 |
| **layered** 138:18 | 75:16 98:5 | 27:21 37:6,6,9 | 131:11 |
| **laypeople** 6:21 | 102:20 131:18 | 40:24 50:19 | **looked** 41:18 |
| 14:3 15:19 | **lift** 20:9 | 54:8 125:13 | 104:20 |
| **lays** 54:15 | **light** 7:10 44:23 | **live** 2:24 33:7 | **looking** 43:21 |
| **leading** 3:20 | 50:2 | 33:19,19,21 | 86:24 |
| **leave** 51:22 | **lights** 49:25 | 63:11 | **looks** 29:1 30:6 |
| 52:11 89:18 | 50:23 | **lived** 38:2 | 42:25 67:13,25 |
| 93:16 | **likely** 9:21 | **lives** 126:6 | 84:9 108:17 |
| **ledanski** 147:3 | **likes** 3:17 | 130:13 | **loose** 91:18 |
| **left** 6:5 41:6 | **limited** 79:12 | **living** 74:20 | 121:18,18 |
| 140:11 145:21 | **line** 15:8 16:17 | **lobby** 143:17 | **lord** 21:17 |
| **legal** 17:3 60:9 | 17:7 20:22 | 144:2 145:1 | **lose** 74:10 |
| 147:11 | **lines** 1:7 9:8 | **location** 19:8 | 85:12 128:23 |
| **legitimacy** | 17:14 59:23 | **log** 19:5,7 | 129:2 133:25 |
| 100:9 | **list** 5:24,24 | 23:16,19,21,23 | **loss** 123:25 |
| **lesser** 96:17 | **listen** 22:3,3,7 | 29:25 31:24 | **lost** 4:21 50:12 |
| 136:2 139:18 | 37:3 69:4,4,25 | **logistics** 24:19 | 74:12 128:22 |
| **letter** 46:4,6 | 69:25 70:12 | 24:20,23 26:9 | 129:8 |
| 56:9,15,17 | 80:23 83:21 | 26:22 27:17 | |

03.23.2023 Kennan McKenzie - 341 Creditor Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[lot - meet]                                                        Page 20

| | | | |
|---|---|---|---|
| **lot**  4:14 6:22 | **maintains** | 145:11,12,13 | 140:6 143:25 |
| 8:23 19:2 | 92:13 | 145:14,19,21 | **matters**  94:18 |
| 23:13 24:7 | **make**  10:4 | 145:23,24 | 112:20 |
| 27:23 37:11 | 13:13 15:13 | 146:1,2,4,7,11 | **matthew**  1:9 |
| 42:13 47:16,20 | 16:18 17:2 | **mama**  42:8 | **mature**  72:4 |
| 51:25 65:2 | 37:10 39:20 | **man**  34:13 54:1 | **mayfield**  6:12 |
| 66:5 68:9 | 48:12 50:23 | 54:3 128:20 | 92:16 |
| 69:11 77:22 | 51:3 56:9 67:8 | 135:18 145:9 | **mean**  13:25 |
| 90:15 91:17 | 71:14 72:22 | 145:12 | 18:10 20:13 |
| 109:17 110:8 | 74:20 119:13 | **manila**  14:22 | 29:6 34:23 |
| 126:6,10 | 121:2 122:1 | **manipulate** | 43:19 51:17 |
| 127:10 | 123:9,10 | 10:7 | 61:12 64:23 |
| **love**  24:12 | 124:23 128:12 | **manipulation** | 69:18,20 77:2 |
| 72:14 124:14 | 132:25 134:20 | 115:20 | 77:16 83:20,21 |
| **loved**  62:12 | 135:23 136:6 | **manner**  15:20 | 89:24 90:10 |
| **loves**  3:12,18 | 140:15 | **manufacturers** | 97:2,25 113:4 |
| **lunch**  139:7 | **makes**  39:16,17 | 4:17 | 133:23 137:10 |
| **lying**  115:20 | 106:4 117:15 | **mapped**  67:13 | 137:23 138:10 |
| | 117:21 | **margin**  115:15 | 138:11 140:19 |
| **m** | **making**  11:13 | **marginalize** | **meaning**  60:19 |
| | 35:19 36:22 | 38:1 | **meaningless** |
| **ma'am**  22:8 | 37:5 68:2 | **marginalizes** | 93:10 |
| **mad**  128:23 | 106:12 107:10 | 70:18 | **means**  9:7 |
| 129:7 146:9,13 | 114:20 133:12 | **marlowe**  2:25 | 18:12 75:3 |
| **made**  25:1 | 134:12 137:25 | 3:5 | 132:11 |
| 64:22 72:1 | **malaysia**  50:6,8 | **married**  132:15 | **meant**  76:12 |
| 73:3 74:17 | **male**  6:25 7:4,9 | **match**  26:24 | **measure** |
| 76:13 86:22 | 7:17,20,24 8:1 | **matching** | 114:16 |
| 116:18 120:24 | 8:3,6 44:19,22 | 110:11 | **mechanism** |
| 131:13 140:24 | 45:1,4,9 49:8 | **material**  92:15 | 17:4 |
| 141:2,3,10 | 49:12 52:22 | 132:1 | **mediate**  94:23 |
| **main**  109:15,16 | 53:2 93:19,25 | **matter**  23:1 | 111:11 |
| **maintained** | 94:5,8 123:19 | 73:5 74:18 | **meet**  2:19 3:6 |
| 15:1 57:21,22 | 135:11 136:19 | 101:4 112:14 | 3:23 50:1 |
| **maintaining** | 136:21 145:8 | 125:11 129:25 | 65:15 79:16 |
| 83:16 86:11 | | | |

03.23.2023 - Kennan Park Fan To Fan Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[meet - nda]**                                                                Page 21

139:6,8,10
**meeting** 62:7
  62:15 67:23
  83:17,24 84:12
  86:21 140:22
  140:24
**meetings** 47:6
  78:10 82:12
  87:2,23 120:25
**member** 8:3
**men** 134:13
**mentioned**
  68:19 102:7,8
**menu** 7:12
**merely** 76:12
**merit** 127:25
**message** 77:1
  115:18 124:23
  138:20
**messages** 31:20
  51:14 68:5
  84:4 102:12
**messaging** 31:3
  50:16
**messy** 37:9
  77:16,17
**met** 3:10 12:18
  12:21 18:17
  19:3 76:8
  89:16
**meta** 14:17
**methodical**
  74:4
**middle** 19:4
  20:8 93:15

94:17,22 96:16
  104:23 110:25
  112:15 119:13
**midst** 114:13
**miguel** 94:2,10
**milo** 49:15,18
  84:14
**mind** 4:21 35:4
  53:17 54:10
  103:21 113:7
**mindset** 4:19
**mine** 3:25
  12:25 74:16
  88:13 111:25
**mineola** 147:14
**minister**
  132:10
**minute** 4:9
  22:10
**minutes** 140:20
**miracle** 91:22
**misappropria...**
  106:19
**missed** 135:19
**missing** 138:15
**mission** 84:6
**mistress** 75:18
**mixed** 110:19
**mob** 83:21
  86:10
**mobilize** 6:4,10
**mock** 30:12,13
  61:25
**mockery**
  113:10 134:13

**mockup** 60:12
**mockups** 87:19
**model** 115:5
**moment** 57:14
  76:16
**moments** 57:13
  60:22
**mommy** 41:14
**mommy's**
  143:4
**money** 4:4
  49:22,24 50:23
  71:15,21,24
  74:19,19 75:10
  75:13,13
  112:12 116:20
  116:21,23
  125:9 128:7,10
**monster** 72:4
**month** 114:17
**months** 50:24
**morality**
  110:17 130:20
**morally** 71:11
**morgan** 130:23
  130:23
**morning** 52:16
**mother** 72:16
**motherfucker**
  146:8,13
**motion** 5:6,9,11
  73:20,23 74:5
  74:5 91:10
**motivation**
  119:2 123:24

**move** 39:1
  103:4,9,14
  125:7
**moved** 25:7
  26:25 44:8
  82:6
**moves** 130:13
  135:21
**moving** 15:20
  113:8
**mud** 72:9,10
**mug** 34:14
**multiple** 14:16
**muta** 1:9

**n**

**n** 147:1
**n0080** 8:5
**name** 6:24
  21:20 26:6
  32:22,22,25
  33:2 49:7 81:3
  91:21 118:13
  145:10
**narrative** 90:20
  91:4,14 92:20
  95:16 98:12
  109:11,15
  112:17 119:19
  129:22 138:3
  138:20
**natural** 81:1
**nature** 17:17
  27:12 73:1
**nda** 125:19

03/2023 Kennan Bray First of Race Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[necessarily - nix]                                                    Page 22

| | | | |
|---|---|---|---|
| **necessarily** | 26:5 51:24 | 22:3,7,12,16,19 | 59:11,17,20 |
| 27:9 29:8 | 53:13,23 55:23 | 22:22 23:21,25 | 60:1,4,8,14,17 |
| 31:20 39:8,10 | 65:25 66:16,23 | 24:5,9,12,17,21 | 60:24 61:9,11 |
| 39:19 46:14 | 66:25 68:12 | 24:23 25:10,16 | 61:18,25 62:3 |
| 75:10 89:9,13 | 71:15 72:1 | 25:20,23 26:2 | 62:6,9,12,14,19 |
| 90:10 94:20 | 79:19 80:3,7 | 26:19 27:7,14 | 62:24 63:2,6,9 |
| 119:5 121:8 | 80:15 88:9 | 28:7,9,12,15,18 | 63:22 64:2,13 |
| 134:16 | 90:6,21 98:7 | 28:25 29:4,6 | 64:19,21 65:9 |
| **need** 11:16,24 | 99:1 107:15 | 29:10 30:12 | 65:15,18,23 |
| 12:3 15:12 | 109:10 111:10 | 31:6,11,17 | 66:4,7,12,20,23 |
| 25:18 26:7 | 125:24 141:1,3 | 32:1,5,9,11,24 | 67:2,17 68:11 |
| 28:13,13,18,20 | **new** 12:22 30:9 | 33:6,11,16,19 | 68:16,18,23 |
| 32:13 48:3,14 | 67:21 72:23 | 34:6,10,15,18 | 69:1,6,20,24 |
| 52:12,12 53:12 | **nice** 2:18 48:20 | 34:22 35:9,15 | 70:6,11,15,25 |
| 64:14,14 65:12 | **nigga** 52:17 | 35:19,24 36:3 | 71:18 72:16 |
| 65:15 79:16 | **night** 52:1,2 | 36:6,12,15,17 | 75:20,25 76:10 |
| 105:12 106:8 | 54:14 78:12 | 36:19,23 37:3 | 76:15,18 77:4 |
| 109:12 111:3 | 113:24 115:1 | 37:8,16,20,23 | 77:12,15,18 |
| 115:16,17 | **nine** 42:6 | 37:25 38:6,10 | 78:1,5,14,23 |
| 122:19 134:7,8 | **nix** 2:2,3,6,10 | 38:14 39:4,14 | 79:6,9,21 80:5 |
| 136:8 146:2 | 2:12,16,18,22 | 39:21 40:1 | 80:12,16,19,23 |
| **needed** 21:11 | 3:1,6,10,14,22 | 42:12,16,22 | 80:25 81:6,9 |
| 30:21 47:1,3 | 4:12 5:4 6:1 | 43:5,8,12,17,22 | 81:12,15,20,23 |
| 48:11 73:10 | 7:1,6,11,21,25 | 44:4,11,16,24 | 82:1,19,23 |
| 87:21 | 8:5,8,11,19 | 45:7,12,17,23 | 83:1,6,12,15,20 |
| **needle** 91:15 | 9:15 10:10,25 | 46:3,7,9,11 | 84:1,14,17,19 |
| 125:8 | 11:20 12:11,16 | 47:2,8,12,15 | 84:22 85:3,18 |
| **needs** 28:16 | 12:19 13:2,7 | 48:10,13,16 | 86:1,3,19,21 |
| 88:17 94:25 | 13:17,21,25 | 49:15 50:7,10 | 87:9 88:2,7,20 |
| 96:1,2 106:9 | 14:12,15 15:7 | 50:13 52:20,25 | 89:2,5,11,18,23 |
| **negotiate** 69:11 | 16:4,7,16,21 | 54:2,6 55:6,25 | 90:1,7,18,24 |
| **neither** 68:14 | 17:1,21 18:7 | 56:3,7,12,15,20 | 91:6,9,17 92:9 |
| 92:24 93:6 | 18:10,15,19 | 56:25 57:4,8 | 92:25 93:3,24 |
| **never** 5:14 18:1 | 19:6,25 21:5,8 | 57:21 58:2,5 | 93:24,25 94:1 |
| 24:10 25:7 | 21:14,16,24 | 58:10,23 59:5 | 94:10,13,16 |

Veritext Legal Solutions

Case 19-56304-sms Doc 243 Filed 01/06/25 Entered 01/07/25 09:21:46 Desc Main
Document Page 173 of 321

03/23 Kennan Presser To The Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[nix - okay]**                                                              Page 23

| | | | |
|---|---|---|---|
| 95:3,6,21 | 120:11,15,22 | **nobody's** 20:22 | **oh** 8:11 21:1,22 |
| 96:18,21,25 | 121:9,12,23 | 72:24 99:8 | 23:14 25:25 |
| 97:9,11,13,16 | 122:5,9,11,25 | **noise** 133:12 | 28:14 30:14 |
| 97:19,23 98:2 | 123:21 124:6,8 | **non** 79:17,20 | 34:13 40:8 |
| 98:7,10,14,18 | 124:12,15,21 | **normally** 47:24 | 44:13 51:21 |
| 98:24 99:16,20 | 125:4,16 | **nose** 111:2 | 56:10 85:15 |
| 99:25 100:3,6 | 126:17,21 | **note** 56:9 | 94:4,15 124:7 |
| 100:11,17,20 | 127:1,3,18 | **notes** 15:4 56:4 | 142:19 143:1 |
| 100:23 101:2 | 128:16,25 | **nothing's** 126:7 | 144:6 145:22 |
| 101:19,23 | 129:4,9,20,23 | **notion** 101:21 | 146:8,9 |
| 102:2,7,14,17 | 130:1,4,18 | **nuance** 90:25 | **okay** 2:8,11 3:1 |
| 102:21,24 | 131:8 132:9,14 | **nuances** 137:7 | 4:7 6:16 10:22 |
| 103:4,8,13,19 | 132:17,19,22 | **number** 5:23 | 12:12,22 14:10 |
| 103:21 104:2,8 | 133:10 134:7 | 8:4 41:23 96:5 | 15:22 18:7,15 |
| 104:12,15,23 | 135:1,4,9,12,14 | 142:15 | 18:20 19:1,10 |
| 105:4,8,14,18 | 135:16,22,25 | **numbers** 27:5 | 24:8,22 28:6 |
| 106:1,11,16 | 136:4,12,15,18 | **ny** 147:14 | 29:19 30:5 |
| 107:3,7,10,14 | 136:20 137:1,4 | | 31:15 33:10 |
| 107:19,24 | 137:12,22 | **o** | 34:1,10,15,18 |
| 108:4,7,11,14 | 138:2,14,18,23 | **o** 147:1 | 34:21 35:7,15 |
| 108:18,23 | 139:5,7,10,13 | **oath** 95:25 96:1 | 35:19 36:4,7 |
| 109:2,5,7,10,14 | 139:24 140:2,5 | **objective** 134:9 | 37:7,16 38:14 |
| 110:1,7,22 | 140:14,18 | **objectivity** | 38:19,19 39:4 |
| 111:6,17,22 | 141:4,9,12,17 | 16:23 92:14 | 39:14,21 40:7 |
| 112:1,7,11 | 141:19,23 | **obscures** | 40:17 42:2 |
| 113:6,14,23 | 142:1,3,5,8,11 | 110:16 | 43:21 46:9,11 |
| 114:4,7 115:4 | 142:14,17,22 | **obviously** 19:2 | 47:11 48:10 |
| 116:1,6,10,12 | 142:24 143:3,7 | 19:11 28:4 | 50:10 51:17 |
| 116:16,21 | 143:9,13,16,19 | 59:5 94:1 | 52:11 55:4,14 |
| 117:1,5,7,10,13 | 143:22 144:1,4 | 116:4,8 137:17 | 55:22 56:12 |
| 117:19,24 | 144:9,12,16,20 | **occasions** 68:20 | 58:4 60:23 |
| 118:2,4,8,11,17 | 144:24 | 101:3 102:9 | 61:3 63:1 |
| 118:20,23 | **nixon** 130:22 | **offensive** 77:6 | 64:21 65:8,22 |
| 119:1,6,12,19 | 132:15 | **office** 44:8 | 66:7 70:3 71:4 |
| 119:22,25 | | 45:21 53:6 | 73:5 76:14 |
| | | 91:21 | |

03/23/2023 Kernan Page Creditors Meeting      June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

## [okay - particular]

| | | | |
|---|---|---|---|
| 77:7,7,12,18 | 133:15 134:2,3 | **organization** | **pages** 8:13 |
| 78:2,16 79:9 | 134:5 135:16 | 79:17 | 43:13,20 |
| 79:13 80:24 | 136:8,15 137:3 | **oriented** 6:20 | 130:11 |
| 81:6,12,17 | 137:20 138:6 | 26:8 | **paid** 49:6 67:6 |
| 82:8,18,25 | 139:5 141:9,12 | **original** 18:4,5 | 82:7 111:16 |
| 84:9,12 85:18 | 141:17 142:19 | 88:10 137:10 | 112:3 |
| 86:2,7,20 87:6 | 143:18 144:3,6 | **orleans** 72:23 | **pain** 77:23 |
| 87:9 91:9 | 144:19 145:22 | **outcome** 117:6 | 113:2 123:25 |
| 92:25 93:1,3,4 | 146:9 | 122:19 | 134:18 |
| 93:12 95:6,21 | **old** 40:16,18,23 | **outfit** 81:3 | **painful** 38:3,4 |
| 96:6 97:19 | 42:5 147:12 | **outside** 15:11 | 38:11 |
| 98:16 100:3,3 | **older** 42:1 | **outsource** | **paints** 129:18 |
| 100:3,17 101:9 | **once** 96:8 | 49:21 50:22 | **paper** 23:13 |
| 101:19 102:14 | 131:21 132:5 | **outsourced** | 29:12 |
| 102:21 104:12 | 135:19 | 48:15 | **papers** 54:20 |
| 105:4,16,18 | **ongoing** 94:24 | **overcome** | 55:15 57:9 |
| 106:11 107:3,7 | **online** 44:15 | 131:23 | **paragraph** |
| 108:7 109:1,6 | **open** 12:2 | **overlap** 109:23 | 79:22 |
| 110:1,19,20 | **openness** | **owes** 136:9 | **pardon** 81:20 |
| 111:13 112:12 | 141:25 | **own** 66:2 92:6 | 123:19,19 |
| 112:22 113:9 | **operate** 4:18 | 92:16,18 | 144:9 |
| 113:10 114:23 | 114:13 | 104:14 | **parenting** 13:6 |
| 115:22 117:19 | **operates** 67:14 | **owned** 104:16 | 75:6 |
| 118:3,17,23 | **operational** | 106:22 | **parents** 73:16 |
| 119:6,22 120:1 | 63:13 | **owner** 106:5 | **parking** 142:25 |
| 120:2,3,18,22 | **operations** | 107:1,21 | 143:20 |
| 121:1,4,11 | 63:18 126:8 | **ownership** | **part** 13:8 31:21 |
| 122:21 123:2 | **opportunity** | 66:14 | 35:3 38:2,3 |
| 124:1,12,25 | 11:25 12:5 | **owns** 78:20 | 65:2 67:15,18 |
| 125:20 126:11 | 21:19 39:24 | **p** | 95:16 99:10 |
| 126:17,21,24 | **optional** 14:2 | | 110:5 118:2 |
| 127:1,2,11,14 | **options** 103:12 | **p** 145:5 | 125:5 135:7 |
| 128:5,11,25 | **order** 46:25 | **pact** 73:4 | **parte** 73:22 |
| 129:6 132:16 | 65:3 111:3 | **pad** 86:7 | **particular** 41:5 |
| 132:20 133:11 | 115:17 | **page** 88:4 | 72:21 74:4 |
| | | 130:9 | |

Veritext Legal Solutions

03.23, Kennan Nixon First Creditee Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[parties - police]                                                          Page 25

| | | | |
|---|---|---|---|
| **parties** 3:15 | **perceived** | 131:2 | **planes** 23:7 |
| **partners** 94:3 | 141:24 | **phone** 20:13,14 | **plans** 23:12 |
| **party** 41:4 | **percent** 27:4 | 20:17,22,25 | 31:14,19 85:21 |
| 42:20 | 101:6 107:21 | 22:14 40:17 | **plant** 25:2 |
| **pass** 38:15 | 114:14 136:10 | 46:17 52:15 | **platter** 5:19 |
| 125:23 131:21 | 137:19 | 53:15 54:16 | 131:1 |
| 142:25 | **percentage** | 68:2 142:15 | **play** 98:22 |
| **passion** 124:14 | 102:9 | **phones** 8:16 | 110:17 |
| **passionate** 50:6 | **perfect** 2:10 | **pick** 38:22 | **played** 104:3 |
| 71:16 124:16 | 84:15 | 39:12 53:13 | **playing** 138:16 |
| **path** 30:2 | **perfectly** 80:3 | **picked** 40:15 | **please** 7:8,15 |
| 122:18 | **performance** | **picking** 129:11 | 7:22 8:4 |
| **patterns** 27:6 | 63:15 114:15 | 136:1 | 135:10 |
| **pay** 50:21 51:3 | **perjury** 70:3 | **picture** 51:16 | **pleasure** 2:22 |
| 67:4,6 | 128:18 | 68:7 87:1 | 3:6 |
| **paying** 67:9 | **permission** | 124:3,4 129:18 | **pocket** 11:12 |
| 101:10 | 56:4 | **piece** 31:12,21 | **poignantly** |
| **peace** 123:22 | **person** 14:9 | 32:6,9 37:6 | 77:21 |
| **peep** 114:9 | 15:3 20:16 | 114:21 126:5 | **point** 28:5,6 |
| **pen** 98:24 | 41:4 43:1 | **pilot** 28:1 73:8 | 38:18 42:5 |
| **people** 4:23 | 44:18 72:15 | 88:17 129:19 | 50:19 53:6 |
| 5:22 14:22 | 75:1 90:4 | 130:6 | 65:23 67:12 |
| 17:10 20:9 | 96:10 | **pilots** 28:15 | 68:11 69:10,10 |
| 21:12 23:1 | **personal** 8:24 | **piss** 85:11 | 76:13 77:4 |
| 26:4 28:19 | 9:2,6,7,11 | 112:16 | 79:5 82:11 |
| 30:18 34:25 | 15:13 50:19 | **pissing** 125:13 | 86:17 87:24 |
| 35:4 42:10 | 96:6 | **pissy** 46:16 | 90:20,20 94:18 |
| 45:25 61:12 | **perspectives** | **place** 6:6 17:4 | 103:2 118:25 |
| 71:11 87:11,13 | 125:18 | 69:16 88:22 | 134:20 136:2 |
| 96:7,8 111:1 | **persuade** | 113:7 114:11 | **pointed** 59:23 |
| 125:13 131:18 | 133:17 | 138:8 | **poking** 131:17 |
| 132:23 135:18 | **pesticides** | **plaintiff** 1:5 | 134:12 |
| 139:17 | 26:21 | **plane** 19:15 | **police** 53:17,18 |
| **people's** 51:1 | **philandering** | 50:6,8,11 76:7 | 53:19,20,21 |
| | 35:17 130:16 | 137:15 | 54:22 |

03.2023 Kennan Meyer - Frances To Face Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[policy - prototype]**                                              Page 26

| | | | |
|---|---|---|---|
| **policy** 74:6 | **present** 8:14 | 46:20 65:6 | 127:9 |
| **position** 84:2 | 119:9 | 69:23 94:1 | **projected** |
| **positive** 60:4 | **presented** | 115:24 116:1,3 | 130:8 |
| 134:23 | 82:12 | 129:3,4,13 | **promise** 69:24 |
| **possible** 6:14 | **preserved** 8:21 | **problems** 13:12 | 70:1,5 95:3 |
| 17:25 75:5 | **preserves** | 28:5 36:9 40:3 | 111:3,9 117:4 |
| 84:23 | 92:14 | 40:4 126:3 | 128:13 |
| **possibly** 115:18 | **president** 91:23 | **proceed** 95:13 | **promises** 121:2 |
| **potential** 17:14 | **pretend** 75:17 | **proceedings** | **promising** |
| 17:16 19:11 | **pretty** 13:5 | 147:5 | 61:16 |
| 35:21 131:23 | 66:17 | **process** 36:22 | **proper** 91:3 |
| **potentially** | **prevarication** | 82:15 90:11 | **properly** 134:8 |
| 106:12 | 115:20 | 138:12 | **property** 56:24 |
| **power** 131:4 | **prevent** 11:4 | **produce** 8:25 | 78:9,21 86:8 |
| **powered** 84:10 | **price** 96:11 | 10:1 105:23 | 101:14 104:14 |
| **practically** | **primary** 88:10 | **produced** 8:22 | 104:17 |
| 74:3 | **principle** | 58:19 66:12 | **prophecy** |
| **pray** 21:20 | 125:11 | 81:15 | 119:20 |
| **predict** 17:11 | **prior** 41:2 | **producing** | **propose** 11:22 |
| **predicted** 63:9 | 50:24 57:11 | 105:21,23 | 69:1 90:18 |
| **pregnant** 33:23 | 65:3 67:8 | **product** 4:17 | **proposing** |
| 33:25 34:1,2 | 80:18 81:14 | 26:18,25 27:1 | 10:25 91:19 |
| **prejudicial** | 89:1 102:6 | 33:12 61:6,20 | **propounded** |
| 131:22 132:4 | 105:11 | 70:20 82:14 | 92:3 |
| **premise** 106:21 | **priority** 92:2 | 83:18 84:10,14 | **proprietary** |
| 111:15 | **private** 11:5 | 87:18 119:16 | 106:5,22 |
| **preparation** | **privilege** 3:25 | 125:18 127:13 | **proteges** 94:11 |
| 87:22 | **probably** 13:11 | **production** | **prototype** |
| **prepare** 17:9 | 47:25 101:12 | 27:4 | 30:10,22 48:5 |
| **prepared** 16:19 | **probative** | **products** 26:17 | 48:7,9 49:2,5 |
| 94:21 137:9 | 131:23 | **program** 74:7 | 50:21 60:12 |
| **prepares** 16:1 | **problem** 20:15 | **prohibit** 70:13 | 61:23 64:17 |
| **preparing** | 22:23 25:18 | **project** 25:3 | 67:7 79:13 |
| 16:19 20:2 | 27:18 37:22 | 26:16 51:1,16 | 82:10,24 84:4 |
| | 38:9,12 39:23 | 68:8 79:14 | 84:10 86:6,12 |

03/2023 Kennan Square Fire & Life Safe Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[prototype - rectify]                                                 Page 27

| | | **r** | 66:18 67:25 |
|---|---|---|---|
| 87:18 101:10 | **put** 6:4 8:21 9:8 | | 71:8 72:11,21 |
| **prototypes** | 12:20 14:22 | **r** 115:19 147:1 | 73:17 76:2 |
| 102:4 | 25:3 30:23 | **radar** 18:1,2 | 80:18 94:18 |
| **proud** 134:16 | 31:16 47:17 | **rahul** 1:7,8 | 105:15 113:12 |
| **prove** 4:10 5:12 | 49:2 58:20 | **rails** 128:2 | 116:24 119:4 |
| 5:12 78:4 | 82:15 107:4 | **rambling** 54:20 | 119:23 120:21 |
| 110:3 115:2 | 146:2,6 | **ramsay** 6:25 | 124:7 127:23 |
| 124:16 | **putting** 11:10 | 7:1 | 129:15 132:22 |
| **provide** 11:1 | 11:11 58:11 | **random** 87:15 | 133:14 |
| 101:12 | | **rang** 4:13 | **rearranged** |
| **provided** 8:22 | **q** | **rankin** 91:22 | 101:13 |
| **provision** | **qrewlive** 31:6 | **reach** 142:5,9 | **reason** 6:1 |
| 104:24 | 32:25 33:6 | **reached** 43:18 | 16:16 17:15 |
| **prowess** 26:13 | 52:3 61:20 | **read** 8:23 12:8 | 54:23 74:10 |
| **psychological** | 78:16 79:10 | 12:11 35:10,12 | 93:8 104:15 |
| 51:10 | 83:17 | 76:3 85:10 | **reasons** 58:16 |
| **psychologica...** | **qrewlog** 29:24 | 115:12 125:16 | **recalibrate** |
| 41:25 | 29:25 | **ready** 105:24 | 134:19 |
| **pull** 44:7,9 | **quarter** 30:7 | 105:25 | **receipt** 135:10 |
| **pulled** 41:10 | **quash** 48:22 | **real** 33:13,19 | **received** 43:6 |
| **pulling** 49:23 | **question** 15:23 | 33:20 34:11 | 43:10,10,12 |
| **purchase** 121:3 | 45:13 47:9 | 39:5 50:4 | 92:4 |
| **purpose** 15:9 | 78:20,22 93:16 | 63:12 78:21 | **recollection** |
| 15:25 17:7 | 137:2,22 | 86:13 101:16 | 58:12 |
| 144:13 | 141:13 | **reality** 77:5 | **reconciled** |
| **purposes** 9:6 | **questionable** | **realize** 19:18 | 110:23 |
| **pursuant** 80:8 | 132:3 | **really** 5:20 6:9 | **record** 147:5 |
| **pursue** 6:10 | **questions** 12:1 | 6:12,13 10:3 | **recorded** 42:6 |
| **push** 20:10 | 13:21 141:20 | 12:24 15:13 | 129:6 |
| 53:23 93:8 | **queues** 22:14 | 19:18 25:7 | **recording** |
| 101:21 | **quickly** 91:19 | 36:3 39:8 41:8 | 41:19,22 |
| **pushed** 86:9 | **quiet** 133:7 | 46:15,16 48:21 | **recoup** 116:20 |
| 101:22 | **quite** 22:25 | 51:24 55:17 | **rectify** 128:4 |
| **pushing** 138:19 | **quote** 64:8 | 57:17 60:18 | |
| | | 64:18 65:3 | |

Case 19-56304-sms Doc 243 Filed 01/06/25 Entered 01/07/25 09:21:46 Desc Main
03/23/23 Kennan Page 178 of 321ce Meeting June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[red - right] Page 28

| | | | |
|---|---|---|---|
| **red** 56:22 123:1 | **relief** 10:22 | **required** 92:14 | **retainer** 122:6 |
| **redact** 11:3 | **relieving** 58:25 | **requirements** | **retro** 105:5 |
| **redacted** 9:7,25 | 59:3,4 | 11:3 | **retroactive** |
| 15:14,15 17:19 | **relishes** 42:18 | **requires** 69:10 | 80:22 105:2,5 |
| **redacting** 9:16 | **reluctant** | 92:5 | 105:7 |
| 131:9 | 136:17 | **requiring** | **returned** 6:18 |
| **reengaging** | **remains** 92:21 | 10:13 | **review** 16:8 |
| 61:19 | **remarkable** | **rerouted** 21:11 | 106:8 |
| **referencing** | 86:3 | **research** 30:2 | **revolutionary** |
| 43:14,23 | **remember** | 65:3 | 86:4 114:19 |
| **referring** 34:7 | 18:21 30:9 | **resourceful** | **revolutionized** |
| **refine** 86:23 | 34:11 50:11 | 122:13 | 63:10 |
| **reflect** 105:15 | 52:1 57:6,11 | **resources** 6:10 | **richard** 83:23 |
| **reflects** 94:24 | 73:3 83:25 | **respect** 59:1 | **riding** 65:4 |
| **refunds** 30:20 | **renderings** | **respond** 9:24 | **rifle** 121:13 |
| **regard** 39:16 | 87:19 | 11:2 15:8 | **right** 2:7 4:7 |
| 86:25 88:7 | **repeat** 99:22,22 | 63:15 92:2 | 5:4,5,7,24 6:3,6 |
| **regroup** 6:10 | **repeated** | 116:8 141:14 | 6:15 7:18 8:6 |
| **relates** 97:1 | 134:17 | **responding** | 8:15,17 9:18 |
| 110:2 123:13 | **reported** 58:14 | 61:14 | 9:23 10:14,16 |
| **relationship** | **represent** 3:24 | **response** 12:6 | 10:16,18,19,19 |
| 12:9 13:6 | 4:3 16:21 | 92:5 | 10:21,21 11:9 |
| 17:22 38:7 | **representation** | **responses** 99:2 | 11:9,15 12:2 |
| 58:7,16 59:21 | 16:17 17:5 | **responsibilities** | 13:22 14:2,6,8 |
| 75:6 120:24 | **representatives** | 59:1 | 14:16,16,18 |
| **relationships** | 82:14 | **responsibility** | 15:16,25 16:5 |
| 9:5 | **represented** | 13:22 | 16:24 17:5,6 |
| **relevance** 9:13 | 16:1 | **responsible** | 17:22 19:19,24 |
| 131:20 | **request** 15:22 | 92:10 128:2 | 20:9,23 22:22 |
| **relevant** 9:1 | 92:3,17 144:7 | **result** 128:3 | 22:24 23:3,23 |
| 14:25 15:7 | 144:11,12,21 | **resulted** 38:16 | 24:6 25:7 |
| 36:4 131:3,12 | **requested** 81:7 | 38:16 | 26:11 27:5,21 |
| 131:15,20 | **requests** 14:25 | **retained** 81:3 | 28:2 30:1,8,16 |
| 133:16 144:17 | **require** 5:12 | 92:7 | 30:20,24 31:5 |
| | 90:21 91:13 | | 31:21 32:4,22 |

[right - saying]                                                    Page 29

33:9,18,22
34:19,20 35:13
35:16,16,20,22
35:23,25 36:7
36:25 37:6,24
38:19 39:5
40:2 41:12,23
43:22 45:4
46:24 47:3,9
47:12 48:17,21
49:2,12,18,18
49:20 51:18
52:22 53:14
54:7,16 58:19
58:24,25 59:14
59:21,22 60:9
61:2,13,15
62:1 63:2,7
64:4,9,10,11,16
65:2,18,18
66:10,13 68:11
68:23 69:4,8
69:12,14 70:1
70:2,8,12
71:13,21,25
72:15 73:9,18
76:2,15,18,18
76:18,24 77:1
77:24 78:4,6
78:24 79:2,14
79:15,17,22,23
79:25 80:14,16
80:17 81:2,2
82:4,16 83:7,9
83:16,21,22

84:1,6 85:5,6,7
85:12,21 86:9
86:10,25 87:3
87:4,5,18,19,24
88:3,13 89:2,2
89:5,6,13
90:13 91:1,12
93:4,11,14,15
93:15,16 94:17
94:25 95:5,22
95:24 96:1,5,5
96:7 97:4
100:14,23,24
101:7 102:9,17
103:24,25
104:17 105:20
107:14,17
109:8,21,23,25
110:3,9 111:4
111:7,18
112:14,16,18
112:19,20
114:19 115:7
115:12,25
116:5,15,18
119:13,14,23
120:5,6,6,16
121:12,18,19
121:23 122:13
122:15,20,23
123:5,8,11,12
123:15 124:2
124:18 125:4,8
125:10,11,12
125:12,21

128:25 130:4,5
130:24 132:1,4
132:6,14,19
133:1,4,17,20
133:21,22
134:10,12,18
134:22 135:25
136:5,7,18
137:16,19
138:6,15,19,20
140:20 141:14
141:17 143:17
144:2,4,22
145:24 146:1,6
146:11
**ring**  39:9 96:9
124:24 132:5,5
132:11
**rings**  121:17
**risk**  69:6 73:11
**road**  147:12
**roadmap**  65:13
**role**  17:2 31:3,8
57:23 79:10
104:4 125:23
125:25 128:11
**rolled**  114:18
**rolling**  138:15
**romantic**  54:4
**roof**  114:17
**room**  54:19,21
55:16
**row**  20:8
**rug**  3:16,20

**rule**  41:23
**rules**  131:6
**rung**  96:9
**running**  4:20
6:15 34:1

**s**

**safely**  115:16
**sake**  72:19
**salad**  7:22
**sale**  87:24
**samant**  1:8
**sanctions**  10:22
**sandy**  62:9,11
64:6,7 81:10
92:17
**sap**  25:3 26:15
**satellite**  50:17
**satisfaction**
114:16
**satisfies**  112:18
**sauers**  62:9
64:6 92:17
**saved**  41:9
50:18
**saving**  113:24
**saw**  17:17 21:6
21:7 62:12
63:14 130:19
136:11
**saying**  13:18
14:1,7 18:2
21:4 23:4 26:3
29:12,20 35:5
35:20,25 38:20
40:1,2 42:9,24

**[saying - sheila]**                                                          Page 30

| | | | |
|---|---|---|---|
| 45:12 52:16 | 90:17 100:13 | 123:21 130:10 | **september** |
| 57:25 59:11,12 | 100:19 101:25 | 132:24 139:16 | 18:21 37:11 |
| 59:17 60:9 | **scared** 19:15 | 143:3 146:9 | **series** 32:14 |
| 63:16 66:8,9 | 47:5 64:25 | **seek** 14:21 | 78:10 |
| 66:15 67:22 | **scenarios** | 17:24 | **serious** 21:23 |
| 69:15 71:23 | 126:10 | **seems** 20:15 | **served** 57:8 |
| 75:3,25 76:4 | **scheduled** | **seen** 10:2 37:11 | **server** 45:24 |
| 80:19,20,25 | 62:14 | 43:19 56:21,25 | **serves** 55:5,7 |
| 81:17 83:2 | **scheduling** | 58:15 64:5 | 55:14 134:9 |
| 85:4 89:5,13 | 31:12,19 32:1 | 66:9 71:24,24 | 144:13 |
| 89:14 91:1 | **scheme** 58:14 | 78:24 83:8 | **services** 27:18 |
| 92:21 95:7,14 | **scope** 15:11 | 114:22 124:16 | 58:24 79:16 |
| 95:15 97:12 | **scratched** | 124:17 135:19 | **serving** 11:14 |
| 99:4,5,5 100:8 | 53:21 | 136:12 | **sessions** 16:11 |
| 100:8 102:24 | **screen** 84:8 | **sees** 124:22 | **set** 4:10 69:15 |
| 103:8 104:13 | **screwed** 123:23 | **self** 119:20 | **seven** 4:25 34:2 |
| 104:16 105:4,5 | **screwing** 34:16 | **sell** 111:24 | 41:13 |
| 106:2,11,16 | **seamlessly** | 137:11 | **sha** 91:22 |
| 107:15 110:1 | 114:12 | **send** 46:3 | **shameful** 5:16 |
| 110:19 112:7,8 | **second** 2:8 | **sending** 84:4 | **shaped** 98:25 |
| 115:13 117:11 | 17:16 27:12 | **sends** 58:12 | **share** 12:3 56:8 |
| 117:19,23 | 86:21 | **sensationalize** | **shared** 63:13 |
| 120:4 121:19 | **secret** 86:9 | 10:7 | 77:21 93:7 |
| 121:23,24,24 | 106:19,20 | **sense** 60:9 | 103:23 |
| 125:20 126:16 | **secrets** 131:14 | 64:23 95:9 | **sharing** 72:25 |
| 126:19,25 | **secure** 116:19 | 117:15,22 | **sheila** 34:25 |
| 127:18 130:1 | **see** 4:2,22 | 133:24 140:19 | 35:2,3,3 36:13 |
| 130:24 132:22 | 17:13,15 22:5 | **sent** 6:18 9:8 | 38:23 41:11,15 |
| 133:11,20 | 23:7 24:19 | 10:17 37:17 | 41:25 46:17 |
| 134:17 140:22 | 27:5,6,6 48:22 | 43:14 44:5 | 47:21 51:15 |
| 141:6 | 53:13 56:18 | 46:5 55:20,20 | 52:3,16 54:16 |
| **says** 20:25 23:9 | 68:6 75:4,23 | 55:21 76:25 | 57:13 68:1,7 |
| 39:15,16 44:18 | 76:3 84:23 | 99:1,1 123:3 | 68:12 72:20 |
| 56:22 65:24 | 93:20 103:2,15 | **separate** 79:23 | 74:20 75:4,4 |
| 75:22,23 87:12 | 122:22 123:4 | 110:17 144:21 | 89:21 133:7,7 |

03/2023, Kennan's Feature Online Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[sheila - son]                                                            Page 31

| | | | |
|---|---|---|---|
| 133:7 | sideshow 138:4 | situations | snowmagedd... |
| **ship** 18:22 | **sideways** 87:1 | 26:10 | 62:1 115:7 |
| 19:12 23:16 | 87:4 127:20 | **six** 5:23 40:15 | **software** |
| **shipping** 26:16 | **sight** 85:12 | 40:17,22,23 | 107:21 113:15 |
| **shit** 70:22 | **sign** 122:4 | 42:5 | 114:10,17 |
| 76:25 116:24 | 146:2,6 | **sketch** 86:6 | **sold** 30:14 |
| 123:23 124:7 | **signature** 147:8 | **sketched** 27:23 | **solely** 98:5 |
| 127:21 146:14 | **signed** 47:18,20 | 29:13,14 | **soltech** 81:3,6 |
| **shocktheory** | 59:9 79:17,19 | **sketcher** 29:9 | 81:10 82:3,5 |
| 14:13 25:12 | 83:7 104:18,20 | **sketches** 34:4 | 82:13 83:6 |
| 34:1 58:24 | **significant** | **skill** 4:10 69:15 | 87:5,12 |
| 59:4,5,7,10,15 | 60:15 137:18 | **skillfully** 69:11 | **soltech's** 83:5 |
| 101:25 | **signing** 78:25 | **sky** 33:9,16 | **solution** 5:19 |
| **shocktherapy** | 89:1 | s███ 40:6 | 23:14 26:8,12 |
| 14:10 104:21 | **signs** 87:9 | 41:7,8 42:5 | 84:15 118:13 |
| **short** 91:6 | **silver** 5:19 | 55:17 93:16 | 126:10 130:25 |
| **shot** 5:8 121:13 | 130:25 | 94:22 118:13 | **solutions** 6:13 |
| **show** 68:3 74:6 | **simply** 12:25 | 118:15 129:12 | 26:14 49:15 |
| 74:9 86:21 | 90:4 | s███ 3:11,19 | 127:13 147:11 |
| **showed** 30:5 | **simulating** 84:5 | 94:16 | **solve** 21:1 |
| 61:22 65:21 | **single** 115:6 | s███ 53:10 | 23:20 24:2 |
| 83:23 | **sir** 6:24 21:14 | **slack** 85:23 | **solved** 25:19 |
| **showing** 30:10 | 45:5 93:18 | 86:1 | **solves** 13:10 |
| **shrimp** 7:14,19 | 123:21 135:9 | **sleeping** 107:11 | **somebody** |
| 8:1 29:1 | 136:19 | **sliced** 114:25 | 73:10 104:10 |
| **sic** 14:10 | **sit** 15:23 16:10 | **slightly** 6:2 | 104:11 |
| 104:21 | 75:16 | **slow** 33:24 | **somebody's** |
| **side** 50:20 | **sits** 93:15 | **small** 115:15 | 53:15 |
| 61:12 75:17 | **sitting** 20:16 | **smart** 26:7 | **someplace** 15:2 |
| 115:16 122:20 | 23:3 40:13 | 93:10 104:5 | **somewhat** |
| 122:20,21 | 77:20 140:7,22 | 111:1 125:17 | 30:22 |
| 143:24 | 140:23 | **smith** 1:10 | **son** 52:8,12,13 |
| **sides** 38:22 | **situation** 20:18 | **smooth** 5:1 | 52:14,18 53:10 |
| 81:2 133:18 | 76:23 105:2 | **smoothly** 27:2 | 73:11,11,14,23 |
| | 126:4 | | 74:10 |

03.23 Kennan Vs. ... Fleece Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

| | | | |
|---|---|---|---|
| **son's** 72:16 | 38:12 39:7,18 | 72:8,17 73:3 | 104:9,13,22 |
| **sonja** 2:17,18 | 39:22 40:4,22 | 73:22 74:14 | 105:1,6,9,16,22 |
| 2:20,24 3:4,8 | 41:21 42:13,18 | 75:8,22 76:6 | 106:7,14,25 |
| 3:13,21 7:7,10 | 42:24 43:6,9 | 76:14,17 77:8 | 107:4,9,13,22 |
| 7:14,18,23 8:2 | 43:16,21 44:1 | 77:13,17 78:3 | 108:2,5,9,12,16 |
| 8:9 10:11 12:7 | 44:6,13,17,21 | 78:19 79:1,4,8 | 108:19,25 |
| 12:8,12,17,20 | 45:2,10,15,19 | 79:19,25 80:7 | 109:3,6,11,12 |
| 13:3,8,20,24 | 46:2,5,8,10,13 | 80:10,14,17,21 | 109:13,25 |
| 14:9,11 16:6 | 46:20 47:3,11 | 80:24 81:4,7 | 110:5,21 |
| 16:15,20 18:5 | 47:13,16,23 | 81:10,13,18,21 | 111:14,20,24 |
| 18:8,12,17,20 | 48:11,14,17 | 82:18,21,25 | 112:5 113:11 |
| 18:25 19:7,21 | 49:1,11,13,17 | 83:4,10,13,25 | 113:21 114:3 |
| 20:1,20 21:6,9 | 50:4,8,11,14 | 84:2,16,18,21 | 115:24 116:3,7 |
| 21:15,18,22 | 51:6 52:7,21 | 84:25 85:15,24 | 116:11,14,17 |
| 22:2,5,11,15,17 | 52:23 53:3,12 | 86:2,20 87:7 | 116:22 117:3,6 |
| 22:21,24 23:12 | 54:3,7,14 55:7 | 87:25 88:5,8 | 117:8,11,17,21 |
| 23:23 24:1,6 | 55:11 56:1,5 | 88:25 89:3,9 | 117:25 118:3,6 |
| 24:10,13,18,22 | 56:10,13,18,21 | 89:12,21,23,24 | 118:10,15,18 |
| 24:25 25:11,17 | 57:2,6,10,24 | 90:1,3,9 91:3,8 | 118:21,24 |
| 25:25 26:15,20 | 58:4,21 59:3,8 | 92:2,23,24 | 119:4,8,17,21 |
| 26:24 27:8,15 | 59:14,19,24 | 93:1,4,5,17,20 | 119:24 120:9 |
| 27:20 28:8,11 | 60:3,11,15,23 | 94:4,6,12,15,17 | 120:13,21 |
| 28:14,17,22 | 61:7,10,17,24 | 95:5 96:13,19 | 121:7,11,22,25 |
| 29:3,5,7,11 | 62:2,8,11,13,17 | 96:22,23 97:7 | 122:6,10,19 |
| 30:5,13 31:1 | 62:21,25 63:5 | 97:10,12,14,17 | 124:4,7,10,13 |
| 31:10,15,18 | 63:20 64:1,11 | 97:20,25 98:3 | 125:2 126:15 |
| 32:2,7,10,12 | 64:16,20,22 | 98:8,11,16,21 | 126:18,23 |
| 33:1,4,7,15,18 | 65:14,22 66:1 | 99:4,10,18,23 | 127:2,7 128:20 |
| 33:21 34:7,8 | 66:5,16,17,21 | 100:1,4,7,13,18 | 129:1,5,10,15 |
| 34:13,16,21,24 | 66:25 67:4,11 | 100:21,25 | 129:21,24 |
| 35:2,12,18,23 | 67:18 68:14,17 | 101:4,20,24 | 130:3 132:12 |
| 36:2,5,8,13,16 | 68:21,25 69:2 | 102:3,4,11,15 | 132:16,18,21 |
| 36:18,20,24 | 69:18,22 70:4 | 102:18,22 | 133:8,23 |
| 37:1,7,13,17,21 | 70:8,14,21 | 103:1,6,11,17 | 134:24 135:2,5 |
| 37:24 38:4,9 | 71:1,10,20 | 103:20 104:5,6 | 135:13,15,17 |

03-2023 Kennan Prange Creditor Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

| | | | |
|---|---|---|---|
| 135:24 136:1,9 | **specifically** | **started**  34:2,8 | **stones**  5:1 |
| 136:13,16,22 | 43:23 | 34:23 60:25 | **stood**  82:11 |
| 137:3,9,13,23 | **specifications** | 61:5 72:25 | 83:22 86:10 |
| 138:10,17 | 86:23 | 83:2 130:5 | **stop**  6:20 22:1 |
| 139:3,8,12,14 | **sped**  27:3 | **starting**  25:12 | 42:2 46:22 |
| 140:1,4,10,12 | **spending**  49:22 | 60:18 61:19 | **storage**  44:9 |
| 140:16 141:1,8 | **spent**  3:11 | 77:7 | **stored**  15:1 |
| 141:10,15,18 | 30:16 50:24 | **starts**  16:8 | **stories**  27:23 |
| 141:21,24 | **spiritedness** | 24:24 105:20 | 40:23,24 76:16 |
| 142:2,4,6,9,13 | 113:4 | **state**  1:1,2 6:19 | **storm**  20:21 |
| 142:16,19,23 | **spite**  74:11 | **statement**  84:6 | **story**  12:1 |
| 143:1,4,15,18 | 111:2 | **statements** | 16:12,14 18:12 |
| 143:21,24 | **split**  123:11 | 37:5 | 19:13,14 20:1 |
| 144:3,6,10,15 | 125:22 | **states**  83:14 | 38:3 40:25 |
| 144:19,22 | **spoke**  4:8 | 104:24 | 60:18,19 76:12 |
| 145:3,7,17,20 | **spoken**  70:15 | **stay**  19:22 | 76:15,19 |
| 145:22,25 | **square**  74:12 | **steal**  56:23 85:2 | 106:18 109:21 |
| 146:3,5,8,13 | **st**  2:24 3:5 | 97:24 98:1 | 117:14 120:19 |
| **sonya**  147:3 | **stake**  69:3 | 119:8 | 121:17 138:9 |
| **soon**  130:14 | 113:10,11,12 | **stealing**  115:21 | 138:10,11 |
| 144:8 | 113:13 122:14 | **steam**  6:14 | **straddle**  140:21 |
| **sorrow**  123:25 | **stakeholder** | **step**  74:22 | **straight**  53:5 |
| **sorry**  40:9 | 69:3 | 87:22 | 70:22 |
| **sounds**  61:15 | **stakeholders** | **stepmom**  36:21 | **straightest** |
| 128:9 | 63:12 86:14 | **steps**  38:6 | 122:18 |
| **source**  82:9,24 | **stalking**  46:18 | **sticking**  118:25 | **strategies**  6:11 |
| 84:11 86:5 | 46:21 | **sticks**  121:15 | **strategy**  6:5 |
| **southwest** | **stand**  112:21 | **stole**  33:13 | **stream**  63:12 |
| 114:1 | **standard** | 74:15 106:21 | 86:14 |
| **spat**  30:19 | 101:11 | 110:18 113:23 | **streamline** |
| **speak**  90:15 | **standpoint** | 115:1 120:2 | 67:24 |
| 91:11 | 28:2,4 99:6 | 131:13 | **streamlined** |
| **speaks**  79:2,6 | **start**  18:8 | **stolen**  33:13 | 62:18 |
| 79:13 | 60:18 62:3 | **stone**  69:9 | **stripes**  120:23 |
| | 93:3,13 132:13 | | 130:8 |

03/2023 Kennan Evans, Jr. State Bar Meeting                      June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[strong - tell]                                                    Page 34

**strong** 99:21

**struggling** 127:15

**stuck** 22:13

**stuff** 14:22 24:7 30:20 41:5 44:12 45:13,18 52:19 68:3 96:6 99:14 110:15 134:14

**stupid** 53:4 57:14 68:3 133:25 134:1

**submit** 125:23 125:25

**suborning** 70:3 128:18

**subpoena** 6:19 10:18 13:19 17:3,16

**subpoenas** 6:22 10:12

**substituted** 49:9

**successfully** 4:6

**successive** 114:9

**sued** 120:17

**suffered** 126:3

**suite** 147:13

**summary** 5:9

**support** 42:17

**supposed** 52:9

**sure** 7:9 11:23 13:13 26:19

41:15 50:23 53:2 56:5 60:3 66:17 71:14 86:9 87:2 95:23 108:25 116:14 122:1 135:11 137:20 146:3

**surely** 17:9

**surreptitious** 124:18

**sweet** 3:10

**sweetie** 143:4

**swim** 41:8

**system** 50:16 88:1 114:25 130:22

**systems** 25:6 26:10

**t**

**t** 115:19,19 147:1,1

**table** 2:8 76:21

**tail** 6:12

**take** 4:22 7:19 10:13 21:10 37:25 40:9 48:12 55:8 56:4 72:18 74:23 75:24 87:22 101:6,9 125:19 131:11 144:5

**taken** 54:15

**takes** 53:25 127:23

**talent** 76:21

**talents** 40:15

**talk** 16:9 32:20 34:11 39:23 41:24 42:3 46:24,25 67:25 69:2 76:2,8 78:24 85:5 88:23 97:3 99:16,17 101:14 112:13 134:2 137:7 139:1

**talked** 91:17 101:5 102:12

**talking** 28:20 30:17 34:3,19 41:16 54:16 58:7 61:6 69:7 72:13 87:11 90:8 99:14 111:17 112:17 122:18 133:12 134:11,15 140:8

**talks** 79:9

**target** 123:4

**tasking** 87:10

**taught** 25:5 27:13,16

**tea** 96:11

**team** 26:4 69:16 98:22

130:5,15

**technical** 59:7 59:13,18 87:23 88:21

**technically** 104:8 127:7

**technologies** 51:13

**technology** 12:20,22 24:12 25:4 26:14 27:11 35:6,6 44:2 47:1 51:18 71:2,16 74:20 98:4 114:21 126:10 138:12

**tell** 9:16 11:24 11:25 16:13 18:10,15,15,16 28:1 34:6,6,11 40:14,23 41:14 42:2 44:4 46:22 48:18 55:12 57:18 61:1 63:23 64:17 66:8 72:12,12 76:16 97:24 98:2 105:18 108:1,4 108:24 109:2,4 112:12 128:7 129:7 130:11 138:3

03-23-2023 Kennan Pamela Freeze of State Meeting    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[telling - time]**    Page 35

| | | | |
|---|---|---|---|
| **telling** 20:24 | 142:3,4,6,22 | 40:20 41:2 | **thirty** 132:14 |
| 23:4,5 30:1 | 143:9,9,15,22 | 42:7,9 47:6 | **thought** 29:18 |
| 40:24 60:5 | 144:21 145:3 | 50:2 56:13 | 30:23 90:11,16 |
| 65:5 69:4 | 145:25 | 58:14 63:16 | 102:19 137:25 |
| 89:13,15 91:12 | **theirs** 144:18 | 71:22 73:1 | **thoughts** 87:15 |
| 99:23 108:14 | **theory** 14:11,12 | 74:14 77:10 | 87:15 |
| 108:18,23 | **therapy** 14:12 | 80:1 85:6 | **thousands** 82:8 |
| 114:24 117:14 | **thief** 78:11 | 91:18 96:8 | **threading** |
| 139:16 141:5 | 96:15,15 97:17 | 97:3 99:12 | 91:14 |
| **tells** 53:21 98:9 | 97:18,24 99:21 | 105:9,17,19 | **threatened** |
| 98:9 100:1 | 104:3 113:24 | 126:9 131:22 | 43:3 |
| **tension** 17:23 | 115:1 | 132:1,2,3,24 | **threatening** |
| **term** 33:17 | **thieves** 97:15 | 134:4,5,17 | 55:19 |
| **terminating** | **thing** 6:12 7:9 | 137:10 | **three** 31:7 |
| 58:23 | 15:3,20 16:5 | **think** 12:6 13:3 | 54:11,18 55:17 |
| **termination** | 20:6 22:6 | 13:4 24:14 | 82:12 132:14 |
| 58:18,21 | 39:15 49:23 | 25:14,17 30:15 | **throw** 121:14 |
| **terms** 64:12 | 51:10 52:9 | 42:18,25 44:11 | **thrown** 128:17 |
| 69:13 84:7 | 53:2 61:3 62:1 | 46:1,15 55:20 | **ticking** 116:4,6 |
| 95:18 96:9 | 67:13,24 73:13 | 57:10 63:1 | 116:7,11 |
| 98:6 131:18 | 74:25 75:23 | 66:18 71:12 | 140:16 |
| **terrible** 49:18 | 79:24 91:1 | 72:21 75:20 | **tied** 51:11 |
| **test** 121:3 | 103:24 108:10 | 76:4 78:19,21 | **tight** 92:21 |
| 131:21 | 109:15,16 | 88:3 89:25,25 | 109:15 |
| **tests** 131:24 | 114:24 118:12 | 95:18 97:8 | **time** 3:11,16 |
| **text** 31:3,20 | 121:6,10 123:5 | 100:8 101:1 | 4:22 6:8 7:13 |
| 50:16 51:14,15 | 128:1,13 | 102:22 111:14 | 10:13 12:4 |
| 68:5 77:1 | 140:14 | 119:17 121:6 | 21:18,20 23:17 |
| **thank** 2:12,16 | **things** 9:2,3 | 124:21 139:13 | 23:17 25:2 |
| 2:21 3:8 6:23 | 10:14 11:23 | 139:21 140:10 | 26:17 27:4 |
| 7:1,23 8:2,9 | 15:5,10 17:18 | **thinking** 32:18 | 29:8,18 31:1 |
| 21:8,14,17,17 | 19:12 23:13 | 66:18 77:8 | 32:16 33:9,14 |
| 21:18 44:16 | 25:8 27:24 | 87:16 126:9 | 33:19,20 44:15 |
| 52:23,23,24,25 | 29:12 31:7 | **thinks** 42:19 | 46:15,17 47:17 |
| 136:20,22,24 | 32:13 33:24 | 70:23,24 93:9 | 47:20 48:19,20 |

03.2023 Kennan Dr. Cul-De-Sac Meeting                                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[time - turning]**                                                          Page 36

| | | | |
|---|---|---|---|
| 49:23 55:18,19 | 55:23 60:25 | **touched** 53:23 | **trucking** 23:24 |
| 55:20 57:5,7 | 73:5 77:14 | **town** 53:5 | 24:1 |
| 63:12,15 64:4 | 102:20 103:23 | **track** 19:5,7 | **trucks** 24:3 |
| 71:12 72:4 | 107:12 112:23 | 23:16,19,21,23 | **true** 26:3 36:5 |
| 76:24 79:5 | 116:9 | 29:25 31:24 | 41:17 60:5 |
| 82:11 86:14,17 | **told** 18:13 | 46:10 | 66:3 73:24,25 |
| 90:14 103:2 | 19:13 20:1 | **tracking** 22:8,9 | 76:24 78:7 |
| 114:15 116:4,6 | 21:1 40:25 | 35:6 | 88:14 92:22 |
| 116:7,11,12 | 41:17 43:24 | **trade** 86:8 | 96:2 98:21 |
| 120:5,15 | 46:23,23 53:9 | 106:19,20 | 121:17,17 |
| 129:11 131:25 | 58:17 63:21 | 131:14 | 127:7 135:14 |
| 132:25 | 66:18 86:23 | **traffic** 20:3 | 138:4,5 147:4 |
| **time's** 140:16 | 88:9 89:16 | 50:15 | **trust** 82:1 |
| **timeframe** | 93:11 98:4 | **training** 73:7 | 89:19 90:6,8 |
| 58:20 60:16 | 100:25 101:3 | 73:15 74:7 | 90:13,19 95:23 |
| 61:4 82:7 | 106:18 112:25 | **trajectory** | 95:23 98:13 |
| **timeline** 116:5 | 127:4,6 132:12 | 37:14 | 111:6,7,10 |
| **timeliness** | 133:6 136:9,13 | **transcript** 1:16 | **trusts** 92:1 |
| 28:19 | 140:20 | 147:4 | **truth** 4:20 |
| **timely** 15:20 | **tolerate** 75:2 | **trauma** 38:18 | 66:19,20,21 |
| **times** 37:9 | **tomatoes** 7:15 | **treats** 73:18 | 77:22 90:22,24 |
| 43:17 51:13 | 7:17 | **tremendous** | 115:19,19 |
| 57:19 90:24 | **took** 52:2 54:10 | 14:5 | 134:8 137:24 |
| **timing** 47:9 | 55:16 63:1 | **trial** 91:5 94:14 | **try** 6:6 10:18 |
| **tires** 130:20 | 65:20 78:11 | **tried** 41:11,15 | 20:10 39:1 |
| **today** 2:13,21 | 113:15 | 42:2 48:19 | 87:25 133:17 |
| 3:23 12:5,25 | **tool** 67:15 | 49:19 68:6 | **trying** 6:13 |
| 17:2 91:18 | 126:11 | **triggered** 57:16 | 24:2 50:2 64:7 |
| 93:7 105:20 | **top** 69:7 71:25 | 57:17 | 72:22 85:4 |
| 129:16 139:15 | 91:22 93:17 | **trip** 52:10 | 96:4 98:19 |
| 141:22 | 94:13 | **trotting** 52:18 | 128:1 145:15 |
| **together** 3:12 | **totally** 55:15 | **trouble** 21:3,7 | **turn** 13:14 |
| 6:4 21:20 | 68:15 139:4 | 23:7 | **turned** 74:24 |
| 30:17,23 31:16 | **touch** 142:11 | **truck** 33:13 | **turning** 69:9 |
| 49:3,23 51:25 | | | |

03-023 - Kennan - Public Town Hall Place Meeting                    June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[two - want]**                                                                    Page 37

| | | | |
|---|---|---|---|
| **two** 2:5,6,7 5:5 | 48:10,16 65:4 | **universe** 5:21 | 131:23 |
| 8:15 14:15 | 67:22 71:22 | 92:18 104:18 | **vendor** 101:10 |
| 30:16 40:16 | 72:5 75:3 80:2 | **unknown** 99:13 | **veritable** 4:25 |
| 42:19 52:14 | 83:5,22 94:19 | **unlawfully** | **veritext** 147:11 |
| 62:16 78:10 | 94:21 96:14 | 106:24 | **versus** 110:11 |
| 82:13 87:2 | 104:7 109:13 | **unreasonable** | 125:12 |
| 96:17 109:21 | 111:3,8 112:25 | 95:15 128:12 | **video** 41:22 |
| 109:23 115:11 | 116:4,5 117:22 | **unredacted** | **villains** 109:21 |
| 139:18 | 122:14 134:25 | 9:19 10:2 | **vindictiveness** |

**u**

135:9 138:21
139:4 140:5

| | | | |
|---|---|---|---|
| **u** 115:19 | **understanding** | **unsafely** 4:19 | 113:3 |
| **ugly** 84:3 | 12:13 63:14 | **unworkable** | **violated** 106:23 |
| 127:21 | 65:5 95:13 | 58:17 | **violence** 90:21 |
| **ultimate** | **understands** | **ups** 73:6,6 74:2 | **vis** 103:15,15 |
| 131:12 | 60:2 137:17 | 74:6 | 103:19,19 |
| **ultimately** 31:7 | **understood** | **upset** 42:14 | 104:17,17 |
| 38:15 65:19 | 26:9 120:13 | **upstanding** | **vision** 60:20 |
| **un** 96:9 132:5 | **undertaking** | 129:19 135:18 | **visual** 23:6 |
| **unbelievable** | 91:11 | **uptick** 63:14 | **voice** 145:1,5 |
| 19:13 22:18 | **undisciplined** | 114:15 | **vows** 132:17 |
| **under** 13:23 | 112:17 | **use** 10:8 50:22 | **vulnerability** |
| 92:5 95:12,25 | **unethical** 95:7 | 60:6 77:4 | 64:14 |
| 96:1 113:2 | 111:9 124:19 | 110:18 114:20 | **vulnerable** |
| 130:19 | **unfair** 18:3 | 115:9 123:4 | 65:11 |
| **underlying** | 59:21 | 125:20 | |

**w**

| | | | |
|---|---|---|---|
| 69:13 127:25 | **unform** 53:19 | **used** 14:24 | **waiting** 20:23 |
| **underneath** | **unfortunately** | 24:14 42:25 | **walk** 75:1 |
| 135:20 | 49:8 | **useful** 128:16 | 109:14 116:23 |
| **understand** | **uniform** 130:6 | **user** 82:20 | **wall** 121:14 |
| 12:9,13 16:12 | **unintended** | **using** 49:24 | **want** 7:12 10:4 |

**v**

| | | | |
|---|---|---|---|
| 16:15,22 17:2 | 10:6 11:4,11 | | 10:23 11:24,24 |
| 21:3,4 25:1,18 | **unique** 28:9 | **v** 1:6 | 15:25 16:9,22 |
| 25:19 36:7 | **unison** 113:9 | **valuable** 126:6 | 27:16 30:16 |
| 38:20 39:8 | | 131:14 | 33:7 34:18 |
| 41:12 42:12,14 | | **value** 26:4 63:6 | 46:13,24 48:4 |
| | | 107:6 115:6 | 53:13 56:8 |

03/23/2023 Kernan Way Creditors Committee Meeting
June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

[want - williams]
Page 38

| | | | |
|---|---|---|---|
| 71:22 75:4,16 | 17:25 28:25 | **welcome** 8:8 | 28:14,17,22 |
| 75:18 80:1 | 33:11 42:5 | 143:12 145:4 | 29:3,5,7,11 |
| 85:11 87:15 | 54:18 63:10 | **went** 27:2,22 | 30:5,13 31:1 |
| 89:23 90:1,4 | 72:25 74:23 | 30:2 32:13,15 | 31:10,15,18 |
| 108:24 109:20 | 92:13 94:23 | 52:1 54:24 | 32:2,7,10,12 |
| 110:12 112:3,6 | 101:7,8 106:4 | 55:3 74:3 82:9 | 33:4,7,15,18,21 |
| 114:20 119:5 | 106:9 109:20 | 98:3 114:16 | 34:8,13,16,21 |
| 119:23,24 | 110:10 120:6 | 145:14 | 35:2,12,18,23 |
| 121:25 122:12 | 123:9 128:2 | **west** 54:5 | 36:2,5,8,13,16 |
| 122:21 123:7 | 134:20 138:3 | **whisper** 6:8 | 36:18,20 37:1 |
| 123:25 125:20 | 140:8,23 | **white** 71:8 | 37:7,13,17,21 |
| 128:7,7,8,9,10 | **ways** 127:24 | **wife** 3:16 48:20 | 37:24 38:4,9 |
| 129:10 134:2 | 134:15 | 72:5,13 75:18 | 38:12 39:7,18 |
| 134:16 141:13 | **we've** 4:5,25 | 76:7 | 39:22 40:4,22 |
| **wanted** 6:20 | 5:21 10:5 | **williams** 2:17 | 41:21 42:13,18 |
| 26:24 33:5 | 13:12 29:12 | 2:20,24 3:4,8 | 42:24 43:6,9 |
| 34:11 46:14 | 30:15 32:16,20 | 3:13,21 7:7,10 | 43:16,21 44:1 |
| 50:21 62:22 | 32:21,22 55:22 | 7:14,18,23 8:2 | 44:6,13,17,21 |
| 72:2 87:21 | 58:18 61:11 | 8:9 12:8,12,17 | 45:2,10,15,19 |
| **wanting** 14:1 | 66:23 83:22 | 12:20 13:3,8 | 46:2,5,8,10,13 |
| **wants** 46:24 | 86:10 91:17 | 13:20,24 14:10 | 46:20 47:3,11 |
| 122:21 | 92:15 94:5,8 | 14:11 16:6,15 | 47:13,16,23 |
| **warehousing** | 103:11 106:18 | 16:20 18:5,8 | 48:11,14,17 |
| 26:25 | 131:13 132:17 | 18:12,17,20,25 | 49:1,11,13,17 |
| **wasting** 120:5 | 138:7 | 19:7,21 20:1 | 50:4,8,11,14 |
| **watch** 53:20,22 | **wearable** 27:11 | 20:20 21:6,9 | 51:6 52:7,21 |
| 53:22 | **weather** 63:17 | 21:15,22 22:2 | 52:23 53:3,12 |
| **watched** 41:11 | 114:5 | 22:5,11,15,17 | 54:3,7,14 55:7 |
| **watches** 27:11 | **websites** 27:10 | 22:21,24 23:12 | 55:11 56:5,10 |
| **water** 7:4 41:7 | **week** 115:9 | 23:23 24:1,6 | 56:13,18,21 |
| 41:10,10 95:12 | **weeks** 34:2 | 24:10,13,18,22 | 57:2,6,10,24 |
| 113:1 | 62:16 | 24:25 25:11,17 | 58:4,21 59:3,8 |
| **way** 8:14 10:14 | **weigh** 93:17 | 25:25 26:15,20 | 59:14,19,24 |
| 10:19,20,21 | **weird** 103:24 | 26:24 27:8,15 | 60:3,11,15,23 |
| 14:23 15:16 | | 27:20 28:8,11 | 61:7,10,17,24 |

03/2023 Kennan Morgan Fire Hire Meeting                                      June 23, 2023
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.

**[williams - works]**                                                            Page 39

| | | | |
|---|---|---|---|
| 62:2,8,11,13,17 | 98:3,8,11,16,21 | 126:18,23 | **wise** 139:13,14 |
| 62:21,25 63:5 | 99:4,10,18,23 | 127:2 128:20 | **wish** 113:1 |
| 63:20 64:1,11 | 100:1,4,7,13,18 | 129:1,5,10,15 | 135:18 |
| 64:16,20,22 | 100:21,25 | 129:21,24 | **witness** 70:2,9 |
| 65:14,22 66:1 | 101:4,20,24 | 130:3 132:12 | 92:15 128:17 |
| 66:5,17,21,25 | 102:3,4,11,15 | 132:16,18,21 | **woman** 39:16 |
| 67:4,11,18 | 102:18,22 | 133:8,23 | 134:21 |
| 68:14,17,21,25 | 103:1,6,11,17 | 134:24 135:2,5 | **women** 42:19 |
| 69:18,22 70:4 | 103:20 104:6,9 | 135:13,15,17 | 51:8 |
| 70:8,14,21 | 104:13,22 | 135:24 136:1,9 | **word** 8:23 |
| 71:1,10,20 | 105:1,6,9,16,22 | 136:13,16,22 | 86:12 112:20 |
| 72:8,17 73:3 | 106:7,14,25 | 137:3,9,13,23 | 140:19 |
| 73:22 74:14 | 107:4,9,13,22 | 138:10,17 | **words** 93:9 |
| 75:8,22 76:6 | 108:2,5,9,12,16 | 139:3,8,12,14 | 99:21 110:19 |
| 76:14,17 77:8 | 108:19,25 | 140:1,4,12,16 | 140:6 |
| 77:13,17 78:3 | 109:3,6,12,13 | 141:1,8,10,15 | **work** 4:15 11:2 |
| 78:19 79:4,8 | 109:25 110:5 | 141:18,21,24 | 11:8,13 14:17 |
| 79:19,25 80:7 | 110:21 111:14 | 142:2,4,6,9,13 | 45:24 49:11 |
| 80:10,14,17,21 | 111:20,24 | 142:16,19,23 | 59:6 68:4 71:3 |
| 80:24 81:4,7 | 112:5 113:11 | 143:1,4,15,18 | 71:7 82:14,22 |
| 81:10,13,18,21 | 113:21 114:3 | 143:21,24 | 83:10,14 86:10 |
| 82:18,21,25 | 115:24 116:3,7 | 144:3,6,10,15 | 92:1,6 100:14 |
| 83:4,10,13,25 | 116:11,14,17 | 144:19,22 | 133:1 138:7 |
| 84:16,18,21,25 | 116:22 117:3,6 | 145:3,7,17,20 | **worked** 25:2 |
| 85:15,24 86:2 | 117:8,11,17,21 | 145:22,25 | 101:8 127:8 |
| 86:20 87:7,25 | 117:25 118:3,6 | 146:3,5,8,13 | 137:14 |
| 88:5,25 89:3,9 | 118:10,15,18 | **willing** 131:10 | **workflow** 28:7 |
| 89:12,21,24 | 118:21,24 | **win** 4:21 9:23 | 28:8 |
| 90:3,9 91:3,8 | 119:4,8,17,21 | 91:13 110:13 | **working** 4:23 |
| 92:23,24 93:1 | 119:24 120:9 | 116:18 133:21 | 11:17,18 24:18 |
| 93:5,20 94:4,6 | 120:13,21 | 133:22,22 | 50:25 83:9 |
| 94:12,15 95:5 | 121:7,11,22,25 | **window** 2:8 | 84:16,18 102:5 |
| 96:13,19,23 | 122:6,10,19 | **wing** 54:5 | 105:11 137:17 |
| 97:7,10,12,14 | 124:4,7,10,13 | **wireframes** | **works** 8:21 |
| 97:17,20,25 | 125:2 126:15 | 82:9,20 | 14:23 63:10 |

Case 19-56304-sms   Doc 243   Filed 01/06/25   Entered 01/07/25 09:21:46   Desc Main
Document   Page 190 of 321

03/2023_Kennan_Dp3-341_Fee 1 of 821e Meeting
Alexander, Craig Vs. Delta Air Lines, Inc. Et Al.
June 23, 2023

[world - à]

Page 40

**world**  14:23
52:18 88:16,16
130:9
**worried**  74:23
74:24
**worth**  51:18
114:23
**worthwhile**
9:23
**wow**  27:21
94:15
**writes**  15:3
**writing**  102:10
111:3 118:7
127:6
**written**  32:14
**wrong**  4:7,9
10:20 69:14
74:15 109:8,24
110:3 124:9,11
124:14 125:12
**wrote**  43:23
127:5,5

**y**

**y'all**  22:13
81:22 117:22
**yeah**  13:25
25:10 27:14
33:15 35:12
45:20 46:8
56:18 57:24
63:20 77:15
82:21 84:25
90:17 96:13
108:25 110:21

128:8 145:11
145:13 146:4,7
**year**  30:9 32:19
113:25
**years**  4:1,5 5:5
5:18 40:15,18
40:23 42:5
78:11 101:5
102:6 114:23
115:11 132:14
136:14
**yesterday**
130:2
**young**  145:8,12

**à**

**à**  103:15,19
104:17

# EXHIBIT D

### IN THE STATE COURT OF DEKALB COUNTY
### STATE OF GEORGIA

| | |
|---|---|
| **CRAIG ALEXANDER,**<br><br>          **Plaintiff**<br><br>**v.**<br><br>**DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10,**<br><br>          **Defendants** | **CIVIL ACTION<br>FILE NO.: 21A03275**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

### <u>PLAINTIFF CRAIG ALEXANDER'S RESPONSES TO DEFENDANT DELTA AIR LINES, INC.'S FIRST SET OF INTERROGATORIES</u>

COMES NOW Plaintiff, CRAIG ALEXANDER, by and through his counsel of record, who objects, answers and otherwise responds to Defendant, Delta Air Lines, Inc.'s ("Delta"), First Set of Interrogatories as follows:

### <u>GENERAL OBJECTIONS</u>

Plaintiff's investigation and discovery in this matter are continuing, and Plaintiff reserves the right to supplement, modify, or amend these responses, if necessary, to conform to facts and evidence. All rights of the Plaintiff are expressly reserved and nothing in the responses that follow is intended as or serves as a waiver of any and all rights of the Plaintiff consistent with the Georgia Civil Practice Act.

Plaintiff objects to Defendant Delta's First Interrogatories and accompanying instructions and definitions to the extent that they seek to impose any obligation on Plaintiff, for supplementation or otherwise, beyond that required by the Georgia Civil Practice Act.

- 1 -

Plaintiff objects to Defendant Delta's First Interrogatories to the extent that they seek information or documents protected by the attorney-client privilege, the work product doctrine, or any other applicable immunity.

Subject to and without waiving the foregoing objections, Plaintiff responds to each Interrogatory as follows:

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Please identify all persons who supplied information or otherwise participated in answering the Interrogatories below, and for each person identified, describe the nature of his or her participation and/or the information he or she provided.

### RESPONSE:

In response to Interrogatory No. 1, Plaintiff states that he alone answered these interrogatories with the assistance of the undersigned counsel of record.

### INTERROGATORY NO. 2:

Please identify all persons whom You believe have knowledge of facts that support, refute, or relate to the claims and allegations in the Complaint and state the facts of which You believe they have knowledge.

### RESPONSE:

In response to Interrogatory No. 2, Plaintiff states that the following individuals have knowledge of facts that support, refute, or relate to the claims and allegations in the Complaint:

1) Steve Dickson (has knowledge in his capacity as then SVP of Delta's Flight Operations of Plaintiff's conceptualization of the forerunner to his QrewLive communications platform (**a/k/a** MobCrew) inasmuch as Dickson communicated directly with Plaintiff starting in roughly April of 2013 about his stated goal of developing a state-of-the-art proprietary digital communications tool to sell to Delta that would enable Delta teammates

involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

2) Ed Gaitan (has knowledge in his capacity as then General Manager of Delta's Flight Operations of Plaintiff's conceptualization of the forerunner to his QrewLive communications platform (**a/k/a** MobCrew) inasmuch as he communicated directly with Plaintiff starting in roughly April of 2013 about his stated goal of developing a state-of-the-art proprietary digital communications tool to sell to Delta that would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

3) Sheila Alexander (has knowledge in her capacity as wife, trusted friend and Delta teammate of Plaintiff's conceptualization of the forerunner to his QrewLive communications platform (**a/k/a** MobCrew) as well as his significant efforts to develop a state-of-the-art proprietary digital communications tool to sell to Delta before the Company unlawfully stole his valuable trade secrets and intellectual property after reneging on a verbal agreement to purchase the same);

4) Carl Forgey (has knowledge in his capacity as a contract consultant of Plaintiff's conceptualization of the forerunner to his QrewLive communications platform (**a/k/a** MobCrew) inasmuch as he attempted unsuccessfully to develop source code

for MobCrew in the spring/summer of 2013 before his consulting contract was terminated sometime in the summer of 2013);

5) Kacper Gazda (has knowledge in his capacity as CEO of Milo Solutions of Plaintiff's conceptualization of the forerunner to his QrewLive communications platform (**a/k/a** MobCrew) inasmuch as his company developed the source code for MobCrew in December of 2013 before his consulting contract was terminated sometime in the spring of 2014);

6) Sonja Williams (has knowledge in her capacity as personal friend and contract consultant of Plaintiff's conceptualization of the forerunner to his QrewLive communications platform (**a/k/a** MobCrew) as well as his significant efforts to develop a state-of-the-art proprietary digital communications tool to sell to Delta inasmuch as she helped draft some of the early design mock ups for QrewLive before her consulting contract was terminated sometime in late 2014 or early 2015);

7) Christopher Risey (has knowledge in his capacity as contract business consultant with Lantern Capital Advisors, LLC, of Plaintiff's significant efforts to develop a state-of-the-art proprietary digital communications platform to sell to Delta and other airlines inasmuch as he helped draft the corporate business plan for QrewLive starting in March of 2015 and thereafter assisted with venture capital funding for product development and marketing);

8) Richard Anderson (has knowledge in his capacity as former Delta CEO of Plaintiff's state-of-the-art proprietary digital communications platform that he informally pitched to him in February of 2014 inasmuch as he encouraged Plaintiff on the spot to formally present his innovative digital communications tool to then Delta CIO,

Theresa Wise, after personally viewing his functional digital prototype in the cockpit just one month after the Company hemorrhaged hundreds of millions of dollars in flight cancellations as a direct result of crippling communications meltdowns during the "Snowmageddon" IROP on January 28, 2014);

9) Theresa Wise (has knowledge in her capacity as former Delta CIO of Plaintiff's state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that he pitched to Delta at the recommendation of then CEO Richard Anderson back in May of 2014, June of 2014, and February of 2015, respectively, inasmuch as she communicated directly with Plaintiff about his innovative digital communications tool and made arrangements for him to meet face-to-face with the Company's top IT "experts" on May 28th, June 10th, and February 26th, respectively, including, but not limited to, Darrell Haskin and Roland Brenny, to flesh out precisely how Plaintiff's proprietary QrewLive communications platform would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

10) Sandra Sowers (has knowledge in her capacity as a consulting member of the design team of Plaintiff's state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta back in May of 2014, and June of 2014, respectively, inasmuch as she attended both face-to-face meetings on May 28th and June 10th, respectively, with the Company's top IT "experts" including, but not limited to, Darrell Haskin, Roland Brenny, and Theresa Wise (by telephone),

to flesh out precisely how Plaintiff's proprietary QrewLive communications platform would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

11) Thayer Tate (has knowledge in his capacity as a consulting member of the SolTech, Inc., contract design team of Plaintiff's state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta for the third time in February of 2015 inasmuch as Tate attended a face-to-face meeting on February 26th with the Company's top IT "experts", including, but not limited to, Darrell Haskin, Roland Brenny, Keith Buck, and David Smith, to review the clickable "prototype" of Plaintiff's proprietary QrewLive communications platform, including custom wireframes with detailed user interface designs, all towards the end of demonstrating precisely how his innovative digital communications tool would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

12) Scott Morris (has knowledge in his capacity as a consulting member of the SolTech, Inc., contract design team of Plaintiff's state-of-the-art proprietary communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta for the third time in February of 2015 inasmuch as Morris attended a face-to-face meeting on February 26th with the Company's top IT "experts", including, but not limited to, Darrell Haskin,

Roland Brenny, Keith Buck, and David Smith, to review the clickable "prototype" of Plaintiff's proprietary QrewLive communications platform, including custom wireframes with detailed user interface designs, all towards the end of demonstrating precisely how his innovative digital communications tool would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company time, money, and customer goodwill during both regular and irregular operations);

13) Darrell Haskin (has knowledge in his capacity as former Director of Delta's Flight Crew IT Systems of the outright theft of Plaintiff's valuable trade secrets and state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta back in May of 2014, June of 2014, February of 2015, August of 2016, and September of 2016, respectively, inasmuch as Haskin attended face-to-face meetings on May 28th, June 10th, February 26th, and August 22nd, respectively, along with the Company's top IT "experts", including, but not limited to, Theresa Wise (by telephone), Matt Muta, Roland Brenny, and David Smith, to flesh out precisely how Plaintiff's proprietary QrewLive communications platform would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

14) Roland Brenny (has knowledge in his capacity as then Principal of Delta's IT Applications of the outright theft of Plaintiff's trade secrets and state-of-the-art proprietary digital communications platform that Plaintiff formally pitched to Delta back in May of 2014, June of 2014, February of 2015, August of 2016, and September of 2016, respectively,

inasmuch as Brenny attended face-to-face meetings on May 28th, June 10th, and February 26th, respectively, along with the Company's top IT "experts", including, but not limited to, Theresa Wise (by telephone), Darrell Haskin, and David Smith, to flesh out precisely how Plaintiff's proprietary QrewLive communications platform would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

15) David Smith (has knowledge in his capacity as then Managing Director of Delta's IT Development of the outright theft of Plaintiff's valuable trade secrets and state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta back in May of 2014, June of 2014, February of 2015, August of 2016, and September of 2016, respectively, inasmuch as Smith attended a face-to-face meeting on February 26th along with the Company's top IT "experts", including, but not limited to, Darrell Haskin and Roland Brenny, to flesh out precisely how Plaintiff's proprietary QrewLive communications platform would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill both during regular and irregular operations);

16) Keith Buck (has knowledge in his capacity as a then Delta IT employee of Plaintiff's state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta for the third time in February of 2015 inasmuch as

Buck attended a face-to-face meeting on February 26th along with the Company's top IT "experts", including, but not limited to, Darrell Haskin, Roland Brenny, and David Smith, to review the clickable "prototype" of Plaintiff's proprietary QrewLive communications platform, including custom wireframes with detailed user interface designs, all towards the end of demonstrating precisely how his innovative digital communications tool would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

17) David Ford (has knowledge in his capacity as then General Manager of Delta's IT Supply Chain Management of the facts and circumstances surrounding Plaintiff's and Delta's joint decision back in August of 2016 to execute a written "MUTUAL CONFIDENTIALITY AGREEMENT", which formalized their prior verbal agreement dating back to May of 2014 to maintain proprietary information disclosed by either party during negotiations pertaining to the purchase of Plaintiff's QrewLive communications platform in the strictest of confidence with the clear understanding that any unauthorized disclosure of confidential information by either party expressly was prohibited);

18) Ed Bastian (has knowledge in his capacity as Delta's CEO of the outright theft of Plaintiff's valuable trade secrets and state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta back in May of 2014, June of 2014, February of 2015, August of 2016, and September of 2016, respectively, inasmuch as Bastian communicated directly with Plaintiff about his innovative

digital communications tool in the immediate aftermath of a costly $150M communications meltdown that resulted in the cancellation of thousands of flights and made arrangements for Plaintiff to meet face-to-face with the Company's top IT "experts" for a second round of negotiations on August 22nd and September 26th, respectively, including, but not limited to, Matt Muta, Darrell Haskin, David Burton and Andy Lui, to flesh out once again precisely how Plaintiff's proprietary QrewLive communications platform would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

19) Rahul Samant (has knowledge in his capacity as then Delta CIO of the outright theft of Plaintiff's valuable trade secrets and state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta back in May of 2014, June of 2014, February of 2015, August of 2016, and September of 2016, respectively, inasmuch as Samant communicated directly with Plaintiff about his innovative digital communications tool at the request of CEO Ed Bastian and made arrangements for Plaintiff to meet face-to-face on August 22nd and September 26th, respectively, with the Company's top IT "experts" including, but not limited to, Matt Muta, Darrell Haskin, David Burton and Andy Lui, to flesh out once again precisely how Plaintiff's proprietary QrewLive communications platform would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby

saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

20) Matthew Muta (has knowledge in his capacity as then VP of Delta's Operations Technology of the outright theft of Plaintiff's valuable trade secrets and state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta back in May of 2014, June of 2014, February of 2015, August of 2016, and September of 2016, respectively, inasmuch as Muta attended face-to-face meetings at the request of then CIO Rahul Samant on August 22nd and September 26th, respectively, along with the Company's top IT "experts", including, but not limited to, Darrell Haskin, David Burton, and Andy Lui, to review the clickable "prototype" of Plaintiff's proprietary QrewLive communications platform, including custom wireframes with detailed user interface designs, all towards the end of demonstrating precisely how his innovative digital communications tool would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

21) David Burton (has knowledge in his capacity as then Delta IT employee of the outright theft of Plaintiff's valuable trade secrets and state-of-the-art proprietary digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta back in May of 2014, June of 2014, February of 2015, August of 2016, and September of 2016, respectively, inasmuch as Burton attended a face-to-face meeting on September 26th along with the Company's top IT "experts", including, but not limited to,

- 11 -

Matt Muta and Andy Lui, to review the clickable "prototype" of Plaintiff's proprietary QrewLive communications platform, including custom wireframes with detailed user interface designs, all towards the end of demonstrating precisely how his innovative digital communications tool would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

22) Andy Lui (has knowledge in his capacity as a then Delta IT employee of Plaintiff's state-of-the-art digital communications platform (**a/k/a** "QrewLive") that Plaintiff formally pitched to Delta for the fifth and final time in September of 2016 inasmuch as Lui attended a face-to-face meeting on September 26th along with the Company's top IT "experts", including, but not limited to, Matt Muta and David Burton, to review the clickable "prototype" of Plaintiff's proprietary QrewLive communications platform, including custom wireframes with detailed user interface designs, all towards the end of demonstrating precisely how his innovative digital communications tool would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations);

23) Lawrence Vickers, Jr. (has knowledge in his capacity as a contract business consultant with SouthStar Associates, LLC, of Plaintiff's significant efforts to sell his state-of-the-art proprietary digital communications platform to other airlines after Delta reneged on

a verbal agreement to purchase QrewLive inasmuch as he and other SouthStar associates provided a plethora of business development services to Plaintiff until he ran out of capital to fund those initiatives);

24) Kevin Kirby (has knowledge in his capacity as a contract business consultant with SouthStar Associates, LLC, of Plaintiff's significant efforts to sell his state-of-the-art proprietary digital communications platform to other airlines after Delta reneged on a verbal agreement to purchase QrewLive inasmuch as he and other SouthStar associates provided a plethora of business development services to Plaintiff until he ran out of capital to fund those initiatives); and,

25) Roy Hagerty (has knowledge in his capacity as a contract business consultant with SouthStar Associates, LLC, of Plaintiff's significant efforts to sell his state-of-the-art proprietary digital communications platform to other airlines after Delta reneged on a verbal agreement to purchase QrewLive inasmuch as he and other SouthStar associates provided a plethora of business development services to Plaintiff until he ran out of capital to fund those initiatives).

Further responding, Plaintiff states that this Interrogatory response is being given at an early stage in discovery prior to the production of documents by Defendants, fact witness depositions and/or discovery of third parties. Consequently, the information contained in this response, while true and correct to the best of Plaintiff's information and belief, may be incomplete or may require supplementation or correction at a later time. Thus, Plaintiff specifically reserves the right to correct and/or modify this Interrogatory response as necessitated by information gained through further discovery.

### INTERROGATORY NO. 3:

Please identify all contracts, agreements, or arrangements between You or MABA and any third-party concerning QrewLive, including, but not limited to, agreements relating to the development of QrewLive, any agreement to purchase or license QrewLive, or any non-disclosure or other confidentiality agreement related to QrewLive.

### RESPONSE:

In response to Interrogatory No. 3, Plaintiff states that he initially contracted with Carl Forgey in April of 2013 to perform software design and consulting services pertaining to the forerunner to QrewLive (**a/ka** MobCrew), and Mr. Forgey signed a non-disclosure agreement on April 28, 2013. Further responding, Plaintiff states that he also contracted with Kacper Gazda of Milo Solutions in December of 2013 to perform software design and consulting services pertaining to the forerunner to QrewLive (**a/ka** MobCrew), and the "Software Development Services Agreement" executed on December 9, 2013, included a non-disclosure confidentiality agreement. Plaintiff further states that he also contracted with Sandra Sowers in February of 2014 to perform software design and consulting services pertaining to QrewLive, and Ms. Sowers signed a non-disclosure agreement on or about February 19, 2014. Further responding, Plaintiff states that he also contracted with Sonja Williams of ShockTheory DLV, Inc., in March of 2014 to perform software design and consulting services pertaining to QrewLive, and the "Professional Services Agreement" executed on March 27, 2014, included a non-disclosure confidentiality agreement. Plaintiff further states that he also contracted with Thayer Tate of SolTech, Inc., in June of 2014, and the "Professional Computer Consulting Services Agreement" executed on June 26/27, 2014, included a non-disclosure confidentiality agreement. Finally, Plaintiff states that between 2013 and 2018, he required a number of individuals to sign non-disclosure confidentiality agreements

related to their involvement with his efforts to develop, market and/or sell QrewLive to the airline industry in general, and Delta in particular, including Carl Forgey dated 4/28/13; Kacper Gazda of Milo Solutions dated 12/9/13; Sandra Sowers dated 2/19/14; Kirk Holmes of Holmes and Associates dated 2/26/14; Sonja Williams of ShockTheory DLV, Inc., dated 3/27/14; Thayer Tate of SolTech, Inc., dated 6/26/14; Christopher Risey of Lantern Capital Advisors, LLC, dated 3/11/15; Scott Akers of Tuxedo Capital Partners dated 8/6/15; Willie Lanier, Sr., of The Lanier Group, LLC, dated 6/13/16; David Ford of Delta Air Lines, Inc., dated 8/30/16; Lawrence Vickers, Jr., of SouthStar Associates, LLC, dated 8/4/15 and 8/8/17, respectively; and Derrick Williams of Williams & Williams dated 9/26/18.

### INTERROGATORY NO. 4:

Please identify all persons or entities who participated in the development of QrewLive.

### RESPONSE:

In response to Interrogatory No. 4, Plaintiff incorporates herein by reference his response to Interrogatories Nos. 2 and 3, above, and states that his development team for QrewLive and the forerunner to QrewLive (**a/ka** MobCrew) consisted of Carl Forgey, Kacper Gazda, Sandra Sowers, Sonja Williams, Thayer Tate and Scott Morris, all of whom were contract consultants generally hired to provide software design and consulting services.

### INTERROGATORY NO. 5:

Please state whether source code for QrewLive exists and, if so, who developed or created it and when it was developed or created.

### RESPONSE:

In response to Interrogatory No. 5, Plaintiff states that source code does in fact exist for both his QrewLive communications platform, as well as for the forerunner to QrewLive (**a/ka** MobCrew). Further responding, Plaintiff states that source code for MobCrew

was developed in 2013 by Milo Solutions, and he maintains possession of the source code

for the front-end but not back-end of the product design.  Plaintiff further states that source code

for QrewLive was developed in 2018 by SolTech, Inc., who currently maintains possession

of that information in its code repository.

## INTERROGATORY NO. 6:

Please identify all persons or entities with whom You discussed QrewLive, including the
dates on which such discussions occurred and the substance of those discussions.

## RESPONSE:

In response to Interrogatory No. 6, Plaintiff incorporates herein by reference his response

to Interrogatories Nos. 2, 3 and 4, above, which, in conjunction with the allegations of

his Complaint, sets forth in explicit detail most, but certainly not all, of the relevant

communications that he had with Delta representatives over a five (5) year period of time

pertaining to the sale of QrewLive to the Company.  Further responding, Plaintiff states that while

it is not possible for him to recall each and every discussion he had with Delta and others about

QrewLive between 2013 and 2018, he has outlined in his Complaint and discovery responses

the substance of the conversations that he does recall that are directly relevant to Delta's

outright theft of his valuable trade secrets and state-of-the-art proprietary digital

communications platform (**a/ka** QrewLive). Plaintiff further states that, in addition to his

Complaint and interrogatory responses, he is producing roughly 2500 responsive documents

which have some relevance to the issues-in-suit and undoubtedly will reflect the date and

substance of many other discussions pertaining to QrewLive.  Finally, Plaintiff states that this

Interrogatory response is being given at an early stage in discovery prior to the production of

documents by Defendants, fact witness depositions, and/or discovery of third parties.

Consequently, the information contained in this response, while true and correct to the best of Plaintiff's information and belief, may be incomplete or may require supplementation or correction at a later time. Thus, Plaintiff specifically reserves the right to correct and/or modify this Interrogatory response as necessitated by information gained through further discovery.

## INTERROGATORY NO. 7:

Please describe all efforts You took to maintain the secrecy and confidentiality of QrewLive.

## RESPONSE:

In response to Interrogatory No. 7, Plaintiff incorporates herein by reference his response to Interrogatories Nos. 2 and 3, above, and states that at all relevant times between 2013 and 2018 he undertook reasonable efforts to maintain the secrecy and confidentiality of his proprietary state-of-the-art QrewLive communications platform by preceding each and every substantive discussion he ever had with any person about the purpose, design, and functionality of QrewLive with an agreement between the parties to maintain the substance of those discussions in the strictest of confidence. Further responding, Plaintiff states that, in addition to soliciting a verbal confidentiality agreement from anyone with whom he spoke substantively about QrewLive, he also required individuals to execute a written non-disclosure confidentiality agreement. Plaintiff further states that as it relates to his substantive discussions with Delta in particular about purchasing his proprietary QrewLive communications platform, both parties verbally agreed during their first formal meeting on May 28, 2014, to maintain the substance of those discussions in the strictest of confidence, in accordance with Delta's policies, especially since it was immediately apparent that both Plaintiff and Delta would be sharing with each other highly confidential information such as

QrewLive's valuable trade secrets and Delta's proprietary 5 Year IT Plan. Finally, Plaintiff states that prior to resuming a second round of negotiations with Delta about the purchase of QrewLive at the request of CEO Ed Bastian in August and September of 2016, he insisted that Delta also sign a written non-disclosure confidentiality agreement as an additional "belt-and-suspenders" measure of protection because he now had reason to suspect that his own employer might be actively attempting to steal his valuable trade secrets given the disingenuous manner in which the first round of negotiations ended in April of 2016.

### INTERROGATORY NO. 8:

Please describe the timeline and process by which You developed QrewLive, including when you had the initial idea for QrewLive and each phase of development of QrewLive, including the creation or drafting of wireframes, development of any prototype and details regarding such prototype, creation of any source code, any other milestone in development, whether a completed product was ever developed or created, and, if not, whether development of QrewLive is ongoing or the date on which You stopped development.

### RESPONSE:

In response to Interrogatory No. 8, Plaintiff incorporates herein by reference his response to Interrogatories Nos. 2, 3, 4, and 5, above, and states that the inspiration for QrewLive was birthed in roughly April of 2013 when he first conceived the idea of developing a digital communications tool for Delta that would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations. Further responding, Plaintiff states that he collaborated with vendors, including Carl Forgey and Milo Solutions, over the next several months to design the forerunner to his QrewLive communications platform (**a/ka** MobCrew), which was a role-based digital text-messaging tool complete with source code that would allow Delta's pilots, flight attendants, gate agents,

- 18 -

tower agents, and flight ops personnel to stay connected in one real time "chat" thereby ensuring that everything required before flight departure would get done in a timely and efficient manner. Plaintiff further states that the design blueprint minus the source code for his state-of-the-art digital communications platform (**a/k/a** "QrewLive") was perfected in the spring of 2014 before he formally met with Delta, at the invitation of then CEO Richard Anderson, to discuss purchasing his digital prototype in May and June of 2014. Further responding, Plaintiff states that after Delta committed to purchasing the "chat" portion of his QrewLive communications platform following the second June 10, 2014, sales meeting, he immediately contracted with SolTech, Inc., on June 26, 2014, to conform his product design to Delta's exact specifications.  Plaintiff further states that his design team hand-delivered Delta a clickable "prototype" with custom wireframes minus the source code which conformed to the Company's exact specifications as requested in February of 2015, after which time Delta's top IT brass reiterated their intention to purchase the "chat" portion of his QrewLive communications platform, and committed to beta testing the same as the next and final step in the deployment process.  Further responding, Plaintiff states that after the February 26th meeting during which Delta reiterated the Company's commitment to purchase the  "chat" portion of his QrewLive communications platform, he commissioned SolTech, Inc., to draft a written operations manual that meticulously documented the functionality of his digital prototype in preparation for beta testing. Plaintiff further states that with the written operations manual for QrewLive now in hand all he needed to develop the source code required for beta testing was long promised input from Delta regarding its specific system architecture since the Company insisted that his platform be housed and integrated with existing IT flight systems.  Finally, Plaintiff states that Delta inexplicably never honored its commitment to beta test QrewLive

as the final step in the deployment process despite knowing since February 26, 2015,

that all Plaintiff needed to perfect source code for the project was long promised access to Delta's

specific system architecture.

### INTERROGATORY NO. 9:

Please describe in detail the complete functionality of QrewLive, including whether that functionality has changed over time, and, if so, when any changes in the proposed functionality for QrewLive changed and why.

### RESPONSE:

In response to Interrogatory No. 9, Plaintiff incorporates herein by reference his response

to Interrogatories Nos. 2, 3, 4, 5, and 8, above, and states that the functionality of the

"chat" portion of his QrewLive communications platform was complete by the spring of 2014

before he formally met with Delta at the invitation of then CEO Richard Anderson

to discuss purchasing his digital prototype in May and June of 2014 inasmuch as he

already possessed source code for the forerunner product (**a/k/a** MobCrew) that he showed

Mr. Anderson, and the design blueprint for his new and improved QrewLive version likewise

was already in hand. Further responding, Plaintiff states that the functionality of his QrewLive

communications platform as conformed to Delta's specific needs is set forth in meticulous detail

in a document entitled "**SYSTEM DOCUMENTATION**" dated September 16, 2015, a copy of

which is being produced in response to Delta's First Request for Production of Documents.

Plaintiff further states that the substance of everything set forth in that document pertaining to the

functionality of his QrewLive communications platform verbally was communicated

to Delta's top IT brass during an earlier face-to-face meeting at Delta's

Corporate Headquarters on February 26, 2015, after which time they reiterated their intention

to purchase his role-based digital text-messaging tool, and committed to beta testing the same

- 20 -

as the next and final step in the deployment process. Further responding, Plaintiff states that any changes, if any, to the functionality of his QrewLive communications platform over time would have been dictated by Delta's system specific needs and interface requirements if the Company had honored its commitment to beta test QrewLive as the final step in the deployment process.

## INTERROGATORY NO. 10:

Please state the resources You devoted to developing QrewLive, including the time and money You, or anyone acting at Your direction, spent on development of QrewLive.

## RESPONSE:

In response to Interrogatory No. 10, Plaintiff states that between February of 2014 after then CEO Richard Anderson encouraged him to formally pitch his role-based digital text-messaging tool to Delta and April of 2016 when Darrell Haskin reneged on Delta's commitment to purchase the "chat" portion of his QrewLive communications platform, he spent $83,330.25 of his own money developing a clickable prototype of QrewLive with custom wireframes and detailed user interface designs that met Delta's requested specifications, and documentation itemizing these expenses is being produced in response to Delta's First Request for Production of Documents. Further responding, Plaintiff states that, in addition to the capital outlay, Plaintiff and others at his request spent countless hours over numerous years developing QrewLive to meet Delta's every need and request, as well as showing the Company's Top IT brass on multiple occasions in precise detail exactly how Plaintiff's proprietary QrewLive communications platform would enable Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving Delta precious time, money, and customer goodwill during both regular and irregular operations.

### INTERROGATORY NO. 11:

Please describe the benefits You claim QrewLive would have provided to Delta.

### RESPONSE:

In response to Interrogatory No. 11, Plaintiff incorporates herein by reference his response to Interrogatories Nos. 2, 3, 4, 5, 8, and 9, above, and states that, just like Flight Family Communication, which Delta designed based on valuable trade secrets and intellectual property stolen from Plaintiff during (2) years of confidential negotiations to purchase his proprietary digital communications tool, QrewLive is an intuitive messaging platform that gives Delta enhanced interdepartmental information sharing capabilities enabling Delta teammates involved in flight operations to seamlessly communicate with each other in real time about a myriad of issues impacting the pre-departure process thereby saving the Company precious time, money, and customer goodwill during both regular and irregular operations.

### INTERROGATORY NO. 12:

Please state if you have sought any intellectual property protection or rights for QrewLive—including, but not limited to any patent, trademark, or copyright—and, if so, describe the status of such efforts.

### RESPONSE:

In response to Interrogatory No. 12, Plaintiff states that he filed a provisional patent application on September 14, 2018, for a "Bi-Directional Mobility Communications System", which identified him as the "Owner/Inventor" on Application # US 62/731,430. Further responding, Plaintiff states that he has not yet filed a non-provisional patent application pertaining to his state-of-the-art digital communications platform (**a/k/a** "QrewLive").

- 22 -

## INTERROGATORY NO. 13:

Please state whether you have attempted to market or sell QrewLive to any other airline or potential purchaser, including the dates upon which you made these attempts, the identity of the entities or individuals to whom you attempted to market or sell QrewLive, and the result of those efforts.

## RESPONSE:

In response to Interrogatory No. 13, Plaintiff incorporates herein by reference his response to Interrogatory No. 2, above, and states that after Delta reneged on its verbal commitment to purchase the "chat" portion of his QrewLive communications platform, he invested considerable time, energy and money trying to market and sell QrewLive to other airlines with the assistance of SouthStar Associates, LLC, but those efforts unfortunately failed because Plaintiff ran out of money to fund business development initiatives.

## INTERROGATORY NO. 14:

Please state when You first learned about FFC and how You learned about it.

## RESPONSE:

In response to Interrogatory No. 14, Plaintiff states that he first learned about FFC on or about April 24, 2018, when Delta's corporate communications staff published a "Coming Soon" announcement on its employee Communications portal entitled, "Five things to know about Flight Family Communication; messaging app to ease pro-departures", which previewed features of a so-called "new digital application launching in May" that was nothing but a shameless carbon copy knockoff of the role-based "chat" portion of his proprietary QrewLive communications platform, which Delta designed based on valuable trade secrets and intellectual property stolen from Plaintiff during two (2) years of confidential negotiations to purchase his digital communications tool.

**INTERROGATORY NO. 15:**

Please identify any and all conversations You have had with anyone at Delta relating to FFC, including the date upon which You had this conversation, with whom, and the substance of the conversation.

**RESPONSE:**

In response to Interrogatory No. 15, Plaintiff states that he had no conversations with anyone at Delta about Flight Family Communication prior to its release because Delta employees, including the named Defendants, intentionally failed to disclose to him that the Company had or was developing such a product as they specifically were required to do by Delta's published business ethics and Supply Chain Management policies and procedures, at any time prior to its release and including during the entire two (2) year period of time when Delta was discussing QrewLive with him.

**INTERROGATORY NO. 16:**

Please describe if You use FFC and how, if at all, it benefits You as a pilot.

**RESPONSE:**

In response to Interrogatory No. 16, Plaintiff incorporates herein by reference his response to Interrogatory No. 11, above, and states that he uses FFC every day that he is on duty, and fully agrees with Delta CEO Ed Bastian that it "is a powerful tool that's transforming the way we work so we can better serve our customers and each other", which is precisely why he created QrewLive for Delta's benefit in the first place.

**INTERROGATORY NO. 17:**

Describe in detail all facts supporting Your claim for attorneys' fees and costs.

**RESPONSE:**

In response to Interrogatory No. 17, Plaintiff incorporates herein by reference his response to Interrogatories Nos. 2, 3, 4, 5, 8, 10, 11, 13, 15 and 16, above, and succinctly states that his claim for attorneys' fees and costs is based upon Defendants' willful, intentional and malicious theft of his valuable trade secrets and proprietary state-of-the-art communications platform after reneging on a verbal agreement to purchase QrewLive for disingenuous reasons designed to cover up their corporate mendacity in clear violation of Delta's most sacred business values, ethics and policies and procedures.

**INTERROGATORY NO. 18:**

State the amount of monetary damages that You claim or intend to claim in this lawsuit from Defendants including (a) how You computed the damage figure; (b) the basis for the calculation of each element of damage; and (c) how each element of damage was allegedly caused by Defendants.

**RESPONSE:**

In response to Interrogatory No. 18, Plaintiff states that he is still in the process of calculating with certainty the amount of his monetary damages as a direct result of Defendants' unlawful theft of his valuable trade secrets and state-of-the-art proprietary communications platform but conservatively estimates that monetary damages for stealing QrewLive will exceed $1 Billion when discovery is completed regarding the value added to Delta's flight operations and stock price by FFC since its introduction in 2018. Further responding, Plaintiff states that this Interrogatory response is being given at an early stage in discovery prior to the production of documents by Defendants, fact witness depositions, and/or discovery of third parties. Consequently, the information contained in this response, while true and correct to the best of Plaintiff's information and belief, may be incomplete or may require supplementation or correction at a later time. Thus, Plaintiff specifically

reserves the right to correct and/or modify this Interrogatory response as necessitated by information gained through further discovery.

## **INTERROGATORY NO. 19:**

Please identify all person whom You expect to call or who may be called to testify as an expert witness at the trial of this matter or to render an opinion regarding any of the facts presented by this matter. With respect to each such person, state the following:

a. His or her educational background, giving the names of all educational institutions attended, the dates of attendance and the degrees earned;

b. His or her experience within the field, giving the dates, names and addresses of employers, if any; the dates, name and addresses of all institutions that he or she is associated with, if any; and any other experience, indicating dates and places;

c. All professional associations of which he or she is a member and/or associates with, stating his or her status with each and the inclusive dates of such status;

d. The title, name of publication, name of publisher, and date of publication of all published articles, papers and books authored by him or her;

e. Whether each such expert has ever been a witness in any other lawsuit and, if so, give the case caption of the lawsuit (including the name of all parties and the involved court), the date of all live testimony given whether at deposition or at trial, and the name and addresses of the parties or attorneys for whom he or she testified; and

f. The subject matter on which the expert witness is expected to testify in this matter.

## **RESPONSE:**

In response to Interrogatory No. 19, Plaintiff states that he has yet to determine who he will identity as an expert witness expected to testify during the trial of this case on the merits. Further responding, Plaintiff states that he will supplement this Interrogatory response, and provide the requested information prior to the Court imposed September 18, 2023, deadline for identifying Plaintiff's experts as specifically set forth in the Court's Scheduling Order dated 1/13/23.

This 8th day of February, 2023.

- 26 -

**MORGAN & MORGAN ATLANTA, PLLC**

*/s/ Keenan R.S. Nix*
Keenan R.S. Nix
KNix@ForThePeople.com
Georgia State Bar No.: 544855
Christopher  J. Graddock
CGraddock@ForThePeople.com
Post Office Box 57007                          Georgia State Bar No.: 304020
Atlanta, Georgia 30343-1007          ShaMiracle J. Rankin
(404) 965-8811 – Telephone           SRankin@forthepeople.com
Georgia State Bar No. 211640

*Attorneys for Plaintiff*

**THE SUMMERVILLE FIRM, LLC**

*/s/ Darren Summerville (with express permission)*
Darren Summerville
darren@summervillefirm.com
Georgia State Bar No. 691978
1226 Ponce de Leon Avenue, NE      Kristopher R. Alderman
Atlanta, Georgia 30306                      kris@summervillefirm.com
(770) 635-0030 – Telephone           Georgia State Bar No.: 179645

*Co-Counsel for Plaintiff*

**JONES & WALDEN LLC**

*/s/ Tyler W. Henderson (w/express permission)*
699 Piedmont Avenue, NE             Tyler W. Henderson
Atlanta, Georgia 30308                      THenderson@joneswalden.com
(404) 564-9300 – Telephone           Georgia State Bar No.: 854853

*Co-Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this day a copy of the foregoing was served via email upon all counsel of record.

This 8th day of February 2023.

**MORGAN & MORGAN ATLANTA, PLLC**

*/s/ Keenan R.S. Nix*
Keenan R.S. Nix
KNix@ForThePeople.com

Post Office Box 57007
Atlanta, Georgia 30343-1007
(404) 965-8811 – Telephone

Georgia State Bar No.: 544855

*Attorney for Plaintiff*

# EXHIBIT E

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| CRAIG ALEXANDER., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO. 21-A-03275-2 |
| | ) | |
| DELTA AIR LINES, INC.; EDWARD | ) | |
| BASTIAN; RAHUL SAMANT; | ) | |
| MATTHEW MUTA; DARRELL HASKIN; | ) | |
| DAVID SMITH; DAVID BURTON; | ) | |
| CORPORATE DOES 1 TO 5; and JOHN | ) | |
| DOES 1 TO 10, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DELTA'S REQUESTS FOR PRODUCTION OF DOCUMENTS
## TO NONPARTY SONJA WILLIAMS

Pursuant to O.C.G.A. § 9-11-34, Defendant Delta Air Lines, Inc. ("Delta" or "Defendant") hereby serves the following Requests for Production of Documents ("Requests") on nonparty Sonja Williams. Your responses to each Request are due no later than thirty (30) calendar days after service of these Requests at the offices of King & Spalding LLP, 1180 Peachtree Street, N.E., Atlanta, Georgia 30309.

## DEFINITIONS

The following terms shall have the meanings set forth below whenever used in any Request:

1.      "You" or "Your" means Sonja Williams and its employees, members, affiliates, partners, parents, subsidiaries, and other agents and representatives.

2.      "Alexander" or "Plaintiff" means and includes Plaintiff Craig Alexander and his employees, members, affiliates, partners, parents, subsidiaries, and other agents and representatives, including MABA Holdings, LLC and QrewLive Visual Communications, Inc.

3. "Person" means any natural person, individual, partnership, corporation, trust, estate, cooperative, association, business, legal or government entity, governmental subdivision or agency, or other entity.

4. "Communication(s)" or "communicate(d)" means any and all transmissions of information, in all forms and by all means, including, but not limited to, written, oral, or electronic.

5. "Complaint" shall refer to the Complaint filed in the above-captioned action on July 12, 2021, and attached hereto as Exhibit A.

6. "Document" has its broadest meaning under the Georgia Civil Practice Act and the Georgia Evidence Code, and includes but is not limited to each and every written, recorded or graphic matter of any kind, type, nature or description that is or has been in Your possession, custody, or control or of which You have knowledge, including but not limited to e-mails, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, letters, telegraphs, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, invoices, order forms, checks, drafts, statements, credit and debit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, or pamphlets, or any written or recorded materials of any other kind, however stored, recorded, produced or reproduced, and also including, but not limited to drafts or copies of any of the foregoing that contain any notes, comments or markings of any kind not found on the original documents or that are otherwise not identical to the original documents.

7. The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the Request inclusive rather than exclusive.

8.    The word "including" shall be construed as broadly as possible and shall mean "without limitation."

9.    "All" means "any and all," and "any" means "any and all."

10.    The terms "refer to," "relate to," or "concerning" or any derivative thereof mean constituting, describing, summarizing, reflecting, containing, embodying, mentioning, showing, comprising, evidencing, discussing, commenting about, referring to, reflecting, or in any way, logically or factually, connected with the matter described in the applicable Request.

11.    Whenever a corporate or legal entity is referred to, the Request shall be deemed to include all predecessors, successors, parents, subsidiaries, employees, agents, or other representatives of that corporate or legal entity.

12.    In these Requests, the present tense includes the past and future tenses; the singular includes the plural; the plural includes the singular; and words in the masculine, feminine, or neuter form shall include each of the other genders.

13.    The term "QrewLive" shall mean Plaintiff's idea related to a role-based text messaging system for members of the flight crew, as alleged in the Complaint, and shall include MobCrew, QrewLive, or any other name Plaintiff used to describe such idea, system or application that is the subject of the claims in the Complaint.

## **<u>INSTRUCTIONS</u>**

1.    Please produce all documents in Your possession, custody, or control, including without limitation any documents in the possession, custody, or control of Your employees, agents, attorneys, representatives, or any other persons acting on your behalf, as well as any of Your past or present subsidiaries, affiliated and related entities, divisions, or successors or predecessors-in-interest.

2.      Pursuant to Rule 26 of the Georgia Civil Practice Act, the documents requested herein must be produced in their original form exactly as they are kept in the usual course of business or must be organized and labeled to correspond to the categories in the Requests.

3.      To the extent that an objection to a Request is based on a definition, please state what You believe to be an appropriate definition and produce documents in response to the Request using the definition You believe to be appropriate.

4.      If You object to any part or subpart of a Request or to providing certain documents requested, state the objection and provide documents responsive to the unobjectionable subpart(s) of the Request and/or supply the unobjectionable documents requested.

5.      The Requests include within their scope all attachments and enclosures to any responsive documents.  If any portion of a document is responsive to a Request, please produce the entire document, including all attachments, enclosures, "post-it"-type notes, and any matter physically attached to the document.  If documents responsive to these Requests are normally kept in a file or folder, please also produce that file or folder with any labels attached thereto.  If responsive documents are segregated or separated from other documents, whether by inclusion in binders, files, sub-files, or by use of dividers, tabs or any other method, please produce such documents in that form.

6.      Any document bearing any marks that are not part of the original text, or any reproduction thereof, is to be considered a separate document for purposes of responding to these Requests.

7.      If any document described below was, but no longer is, in Your possession, or subject to Your custody or control, or in existence, state whether:  (a) it is missing or lost; (b) it has been destroyed; (c) it has been transferred, voluntarily or involuntarily, to others; or (d) it has

been disposed of otherwise.  In each instance, explain the circumstances surrounding such disposition and identify the person(s) directing or authorizing same and the date(s) thereof. Identify each document by listing its author, his/her address, type of document (e.g., letter, memorandum, chart, etc.), date, subject matter, present location(s), and custodian(s), and state whether the original document or any copies thereof are still in existence.

## REQUESTS FOR PRODUCTION

1.      Any contract or agreement between You and Alexander for the development of or consultation regarding the development of the QrewLive concept or any other role-based text messaging concept and all documents and communications related to the same.

2.      All documents and communications related to Your provision of technical or other consulting services to Alexander, including, but not limited to, showing the scope of any services you provided to Alexander.

3.      Any prototypes or other work product produced by You for the purpose of providing technical consulting services to Alexander.

4.      All documents and communications related to the development of Alexander's QrewLive concept, including documents showing the genesis of the idea for QrewLive.

5.      All documents and communications related to any meetings between You and Alexander, or between You, Alexander, and Defendants.

6.      All communications between You and Alexander regarding the QrewLive concept.

7.      All communications between You and Alexander regarding the above captioned lawsuit or the allegations in the Complaint.

8.      All communications between You and any third party regarding the QrewLive concept.

5

9.     All communications between You and any third party regarding the above captioned lawsuit or the allegations in the Complaint.

This 22nd day of March, 2023.

> */s/ David L. Balser*
> David L. Balser
> Georgia Bar No. 035835
> Lawrence A. Slovensky
> Georgia Bar No. 653005
> James M. Brigman
> Georgia Bar No. 254905
> Charles G. Spalding, Jr.
> Georgia Bar No. 411926
> **KING & SPALDING LLP**
> 1180 Peachtree Street, N.E.
> Atlanta, GA  30309-3521
> Telephone:  404-572-4600
> Fax:  404-572-5100
> dbalser@kslaw.com
> lslovensky@kslaw.com
> mbrigman@kslaw.com
> cspalding@kslaw.com
>
> Julia C. Barrett
> Georgia Bar No. 354322
> **KING & SPALDING LLP**
> 500 W. Second Street, Suite 1800
> Austin, Texas 78701
> Telephone:  512-457-2053
> Fax:  512-457-2100
> jbarrett@kslaw.com
>
> *Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on this day a copy of the foregoing was served via email upon all counsel of record.

DATED this 22nd day of March, 2023.

*/s/ David L. Balser*
David L. Balser
(Ga. Bar. No. 035835)

*Counsel for Defendant*

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| CRAIG ALEXANDER., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO. 21-A-03275-2 |
| | ) | |
| DELTA AIR LINES, INC.; EDWARD | ) | |
| BASTIAN; RAHUL SAMANT; | ) | |
| MATTHEW MUTA; DARRELL HASKIN; | ) | |
| DAVID SMITH; DAVID BURTON; | ) | |
| CORPORATE DOES 1 TO 5; and JOHN | ) | |
| DOES 1 TO 10, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DELTA'S REQUESTS FOR PRODUCTION OF DOCUMENTS
## TO NONPARTY SHOCKTHEORY, DLV INC.

Pursuant to O.C.G.A. § 9-11-34, Defendant Delta Air Lines, Inc. ("Delta" or "Defendant") hereby serves the following Requests for Production of Documents ("Requests") on nonparty ShockTheory, DLV Inc. ("ShockTheory"). Your responses to each Request are due no later than thirty (30) calendar days after service of these Requests at the offices of King & Spalding LLP, 1180 Peachtree Street, N.E., Atlanta, Georgia 30309.

### DEFINITIONS

The following terms shall have the meanings set forth below whenever used in any Request:

1.      "You" or "Your" means ShockTheory, DLV Inc. and its employees, members, affiliates, partners, parents, subsidiaries, and other agents and representatives.

2.      "Alexander" or "Plaintiff" means and includes Plaintiff Craig Alexander and his employees, members, affiliates, partners, parents, subsidiaries, and other agents and representatives, including MABA Holdings, LLC, and QrewLive Visual Communications, Inc.

3.      "Person" means any natural person, individual, partnership, corporation, trust, estate, cooperative, association, business, legal or government entity, governmental subdivision or agency, or other entity.

4.      "Communication(s)" or "communicate(d)" means any and all transmissions of information, in all forms and by all means, including, but not limited to, written, oral, or electronic.

5.      "Complaint" shall refer to the Complaint filed in the above-captioned action on July 12, 2021, and attached hereto as Exhibit A.

6.      "Document" has its broadest meaning under the Georgia Civil Practice Act and the Georgia Evidence Code, and includes but is not limited to each and every written, recorded or graphic matter of any kind, type, nature or description that is or has been in Your possession, custody, or control or of which You have knowledge, including but not limited to e-mails, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, letters, telegraphs, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, teletypes, telexes, invoices, order forms, checks, drafts, statements, credit and debit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, or pamphlets, or any written or recorded materials of any other kind, however stored, recorded, produced or reproduced, and also including, but not limited to drafts or copies of any of the foregoing that contain any notes, comments or markings of any kind not found on the original documents or that are otherwise not identical to the original documents.

7.      The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the Request inclusive rather than exclusive.

8.      The word "including" shall be construed as broadly as possible and shall mean "without limitation."

9.      "All" means "any and all," and "any" means "any and all."

10.     The terms "refer to," "relate to," or "concerning" or any derivative thereof mean constituting, describing, summarizing, reflecting, containing, embodying, mentioning, showing, comprising, evidencing, discussing, commenting about, referring to, reflecting, or in any way, logically or factually, connected with the matter described in the applicable Request.

11.     Whenever a corporate or legal entity is referred to, the Request shall be deemed to include all predecessors, successors, parents, subsidiaries, employees, agents, or other representatives of that corporate or legal entity.

12.     In these Requests, the present tense includes the past and future tenses; the singular includes the plural; the plural includes the singular; and words in the masculine, feminine, or neuter form shall include each of the other genders.

13.     The term "QrewLive" shall mean Plaintiff's idea related to a role-based text messaging system for members of the flight crew, as alleged in the Complaint, and shall include MobCrew, QrewLive, or any other name Plaintiff used to describe such idea, system or application that is the subject of the claims in the Complaint.

## **INSTRUCTIONS**

1.      Please produce all documents in Your possession, custody, or control, including without limitation any documents in the possession, custody, or control of Your employees, agents, attorneys, representatives, or any other persons acting on your behalf, as well as any of Your past or present subsidiaries, affiliated and related entities, divisions, or successors or predecessors-in-interest.

3

2.     Pursuant to Rule 26 of the Georgia Civil Practice Act, the documents requested herein must be produced in their original form exactly as they are kept in the usual course of business or must be organized and labeled to correspond to the categories in the Requests.

3.     To the extent that an objection to a Request is based on a definition, please state what You believe to be an appropriate definition and produce documents in response to the Request using the definition You believe to be appropriate.

4.     If You object to any part or subpart of a Request or to providing certain documents requested, state the objection and provide documents responsive to the unobjectionable subpart(s) of the Request and/or supply the unobjectionable documents requested.

5.     The Requests include within their scope all attachments and enclosures to any responsive documents.  If any portion of a document is responsive to a Request, please produce the entire document, including all attachments, enclosures, "post-it"-type notes, and any matter physically attached to the document.  If documents responsive to these Requests are normally kept in a file or folder, please also produce that file or folder with any labels attached thereto.  If responsive documents are segregated or separated from other documents, whether by inclusion in binders, files, sub-files, or by use of dividers, tabs or any other method, please produce such documents in that form.

6.     Any document bearing any marks that are not part of the original text, or any reproduction thereof, is to be considered a separate document for purposes of responding to these Requests.

7.     If any document described below was, but no longer is, in Your possession, or subject to Your custody or control, or in existence, state whether:  (a) it is missing or lost; (b) it has been destroyed; (c) it has been transferred, voluntarily or involuntarily, to others; or (d) it has

been disposed of otherwise.   In each instance, explain the circumstances surrounding such disposition and identify the person(s) directing or authorizing same and the date(s) thereof. Identify each document by listing its author, his/her address, type of document (e.g., letter, memorandum, chart, etc.), date, subject matter, present location(s), and custodian(s), and state whether the original document or any copies thereof are still in existence.

## REQUESTS FOR PRODUCTION

1.      Any contract or agreement between You and Alexander for the development or consultation regarding the development of the QrewLive concept or any other role-based text messaging concept and all documents and communications related to the same.

2.      All documents and communications related to Your provision of technical consulting services to Alexander, including, but not limited to, showing the scope of any services you provided to Alexander.

3.      Any prototypes or other work product produced by You for the purpose of providing technical consulting services to Alexander.

4.      All documents and communications related to the development of Alexander's QrewLive concept.

5.      All documents and communications related to any meetings between You and Alexander, or between You, Alexander, and Defendants.

6.      All communications between You and Alexander regarding the QrewLive concept.

7.      All communications between You and Alexander regarding the above captioned lawsuit or the allegations in the Complaint.

8.      All communications between You and any third party regarding the QrewLive concept.

9.    All communications between You and any third party regarding the above captioned lawsuit or the allegations in the Complaint.

This 22nd day of March, 2023.

*/s/ David L. Balser*
David L. Balser
Georgia Bar No. 035835
Lawrence A. Slovensky
Georgia Bar No. 653005
James M. Brigman
Georgia Bar No. 254905
Charles G. Spalding, Jr.
Georgia Bar No. 411926
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521
Telephone:  404-572-4600
Fax:  404-572-5100
dbalser@kslaw.com
lslovensky@kslaw.com
mbrigman@kslaw.com
cspalding@kslaw.com

Julia C. Barrett
Georgia Bar No. 354322
**KING & SPALDING LLP**
500 W. Second Street, Suite 1800
Austin, Texas 78701
Telephone:  512-457-2053
Fax:  512-457-2100
jbarrett@kslaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this day a copy of the foregoing was served via email upon all counsel of record.

DATED this 22nd day of March, 2023.

<u>/s/ David L. Balser</u>
David L. Balser
(Ga. Bar. No. 035835)

*Counsel for Defendant*

# EXHIBIT F

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| **CRAIG ALEXANDER,** | **CIVIL ACTION**<br>**FILE NO.: 21A03275** |
| **Plaintiff** | |
| **v.** | |
| | **JURY TRIAL DEMANDED** |
| **DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10,** | |
| **Defendants** | |

**DEFENDANT DELTA AIR LINES, INC.'S SEVENTH SET OF INTERROGATORIES TO PLAINTIFF CRAIG ALEXANDER**

Pursuant to O.C.G.A. § 9-11-26 and 9-11-33, Defendant Delta Air Lines, Inc. ("Delta") serve upon Plaintiff Craig Alexander ("Plaintiff") the following interrogatories to be answered in writing and under oath no later than thirty (30) calendar days after service at the offices of King & Spalding LLP, 1180 Peachtree Street, N.E., Atlanta, Georgia 30309.

**DEFINITIONS**

The following terms shall have the meanings set forth below whenever used in any Interrogatory:

1.      "Alexander," "Plaintiff," "You," and "Your" shall refer to Plaintiff Craig Alexander.

2.      "Former Counsel" shall refer to Morgan & Morgan Atlanta, PLLC, Keenan R.S. Nix, Christopher J. Graddock, ShaMiracle J. Rankin, Darren Summerville, Kristoper Alderman,

The Summerville Firm, LLC, Tyler Henderson, Briarwood Legal, LLC, Anna Green Cross, Meredith Kincaid, and Cross Kincaid.

3.      The term "QrewLive" shall mean Plaintiff's idea related to a role-based text messaging system for members of the flight crew, as alleged in the Complaint, and shall include MobCrew, QrewLive, or any other name Plaintiff used to describe such system or application that is the subject of the claims in the Complaint.

4.      "Document" shall mean each and every written, recorded, or graphic matter of any kind, type, nature, or description that is or has been in Your possession, custody, or control, including, but not limited to, computer files, computer databases, computer printouts, correspondence, electronic mail, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, drafts of documents, exhibits, work papers, schedules, forms, elections, audits, charts, plans, articles, specifications, diaries, letters, telegraphs, photographs, minutes, contracts, agreements, reports, surveys, data compilations of any kind, teletypes, telexes, facsimiles, invoices, checks, drafts, statements, receipts, summaries, books, ledgers, or any written or recorded materials of any kind, however stored, recorded, produced, or reproduced and also including, but not limited to, drafts or copies of any of the foregoing that contain any notes, comments, or makings of any kind not found in the original documents or that are otherwise not identical to the foregoing.

5.      "Relating to" or "relate to" shall mean concerning, pertaining to, involving, discussing, describing, referring to, mentioning, demonstrating, illustrating, or providing evidence thereof.

6.      The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the Interrogatory inclusive rather than exclusive.

- 2 -

7.      The term "including" shall be construed as broadly as possible and shall mean "without limitation."

8.      The term "any" is used in its inclusive sense. For example, if an interrogatory refers to "any" communications between Plaintiff and a third party regarding a particular subject matter, You should provide information in which You or someone acting on Your behalf communicated with a third party regarding the subject matter.

9.      "Delta Highly Confidential Documents" means any document bearing a Bates stamp beginning with "DELTA" and designated as "Highly Confidential" pursuant to the terms of the Court's Stipulated Confidentiality Agreement and Protective Order, entered on December 21, 2021.

10.      "Delta Confidential Documents" means any document bearing a Bates stamp beginning with "DELTA" and designated as "Confidential" pursuant to the terms of the Court's Stipulated Confidentiality Agreement and Protective Order, entered on December 21, 2021.

11.      "Identify" or "describe" means the following:

a.      When used in connection with natural persons, "identify" or "describe" means to give, to the extent known, the person's full name, present or last known address, the present or last known place of employment, and city of residence as well as the substance of the person's knowledge, where such knowledge was obtained, whether such knowledge was discussed with You, when such discussions occurred, who participated in such discussions, and the substance of all discussions.

b.      When used in connection with an entity, "identify" or "describe" means to state the entity's full name, last known address(es), telephone number, and organization form (e.g., corporation, sole proprietorship, partnership, joint venture, etc.).

- 3 -

      c.     When used in connection with an act, "identify" or "describe" means to provide a description of the act, including the place, date, and time of its occurrence, and the person(s) and/or entity(ies) engaged in or present during the act.

      d.     When used with respect to a Document or Communication, "identify" or "describe" includes providing the following information:

      i.     a description of the type of Document or Communication;

      ii.     date or dates appearing on the face of the Document or, if no date appears, the date upon which the Document was prepared;

      iii.     date or dates in which the Communication was made;

      iv.     the identity of its originator, including all Persons who authored, wrote, signed, initiated, dictated, reviewed, approved or otherwise participated in creating the Document or making the Communication;

      v.     the identity of the addressee(s) and of each other recipient;

      vi.     the title and the general subject matter of the Document or Communication;

      vii.     the number of pages of the Document or Communication;

      viii.     any numerical or alphabetical designation applied to the Document or Communication;

      ix.     the designation and location of the file(s) where the original and each copy are normally and/or presently being kept and the identity of each custodian thereof; and

      x.     if the Document or Communication no longer exists, a description of the disposition that was made of it and the identity of the Person who disposed of it.

      e.  When used with respect to Delta Highly Confidential Documents or Delta Confidential Documents, "identify" or "describe" includes providing the Bates number of the document and a description of the contents of the document.

12.     In these Interrogatories, the present tense includes the past and future tenses; the singular includes the plural; the plural includes the singular; and words in the masculine, feminine, or neuter form shall include each of the other genders.

13.     The relevant time period for these Interrogatories is January 1, 2013 through the present, unless otherwise noted.

## INSTRUCTIONS

1.     Each Interrogatory must be answered separately and to the fullest extent possible in writing under oath, unless it is objected to, in which event the reason(s) for objection shall be stated in lieu of an answer.

2.     If in answering these Interrogatories You claim any ambiguity in interpreting either an individual interrogatory or a definition or instruction applicable thereto, such claims shall not be utilized by You as a basis for refusing to respond, but there shall be set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding.

3.     If You object to any part or subpart of an Interrogatory on the grounds that the Interrogatory is unduly burdensome, please describe the burden or expense of the proposed discovery.

4.     Any response as to which You claim privilege or exemption from discovery shall be identified in a privilege log as agreed by the parties pursuant to the Parties' Stipulation Regarding Discovery of Electronically Stored Information. Paragraph 3(d) of the Parties' Stipulation Regarding Discovery of Electronically Stored Information, which provides that the Parties are not required to include information generated after the filing of the Complaint in a privilege log, does not apply to these Interrogatories.

5.      Each paragraph and subparagraph of these Interrogatories should be construed independently, and no other paragraph or subparagraph shall be referred to or relied on for the purpose of limiting the scope. You are under a duty to supplement Your responses to the Interrogatories with respect to the identity and location of persons having knowledge of discoverable matters and the identity of persons expected to be called as expert witnesses, as well as the subject matter on which they are expected to testify and the substance of their testimony.

6.      You are under a duty to amend a prior response if You obtain information upon the basis of which You know that the response was incorrect when made, or You know that the response, though correct when made, is no longer true and the circumstances are such that a failure to amend the response would be, in substance, a knowing concealment.

## **INTERROGATORIES**

### **INTERROGATORY NO. 29:**

Identify all Delta Highly Confidential Documents shown to; provided to; or the contents of which were communicated, summarized, explained, and/or described to; You by Former Counsel.

### **INTERROGATORY NO. 30:**

Identify and describe with specificity all Delta Highly Confidential Documents or Delta Confidential Documents You showed to; provided to; or the contents of which You communicated, summarized, explained, and/or described to; a third party.

### **INTERROGATORY NO. 31:**

Identify, list, and describe with specificity every conversation, written or oral, You have had with Sonja Williams relating to this lawsuit.

**INTERROGATORY NO. 32:**

Identify, list, and describe with specificity every conversation, written or oral, You have had with Former Counsel relating to Sonja Williams's response to Delta's Requests for Production or her role as a witness in this case.

**INTERROGATORY NO. 33:**

Identify, list, and describe with specificity every conversation, written or oral, You have had with any third party relating to this lawsuit including, but not limited to, Joseph Mayfield, Sandra Sowers, and any current or former agent of SolTech, Inc.

Dated: July 11, 2023.

*/s/ David L. Balser*

David L. Balser
Georgia Bar No. 035835
Lawrence A. Slovensky
Georgia Bar No. 653005
James M. Brigman
Georgia Bar No. 254905
Charles G. Spalding, Jr.
Georgia Bar No. 411926
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521
Telephone:  404-572-4600
Fax:  404-572-5100
dbalser@kslaw.com
lslovensky@kslaw.com
mbrigman@kslaw.com
cspalding@kslaw.com

Julia C. Barrett
Georgia Bar No. 354322
**KING & SPALDING LLP**
500 W. Second Street, Suite 1800
Austin, Texas 78701
Telephone:  512-457-2053

Fax:  512-457-2100
jbarrett@kslaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this day a copy of the foregoing was served via U.S. mail upon Plaintiff at 185 Wynfield Way, Atlanta, GA 30331.

DATED this 11th day of July, 2023.

<u>*/s/ David L. Balser*</u>
David L. Balser
(Ga. Bar. No. 035835)

*Counsel for Defendant*

# EXHIBIT G

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **CRAIG ALEXANDER,** | **CIVIL ACTION** |
| **Plaintiff** | **FILE NO.: 21A03275** |
| **v.** | |
| | **<u>JURY TRIAL DEMANDED</u>** |
| **DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10,** | |
| **Defendants** | |

---

## <u>DEFENDANT DELTA AIR LINES, INC'S SECOND REQUESTS FOR ADMISSION TO PLAINTIFF CRAIG ALEXANDER</u>

Pursuant to O.C.G.A §§ 9-11-26 and 9-11-36, Defendant Delta Air Lines, Inc., ("Delta") requests that Plaintiff Craig Alexander ("Plaintiff") respond to the following Requests for Admission within thirty (30) days of service of these Requests.

### <u>DEFINITIONS</u>

The following terms shall have the meanings set forth below whenever used in any request:

1.      "Alexander," "Plaintiff," "You," and "Your" shall refer to Plaintiff Craig Alexander.

2.      "Former Counsel" shall refer to Morgan & Morgan Atlanta, PLLC, Keenan R.S. Nix, Christopher J. Graddock, ShaMiracle J. Rankin, Darren Summerville, Kristopher Alderman, The Summerville Firm, LLC, Tyler Henderson, Briarwood Legal, LLC, Anna Green Cross, Meredith Kincaid, and Cross Kincaid.

3.      "Relating to" or "relate to" shall mean concerning, pertaining to, involving, discussing, describing, referring to, mentioning, demonstrating, illustrating, or providing evidence thereof.

4.      The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

5.      The term "including" shall be construed as broadly as possible and shall mean "without limitation."

6.      The term "any" is used in its inclusive sense. For example, if the request refers to "any" communications between Plaintiff and a third party regarding a particular subject matter, You should produce all Documents in which You or someone acting on Your behalf communicated with a third party regarding the subject matter.

7.      "Delta Highly Confidential Documents" means any document bearing a Bates stamp beginning with "DELTA" and designated as "Highly Confidential" pursuant to the terms of the Court's Stipulated Confidentiality Agreement and Protective Order, entered on December 21, 2021.

8.      "Delta Confidential Documents" means any document bearing a Bates stamp beginning with "DELTA" and designated as "Confidential" pursuant to the terms of the Court's Stipulated Confidentiality Agreement and Protective Order, entered on December 21, 2021.

9.      In these Requests, the present tense includes the past and future tenses; the singular includes the plural; the plural includes the singular; and words in the masculine, feminine, or neuter form shall include each of the other genders.

## INSTRUCTIONS

1.      If the Request cannot be admitted or denied, please state in detail the reasons why You cannot truthfully admit or deny the matter.

2.      If You cannot admit or deny the Request in its entirety, please state that part which you cannot admit or deny and state in detail the reasons for any such qualifications.

3.      If in answering this Request You claim any ambiguity in interpreting either an individual request or a definition or instruction applicable thereto, such claims shall not be utilized by You as a basis for refusing to respond, but there shall be set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding.

4.      If You object to any part or subpart of a Request on the grounds that the Request is unduly burdensome, please describe the burden or expense of the proposed discovery.

## REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 3:

Admit that during Your March 24, 2023, phone call with Sonja Williams You said that You would not be mad if Sonja Williams lost documents.

### REQUEST FOR ADMISSION NO. 4:

Admit that You discussed Your March 24, 2023, phone call with Sonja Williams with Keenan Nix.

### REQUEST FOR ADMISSION NO. 5:

Admit that Keenan Nix discussed his March 24, 2023, phone call with Sonja Williams with You.

### REQUEST FOR ADMISSION NO. 6:

Admit that Keenan Nix discussed his March 30, 2023, lunch meeting with Sonja Williams with You.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Former Counsel showed, provided, or summarized the contents of Delta Highly Confidential Documents to You.

**REQUEST FOR ADMISSION NO. 8:**

Admit that You showed, provided, or summarized the contents of Delta Highly Confidential Documents to Sonja Williams.

**REQUEST FOR ADMISSION NO. 9:**

Admit that You showed, provided, or summarized the contents of Delta Confidential Documents to Sonja Williams.

Dated: July 11, 2023.

*/s/ David L. Balser*
David L. Balser
Georgia Bar No. 035835
Lawrence A. Slovensky
Georgia Bar No. 653005
James M. Brigman
Georgia Bar No. 254905
Charles G. Spalding, Jr.
Georgia Bar No. 411926
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521
Telephone:  404-572-4600
Fax:  404-572-5100
dbalser@kslaw.com
lslovensky@kslaw.com
mbrigman@kslaw.com
cspalding@kslaw.com

Julia C. Barrett
Georgia Bar No. 354322
**KING & SPALDING LLP**
500 W. Second Street, Suite 1800

Austin, Texas 78701
Telephone:  512-457-2053
Fax:  512-457-2100
jbarrett@kslaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this day a copy of the foregoing was served via U.S. mail upon Plaintiff at 185 Wynfield Way, Atlanta, GA 30331.

DATED this 11th day of July, 2023.

*/s/ David L. Balser*
David L. Balser
(Ga. Bar. No. 035835)

*Counsel for Defendant*

# EXHIBIT H

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **CRAIG ALEXANDER,** | **CIVIL ACTION**<br>**FILE NO.: 21A03275** |
| **Plaintiff** | |
| **v.** | |
| **DELTA AIR LINES, INC.; EDWARD**<br>**BASTIAN; RAHUL SAMANT;**<br>**MATTHEW MUTA, DARRELL**<br>**HASKIN; DAVID SMITH; DAVID**<br>**BURTON; CORPORATE DOES 1 TO**<br>**5; and JOHN DOES 1 TO 10,** | **JURY TRIAL DEMANDED** |
| **Defendants** | |

### DEFENDANT DELTA AIR LINES, INC'S THIRD REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF CRAIG ALEXANDER

Pursuant to O.C.G.A §§ 9-11-26 and 9-11-34, Defendant Delta Air Lines, Inc., ("Delta") requests that Plaintiff Craig Alexander ("Plaintiff") produce the following documents within thirty (30) days of service of these Requests for Production of Documents to the undersigned counsel for Defendants at King & Spalding LLP, 1180 Peachtree Street, N.E., Atlanta, Georgia 30309.

### DEFINITIONS

The following terms shall have the meanings set forth below whenever used in any request:

1.      "Alexander," "Plaintiff," "You," and "Your" shall refer to Plaintiff Craig Alexander.

2.      "Former Counsel" shall refer to Morgan & Morgan Atlanta, PLLC, Keenan R.S. Nix, Christopher J. Graddock, ShaMiracle J. Rankin, Darren Summerville, Kristopher Alderman, The Summerville Firm, LLC, Tyler Henderson, Briarwood Legal, LLC, Anna Green Cross, Meredith Kincaid, and Cross Kincaid.

3.      "Communication(s)" or "communicate(d)" means any and all transmissions of information, in all forms and by all means, including, but not limited to, written, oral, or electronic.

4.      "Document" shall mean each and every written, recorded, or graphic matter of any kind, type, nature, or description that is or has been in Your possession, custody, or control, including, but not limited to, computer files, computer databases, computer printouts, correspondence, electronic mail, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, drafts of documents, exhibits, work papers, schedules, forms, elections, audits, charts, plans, articles, specifications, diaries, letters, telegraphs, photographs, minutes, contracts, agreements, reports, surveys, data compilations of any kind, teletypes, telexes, facsimiles, invoices, checks, drafts, statements, receipts, summaries, books, ledgers, or any written or recorded materials of any kind, however stored, recorded, produced, or reproduced and also including, but not limited to, drafts or copies of any of the foregoing that contain any notes, comments, or makings of any kind not found in the original documents or that are otherwise not identical to the foregoing.

5.      Unless otherwise indicated, the term "Complaint" refers to Plaintiff's Complaint, filed on July 13, 2021, as it may be further amended in accordance with the Georgia Civil Practice Act or by Order of the Court.

6.      "Relating to" or "relate to" shall mean concerning, pertaining to, involving, discussing, describing, referring to, mentioning, demonstrating, illustrating, or providing evidence thereof.

7.      The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

8.     The term "including" shall be construed as broadly as possible and shall mean "without limitation."

9.     The term "any" is used in its inclusive sense. For example, if the request refers to "any" communications between Plaintiff and a third party regarding a particular subject matter, You should produce all Documents in which You or someone acting on Your behalf communicated with a third party regarding the subject matter.

10.     "Delta Highly Confidential Documents" means any document bearing a Bates stamp beginning with "DELTA" and designated as "Highly Confidential" pursuant to the terms of the Court's Stipulated Confidentiality Agreement and Protective Order, entered on December 21, 2021.

11.     "Delta Confidential Documents" means any document bearing a Bates stamp beginning with "DELTA" and designated as "Confidential" pursuant to the terms of the Court's Stipulated Confidentiality Agreement and Protective Order, entered on December 21, 2021.

12.     In this Request, the present tense includes the past and future tenses; the singular includes the plural; the plural includes the singular; and words in the masculine, feminine, or neuter form shall include each of the other genders.

13.     The relevant time period for these Requests is January 1, 2013 through the present, unless otherwise noted.

## <u>INSTRUCTIONS</u>

1.     In providing the Documents called for by this Request, You are requested to produce them as they are kept in the usual course of business or organize and label them to correspond with the categories to which they relate.

2.      Documents which cannot be legibly copied should be produced in their original form.

3.      These Requests are intended to cover all Documents in Your possession, or subject to Your custody and control, whether directly or indirectly.

4.      Each paragraph and subparagraph of these Requests should be construed independently, and no other paragraph or subparagraph shall be referred to or relied on for the purpose of limiting the scope.

5.      If in answering these Requests You claim any ambiguity in interpreting either an individual request or a definition or instruction applicable thereto, such claims shall not be utilized by You as a basis for refusing to respond, but there shall be set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding.

6.      If You object to any part or subpart of a Request on the grounds that the Request is unduly burdensome, please describe the burden or expense of the proposed discovery.

7.      Any Documents as to which You claim privilege or exemption from discovery shall be identified in a privilege log as agreed by the parties pursuant to the Parties' Stipulation Regarding Discovery of Electronically Stored Information. Paragraph 3(d) of the Parties' Stipulation Regarding Discovery of Electronically Stored Information, which provides that the Parties are not required to include information generated after the filing of the Complaint in a privilege log, does not apply to these Requests.

8.      All designated documents are to be taken as including all attachments and enclosures. If any portion of a Document is responsive to a Request, the entire Document should be produced. If Documents responsive to this Request are normally kept in a file or other folder, also produce that file or folder.

9.      Electronically Stored Information shall be produced in accordance with the provisions set forth in the Parties' Stipulation Regarding Discovery of Electronically Stored Information.

**REQUESTS FOR PRODUCTION**

**REQUEST NO. 56:**

The correspondence dated June 26, 2023, referenced in the Motion to Withdraw as Counsel of Record for Plaintiff attached hereto as Exhibit A.

**REQUEST NO. 57:**

Any and all Documents reflecting the transmission and/or summation of any document that was produced by Delta and designated as "Highly Confidential" to You.

**REQUEST NO. 58:**

Any and all Documents reflecting the transmission and/or summation of a document that was produced by Delta and designated as "Confidential" or "Highly Confidential" from You or Former Counsel to a third party.

**REQUEST NO. 59**:

Any and all Documents or Communications relating to Your March 24, 2023, phone call with Sonja Williams, including but not limited to, any notes taken by You or Former Counsel regarding the call or any communications exchanged between You, Former Counsel, and/or Sonja Williams.

**REQUEST NO. 60**:

Any and all Documents or Communications relating to Former Counsel's March 24, 2023, phone call with Sonja Williams, including but not limited to, any notes taken by You or Former

Counsel regarding the call or any communications exchanged between You, Former Counsel, and/or Sonja Williams.

**REQUEST NO. 61**:

Any and all Documents or Communications relating to Keenan Nix's March 30, 2023, lunch meeting with Sonja Williams, including but not limited to, any notes taken by You or Former Counsel regarding the meeting or any communications exchanged between You, Former Counsel, and/or Sonja Williams.

**REQUEST NO. 62**:

Any and all Documents reflecting or relating to Communications between You and Sonja Williams relating to this lawsuit.

**REQUEST NO. 63:**

Any and all Documents reflecting or relating to Communications between Former Counsel and Sonja Williams relating to this lawsuit.

**REQUEST NO. 64**

Any and all Documents reflecting or relating to Communications between You and any third party relating to this lawsuit including, but not limited to, Joseph Mayfield, Sandra Sowers, and any current or former agent of SolTech, Inc.

**REQUEST NO. 65**

Any and all Documents reflecting or relating to Communications between Former Counsel and any third party relating to this lawsuit including, but not limited to, Joseph Mayfield, Sandra Sowers, and any current or former agent of SolTech, Inc.

**REQUEST NO. 66:**

Any and all Delta Highly Confidential Documents or Delta Confidential Documents currently in Your possession.

Dated: July 11, 2023.

/s/David L. Balser
David L. Balser
Georgia Bar No. 035835
Lawrence A. Slovensky
Georgia Bar No. 653005
James M. Brigman
Georgia Bar No. 254905
Charles G. Spalding, Jr.
Georgia Bar No. 411926
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521
Telephone:  404-572-4600
Fax:  404-572-5100
dbalser@kslaw.com
lslovensky@kslaw.com
mbrigman@kslaw.com
cspalding@kslaw.com

Julia C. Barrett
Georgia Bar No. 354322
**KING & SPALDING LLP**
500 W. Second Street, Suite 1800
Austin, Texas 78701
Telephone:  512-457-2053
Fax:  512-457-2100
jbarrett@kslaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this day a copy of the foregoing was served via U.S. mail upon Plaintiff at 185 Wynfield Way, Atlanta, GA 30331.

DATED this 11th day of July, 2023.

*/s/ David L. Balser*　　　　

David L. Balser

(Ga. Bar. No. 035835)

*Counsel for Defendant*

# EXHIBIT I

**IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA**

| | |
|---|---|
| **CRAIG ALEXANDER,** | **CIVIL ACTION**<br>**FILE NO.: 21A03275** |
| **Plaintiff** | |
| **v.** | |
| | **JURY TRIAL DEMANDED** |
| **DELTA AIR LINES, INC.; EDWARD**<br>**BASTIAN; RAHUL SAMANT;**<br>**MATTHEW MUTA, DARRELL**<br>**HASKIN; DAVID SMITH; DAVID**<br>**BURTON; CORPORATE DOES 1 TO**<br>**5; and JOHN DOES 1 TO 10,** | |
| **Defendants** | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT DELTA AIR LINES,
INC.'S SEVENTH SET OF INTERROGATORIES
TO PLAINTIFF CRAIG ALEXANDER**

COMES NOW Craig Alexander, Plaintiff in the above-captioned action, and pursuant to

O.C.G.A. §§ 9-11-26 and 9-11-33, hereby responds to Defendant Delta Air Lines, Inc.'s Seventh

Set of Interrogatories to Plaintiff Craig Alexander.

**GENERAL OBJECTIONS**

1.

Plaintiff objects to each and every interrogatory to the extent it requires Plaintiff to respond

by disclosing his attorneys' or any other representatives' mental impressions, conclusions,

opinions, computations, calculations, projections, reasons, legal theories, other work-product, or

the like, on the ground that said request exceeds the permissible scope of discovery under Rule 26

of the Georgia Civil Practice Act.

2.

Plaintiff objects to each and every interrogatory to the extent that it seeks information regarding materials prepared by or for Plaintiff or his representatives in anticipation of litigation or for trial on the grounds that Defendant has not made the required showing for the discovery of such work-product material under Rule 26 of the Georgia Civil Practice Act.

3.

Plaintiff objects to each and every interrogatory to the extent it, whether standing alone or taken in conjunction with any and all other requests, is calculated, or would operate, to annoy, embarrass, oppress, unduly burden or unduly cause expense to Plaintiff, or would be unduly vexatious or burdensome to respond to, on the ground that said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act.

4.

Plaintiff objects to each and every interrogatory to the extent it requires Plaintiff to respond by acquiring or providing information that is not relevant to the claims or defenses of a party to this action or is not reasonably calculated to lead to the discovery of admissible evidence, on the ground that said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act.

5.

Plaintiff objects to each and every interrogatory to the extent that it seeks information regarding communications between Plaintiff and its legal counsel on the grounds that such communications are privileged and not subject to discovery under Rule 26 of the Georgia Civil Practice Act.

6.

Plaintiff objects to objects to each and every interrogatory to the extent it seeks information

not contained in documents, if any, in Plaintiff's possession and instead seeks to requires Plaintiff

to create or compile new documents.

7.

Insofar as any of Plaintiff's Interrogatories seek information to which the foregoing

General Objections apply, specification or failure to note particular General Objections shall not

constitute a waiver of those or other General Objections with respect to any request.

8.

Plaintiff objects to these Interrogatories to the extent that the information sought has been

previously asked and answered.

9.

Plaintiff objects to these Interrogatories to the extent that it exceeds the maximum

number of interrogatories allowable under the rules and therefore violates the Georgia Civil

Practice Act.

10.

To the extent that Plaintiff responds to an Interrogatory, this should not be construed as a

representation or admission that the responses are admissible at trial.

## **PRELIMINARY STATEMENT**

a.      The following responses are based upon information presently available to

Plaintiff of which Plaintiff believes to be correct. Said responses are made without prejudice to the

right to utilize subsequently discovered facts.

b.      No incidental or implied admission of fact by Plaintiff is made by the responses

below. The fact that Plaintiff has answered part or all of any interrogatory is not intended to, and

shall not be, construed to be a waiver by Plaintiff of all or any part of any objection of Plaintiff to

the admissibility of same at trial, or the relevance of the response.

c.       Responses to these interrogatories may be supplemented upon Plaintiff's further investigation and acquisition of information which Plaintiff does not either possess or recall at this time. However, any such further supplementation shall be made only in accordance with the Georgia Civil Practice Act.

d.       This Preliminary Statement is incorporated in each of the responses set forth below.

e.       Notwithstanding any of the "definitions" or preliminary instructions contained within Defendant's interrogatories, Plaintiff will only provide responses which are required pursuant to the Georgia Civil Practice Act.

f.       Any inadvertent production of privileged documents/information shall not be deemed a waiver of the privilege.

g.       Unless otherwise specified the term "Defendant" as used below shall refer to Delta Air Lines, Inc; Edward Bastian; Rahul Samant; Mathew Muta, Darrell Haskin; David Burton, Corporate Does 1 to 5; and John Does 1 to 10.

h.       Unless otherwise specified the term "Plaintiff" as used below shall refer to Craig Alexander.

<u>**SPECIFIC RESPONSES**</u>

Subject to the foregoing General Objections, which are incorporated as if set forth in each of the following responses, Plaintiff responds to Defendant's Seventh Set of Interrogatories to Plaintiff Craig Alexander as follows:

## **DEFENDANT'S REQUEST FOR INTERROGATORIES**

**INTERROGATORY NO. 29:**

Identify all Delta Highly Confidential Documents shown to; provided to; or the contents of which were communicated, summarized, explained, and/or described to; You by Former Counsel.

**RESPONSE:**

Plaintiff objects to this interrogatory because it requires Plaintiff to respond by disclosing communications, legal theories, opinions and litigation strategies discussed between Plaintiff and his attorney and other legal representatives and said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act. Subject to, and without waiving the foregoing objections, Plaintiff states that he vaguely recalls being shown two emails he drafted and sent to Delta that were marked "Confidential" but he did not understand why the emails he drafted and sent to Delta were marked confidential. In further response, Plaintiff states that he is not in possession of those emails and does not recall the contents.

**INTERROGATORY NO. 30:**

Identify and describe with specificity all Delta Highly Confidential Documents or Delta Confidential Documents You showed to; provided to; or the contents of which You communicated, summarized, explained, and/or described to; a third party.

**RESPONSE:**

Plaintiff does not recall showing, providing, communicating any contents, summarizing, explaining, and/or describing to a third party, any documents labeled or recognized as "Delta Highly Confidential Document" or labeled Delta "Confidential Document."

**INTERROGATORY NO. 31:**

Identify, list, and describe with specificity every conversation, written or oral, You have had with Sonja Williams relating to this lawsuit.

**RESPONSE:**

Plaintiff states that he had a conversation with Sonja Williams on March 24, 2023 which is evidenced by a recording, recorded by Sonja Wiliams, without Plaintiff's consent. Plaintiff does not recall any other discussions with Sonja Williams, written or oral, relating to the lawsuit.

**INTERROGATORY NO. 32:**

Identify, list, and describe with specificity every conversation, written or oral, You have had with Former Counsel relating to Sonja Williams's response to Delta's Requests for Production or her role as a witness in this case.

**RESPONSE:**

Plaintiff objects to this interrogatory to the extent that it seeks the disclosure of information prepared or obtained in anticipation of litigation or trial as such information constitutes protected work product and attorney-client privilege. Plaintiff objects to this interrogatory because it requires Plaintiff to disclose communications, legal theories, opinions and litigation strategies discussed between Plaintiff and his attorney and other legal representatives and said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act. Subject to, and without waiving the foregoing objections, Plaintiff states he did not have conversations with, written or oral, with his former counsel relating to Sonja Williams' response to Delta's Requests for Production.

**INTERROGATORY NO. 33:**

Identify, list, and describe with specificity every conversation, written or oral, You have

had with any third party relating to this lawsuit including, but not limited to, Joseph Mayfield, Sandra Sowers, and any current or former agent of SolTech, Inc.

**RESPONSE:**

Plaintiff objects to this interrogatory because it is overly broad and unduly burdensome. Plaintiff states that he only had an oral discussion with Joseph Mayfield to request that he meet with Plaintiff's former counsel to discuss the lawsuit with former counsel but Plaintiff did not have a discussion with Joseph Mayfiled about the lawsuit. Plaintiff states that he did not have a discussion with Sandra Sowers about the lawsuit because Sandra Sowers was already informed of the lawsuit from its inception and retained counsel during the pendency of the lawsuit. Plaintiff states that he did not have discussions with SolTech about the lawsuit.

This 2$^{1st}$ of October, 2023

**THE ELLIS FIRM**

*/s/ Willie C. Ellis Jr.*

303 Peachtree Street, Ste. 4180
Atlanta, Georgia 30308
Telephone: (770) 212-1432
will@call-ellis.com

Willie C. Ellis Jr.
Georgia Bar No. 246116
*Counsel for Plaintiff*

**BELIESOL LEGAL, LLC**

*/s/ Germaine Austin*

570 Piedmont Avenue NE,
Number 54741
Atlanta, Georgia 30308
Germaine@Beliesol.com

Germaine Austin
Georgia Bar No. 813810
*Counsel for Plaintiff*

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **CRAIG ALEXANDER,**<br><br>                    **Plaintiff**<br><br>**v.**<br><br>**DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10,**<br><br>                    **Defendants** | **CIVIL ACTION**<br>**FILE NO.: 21A03275**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing **PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT DELTA AIR LINES, INC.'S SEVENTH SET OF INTERROGATORIES TO PLAINTIFF CRAIG ALEXANDER** was mailed via United States Mail, postage prepaid and properly addressed, e-filed through the Court's e-file system and sent by electronic mail to the following:

David L. Balser
Lawrence A. Slovensky
James M. Brigman
Alexandra Titus
Julia C. Barrett
Charles G. Spalding, Jr.
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521

This 2$^{1st}$ day of October 2023.

/S/Germaine Austin
GERMAINE AUSTIN

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| **CRAIG ALEXANDER,** | **CIVIL ACTION** |
| | **FILE NO.: 21A03275** |
| Plaintiff | |
| v. | |
| | **JURY TRIAL DEMANDED** |
| **DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10,** | |
| Defendants | |

**STATE OF GEORGIA**

**COUNTY OF DEKALB**

**VERIFICATION**

BEFORE ME, the undersigned authority appeared CRAIG ALEXANDER, who being first duly sworn, deposes and says:

That he is the person named in the foregoing Plaintiff's Objections and Responses to Defendant Delta Airlines, Inc.'s Sixth Set and Seventh Set of Interrogatories to Plaintiff Craig Alexander; that he read the same; knows the contents thereof and that the same are true and correct to the best of his information and belief.

This 23 day of Oct , 2023

**CRAIG ALEXANDER**

Sworn to and subscribed before me.

This 23 day of OCTOBER , 2023.

NOTARY PUBLIC

My Commission Expires: 07-21-2024



# EXHIBIT J

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| CRAIG ALEXANDER, | CIVIL ACTION |
| | FILE NO.: 21A03275 |
| **Plaintiff** | |
| v. | <u>**JURY TRIAL DEMANDED**</u> |
| DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10, | |
| **Defendants** | |

<u>**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT DELTA AIR LINES, INC'S SECOND REQUESTS FOR ADMISSION TO PLAINTIFF CRAIG ALEXANDER**</u>

COMES NOW Craig Alexander, Plaintiff in the above-captioned action, and pursuant to O.C.G.A. § 9-11-36, hereby responds to Defendant Delta Air Lines, Inc's Second Requests for Admissions to Plaintiff Craig Alexander as follows:

<u>PRELIMINARY STATEMENT</u>

(a)     In accordance with O.C.G.A. § 9-11-36(b), Plaintiff's responses to Defendant's requests are for the purposes of the pending action only and shall not constitute an admission by Plaintiff for any other purpose, nor may they be used against Plaintiff in any other proceeding.

(b)     The following responses are based upon information presently available to Plaintiff which Plaintiff believes to be correct.  Said responses are made without prejudice to Plaintiff's right to use subsequently discovered facts.

(c)     Responses to Defendant's requests may be supplemented upon Plaintiff's further investigation and acquisition of information which Plaintiff does not either possess or

recall at this time.  Any such further supplementation shall be made in accordance with the Georgia Civil Practice Act, O.C.G.A. § 9-11-1, *et seq.*

(d)    No incidental or implied admission of fact by Plaintiff is made by the responses below.  The only admissions are express admissions.  The fact that the Plaintiff has responded to these requests may not properly be taken as an admission that Plaintiff's responses constitute admissible evidence.  The fact that Plaintiff has responded to part or all of Defendant's requests is not intended to, and shall not be constituted to be, a waiver by Plaintiff of all or any part of any objection of Plaintiff to the admissibility of same at trial, or the relevance of the response.

(e)    Plaintiff objects to all Defendant's Second Request for Admissions on the grounds that discovery has not yet been completed and all facts are not yet known which may be applicable to responding to said Request for Admissions.

(f)    Notwithstanding any of the definitions or preliminary instructions contained within Defendant's requests, Plaintiff only provides responses which are required pursuant to the Georgia Civil Practice Act.

(g)    This preliminary statement 1s incorporated m each of the responses and objections set forth below:

## RESPONSES AND OBJECTIONS

## REQUEST FOR ADMISSION NO. 3:

Admit that during Your March 24, 2023, phone call with Sonja Williams You said that You would not be mad if Sonja Williams lost documents.

**RESPONSE:** DENIED.

**REQUEST FOR ADMISSION NO. 4:**

Admit that You discussed Your March 24, 2023, phone call with Sonja Williams with Keenan Nix.

**RESPONSE:** ADMITTED. In further response, Plaintiff states that he had a summarized, non-detailed, oral discussion about the Sonja Williams phone call with his former counsel.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Keenan Nix discussed his March 24, 2023, phone call with Sonja Williams with You.

**RESPONSE:** DENIED.

**REQUEST FOR ADMISSION NO. 6:**

Admit that Keenan Nix discussed his March 30, 2023, lunch meeting with Sonja Williams with You.

**RESPONSE:** ADMITTED. In further response, Plaintiff states that his former counsel simply stated that he met with Sonja Williams and that Sonja Williams said she taped her conversation with Plaintiff. Nothing further regarding the meeting was discussed.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Former Counsel showed, provided, or summarized the contents of Delta Highly Confidential Documents to You.

**RESPONSE:** DENIED

**REQUEST FOR ADMISSION NO. 8:**

Admit that You showed, provided, or summarized the contents of Delta Highly Confidential Documents to Sonja Williams.

**RESPONSE:** DENIED.

- 3 -

**REQUEST FOR ADMISSION NO. 9:**

Admit that You showed, provided, or summarized the contents of Delta Confidential

Documents to Sonja Williams.

**RESPONSE:** DENIED.

This 21st of October, 2023

<table>
<tr><td></td><td>**THE ELLIS FIRM**</td></tr>
<tr><td></td><td>/s/ *Willie C. Ellis Jr.*</td></tr>
<tr><td>303 Peachtree Street, Ste. 4100<br>Atlanta, Georgia 30308<br>Telephone: (770) 212-1432<br>will@call-ellis.com</td><td>_____<br>Willie C. Ellis Jr.<br>Georgia Bar No. 246116<br>*Counsel for Plaintiff*</td></tr>
<tr><td></td><td>**BELIESOL LEGAL, LLC**</td></tr>
<tr><td>570 Piedmont Avenue NE,<br>Number 54741<br>Atlanta, Georgia 30308<br>Germaine@Beliesol.com</td><td>/s/ *Germaine Austin*<br><br>_____<br>Germaine Austin<br>Georgia Bar No. 813810<br>*Counsel for Plaintiff*</td></tr>
</table>

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **CRAIG ALEXANDER,** | **CIVIL ACTION** |
| | **FILE NO.: 21A03275** |
| **Plaintiff** | |
| **v.** | |
| | **JURY TRIAL DEMANDED** |
| **DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10,** | |
| **Defendants** | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANT DELTA AIR LINES, INC'S SECOND REQUESTS FOR ADMISSION TO PLAINTIFF CRAIG ALEXANDER** was mailed via United States Mail, postage prepaid and properly addressed, e-filed through the Court's e-file system and sent by electronic mail to the following:

David L. Balser
Lawrence A. Slovensky
James M. Brigman
Alexandra Titus
Julia C. Barrett
Charles G. Spalding, Jr.
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521

This 2$^{1st}$ day of October 2023.

/S/Germaine Austin
GERMAINE AUSTIN

# EXHIBIT K

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **CRAIG ALEXANDER,** | **CIVIL ACTION**<br>**FILE NO.: 21A03275** |
| **Plaintiff** | |
| **v.** | |
| **DELTA AIR LINES, INC.; EDWARD**<br>**BASTIAN; RAHUL SAMANT;**<br>**MATTHEW MUTA, DARRELL**<br>**HASKIN; DAVID SMITH; DAVID**<br>**BURTON; CORPORATE DOES 1 TO**<br>**5; and JOHN DOES 1 TO 10,** | **JURY TRIAL DEMANDED** |
| **Defendants** | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO**
**DEFENDANT DELTA AIR LINES, INC'S THIRD REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO PLAINTIFF CRAIG ALEXANDER**

COMES NOW Craig Alexander, Plaintiff in the above-captioned action, and pursuant to

O.C.G.A. §§ 9-11-26 and 9-11-34, hereby responds to Defendant Delta Airlines, Inc's Third

Requests For Production of Documents to Plaintiff Craig Alexander as follows:

**GENERAL OBJECTIONS**

1.

Plaintiff objects to every request to produce to the extent it requires Plaintiff to respond by

disclosing his attorney's or any other representatives' mental impressions, conclusions, opinions,

computations, calculations, projections, reasons, legal theories, other work-product, or the like, on

the ground that said request exceeds the permissible scope of discovery under Rule 26 of the

Georgia Civil Practice Act.

2.

Plaintiff objects to each and every request to produce to the extent that it seeks information regarding materials prepared by or for Plaintiff or his representatives in anticipation of litigation or for trial on the grounds that Defendant has not made the required showing for the discovery of such work-product material under Rule 26 of the Georgia Civil Practice Act.

3.

Plaintiff objects to each and every request to produce to the extent it, whether standing alone or taken in conjunction with any and all other requests, is calculated, or would operate, to annoy, embarrass, oppress, unduly burden or unduly cause expense to Plaintiff, or would be unduly vexatious or burdensome to respond to, on the ground that said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act.

4.

Plaintiff objects to each and every request to produce to the extent it requires Plaintiff to respond by acquiring or providing information that is not relevant to the claims or defenses of a party to this action or is not reasonably calculated to lead to the discovery of admissible evidence, on the ground that said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act.

5.

Plaintiff objects to each and every request to produce to the extent that it seeks information regarding communications between Plaintiff and his legal counsel on the grounds that such communications are privileged and not subject to discovery under Rule 26 of the Georgia Civil Practice Act.

6.

Plaintiff objects to each and every request to produce to the extent it seeks information not contained in documents, if any, in Plaintiff's possession and instead seeks to require Plaintiff to create or compile new documents.

7.

Insofar as any of Defendant's requests to produce seek information to which the foregoing General Objections apply, specification or failure to note particular General Objections shall not constitute a waiver of those or other General Objections with respect to any request.

## PRELIMINARY STATEMENT

The following responses are based upon information presently available to Plaintiff of which this Plaintiff believes to be correct. Said responses are made without prejudice to Plaintiff's right to utilize subsequently discovered facts.

No incidental or implied admission of fact by Plaintiff is made by the responses below. The only admissions are express admissions. The fact that Plaintiff has produced any documents herein may not properly be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by such production of documents, or that such response constitutes admissible evidence. The fact that Plaintiff has answered part or all of any request to produce is not intended to, and shall not be, construed to be a waiver by this Plaintiff of all or any part of any objection of this Plaintiff to the admissibility of same at trial, or the relevance of the response.

Responses to these requests to produce may be supplemented upon Plaintiff's further investigation and acquisition of information which this Plaintiff does not either possess or recall at this time. However, any such further supplementation shall be made only in accordance with

the Georgia Civil Practice Act.

This Preliminary Statement is incorporated in each of the responses set forth below. Notwithstanding any of the "definitions" or preliminary instructions contained within Defendant's requests to produce, Plaintiff will only provide responses which are required pursuant to the Georgia Civil Practice Act.

Any inadvertent production of privileged documents/information shall not be deemed a waiver of the privilege. Unless otherwise specified the term "Defendant" as used below shall refer to Delta Air Lines, Inc.; Edward Bastian; Rahul Samant; Mathew Muta, Darrell Haskin; David Smith; David Burton; Corporate Does 1 to 5; and John Does 1 to 10.

## SPECIFIC RESPONSES

Subject to the foregoing General Objections, which are incorporated as if set forth in each of the following responses, Plaintiff responds to Defendant Delta Airlines, Inc's Third Requests For Production of Documents to Plaintiff Craig Alexander as follows:

## DEFENDANT'S REQUESTS FOR PRODUCTION

**REQUEST NO. 56:**

The correspondence dated June 26, 2023, referenced in the Motion to Withdraw as Counsel of Record for Plaintiff attached hereto as Exhibit A.

**RESPONSE:**

Plaintiff objects to this Request because it is confusing as the purported request seeks an admission an admission.  Plaintiff also objects to this Request to the extent that it seeks the disclosure of information prepared or obtained in anticipation of litigation or trial as such information constitutes protected work product and attorney-client privilege. Additionally, Plaintiff objects to this request for production because it seeks privileged information regarding

- 4 -

materials prepared by Plaintiff's Former Counsel for Plaintiff in anticipation of litigation or for trial on the grounds that Defendant has not made the required showing for the discovery of such work-product material under Rule 26 of the Georgia Civil Practice Act. Subject to and without waiving the foregoing objections, Plaintiff states that there was no Exhibit A attached. Plaintiff has reason to believe that Defendant is referring to the notice of intention to withdrawal Plaintiff's former counsel sent Plaintiff advising Plaintiff of his intention to withdraw and how to move forward with the litigation. Plaintiff directs Defendant to the privilege log attached hereto as Exhibit A.

**REQUEST NO. 57:**

Any and all Documents reflecting the transmission and/or summation of any document that was produced by Delta and designated as "Highly Confidential" to You.

**RESPONSE:**

Plaintiff does not have any documents responsive to this request for production.

**REQUEST NO. 58:**

Any and all Documents reflecting the transmission and/or summation of a document that was produced by Delta and designated as "Confidential" or "Highly Confidential" from You or Former Counsel to a third party.

**RESPONSE:**

Plaintiff objects to this request to produce because it requires Plaintiff to respond by disclosing his attorney's or any other representatives' mental impressions, conclusions, opinions, computations, calculations, projections, reasons, legal theories, other work-product, or the like, on the ground that said request exceeds the permissible scope of discovery under Rule 26 of the

Georgia Civil Practice Act. Subject to and without waiving the forgoing objection, Plaintiff states that he does not have documents responsive to this request for production.

**REQUEST NO. 59**:

Any and all Documents or Communications relating to Your March 24, 2023, phone call with Sonja Williams, including but not limited to, any notes taken by You or Former Counsel regarding the call or any communications exchanged between You, Former Counsel, and/or Sonja Williams.

**RESPONSE:**

Plaintiff objects to this request to produce because it requires Plaintiff to respond by disclosing his attorney's or any other representatives' mental impressions, conclusions, opinions, computations, calculations, projections, reasons, legal theories, other work-product, or the like, on the ground that said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act. Subject to, and without waiving the foregoing objections, Plaintiff states that does not have documents responsive to this request for production.

**REQUEST NO. 60**:

Any and all Documents or Communications relating to Former Counsel's March 24, 2023, phone call with Sonja Williams, including but not limited to, any notes taken by You or Former Counsel regarding the call or any communications exchanged between You, Former Counsel, and/or Sonja Williams.

**RESPONSE:**

Plaintiff objects to this request to produce because it requires Plaintiff to respond by disclosing his attorney's or any other representatives' mental impressions, conclusions, opinions, computations, calculations, projections, reasons, legal theories, other work-product, or the like, on

the ground that said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act. Plaintiff also objects to this request for production because it seeks privileged information regarding materials prepared by Plaintiff's Former Counsel for Plaintiff in anticipation of litigation or for trial on the grounds that Defendant has not made the required showing for the discovery of such work-product material under Rule 26 of the Georgia Civil Practice Act. Subject to and without waiving the foregoing objections, Plaintiff states that he does not have documents responsive to this request for production.

**REQUEST NO. 61**:

Any and all Documents or Communications relating to Keenan Nix's March 30, 2023, lunch meeting with Sonja Williams, including but not limited to, any notes taken by You or Former Counsel regarding the meeting or any communications exchanged between You, Former Counsel, and/or Sonja Williams.

**RESPONSE:**

Plaintiff objects to this request to produce because it requires Plaintiff to respond by disclosing his attorney's or any other representatives' mental impressions, conclusions, opinions, computations, calculations, projections, reasons, legal theories, other work-product, or the like, on the ground that said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act. Plaintiff also objects to this request for production because it seeks privileged information regarding materials prepared by Plaintiff's Former Counsel for Plaintiff in anticipation of litigation or for trial on the grounds that Defendant has not made the required showing for the discovery of such work-product material under Rule 26 of the Georgia Civil Practice Act. Subject to and without waiving the foregoing objections, Plaintiff states that he does not have documents responsive to this request for production.

**REQUEST NO. 62**:

Any and all Documents reflecting or relating to Communications between You and Sonja Williams relating to this lawsuit.

**RESPONSE:**

Plaintiff objects to this Request because it is overly broad and unduly burdensome. Subject to and without waiving the foregoing objection, Plaintiff does not have any documents relevant to this request for production.

**REQUEST NO. 63:**

Any and all Documents reflecting or relating to Communications between Former Counsel and Sonja Williams relating to this lawsuit.

**RESPONSE:**

Plaintiff objects to this request to produce because it requires Plaintiff to respond by disclosing his attorney's or any other representatives' mental impressions, conclusions, opinions, computations, calculations, projections, reasons, legal theories, other work-product, or the like, on the ground that said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act. Plaintiff also objects to this request for production because it seeks privileged information regarding materials prepared by Plaintiff's Former Counsel for Plaintiff in anticipation of litigation or for trial on the grounds that Defendant has not made the required showing for the discovery of such work-product material under Rule 26 of the Georgia Civil Practice Act. Subject to and without waiving the foregoing objections, Plaintiff states that he does not have documents responsive to this request for production.

**REQUEST NO. 64**

Any and all Documents reflecting or relating to Communications between You and any

- 8 -

third party relating to this lawsuit including, but not limited to, Joseph Mayfield, Sandra Sowers, and any current or former agent of SolTech, Inc.

**RESPONSE:**

Plaintiff objects to this Request because it is overly broad and unduly burdensome. Subject to and without waiving the foregoing objection, Plaintiff does not have any documents relevant to this request for production in his possession. Plaintiff further states that whatever documents exist that may relate to this request for production have already been produced in response to prior requests for production of documents.

<u>**REQUEST NO. 65**</u>

Any and all Documents reflecting or relating to Communications between Former Counsel and any third party relating to this lawsuit including, but not limited to, Joseph Mayfield, Sandra Sowers, and any current or former agent of SolTech, Inc.

**RESPONSE:**

Plaintiff objects to this Request because it is overly broad and unduly burdensome. Plaintiff objects to this request to produce because it requires Plaintiff to respond by disclosing his attorney's or any other representatives' mental impressions, conclusions, opinions, computations, calculations, projections, reasons, legal theories, other work-product, or the like, on the ground that said request exceeds the permissible scope of discovery under Rule 26 of the Georgia Civil Practice Act. Plaintiff also objects to this request for production because it seeks privileged information regarding materials prepared by Plaintiff's Former Counsel for Plaintiff in anticipation of litigation or for trial on the grounds that Defendant has not made the required showing for the discovery of such work-product material under Rule 26 of the Georgia Civil Practice Act. Subject

to and without waiving the foregoing objections, Plaintiff states that he does not have documents responsive to this request for production.

**REQUEST NO. 66:**

Any and all Delta Highly Confidential Documents or Delta Confidential Documents currently in Your possession.

**RESPONSE:**

Plaintiff states that he does not have documents responsive to this request for production.

This 21st of October, 2023

<table>
<tr><td></td><td>**THE ELLIS FIRM**</td></tr>
<tr><td></td><td>*/s/ Willie C. Ellis Jr.*</td></tr>
<tr><td>303 Peachtree Street, Ste. 4100<br>Atlanta, Georgia 30308<br>Telephone: (770) 212-1432<br>will@call-ellis.com</td><td>_____<br>Willie C. Ellis Jr.<br>Georgia Bar No. 246116<br>*Counsel for Plaintiff*</td></tr>
<tr><td></td><td>**BELIESOL LEGAL, LLC**</td></tr>
<tr><td>570 Piedmont Avenue NE,<br>Number 54741<br>Atlanta, Georgia 30308<br>Germaine@Beliesol.com</td><td>*/s/ Germaine Austin*<br>_____<br>Germaine Austin<br>Georgia Bar No. 813810<br>*Counsel for Plaintiff*</td></tr>
</table>

**IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA**

| | |
|---|---|
| **CRAIG ALEXANDER,** | **CIVIL ACTION FILE NO.: 21A03275** |
| **Plaintiff** | |
| **v.** | |
| | **JURY TRIAL DEMANDED** |
| **DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10,** | |
| **Defendants** | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing **PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT DELTA AIR LINES, INC'S THIRD REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF CRAIG ALEXANDER** was mailed via United States Mail, postage prepaid and properly addressed, e-filed through the Court's e-file system and sent by electronic mail to the following:

David L. Balser
Lawrence A. Slovensky
James M. Brigman
Alexandra Titus
Julia C. Barrett
Charles G. Spalding, Jr.
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521

This 21st day of October 2023.

\S\ Germaine Austin
GERMAINE AUSTIN

- 11 -

| # | Priv Number | Priv Family Number | Privileged | Record Type | Email_To | Email_From | Email_CC | Description | Email Subject | Date Master Sort |
|---|---|---|---|---|---|---|---|---|---|---|
| 324 | PRIV_0000323 | N/A | Attorney-Client;Attorney Work Product | Email/Attachments | Craig A [redline26@yahoo.com];'Craig Alexander' [craigalexander26@gmail.com] | Krystal Martinez (Litigation Paralegal) kmartinez@forthepeople.com Scott T Bushnell [sbushnell@bdhalaw.com] | Keenan Nix (Attorney) KNix@ForThePeople.com | Email sent to client, with two attachments sent by Litigation Paralegal on the behalf of and at the direction of Plaintiff's attorney, providing legal advice and trial strategy steps for and during pending litigation. | Withdrawal of Representation | N/A |

EXHIBIT A

# EXHIBITS L-P

# PLACE HOLDER FOR:

# AUDIO RECORDINGS IN SUPPORT OF ITS MOTION FOR TERMINATING SANCTIONS OR, IN THE ALTERNATIVE, TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE:                                :         **CASE NO. 19-56304**

                                     :

**SONJA NICOLE WILLIAMS**             :         **CHAPTER 7**

                                     :

      Debtor.                    :

**<u>EXHIBIT C</u>**

**IN THE STATE COURT OF DEKALB COUNTY**

**STATE OF GEORGIA**

| | | |
|---|---|---|
| **CRAIG ALEXANDER,** | * | |
| Plaintiff, | * | |
| | * | **CIVIL CASE NO. 21A03275** |
| v. | * | |
| | * | |
| **DELTA AIRLINES, INC.; ET.AL.,** | * | |
| Defendant. | * | |

**<u>ORDER FOR SANCTIONS</u>**

This matter came before this Court on February 8, 2024, to address Defendants'
Motion for Termination Sanctions based on allegations that Plaintiff attempted to tamper
with evidence. After consideration of the evidence and arguments the parties submitted
to the Court, the Court finds sanctions are appropriate in this case. The Court finds as
follows:

RELEVANT FACTS

Plaintiff filed suit against Defendants in July 2021, alleging Defendants
misappropriated trade secrets and additional related claims relating to a text-based
communication application called QrewLive. In the course of discovery, Plaintiff
identified Sonja Williams as a person with knowledge and information relating to this
matter. Based on the information submitted to the Court, Ms. Williams and Plaintiff had
a past romantic relationship and currently co-parent a minor child, S.  Additionally, Ms.
Williams participated in the creation and development of QrewLive both during and after
her romantic relationship with Plaintiff.  The parties agree that the current personal
relationship between Plaintiff and Ms. Williams is somewhat contentious. After Plaintiff
identified Ms. Williams, Defendants served requests for production of documents on Ms.
Williams.

STATE COURT OF
DEKALB COUNTY, GA.
3/8/2024 8:18 AM
E-FILED
BY: Patricia Nesbitt

At some point after Defendants served these requests on Ms. Williams, Plaintiff's former counsel, Keenan Nix, contacted Ms. Williams by phone to introduce himself. During that call, Mr. Nix asked to meet with Ms. Williams and offered to retain counsel for her to assist her with responding to the requests. Ms. Williams was polite but non-committal in response. Plaintiff himself also called Ms. Williams to request that she meet with his attorneys about the case. During that phone call, which Ms. Williams recorded, Ms. Williams brings up her contention that she owns 30% of QrewLive. In response, Plaintiff first states, "There is no 30%." Ms. Williams then tells Plaintiff that she has emails confirming she owns 30% of QrewLive. Plaintiff then responds:

> Listen, if you want to claim you own 30%, doesn't matter whether you're right or wrong. If you claim you own 30%, you are going to wind up tanking this case and nobody gets anything.... [I]f they're able to make the claim that, hey, multiple people own this property, then they're not bringing suit and this suit is null and void. It will get tossed out of court. That's the risk you are running when you say things like that. Keep that in mind. And that's why I'm encouraging you to talk to [my] attorneys before you say stuff like that. Don't listen to me, talk to [my] attorneys. **But I implore you, do not ever say anything like that to anyone. You will completely tank the case.**

(emphasis added.)  Ms. Williams then agrees to meet with Plaintiff's attorneys.[1]

After Defendants received the recording of this conversation, Defendants filed a Motion for Terminating Sanctions, alleging that Plaintiff's words to Ms. Williams were an attempt to tamper with her testimony in violation of O.C.G.A. § 16-10-93 which warrants dismissal of Plaintiff's claims.  In the alternative, Defendants request that the Court

---

[1] The Court has no knowledge (or opinion) as to whether Ms. Williams contention that she owns a share of QrewLive is accurate.

compel disclosure of the communications between Plaintiff and his former counsel regarding the conversations and meetings with Ms. Williams.[2]

LEGAL ANALYSIS

Pursuant to O.C.G.A. § 16-10-93, the attempt to influence a witness's testimony in a legal proceeding is a criminal offense. The statute reads, in relevant part:

> (a) A person who, with intent to deter a witness from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, communicates, directly or indirectly, to such witness any threat of injury or damage to the person, property, or employment of the witness or to the person, property, or employment of any relative or associate of the witness or who offers or delivers any benefit, reward, or consideration to such witness or to a relative or associate of the witness shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.

Plaintiff's statements to Ms. Williams represent a plain attempt to interfere with Ms. Williams's testimony by asking her to conceal information from the case regarding her claimed ownership of QrewLive.[3]   Plaintiff's statements to Ms. Williams indicate an "intent to deter a witness from testifying freely, fully, and truthfully" in this case. Moreover, Plaintiff's comment to Ms. Williams that "**nobody** gets anything" served as an indirect communication that either she would suffer pecuniary loss if she mentioned her

---

[2] After hearing Ms. Williams's recordings, Plaintiff's original counsel withdrew from representing him in this matter.

[3] Plaintiff's counsel argued at the hearing on this matter that this interpretation of Plaintiff's words is incorrect and that he was, in fact, telling Ms. Williams that her claim of 30% ownership was a lie and warning her that this falsehood would harm the case. First, Plaintiff's counsel's contention regarding Plaintiff's intent has no evidentiary basis. The Court received no sworn testimony from Plaintiff affirming this different interpretation of his words. Second, the Court does not find Plaintiff's words are consistent with this contention.

ownership share or that there would be a monetary benefit or reward to Ms. Williams if she testifies as Plaintiff requests.

The Court has the power "to control, in the furtherance of justice, the conduct of its officers and all other persons connected with a judicial proceeding before it, in every matter appertaining thereto." O.C.G.A. § 15-1-3(4). The Court finds it necessary to exercise this power to address Plaintiff's attempt to tamper with a material witness in this case and determine whether to sanction Plaintiff's conduct.

In determining whether to sanction a party for attempting to influence or tamper with a witness, the Georgia Court of Appeals requires the Court to consider the same factors as if sanctioning for discovery violations such as spoliation. See Wellstar Health Sys. v. Kemp, 324 Ga. App. 629 (2013). The relevant inquiry is (1) whether the party seeking sanctions was prejudiced as a result of the [bad conduct]; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the party who [tampered with] the evidence acted in good or bad faith; and (5) the potential for abuse [if the conduct is not sanctioned]. In this matter, Defendants are requesting the most extreme sanction: dismissal.

As to factors (1) and (2), it is difficult for the Court to assess the prejudice to Defendants and whether it can be cured. On one hand, Ms. Williams made Defendants aware of the conversation between Plaintiff and Defendants very shortly after it occurred, indicating Ms. Williams appears to be unlikely to agree to Plaintiff's requests to testify as he prefers. On the other, because no party had yet deposed Ms. Williams, no one can know what her testimony would have been before Plaintiff attempted to influence her testimony. As to factor (3), Ms. Williams is a material witness who seems to have been present for QrewLive's inception and worked with Plaintiff at certain times during its

development. If indeed there was an agreement between the parties regarding sharing in the ownership of the application, this could have significant impact on Plaintiff's claims. The importance of Ms. Williams testimony regarding her share of QrewLive is clear from Plaintiff imploring Ms. Williams not to reveal said testimony. As to factor (4), although Plaintiff is not an attorney and may not have the same understandings of ethical obligations and the importance of judicial integrity, the Court cannot find that his actions were unintentional or inadvertent. Thus, the Court finds Plaintiff's effort to influence Ms. Williams was made in bad faith. The Court also finds great importance in deterring this type of conduct to prevent its recurrence, which speaks to factor (5). Looking at these factors together, the Court concludes Plaintiff's actions warrant sanctions.

As the parties agree, there are no cases in Georgia that approve the dismissal of a plaintiff's claims due to witness tampering, and the Court will not impose this extreme sanction. However, based on the seriousness of the matter and the harm caused to Defendants' case, the Court will dismiss with prejudice Plaintiff's claims for attorney's fees (Count VII) and punitive damages (Count VIII).

**IT IS SO ORDERED**, this __7th__ day of __March__, 2024.

_____
Hon. Kimberly K. Anderson
State Court of DeKalb County

cc: Counsel of record; Clerk's file

STATE COURT OF
DEKALB COUNTY, GA.
3/8/2024 8:18 AM
E-FILED
BY: Patricia Nesbitt

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE:                                    :        **CASE NO. 19-56304**

                                          :

**SONJA NICOLE WILLIAMS**                 :        **CHAPTER 7**

                                          :

         Debtor.                          :

**EXHIBIT D**

**shocktheory**                                          Sonja Ross <sonja.ross@shocktheory.com>

---

## Re: Discovery Stayed/Information Requested
1 message

---

**Nnamdi Anozie** <nma@anoziellp.com>                      Fri, Oct 18, 2024 at 8:20 AM
To: Sonja Ross <sonja.ross@shocktheory.com>, Karen Grant <kwg@anoziellp.com>, "kaw@anoziellp.com"
<kaw@anoziellp.com>
Cc: Work <cmb@anoziellp.com>


Hello Sonja,


Discovery was stayed in this case in part by operation of law and in part by the Court.  First with respect to
operation of law, because Delta filed their Answer together with their Motion to Dismiss. Please see
O.C.G.A. § 9-11-12(j)(1) which is also attached here for your convenience:


(j) *Stay of discovery.*

(1) If a party files a motion to dismiss before or at the time of filing an answer and pursuant to the provisions
of this Code section, discovery shall be stayed for 90 days after the filing of such motion or until the ruling of
the court on such motion, whichever is sooner. The court shall decide the motion to dismiss within the 90
days provided in this paragraph.


Second, during the status conference on 8/15 the Court verbally stayed discovery during the pendency of
the motions and her rulings.   There was no Order issued by the Court.


Please let me know if you have additional questions.


---

**From:** Sonja Ross <sonja.ross@shocktheory.com>
**Date:** Friday, October 18, 2024 at 6:01 AM
**To:** Nnamdi Anozie <nma@anoziellp.com>, Karen Grant <kwg@anoziellp.com>, kaw@anoziellp.com
<kaw@anoziellp.com>
**Subject:** Discovery Stayed/Information Requested

Good Morning,


I believe I was told discovery was stayed. Can you please send me a copy of the order? Or provide additional details.


Thanks,


Sonja Ross

9-11-12 Defenses and objections--when and how presented[21].pdf
124K

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE:                                    :        **CASE NO. 19-56304**

                                          :

**SONJA NICOLE WILLIAMS**                 :        **CHAPTER 7**

                                          :

      Debtor.                          :

**<u>EXHIBIT E</u>**

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **SONJA ROSS,**<br><br>　　　　　**Plaintiff/Intervenor,**<br><br>**v.**<br><br>**CRAIG ALEXANDER,**<br><br>　　　　　**Plaintiff,**<br>**and**<br><br>**DELTA AIR LINES, INC.;**<br>**EDWARD BASTIAN; RAHUL**<br>**SAMANT; MATTHEW MUTA,**<br>**DARRELL HASKIN; DAVID**<br>**SMITH; DAVID BURTON;**<br>**CORPORATE DOES 1 TO 5; and**<br>**JOHN DOES 1 TO 10, MABA**<br>**HOLDINGS, LLC, KEENAN NIX,**<br>**DARREN SUMMERVILLE,**<br>**MORGAN AND MORGAN, P.A.,**<br>**MICHAEL RAFI AND SHEILA**<br>**ALEXANDER,**<br><br>　　　　　**Defendants** | **CIVIL ACTION**<br>**FILE NO.: 21A03275**<br><br><br>**JURY TRIAL DEMANDED** |

## DELTA DEFENDANTS' OPPOSITION TO INTERVENOR'S MOTION TO STAY

Defendants Delta Air Lines, Inc. ("Delta"), Edward Bastian, Rahul Samant, Matthew Muta, Darrell Haskin, David Smith, and David Burton (the "Individual Defendants" and with Delta, the "Delta Defendants") hereby oppose Intervenor Sonja Ross's ("Intervenor") Motion to Stay the Case pending the resolution of the Motion to Reopen Bankruptcy Case filed in *In re Sonja Nicole Williams,* No. 19-56304 (N.D. Ga. Bankr. Nov. 6, 2024) (Dkt. 217).

## INTRODUCTION

Plaintiff Craig Alexander ("Plaintiff") filed this lawsuit against the Delta Defendants more than three years ago. Since July 2023, the case has been waylaid by improper conduct by Plaintiff and Plaintiff's former counsel. That improper conduct, in turn, triggered an effort by Intervenor to intervene in this case to assert claims against Plaintiff, Plaintiff's former lawyers, the Delta Defendants, Plaintiff's wife, and Intervenor's own former lawyer, coupled with a representation that her intervention "would not delay or prejudice the adjudication of the rights of the parties in this action." But Intervenor—represented by her third round of counsel—now seeks the exact kind of delay she represented her intervention would not cause. She asks to stay the case pending the resolution of a motion to reopen her bankruptcy case in the United States Bankruptcy Court for the Northern District of Georgia, a reopening request that presumably was triggered by her own failure to properly list assets in her bankruptcy. The Court should not condone Intervenor's dilatory conduct and should deny the Motion to Stay.

The motion to reopen Intervenor's bankruptcy case has no bearing on Intervenor's claims against the Delta Defendants. Nor will a grant of that motion cure the fatal legal defects in her claims against the Delta Defendants. In fact, the Court has already dismissed her Original Complaint against the Delta Defendants **with prejudice**. *See generally* Nov. 19, 2024 Order on Delta Defs' Mot. to Dismiss Intervenor's Compl. (the "MTD Order"). Whether Intervenor pursues what is left of her claims in this litigation, or the bankruptcy trustee stands in her shoes to pursue them, does not impact their validity. As such, a stay pending the resolution of the motion to reopen is not warranted, and Intervenor's Motion should be denied.

## BACKGROUND

On April 12, 2024, almost three years after Plaintiff filed this action, and six years after Delta announced Flight Family Communication ("FFC"), Intervenor filed her Motion to Intervene.

In her Motion to Intervene, she represented that her intervention would "not delay or prejudice the adjudication of the rights of the parties in this action." Mot. to Intervene at 11. The Delta Defendants did not oppose her intervention, but expressly noted that Intervenor "should not be permitted to cause any further delay in the schedule in this case." Delta Defs' May 14, 2024 Res. to Mot. to Intervene at 3. The Court granted Intervenor's Motion to Intervene on June 24, 2024.

She then filed her Original Complaint on June 25, 2024. Despite the fact that the Delta Defendants never met or corresponded with Intervenor, or even knew who she was, prior to this litigation, Intervenor asserted claims against the Delta Defendants for (1) misappropriation of trade secrets under the Georgia Trade Secrets Act ("GTSA") (Count II); (2) theft and conversion (Count V); (3) civil conspiracy to commit theft and conversion (Count VI); (4) breach of the non-disclosure agreement (Count VII); (5) exemplary damages under the GTSA (Count X); (6) punitive damages under O.C.G.A. § 51-12-5.1 (Count XI); and attorneys' fees under the GTSA (Count XII).

On July 25, 2024, the Delta Defendants filed their Motion to Dismiss Intervenor's Original Complaint. The Court heard argument on that motion on October 3, 2024, and informed the Parties that it would dismiss Intervenor's Original Complaint. The Court asked the Delta Defendants to submit a proposed order dismissing Intervenor's claims as to the Delta Defendants, which they did on October 14, 2024. On November 12, 2024—after the Court orally announced its intention to dismiss the Original Complaint as to the Delta Defendants—Intervenor filed an Amended Complaint. The Amended Complaint does not allege any new facts, but instead simply asserts two new legal claims against the Delta Defendants: (1) Equity—Quantum Meruit—Quantum Valebat (Count XII) and (2) Breach of Contract Damages as Third-Party or Intended Beneficiary (Count XII). On November 19, 2024, the Court entered the MTD Order dismissing **with prejudice** Intervenor's Original Complaint as to the Delta Defendants. As explained in the Delta Defendants'

3

separately-filed Motion for Clarification of November 19, 2024 Order, the reasoning in the MTD

Order applies to Intervenor's new claims such that they should also be dismissed.

On November 1, 2024—just days before the November 7 hearing on the other defendants'

motions to dismiss—Intervenor apparently terminated her second set of lawyers. On November 6,

2024, Intervenor's bankruptcy trustee, Mary Ida Townson ("Trustee"), filed a Motion to Reopen

Bankruptcy Case based on Intervenor's claims against the defendants in this case. On November

8, 2024, Intervenor's newest counsel filed a notice of appearance. And on November 14, 2024,

Intervenor filed the instant Motion, seeking to stay the case pending the resolution of the motion

to reopen Intervenor's bankruptcy case.

## ARGUMENT AND CITATION TO AUTHORITY

### I.    The Bankruptcy Court's Determination Will Not Cure the Legal Defects in Intervenor's Claims.

As the Court has already determined, Intervenor's claims in her Original Complaint against

the Delta Defendants fail as a matter of law. These legal defects cannot be cured by the bankruptcy

court's ruling on the motion to reopen or by the Trustee's involvement in the case. As the

representative of the estate, the Trustee "succeeds into the rights of the debtor-in-bankruptcy" and

"stands in the shoes of the debtor[.]" *Official Comm. of Unsecured Creditors of PSA, Inc. v.

Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006); *Nisselson v. Lernout*, 469 F.3d 143, 153 (1st Cir.

2006) ("[A] trustee in bankruptcy cannot and does not acquire rights or interests superior to, or

greater than, those possessed by the debtor."); *In re Mediators, Inc.*, 105 F.3d 822, 825 (2d Cir.

1997) (explaining trustee stands in the shoes of the debtor). But the Trustee does not acquire rights

and interests greater than what the debtor possessed at the commencement of the bankruptcy.

*Edwards*, 437 F.3d at 1150; *see also Nisselson*, 469 F.3d at 153; *In re Mediators*, 105 F.3d at 825.

To the contrary, the involvement of the Trustee as the party pursuing Intervenor's claims (if that is

the result of Trustee's motion to reopen Intervenor's bankruptcy) will not provide the Trustee with any substantive rights or claims that Intervenor herself does not have. For the reasons stated in the MTD Order, Intervenor's claims against the Delta Defendants—including her claims in the Amended Complaint—fail as a matter of law. The bankruptcy court's ruling on the motion to reopen and the Trustee's potential involvement in the case cannot alter the substantive lack of merit of those claims.

Intervenor contends that a stay is necessary to ensure the case "proceed[s] with clarity regarding the real party in interest and avoids the possibility of duplicative or conflicting proceedings." Mot. at 3. Intervenor does not explain how the proceedings may "conflict," and Intervenor's unsupported argument does not justify a stay. Intervenor's musings that the bankruptcy court's ruling "may also have direct impact on any statute of limitations or standings defenses" are similarly unsupported. *Id.* These arguments are insufficient grounds to warrant a stay of this lawsuit. Indeed, the case on which Intervenor relies, *Matter of Lemco Gypsum, Inc.*, 910 F.2d 784 (11th Cir. 1990), does not support her position. That case addresses a jurisdictional question unrelated to standing or the statute of limitations. *See id.* at 789.

Intervenor's Motion serves no other purpose but to delay and prejudice the Delta Defendants who are prepared to move forward with discovery in this case that has been pending for over three years. As the Court has already determined, Intervenor's claims against the Delta Defendants suffer legal defects requiring dismissal ***with prejudice***. And assuming the bankruptcy court grants the motion to reopen, it presumably would be in the interest of the Trustee and creditors that this litigation proceeds expeditiously. A stay only further delays the resolution of this case and is not in the interest of judicial economy where, as here, a grant of the motion to reopen has no impact on Intervenor's claims against the Delta Defendants.

**II.      The Court Should Not Permit Intervenor to Further Delay the Case.**

Intervenor represented in her Motion to Intervene that her intervention would "not delay or prejudice the adjudication of the rights of the parties in this action." Mot. to Intervene at 11. Yet Intervenor has repeatedly delayed this case by terminating her lawyers, continuing the hearing on the other defendants' motions to dismiss, filing an Amended Complaint, and seeking a stay of proceedings based on a motion to reopen that has no bearing on her claims. Intervenor's Motion to Stay risks delaying this case by many more months, as the Parties wait on the bankruptcy court to rule on the motion to reopen, the Trustee moves to intervene in the case, and the Court finally has the opportunity to rule on the other defendants' motions to dismiss. The Court should not countenance this delay tactic and should deny the Motion.

<u>**CONCLUSION**</u>

For the reasons stated herein, the Court should deny Intervenor's Motion to Stay.

Respectfully submitted this 21st day of November 2024.

*/s/ David L. Balser*
David L. Balser
Georgia Bar No. 035835
Lawrence A. Slovensky
Georgia Bar No. 653005
James M. Brigman
Georgia Bar No. 254905
Charles G. Spalding, Jr.
Georgia Bar No. 411926
**KING & SPALDING, LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
Telephone: 404-572-4600
Fax: 404-572-5100
dbalser@kslaw.com
lslovensky@kslaw.com
mbrigman@kslaw.com
cspading@kslaw.com

6

STATE COURT OF
DEKALB COUNTY, GA.
11/21/2024 11:17 AM
E-FILED
BY: Patricia Nesbitt

Julia B. Bates
Georgia Bar No. 354322
**KING & SPALDING LLP**
500 W. Second Street, Suite 1800
Austin, Texas 78701
Telephone: 512-457-2053
Fax: 512-457-2100
jbates@kslaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via the Court's e-filing service, which will automatically email a copy of the foregoing to all counsel of record.


*/s/ David L. Balser*
David L. Balser
Georgia Bar No. 035835

STATE COURT OF
DEKALB COUNTY, GA.
11/21/2024 11:17 AM
E-FILED
BY: Patricia Nesbitt

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | : | **CASE NO. 19-56304** |
| | : | |
| **SONJA NICOLE WILLIAMS** | : | **CHAPTER 7** |
| | : | |
| **Debtor.** | : | |

**<u>EXHIBIT F</u>**

# Exhibit A

## MUTUAL CONFIDENTIALITY AGREEMENT

This Mutual Confidentiality Agreement (this "Agreement") is made and entered into by and between MABA Holdings ("Company"), with a principal place of business at 19 Summerlin Dr, LaPlace, La. 70068, and Delta Air Lines, Inc. ("Delta"), with a principal place of business at 1030 Delta Boulevard, Atlanta, GA 30354-1989, and is effective as of August 22, 2016 (the "Effective Date"). For the purposes of this Agreement, as the context requires, Company and Delta will be referred to as a "disclosing party" or a "receiving party."

In consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Definitions**.  As used herein, the following terms shall have the following meanings:

(a)    "Project" shall mean Qrewlive Communications.

(b)    "Affiliates" shall mean any individual, corporation, partnership, association, or business that directly or indirectly through intermediaries, controls, is controlled by or is under common control with a party. "Control" shall exist whenever there is an ownership, profits, voting, or similar interest (including any right or option to obtain such an interest) representing at least 50% of the total interests of the pertinent entity then outstanding.

(c)    "Confidential Information" shall mean all non-public information (whether in writing or retained as mental impressions) concerning Company, Delta, Delta Connection Carriers®, Delta code share partners and their respective Affiliates, which has been disclosed to the receiving party or the Affiliates of the receiving party by or on behalf of the disclosing party or the disclosing party's Affiliates, directly or indirectly, in writing, orally, or by the receiving party's visual inspection or mental impression. Confidential Information does not include information that: (i) the receiving party can show was previously known to it as a matter of record at the time of receipt; (ii) is lawfully obtained by the receiving party from a Person who lawfully obtained the information free of any obligation of confidentiality; (iii) is or that becomes generally available to the public, through no action or fault of the receiving party; or (iv) has been or is independently developed by the receiving party or any other person as a matter of record, without reliance on the information provided by the disclosing party.

(d)    "Permitted Systems" shall mean computer systems and files of Delta and its Affiliates that Delta expressly authorizes Company to access, use, or modify.

(e)    "Person" shall mean any firm, corporation, group, organization, subsidiary, joint venture, partnership, trust, association, governmental authority, regulatory agency, natural person or legal entity.

(f)    "Personally Identifying Information" or "PII" shall mean any information regarding identifiable individuals, including without limitation, data regarding the disclosing party's Personnel collected by or on behalf of the disclosing party or its Affiliates.

(g)    "Personnel" shall mean employees, officers, directors, independent contractors, agents and authorized representatives of a Person.

(h)    "Trade Secrets" shall mean information (whether in writing or retained as a mental impression) including, but not limited to, technical or non-technical data, a design, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, software code, documentation, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2.    **Term**.  The term of this Agreement shall begin on the Effective Date and end twenty-four (24) months thereafter.  The confidentiality obligation with respect to Confidential Information received by either party shall remain in effect until three (3) years from the termination or expiration of this Agreement.  The confidentiality

Rev. 03.14.14



obligation with respect to Confidential Information consisting of PII shall remain in effect in perpetuity; provided, however, that if governing law requires a reasonable limit upon the duration of such obligation for such obligation to be enforceable, the parties agree that a duration of seven (7) years from the later of the date of this Agreement or the date of receipt of the PII shall be deemed reasonable. The confidentiality obligation with respect to Confidential Information consisting of Trade Secrets received by either party shall remain in effect for as long as governing law allows.

3.    **Rights in Confidential Information.** Each receiving party acknowledges that Confidential Information is and shall remain the sole and exclusive property of the disclosing party. No rights or licenses under copyright, patent or trademark of either party are hereby granted or implied by either a confidential or non-confidential disclosure, except either party may make a reasonable number of copies of documents in order to carry out the Project. Nothing in this Agreement or in any discussions undertaken or disclosures made pursuant to this Agreement shall: (a) be deemed as a commitment to engage in any business relationship, contract, or future dealings between the parties; or (b) limit either parties' right to enter into similar discussions or activities similar to that undertaken pursuant to this Agreement, so long as such discussions or activities do not violate this Agreement.

4.    **Non-Disclosure, Access to and Use of Confidential Information.** Each party will protect the other party's Confidential Information from disclosure to Persons not authorized to receive it, as provided in this Agreement, with at least that degree of care used to protect the receiving party's own Confidential Information, but in any event with not less than reasonable care. Each receiving party shall not use, exploit, or reproduce such Confidential Information for its own or any other purpose except as reasonably necessary for the performance of the Project and as permitted by this Agreement. Each receiving party shall not provide or make available any of the disclosing party's Confidential Information in any form to any Person other than those Personnel of the receiving party or its Affiliates who have a need to know consistent with the Project and who are under a written obligation of confidentiality governing the Confidential Information at least as restrictive as the terms of this Agreement. In the event a receiving party desires to disclose Confidential Information to other Persons, it shall first obtain the written consent of the disclosing party, which consent shall not be unreasonably withheld, and shall obtain from that Person a fully executed confidentiality agreement reasonably acceptable to the disclosing party.

5.    **Personally Identifying Information.** In addition to the other obligations in this Agreement, Company shall abide by the provisions of this Section 5 concerning PII. For the purposes of these provisions: the terms "process," "processing" or "processed" in relation to PII include, without limitation, collection, recording, organization, storage, amendment, retrieval, consultation, manipulation, and erasure.

        (a)        General: Delta has entrusted Company with PII. Company agrees to use reasonable measures to prevent the unauthorized processing, capture, transmission and use of PII which Delta may disclose to Company during the course of Delta's relationship with Company.

        (b)        Processing and Use of PII: Company shall process and use PII solely in accordance with the provisions of this Agreement. Company shall process and not use PII for any purpose other than the Project without Delta's express prior written consent. At any time, Delta may make inquiries to Company about PII transferred by Delta and stored by Company, and Company agrees to provide to Delta copies of such PII as maintained by Company within a reasonable time and to perform corrections or deletions of, or additions to, PII as reasonably requested by Delta.

        (c)        Inspection Rights: Delta shall have the right upon reasonable prior notice to verify Company's compliance with the terms and conditions of this Agreement, or to appoint a third party under covenants of confidentiality to verify the same on Delta's behalf. Company shall grant Delta's agents escorted access to the extent necessary to accomplish the inspection and review of all data processing facilities, data files and other documentation used by Company for processing and utilizing PII. Company agrees to provide reasonable assistance to Delta in facilitating this inspection function. These inspection rights shall survive the earlier expiration or termination of this Agreement for so long as the Company holds any item of Confidential Information or PII.

        (d)        Use of Subcontractors; Transmission of PII to Third Parties: Company may not transfer PII to any third party without Delta's prior written consent, and then only upon such third party's execution of an agreement containing covenants for the protection of PII no less stringent than those contained in this Agreement.

        (e)        Breach Notification: Company shall report security data or network security breaches to Delta in



a prompt and timely manner and assist Delta's Information Security and Privacy Office in its investigation thereof.

(f)     Data Security:  Company shall implement, at a minimum, the data security measures and observe the minimum standards for the protection of PII as set forth in this Section 5(f):

(i)     Access of Persons: Company agrees to use reasonable measures to prevent unauthorized persons from gaining access to the data processing equipment or media where PII is stored or processed.  Company agrees to provide its employees and agents access to PII on a need-to-know basis only and agrees to cause any persons having authorized access to such information to be bound by obligations of confidentiality, non-use and non-disclosure no less stringent than those imposed upon Company by this Agreement.

(ii)    Data Media: Company agrees to use reasonable measures to prevent the unauthorized reading, copying alteration or removal of the data media used by Company and containing PII.

(iii)   Data Retention: Company shall not retain PII any longer than is reasonably necessary to accomplish the intended purposes for which PII was transferred as set forth in this Agreement.  Upon the earlier termination of this Agreement or the written request of Delta, Company shall delete and/or destroy all PII in Company's possession, including any copies thereof, and shall deliver a written statement to Delta within 15 days of Delta's request confirming that Company has done so.

(iv)    Data Memory: Company agrees to use reasonable measures to prevent unauthorized data input into memory and the unauthorized reading, alteration or deletion of PII.

(v)     Personnel: Upon request, Company shall provide Delta with a list of Company's employees and agents entrusted with processing the PII transferred by Company, together with a description of their access rights.

(vi)    Transmission: Company agrees to use reasonable measures to prevent PII from being read, copied, altered or deleted by unauthorized parties during the transmission thereof or during the transport of the data media on which PII is stored.

**6.     Remote Access.**  In the event Company accesses Delta's Confidential Information by electronic means (including, without limitation, by remote or direct connection to Delta's computer systems, intranet, databases or extranet), Company, in addition to its other obligations in this Agreement, shall comply with the provisions of this Section 6.

(a)     Access to Delta's computer systems, intranet, databases or extranet is not granted by this Agreement.  Any such access shall only be exercised by Company following Delta's separate written consent, which consent shall refer to this Agreement, and which can be revoked by Delta at any time without cause.

(b)     Company shall only access, use, or modify the Permitted Systems, notwithstanding that other Confidential Information and related computer systems and files may be accessible to Company.

(c)     Company shall not permit or allow any unauthorized person or third party to access, use, or modify the Permitted Systems.

(d)     Company shall, at a minimum, comply with any written guidelines from Delta related to remote or direct access; provided, however, that Company shall remain solely liable for the breach of any other obligations under this Agreement, notwithstanding Company's compliance with such guidelines.

(e)     Company shall take commercially reasonable efforts to avoid the introduction into Delta's computer systems, intranet, databases or extranet, by way of remote or direct access or otherwise, of any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," "preventative routines" or other computer software routine designed: to permit unauthorized access to or use or modification of either the Confidential Information or Delta's computer systems, intranet, databases or extranet; to disable, modify, damage or delete the Confidential Information, or any data, computer hardware or other equipment or software operated or maintained by Delta; or to perform any other such similar actions.

**7.     Return of Confidential Information.**  Following the conclusion of the Project, each disclosing party's tangible Confidential Information shall be promptly returned by the receiving party to the disclosing party, and each receiving party will destroy any working papers, notes, copies, extracts, or other reproductions containing any part

Rev. 03.14.14                                    5



of the disclosing party's Confidential Information. Upon request of the disclosing party, the receiving party shall deliver to the disclosing party a signed certification that all such working papers, notes, copies, extracts, or other reproductions have been destroyed; provided, however, nothing in this Agreement shall require the destruction of the other party's business records derived from the use of the disclosing party's Confidential Information to the extent such records are produced and maintained for administrative or archival purposes and are treated as Confidential Information under this Agreement.

**8.      Remedies**. Each party advises the other that the disclosure of any of its Confidential Information may give rise to irreparable injury inadequately compensable in damages. Accordingly, when and as supported by the facts, the injured party may seek to obtain injunctive relief to prevent the unauthorized use or disclosure, whether existing, imminent or threatened, of its Confidential Information, in addition to any other remedies which may be available to it. All remedies shall be cumulative and all such remedies may be exercised from time to time and as often and in such order as the injured party deems expedient.

**9.      Disclosure Pursuant to Legal Process**. Notwithstanding any provision to the contrary, the receiving party shall be allowed to release Confidential Information if compelled to do so by a court of competent jurisdiction, subject to the conditions that the receiving party: (i) takes reasonable steps to preserve the confidentiality of Confidential Information, including without limitation requesting that the Confidential Information not be released to third parties or the public; (ii) gives the disclosing party prompt notice of the legal process and gives the disclosing party the opportunity to seek an appropriate protective order or to pursue such other legal action necessary to preserve the confidentiality of the Confidential Information; and (iii) provides reasonable assistance to and cooperates with the disclosing party in its efforts to preserve the confidentiality of the Confidential Information.

**10.     Disclaimer of Warranties**. Each party understands and agrees that it is receiving Confidential Information and that Company is accessing the Permitted Systems on an "as is" basis. NEITHER PARTY MAKES ANY WARRANTIES, EXPRESSED OR IMPLIED, CONCERNING ANY SUBJECT MATTTER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT WITH RESPECT TO THE CONFIDENTIAL INFORMATION OR ACCESS TO THE PERMITTED SYSTEMS. Delta shall not be liable for damages of any kind whatsoever, whether direct, indirect, special, consequential or exemplary, resulting from Company's use of the Permitted Systems.

**11.     Notices**. Any notice, demand or document which either party is required or desires to give or deliver to or make upon the other party shall be in writing and shall be (a) personally delivered or (b) delivered by depositing in the United States Mail, registered or certified, return receipt requested, with postage prepaid, addressed as follows:

If to Company:    MABA Holdings LLC
                  19 Summerlin Dr.
                  LaPlace, La. 70068
                  ATTN: Craig A. Alexander

If to Delta:      Delta Air Lines, Inc.
                  Department
                  1030 Delta Boulevard
                  Atlanta, GA  30320
                  ATTN:

                  with copy to General Counsel

or to such other address as the respective parties hereto shall designate by notice similarly given to the other party. Any such notice, demand or document shall be deemed to be effective upon receipt by the party to whom notice, demand or document is addressed.

**12.     Miscellaneous.** This Agreement shall be binding upon the parties and their successors and permitted assigns. Neither party may assign all or any portion of this Agreement or any rights or obligations hereunder without the prior written consent of the other party and any such attempted assignment shall be void. This

C   I A.

Agreement shall be governed by the laws of the state of Georgia, USA, without giving effect to its conflicts of law rules. No party's waiver of any breach shall extend to or waive any other breach or impair any rights, powers or remedies. In the event that any one or more of the provisions of this Agreement shall be determined to be invalid, unenforceable or illegal, such invalidity, unenforceability, or illegality shall not affect any other provisions of this Agreement, and the Agreement shall be construed as if such invalid, unenforceable, or illegal provision had never been contained in this Agreement. The captions and titles herein are for convenience only and are not intended to define or aid interpretation of the subject matter of the text. This Agreement may be executed in counterparts and if so executed in counterparts will be enforceable and effective upon the exchange of executed counterparts or exchange of facsimile transmissions of executed counterparts. The obligations set forth in this Agreement are in addition to, and not in lieu of, any fiduciary duties or obligations of confidentiality or nondisclosure that the parties may have to each other under the common law, laws providing for the protection of Trade Secrets, or other statutory law. This Agreement constitutes and represents the entire agreement between the parties as to its subject matter and supersedes the parties' prior written or oral agreements. Any provisions of this Agreement that by their nature should, or by their express terms do, survive termination or expiration of this Agreement, shall survive or extend beyond termination or expiration of this Agreement. This Agreement may be amended in whole or in part only in a writing signed by both parties that refers to this Agreement by name and date.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

**Delta Air Lines, Inc.**                          **MABA Holdings, LLC.**

By: _____                By: _____

Title: General Manager - IT SCM              Title: Owner / CEO

Date: 8/30/2016                               Date: 6/22/16

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE:                                    :        **CASE NO. 19-56304**

                                          :

**SONJA NICOLE WILLIAMS**                 :        **CHAPTER 7**

                                          :

      Debtor.                             :

## EXHIBIT G

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**IN RE:**                               :        **CASE NO. 19-56304**

                                                    :

**SONJA NICOLE WILLIAMS**            :        **CHAPTER 7**

                                                    :

            **Debtor.**                      :

**EXHIBIT H**

**IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA**

|                                                                                                                                                                                                                                      |                                                      |
| ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ | ---------------------------------------------------- |
| **SONJA ROSS,** <br><br>         **Plaintiff/Intervenor,** <br><br> **v.** <br><br> **CRAIG ALEXANDER,** <br><br>         **Plaintiff,** <br> **and** <br><br> **DELTA AIR LINES, INC.; EDWARD BASTIAN; RAHUL SAMANT; MATTHEW MUTA, DARRELL HASKIN; DAVID SMITH; DAVID BURTON; CORPORATE DOES 1 TO 5; and JOHN DOES 1 TO 10, MABA HOLDINGS, LLC, AND SHEILA ALEXANDER,** <br><br>         **Defendants.** | **CIVIL ACTION FILE NO.: 21A03275** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

<u>**ORDER DENYING INTERVENOR'S MOTION
TO STAY**</u>

Intervenor Sonja Ross filed a Motion to Stay the proceedings in this case based on the recent re-opening of her previously-closed Chapter 7 bankruptcy action. Plaintiff and Defendants filed briefs objecting to staying this case. The Court finds as follows:

RELEVANT PROCEDURAL FACTS

Intervenor filed a Chapter 13 bankruptcy action, Case no. 19-56304, in the Northern District of Georgia Bankruptcy Court in April 2019. In December 2019, the Court converted Intervenor's bankruptcy action to a Chapter 7 action and appointed a trustee to

- 1 -

STATE COURT OF
DEKALB COUNTY, GA.
12/19/2024 4:38 PM
E-FILED
BY: Patricia Nesbitt

assess Intervenor's assets and debts and prepare a report of his determinations to the Court. Based on the information Intervenor provided to the trustee, the trustee's report failed to include QrewLive as an asset belonging to Intervenor. In August 2021, the Bankruptcy Court granted a discharge to Intervenor, released the trustee from his obligations, and closed the bankruptcy action.

After the instant case commenced and after Intervenor filed her intervening Complaint, Plaintiff submitted records to the Court about Intervenor's previous bankruptcy case. In arguing that the Court should dismiss Intervenor's claims, Plaintiff informed this Court that Intervenor never claimed QrewLive as an asset in the sworn documents she submitted, which bars her claim that she has any ownership interest in the application. In response, Intervenor filed a motion in the Bankruptcy Court to re-open her bankruptcy action to add the application as an asset, which the Bankruptcy Court permitted, and now claims this Court must stay this case under 11 U.S.C. § 362(a) while that action is pending.

## BANKRUPTCY STAY

The U.S. Bankruptcy Code orders an automatic stay in eight different types of pending litigation. See 11 U.S.C. § 362(a)(1)-(8). The common thread in these eight types of cases is that they are all actions where claims are being brought *against* the debtor, which is consistent with the purpose of the automatic stay provision. As provided in the legislative history for the Bankruptcy Code, the automatic stay provision has two important effects. First, it freezes the debtor's estate at the time of the filing without allowing the possibility of various proceedings in different courts to affect its value. See In re Sparks, 181 B.R. 341 (N.D. Ill. 1995). Second, it gives the debtor a "breathing spell" to be relieved from pressures from its creditors. See In re Siciliano, 13 F.3d 748 (3rd Cir. 1994). Thus, the Code is drafted to automatically stay cases only involving a creditor seeking to

collect money from a debtor or enforcing a judgment or lien against a debtor.

The instant case does not fit any of the eight circumstances described in 11 U.S.C. § 362(a). This matter includes no claims against Intervenor; she only serves in the role of an Intervenor/Plaintiff, not as a defendant or debtor.[1] Neither Plaintiff nor Defendants are seeking payment of any kind from Intervenor, nor trying to enforce any monetary judgment against her. Thus, the Court finds the automatic stay provision is inapplicable and **DENIES** Intervenor's Motion to Stay.

**IT IS SO ORDERED,** this 19th day of December, 2024.

_____
Hon. Kimberly K. Anderson
State Court of DeKalb County

STATE COURT OF
DEKALB COUNTY, GA.
12/19/2024 4:38 PM
E-FILED
BY: Patricia Nesbitt

---

[1] The only exception in this case is the counterclaim from former Defendant Michael Rafi who filed claims against Intervenor for alleged unpaid legal bills. The Court must stay the proceedings relating to this single claim between Rafi and Ross pursuant to the Bankruptcy Code.

- 3 -