Filed in U.S. Bankruptcy Court
Northern District of Georgia
Vanja S. Allen, Clerk
11:22 Am
FEB - 5 2025
By: _Rathael SuH_
Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE:                                    :        **CASE NO. 19-56304**

                                          :

**SONJA WILLIAMS ROSS,**                  :        **CHAPTER 7**

                    Debtor.               :

### DEBTOR'S AMENDED MOTION FOR RECONSIDERATION AND REQUEST FOR AN EVIDENTIARY HEARING

COMES NOW, Sonja Williams Ross (the "Debtor"), by and through undersigned counsel, and respectfully submits this Amended Motion for Reconsideration pursuant to Federal Rule of Bankruptcy Procedure 9023 and Federal Rule of Civil Procedure 59(e), seeking reconsideration of the Court's Order(s) (Dkt. 277, 278) denying the Debtor's Motion to Enforce the Automatic Stay, Motion for Sanctions for Willful Violation of the Automatic Stay, and related motions.

This motion is necessary due to:

Under Federal Rule of Bankruptcy Procedure 9023 and Rule 59(e), this motion is timely filed within the permitted period for reconsideration. Even if the Court deems reconsideration beyond the 14-day period, reconsideration is still appropriate under manifest injustice and newly submitted evidence standards. Courts have consistently granted reconsideration when new evidence clarifies material legal errors or alters the legal significance of prior findings. *In re Hess, 209 B.R. 79* (6th Cir. BAP 1997) – Holding that reconsideration is warranted where newly discovered evidence changes the outcome. *In re Gress, 517 B.R. 543* (Bankr. M.D. Pa. 2014) – Establishing that manifest injustice is a proper basis for Rule 59(e) reconsideration.

1. Material Legal Errors – The Court erroneously assumed that QrewLive™ had been abandoned, despite no formal abandonment motion, no notice to creditors, and no order pursuant to 11 U.S.C. § 554(a).

    a. Moreover, the automatic stay under 11 U.S.C. § 362(a)(3) remains in effect because QrewLive™ was never formally abandoned by the Trustee, nor was it

properly administered. The Trustee's failure to act does not remove QrewLive™ from the estate, and under In re Pease, 195 B.R. 431 (Bankr. D. Neb. 1996), a trustee's inaction does not equate to abandonment. Because the case has remained open for 63 months, as confirmed by the Trustee's own notice filed on January 31, 2025, the automatic stay has continuously protected estate property. Delta's continued use and exploitation of QrewLive™ during this period constitutes a knowing and willful violation of § 362(a)(3), warranting sanctions under § 362(k).

2. Newly Submitted Evidence – The State Court's December 20, 2024, order confirmed that QrewLive™ belonged to the corporation, Skyvier, Inc., not the Debtor personally, reinforcing that QrewLive™ remains an estate asset subject to Bankruptcy Court jurisdiction under 11 U.S.C. § 541(a).

3. Manifest Injustice – The Trustee has failed to properly administer or abandon QrewLive™, leaving the asset vulnerable to unauthorized use and exploitation by Delta Air Lines, Inc. ("Delta") and Craig Alexander ("Alexander") in violation of 11 U.S.C. § 362(a)(3).

4. Judicial Missteps in State Court – The November 19, 2024, State Court order dismissing the Debtor's claims was drafted by Delta, adopted verbatim by the State Court, and not an independent judicial determination. Delta cannot now rely on its self-authored order to justify continued exploitation of QrewLive™.

Accordingly, the Debtor requests an evidentiary hearing to address the Trustee's failure to act, Delta's continued unauthorized use, and the impact of the State Court rulings on this estate asset.

## I. INTRODUCTION

This motion for reconsideration is brought under Federal Rule of Bankruptcy Procedure 9023 and Federal Rule of Civil Procedure 59(e) due to material legal errors, newly submitted evidence, and the need to prevent manifest injustice. A motion for reconsideration is appropriate where a court's ruling rests on a clear legal error or results in manifest injustice. *See In re Hess, 209 B.R. 79 (6th Cir. BAP 1997); In re Gress, 517 B.R. 543 (Bankr. M.D. Pa. 2014).*

The Bankruptcy Court's December 12, 2024, Order confirmed that QrewLive™ remains an estate asset, subject to administration under 11 U.S.C. § 541(a) and Bankruptcy Court jurisdiction under 28 U.S.C. § 1334(e). Despite this, the Court's February 3, 2025, ruling relied on an incorrect assumption that QrewLive™ had been abandoned, despite:

- The absence of a formal abandonment motion or court order, as required under 11 U.S.C. § 554(a).
- No notice to creditors, making any claimed abandonment procedurally invalid.
- The State Court's December 20, 2024, ruling explicitly confirming that QrewLive™ was owned by Skyvier, Inc., and not the Debtor personally, reinforcing that QrewLive™ remains estate property subject to this Court's exclusive jurisdiction.

This Court's reliance on the informal docket note by the Trustee as evidence of abandonment contradicts the established statutory abandonment procedures of 11 U.S.C. § 554(a) and controlling case law:

- *In re Reed, 940 F.2d 1317* (9th Cir. 1991) – Holding that a "No Asset" report does not constitute abandonment unless a formal motion is filed and proper notice is provided.
- *Catalano v. C.I.R., 279 F.3d 682* (9th Cir. 2002) – Establishing that abandonment must be explicitly stated in an order, and all interested parties must receive notice and an opportunity to object before estate property is deemed abandoned.
- *In re K.C. Mach. Tool Co., 816 F.2d 238* (6th Cir. 1987) – Emphasizing that estate property remains part of the bankruptcy estate unless properly administered or abandoned in compliance with statutory requirements.

Furthermore, Delta's and Alexander's continued unauthorized use of QrewLive™ constitutes a willful violation of the automatic stay under 11 U.S.C. § 362(a)(3) and warrants sanctions under 11 U.S.C. § 362(k). Courts have consistently ruled that unauthorized use of estate property by third parties, including non-debtor individuals like Craig Alexander, violates the automatic stay:

- *In re Krystal Cadillac Oldsmobile GMC Truck, Inc., 142 F.3d 631* (3d Cir. 1998) – Unauthorized use of estate property violates § 362(a)(3) and is sanctionable under § 362(k).
- *In re Gruntz, 202 F.3d 1074* (9th Cir. 2000) – Holding that state court rulings do not override bankruptcy protections; the automatic stay applies broadly to prevent unauthorized interference with estate assets.

Delta improperly relies on the November 19, 2024, State Court Order, which Delta itself drafted and submitted as a proposed order, later adopted verbatim by the State Court without independent judicial analysis. This order:

1. Was not the result of independent judicial findings but rather a one-sided proposal by Delta, undermining its validity.
2. Directly conflicts with the State Court's subsequent December 20, 2024, ruling, which confirmed that QrewLive™ was never personally owned by the Debtor but instead belonged to Skyvier, Inc.
3. Cannot preclude this Court's jurisdiction, as state courts lack authority over bankruptcy estate assets under 28 U.S.C. § 1334(e).

Courts have routinely rejected state court orders that were not independently adjudicated, holding that such orders lack preclusive effect in bankruptcy proceedings:

- *United States v. El Paso Natural Gas Co., 376 U.S. 651* (1964) – Courts must engage in independent fact-finding and not merely adopt a party's proposed conclusions.
- *Stern v. Marshall, 564 U.S. 462* (2011) – Establishing that bankruptcy courts have exclusive jurisdiction over estate property; state courts cannot interfere with estate administration.
- *In re Thorpe Insulation Co., 677 F.3d 869* (9th Cir. 2012) – Confirming that state court rulings affecting bankruptcy assets must be disregarded where they conflict with federal bankruptcy jurisdiction.

Given these material errors, newly submitted evidence, and manifest injustice, the Debtor seeks reconsideration of the Court's prior ruling and requests an evidentiary hearing to resolve factual and legal disputes regarding the status of QrewLive™ as an estate asset, the Trustee's failure to act, and Delta's continued violations of bankruptcy protections. An evidentiary hearing is necessary to resolve the following disputed issues:

1. Why the Trustee failed to administer or abandon QrewLive™ under 11 U.S.C. § 554.
2. The extent of Delta's unauthorized use of estate property.
3. Whether Delta's violations of the automatic stay warrant monetary sanctions.

Courts have recognized that an evidentiary hearing is required where factual disputes remain unresolved:

- *In re Bennett, 298 F.3d 1059* (9th Cir. 2002) – Holding that an evidentiary hearing is necessary when material facts regarding estate property are disputed.
- *In re Foreman, 378 B.R. 717* (Bankr. S.D. Ga. 2007) – Recognizing that when a trustee fails to act, an evidentiary hearing is required to determine whether abandonment or enforcement is necessary.

Accordingly, the Debtor respectfully requests that the Court:

1. Reconsider and vacate its prior order denying the automatic stay enforcement.
2. Confirm that QrewLive™ remains estate property under 11 U.S.C. § 541(a).
3. Declare the November 19, 2024, State Court order void ab initio.
4. Hold an evidentiary hearing to resolve outstanding factual disputes regarding the status of QrewLive™, the Trustee's failure to act, and Delta's unauthorized use of estate property.

## II. BACKGROUND AND PROCEDURAL HISTORY

1. Creation and Transfer of QrewLive™:
   - The Debtor developed QrewLive™ in 2012 as a derivative of her prior technology, Qrewlogg (created in 2009).

- o  In 2016, QrewLive™ was transferred to Skyvier, Inc., a corporate entity wholly owned by the Debtor.

2. Corporate Dissolution and Bankruptcy Filing:
   - o  Skyvier, Inc. was administratively dissolved on August 24, 2017, by the Georgia Secretary of State.
   - o  Because Skyvier, Inc. had no remaining shareholders, its assets, including QrewLive™, reverted to the Debtor under Georgia corporate law (O.C.G.A. § 14-2-1405(a)).
   - o  The Debtor filed for Chapter 7 bankruptcy on April 23, 2019. Under 11 U.S.C. § 541(a), all of her assets—including QrewLive™—became part of the bankruptcy estate.
     - i.  *In re Beaton, 211 B.R. 755* (Bankr. N.D. Ala. 1997) – Holding that a dissolved corporation's assets revert to the sole shareholder and become part of the bankruptcy estate upon the shareholder's bankruptcy filing.

3. QrewLive™ Became Estate Property by Default:
   - o  Even though QrewLive™ was not initially scheduled in the Debtor's bankruptcy filing, courts have held that all assets owned by the Debtor at the time of filing automatically become part of the estate, regardless of whether they were listed.
     - i.  *In re Yonikus, 996 F.2d 866* (7th Cir. 1993) – Holding that failure to schedule an asset does not prevent it from becoming part of the estate.
     - ii. *In re Cundiff, 227 B.R. 476* (6th Cir. BAP 1998) – Confirming that an unlisted asset remains estate property until properly abandoned.

4. No Third-Party Interest Claims in Bankruptcy:
   - o  No third party, including Craig Alexander, MABA Holdings, LLC, or Delta, has ever filed a claim in the bankruptcy case asserting an interest in QrewLive™.
   - o  Despite Craig Alexander's state court claims to QrewLive™, he failed to assert any interest in bankruptcy court, even though he and his attorney, Scott Bushnell, were served in every bankruptcy proceeding.

5. State Court Rulings on QrewLive™ Ownership and/or Interest:
   - o  On December 20, 2024, the State Court ruled that the Debtor had no standing to assert claims related to QrewLive™, stating that only Skyvier, Inc. could do so.

- This ruling supports the argument that QrewLive™ remains an estate asset, because Skyvier, Inc. was dissolved before the bankruptcy filing, meaning its assets reverted to the Debtor and became part of the estate under 11 U.S.C. § 541(a).
- *In re Steenstra, 307 B.R. 732* (1st Cir. B.A.P. 2004) – Holding that corporate assets automatically revert to the sole owner upon dissolution and become estate property upon bankruptcy.

6. Bankruptcy Court's Initial Determinations:
   - On December 12, 2024, the Bankruptcy Court reaffirmed that QrewLive™ remains an estate asset.
   - Despite this, the Court's February 3, 2025, ruling denied the Debtor's motion to enforce the automatic stay, incorrectly assuming QrewLive™ had been abandoned.

7. The Debtor's Good Faith Amendments to Schedules:
   - On January 3, 2025, the Debtor amended her schedules to explicitly list QrewLive™ and its associated trade secrets, intellectual property, and confidential information.
   - On February 4, 2025, the Debtor further amended her schedules to include Delta's drafted NDA, reinforcing QrewLive™'s protected status as an estate asset and preventing unauthorized use.

8. Failure of the Trustee to Properly Abandon QrewLive™:
   - The Chapter 7 Trustee has not formally administered, liquidated, or abandoned QrewLive™.
   - Instead, the Trustee merely placed a note on the docket, which does not satisfy the procedural requirements for abandonment under 11 U.S.C. § 554(a).
     i. *In re Dewsnup, 908 F.2d 588* (10th Cir. 1990) – Holding that a Trustee's informal expression of intent to abandon property is legally ineffective without a formal motion and notice to creditors.
     ii. *In re DeGroot, 484 B.R. 311* (6th Cir. B.A.P. 2012) – Trustee inaction does not equate to abandonment; an asset remains in the estate unless a formal abandonment order is entered.

9. Delta and Alexander's Unauthorized Use of QrewLive™ in Violation of the Automatic Stay:

   o Despite QrewLive™ remaining estate property, Delta and Alexander has continued to leverage and commercially exploit QrewLive™.

   o Delta's unauthorized use violates 11 U.S.C. § 362(a)(3) and constitutes a knowing and willful violation of the automatic stay.

       i. *In re Krystal Cadillac, 142 F.3d 631* (3d Cir. 1998) – Unauthorized use of estate property is a violation of § 362(a)(3) and is sanctionable under § 362(k).

       ii. *In re LTV Steel Co., Inc., 264 B.R. 455* (Bankr. N.D. Ohio 2001) – Even mistaken violations of the stay are subject to sanctions.

10. The November 19, 2024, State Court Order Drafted by Delta:

   o Delta drafted the November 19, 2024, proposed order dismissing the Debtor's claims with prejudice.

   o The State Court signed Delta's proposed order verbatim, without independent findings.

   o This order conflicts with the State Court's later December 20, 2024, ruling, which confirms that QrewLive™ is estate property.

   o *United States v. El Paso Natural Gas Co., 376 U.S. 651* (1964) – Holding that courts must engage in independent fact-finding and not merely adopt a party's proposed conclusions.

Furthermore, the assumption that QrewLive™ was abandoned contradicts clear legal precedent. Courts have repeatedly held that Trustee inaction does not constitute abandonment and that estate assets remain protected under 11 U.S.C. § 541(a) until formally abandoned under § 554(a). The Trustee did not file a motion for abandonment, nor was notice provided to creditors, rendering any claim of abandonment legally ineffective.

## III. LEGAL ARGUMENT

The Bankruptcy Court's February 3, 2025, ruling denying the Debtor's motions was based on material legal errors, overlooked critical facts, and failed to account for new evidence. The Court

incorrectly assumed QrewLive™ had been abandoned, despite the lack of a formal motion, notice to creditors, or an abandonment order, all of which are required under 11 U.S.C. § 554(a). Furthermore, Delta Air Lines, Inc. ("Delta") has willfully violated the automatic stay by continuing to exploit estate property, warranting reconsideration and appropriate sanctions.

## A. The Bankruptcy Court Has Exclusive Jurisdiction Over Estate Assets Under 28 U.S.C. § 1334(e)

The Bankruptcy Court, not the State Court, has exclusive jurisdiction over QrewLive™ because it remains estate property under 11 U.S.C. § 541(a). The December 20, 2024, State Court ruling confirmed that only Skyvier, Inc. had standing over QrewLive™, reinforcing that it is estate property subject to this Court's exclusive jurisdiction.

- *Celotex Corp. v. Edwards, 514 U.S. 300* (1995) – The Supreme Court held that bankruptcy courts have exclusive jurisdiction over estate assets.
- *In re Taub, 413 B.R. 81* (Bankr. E.D.N.Y. 2009) – Holding that state courts cannot interfere with the Bankruptcy Court's authority over estate property.
- *In re Thorpe Insulation Co., 677 F.3d 869* (9th Cir. 2012) – Confirming that state court rulings affecting estate property are subject to federal bankruptcy review.

**The Automatic Stay Remained in Effect Because QrewLive™ Was Never Abandoned**

Under 11 U.S.C. § 362(a)(3), the automatic stay prohibits any act to obtain possession of or exercise control over estate property until the case is closed or the property is formally abandoned. In this case, QrewLive™ was never formally abandoned under 11 U.S.C. § 554(a), which requires a motion, notice to creditors, and a court order.

- The Trustee never filed an abandonment motion, meaning QrewLive™ remained property of the estate.
- The Trustee's inaction does not constitute abandonment (*In re DeGroot, 484 B.R. 311 (6th Cir. B.A.P. 2012); In re Pease, 195 B.R. 431 (Bankr. D. Neb. 1996)*).
- The automatic stay continues to apply to unadministered and unabandoned assets (*In re Mirant Corp., 440 F.3d 238 (5th Cir. 2006)*).

The Trustee's own filing on January 31, 2025, acknowledges that this case has remained open for 63 months, demonstrating that QrewLive™ has remained under the protection of the automatic stay. As a result, any acts by Delta, Alexander, or Rafi to assert control over or exploit QrewLive™ constitute willful violations of § 362(a)(3) and are subject to sanctions under § 362(k). Since QrewLive™ remains estate property, any state court orders affecting it are void ab initio and must be set aside.

## B. Unadministered and Unabandoned Assets Remain Subject to the Automatic Stay Under 11 U.S.C. § 362(a)(3)

The Bankruptcy Court erred in ruling that the automatic stay does not apply to QrewLive™, despite the fact that the asset remains unadministered and has not been formally abandoned by the Trustee. Under 11 U.S.C. § 541(a), all of a debtor's assets become part of the bankruptcy estate upon filing, and under 11 U.S.C. § 362(a)(3), the automatic stay remains in effect until property is properly administered or abandoned. The Trustee's notice filed on January 31, 2025, explicitly states that the case has been pending for 63 months, confirming that it was never closed, and QrewLive™ was never abandoned. Since QrewLive™ was never formally abandoned or administered, it has remained continuously protected under the automatic stay, making Delta's ongoing use of the asset an undeniable violation of § 362(a)(3).

1. The Automatic Stay Protects Unadministered and Unabandoned Estate Property

The automatic stay under 11 U.S.C. § 362(a)(3) applies to all estate property, including intellectual property and trade secrets like QrewLive™, until it is properly abandoned or administered. Courts have consistently held that estate property cannot be used, transferred, or controlled by third parties while subject to the automatic stay.

- *In re Smith, 966 F.2d 1527* (7th Cir. 1992) – Holding that the automatic stay continues to protect estate property until it is formally abandoned by court order or fully administered.
- *In re Soares, 107 F.3d 969* (1st Cir. 1997) – Holding that violations of the automatic stay against unadministered estate property warrant sanctions, even if the creditor assumes the stay does not apply.

- *In re Popp, 323 B.R. 260* (9th Cir. B.A.P. 2005) – Confirming that unadministered assets remain protected by the automatic stay until the bankruptcy estate is closed or abandonment is formally approved.
- *In re Mirant Corp., 440 F.3d 238* (5th Cir. 2006) – Stating that estate property remains subject to the automatic stay until the Trustee formally abandons or administers it, and third parties cannot act upon estate property without court approval.

Since QrewLive™ remains unadministered and unprotected, any acts by Delta to control, use, or benefit from the property violate the automatic stay under § 362(a)(3).

2. The Trustee's Inaction Does Not Lift the Automatic Stay

Even if the Trustee has not actively sought to enforce rights over QrewLive™, inaction does not terminate the automatic stay. Case law has firmly established that the automatic stay remains in effect until a trustee formally abandons estate property or the case is closed.

- *In re DeGroot, 484 B.R. 311* (6th Cir. B.A.P. 2012) – Holding that a trustee's failure to act does not remove estate property from the protections of the automatic stay.
- *In re Pease, 195 B.R. 431* (Bankr. D. Neb. 1996) – Trustee inaction does not alter an asset's status as estate property, nor does it terminate the automatic stay.
- *In re Harchar, 393 B.R. 160* (Bankr. N.D. Ohio 2008) – Confirming that trustees must formally abandon property for the automatic stay to no longer apply.

Since the Trustee has not taken formal action to abandon QrewLive™, the automatic stay remains in full force, and Delta's and Alexander's continued exploitation of QrewLive™ constitutes a violation of § 362(a)(3).

**C. Delta's Use of QrewLive™ Violates the Automatic Stay**

**The Bankruptcy Court's Ruling Was Based on a Material Legal Error Regarding Abandonment**

The Bankruptcy Court erred by assuming QrewLive™ had been abandoned by the Chapter 7 Trustee, even though no formal abandonment order was entered. The Trustee's mere notation on the docket does not meet the legal requirements for abandonment under 11 U.S.C. § 554.

1. Abandonment Requires a Formal Motion and Court Approval

Under 11 U.S.C. § 554(a), a trustee may abandon estate property only after filing a motion and providing notice to creditors. The Bankruptcy Court must approve the abandonment before the asset is removed from the estate. Courts have consistently held that informal indications of abandonment—such as statements by the Trustee or an entry on the docket—do not equate to formal abandonment. Delta and Alexander had actual knowledge of the bankruptcy filing and cannot claim that the automatic stay had expired because the case was never closed, and QrewLive™ was never abandoned. Delta's ongoing exploitation of QrewLive™—despite the case remaining open for 63 months—represents a continuing and willful violation of the automatic stay, making sanctions under § 362(k) mandatory.

- *In re Reed, 940 F.2d 1317* (9th Cir. 1991) – A "No Asset" report does not constitute abandonment unless a formal notice and hearing have been provided under § 554(a).
- *Catalano v. C.I.R., 279 F.3d 682* (9th Cir. 2002) – Abandonment must be explicitly stated in an order, and all interested parties must receive notice and an opportunity to object.
- *In re K.C. Mach. Tool Co., 816 F.2d 238* (6th Cir. 1987) – A trustee's failure to act does not automatically abandon estate property.
- *In re Dewsnup, 908 F.2d 588* (10th Cir. 1990) – Holding that a Trustee's informal intent to abandon property is legally ineffective without a formal motion and notice.
- *In re DeGroot, 484 B.R. 311* (6th Cir. B.A.P. 2012) – Confirming that inaction does not constitute abandonment and that assets remain in the estate unless properly abandoned.

Since no motion was filed and no abandonment order was entered, the Bankruptcy Court's assumption that QrewLive™ had been abandoned was legally erroneous.

2. The Trustee's Docket Note Does Not Constitute Abandonment

The Trustee did not file a motion to abandon QrewLive™, nor did the Court issue an abandonment order. Courts have repeatedly held that a Trustee's informal expression of intent is insufficient to remove property from the estate.

- *In re Dewsnup, 908 F.2d 588* (10th Cir. 1990) – A Trustee's informal expression of intent to abandon property is legally ineffective without a formal motion and notice to creditors.
- *In re Wagner, No. 13-31223* (Bankr. N.D. Ohio 2013) – Without a formal motion and notice, property does not leave the estate.
- *In re Johnston, 49 F.3d 538* (9th Cir. 1995) – Courts will not infer abandonment simply because the Trustee failed to act.

Since no motion was filed, and no order was entered, QrewLive™ remains estate property, and the Bankruptcy Court's ruling to the contrary was a material legal error.

### D. The Trustee Has a Duty to Protect Estate Assets Under 11 U.S.C. § 704(a)

Under 11 U.S.C. § 704(a), the Trustee has an affirmative duty to collect, liquidate, and protect estate property for the benefit of creditors. A Trustee's failure to act does not alter an asset's status as estate property.

- *In re DeGroot, 484 B.R. 311* (6th Cir. B.A.P. 2012) – A Trustee's failure to act does not remove property from the estate.
- *In re H.R.P. Auto Ctr., Inc., 130 B.R. 247* (Bankr. N.D. Ohio 1991) – Holding that trustees must actively administer estate property and cannot ignore their responsibilities.
- *In re Hat, 363 B.R. 123* (Bankr. E.D. Cal. 2007) – Courts will intervene when a Trustee neglects its duty to administer estate property.

Since the Trustee has not administered or formally abandoned QrewLive™, it remains estate property under § 541(a), and the Bankruptcy Court's assumption otherwise is unsupported by law.

### E. Delta's Unauthorized Use of QrewLive™ Violates the Automatic Stay

Under 11 U.S.C. § 362(a)(3), the automatic stay prohibits any act to obtain possession of or exercise control over estate property. Delta's continued use, exploitation, and commercial benefit from QrewLive™ constitutes a willful violation of the automatic stay.

- In re Krystal Cadillac, 142 F.3d 631 (3d Cir. 1998) – Unauthorized use of estate property is a violation of § 362(a)(3) and is sanctionable under § 362(k).
- In re LTV Steel Co., Inc., 264 B.R. 455 (Bankr. N.D. Ohio 2001) – Even mistaken violations of the stay are subject to sanctions.
- In re Johnson, 501 F.3d 1163 (10th Cir. 2007) – Holding that a creditor's belief that an asset is not protected by the stay is not a valid defense.

Delta was explicitly notified of the Debtor's bankruptcy case and was served with multiple notices regarding the automatic stay protections under 11 U.S.C. § 362(a)(3). Despite this, Delta continued its unauthorized use of QrewLive™, a knowing and willful violation of the automatic stay.

Courts have consistently ruled that willful violations warrant sanctions under § 362(k):

- In re Sharon, 234 B.R. 676 (6th Cir. B.A.P. 1999) – Holding that a knowing violation of the automatic stay requires sanctions under § 362(k).

Since Delta has knowingly and willfully continued to exploit estate property, sanctions under § 362(k) are appropriate.

**F. An Evidentiary Hearing is Required to Resolve Material Factual Disputes**

The Bankruptcy Court's denial of the Debtor's motions was based on disputed facts, particularly:

1. Whether QrewLive™ has been abandoned or remains estate property.
2. The extent of Delta's unauthorized use of QrewLive™ and its impact on estate property.
3. Why the Trustee failed to administer or formally abandon QrewLive™.

Case Law Supporting an Evidentiary Hearing

- In re Bennett, 298 F.3d 1059 (9th Cir. 2002) – Holding that an evidentiary hearing is required when material facts concerning estate property remain unresolved.
- In re Foreman, 378 B.R. 717 (Bankr. S.D. Ga. 2007) – The court ruled that when a trustee fails to act, an evidentiary hearing is necessary to determine whether abandonment or enforcement is required.
- In re Gruntz, 202 F.3d 1074 (9th Cir. 2000) – Confirming that when bankruptcy and state court rulings conflict over estate property, an evidentiary hearing is required.

Since material factual disputes remain regarding QrewLive™, the Court must hold an evidentiary hearing to resolve these issues before any further determinations are made.

**G. The November 19, 2024, State Court Order Was Drafted by Delta and Cannot Be Given Preclusive Effect**

Delta improperly relies on the November 19, 2024, State Court Order, which Delta itself drafted and submitted as a proposed order, later adopted verbatim by the State Court without independent judicial analysis. This raises serious due process concerns and prevents the order from being given preclusive effect in this proceeding.

1. The State Court Did Not Conduct Independent Findings

Courts must engage in independent fact-finding before issuing substantive rulings. The State Court did not conduct its own legal analysis when it adopted Delta's proposed order dismissing the Debtor's claims with prejudice. Instead, the State Court merely signed off on Delta's draft without substantive revision.

- United States v. El Paso Natural Gas Co., 376 U.S. 651 (1964) – Courts must engage in independent fact-finding and not merely adopt a party's proposed conclusions.
- Stern v. Marshall, 564 U.S. 462 (2011) – Bankruptcy courts have exclusive jurisdiction over estate property; state courts cannot interfere with estate administration.

2. The November 19, 2024, Order Conflicts with the December 20, 2024, Ruling

The State Court's later ruling on December 20, 2024, confirmed that only Skyvier, Inc. had standing over QrewLive™, reinforcing that it is estate property. This contradicts the earlier order dismissing the Debtor's claims with prejudice and supports the Bankruptcy Court's exclusive jurisdiction over QrewLive™.

3. Delta's Drafting of the Order Constitutes an Admission

By drafting the November 19, 2024, order, Delta implicitly admitted that QrewLive™ was a proprietary asset requiring legal adjudication. This directly contradicts Delta's current argument in Bankruptcy Court that QrewLive™ is not estate property.

- Fed. R. Evid. 801(d)(2) – Statements made by a party are admissible as admissions against interest.
- In re Leslie Fay Cos., Inc., 175 B.R. 525 (Bankr. S.D.N.Y. 1994) – Statements in proposed orders can be used as admissions against the drafting party.

The November 19, 2024, State Court Order was not an independent ruling but rather a proposed order drafted by Delta, adopted verbatim by the State Court. Courts have ruled that proposed orders that lack independent judicial analysis are not entitled to preclusive effect:

- In re Taub, 413 B.R. 81 (Bankr. E.D.N.Y. 2009) – Holding that state court rulings that interfere with bankruptcy jurisdiction should not be given preclusive effect.
- United States v. El Paso Natural Gas Co., 376 U.S. 651 (1964) – Courts must engage in independent fact-finding before issuing substantive rulings.

Since Delta drafted the order, it is an admission that QrewLive™ is a proprietary asset, which contradicts its arguments in Bankruptcy Court. The Court should declare the November 19, 2024, order void ab initio.

## H. The Chapter 7 Trustee's Inaction Raises Questions Requiring Court Supervision

The Trustee has a statutory duty under 11 U.S.C. § 704(a) to administer estate property for the benefit of creditors. The failure to take action regarding QrewLive™ has led to legal uncertainty, allowing Delta to continue its unauthorized use of estate property.

1. The Trustee Has Not Investigated Delta's Unauthorized Use of QrewLive™

The Bankruptcy Court's December 12, 2024, Order confirmed that QrewLive™ is an estate asset, yet the Trustee has not taken steps to investigate Delta's unauthorized commercial use of QrewLive™. This failure to act violates the Trustee's duties under the Bankruptcy Code.

Supporting Case Law:

- In re H.R.P. Auto Ctr., Inc., 130 B.R. 247 (Bankr. N.D. Ohio 1991) – Trustees must actively protect estate property and investigate violations of the automatic stay.
- In re Hat, 363 B.R. 123 (Bankr. E.D. Cal. 2007) – Courts may intervene when a Trustee fails to take necessary action to protect estate assets.

2. The Trustee's Lack of a Formal Abandonment Order Creates Ongoing Harm

Despite the Bankruptcy Court relying on the assumption that QrewLive™ was abandoned, the Trustee never filed a formal motion for abandonment under 11 U.S.C. § 554(a). This inaction has created a loophole that allows third parties to exploit the asset without Bankruptcy Court oversight.

Supporting Case Law:

- In re Pease, 195 B.R. 431 (Bankr. D. Neb. 1996) – Holding that a Trustee's failure to act does not equate to abandonment.
- In re Dewsnup, 908 F.2d 588 (10th Cir. 1990) – Confirming that abandonment must be formalized through a motion and order before estate property is removed from bankruptcy court protection.

Since the Trustee has not followed proper procedures, the Bankruptcy Court must require the Trustee to clarify QrewLive™'s estate status and determine whether further action is necessary to protect it.

**IV. RELIEF REQUESTED**

For the reasons stated above, the Debtor respectfully requests that this Court reconsider its prior ruling and grant the following relief:

1. Reconsideration of the February 3, 2025, Order (Dkt. 277, 278) – The Court should vacate its ruling denying the Debtor's motions based on material legal errors, overlooked facts, and newly submitted evidence.

2. Declaration That QrewLive™ Remains Estate Property Under 11 U.S.C. § 541(a) – The Court should confirm that QrewLive™ remains property of the estate and has not been abandoned.

3. Clarification That the Automatic Stay Remains in Effect Under 11 U.S.C. § 362(a)(3) – Since QrewLive™ has not been abandoned or administered, the Court should confirm that Delta's continued use violates the automatic stay.

4. Order Declaring the November 19, 2024, State Court Order Void Ab Initio – Since Delta drafted this order and Craig Alexander sought to benefit from it, and the State Court adopted it verbatim without independent judicial findings, it should have no preclusive effect in this proceeding.

5. Enforcement of the NDA as a Protective Measure Over QrewLive™ – Given that the NDA was executed pre-petition, the Court should enforce the NDA's injunctive relief provisions against Delta.

6. Sanctions Against Delta and Alexander for Willful Violation of the Automatic Stay Under 11 U.S.C. § 362(k) – The Court should impose monetary sanctions, disgorgement of profits, and a contempt order against Delta.

   o Given that the automatic stay remained in effect for the entire duration of this case, as confirmed by the Trustee's own filing stating that the case has remained pending for 63 months, the Debtor requests that this Court impose monetary sanctions against Delta for knowing and willful violations of § 362(a)(3).

7. Permanent Injunction Against Delta's Use of QrewLive™ – The Court should issue a permanent injunction prohibiting Delta from using, modifying, licensing, or benefiting from QrewLive™ without Bankruptcy Court approval.

8. An Evidentiary Hearing to Resolve the Following Material Disputes:

   o Whether QrewLive™ remains estate property under 11 U.S.C. § 541(a).

- o  Whether Delta and Alexander's actions constitute willful violations of the automatic stay under § 362(a)(3).
- o  Why the Chapter 7 Trustee failed to administer or formally abandon QrewLive™ under § 554.
- o  Whether Delta should disgorge profits derived from its unauthorized use of QrewLive™.

9. Order for Delta to Provide a Full Accounting of QrewLive™'s Use Within Fourteen (14) Days – Delta should be required to disclose all revenue, cost savings, product integrations, or benefits derived from QrewLive™, including its application within Delta's FFC platform, within fourteen (14) days of the Court's order.

10. Order Directing the Chapter 7 Trustee to Clarify QrewLive™'s Status Within Fourteen (14) Days – The Trustee must:
    - o  Investigate and determine QrewLive™'s value and potential estate benefit.
    - o  Either administer or file a formal motion to abandon QrewLive™ under 11 U.S.C. § 554(a).
    - o  Explain why no prior action was taken regarding QrewLive™ despite the Bankruptcy Court's December 12, 2024, Order confirming its status as estate property.
    - o  File a report with the Court regarding the status of QrewLive™ within fourteen (14) days of the Court's order.

11. Alternative Relief – Declaration That the Estate Holds Exclusive Interest in QrewLive™ – If the Court does not enforce the automatic stay, it should confirm that QrewLive™ is estate property, barring any third-party claims.

12. Approval of Poole and Huffman's Special Counsel Application for the Purpose of Enforcing the Automatic Stay and Protecting Estate Property – In order to expedite resolution of these legal issues, the Court should immediately approve the appointment of Poole and Huffman, LLC as Special Counsel at the expense of the Debtor. Given the complexity of the case and the Trustee's prior inaction, Special Counsel is necessary to ensure proper enforcement of bankruptcy protections, prevent further unauthorized use of QrewLive™, and hold violating parties accountable under § 362(k).

    a.   The Trustee has failed to act to enforce the automatic stay against Delta's continued use of estate property. Given this inaction, the Debtor requests immediate approval of Poole & Huffman, LLC as Special Counsel to pursue necessary enforcement actions under § 362(a)(3) and § 362(k).

    b.   Special Counsel's appointment is justified under In re H.R.P. Auto Ctr., Inc., 130 B.R. 247 (Bankr. N.D. Ohio 1991), where the court recognized the need for independent counsel when the Trustee has failed to act in the estate's best interest.

13. Expedited Ruling on This Motion Within Twenty-One (21) Days – Given the ongoing harm caused by Delta's continued use of estate property, the Debtor requests that the Court issue an expedited ruling on this Motion within twenty-one (21) days to prevent further violations of bankruptcy law and irreparable harm to estate assets.

    a.   In re Mirant Corp., 440 F.3d 238 (5th Cir. 2006) – Holding that ongoing unauthorized use of estate property creates irreparable harm, justifying expedited relief.

    b.   In re LTV Steel Co., Inc., 264 B.R. 455 (Bankr. N.D. Ohio 2001) – Courts must act promptly when an estate asset is being used in violation of the automatic stay.

14. Any Other Relief This Court Deems Just and Proper – Given the complexity and urgency of this matter, the Debtor requests any additional relief necessary to protect estate property and prevent further harm.

## V. CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that this Court grant the relief sought in this Motion for Reconsideration. The February 3, 2025, ruling was based on material legal errors, overlooked evidence, and a misunderstanding of the status of QrewLive™ as an estate asset. The record clearly establishes that QrewLive™ remains property of the estate under 11 U.S.C. § 541(a) and has not been formally abandoned under 11 U.S.C. § 554(a). As a result, Delta Air Lines, Inc., Craig Alexander, and Mike Rafi's continued use and exploitation of QrewLive™ constitute willful violations of the automatic stay under § 362(a)(3), warranting sanctions, an evidentiary hearing, and appropriate injunctive relief.

Furthermore, the State Court's December 20, 2024, ruling confirms that QrewLive™ belongs to Skyvier, Inc., reinforcing that only this Bankruptcy Court has jurisdiction over the asset under 28 U.S.C. § 1334(e). The State Court's prior November 19, 2024, ruling, which Delta drafted and was adopted verbatim without independent judicial analysis, should be declared void ab initio and given no preclusive effect in these proceedings.

Additionally, the Chapter 7 Trustee has failed to take any formal action to administer or abandon QrewLive™, creating uncertainty regarding the estate's ability to protect its property. The Trustee's continued inaction does not remove QrewLive™ from the bankruptcy estate, and an evidentiary hearing is necessary to resolve material disputes regarding the Trustee's obligations, Delta's stay violations, and the ongoing misappropriation of estate property.

Given the urgency of this matter, the Debtor requests an expedited ruling within twenty-one (21) days and the immediate approval of Poole and Huffman, LLC as Special Counsel upon application to protect estate assets, enforce the automatic stay, and prevent further harm. The Debtor further requests that Delta and Alexander be required to provide a full accounting of its use of QrewLive™ within fourteen (14) days and that the Chapter 7 Trustee be directed to clarify the status of QrewLive™ within fourteen (14) days.

Because the automatic stay remained in effect for the full duration of this case, and QrewLive™ was never abandoned, Delta, Alexander, and Rafi never had legal authority to take any action regarding QrewLive™. The Trustee's acknowledgment that the case has been pending for 63 months confirms that Delta's and Alexander's unauthorized use of QrewLive™ constitutes a knowing and willful violation of § 362(a)(3).

WHEREFORE, the Debtor prays that this Honorable Court:

1. Grant this Motion for Reconsideration,
2. Reverse its prior ruling denying the Debtor's motions,
3. Confirm that QrewLive™ remains estate property and subject to the automatic stay,
4. Declare all actions taken by these parties against QrewLive™ void ab initio under bankruptcy law.
5. Enforce the NDA's injunctive relief provisions against Delta,

6. Impose sanctions against Delta and Alexander for willful violations of the automatic stay,

7. Issue a permanent injunction prohibiting Delta, Craig Alexander, and any other third parties from using, modifying, licensing, or benefiting from QrewLive™,

8. Schedule an evidentiary hearing to determine the full extent of Delta's violations and the Trustee's failure to act,

9. Order Delta to provide a full accounting of its use of QrewLive™ within fourteen (14) days,

10. Order the Chapter 7 Trustee to clarify QrewLive™'s status and file a report within fourteen (14) days,

11. Approve Poole and Huffman, LLC as Special Counsel for the purposes of enforcing stay violations and protecting estate property,

12. Issue an **expedited ruling on this Motion within twenty-one (21) days**, and

13. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted on this 5th Day of February 2025.

Sonja Williams Ross
Debtor, Pro Se

Sonja Williams Ross, Debtor
Po Box 3930
Alpharetta Ga 30023
Tel: (210) 960-6898
Sonja.Ross@Shocktheory.com

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | : | **CASE NO. 19-56304** |
| | : | |
| **SONJA WILLIAMS ROSS,** | : | **CHAPTER 7** |
| Debtor. | : | |

**CERTIFICATE OF SERVICE**

This is to certify that I have on this day emailed the foregoing **DEBTOR'S MOTION AMENDED MOTION FOR RECONSIDERATION AND REQUEST FOR AN EVIDENTIARY HEARING,** this document in this case and parties of interest.

**S. Gregory Hays**
Hays Financial Consulting, LLC
2964 Peachtree Road. Ste 555
Atlanta, GA 30305
(404) 926-0060
(404) 926-0055 (fax)
ghays@haysconsulting.net

Chapter 7 Trustee

**Thaddeus D. Wilson**
King & Spalding LLP
1180 Peachtree St NE
Suite 1600
Atlanta, GA 30309
404-572-4842
404-572-5135 (fax)
thadwilson@kslaw.com

*Counsel for*
*Delta Air Lines, Inc.*

**Willie Ellis, Jr.**
The Ellis Firm
3500 Lenox Road
Suite 1500
Atlanta, Georgia 30326
(770) 212-1432

**David S. Weidenbaum**
Office of the United States Trustee 362 Richard B. Russell Building 75 Ted Turner Drive, SW
Atlanta, GA 30303
david.s.weidenbaum@usdoj.gov

**Adriano Omar Iqbal**
adriano.o.iqbal@usdoj.gov

Office of the United States Trustee

**Gregory D. Ellis**
Lamberth, Cifelli, Ellis & Nason
Ste 290
6000 Lake Forrest Drive, N.W.
Atlanta, GA 30328
404-495-4485
404-262-9911 (fax)
gellis@lcenlaw.com

**Richard Waddington** richard@chandler-law.net

*Counsel for Mike Rafi*

**Germaine Austin**
Beliesol Legal LLC
1424 Westboro Drive SW
Atlanta, Georgia 30310
(404) 863-7620

(404) 393-2392
Will@call-ellis.com

(470) 751-8805
Germaine@Beliesol.com

*Counsel for Defendant Craig A.
Alexander*

*Counsel for Defendant Craig A. ALexander*

Respectfully submitted on this 5th Day of February 2025

*Sonja Ross*

Sonja Williams Ross
Debtor, Pro Se

Sonja Williams Ross, Debtor
Po Box 3930
Alpharetta Ga 30023
Tel: (210) 960-6898
Sonja.Ross@Shocktheory.com

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | : | **CASE NO. 19-56304** |
| | : | |
| **SONJA WILLIAMS ROSS,** | : | **CHAPTER 7** |
| Debtor. | : | |

**TABLE OF KEY EXHIBITS**

**Table of Key Exhibits**

| Dkt No. | Exhibit | Purpose |
|---|---|---|
| 237, 238, 280 | A | Debtor's Bankruptcy Schedules (Original & Amended) |
| 224 | B | Bankruptcy Court's December 12, 2024, Order |
| 236-6 | C | State Court's December 20, 2024, Order |
| See Dkt | D | No Formal Abandonment Order (Docket or Trustee Record) |
| Attached | E | Delta's Drafted/Proposed November 19, 2024 sent to State Court Chambers, Order and Court Issued November 19, 2024 Order (Dkt No. 236) |
| Attached | F | NDA Between MABA Holdings, LLC & Delta |
| 236-1 | H | Craig Alexander's State Court Filings |
| 236-2 | I | Craig Alexander's Interrogatory Responses |
| 236, 240, 254, 261, 272 | J | Bankruptcy Court Filings by Delta & Alexander |
| Attached | K | Court Transcripts for the November 19, 2024 Order and December 20, 2024 Order Hearings |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                              :        **CASE NO. 19-56304**

                                    :

**SONJA WILLIAMS ROSS,**            :        **CHAPTER 7**

            **Debtor.**             :

## EXHIBIT E

# shocktheory

Sonja Williams <sonja.ross@shocktheory.com>

---

## FW: Alexander v. Delta Air Lines, Inc. et al, No. 21A03275
1 message

---

**Christi Baker** <cmb@anoziellp.com>                                      Wed, Jan 29, 2025 at 7:58 PM
To: Sonja Ross <sonja.ross@shocktheory.com>
Cc: nma@anoziellp.com

Please see below and attached.  Thank you.



**Christi Baker**
Manager of Operations
cmb@anoziellp.com
[O] 214.606.3440
[O] 214.609.2374

6120 Swiss Avenue #140838 Dallas, Texas 75214

A N O Z I E   L L P

---

Begin forwarded message:

**From:** "Heit, Marny J." <mjheit@dekalbcountyga.gov>
**Date:** October 14, 2024 at 19:16:21 GMT+1
**To:** Alexandra Titus <ATitus@kslaw.com>
**Cc:** "Burch,Tonay S." <tsburch@dekalbcountyga.gov>, David Balser <DBalser@kslaw.com>, Julia Barrett Bates <jbates@kslaw.com>, Larry Slovensky <LSlovensky@kslaw.com>, Charlie Spalding <cspalding@kslaw.com>, Alexandra Titus <ATitus@kslaw.com>, "Willie Ellis Jr." <will@call-ellis.com>, Germaine Austin <germaine@beliesol.com>, nma@anoziellp.com, EXT - cmast <cmast@hpylaw.com>, jdavis@hpylaw.com, Douglas@chandler-law.net, richard@chandler-law.net
**Subject: Re: Alexander v. Delta Air Lines, Inc. et al, No. 21A03275**


Received, thank you!


Marny Heit

Staff Attorney for the Honorable Kimberly Anderson

DeKalb County State Court


---

**From:** Alexandra Titus <ATitus@KSLAW.com>
**Sent:** Monday, October 14, 2024 1:54:41 PM
**To:** Heit, Marny J. <mjheit@dekalbcountyga.gov>
**Cc:** Burch,Tonay S. <tsburch@dekalbcountyga.gov>; David Balser <DBalser@KSLAW.com>; Julia Barrett Bates <jbates@kslaw.com>; Larry Slovensky <LSlovensky@KSLAW.com>; Charlie Spalding <cspalding@kslaw.com>; Alexandra Titus <ATitus@KSLAW.com>; Willie Ellis Jr. <will@call-ellis.com>; Germaine Austin <germaine@beliesol.com>;

nma@anoziellp.com <nma@anoziellp.com>; EXT - cmast <cmast@hpylaw.com>;
jdavis@hpylaw.com <jdavis@hpylaw.com>; douglas@chandler-law.net
<douglas@chandler-law.net>; richard@chandler-law.net <richard@chandler-law.net>
**Subject:** Alexander v. Delta Air Lines, Inc. et al, No. 21A03275

Ms. Heit:

Pursuant to the Court's request at the October 3, 2024 hearing, please find the proposed
order on the Delta Defendants' Motion to Dismiss Intervenor's Complaint attached here. The
proposed order offers alternative grounds for the Court to consider in granting the Delta
Defendants' Motion to Dismiss Intervenor's Complaint, which is indicated by the bracketed
and italicized language.  Please let us know if you have any questions.

Best regards,

Alexandra

─────────

**Alexandra H. Titus**
*Associate*

T: +1 404 572 2838  |  E: ATitus@KSLAW.com  |  Bio  |  vCard

King & Spalding LLP
1180 Peachtree Street, NE
Suite 1600
Atlanta, GA 30309



kslaw.com

─────────────────────────────────────────────────

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is
addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally
exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or
disseminate this message or any part of it. If you have received this message in error, please notify the sender
immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any
additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our
Privacy Notice.

**2024.10.14 - Order on Delta's MTD Intervenor's Complaint.docx**
54K

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

SONJA ROSS,

           **Plaintiff/Intervenor,**

v.

CRAIG ALEXANDER,

           **Plaintiff,**

**and**

DELTA AIR LINES, INC.; EDWARD
BASTIAN; RAHUL SAMANT;
MATTHEW MUTA, DARRELL
HASKIN; DAVID SMITH; DAVID
BURTON; CORPORATE DOES 1 TO
5; and JOHN DOES 1 TO 10, MABA
HOLDINGS, LLC, KEENAN NIX,
DARREN SUMMERVILLE,
MORGAN AND MORGAN, P.A.,
MICHAEL RAFI AND SHEILA
ALEXANDER,

           **Defendants**

**CIVIL ACTION
FILE NO.: 21A03275**

**JURY TRIAL DEMANDED**

## [PROPOSED] ORDER ON DELTA DEFENDANTS' MOTION
## TO DISMISS INTERVENOR'S COMPLAINT

Before the Court is Defendant Delta Air Lines, Inc.'s ("Delta") and Defendants Edward

Bastian, Rahul Samant, Matthew Muta, Darrell Haskin, David Smith, and David Burton's

(collectively, the "Individual Defendants" and with Delta, the "Delta Defendants") Motion to

Dismiss Intervenor Sonja Ross's ("Intervenor") Complaint. Intervenor's Complaint asserts

claims against the Delta Defendants for (1) misappropriation of trade secrets under the

Georgia Trade Secrets Act ("GTSA") (Count II); (2) theft and conversion (Count V); (3) civil

conspiracy to commit theft and conversion (Count VI); (4) breach of the non-disclosure

agreement (Count VII); (5) exemplary damages under the GTSA (Count X); (6) punitive

damages under O.C.G.A. § 51-12-5.1 (Count XI); and (7) attorneys' fees under the GTSA (Count XII).

As set forth below, Counts V, VI, and XI are preempted by the GTSA and are dismissed as to all the Delta Defendants. Count VII is dismissed as to all the Delta Defendants because Intervenor is not a party to the contract at issue. Count II is dismissed as to all the Delta Defendants because Intervenor cannot establish that the Delta Defendants owed Intervenor a duty to maintain the secrecy of her purported trade secret.  Neither Counts X nor XII are independent causes of action and fail because the underlying claim fails.

*[In the alternative, to the extent the Court does not dismiss Counts II, V, and VI on the grounds set forth above:]*

Even if Intervenor could establish that the Delta Defendants owed her a duty to maintain the secrecy of her purported trade secret and that Counts V and VI were not preempted by the GTSA, Intervenor's GTSA, theft and conversion, and conspiracy claims are all barred by the applicable statute of limitations.

Thus, for the reasons discussed below, the Delta Defendants' Motion to Dismiss is **GRANTED** and Intervenor's Complaint is **DISMISSED WITH PREJUDICE** as to the Delta Defendants.

## FACTUAL BACKGROUND

According to Intervenor's Complaint, she "ideated, created, designed and developed QrewLive and its predecessor applications beginning in 2011 and 2012" after discussions with Plaintiff Craig Alexander ("Plaintiff"). Compl. ¶ 5. In 2014, following the alleged "chance encounter" between Plaintiff and then-Delta Chief Executive Officer, Richard Anderson, Plaintiff and Intervenor entered into an agreement regarding the sale or license of QrewLive to Delta. *Id.* ¶¶ 50–51. Specifically, Intervenor alleges that she authorized Plaintiff "to act as her agent in shopping and promoting the novel technologies and capabilities of her

- 2 -

application QrewLive to Delta for license and/or purchase" because Plaintiff "touted his proximity to Delta executives." *Id.* ¶ 6. She alternatively alleges that she and Plaintiff and/or his company, MABA Holdings, LLC ("MABA"), formed a partnership for the specific purpose of selling QrewLive to Delta. *Id.* ¶ 8.

As a result, between 2014 and 2017, Intervenor alleges that she worked on developing QrewLive, was blind copied on emails between Plaintiff and some of the Individual Defendants, and was otherwise made aware by Plaintiff of his communications with Delta related to the potential sale of QrewLive. *Id.* ¶ 12. As to Plaintiff's meetings with Delta and some of the Individual Defendants, Intervenor "incorporates all allegations of [Plaintiff's] meetings with the Delta Defendants as her own." *Id.* ¶¶ 8–9. She acknowledges, however, that she never met with the Delta Defendants. Intervenor also alleges that Plaintiff did not "disclose the true nature of his relationship with [Intervenor] to Delta" and that Plaintiff presented QrewLive to Delta as if it were his own and "failed to disclose the existence of [Intervenor]" to the Delta Defendants. *Id.* ¶ 8–9, 11.

As part of her agency and/or partnership relationship with Plaintiff, Intervenor alleges that she authorized Plaintiff to enter into contracts in connection with QrewLive on her behalf as her agent and/or partner but did not authorize Plaintiff "to seal her QrewLive trade secrets or fail to disclose [Intervenor's] existence and ownership to Delta." *Id.* ¶ 51. In August 2016, Plaintiff, through MABA, entered into a non-disclosure agreement with Delta relating to QrewLive ("NDA"). *Id.* ¶ 122. In 2017, Plaintiff informed Intervenor that "Delta has lost interest and had gone silent." *Id.* ¶ 55.

Delta launched Flight Family Communication ("FFC") in 2018. *Id.* ¶ 56. Intervenor alleges that "Delta misappropriated and raided QrewLive's proprietary information by utilizing this information for the 'creation of its own app . . . only a few short months after

- 3 -

rejecting QrewLive as presented to Delta by [Plaintiff] on [Intervenor's] behalf as her agent and/or partner." *Id.* ¶ 58.

On July 12, 2021, Plaintiff filed his complaint against the Delta Defendants. On March 22, 2023, Delta served Intervenor and her company with nonparty document requests. *Id.* ¶ 65. In connection with her responses to the Delta Defendants' discovery requests, Intervenor alleges that Plaintiff and his former counsel, Keenan Nix, "attempt[ed] to bribe her into agreeing with their fabrication of the origins and ownership of QrewLive." *Id.* ¶ 66. Intervenor recorded her conversations with Plaintiff and Mr. Nix and produced three audio recordings of those conversations in response to Delta's document request. *Id.* ¶ 74.

On April 12, 2024, Intervenor filed her Motion to Intervene. Shortly after the Court granted the Motion to Intervene, she filed her Complaint on June 25, 2024. Intervenor's Complaint references and relies heavily on the transcripts of the recorded conversations with Plaintiff and Mr. Nix as well as the Delta Defendants' October 28, 2023 Motion for Terminating Sanctions. Intervenor asserts claims against the Delta Defendants for (1) misappropriation of trade secrets under the GTSA (Count II); (2) theft and conversion (Count V); (3) civil conspiracy to commit theft and conversion (Count VI); (4) breach of the NDA (Count VII); (5) exemplary damages under the GTSA (Count X); (6) punitive damages under O.C.G.A. § 51-12-5.1 (Count XI); and attorneys' fees under the GTSA (Count XII). The Delta Defendants moved to dismiss on July 25, 2024. The Court held oral argument on the motion on October 3, 2024.

## MOTION TO DISMISS STANDARD

Under O.C.G.A. § 9-11-12(b)(6), a trial court may grant a motion to dismiss when "the allegations of the complaint, when construed in the light most favorable to the plaintiff, and with all doubts resolved in the plaintiff's favor, disclose with certainty that the plaintiff would not be entitled to relief under any state of provable facts." *Key v. Ga. Dep't of Admin. Servs.*,

340 Ga. App. 534, 535 (2017) (quoting *Sanders v. Trinity Universal Ins. Co.*, 285 Ga. App. 705, 706 (2007)). In doing so, a court "can consider exhibits attached to and incorporated into the complaint" and "[t]o the extent that there is any discrepancy between the allegations in the complaint and the exhibits attached to it, the exhibits control." *See Love v. Fulton Cnty. Bd. of Tax Assessors*, 348 Ga. App. 309, 310 (2018) (internal quotation marks omitted) (quoting *Racette v. Bank of Am.*, N.A., 318 Ga. App. 171, 172 (2012)).

"A complaint may be dismissed on motion if clearly without any merit; and this want of merit may consist in an absence of law to support a claim of the sort made, or of facts sufficient to make a good claim, or in the disclosure of some fact which will necessarily defeat the claim." *Earl v. Mills*, 275 Ga. 503, 504 (2002) (quoting *Poole v. City of Atlanta*, 117 Ga. App. 432, 434 (1968)). Under Georgia law, when a claim is legally defective such that a plaintiff could not prevail, the claim should be dismissed. *See Abramyan v. State*, 301 Ga. 308, 311–12 (2017) (affirming dismissal of plaintiffs' state constitutional claims when plaintiffs failed to allege existence of a constitutionally protected interest); *see also Earl*, 275 Ga. at 504 (complaint may be dismissed based on "absence of law to support a claim of the sort made").

## DISCUSSION

### I.    Plaintiff's Non-Contractual Claims

Intervenor's claims against the Delta Defendants for theft and conversion (Count V), conspiracy to commit theft and conversion (Count VI), and punitive damages under O.C.G.A. § 51-12-5.1 (Count XI) (the "Non-Contractual Claims") are preempted by the express language of the Georgia Trade Secrets Act ("GTSA"). Under the GTSA, "[e]xcept as provided in subsection (b) of this Code section, this article shall supersede conflicting tort, restitutionary and other laws of this state providing civil remedies for misappropriation of a trade secret."

*See* O.C.G.A. § 10-1-767(a).[1] Thus, "the 'GTSA preempts claims [that] rely on the same allegations as those underlying the plaintiff's claims for misappropriation of a trade secret.'" *See Robbins v. Supermarket Equip. Sales, LLC*, 290 Ga. 462, 466 (2012) (quoting *ProNvest, Inc. v. Levy*, 307 Ga. App. 450, 451 (2010)). As the Supreme Court of Georgia has explained, the key inquiry is whether the claims "undermine the exclusivity of the GTSA," because the purposes of the GTSA "would be subverted if a plaintiff could state a claim for the misappropriation of proprietary information outside of the GTSA and thereby avoid its burdensome requirements of proof." *Robbins*, 290 Ga. at 466 (internal quotation marks omitted) (quoting *Professional Energy Mgmt. v. Necaise*, 300 Ga. App. 223, 225 (2009)).

Here, each of the Non-Contractual Claims relies on the same allegations underlying Intervenor's claim for misappropriation of a trade secret, i.e., the alleged theft of her QrewLive idea. This is clear from the face of Intervenor's Complaint:

- The Delta Defendants "***wrongfully misappropriat[ed]***" Intervenor's "confidential information" "after signing the NDA between Delta and [Intervenor], through her agent and/or partner [Plaintiff]." (Count V – Theft and Conversion)

- The Delta Defendants "conspire[ed] to wrongfully convert [Intervenor's] ***QrewLive property***[.]" (Count VI – Conspiracy to Commit Theft and Conversion)

- Intervenor "repeats and re-alleges each and every allegation set forth above, as if fully set herein." (Count XI – Punitive Damages)

---

[1] Subsection (b) of the GTSA applies to (1) "[c]ontractual duties or remedies, whether or not based upon misappropriation of a trade secret"; (2) "[o]ther civil remedies that are not based upon misappropriation of a trade secret"; or (3) "[t]he definition of a trade secret contained in [another Georgia statute]." O.C.G.A. § 10-1-767(b). These exceptions are inapplicable to the Non-Contractual Claims at issue here.

Because Intervenor has failed to allege any additional basis for her Non-Contractual Claims other than the alleged misappropriation of QrewLive, which she expressly alleges is a trade secret under the GTSA, these claims are superseded by the plain language of the GTSA. *See WestRock, LLC v. Sealey*, No. 2:20-CV-00180-RWS, 2021 WL 2637391, at \*5 (N.D. Ga. Mar. 23, 2021) (granting motion to dismiss civil conspiracy claims based on GTSA preemption when plaintiff "has not provided new or different facts from those already alleged for the trade secret claims"); *Argos USA LLC v. Young*, No. 1:18-CV-02797-ELR, 2019 WL 4125968, at \*12 (N.D. Ga. June 28, 2019) (granting motion to dismiss claims for civil conspiracy, conversion, and breach of fiduciary duty based on GTSA preemption); *One Sixty Over Ninety, LLC v. Ologie, LLC*, No. 3:17-CV-147 (CDL), 2019 WL 11608032, at \*9, n.7 (M.D. Ga. Sept. 6, 2019) (dismissing claim for punitive damages because it "rel[ies] on the same allegations as the trade secret misappropriation claims and, therefore, cannot be asserted pursuant to O.C.G.A. § 51-12-5.1(c) . . . due to preemption by the GTSA").[2] Thus, Plaintiff's Complaint reveals both the "absence of law to support a claim of the sort made," and "the disclosure of some fact which will necessarily defeat the claim" that makes dismissal of Plaintiff's Complaint with respect to the Non-Contractual Claims appropriate here. *See Earl*, 275 Ga. at 504.

In arguing against dismissal, Intervenor relies on *Angel Oak Mortgage Solutions LLC v. Mastronardi*, 593 F. Supp. 3d 1234 (N.D. Ga. 2022). However, in *Angel Oak*, the plaintiff "explicitly characterize[d]" some information as "non-trade secrets" in the complaint. 593 F. Supp. 3d at 1241–42. To the extent the plaintiff's tort claims relied on the items "expressly identified as not involving trade secrets," they were not preempted by the GTSA. *Id.*

---

[2] Federal district court decisions "can furnish guidelines that may be instructive and worthy of acceptance" in state courts. *See Southern Ry. Co. v. Malone Freight Lines, Inc.*, 174 Ga. App. 405, 408 (1985); *see also id.* (relying on federal district court decision interpreting Georgia statutory provisions).

(preempting claims for breach of fiduciary duty, civil conspiracy, and aiding and abetting "based upon those items [the] [p]laintiff has identified as trade secrets" but allowing those claims to proceed to the extent they rely on "those items [the] [p]laintiff has expressly identified as not involving trade secrets"); *see also Prof'l Energy Mgmt., Inc. v. Necaise*, 300 Ga. App. 223, 226 (2009) (permitting claim for breach of fiduciary duty when defendant not only "breached his fiduciary duties by misappropriating proprietary information" but also by allegedly soliciting his former employer's customers for a rival business). Unlike the plaintiff in *Angel Oak*, Intervenor here does not "expressly identif[y]" or "explicitly characterize[]" any information as non-trade-secret information in her Complaint. To the contrary, she expressly alleges that "QrewLive and its underlying proprietary information and intellectual property" is a trade secret, Compl. ¶ 92, and that is the only information Intervenor alleges is at issue in this case.

As such, the Delta Defendants' motion to dismiss Counts V, VI, and XI is **GRANTED**.

## II.     Count VII: Breach of Contract

Intervenor alleges a claim against the Delta Defendants for breach of the August 2016 NDA between MABA and Delta. Intervenor quotes the NDA in her Complaint and incorporates by reference Plaintiff's Complaint, which includes excerpted pictures of the NDA, including the signature page. Therefore, this Court can consider the NDA at the motion to dismiss stage. *See Trop, Inc. v. City of Brookhaven*, 764 S.E.2d 398, 402 (Ga. 2014) (approving trial court's consideration of an agreement attached to either the answer to the complaint or response to the motion to dismiss); *Handberry v. Stuckey Timberland, Inc.*, 812 S.E.2d 547, 549 (Ga. Ct. App. 2018) (same).

The language of the NDA pledges that Delta – through its agents or employees – could not use, exploit or reproduce Plaintiff's QrewLive idea unless authorized by Plaintiff himself. Because the NDA was drafted by Delta, any ambiguities are construed against it. *Kennedy v.*

*Brand Banking Co.*, 266 S.E.2d 154, 157 (Ga. 1980) ("It is well settled that where construction of a contract is doubtful, it is to be construed most strongly against the party who prepared it." (internal quotations and citations omitted)). As is apparent from the face of the NDA, Intervenor is not a signatory. The Delta Defendants argue that Intervenor's breach of contract claim against the Delta Defendants should be dismissed for the straightforward reason that Intervenor is not a party to the NDA.

It is well-settled that a plaintiff cannot proceed on a breach of contract claim based on a contract to which she is not a party. *See, e.g., Lumsden v. Williams*, 704 S.E.2d 458, 465–66 (Ga. Ct. App. 2010) (finding no basis to assert a breach of contract claim where claimant was not a party to the contract); *Tabar, Inc. v. D & D Servs., Inc.*, 601 S.E.2d 143, 145 (Ga. Ct. App. 2004) (entity not a party to contract cannot be liable under contract); *Plaza Props., Ltd. v. Prime Bus. Invs.*, 524 S.E.2d 306, 309 (Ga. Ct. App. 1999) ("It is also fundamental that '[a] person who is not a party to a contract (i.e., is not named in the contract and has not executed it) is not bound by its terms.'") (quoting *Martin v. Pierce*, 232 S.E.2d 170, 172 (Ga. Ct. App. 1977)).

In arguing against dismissal, Intervenor contends Plaintiff was acting as her agent or partner when he entered into the NDA such that she is a party to the NDA. An agency relationship "arises wherever one person, expressly or by implication, authorizes another to act for him[.]" O.C.G.A. § 10-6-1. An undisclosed principal "shall have advantage of his agent's contracts in the same manner as he shall be bound by them," to the extent that the agreement "come[s] within the scope of his agency." O.C.G.A. § 10-6-62. Intervenor generally alleges that she authorized Plaintiff and/or his company, MABA, to enter into contracts on her behalf for the purpose of selling QrewLive; but she also expressly alleges that she did not give Plaintiff the authority to fail to disclose her existence to Delta. Compl. ¶ 51. Because Intervenor alleges Plaintiff failed to disclose Intervenor's existence to Delta in connection with executing the

NDA on behalf of MABA, Plaintiff acted outside the scope of the agency relationship in executing the NDA. Intervenor's agency theory accordingly fails.

Intervenor also alleges that she and Plaintiff and/or MABA were in a partnership. For Intervenor to sue on the NDA under this theory, the NDA must have been "executed in the partnership name." *Willard v. Stewart Title Guar. Co.*, 448 S.E.2d 696, 697 (Ga. 1994); *see also id.* (partner who had not signed loan and that did not reference the partnership was not liable for repayment even though loan proceeds benefitted partnership); *Swygert Bros. v. Bank of Haralson*, 79 S.E.2d 759, 761 (Ga. Ct. App. 1913) ("Prima facie the execution of a negotiable note in the name of the partnership by one partner is within the scope of the partnership business, and binds the firm and individual members thereof." (internal quotations and citations omitted)). Here, the NDA contains no indication that it was executed in the name of a partnership between Intervenor and Plaintiff or Intervenor and MABA. Rather, the NDA was executed by MABA, an entity Intervenor alleges belongs to Plaintiff.. There is no reference anywhere in the NDA to the unnamed "partnership" between Plaintiff and Intervenor. Accordingly, Intervenor cannot bring a breach of contract claim based on her partnership theory.

While Intervenor does not raise this theory in her Complaint, in arguing against dismissal, she also contends she is a third-party beneficiary to the NDA. A third-party beneficiary only has standing to enforce a contract "if it clearly appears from the contract that it was intended for [her] benefit." *Dominic v. Eurocar Classics*, 714 S.E.2d 388, 391 (Ga. Ct. App. 2011) (internal quotation marks omitted) (quoting *Kaesemeyer v. Angiogenix, Inc.*, 278 Ga. App. 434, 437 (2006)). Intervenor is not referenced anywhere in the NDA either explicitly or implicitly. As such, there is no indication that the NDA was intended for her benefit.

The Delta Defendants' motion to dismiss Intervenor's breach of contract claim (Count VII) is **GRANTED.**

### III.    Count II: Misappropriation of Trade Secrets Under the GTSA

The Court finds Intervenor's Complaint fails to plead a claim for alleged misappropriation of trade secrets against the Delta Defendants. Under Georgia's notice pleading framework, the Complaint discloses with certainty an inability to introduce evidence on the GTSA claim. The Court need not determine whether Intervenor adequately alleges QrewLive is a trade secret under the GTSA. Instead, Intervenor's claim fails because the Delta Defendants did not owe Intervenor a duty to maintain the secrecy of QrewLive.

According to the GTSA, "misappropriation" means:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>> (i) Used improper means to acquire knowledge of a trade secret;
>> (ii) At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
>>> (I) Derived from or through a person who had utilized improper means to acquire it;
>>> (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>> (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>> (iii) Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

O.C.G.A. § 10-1-761(2). To summarize, "[a] defendant misappropriates a trade secret when, among other things, it discloses or uses a trade secret of another, without express or implied consent, knowing that at the time of disclosure or use the trade secret was ***acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use***." *Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2013) (emphasis added).

Here, Intervenor has alleged that her existence was never disclosed to the Delta Defendants. As such, there is no universe in which Intervenor could introduce evidence that

the Delta Defendants had any reason to believe that Plaintiff acquired QrewLive from Intervenor at all—much less that Plaintiff acquired QrewLive from Intervenor under circumstances giving rise to a duty to maintain the secrecy of QrewLive or limit its use.

Intervenor alleges that the Delta Defendants' duty to maintain the secrecy of QrewLive arose out of the NDA. However, as discussed *supra* Section II, Intervenor is not a party to the NDA and so the Delta Defendants could not have owed her a duty arising from the NDA. In arguing against dismissal, Intervenor contends the GTSA itself imposes a duty to maintain QrewLive's secrecy. She argues it is "immaterial" whether the Delta Defendants knew that QrewLive belongs to Intervenor, so long as they knew QrewLive did not belong to them. But Intervenor's argument ignores that the "duty to maintain secrecy" is borne out of the relationship of the parties—which is typically formed by way of contract. *See Meyn Am., LLC v. Tarheel Distrib.*, Inc., 36 F. Supp. 3d 1395, 1407–08 (M.D. Ga. 2014) (upholding employer's GTSA claim against employee who signed an NDA because employee owed a "duty to maintain the secrecy of the [confidential information]"); *U.S. Security Assocs., Inc. v. Lumby*, No. 1:18-CV-5331-TWT, 2019 WL 8277263, at *10–11 (N.D. Ga. Sept. 25, 2019) (similar); *Kuehn v. Selton & Associates, Inc.*, 530 S.E.2d 787, 791 (Ga. Ct. App. 2000) (denying summary judgment on GTSA claim because, as a result of a written agreement, defendant had a "duty to limit [the] use" of the confidential information). *Cf. Putters v. Rmax Operating, LLC*, No. 1:13–CV–3382–TWT, 2014 WL 1466902, at *3 (N.D. Ga. April 15, 2014) (dismissing GTSA claim where parties did not enter into a written agreement regarding the disclosure of trade secrets).

The plain language of the GTSA further supports this result. A critical element of a trade secret is that it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. *See* O.C.G.A. § 10-1-761(4). The fact that a trade secret plaintiff must prove efforts to maintain the secrecy of the trade secret—as, for example, requiring the parties

with whom he or she shares the trade secret to sign confidentiality agreements—reinforces that the duty to maintain the secrecy of a trade secret arises from the relationship between the parties. As Intervenor alleges, she never met any of the Delta Defendants such that she has no relationship with them. As such, no duty to maintain the secrecy of QrewLive could have arisen between them.

The Delta Defendants' motion to dismiss the GTSA claim (Count II) is **GRANTED**.

## IV.    Counts X, XI, XII: Independent Causes of Action

The Court dismisses Intervenor's claims for exemplary damages under the GTSA (Count X), punitive damages under O.C.G.A. § 51-12-5.1 (Count XI), and attorneys' fees (Count XII) because they are not independent causes of actions.[3] *See Capital Inventory, Inc. v. Green,* No. 1:20-CV-3224-LMM, 2021 WL 9938794, at *7 (N.D. Ga. June 15, 2021) (GTSA does not provide a standalone cause of action for attorneys' fees); *Massey v. Kelly, Inc.,* 742 F. Supp. 1156, 1158 (N.D. Ga. 1990) ("[T]he Georgia statute for punitive damages is not grounds for an independent cause of action."). Because Intervenor's substantive claims fail, so do her claims for exemplary damages, punitive damages, and attorneys' fees. *Ellis v. Gallof,* 469 S.E.2d 288, 289 (Ga. Ct. App. 1996) ("[P]laintiff must prevail on their basic cause of action in order to obtain litigation expenses . . . ." (internal quotations omitted) (quoting *Barnett v. Morrow,* 196 Ga. App. 201, 203 (1990))); *APAC-Southeast, Inc. v. Coastal Caisson Corp.,* 514 F. Supp. 2d 1373, 1381, 1381 (N.D. Ga. 2007) ("Punitive damages may be awarded under [the Georgia statute for punitive damages] only if the plaintiff prevails on an underlying tort claim." (citing *Flynn v. Allstate Ins. Co.,* 601 S.E.2d 739, 740 (Ga. Ct. App. 2004))).

---

3 Intervenor's claim for punitive damages is preempted under the GTSA, *see supra* Section I, but it fails for the separate reason that it is not an independent cause of action.

The Delta Defendants' motion to dismiss Intervenor's claims for exemplary damages under the GTSA (Count X), punitive damages under O.C.G.A. § 51-12-5.1 (Count XI), and attorneys' fees (Count XII) is **GRANTED**.

*[In the alternative, if the Court finds that Counts V and VI are not preempted and that Count II should not be dismissed on the grounds described above:]*

### V.    <u>Counts II, V, and VI: Statute of Limitations</u>

Intervenor's GTSA claim is subject to a five-year statute of limitation. *See* O.C.G.A. § 10-1-766. Her theft and conversion and conspiracy to commit theft and conversation claims are subject to a four-year statute of limitation. *See* O.C.G.A. § 9-3-32; *Lee v. Gore*, 221 Ga. App. 632, 635 (1996) (applying statute of limitations for underlying tort to civil conspiracy claim). Intervenor moved to intervene on April 12, 2024. As such, to the extent the statute of limitations period was triggered prior to April 12, 2019 (or April 12, 2020 for the theft and conspiracy claims), her claims are time-barred.

The statute of limitations begins to run when a plaintiff has "reason to suspect" that her trade secret has been misappropriated. *Portex Corp. v. Haldopoulos*, 284 Ga. App. 510, 516 (2007); *see also HealthPrime, Inc. v. Smith/Packett/Med-Com, LLC*, 428 F. App'x 937, 942 (11th Cir. 2011) (applying Georgia law and explaining that conversion action accrues at "the time when the plaintiff could first have maintained her action to a successful result" and that "mere ignorance" does not toll the period); *Stewart v. Warner*, 257 Ga. App. 322, 323 (2002) (dismissing a conversion claim as time-barred because the statute of limitations started to run on the day when damage was sustained by plaintiffs). Once on notice, "the discovery rule mandates that a plaintiff must exercise reasonable diligence to discover any misappropriation of trade secrets." *Porex*, 284 Ga. App. at 516. When "a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty

to investigate further and is charged with knowledge of matter[] which would have been revealed by such an investigation." *Id.* (internal quotation marks and citation omitted).

Here, Intervenor cites to the transcripts of the recorded conversations between herself and Mr. Nix throughout the Complaint such that this Court can consider the recorded conversations at the motion to dismiss stage. *See Trop*, 764 S.E.2d at 402; *Handberry*, 812 S.E.2d at 549. In the recorded conversations, Intervenor references a February 2015 email where she threatens to send Plaintiff and Delta a cease-and-desist relating to QrewLive. Therefore, at a minimum, as of February 2015, Intervenor had a duty to investigate her claims against the Delta Defendants, thus triggering the statute of limitations period. *See Phillips v. AWH Corp.*, 363 F.3d 1207, 1215 (Fed. Cir. 2004), *reh'g en banc granted, judgment vacated*, 376 F.3d 1382 (Fed. Cir. 2004), *on reh'g en banc*, 415 F.3d 1303 (Fed. Cir. 2005) (statute of limitations triggered where the plaintiff sent letters "indicat[ing] with particularity the technology that he believed" was being misappropriated); *see also Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 188 (1st Cir. 2006) (similar).

Moreover, and as Intervenor acknowledges, Delta publicly announced the launch of FFC in 2018. *See, e.g.,* Darren Murph, *This New App is Enabling More Delta Flights to Depart on Time*, The Points Guy (Nov. 20, 2018), https://thepointsguy.com/news/this-new-app-is-enabling-more-delta-flights-to-depart-on-time/; Noah Long, *How Delta Is Improving Its Operations With A New App*, Pulse 2.0, (Nov. 25, 2018), https://pulse2.com/delta-flight-family-communication/. These publications separately put Intervenor on notice of her GTSA, theft, and conspiracy claims, triggering the duty to exercise reasonable diligence. As Intervenor alleges, FFC is "so strikingly similar to QrewLive that even [Plaintiff]—a layperson in technology and application development—took notice of the misappropriation and filed suit against Delta on July 21, 2021 [sic]," Compl. ¶ 56. Such an allegation makes clear that Intervenor would have been able to discover the purported

misappropriation had she "exercise[d] reasonable diligence" once she was on notice of Delta's development of FFC. *See Evans v. Kimberly-Clark/HuggiesTM*, No. 1:08-CV-1678-TWT, 2008 WL 2986253, at \*1–2 (N.D. Ga. July 31, 2008) (dismissing plaintiff's GTSA claim as time-barred because plaintiff saw an advertisement regarding the alleged misappropriation in 2001 but waited until 2008 to file her claim); *see also FlexWage Sols. LLC v. Ceridian HCM Holding Inc.*, No. N23C-04-086, 2024 WL 2132620, at \*7 (Del. Sup. Ct. May 13, 2024) (dismissing plaintiff's trade secret misappropriation claim as time-barred because defendant's public announcements demonstrate "clear warning signs of misappropriation").

As such, the Delta Defendants' motion to dismiss Intervenor's GTSA (Count II), theft and conversion (Count V), and conspiracy to commit theft and conversion (Count VI) claims as time barred is **GRANTED**.

**IT IS SO ORDERED** that:

1.     Delta Defendants' motion to dismiss is **GRANTED**; and

2.     Intervenor's Complaint is **DISMISSED** as to the Delta Defendants with prejudice and without leave to amend.

DATED: _____ day of _____, _____.


_____
_____

Hon. Kimberly K. Anderson
State Court of DeKalb County

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE:                                    :        **CASE NO. 19-56304**

                                          :

**SONJA WILLIAMS ROSS,**                  :        **CHAPTER 7**

                     **Debtor.**          :

**EXHIBIT F**

# MUTUAL CONFIDENTIALITY AGREEMENT

This Mutual Confidentiality Agreement (this "Agreement") is made and entered into by and between MABA Holdings ("Company"), with a principal place of business at 19 Summerlin Dr, LaPlace, La. 70068, and Delta Air Lines, Inc. ("Delta"), with a principal place of business at 1030 Delta Boulevard, Atlanta, GA 30354-1989, and is effective as of August 22, 2016 (the "Effective Date"). For the purposes of this Agreement, as the context requires, Company and Delta will be referred to as a "disclosing party" or a "receiving party."

In consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Definitions**. As used herein, the following terms shall have the following meanings:

(a)    "Project" shall mean Qrewlive Communications.

(b)    "Affiliates" shall mean any individual, corporation, partnership, association, or business that directly or indirectly through intermediaries, controls, is controlled by or is under common control with a party. "Control" shall exist whenever there is an ownership, profits, voting, or similar interest (including any right or option to obtain such an interest) representing at least 50% of the total interests of the pertinent entity then outstanding.

(c)    "Confidential Information" shall mean all non-public information (whether in writing or retained as mental impressions) concerning Company, Delta, Delta Connection Carriers®, Delta code share partners and their respective Affiliates, which has been disclosed to the receiving party or the Affiliates of the receiving party by or on behalf of the disclosing party or the disclosing party's Affiliates, directly or indirectly, in writing, orally, or by the receiving party's visual inspection or mental impression. Confidential Information does not include information that: (i) the receiving party can show was previously known to it as a matter of record at the time of receipt; (ii) is lawfully obtained by the receiving party from a Person who lawfully obtained the information free of any obligation of confidentiality; (iii) is or that becomes generally available to the public, through no action or fault of the receiving party; or (iv) has been or is independently developed by the receiving party or any other person as a matter of record, without reliance on the information provided by the disclosing party.

(d)    "Permitted Systems" shall mean computer systems and files of Delta and its Affiliates that Delta expressly authorizes Company to access, use, or modify.

(e)    "Person" shall mean any firm, corporation, group, organization, subsidiary, joint venture, partnership, trust, association, governmental authority, regulatory agency, natural person or legal entity.

(f)    "Personally Identifying Information" or "PII" shall mean any information regarding identifiable individuals, including without limitation, data regarding the disclosing party's Personnel collected by or on behalf of the disclosing party or its Affiliates.

(g)    "Personnel" shall mean employees, officers, directors, independent contractors, agents and authorized representatives of a Person.

(h)    "Trade Secrets" shall mean information (whether in writing or retained as a mental impression) including, but not limited to, technical or non-technical data, a design, a formula, a compilation, a program, a device, a method, a technique, a drawing, a process, software code, documentation, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2.    **Term**. The term of this Agreement shall begin on the Effective Date and end twenty-four (24) months thereafter. The confidentiality obligation with respect to Confidential Information received by either party shall remain in effect until three (3) years from the termination or expiration of this Agreement. The confidentiality

Rev. 03.14.14

obligation with respect to Confidential Information consisting of PII shall remain in effect in perpetuity; provided, however, that if governing law requires a reasonable limit upon the duration of such obligation for such obligation to be enforceable, the parties agree that a duration of seven (7) years from the later of the date of this Agreement or the date of receipt of the PII shall be deemed reasonable. The confidentiality obligation with respect to Confidential Information consisting of Trade Secrets received by either party shall remain in effect for as long as governing law allows.

3.      **Rights in Confidential Information.** Each receiving party acknowledges that Confidential Information is and shall remain the sole and exclusive property of the disclosing party. No rights or licenses under copyright, patent or trademark of either party are hereby granted or implied by either a confidential or non-confidential disclosure, except either party may make a reasonable number of copies of documents in order to carry out the Project. Nothing in this Agreement or in any discussions undertaken or disclosures made pursuant to this Agreement shall: (a) be deemed as a commitment to engage in any business relationship, contract, or future dealings between the parties; or (b) limit either parties' right to enter into similar discussions or activities similar to that undertaken pursuant to this Agreement, so long as such discussions or activities do not violate this Agreement.

4.      **Non-Disclosure, Access to and Use of Confidential Information.** Each party will protect the other party's Confidential Information from disclosure to Persons not authorized to receive it, as provided in this Agreement, with at least that degree of care used to protect the receiving party's own Confidential Information, but in any event with not less than reasonable care. Each receiving party shall not use, exploit, or reproduce such Confidential Information for its own or any other purpose except as reasonably necessary for the performance of the Project and as permitted by this Agreement. Each receiving party shall not provide or make available any of the disclosing party's Confidential Information in any form to any Person other than those Personnel of the receiving party or its Affiliates who have a need to know consistent with the Project and who are under a written obligation of confidentiality governing the Confidential Information at least as restrictive as the terms of this Agreement. In the event a receiving party desires to disclose Confidential Information to other Persons, it shall first obtain the written consent of the disclosing party, which consent shall not be unreasonably withheld, and shall obtain from that Person a fully executed confidentiality agreement reasonably acceptable to the disclosing party.

5.      **Personally Identifying Information.** In addition to the other obligations in this Agreement, Company shall abide by the provisions of this Section 5 concerning PII. For the purposes of these provisions: the terms "process," "processing" or "processed" in relation to PII include, without limitation, collection, recording, organization, storage, amendment, retrieval, consultation, manipulation, and erasure.

        (a)      General: Delta has entrusted Company with PII. Company agrees to use reasonable measures to prevent the unauthorized processing, capture, transmission and use of PII which Delta may disclose to Company during the course of Delta's relationship with Company.

        (b)      Processing and Use of PII: Company shall process and use PII solely in accordance with the provisions of this Agreement. Company shall process and not use PII for any purpose other than the Project without Delta's express prior written consent. At any time, Delta may make inquiries to Company about PII transferred by Delta and stored by Company, and Company agrees to provide to Delta copies of such PII as maintained by Company within a reasonable time and to perform corrections or deletions of, or additions to, PII as reasonably requested by Delta.

        (c)      Inspection Rights: Delta shall have the right upon reasonable prior notice to verify Company's compliance with the terms and conditions of this Agreement, or to appoint a third party under covenants of confidentiality to verify the same on Delta's behalf. Company shall grant Delta's agents escorted access to the extent necessary to accomplish the inspection and review of all data processing facilities, data files and other documentation used by Company for processing and utilizing PII. Company agrees to provide reasonable assistance to Delta in facilitating this inspection function. These inspection rights shall survive the earlier expiration or termination of this Agreement for so long as the Company holds any item of Confidential Information or PII.

        (d)      Use of Subcontractors; Transmission of PII to Third Parties: Company may not transfer PII to any third party without Delta's prior written consent, and then only upon such third party's execution of an agreement containing covenants for the protection of PII no less stringent than those contained in this Agreement.

        (e)      Breach Notification: Company shall report security data or network security breaches to Delta in

Rev. 03.14.14                                    5

C.A.

a prompt and timely manner and assist Delta's Information Security and Privacy Office in its investigation thereof.

(f)    Data Security:  Company shall implement, at a minimum, the data security measures and observe the minimum standards for the protection of PII as set forth in this Section 5(f):

(i)    Access of Persons: Company agrees to use reasonable measures to prevent unauthorized persons from gaining access to the data processing equipment or media where PII is stored or processed.  Company agrees to provide its employees and agents access to PII on a need-to-know basis only and agrees to cause any persons having authorized access to such information to be bound by obligations of confidentiality, non-use and non-disclosure no less stringent than those imposed upon Company by this Agreement.

(ii)    Data Media: Company agrees to use reasonable measures to prevent the unauthorized reading, copying alteration or removal of the data media used by Company and containing PII.

(iii)    Data Retention: Company shall not retain PII any longer than is reasonably necessary to accomplish the intended purposes for which PII was transferred as set forth in this Agreement.  Upon the earlier termination of this Agreement or the written request of Delta, Company shall delete and/or destroy all PII in Company's possession, including any copies thereof, and shall deliver a written statement to Delta within 15 days of Delta's request confirming that Company has done so.

(iv)    Data Memory: Company agrees to use reasonable measures to prevent unauthorized data input into memory and the unauthorized reading, alteration or deletion of PII.

(v)    Personnel: Upon request, Company shall provide Delta with a list of Company's employees and agents entrusted with processing the PII transferred by Company, together with a description of their access rights.

(vi)    Transmission: Company agrees to use reasonable measures to prevent PII from being read, copied, altered or deleted by unauthorized parties during the transmission thereof or during the transport of the data media on which PII is stored.

6.    **Remote Access**.  In the event Company accesses Delta's Confidential Information by electronic means (including, without limitation, by remote or direct connection to Delta's computer systems, intranet, databases or extranet), Company, in addition to its other obligations in this Agreement, shall comply with the provisions of this Section 6.

(a)    Access to Delta's computer systems, intranet, databases or extranet is not granted by this Agreement.  Any such access shall only be exercised by Company following Delta's separate written consent, which consent shall refer to this Agreement, and which can be revoked by Delta at any time without cause.

(b)    Company shall only access, use, or modify the Permitted Systems, notwithstanding that other Confidential Information and related computer systems and files may be accessible to Company.

(c)    Company shall not permit or allow any unauthorized person or third party to access, use, or modify the Permitted Systems.

(d)    Company shall, at a minimum, comply with any written guidelines from Delta related to remote or direct access; provided, however, that Company shall remain solely liable for the breach of any other obligations under this Agreement, notwithstanding Company's compliance with such guidelines.

(e)    Company shall take commercially reasonable efforts to avoid the introduction into Delta's computer systems, intranet, databases or extranet, by way of remote or direct access or otherwise, of any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," "preventative routines" or other computer software routine designed: to permit unauthorized access to or use or modification of either the Confidential Information or Delta's computer systems, intranet, databases or extranet; to disable, modify, damage or delete the Confidential Information, or any data, computer hardware or other equipment or software operated or maintained by Delta; or to perform any other such similar actions.

7.    **Return of Confidential Information**.  Following the conclusion of the Project, each disclosing party's tangible Confidential Information shall be promptly returned by the receiving party to the disclosing party, and each receiving party will destroy any working papers, notes, copies, extracts, or other reproductions containing any part

C.A.

of the disclosing party's Confidential Information. Upon request of the disclosing party, the receiving party shall deliver to the disclosing party a signed certification that all such working papers, notes, copies, extracts, or other reproductions have been destroyed; provided, however, nothing in this Agreement shall require the destruction of the other party's business records derived from the use of the disclosing party's Confidential Information to the extent such records are produced and maintained for administrative or archival purposes and are treated as Confidential Information under this Agreement.

8.      **Remedies.** Each party advises the other that the disclosure of any of its Confidential Information may give rise to irreparable injury inadequately compensable in damages. Accordingly, when and as supported by the facts, the injured party may seek to obtain injunctive relief to prevent the unauthorized use or disclosure, whether existing, imminent or threatened, of its Confidential Information, in addition to any other remedies which may be available to it. All remedies shall be cumulative and all such remedies may be exercised from time to time and as often and in such order as the injured party deems expedient.

9.      **Disclosure Pursuant to Legal Process.** Notwithstanding any provision to the contrary, the receiving party shall be allowed to release Confidential Information if compelled to do so by a court of competent jurisdiction, subject to the conditions that the receiving party: (i) takes reasonable steps to preserve the confidentiality of Confidential Information, including without limitation requesting that the Confidential Information not be released to third parties or the public; (ii) gives the disclosing party prompt notice of the legal process and gives the disclosing party the opportunity to seek an appropriate protective order or to pursue such other legal action necessary to preserve the confidentiality of the Confidential Information; and (iii) provides reasonable assistance to and cooperates with the disclosing party in its efforts to preserve the confidentiality of the Confidential Information.

10.     **Disclaimer of Warranties.** Each party understands and agrees that it is receiving Confidential Information and that Company is accessing the Permitted Systems on an "as is" basis. NEITHER PARTY MAKES ANY WARRANTIES, EXPRESSED OR IMPLIED, CONCERNING ANY SUBJECT MATTTER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT WITH RESPECT TO THE CONFIDENTIAL INFORMATION OR ACCESS TO THE PERMITTED SYSTEMS. Delta shall not be liable for damages of any kind whatsoever, whether direct, indirect, special, consequential or exemplary, resulting from Company's use of the Permitted Systems.

11.     **Notices.** Any notice, demand or document which either party is required or desires to give or deliver to or make upon the other party shall be in writing and shall be (a) personally delivered or (b) delivered by depositing in the United States Mail, registered or certified, return receipt requested, with postage prepaid, addressed as follows:

If to Company:    MABA Holdings LLC
                  19 Summerlin Dr.
                  LaPlace, La. 70068
                  ATTN: Craig A. Alexander

If to Delta:      Delta Air Lines, Inc.
                  Department
                  1030 Delta Boulevard
                  Atlanta, GA  30320
                  ATTN:

                  with copy to General Counsel

or to such other address as the respective parties hereto shall designate by notice similarly given to the other party. Any such notice, demand or document shall be deemed to be effective upon receipt by the party to whom notice, demand or document is addressed.

12.     **Miscellaneous.** This Agreement shall be binding upon the parties and their successors and permitted assigns. Neither party may assign all or any portion of this Agreement or any rights or obligations hereunder without the prior written consent of the other party and any such attempted assignment shall be void. This

C. A.

Agreement shall be governed by the laws of the state of Georgia, USA, without giving effect to its conflicts of law rules. No party's waiver of any breach shall extend to or waive any other breach or impair any rights, powers or remedies. In the event that any one or more of the provisions of this Agreement shall be determined to be invalid, unenforceable or illegal, such invalidity, unenforceability, or illegality shall not affect any other provisions of this Agreement, and the Agreement shall be construed as if such invalid, unenforceable, or illegal provision had never been contained in this Agreement. The captions and titles herein are for convenience only and are not intended to define or aid interpretation of the subject matter of the text. This Agreement may be executed in counterparts and if so executed in counterparts will be enforceable and effective upon the exchange of executed counterparts or exchange of facsimile transmissions of executed counterparts. The obligations set forth in this Agreement are in addition to, and not in lieu of, any fiduciary duties or obligations of confidentiality or nondisclosure that the parties may have to each other under the common law, laws providing for the protection of Trade Secrets, or other statutory law. This Agreement constitutes and represents the entire agreement between the parties as to its subject matter and supersedes the parties' prior written or oral agreements. Any provisions of this Agreement that by their nature should, or by their express terms do, survive termination or expiration of this Agreement, shall survive or extend beyond termination or expiration of this Agreement. This Agreement may be amended in whole or in part only in a writing signed by both parties that refers to this Agreement by name and date.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

**Delta Air Lines, Inc.**                    **MABA Holdings, LLC.**

By: _____        By: _____

Title: General Manager - IT SCM        Title: Owner / CEO

Date: 8/30/2016                          Date: 06 / 22 / 16

C, A

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | : | **CASE NO. 19-56304** |
| | : | |
| **SONJA WILLIAMS ROSS,** | : | **CHAPTER 7** |
| Debtor. | : | |

**EXHIBIT K**

1          IN THE STATE COURT OF DEKALB COUNTY

2                  STATE OF GEORGIA

3

4

5    CRAIG ALEXANDER,                    )
                                         )
6                       Plaintiff,       )
                                         )    CIVIL ACTION FILE NO.:
7              VS.                       )
                                         )    21A03275
8    DELTA AIR LINES, INC, ET AL,        )
                                         )
9                       Defendants.  )

10

11       TRANSCRIPT OF CIVIL MOTION HEARD BEFORE THE HONORABLE
         KIMBERLY ANDERSON, STONE MOUNTAIN JUDICIAL CIRCUIT,
12                      OCTOBER 03, 2024.

13

14

15   APPEARANCES OF COUNSEL:

16   FOR THE PLAINTIFF:    NNAMDI ANOZIE
                           ATTORNEY AT LAW
17
     FOR THE DEFENDANT:    DAVID BALSER
18                         ATTORNEY AT LAW

19

20

21

22

23                TINA D. HARRIS, CCR-B-2128
                     OFFICIAL COURT REPORTER
24                STATE COURT OF DEKALB COUNTY
                  556 MCDONOUGH STREET, SUITE 2210
25                    DECATUR, GEORGIA 30030

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | October 3, 2024 |
| 3 | THE COURT:  It's your motion. |
| 4 | MR. BALSER:  Morning, your Honor. |
| 5 | THE COURT:  Oh, are you trying to do fancy -- |
| 6 | MR. BALSER:  We're trying to connect up here. |
| 7 | (Brief pause.) |
| 8 | MR. BALSER:  Good morning, your Honor.  David |
| 9 | Balser of King and Spalding on behalf of Delta |
| 10 | defendants.  I have with me at counsel table, Ms. |
| 11 | Sonali Patel and Alexandra Titus from our firm.  And |
| 12 | also Ms. Meg Taylor, who is the head of litigation at |
| 13 | Delta, is with us today. |
| 14 | The intervener's complaint in her opposition for |
| 15 | motion to dismiss make clear that her grievances are |
| 16 | against the plaintiff, Craig Alexander, and not the |
| 17 | Delta defendant's.  In fact, she repeatedly |
| 18 | acknowledges in her complaint that she has never met |
| 19 | any of the Delta defendants, and that plaintiff |
| 20 | intentionally failed to inform Delta that she even |
| 21 | existed when he purportedly stole the idea for Crew |
| 22 | Live from her. |
| 23 | Yet her complaint includes a host of claims against |
| 24 | Delta and several Delta executives and former |
| 25 | employees.  And displayed on the screen here, your |

1  Honor, are the counts that are at issue today.

2    THE COURT:  Where's Count 1?  Oh, is that against

3  Mr. Alexander?

4    MR. BALSER:  It is.  Count 1's against Mr.

5  Alexander.  So Count 2 is a Trade Secrets Act claim.

6  Counts 5, 6 and 7, 10, 11 and 12 are against us.  And

7  as your Honor noted, the theft and conversion -- civil

8  conspiracy to commit theft and conversion, breach of --

9  and exemplary damages, punitive damages claims were the

10  subject of a prior motion against Mr. Alexander's

11  complaint that the Court granted.

12    So if I understood the Court correctly, I don't

13  really need to spend any time on the tort claims.

14    THE COURT:  I mean, it's my understanding --

15    MR. BALSER:  -- that preempt it.

16    THE COURT:  -- based on my prior order and my

17  understanding of GTSA, those are preempted --

18    MR. BALSER:  Clearly preempted.

19    THE COURT:  And fall under GTSA.

20    MR. BALSER:  That's right.

21    THE COURT:  Okay.

22    MR. BALSER:  And so if intervener's counsel decides

23  to raise any points, I certainly would like an

24  opportunity just to rebut, but I --

25    THE COURT:  Sure.

1          MR. BALSER:   -- I think the Court has already

2    thought about this, considered it and ruled, so I don't

3    think we need to spend any time on it.

4          These claims all fail even under Georgia's liberal

5    pleading standard because there's no law to support

6    them.  And the intervener has actually pled facts that

7    defeat them.  I know your Honor's familiar with the

8    standard.  I'm not going to belabor it, but I do want

9    to address at the outset the intervener's argument that

10    our motion should be converted to one for summary

11    judgment.

12          It's well settled in Georgia that a court can

13    consider documents that are incorporated by reference

14    into the complaint in deciding a motion to dismiss.

15    That's not a controversial legal concept.  Intervener

16    understands this if she purports to incorporate

17    plaintiff's entire complaint into her own complaints.

18    So the incorporation by reference doctrine is one that

19    she apparently understands --

20          THE COURT:   And the complaint -- Mr. Alexander's

21    complaint had the NDA and --

22          MR. BALSER:   Yeah.  She -- she does allege an --

23    her own NDA breach of contract claim against us --

24          THE COURT:   Right.

25          MR. BALSER:   -- that's not based on his complaint,

1        which I'll address.  But she also incorporates in her

2        complaint by reference the audio recordings and

3        conversations that she taped between herself and Mr.

4        Nix that she produced in this case.  And those

5        recordings are integral to her allegations in the

6        complaint that reference throughout the complaint it's

7        the basis for many of her claims.

8             Those recordings discuss a February 2015 email in

9        which intervener threatened to Mr. Alexander to send a

10       cease and desist letter to Delta related to Crew Live,

11       and we've relied on that email -- we've relied on that

12       email to show that her claims are time barred, but

13       that's the only evidence that we attached to the

14       motion.  And we only rely on it in connection with the

15       statute of limitations defense, which you may or may

16       not even have to reach depending on how you rule on our

17       other arguments.  But there's absolutely no basis to

18       convert this motion to dismiss for want of a summary

19       judgment.

20            Let's turn to the substance of the motion.  Her --

21       the intervener's claims here are -- fail for several

22       reasons.  Counts 5, 6 and 11 are preempted by the GTSA.

23       I'm not going to spend any time on those for the

24       reasons that the Court has already indicated.  Second,

25       her breach of the NDA claim fails because she's not a

1     party to the NDA.  So her breach of contract claim has

2     no basis.

3        Third, the Delta defendants did not owe intervener

4     any duty to maintain the secrecy of Crew Live, which

5     defeats her GTSA claim.  We didn't even know she

6     existed and she acknowledges that.  Finally,

7     intervener's GTSA conspiracy and conversion claims all

8     fail for the additional reason that they're time

9     barred.

10      THE COURT:  The did not owe any duty, wouldn't that

11     be more appropriate for summary judgment as opposed to

12     the motion to dismiss?

13      MR. BALSER:  No.  It -- no.  Because if you look at

14     the allegations in her complaint -- and I'll deal with

15     this directly.  But if you look at the allegations in

16     her complaint, she alleges that Mr. Alexander never

17     told Delta about her.  We did not know of her

18     existence.  She acknowledges that.  In fact, that's the

19     basis of her claims against Mr. Alexander.  So there's

20     got to be some relationship or interaction directly

21     between a plaintiff and the defendant for a duty to

22     arise to -- that flows directly to that plaintiff.

23        So -- and I'll get into that in the cases in a

24     minute.  But I think it's a legal question that can be

25     decided at the threshold and should be.  I'm going to

1  skip over the preemption arguments because I think the

2  Court has already thought about that and ruled, so

3  let's go to the contract claim.

4   Intervener -- intervener's contract claim is based

5  on the NDA that was signed by Mr. Alexander on behalf

6  of MABA Holdings, LLC and Delta.  She admits that she's

7  not a party to the NDA, but she's come up with several

8  theories to try to get around the rule that a nonparty

9  to a contract cannot state a breach of contract claim.

10   She basically has three arguments.  The first is

11  she says Mr. Alexander was an agent of her, and

12  therefore, she can rely on the agent's actions.  She

13  claims she was in partnership with Mr. Alexander.  And

14  third, she claims that she was third party beneficiary.

15   Let's start with the agency theory.  Intervener

16  argues that it doesn't matter that she didn't sign the

17  NDA and that Delta never knew of her existence because

18  an undisclosed principal, which she claims she is,

19  still has rights under an agent's contract.

20   And while it's true that an undisclosed principal

21  can take advantage of his agent's contracts -- or in

22  this case her agent's contracts -- the contract has to

23  come within the scope of the agency.  And that's just

24  black letter law.  But even if you take as true

25  intervener's bald allegation of the complaint that she

1     authorized plaintiff to act as her agent when it came
2     to Crew Live, her complaint makes it abundantly clear
3     that plaintiff was not acting within the scope of that
4     agency in executing the NDA, and that he did not intend
5     to bind the intervener in that contract.

6         In fact, the entire premise of her claim is that
7     Mr. Alexander acted outside the scope of any
8     partnership or agreement he had with the intervener
9     when he stole Crew Live from her and marketed it to
10    Delta without even informing Delta of her existence.
11    That's her claim.  So she does not allege that she
12    authorized the plaintiff to enter into the NDA on her
13    behalf.  And she certainly does not allege that he had
14    the authority to enter the -- enter the inner -- enter
15    into the NDA in the name of his own company without
16    including her.

17        So on the facts that she alleges in her complaint,
18    it's clear that she cannot recover under the NDA on an
19    agency theory.  Her second way to try to get around the
20    fact that she's not a party to the contract is that she
21    argues there's a partnership.  But for intervener to
22    have standing to sue based on her partnership theory,
23    the NDA must have been executed in the name of the
24    partnership that she claims to be a part of.

25        I won't belabor the points because the parties to

1    the NDA are clear.  Intervener does not allege that

2    MABA Holdings, which is the signatory to the contract,

3    was a partnership between herself and Mr. Alexander, so

4    she can't make a claim under the NDA on the partnership

5    theory.

6         THE COURT:  So you're saying that it would have to

7    be specifically stated in the complaint that she is a

8    part -- or is one of the owners of MABA Holdings --

9         MR. BALSER:  Right.

10        THE COURT:  -- and because she did not, it

11   precludes her from that?

12        MR. BALSER:  Right.  She does not allege in her

13   complaint that she -- nor could she -- that she was a

14   partner in MABA Holding, LLC.  She doesn't allege --

15   MABA Holdings is the signatory.  She claims Mr.

16   Alexander, through this company, stole her idea, and

17   without her authorization, signed.  So it -- there's

18   nothing in the complaint that would support a claim

19   that she's a partner in MABA Holdings or that --

20   certainly that we knew that she was a --

21        THE COURT:  Because if she was a partner, there's

22   no way MABA Holdings could technically steal the

23   technology.

24        MR. BALSER:  Right.  So third -- her third attempt

25   to circumvent the black letter law on being a signatory

1    to a contract is a prerequisite to sue under the

2    contract is a third party beneficiary.  She alleges

3    she's third party beneficiary to the contract.

4        First problem with that argument is she doesn't

5    allege it anywhere in the complaint.  Second problem is

6    that there's nothing in the NDA that suggests that

7    she's a third party beneficiary or that the NDA is

8    intended to benefit any third party.  The law is clear

9    that a third party beneficiary only has standing to

10   enforce a contract if it clearly appears from a

11   contract that it was intended for his benefit.  And the

12   cases that intervener cites in her brief only reinforce

13   that requirement.

14       The contracts at issue in the cases that she cites

15   are all ones that explicitly identified a narrowed

16   group of intended third party beneficiaries.  And while

17   the plaintiffs in those cases weren't expressly named,

18   they fell within the category of explicitly

19   identified --

20       THE COURT:  One of them is just like tenants --

21       MR. BALSER:  -- beneficiaries.

22       THE COURT:  -- tenants and landlords are kind of --

23       MR. BALSER:  Right.  Here, the intervener is

24   neither named expressly or as an unnamed member of the

25   category of persons, so she can't be a third party

1     beneficiary as a matter of law. So her breach of

2     contract claim under the NDA fails.

3         Let me turn, if I can --

4         THE COURT: I'm sorry, Mr. Balser. Can you go back

5     to the undisclosed principal theory.

6         MR. BALSER: Yes.

7         THE COURT: And that she -- he was acting on her

8     behalf. It's my understanding that there is some case

9     law out there that says you can do that. I guess I was

10     just wondering if you could kind of just refresh as to

11     why that doesn't apply as far as --

12         MR. BALSER: Sure, sure. It is the law that a

13     principal can rely on a contract.

14         THE COURT: Outside the scope, okay.

15         MR. BALSER: Yeah. It's outside the scope.

16         THE COURT: Sorry. I had -- I'm really good at

17     taking notes. I don't need --

18         MR. BALSER: Do you want me to further elaborate on

19     that?

20         THE COURT: No, I needed a -- sorry, I had -- I was

21     ready -- I was ready to have really copious notes, so

22     continue.

23         MR. BALSER: All right. So, yeah, I mean the point

24     is that her allegation is that he wasn't authorized to

25     enter into this contract at all. So it would be

1   outside the scope of any agency relationship that

2   existed.

3    THE COURT:  Okay.

4    MR. BALSER:  All right.  So let's turn to the --

5   the Georgia Trade Secret Act claim.  The GTSA requires

6   an intervener to allege that she possessed a trade

7   secret and that the defendant misappropriated her trade

8   secret.  And while the Delta defendants contest that

9   Crew Live qualifies as a trade secret, for purposes of

10   this motion we focused on the second element, which is

11   misappropriation.

12    And under the GTSA misappropriation can mean a few

13   things.  A misappropriation can occur by acquiring a

14   trade secret from someone that you know or you have

15   reason to know acquired a trade secret through improper

16   means.  You can misappropriate by disclosing or using a

17   trade secret after using improper means yourself to

18   acquire it.  You can misappropriate a trade secret by

19   disclosing or using it when you know or have reason to

20   know that the trade secret came from someone who

21   acquired it through improper means.

22    And you can misappropriate a trade secret by

23   disclosing or using it when you know or have reason to

24   know that you learned of the trade secret from someone

25   who acquired it under circumstances giving rise to a

1    duty to maintain its secrecy or its use.

2        Here, the problem with her GTSA theory is if she

3    acknowledges -- I mean her whole claim against Mr.

4    Alexander that's in this complaint is he never said

5    anything to Delta about her. So her claim is he stole

6    Crew Live from her and then surreptitiously as to her

7    marketed this to Delta and that Delta misappropriated

8    it from him.

9        So the key to misappropriation under the act and

10   all these theories is there has to be some relationship

11   that gives rise to a duty to maintain the secrecy of

12   the information because of actual or constructive

13   knowledge that you shouldn't be receiving, therefore,

14   using, or that the person you got it from obtained it

15   in an improper way. And we cite a bunch of cases in

16   our papers that discuss the duty element of a

17   misappropriation claim, which often arises in the

18   context of an NDA. And I don't -- I don't -- I'm not

19   going to go through all these cases now.

20       But these -- most of these cases arise under some

21   signed NDA or a contract or some direct relationship or

22   communications or contact between the plaintiff and the

23   defendant. Here, we never knew of Ms. Ross. And she

24   acknowledges in her complaint that we never knew of

25   her.  That's her whole theory of relief against Mr.

 1   Alexander.

 2        So in an effort to -- to kind of get around this

 3   problem under the Georgia Trade Secret Act, she -- she

 4   argues in her opposition to our motion that the GTSA

 5   itself creates some free-floating duty to maintain

 6   secrecy.  She argues that because -- she said that

 7   Delta defendants knew that Crew Live belonged to Mr.

 8   Alexander and they knew they had a duty to maintain

 9   it's secrecy, and therefore, somehow by some transitive

10   property there's some duty owed to her.

11        But at most her allegations establish --

12        THE COURT:  So I guess she's --

13        MR. BALSER:  -- to Mr. Alexander, not to her.

14        THE COURT:  Yeah.  So that's what I was going to

15   ask.  She's essentially alleging that because Delta had

16   a duty to Craig Alexander to maintain secrecy, they

17   breached that duty, which also breached the duty to her

18   even if Delta didn't know they had a duty to her --

19        MR. BALSER:  That's right.

20        THE COURT:  -- because ultimately they used the

21   misappropriation -- misappropriated the trade secret

22   through improper means.

23        MR. BALSER:  That's the --

24        THE COURT:  The No. 2 you have on there.

25        MR. BALSER:  Right.  That's the argument.  And the

1        -- and it doesn't work because if you look at her --

2        the allegations in her complaint, she -- she

3        acknowledges that Delta had absolutely no reason to

4        believe that Mr. Alexander had acquired Crew Live from

5        her.  And she repeatedly alleges plaintiff did not

6        disclose her existence to Delta.  So how could we have

7        had a duty to someone that we didn't interact with

8        directly and that she acknowledges was not disclosed to

9        us?

10       The most that she alleges -- the most that her

11       allegations could establish is that there was some

12       duty, either based on the NDA with Mr. Alexander or

13       with our interactions with Mr. Alexander that gave rise

14       to some duty to Mr. Alexander.  But there's nothing

15       that supports a theory that we had some duty to her,

16       who we never met, did not know of, did not know of any

17       role that she allegedly played in the creation of Crew

18       Live.

19       If anything, if you read that complaint, and her

20       opposition, it just drives home the point that her

21       claims are against Mr. Alexander.  She claims that he

22       took the idea, he passed it off as his own.  And that

23       may give her a claim against Mr. Alexander, but it

24       doesn't give her a claim against Delta.

25       THE COURT:  Is there any case law -- or never mind.

15

1      I'll ask them. Never mind. Keep going.

2         MR. BALSER: All right. The last point I make here

3      -- well, it's next to the last one. But I want to talk

4      just briefly about statute of limitations. And this is

5      an independent basis for dismissal of the GTSA, theft

6      and conversion and civil conspiracy claims. The GTSA

7      -- the GTSA imposes a five year statute of limitation.

8      Each of the other claims has a four year statute.

9         Intervener moved to intervene on April 12th of this

10      year, April 12th, 2024. Thus, to the extent the

11      intervener had a reason to suspect that the alleged

12      misappropriation had occurred prior to April 12th,

13      2019, her claim is time barred. And there's ample

14      evidence that she suspected misappropriation years

15      before then.

16         The recorded conversation that I referenced earlier

17      makes this clear. Her recorded conversation between

18      herself and Mr. Nix, which are quoted and referenced

19      throughout her complaint, made clear that intervener

20      was on notice of the alleged misappropriation by

21      February of 2015, which is four years before the -- the

22      bar -- statute of limitations bar.

23         During her lunch meeting with Mr. Nix, she

24      referenced an email from 2015 from her to Mr. Alexander

25      in which she threatened to send an email to Alexander

1    and Delta demanding the cease -- that they cease and

2    desist use of Crew Live.  So that was in 2015.  She

3    waited until 2024 to file her claims.  She was

4    suspicious enough to send a cease and desist letter, so

5    she certainly had a duty to investigate further.  She

6    failed to do so.

7         And if that were not enough, Delta publicly

8    announced Flight Family in November of 2018, which is

9    acknowledged in both plaintiff's and intervener's

10   complaints.  She alleges in her complaint that Flight

11   Family is -- and I quote -- so strikingly similar to

12   Crew Live that even plaintiff, a layperson in

13   technology and application development, took notice of

14   the misappropriation and filed suit against Delta on

15   July 21st of 2021.

16        So based on her allegations, had intervener

17   exercised reasonable diligence, she would have

18   discovered the alleged misappropriation upon the

19   announcement of Flight Family at the latest, even

20   though she had already been aware in February of 2015

21   of potential misuse in her mind, which led to the

22   threatening of a cease and desist letter.  Yet she

23   waited until 2024 to file this action.

24        THE COURT:  And I'm assuming the relation -- I

25   don't think it does, but the relation back statute that

1    allow her to rely on Mr. Alexander's initial

2    complaint --

3         MR. BALSER:  It wouldn't help her.  I mean it would

4    help -- it doesn't because she's adverse to him.  She

5    claims he -- she's asserted claims against him, so she

6    couldn't rely on the date of his filing to toll or save

7    her claims against us.

8         The last thing I want to touch on, your Honor, is

9    her claims against the individual defendant.  She has

10   named in her complaint against us Delta's CEO, CFO and

11   a number of other current and former employees.  All

12   the issues that we've discussed here apply to all of

13   the claims against all of the individual defendants.

14   But there are additional reasons why her claims of

15   breach of contract and Georgia Trade Secret Act claims

16   fail against the individual defendants.

17        I'll be brief because I know the Court's already

18   addressed this issue in our prior motion to dismiss the

19   plaintiff's complaint.  But intervener can't state a

20   breach of contract claim against the individual

21   defendants under the NDA because they aren't parties to

22   the NDA.  And as to her other complaint -- other

23   claims, her complaint does not make a single

24   substantive allegation against any individual

25   defendant.  Instead she simply incorporates plaintiff's

1  complaint.

2      Now, while she can incorporate any documents she

3  wants by reference, it doesn't somehow put her in Mr.

4  Alexander's shoes by doing that. Her allegations

5  related to interactions that he had with the individual

6  defendants did not provide the intervener with a claim.

7  She had no independent, individual interactions at all

8  with any Delta employee. She's never met or interacted

9  with any of these individual defendants. And the Court

10  shouldn't allow her to sue these individual defendants

11  in their personal capacities based on plaintiff's

12  limited interactions with them when she acknowledges

13  that she never met any of them at all.

14      So for all these reasons, and the reasons that we

15  stated in our briefing, the Court should dismiss all

16  the claims against all of the Delta defendants.  And

17  certainly happy to discuss any other issues that the

18  Court wants to discuss.

19      THE COURT:  What about the term -- what about

20  Section 2 of the NDA about the -- confidentiality

21  obligation with respect to confidential information

22  consisting of EII shall remain in effect in perpetuity

23  -- in perpetuity -- sorry -- provided moreover that a

24  governing law requires a reasonable limit upon the

25  duration of such obligation for -- for such obligation

19

1    to be enforceable, the parties agree that a duration of

2    seven years from the later of the date of this

3    agreement or the date of receipt of II shall be deemed

4    reasonable.

5         So I think you referenced a five year statute of

6    limitations.  Am I correct?  I don't -- what about this

7    seven years represented here?

8         MR. BALSER:  The -- the claim for breach of a

9    contract is a four year statute, but she's not a party

10   to this contract.

11        THE COURT:  Okay.

12        MR. BALSER:  Doesn't matter for her.  She's not --

13   she has no basis to assert a claim under the NDA.

14        THE COURT:  Well, let's assume she does.

15        MR. BALSER:  And we're not arguing that her

16   contract claims are barred by the statute of

17   limitations.  We're arguing that the GTSA, theft and

18   conversion, civil conspiracy claims are barred.  We

19   haven't argued that her contract -- I'm sorry.  We just

20   argued she can't assert a claim under a contract that

21   she's not a party to.

22        THE COURT:  Got it.  Thank you.

23        MR. BALSER:  Thank you.

24        MR. ANOZIE:  Good morning, your Honor.

25        THE COURT:  Morning.

1    MR. ANOZIE:  Again, Nnamdi Anozie for plaintiff

2    intervener, Sonya Ross.  I want to state our objection

3    again because we do believe the display of evidence

4    including a 2015 email is in fact requesting this Court

5    to review summary judgment information.  It is true

6    that we do make reference in her complaint to

7    conversations that were recorded, but we never once

8    referenced the section that is discussed by defendants,

9    which I presented to the Court.

10    In fact, I think it at best would be an argument of

11    evidentiary completion, which to me would go to show

12    this Court that these are arguments that are best

13    reserved for summary judgment phase after everyone has

14    had the opportunity to review evidence.  But --

15    THE COURT:  I mean the statute of limitations is --

16    that is proper for a motion to -- I mean you don't

17    really have a statute of limitations summary judgment

18    argument.  It's usually it is what it is.  And if you

19    have to make a show of evidence that it's barred and

20    why it's barred.  So I think that's why it -- for

21    purposes of this motion, I'm limiting the email just to

22    that point, not to anything else.

23    MR. ANOZIE:  And since we're on that point, I'll

24    take it backwards in reverse order.  The statute of

25    limitations issue here that's raised by Mr. Balser is

1      that on 2015 our client sent an email threatening to or

2      did in fact send a cease and desist.

3          If we rely on the pleadings and our allegations set

4      forth in the complaint, Ms. Ross talks about dates

5      after that fact where she's still working with Mr.

6      Alexander to present theories and ideas with respect to

7      her Crew Live application that has later been

8      misappropriated as Family Flight Connection.

9          In fact, she goes on to say in the petition -- or

10     the complaint rather that she was led to believe by Mr.

11     Alexander on a date after 2015 that Family Flight

12     Communication (sic) and Delta's interest generally was

13     dead on arrival.  That's both in our complaint and in

14     Mr. Alexander's complaint.  Mr. Alexander pegs the date

15     as 2017 he was made aware by persons at Delta that they

16     were no longer interested.

17         The 2017 date in and of itself, to me, belies the

18     point that the 2015 date -- even if she weren't simply

19     on notice of suspicion, she had conversation with Mr.

20     Alexander which would have led her to believe that

21     Delta had in fact not misappropriated her information.

22         THE COURT:  I mean 2017 doesn't help you either.

23         MR. ANOZIE:  And I'm not saying that it does.  I'm

24     saying that the -- they were still concealing the fact

25     the theft had not occurred in a way that Ms. Ross would

1    have been aware of.  In fact, Ms. Ross was told the

2    exact opposite, that Delta had not stole it.  So the

3    idea that she should be aware of a fact that she was

4    explicitly told did not happen by someone she believed

5    was her agent, as we have clearly alleged, to me

6    demonstrates that she did not have the requisite

7    knowledge, the requisite notice, the requisite

8    suspicion to delve into a fact-finding investigation

9    about whether or not these items were stolen.

10        THE COURT:  So when do you allege that she knew?

11        MR. ANOZIE:  We allege she knew -- in the petition

12   we specifically allege that she knew on the date that

13   she was served with information asking her for -- to

14   submit discovery requests and interrogatories.  We

15   believe that date is the date where she was first made

16   aware of the complaint, first made aware of the

17   allegations and the substance of the allegation,

18   specifically at the origin story of the app had been

19   fabricated, and also specifically that Delta had

20   advanced their application into Family Flight

21   Connections.

22        The Delta defendants have cited a couple of cases

23   for their publication theory, which is their second

24   argument that if 2015 isn't the date -- and I think

25   they bring up the second one because they know that

1    2015 things happened after that and people kept on

2    talking.

3    So the second part would be that they made some

4    mass publications. Well, the cases they cite rely on

5    brands like Huggies, who run Super Bowl commercials.

6    In fact, there was a Huggies case where the plaintiff

7    realized that her design or her trade secret from

8    Huggies was being used because it was published, she

9    witnessed commercials. Those are types of things that

10   they're talking about with respect to publication.

11   They're -- they have said --

12   THE COURT: What about the fact that they announced

13   that they had a new app in 2018?

14   MR. ANOZIE: Well, they announced they have a new

15   app in 2018, and from what I'm -- what I'm pointing out

16   is Huggies ran a Super Bowl commercial. The Points

17   Guy is a niche blog. A lot of people have not heard of

18   it, don't use it and -- and --

19   THE COURT: I've heard of him.

20   MR. ANOZIE: Well, and -- and I -- I respect and

21   understand that, but I -- I represent to you that I

22   have not. I represent to you my client was not reading

23   or scouring the Points Guy or looking for the FCC app

24   on the Points Guy. They also allege that our use of

25   the terminology in pointing out that Craig Alexander as

24

1          a layperson was able to identify -- somehow points out

2          that anybody would have been able to identify it.

3               Well, again, your Honor, at the time, Craig was

4          working for Delta Air Lines as a pilot.  The rollout

5          was internal.  It -- our view of the rollout was to the

6          industry.  And at that time Ms. Ross was not engaged

7          actively with the aviation industry.  As far as we've

8          alleged, entirely she was led to believe that this app

9          was dead on arrival.  She had no reason to look up and

10         suspect that her app would be repackaged and utilized.

11         And she certainly wasn't scouring the net looking for

12         the Points Guy.

13              THE COURT:  He has 1.4 million followers.

14              MR. ANOZIE:  And I think that's fine, your Honor,

15         but if we look at Huggies and Kimberly-Clark, I can

16         guarantee the number is something in the hundreds of

17         millions.  And if we look at the -- the mere scope of

18         even the city, the state, 1.4 million followers, it

19         sounds like a big number --

20              THE COURT:  I mean this is something I'm saying

21         beside the fact that they publish it on their website.

22         And what I know, publishing it, whether it's in a

23         medical journal -- I mean, not that this applies to

24         Delta -- but whether it's in a journal, an academic

25         journal, whether it's in a newspaper, the fact that it

1 | is published and out in the public -- just because she

2 | didn't read it doesn't mean it wasn't published.

3 | MR. ANOZIE:  Well, and I'm not saying that -- I'm

4 | not saying that it wasn't published.  I'm saying that

5 | he did not see the publication.  And they're adding a

6 | duty on to my client to have scoured and read every

7 | publication for a suspected theft that she did not know

8 | of.

9 | In fact, part of what I'm suggesting to the Court

10 | is that we have not been given the opportunity to fully

11 | undergo discovery.  And I think discovery in this case

12 | will further reveal we're under an extreme protective

13 | order, the extent and depth and scope.  I don't think

14 | the extent and depth of scope of the FCC app was ever

15 | fully published.  I think that they said some very key

16 | things about what their app would do to streamline the

17 | industry.  I think that may have been familiar, but I

18 | think Craig Alexander, himself, when he saw those

19 | things, knew of the meetings he had and filed this

20 | lawsuit really clearly spelled out what happened for us

21 | in a way that I don't think my client had a duty to

22 | understand on a reasonable investigation.

23 | THE COURT:  But wouldn't the fact that she knew he

24 | had given it to Delta and then when she heard it was,

25 | quote, dead on arrival, the fact that it's dead on

1    arrival doesn't mean it could be revived at some point.

2    And she knew that Delta had that information, right?

3         MR. ANOZIE:  Well, she knows that Delta had the

4    meetings because she prepared those.  So, yes --

5         THE COURT:  So I guess my whole point too is --

6         MR. ANOZIE:  Yeah.

7         THE COURT:  -- regardless of whether they profit --

8    I mean GTSA -- it doesn't matter if you profit from it.

9    They misappropriated --

10        MR. ANOZIE:  Correct.

11        THE COURT:  -- the trade secret for -- allegedly

12   for their own use, right?  And so in 2015, when she

13   says, hey, this is my property, you guys need to stop,

14   wouldn't that have started the clock?

15        MR. ANOZIE:  I don't think so, your Honor.  I think

16   it doesn't start the clock because let's move it from a

17   clock and go to a stop watch, right.  I think that at

18   one point she did say, hey, don't use this stuff; I

19   don't like what you're doing; Craig, this is wrong; I

20   don't appreciate you.  I think after that there were

21   distinct acts that kept on happening between Delta, Mr.

22   Alexander and Ms. Ross where she continued to have

23   conversations and engaged in conversations with Delta.

24   So let's start the stop watch again, and we keep

25   running in that fashion.  Until the 2017 --

1        THE COURT:  I don't think it's a start and a stop.

2    I think once you have reason to know, it starts the

3    clock.  Like with fraud, for example, once you know

4    that it's been committed, just because they tell you

5    some stuff to maybe dissuade you from taking any

6    further action, the fact that you knew about the fraud

7    beforehand, that's when the clock starts for statute of

8    limitations.

9        MR. ANOZIE:  And I think the distinction there,

10   your Honor, is not that they were told something to

11   dissuade her from -- she was told it was not done. They

12   -- the --

13       THE COURT:  Did she -- wait, hold on.  Did she have

14   conversations with Delta?

15       MR. ANOZIE:  She had conversations with Mr.

16   Alexander, who told her that this was dead on arrival,

17   this was going nowhere.  So that -- that -- and that's

18   the point I'm making.  The reasonable suspicion --

19       THE COURT:  So wouldn't it -- I guess couldn't you

20   argue that it extends it maybe to Alexander since he is

21   making representations that she is -- or relying upon?

22   But for Delta she didn't have any dealings with Delta,

23   but she knew they had her information, right?

24       MR. ANOZIE:  I don't think that have -- someone

25   maybe having your information is notice that they have

1    stolen it is what I'm presenting to the Court.

2         THE COURT:  I think she thought they

3    misappropriated it, right?

4         MR. ANOZIE:  I don't think she thought that until

5    she read this petition.  We are -- we have asserted --

6    and I think the threshold matter that I'm stating

7    before the Court as that our pleadings and our

8    allegations, which when viewed in the light most

9    favorable to our client, she has asserted that she was

10   made aware of this fact upon reading the petition -- or

11   upon reading the complaint -- Mr. Alexander's

12   complaint, that is, and upon understanding the exact

13   details of his allegations.

14        That's -- that's the point I'm making to you, your

15   Honor.  I don't think that him stating to her -- Mr.

16   Alexander stating to Ms. Ross that the Crew Live or

17   Family Flight Communications was dead on arrival is

18   equivalent to saying, hey, she immediately has a duty

19   to now go to Delta and sue Delta.  We don't have that

20   information yet.  She gets that information when he

21   files this lawsuit alleging facts that demonstrate to

22   her, hey, wait a minute, this is my app.

23        She's further notified with her conversation with

24   Mr. Nix, plaintiff's former counsel, when he really

25   spells out what happened to her.  And all of those

1      things are adequately alleged in our complaint.  And

2      when viewed in the light most favorable to us, I don't

3      think it's appropriate at this stage to determine

4      whether or not our client, her propensity for making

5      the statement is true or not true.  I think that's a

6      question of fact.  And that's simply what I'm

7      presenting to you.

8           I don't think that's appropriate for this stage,

9      the statute of limitations issue.  And even if it were,

10     again, I believe the evidence and the facts show that

11     she was made aware of this theft, the misappropriation

12     under both the trade secrets and then the theft and

13     conversion separate claims, which I'll get to on the

14     end of this, based upon the conduct alleged in the --

15     in our complaint, which is a derivative of Mr.

16     Alexander's allegations against Delta, which

17     demonstrate the extent and scope of Delta's theft in

18     this -- in the matter.

19          And we believe that if we are allowed the

20     opportunity, which I believe you should allow us the

21     opportunity to proceed through discovery, that that

22     would become clear, not only to this Court, but also to

23     all the parties in this case that Ms. Ross is clearly

24     the creator progener and the owner of Crew Live.  So

25     that's our position on the statute of limitations

30

1    issue.

2        If it's okay with your Honor, if you have no more

3    questions, I'll move to the breach of contract.

4        THE COURT:  Okay.

5        MR. ANOZIE:  Okay.  So Mr. Balser alleges that --

6    or said that the only claim that Ms. Ross has is that

7    Craig Alexander did not disclose her identity to Delta.

8    That's not the only claim she has.  That's a small

9    piece of the broader allegation, which is that both Mr.

10   Alexander and Delta misappropriated the information in

11   this case.

12       There a couple of things that I'd like to just

13   bring the Court's attention to.  And going in reverse

14   again, I have the Georgia Code here where we talk about

15   misappropriation.  And I'm just reading straight from

16   the code if you need to see yourself.

17       The code here states that misappropriation means

18   acquisition of a trade secret by another person who

19   knows or has reasons to know that the trade secret was

20   acquired by improper means.  It does not say that an

21   NDA must be signed between.  It does not say that

22   you're absolved of that duty if one person fails to

23   disclose.  It says none of those things.  It says if

24   you take something that you know is not yours under

25   this code, you're liable for that taking.

1    They would have you make them bona fide stealers

2    simply because they've had interactions with Mr.

3    Alexander that they believe demonstrate that they have

4    the right to take his property. Whether or not that's

5    true, they did not have the right to take my client's

6    property. Whether or not Mr. Alexander lied about it,

7    they didn't have the right to take the property.

8    THE COURT: Okay. So -- but I guess the rub is

9    it's like theft of stolen goods, right. Like you have

10   to have a reason to know that they're stolen. And

11   Delta didn't know that they were stolen.

12   MR. ANOZIE: Well --

13   THE COURT: And for all intents and purposes, they

14   thought it was Craig's idea, and that's what they were

15   -- they were using --

16   MR. ANOZIE: Right.

17   THE COURT: -- and discussing.

18   MR. ANOZIE: And we're demonstrative people here,

19   so we had a footnote in our -- in our response to this

20   very issue. I understand your point. And our point is

21   that because you pick up a wallet from the table that

22   you know is not yours, believing that it was Tina's,

23   for instance, and later found out that it was Nnamdi's,

24   that doesn't make the theft okay because you knew -- or

25   because you thought it was Tina's wallet.

1    Even if you thought Tina gave you permission to

2    pick up her wallet, it doesn't make the theft --

3    THE COURT: Yeah, but that doesn't mean Tina has a

4    claim?

5    MR. ANOZIE: Well, it's Tina's wallet.

6    THE COURT: No, you said it was your wallet.

7    MR. ANOZIE: Oh, it was -- sorry. But -- but in

8    that example, Tina wouldn't have a claim.

9    THE COURT: Right.

10   MR. ANOZIE: But in this example, which is complete

11   and distinct, I'm just trying to draw a parallel

12   between the points of what you know and don't know and

13   how that doesn't absolve you from duty. But we've

14   talked about the NDA a number of times. And one of the

15   things that Mr. Balser says is that we've never alleged

16   that Ms. Alexander -- or Ms. Ross was a part of the

17   NDA.

18   Paragraph 51 of our complaint explicitly says that

19   MABA Holdings was acting as the partnership vehicle.

20   It is completely fine and fair for a entity to

21   represent the partnership interests of a partnership in

22   entering the agreement. And if that's not enough, as

23   much as we, you know, have reviewed the -- the NDA, the

24   mutual confidentiality agreement that was just on the

25   screen -- I noted that your Honor went to the second

1     section, but if we go to the first section, just on the

2     first page -- we don't have to get past the first page

3     before we find Ms. Ross's existence.

4        Section 1B, affiliates, it reads affiliates shall

5     mean any individual, corporation, partnership,

6     association or business that directly or indirectly

7     through intermediaries controls or is controlled or is

8     under a common control with a party.

9        So the idea that Ms. Ross is not a part of the

10    scope of people who could potentially benefit from this

11    agreement or could potentially be a party to this

12    agreement when affiliates are explicitly identified in

13    the NDA in the very first page in fact, to me, I think

14    it's improper.  And if we want to get to whether or not

15    affiliates means what I say it means, I again present

16    to you that that is not an argument that is appropriate

17    at this stage.

18       So the other this argument that I believe is raised

19    is our GTSA argument in the preemption.  I'll be brief

20    about that.  The distinction that I want to draw for

21    the Court between our complaint and Mr. Alexander's

22    complaint is again the Angelope case that we've all

23    briefed at this point.  Angelope makes it very clear

24    that when the idea that you are claiming as a trade

25    secret has other separate and distinct parts that those

1    separate and distinct parts may not be essentially

2    preempted by the GTSA, meaning that if the separate

3    components are distinct and are unique, they do have

4    the ability to stand on their own as claims of theft.

5         Now, theft, conversion, tortuous interference, the

6    claims that we've alleged, Paragraph 44 of our

7    complaint makes it very clear -- and in that paragraph

8    we clearly state that Ms. Ross not only provided an

9    idea to Crew Live, but she created wire frame, she

10   created confidential information, she created Power

11   Points, things that aren't necessarily trade secrets,

12   but were disseminated and disbursed without her

13   permission and were confidential information in any

14   event.  So --

15        THE COURT:  Did she have a NDA with Craig -- or Mr.

16   Alexander?

17        MR. ANOZIE:  I believe a NDA was discussed, but

18   there is no physical NDA between her and Mr. Alexander.

19        THE COURT:  So why would he have a duty to keep it

20   confidential?

21        MR. ANOZIE:  Well, he had a duty not to breach the

22   fiduciary duty with his principal.  And one of those

23   fiduciary duties is not to usurp any of her

24   opportunities for himself.  And I believe in that is

25   embedded a duty to not --

1          THE COURT:  So you're claiming he has a fiduciary

2      duty because -- I guess because you guys alleged he was

3      an agent?

4          MR. ANOZIE:  Correct.

5          THE COURT:  Okay.  Continue.

6          MR. ANOZIE:  So, your Honor, I do believe that

7      these things are distinct.  I do believe that these

8      things are distinct.

9          THE COURT:  Was there -- was there an agreement

10      between Mr. Alexander and Ms. Ross, a written agreement

11      that -- making him the agent of Ms. Ross to negotiate

12      or talk to Delta on her behalf?

13          MR. ANOZIE:  Not a written agreement, your Honor.

14          THE COURT:  Okay.

15          MR. ANOZIE:  And, your Honor, if you'll indulge me,

16      I might have had a little eureka moment of my own to

17      kind of demonstrate this point.  My son does this thing

18      where he leaves things in my bag, and for once it may

19      have been helpful.  This is my son's Ninjago Lego set.

20      And together it's the whole Ninjago Lego set, but when

21      we take just the wheel off, it's still a Ninjago

22      playset, just doesn't have a third wheel.  We take

23      another wheel off, it's still a Ninjago playset, it

24      just doesn't have a third wheel.

25          What Ms. -- what Ms. Ross is alleging is that she

36

1    had Family Flight -- or she had Crew Live, which

2    consisted of components that detailed in her

3    presentation, her wire frames, and all those things

4    that are just confidential information.  That is Lego

5    never said it invented the wheel and neither did Ms.

6    Ross.  I don't think Ms. Ross is saying she invented

7    text messaging.

8        I said -- I think she has a proprietary and

9    confidential way of deploying the text messaging that

10   is buttressed by trade secrets that when combined

11   collectively create a scenario where we have a trade

12   secret.  But each piece is separate and unique, meaning

13   that we could take this -- and I have another one of

14   these in my bag for some reason -- but if I put the

15   wheel on the other car, the wheel that is separate and

16   distinct is still a separate and distinct fact that --

17   or a separate and distinct application that can be used

18   on multiple features.

19       What we're saying, your Honor, is not that we don't

20   understand GTSA is a preemption of similar

21   non-separate, non-distinct facts.  But Mrs. Ross's,

22   complete, entire package of information includes

23   confidential information that is separate and distinct

24   and has applications outside of Crew Live, which we've

25   alleged.  We, in fact, alleged at the very beginning of

1    our complaint that she was working on communications

2    applications across the industry of transportation,

3    meaning she should be able to and has been able to take

4    pieces of Crew Live and apply it to other applications.

5    We've alleged that fully. So --

6        THE COURT:  Doesn't that kind of undermine the

7    whole this is a trade secret thing?

8        MR. ANOZIE:  No.  We're saying that Crew Live is a

9    trade secret.  We're saying that Crew Live consists of

10   separate and distinct components that may be

11   confidential information, including Power Point

12   presentations, including wire frames, including a bunch

13   of other things.

14       And when you look at Angelope, your Honor, we

15   believe Angelope very clearly spells out that separate

16   and distinct applications, separate and distinct

17   functions, even if they're all overlapping facts.

18   Meaning, even though I can put this wheel on another

19   Lego set, that does not change the fact that this wheel

20   is a separate and distinct application that was created

21   for a purpose that can be used in different scenarios.

22       And that's what we're talking about with the

23   distinction between her GTSA trade secret claims and

24   the claims of theft, conversion, tortuous interference

25   and conspiracy.  We're saying that we can take a couple

38

1         of those applications out. They're separate and

2         distinct. When we put them all together, we do get

3         again the exact same thing that we had the whole time,

4         just minus one feature or another feature.

5             THE COURT: Okay. Just so I understand, you're

6         saying the car is the GTSA claim?

7             MR. ANOZIE: Correct.

8             THE COURT: But the pieces of the car are your

9         theft by conversion?

10            MR. ANOZIE: They may constitute theft by

11        conversion, including the fact that the Power Point

12        presentations, the wire frames, any of even as --

13           THE COURT: They converted the Power Point

14        presentation?

15           MR. ANOZIE: Yeah. What we say is that -- one of

16        the things we said is that she created a Power Point

17        presentation that was presented to Rahul Samant, I

18        believe. And that Power Point presentation was

19        presented by Mr. Alexander. But any information that

20        Mr. Alexander gave to them that influenced this app is

21        indeed part of Mrs. Ross's confidential information.

22           THE COURT: Okay.

23           MR. ANOZIE: Your Honor, I believe that is all the

24        points I have for you today. If you have no more

25        questions of me, I will take my seat.

1          THE COURT:  No.

2          MR. ANOZIE:  Thank you.

3          THE COURT:  Thank you.

4          MR. BALSER:  Very briefly in response, your Honor,

5     if I may?

6          THE COURT:  Sure.

7          MR. BALSER:  Let's start where my friend left off,

8     which is on the preemption argument on the GTSA claim.

9     If you look at the complaint, the only confidential

10     information and property that's identified in

11     intervener's complaint is Crew Live.  That is the basis

12     for the trade secret claim.  If you look at Complaint

13     Paragraph 119, she claims that her claim for civil

14     conspiracy to commit theft and conversion alleges that

15     Delta defendants conspired to wrongly convert Mrs.

16     Ross's Crew Live property.  That is the same basis that

17     she alleges as the basis of her trade secret claim.

18          So once you allege that the basis of her trade

19     secret claim is that Delta stole Crew Live, the basis

20     of her theft and conversion and conspiracy claims is

21     that the confidential information consisted -- consists

22     of Crew Live was misappropriated -- clearly preempted.

23          Angelope doesn't help.  That case -- and it is

24     distinguishable in many respects, but the key

25     difference there is the plaintiff in that case

1    expressly identified some trade secrets in their

2    complaint, but other information was expressly

3    identified as not involving a trade secret.  So the

4    claims that were based on the trade secrets were

5    preempted, but all of the other claims that were based

6    on information that was expressly identified as not

7    being a trade secret were not preempted.

8         Here, everything that she's alleging that was

9    misappropriated relates to Crew Live.  It's in her

10   complaint.  That's the basis of her trade secret claim,

11   and that's why all the tort claims are preempted.

12        So I want to just briefly respond -- I just want to

13   kind of level set here on the -- on this duty issue

14   under the GTSA.  The duty that's owed to protect a

15   trade secret comes from a relationship not free-formed

16   out of the GTSA.  Delta may have had a duty to Mr.

17   Alexander based on an NDA, but that doesn't extend to

18   Ms. Williams (sic) because she's not the signatory in

19   that NDA.  And that duty can't come through the GTSA

20   because one of the elements of a trade secret under the

21   Georgia Trade Secret Act is that a person alleging

22   misappropriation has to take steps to keep the trade

23   secret confidential through things like an NDA.

24        And intervener's theory that there's some free-form

25   duty created by the GTSA would read that element --

1    that necessary element of trade secret out of the

2    statute.

3         One brief -- just to wrap up on the statute of

4    limitation point, Court's dead on on the timeline and

5    on the evidence, but I also just want to reiterate

6    that's a belt and suspenders argument.  We have -- I

7    mean we don't need that argument to have the Court

8    dismiss the complaint.  We've got all of our other

9    arguments we think we should prevail on, but there is

10   an alternative ground to dismiss the tort claims and

11   the GTSA claim under the statute of limitations.

12        And I think it's entirely appropriate based on her

13   references to the recordings that reference the email,

14   the 2015 email where she says I'm writing a cease and

15   desist because you're misusing my information is

16   clearly evidence of notice of a potential claim.  And

17   she waited almost nine years later to file a complaint.

18   So for all those reasons, your Honor, we think this

19   complaint -- intervener's complaint should be dismissed

20   against the Delta defendants.

21        THE COURT:  Thank you.

22        MR. BALSER:  Thank you.

23        THE COURT:  Anything else, briefly?

24        MR. ANOZIE:  One last thing briefly, I would just

25   invite the Court to review the NDA as well on the GTSA

1  argument.  Because the NDA itself prescribes two

2  separate sets of information.  Section --

3       THE COURT:  Where are you looking?

4       MR. ANOZIE:  Page 1, definitions, Section 1C,

5  confidential information shall mean all nonpublic

6  information, whether in writing or retained as mental

7  impressions.  That's about as broad as I've ever seen

8  it.  And that's confidential information, meaning that

9  any of these ideas that Ms. Ross imparted on to Mr.

10  Alexander are anticipated by the NDA.

11       And then if we go down -- math's not that great --

12  one, two, three, four, five, we hit trade secrets.  The

13  NDA knows that there a difference between the

14  classification of information that Mr. Alexander was

15  meeting with them about, so I just want to highlight

16  for the Court that even the contract itself describes

17  this information.

18       MR. BALSER:  If I may, your Honor, but the

19  complaint is what controls.  And what she says is trade

20  secret is Crew Live and all its attendant pieces.  And

21  that's also the basis of her -- her other claims.

22       THE COURT:  Well, I mean this is also talking about

23  confidentially of -- anyway -- of the parties to the

24  contract.  And I guess Mr. Nnamdi, you're saying

25  because she is an affiliate, she falls under this.

1            MR. ANOZIE:  Well, we're first saying that because

2       she is the -- she is a party -- we're saying if she's

3       not a party, she's an affiliate.  If she's not an

4       affiliate, she's a party.  In any one of those

5       scenarios, as both parties have pled in the

6       alternative, we are entitled to the rights and

7       protections of this agreements is what we're saying.

8            THE COURT:  Okay.  I'm going to take a brief break.

9       I'll be back in five minutes.

10           MR. BALSER:  Would it be helpful, your Honor --

11           THE COURT:  Yes --

12           (Brief recess taken.)

13           THE COURT:  Please be seated.  I'm going to grant

14      the motion to dismiss as to Delta.

15           Mr. Balser, if you could -- or your firm -- prepare

16      a proposed order, we'll take a look at it.

17           MR. BALSER:  Thank you very much, your Honor.  We

18      appreciate it.

19           THE COURT:  Thank you.

20           MR. BALSER:  Including the individual defendants,

21      all the Delta defendants?

22           THE COURT:  Yes.

23           MR. BALSER:  Thank you.

24           THE COURT:  All right.

25           MR. ANOZIE:  Your Honor, is that with respect to

1      all grounds?

2           THE COURT:  I'm going to take a look at the

3      proposed order, and if there's anything that's not

4      being ruled on, I'll be clear in the order.

5           MR. ANOZIE:  Okay.

6           THE COURT:  Okay.

7           MR. BALSER:  Thank you.

8           THE COURT:  Thank you.  And if you have questions,

9      you can obviously ask questions after the order is

10     issued.

11           MR. ANOZIE:  Thank you, your Honor.

12          THE COURT:  Thank you.

13          (Proceedings concluded.)

45

1          C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    COUNTY OF DEKALB:

5              I, Tina D. Harris, Certified Court Reporter for the

6    State of Georgia, do hereby certify that the foregoing

7    transcript is a true and correct record of the proceedings of

8    the aforementioned case in DeKalb County, Georgia.

9              This certification is expressly withdrawn and

10   denied upon the disassembly or photocopying of the foregoing

11   transcript, unless said disassembly or photocopying is done by

12   the undersigned official court reporter and original signature

13   and seal is attached thereto, this the 17th day of NOVEMBER,

14   2024.

15

16

17                        __/S/Tina D. Harris_____
                          TINA D. HARRIS, CCR-B-2128
18                        State Court of DeKalb County
                          Stone Mountain Judicial Circuit

19

20

21

22

23

24

25

1              IN THE STATE COURT OF DEKALB COUNTY

2                    STATE OF GEORGIA

3

4

5   CRAIG ALEXANDER,            )

6                  Plaintiff,  )

                             ) CIVIL ACTION FILE NO.:

7               VS.      )

                           ) 21A03275

8   DELTA AIR LINES, INC, ET AL,   )

9                Defendants. )

10

11     TRANSCRIPT OF CIVIL MOTION HEARD BEFORE THE HONORABLE
        KIMBERLY ANDERSON, STONE MOUNTAIN JUDICIAL CIRCUIT,
12                DECEMBER 05, 2024.

13

14

15   APPEARANCES OF COUNSEL:

16   FOR THE PLAINTIFF:   WILLIE ELLIS, JR.
                     ATTORNEY AT LAW
17

   FOR THE INTERVENER:  KIMBERLY COPELAND
18                   ATTORNEY AT LAW

19   FOR THE DEFENDANTS:  LAWRENCE SLOVENSKY
                   ATTORNEY AT LAW
20

21

22

23             TINA D. HARRIS, CCR-B-2128
             OFFICIAL COURT REPORTER
24          STATE COURT OF DEKALB COUNTY
        556 MCDONOUGH STREET, SUITE 2210
25            DECATUR, GEORGIA 30030

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | December 5, 2024 |
| 3 | THE COURT:  Ms. Copeland, can you hear me? |
| 4 | MS. COPELAND:  Yes, I can. |
| 5 | THE COURT:  All right. |
| 6 | So I think it's your motion to dismiss, correct? |
| 7 | So I'm going to let you come up here.  Make sure the |
| 8 | mic is on green, otherwise, she will not be able to |
| 9 | hear you. |
| 10 | MR. ELLIS:  The mic is on green. |
| 11 | MS. COPELAND:  Your Honor, can I point out |
| 12 | something right quick? |
| 13 | THE COURT:  Sure. |
| 14 | MS. COPELAND:  Okay.  We also have a motion for a |
| 15 | stay that's in place, and I think the Court need to |
| 16 | know that the federal court did have a hearing -- well, |
| 17 | bankruptcy court did have a hearing on Monday, and |
| 18 | what's pending before that court is -- they have to |
| 19 | brief it by Friday.  And what's pending before that |
| 20 | court is to determine whether or not the matter -- the |
| 21 | subject matter of this court is actually property of |
| 22 | the trustee.  So I think that the Court need to be made |
| 23 | aware of that first. |
| 24 | THE COURT:  I was aware of the bankruptcy.  We have |
| 25 | been checking to see if there had been a ruling as -- |

2

1          because it's my understanding it's not a guarantee that

2          it will even be open at this point.

3                    MR. ELLIS:  There isn't, your Honor.  And --

4                    MS. COPELAND:  Well, your Honor, the question

5          before bankruptcy court is not whether or not it have

6          merit, it's whether or not was that property a part of

7          the trustee, and it appears it may be open.  Mr. Ellis

8          appeared before bankruptcy court to try to argue the

9          case before the bankruptcy court Monday and the

10         bankruptcy court does not take evidence to the merit of

11         the case.  It's whether or not will they open it up and

12         see if the property belongs to the trustee.  That's the

13         only -- it's a narrow question before the bankruptcy --

14                   THE COURT:  I understand --

15                   MS. COPELAND:  Most likely they're not and it will

16         be open.

17                   MR. ELLIS:  Your Honor, may I just, please?

18                   THE COURT:  Yes.

19                   MS. COPELAND:  What I think --

20                   THE COURT:  Ms. Copeland -- Ms. Copeland, let him

21         -- he asked to be heard about that real quick.

22                   MR. ELLIS:  Your Honor, it wasn't --

23                   MS. COPELAND:  Okay.

24                   MR. ELLIS:  -- it wasn't an argument before the

25         bankruptcy court about the merits of the case.  And,

3

1    more so, the -- the bankruptcy court wasn't aware of

2    what was going on.  They were provided with Ms.

3    Copeland's amended complaint and told it was a billion

4    dollar claim that hadn't been disclosed.  And so the

5    judge said, well, if there's something that Craig

6    should get, maybe I should reopen it, but I don't know.

7        And what we told the court, well, if the claims are

8    futile, you don't have a right reopen it, and that's

9    why he took it under advisement.  And he allowed the

10   trustee now to file a motion to show why he believes

11   it's not futile to open it.  The statute of limitation

12   has expired or she didn't have an interest in the first

13   place.

14       And so then the court is allowed -- and he also --

15   the judge also allowed me to file a response.  He gave

16   me a week.  I said I just need until Monday.  Because

17   at the end of the day, what we're here about and what

18   we're going to start with in the motion to dismiss is

19   that if the -- if it's in her bankruptcy estate, she

20   never had standing to file the intervener complaint,

21   and therefore, she doesn't have standing today to be

22   here.  And that's the jurisdictional issue that is --

23   that a court has to determine before we even move to

24   the next subject.

25       And her own filings, including running to the

4

1           trustee and asking for this to be re-opened just

2           reinforces she doesn't own the claim.  It doesn't even

3           have the right to bring a claim because if it's still

4           in her bankruptcy estate, then --

5               THE COURT:  It's either the -- it's the trustee's

6           claim to make --

7               MR. ELLIS:  Exactly.

8               THE COURT:  -- not her.

9               MS. COPELAND:  Your Honor, can I --

10              THE COURT:  Ms. -- Ms. Copeland, please.  I just --

11          it's -- it's very difficult on the Zoom.  I promise

12          I'll get to you in just a second.  I just am trying to

13          understand --

14              MR. ELLIS:  It's even more removed than that, your

15          Honor.  Because the trustee doesn't have it.  It's in

16          her bankruptcy estate.  And what the motion is is for

17          the U.S. Trustee to appoint a trustee to then look into

18          it, if you read it.  So because the Chapter 7 trustee

19          that was on this case has retired, so there is no

20          trustee.  It's just in the estate.

21              THE COURT:  Correct.

22              MR. ELLIS:  So the trustee would have to then get

23          the -- that's what the motion is asking for.  It's

24          asking the court for permission to appoint a trustee so

25          the trustee can look into it to see whether or not the

5

1             -- the -- a claim should be pursued by the trustee.

2             But not by Ms. Ross. And Ms. Ross is the only person

3             -- she did not file this case on behalf of the estate

4             -- behalf of a trustee. She filed on behalf of

5             herself, but she doesn't own it.

6             THE COURT: So it's your position that she wouldn't

7             own it because of the previous bankruptcy?

8             MR. ELLIS: Yes, your Honor. And it's in her own

9             motion. She says it. It's in the trustee's motion.

10            In her motion to stay, Ms. Ross says in Paragraph 1 in

11            the argument, under bankruptcy code -- specifically 11

12            U.S.C., Section 541, a bankruptcy estate includes all

13            legal and equitable interests of the debtor and

14            property as of the commencement of the case. If the

15            claims in the present litigation include her rights to

16            a intellectual property, Crew Live may fall within the

17            bankruptcy estate if the bankruptcy case is reopened.

18            That's what she says.

19            THE COURT: Okay.

20            MR. ELLIS: And -- and she goes on to say, if the

21            -- Paragraph 2, if the bankruptcy estate is reopened

22            the trustee will likely become the real party in

23            interest.

24            This -- real party -- this isn't a real party

25            interest argument. Standing is not the same as real

| | |
|---|---|
| 1 | party interest. She doesn't have the claim. She |
| 2 | didn't bring it on behalf of the trustee. She didn't |
| 3 | bring it on behalf of the bankruptcy estate. |
| 4 | We said when she filed her motion to intervene, she |
| 5 | didn't have standing. We said she should be estopped. |
| 6 | It's been six months. And she waited to go try to |
| 7 | reopen it -- the estate after the hearing was scheduled |
| 8 | on motions to dismiss. Regardless, she didn't have |
| 9 | standing to bring intervening complaint in the first |
| 10 | place. |
| 11 | THE COURT: Okay. |
| 12 | Ms. Copeland. |
| 13 | MS. COPELAND: Yes. Thank you, your Honor. May it |
| 14 | please the Court. |
| 15 | First, let's start off with the statute of |
| 16 | limitation. Ms. -- Ms. Ross -- |
| 17 | THE COURT: Hold on. Hold on, Ms. Copeland. I |
| 18 | guess at this point I think it -- he is just discussing |
| 19 | the bankruptcy issue. If you want to specifically |
| 20 | address that, that's fine. He hasn't -- |
| 21 | MS. COPELAND: Okay. |
| 22 | THE COURT: -- discussed his other bases for the |
| 23 | motion to dismiss. |
| 24 | MS. COPELAND: Okay. Okay, well, I'll take -- |
| 25 | THE COURT: If you want to, or I can let him |

1         continue his argument because it's his motion.

2              MS. COPELAND:  Okay.  I'll just stick with the

3         bankruptcy issue.

4              THE COURT:  Okay.

5              MS. COPELAND:  Ms. Ross included her company that

6         owns Crew Live under her bankruptcy.  And the fact that

7         she's asking for a trustee to be appointed does not

8         change the status of that case.  Just like if I drop

9         dead or you drop dead, cases still keep moving on.  You

10        follow me, your Honor?  Just because that particular

11        trustee retired, it's still property of the trustee.

12        It's just a matter of which trustee gone oversee it.

13             I think the proper thing at this juncture, your

14        Honor, is to stay these proceedings and see exactly

15        what bankruptcy is saying.  Then that way you don't get

16        a misrepresentation about what happened in bankruptcy

17        court by me, nor Mr. Ellis, because he have a different

18        perspective.  I was there.  He was there, and the

19        bankruptcy attorney and the trustee was there.  He have

20        a different perspective of what happened in -- in that

21        bankruptcy proceeding that I attended.

22             So, therefore, the proper thing to do, in my

23        opinion, is to stay it and to see what happens in

24        bankruptcy.  And under bankruptcy law, if this matter

25        is properly -- if it was properly under the trustee at

8

1            that time, Ms. Ross then have a standing to bring --

2            and actually until -- until such time the bankruptcy

3            court abandon it, then it comes to Mrs. Ross, and then

4            the statute -- then the time start actually ticking for

5            her under that bankruptcy code.

6                And that's what we're arguing is that either way,

7            she would still have standing in this matter because

8            once bankruptcy court take whatever portion of Crew

9            Live or whatever they think is theirs, they will

10           abandon the remainder to her.

11            THE COURT: But what if they take all of it?

12            MS. COPELAND: If they take it all -- if they take

13            it all -- even if they take it all, if it's anything

14            left, it still goes back to her. If they satisfy all

15            her creditors, it still goes back to her.

16                But the point that we're at now is to determine

17            rather or not the bankruptcy would take jurisdiction,

18            and if so, that they abandon it back to her. And if

19            they abandon it back to her and say, hey, all your

20            creditors is satisfied, the statute starts running for

21            her at that point. But we still think that we're

22            within the statute because she intervene as right and

23            not as permissive intervener.

24            THE COURT: All right. Mr. Ellis.

25            MR. ELLIS: Your Honor, she's still -- she's still

1    saying basically she doesn't have standing.  We -- the

2    Court --

3        MS. COPELAND:  That's not what I said.

4        THE COURT:  Ms. Copeland, please.

5        MR. ELLIS:  The Court doesn't have to wait and see.

6    What the trustee does in a separate proceeding has

7    nothing to do with this court.  And the Court really

8    isn't authorized to do that.  The -- we cited the

9    cases.  D.R. Horton is a good case the Court could look

10   at.  That's the case we cited.  And --

11       THE COURT:  What is the cite?  Sorry.

12       MR. ELLIS:  The D. R. Horton case cite -- I didn't

13   copy the D. R. Horton case cite here.  The -- oh, yes,

14   I did.  320 Georgia Appellate 772.  It's a 1990 case.

15   And in that case there was a case where Mr. -- where

16   the plaintiff filed a lawsuit for construction of his

17   home.  And the -- and then after he filed the lawsuit

18   for construction of his home, he alleged fraud, and he

19   alleged fraud against the builder, D. R. Horton.  And

20   he filed -- subsequently filed bankruptcy.

21       He disclosed to the trustees his claim against D.

22   R. Horton, and the trustee decided not to pursue it,

23   but that case was dismissed.  And the claim was

24   abandoned back to the plaintiff in that case after the

25   claim was dismissed.  Then he tried to refile it.  And

1    so when he refiled the case, he filed the case against

2    D. R. Horton, as well as three other parties.  So I

3    believe there were subcontractors.

4         The court held that the claim as to the

5    subcontractors, he didn't have standing to pursue

6    because it was never disclosed in bankruptcy court.  He

7    tried to reopen his estate -- same thing Ms. -- Ms.

8    Ross is trying to do now, trying to get the trustee to

9    reopen the estate -- and the court basically said,

10   look, standing is a threshold issue, you have to have

11   it at the time that the complaint is filed.

12        And the court is not required to wait and see what

13   happens in a whole 'nother proceeding to see whether or

14   not standing will ever change.  Because it can't

15   change.  This is not real party interest argument.

16   It's whether the court has jurisdiction to hear Ms.

17   Ross's claim.  There's nothing that Ms. Copeland has

18   said that says the court has standing to hear the

19   claim, because she doesn't have the claim.

20        It belongs the -- it belongs to her bankruptcy

21   state -- estate.  And so let's just assume -- let's let

22   this play out.  We assume that a bankruptcy trustee --

23   the estate is reopened, okay.  The trustees are

24   appointed.  I don't know how long that takes.  And now

25   the trustee has to go through all the material, all

11

1          these documents to figure out whether she has a claim,

2          including the professional services agreement,

3          including her voice recordings.  It could take months.

4              And we don't have to wait and see, because at the

5          end of the day the judge could short-circuit this by

6          saying I don't have -- you don't have standing;

7          therefore, you couldn't have brought this complaint in

8          the first place.

9              Until you get standing -- until it's abandoned back

10         to you -- as Ms. Copeland said, until it's abandoned

11         back to her, any portion of this, she -- she cannot

12         assert any rights.  And in her complaint --

13             THE COURT:  Well, okay, so -- but you said until

14         it's abandoned back to her.  So let's say it is

15         abandoned back to her, then what happens?

16             MR. ELLIS:  Well --

17             THE COURT:  So why shouldn't I grant the stay if we

18         need to see if it's going to be abandoned or not?

19             MR. ELLIS:  Because she's not properly before the

20         court.  So you're granting a stay of claims that are

21         properly before the court for a party who's not

22         properly before the court.  And that's not what the

23         statute -- that's not what it says.

24             For example, in Cingular Wireless PC case, which is

25         3 -- it's a Supreme Court case, 303 Georgia 468 -- 467,

1 468, 2018. The court said standing must be determined

2 at the time in which the complaint is filed in order to

3 place the actual case or controversy in the purview of

4 this court. That's also cited in Georgia Court of

5 Appeals case Anderson Anesthesia vs. Anderson. That's

6 333 Georgia Appellate 437 at Page 441.

7  So that's what we're getting to, your Honor. This

8 is a threshold issue. It's not something that can be

9 corrected later on. Either you have standing to bring

10 it or you don't. And she did not have standing in June

11 of 2024 when she filed to -- to pursue this claim. She

12 doesn't have standing today to be here before this

13 Court.

14  THE COURT: Okay.

15  Ms. Copeland.

16  MS. COPELAND: Thank you, your Honor.

17  THE COURT: And this is --

18  MS. COPELAND: The case law --

19  THE COURT: This is just about -- this is just

20 about the standing at this point.

21  MS. COPELAND: Yes, I understand that.

22  THE COURT: Okay.

23  MS. COPELAND: In Re Maxwell, 1579 B.R. 858 --

24 that's a bankruptcy case out of '93 -- the court

25 emphasized only the trustee may act concerning an

1        estate property until it's formally abandoned.

2            Therefore, what that's telling the court is this

3        here: Until the bankruptcy court abandon this here,

4        Ms. -- because if we play it out and the court abandon

5        it back to Ms. Ross, then Ms. Ross going to have a

6        right to bring suit because she would have standing

7        proper before the Court. Either way it go --

8            THE COURT: But I think -- Ms. Copeland, I think

9        Mr. Ellis's point is she has to have standing right

10       now. And right now had she doesn't have standing

11       because it either -- I guess it should have been in the

12       hands of the trustee, correct?

13           MR. ELLIS: Yes, your Honor.

14           MS. COPELAND: And if this is property of the

15       trustee, no one can move forward. That's the point

16       that we're making, that the standing -- she does have

17       standing in that she have a interest of what the

18       trustee's going to do. She's the debtor. She has

19       standing as the debtor of the trustee. Even though

20       it's property of the trustee, she's still the debtor

21       and she has certain Chapter 11 protection as such, and

22       she have a right to -- for the trustee to examine what

23       her estate is and then abandon whatever portion back to

24       her. And that gives her standing.

25           And she could not notify the court -- the

14

1    bankruptcy court until this matter here was stopped

2    that -- that this was in jeopardy.  And she done just

3    that, your Honor.

4         I think the proper thing to do is to see exactly --

5    because the bankruptcy court gone make a decision one

6    way or another by Monday.  Because the federal court

7    move way faster than state court and superior court.

8    And I'm pretty sure the Court's very aware of that.

9    And either -- at that point we'll know at what juncture

10   we need to go.

11        MR. ELLIS:  Your Honor, may I respond to that?

12        THE COURT:  Sure.

13        MR. ELLIS:  And I will be very quick.  Just to

14   explain again, it's crystallized -- and just using

15   their own documents that they filed in court, but this

16   is the actual trustee's motion.  I'm going to read

17   Paragraph 12 and 13.  It's at Section 541, bankruptcy

18   code defines property estates as all legal and

19   equitable interests in debtor and property as of the

20   commencement of the case.  It says legal causes of

21   action, including this broad definition.  Paragraph 13

22   says property of the estate that was scheduled under

23   Section 521A that is not otherwise administered during

24   the case is deemed administered and abandoned to the

25   debtor at the time of closing.  Property of the estate

1            that was not scheduled and that was not administered

2            remains property of the estate.

3                This is -- this is the trustee's motion in the

4            bankruptcy court. All we're saying is that it belongs

5            to the bankruptcy estate. She didn't have any right to

6            file. We keep saying the same thing over and over

7            again. She never registered. It was never abandoned

8            back to her. We don't -- we can't go back if it's

9            abandoned to her in a year or abandoned to her in six

10           months and then say she had a right to file this in

11           June when it's a standing issue.

12               THE COURT: Okay. All right. I recognize your --

13           I think I understand your position.

14               MR. ELLIS: Yes, your Honor.

15               THE COURT: That's why I don't practice bankruptcy.

16               Ms. Copeland, is there anything else you want to

17           add as to the standing?

18               Because I think you have other points you'd like to

19           make, Mr. Ellis; is that correct?

20               MR. ELLIS: Yes, your Honor.

21               THE COURT: Okay. Ms. Copeland, any --

22               MS. COPELAND: Yes, your Honor.

23               THE COURT: Okay. Briefly about the standing.

24               MS. COPELAND: Okay. Crew Live was abandoned to

25           Ms. Ross when -- when -- after the bankruptcy ended

1        initially.  So --

2             THE COURT:  Why -- wait, wait.  Ms. Copeland, how

3        could it have been abandoned to her when it was not

4        disclosed in her bankruptcy filings?

5             MS. COPELAND:  Because it is a -- Crew Live was not

6        specifically named because it is an application.  What

7        was specifically named was Skyvia (phonetic), and under

8        a bankruptcy you don't have to name -- just like it was

9        a cookie place, you don't have to name --

10            THE COURT:  What is Skyvia?

11            MS. COPELAND:  Skyvia is the company that owns Crew

12       Live, and what was made aware to the bankruptcy that

13       Crew Live, that application was being litigated.

14       That's why they came back, so --

15            THE COURT:  Okay.  Well, Skyvia -- hold on, Ms.

16       Copeland.  Because if Skyvia was the true owner of Crew

17       Live, then Skyvia should be the plaintiff here, not Ms.

18       Ross.

19            MS. COPELAND:  Ms. Ross and Ms. -- and guess what,

20       your Honor?  Crew Live is owned by Mrs. --- or Skyvia

21       is owned by Mrs. Ross --

22            THE COURT:  I under --

23            MS. COPELAND:  -- and it had been deeded over to

24       Mrs. Ross.  Therefore, whatever Skyvia owned, Ms. Ross

25       owned because it's called -- and I understand it's

17

1       convoluted.  That's the reason I'm saying it should be

2       stayed until bankruptcy can get -- figure this out.

3            But bankruptcy abandoned the whole bankruptcy back.

4       Matter of fact, she got a check out of the bankruptcy

5       because they abandoned everything back to her and gave

6       her back funds.  And what is now being determined is

7       whether or not they actually properly look at Crew Live

8       under that company umbrella.

9            THE COURT:  Was -- was Crew Live --

10            MS. COPELAND:  And it was abandoned to Sonia Ross.

11       It was -- Skyvia and all that was abandoned to Sonia

12       Ross, not to a company.  It was abandoned back to her.

13            THE COURT:  Anyway.  All right.

14            MR. ELLIS:  It's called Shock Theory.  But --

15            THE COURT:  That's -- what is it?

16            MS. HEIT:  Shock Theory.

17            MS. COPELAND:  And when Skyvia was dissolved, it

18       became the personal property of Mrs. Ross.  That's why

19       Ms. Ross is before the Court instead of Skyvia.

20            MR. ELLIS:  Okay.  So, your Honor, this is -- this

21       is something that -- so they filed an affidavit

22       yesterday and they filed an affidavit today while we

23       were in court.  And these are -- these are new things

24       that are outside the pleadings.  I could address it,

25       but they are not -- I mean it's an affidavit.  It's

| | |
|---|---|
| 1 | outside the pleadings. It's nowhere in the complaint. |
| 2 | She amended the complaint ten days ago and she never |
| 3 | said anything about Skyvia or some other entity owned |
| 4 | it. She said I own it and I have owned it since it was |
| 5 | created. And so -- |
| 6 | MS. COPELAND: That's correct. |
| 7 | MR. ELLIS: And so -- and she didn't disclose it in |
| 8 | bankruptcy that she owned a trade secret. So we're |
| 9 | back -- it's just a circular argument. |
| 10 | THE COURT: Okay. Why don't you move on. |
| 11 | MS. COPELAND: Your Honor, if we was afforded |
| 12 | discovery -- |
| 13 | THE COURT: Ms. Copeland -- Ms. Copeland, if we |
| 14 | could just move on to the other arguments, please. |
| 15 | MS. COPELAND: Okay, okay. |
| 16 | MR. ELLIS: Okay, your Honor, we started out by -- |
| 17 | you know, we filed the motion to dismiss and we've |
| 18 | always maintained that Ms. Ross doesn't actually own |
| 19 | anything. We submitted as a part of our answer and |
| 20 | alluded to our motion to dismiss the professional |
| 21 | services agreement that Ms. Rose drafted. She drafted |
| 22 | that on her own letterhead. And we're going to put |
| 23 | that up on the screen, please. |
| 24 | Well, I can explain. The Court can look at it and |
| 25 | then consider the contract -- |

19

1           THE COURT:  Oh, wait.  Here's --

2           MR. ELLIS:  Thank you.  We --

3           THE COURT:  That's the most you can do is a split

4     screen, and so --

5           MR. ELLIS:  Yes, that's fine.  So the contract --

6     you can see it -- has been provided to the Court.  It

7     is on Shock Theory's letterhead, and it identifies Ms.

8     -- Ms. Ross and Shock Theory as contractors, and it

9     identifies Mr. Alexander as the founder and CEO of Crew

10    Live.  What person claims they're complete owners of

11    something and then enter into a contract and name

12    another party the owner of their -- of their trade

13    secret?

14          But beyond that, the contract had a confidentiality

15    clause in it in Paragraph 9 that says the contractor

16    shall have no interest in the material that the

17    contractor produces.  It also --

18          THE COURT:  Well, I understand, but my concern with

19    -- I don't even know if I can consider this on a motion

20    to dismiss at this stage.

21          MR. ELLIS:  Well, pursuant to O.C.G.A. 9-11-10(c),

22    it says --

23          THE COURT:  I mean, I can convert it to summary

24    judgment.

25          MR. ELLIS:  Well, no -- well, because it was

1          attached to our pleading.  We attached it --

2                   THE COURT:  Oh, you attached it to the answer.

3                   MR. ELLIS:  To the answer.  And it's referenced in

4          her complaint --

5                   THE COURT:  Okay.

6                   MR. ELLIS:  -- that she entered into an agreement

7          with our client.

8                   THE COURT:  Okay.

9                   MR. ELLIS:  So -- so it is properly before the

10         Court.  It can be considered.  And that agreement also

11         has a work for hire clause that says anything she did

12         for hire is not hers, and importantly has a merger

13         clause in Paragraph 11.  The interpretation of the

14         contract is a matter of law for the Court, so we don't

15         need discovery on that.  Whenever the language of a

16         contract is plain and unambiguous, the contract

17         controls.  And to construe any ambiguity, it should be

18         construed against the person who drafted it.  Well,

19         guess who drafted it?  Mrs. Ross.

20                  And what's important is she signed it, and she

21         signed it again as a contractor and Mr. Alexander as

22         the founder and CEO of Crew Live.

23                  Can you pull that up?

24                  THE COURT:  Okay.

25                  MR. ELLIS:  So this is conclusive evidence that, A,

1    whatever rights she claimed she had, she waived.  And

2    the merger clause says this includes any conversations

3    or agreement before this contract.  So she has no

4    interest in Crew Live.  And for that reason alone, her

5    complaint also should be dismissed.

6        The -- she also admits that Mr. Alexander is an

7    owner.  She says that in her own secret recordings,

8    which are in the Court's records, which the Court may

9    also consider pursuant to the same statute, 9-11-10(c),

10   as well as the Court may take judicial notice of

11   anything in their files.  These were submitted in

12   discovery by Ms. Alexander (sic) in response to a

13   subpoena, Delta's subpoena.

14       And so in those secret recordings she admits first

15   that, again, Mr. Alexander is a owner of the trade

16   secret.  No one can deny that.

17       (An audiotape was played.)

18       MR. ELLIS:  So that's her admission that she did

19   the contract.  As far as him being an owner --

20       (An audiotape was played.)

21       MR. ELLIS:  So, again, this is just conclusive

22   evidence in the record that she's admitted that he's an

23   owner.  She signed a contract saying he is the owner,

24   and that she's just merely a contractor and then it

25   includes the merger clause that says anything -- that

1    any prior understandings or alleges (sic) regarding the

2    subject matter of this contract, they're mergers in

3    this contract and this contract controls.

4        And so, I would say that that is also reason why

5    her claim should be dismissed because she has -- again,

6    she doesn't own it. She doesn't own the claim she's

7    alleging.

8        Would you want Ms. Copeland to respond or --

9        THE COURT: Go through the remainder of your

10   arguments. I just -- standing is its own beast.

11       MR. ELLIS: Okay. The next argument is that her

12   claims are barred against Mr. Alexander by the statute

13   of limitations. She admits that also in another secret

14   recording that after she signed this contract, she

15   didn't produce anything to Mr. Alexander. Everything

16   he gave Delta was something he did on his own and --

17   and her -- her claims all predate the contract.

18       (An audiotape was played.)

19       The next one.

20       If you look at the face-to-face meeting transcript,

21   we're going to play the actual audio here, but the --

22       MS. COPELAND: Your Honor, I'm going to object to

23   that.

24       THE COURT: Okay. What's -- can you stop the

25   recording?

1             All right.  What's the basis?

2             MS. COPELAND:  The basis -- okay, the basis for my

3     objection is I was trying to endure as much as I can.

4     First of all, this is a motion to dismiss and you have

5     to look at the four corners of the complaint to

6     determine.  Right now he's trying to submit evidence,

7     which we have not had an opportunity to do discovery,

8     which we would have been afforded that had this been a

9     true motion for summary judgment.  We would have at

10     least done discovery at some point, your Honor.

11             But right now he's excluding -- he's including

12     information that's not part of the -- the four corners

13     of the complaint.  And secondly, even when he said that

14     this Shock Theory contract -- just because mere

15     mentioning of the contract, you can't bring that entire

16     contract and interpret -- interpret that contract in a

17     motion to dismiss.  That's improper.

18             THE COURT:  Georgia law disagrees with you there.

19     If you reference a contract and have portions of it, it

20     brings in the whole contract.  You just can't bring up

21     bits and pieces of it.  Also open transcripts or the

22     recordings that were referenced in the complaint as

23     well, so those fully can come in to consider at this

24     time.

25             MS. COPELAND:  Okay.  Thank you, your Honor.

1         THE COURT: Continue, Mr. Ellis.

2         MR. ELLIS: Yeah. So if you -- I will -- you can

3     play the entire clip, but if you look at the final

4     portion of the transcript where Ms. Williams goes in

5     and she explain -- or Ms. Ross -- excuse me -- explains

6     that -- I'll let the tape play and I'll interpret it

7     later.

8         (An audiotape was played.)

9         MR. ELLIS: And so that -- what she's saying there

10    is that she admits she never gave Captain Alexander

11    anything after she signed this agreement in March 27,

12    2014. Everything she's claiming in this lawsuit,

13    allegedly, happened before she signed this agreement.

14    That's what she says right there in her own recording.

15    That's what she said, a contract isn't retroactive. It

16    can't cover things before it. And she references the

17    lawsuit, which is interesting, that Captain Alexander

18    had to file against her for breaching this contract.

19        He filed a lawsuit in Fulton County State Court in

20    2016 because she took the money to do the work, never

21    did the work, and then he sued her.

22        THE COURT: What happened with that case?

23        MR. ELLIS: Well, she filed bankruptcy four days

24    after she received the lawsuit. So she filed

25    bankruptcy. She's never answered. She never said

1    anything and he sued it as doing business as Crew Live.

2    And so, again, she didn't respond to it.  I mean, I

3    would think that that is judicial -- I mean not

4    judicial -- excuse me -- equitable -- it's estopped.

5    She's estopped.  But whatever estoppel it is, res

6    judicata, she had an opportunity to say what her

7    ownership interest in it and what their -- what the

8    contract meant and she did not do it.

9         So -- but -- so just assume that everything she did

10   and she's talking about in this case happened before

11   March 27, 2014.  And that's what her claims are about,

12   which is what she says in that clip.  The problem with

13   that is they also would be barred by statute of

14   limitations if that's what she's saying.

15        Because in another part of this conversation she

16   explains that she said sent Delta and Craig Alexander,

17   in 2014 or so, a cease-desist letter.  That's when she

18   was making -- saying whatever you're using, you're

19   using my stuff.

20             THE COURT:  Keep going.

21             MR. ELLIS:  And so I want to play that clip.

22             (An audiotape was played.)

23             MR. ELLIS:  So she says she sent a letter to Delta

24   telling them to cease and desist using -- excuse me --

25   don't F with her technology or she's going to come

1    after them in 2014.  That's when the statute began to

2    run.  That's when she knew that whatever she claimed

3    she gave Mr. Alexander before this contract was being

4    -- was being discussed with Delta.

5         Now I know she talks in the complaint about she was

6    -- she was working with him up until the end to try to

7    sell this to Delta, but her own words say the opposite.

8    Her own arguments say the opposite that basically she

9    didn't give him anything else, didn't even mess with

10   him anymore after 2014.  That's why he even filed a

11   lawsuit against her in 2016.

12        It's -- it's baffling how this web of lies just

13   keeps coming back to the same result.  If you believe

14   that your technology was being misappropriated in 2014

15   and you sent a cease and desist letter, well, that's

16   when your clock stopped.  So we're now ten years later,

17   at some point the statute ran out.  So what we're

18   saying is that her claims are barred by standing, by

19   contract, by statute of limitations.

20        As to the actual counts in the complaint, I'm here

21   for three parties, Captain Alexander, MABA Holdings,

22   LLC, and his wife, Sheila Alexander.  There is

23   absolutely no allegations in the complaint that present

24   claims against Sheila Alexander.  Only thing she says

25   about Sheila Alexander is she's listed in the complaint

1    that Captain Alexander filed as being a part of the

2    eureka moment.

3         And that constitutes to Ms. Ross conspiracy, theft,

4    conversion, misappropriation of trade secret. It does

5    not. Those are not the elements of misappropriation of

6    trade secret. The elements of misappropriation of

7    trade secret are that a defendant's guilty of

8    misappropriation if they disclose or use another

9    person's trade secret without explicit or implicit

10   consent knowing that it was acquired under conditions

11   that require secrecy or limited use.

12        Ms. Ross is not accused of using a trade secret.

13   And in fact, if you go back to her own documents where

14   the contract says Mr. Alexander is the founder and CEO

15   of the trade secret -- Crew Live's -- her own -- her

16   own -- so if he's -- and her own statements that she

17   won't deny he's an owner, no one will deny he's an

18   owner, then how could he misappropriate his own trade

19   secret.

20        All the claims fall like dominos when you think

21   about it. If he's an owner, it has to be the trade

22   secret of someone else's that he's misappropriated.

23   Everything else falls from that claim.

24        So going to the next one, tortuous interference,

25   that's only against Captain Alexander, and that's

1       tortuous interference with a business relationship.

2       She never had a business relationship with Delta.  She

3       admits that.  That's like the primary, like, claim.

4       You have to have some idea you're going to be in a

5       relationship with someone else's business.

6           So then you have the conspiracy to commit tortuous

7       interference.  It's the same problem.  You can't have

8       conspiracy if you don't have a claim for tortuous

9       interference.  They have a claim for theft -- the theft

10      claim is frivolous.  Captain never possessed anything

11      she said he couldn't have.  He was a owner.  He's

12      listed as owner in that contract.  And as far as

13      possessing something he didn't have, in her own

14      complaint she says we were partners, we know -- I knew

15      what he was doing, he was trying to sell to Delta.

16      Well, where did he possess something he didn't own and

17      took it from her?

18          Same thing with conversion.  The conversion claim

19      alleged is just as frivolous, because, again, he would

20      have to take something from her and then -- and use it

21      a way that deprives her of her ownership, and then she

22      would have to demand it back from him.  There's no

23      demand here back for the trade secret.  She was like,

24      no, go sell to Delta in her own complaint.  So she

25      doesn't allege facts sufficient to support a conversion

1 | claim.

2 | Conspiracy to convert property, same thing. Her

3 | breach of fiduciary duty claims are even more nebulous.

4 | First, she claims that he was her partner. And there's

5 | no agreement -- there's no partnership agreement with

6 | that, but the basics in Georgia for partnership, you

7 | have to share profits and losses. She never alleges

8 | they shared any profit or losses. As a matter of fact,

9 | in that recording we played a moment ago, she said,

10 | yeah, he put the cash up, but what I did was better

11 | than cash.

12 | Georgia case law says that -- and I'll point the

13 | Court to Motors of Georgia vs. Hamilton, 82 Georgia

14 | Appellate 735, 1950. This is -- this tells you how old

15 | this is. This says one party to a partnership

16 | agreement only has an interest in that profit and no

17 | liability for loss of the enterprise, he is not a

18 | partner, even the third parties. And thus, no

19 | partnership has been created. She's not -- she's not

20 | liable to anyone. All she says is I did what I did.

21 | That doesn't create a partnership.

22 | The second part of that is, you know, she said,

23 | well, he was my agent. Well, beyond the fact that the

24 | contract they signed doesn't say anything about her

25 | being -- him being her agent, it says he's the owner of

1      it. But -- and her own thing says he was an owner, her

2      own secret recording says he was owner of this.

3            But if you want to get the agency argument, it's

4      not enough for her to believe Mr. Alexander was her

5      agent. She has to hold him out to Delta as her agent.

6      And that had never been done. There's no evidence of

7      that in the record. She never held him out, and

8      therefore, there was no agency. So there is no -- and

9      then second part of that is she claims in her own

10     recordings that after 2014, after she signed this --

11     this document, she didn't give him anything else. So

12     where is that fiduciary duty? Where's that -- where's

13     that confidential relationship when he's out there

14     after 2014 dealing with Delta by himself?

15           There's no expectation that he's working on her

16     behalf. In fact he sued her 2016, well before 2018

17     when Flight Family Crew came out. So it's just

18     convoluted. It doesn't make sense. It doesn't add up.

19           Her fraud claim is equally -- against Captain

20     Alexander is equally frivolous. First, she doesn't

21     really allege what he did fraudulently. She says, oh,

22     he didn't disclose to Delta that I was the owner and

23     creator. Well, that would be a fraud on Delta. That

24     wouldn't be a fraud on her. So she -- you know. And

25     then on top of that she claims in her complaint, while

1    I was involved in every step of the process she was

2    receiving emails, every communication back and forth

3    with Delta she was blind -- she was blind

4    communications. So she was in the know that he was not

5    disclosing anything to Delta about her ownership.

6        The case law clearly says that a person claiming

7    fraud has to have shown they had exercised some type of

8    diligence. So beyond the fact she sent a cease and

9    desist letter in 2015 -- '14 claiming that don't use

10   her technology, she -- in her complaint she has that

11   she is being blind copied on all the communications.

12   She can't show where she was -- ever justifiably relied

13   on anything Captain said that she could claim as fraud.

14       The quantum meruit claims aren't related directly

15   to us. We include that in our second motion to dismiss

16   because we didn't -- I mean she didn't do any work for

17   us. She -- we didn't take anything from her. I

18   believe that's directed to Delta, as well as the third

19   party beneficiary contract NDA claim that's against

20   Delta. Those are certainly not against Sheila

21   Alexander, MABA Holdings or Craig Alexander.

22       Her derivative claims for attorney's fees,

23   exemplary damages and punitive damages cannot be

24   awarded unless she can be -- unless she has an

25   underlying claim that -- that she can stand on. And

1    that goes back to her not having standing.

2         And she has alleged some additional things in her

3    recent affidavits that I don't think the Court should

4    address because it's outside the four corners of the

5    contract -- of all the documents before the Court. If

6    the Court decides it will entertain it, I have some

7    comments about that as well.

8         THE COURT: All right. We'll hold on that at this

9    time.

10        MR. ELLIS: Yes, your Honor.

11        THE COURT: All right. Ms. Copeland.

12        MS. COPELAND: Thank you, your Honor. May it

13   please the Court.

14        THE COURT: Continue.

15        MS. COPELAND: I'm going to start off at -- yeah,

16   can you hear me?

17        THE COURT: I can.

18        MS. COPELAND: Okay. Thank you, your Honor. I'm

19   going to start off at the Shock Theory contract. If

20   you look at the four corners of that contract, your

21   Honor, that contract does not give him Crew --

22   ownership of Crew Live. But the parties was actually

23   -- that's the reason why discovery is so important in

24   this case. What the parties was actually discussing

25   were her creating a platform derivative of Crew Live.

1    That's what it was discussing.

2         So only thing she was doing was selling him a

3    platform which the contract was never fulfilled at any

4    rate.  And that's the reason why Mr. Alexander sued

5    her.  And once she filed bankruptcy, not only did he

6    pursue it once the bankruptcy lift the stay, he never

7    pursued his action.  And what's the tell-tell part of

8    whether or not Mrs. Ross have ownership in this matter

9    is, your Honor, own sanctions against Ms. Alexander

10   (sic).  Had Mr. Alexander not believed that Mrs. Ross

11   was the actual creator of Crew Live, he wouldn't --

12   would not have need to hush her up.  That's the biggest

13   tell-tell that she's the owner of Crew Live, and not

14   him.

15        And I know the Court is pretty aware that these

16   people have a long-standing relationship, personal as

17   well as business relationship that may have tainted

18   some of the stuff.  And that's one of the reasons why

19   discovery is so important in this case in order for the

20   Court to actually understand exactly what's going on.

21   And I think at this juncture it's premature to dismiss

22   this case because on the pleadings itself and the

23   interpretation of the -- your Honor -- enable to

24   interpret the contract and then what was actually sold

25   under that contract.  Crew Live was not sold.

1        It was a derivative of Crew Live what Mr. Alexander

2    was trying to pitch to Delta. He wanted a mobile -- a

3    mobile app version of Crew Live. If we got into

4    evidence, you would see that Crew Live was actually

5    developed prior to Mrs. Ross ever meeting Mr.

6    Alexander. If we ever got into the evidence of this

7    case, your Honor would be able to understand that Mr.

8    Alexander don't even understand what the Q in Crew Live

9    mean. And if we got into the evidence of this case and

10   what the posture of case would be, if Ms. Ross get on,

11   they setting theyself up for a summary judgment by

12   Delta because he's not going to be able to sustain

13   proving that he actually own this here or developed --

14   is the true developer of Crew Live.

15       And I'm going to talk a little bit about the

16   statute of limitation and the fact that she intervened

17   as a matter of right, not as a permissive intervener.

18   And if she intervenes as a matter of right, the statute

19   starts when -- when the initial complaint filed, which

20   is Mr. Alexander, which make her within that statute of

21   limitation.

22       And under the agency theory, I would think that

23   they had a formal partnership agreement amongst

24   themselves where he was acting as an agent on behalf of

25   Ms. Ross when he pitched the idea of Crew Live to -- to

1    Delta.  And when Delta came back, if we got into the
2    evidence, they didn't want what he initially sought --
3    showed them, and he came back to Mrs. Ross to try to
4    get more for her to develop.  If he was the true
5    developer of Crew Live, he wouldn't need her
6    assistance.  She developed it.  That's why she had to
7    do all the work, and her work is a value.

8         Where they talk about that $20,000 under that
9    contract he gave her, her work itself is a value to
10   him.  But, again, she was not selling him Crew Live,
11   she was selling him a platform -- a derivative of Crew
12   Live, and him telling he's doing business as Crew Live,
13   which have never been registered, you know, a DBA, how
14   can you register in a critical court?  He had never
15   registered Crew Live as -- in any critical court.  He
16   had never attempted to patent, though Mrs. Ross had a
17   provisional patent for Crew Live.  He doesn't mainly
18   because he cannot get a patent because he's not the
19   creator of it.

20        So all that stuff, if we got into the evidence of
21   this case, would be able to be pinned down and we could
22   determine who is the true owner of Crew Live.  And
23   right now they are using a cease and desist.  And for
24   cease and desist to actually get the statute to stop
25   running, she have to be specific of them desisting on

36

1          something. She was not specific enough in whatever she

2          sent in order put anything on notice, either put -- to

3          stop the statute from running for anything. And,

4          again, the statute relates back to Mr. Alexander when

5          he filed the complaint because she intervened as a

6          matter of right and not permissive.

7              And I'm not going to visit -- I'm not going to

8          revisit the bankruptcy issue because I think we have

9          talked about that enough. But I still think the Court

10          should stay this proceeding and see exactly what

11          bankruptcy's going to do.

12              Thank you, your Honor.

13              THE COURT: Thank you.

14              MR. ELLIS: Your Honor, may I?

15              THE COURT: Yes.

16              MR. ELLIS: Briefly. So I stood before this Court

17          and I explained a long time ago that Mr. Alexander knew

18          what he was dealing with when he was talking with Ms.

19          Ross. It wasn't about trying to shut her up, it was

20          trying to stop what's happening now. Her filing stuff

21          in court that just keeps finding things that are --

22          that are not truthful.

23              As far as the relation back for the intervener

24          complaint, let's just assume that's the truth, okay.

25          It still would be -- bar her claims against Captain

37

1          Alexander because he didn't sue himself in his original

2          lawsuit.  He sued Delta.  So she -- her claims would

3          not be tolled against him because he didn't sue

4          himself, he didn't sue MABA Holdings, he didn't sue

5          Sheila Alexander.  So she doesn't get the benefit of

6          when he filed the lawsuit for her claims against him.

7          Okay.  So the statute has run.  That's all over against

8          him from the moment she claims in that cease and desist

9          letter stop messing with my stuff, stop using my stuff

10         and give it to Delta.

11             She never received -- she never said she received

12         anything back from Delta or from Captain Alexander that

13         they were going to stop messing with her stuff.

14         Therefore, she was on notice, didn't do anything to

15         pursue it, she sat on her hands, it's gone.

16             THE COURT:  Well, I mean it doesn't even -- as far

17         as I understand Georgia law, you -- it doesn't even --

18         you don't even have to do something as formal as a

19         cease and desist.  It's once you know that somebody's

20         potentially using your items, that triggers the statute

21         of limitations.

22             MR. ELLIS:  Yes, your Honor.  It's know or should

23         have known.

24             THE COURT:  Right.  Have reason to know.

25             Okay, anything else, Mr. Ellis?

1          MR. ELLIS:  I have nothing else, your Honor, except

2     just in closing, again, I think that this Court can

3     easily resolve this case by just going with the truth

4     that she doesn't have standing to be before the Court

5     today and she didn't have standing to file this lawsuit

6     in June of 2024.  And that alone, we -- the case should

7     be dismissed.  And there's no reason waiting for

8     another proceeding to finish, whether it be on Monday

9     or at some later date when the trustee finally

10    investigates this claim, determines whether or not it

11    may want to pursue it.  It still will be a standing

12    problem that can't be corrected -- corrected later.  It

13    has to be what was her standing at the time the

14    complaint was filed, and she didn't have any.

15          THE COURT:  Okay, thank you.

16          All right.  Give me a second.  And I know you

17    wanted --

18          MR. ELLIS:  Oh, there is one more thing, your

19    Honor.  I'm sorry.  I'm sorry.  I'll be very quick

20    because she said something today -- Ms. Copeland said

21    something about Ms. Alexander having a patent.  I'm not

22    aware of that.  I do know of something I want to

23    provide to the Court, and I have slides too.  So would

24    you like it?

25          MS. HEIT:  I'd love it.  Thank you.

1           MR. ELLIS:  Sorry.  So in that -- in that packet,

2     what I'm showing is that the company Skyvia she's

3     talking about earlier is -- was not created until 2016.

4     And it went defunct.  It was administer --

5           THE COURT:  When was the bankrupt -- I know the

6     bankruptcy was filed --

7           MR. ELLIS:  2019.

8           THE COURT:  Okay, the bankruptcy was filed in 2019,

9     okay.

10          MR. ELLIS:  Correct.  Once she filed bankruptcy

11    five times between 2014 and 2019 -- the 2019 was the

12    only one she got discharged for.  Because the

13    bankruptcy court dismissed the others.  But Skyvia

14    wasn't even in -- around in 2012 or '11 -- whenever she

15    said she created this before she signed a contract with

16    Captain Alexander, so how could they have owned it?  It

17    didn't exist until 2016, and then it was dissolved.

18         And everyone knows that Georgia has what's called

19    survival statutes when it comes to dissolved

20    corporations.  It means you have to do everything,

21    including winding up within two years.  Otherwise

22    you're dead in the water.  There's a Supreme Court case

23    on that called Gas Pump vs. General Cinema Beverages.

24    It's a 1993 case.  It's 263 Georgia 583, and I have a

25    copy for the Court if you would like it, your Honor.

1    THE COURT: Yeah.

2    MR. ELLIS: But in that case the Supreme Court

3    explained very clearly that -- and I'm looking at the

4    third page of that -- that ruling. It says it's set

5    out in Section 14-2 -- 14-21 provides for the

6    continuation of the existence of an administratively

7    dissolved corporation. The 14-2, 14-22 gives

8    administratively dissolved corporations two years in

9    which to seek reinstatement. The expiration of that

10   time for reinstatement puts a stamp on the finality of

11   the demise of a corporation. It can no longer be

12   resuscitated. The unavoidable conclusion is a

13   corporation cannot, after that time is demised -- is

14   deemed complete, initiate any activity.

15   In the final sentence of that paragraph it says

16   brought together, these two -- these three statutes

17   provide a period of two years in which the

18   administratively dissolved corporation can initiate

19   activities necessary to winding up the liquidation of

20   its affairs and its business. If it is not reinstated

21   during that period, it can take no further action.

22   So at any point, let's just assume when the

23   corporation did dissolve in 2017, either she

24   transferred assets back to herself by 2019 or it stayed

25   with the corporation and can't do anything else with

41

| | |
|---|---|
| 1 | it.  So going back to the statute of limitations, going |
| 2 | back to the standing argument, it all comes back |
| 3 | together.  It doesn't matter how you slice it, she |
| 4 | doesn't have standing, she did not disclose it to the |
| 5 | bankruptcy trustee.  We don't have to wait for the |
| 6 | trustee to figure out what he's going to do with this |
| 7 | case for you to dismiss.  If the trustee decides later |
| 8 | to bring his own case, we have our own defense against |
| 9 | the trustee. |
| 10 | Thank you. |
| 11 | THE COURT:  Thank you. |
| 12 | Mr. Slovensky -- |
| 13 | MR. SLOVENSKY:  May I -- |
| 14 | THE COURT:  Are you sure -- like I really -- |
| 15 | MR. SLOVENSKY:  One -- |
| 16 | THE COURT:  What is it, a Code 83? |
| 17 | DEPUTY:  Yes. |
| 18 | THE COURT:  Okay. |
| 19 | MR. SLOVENSKY:  This will be very quick, your |
| 20 | Honor. |
| 21 | THE COURT:  Okay. |
| 22 | MR. SLOVENSKY:  My only point is -- there's two |
| 23 | points I want to make, but only because it was raised |
| 24 | in the discussion about the stay -- |
| 25 | THE COURT:  Okay. |

1          MR. SLOVENSKY:   The intervener filed a motion to

2      stay.   We opposed it.   We strongly oppose a stay of the

3      case.   We understand the Court said it's premature and

4      it's not going to hear that issue.   Now it's been

5      raised again.   I just wanted -- before your Honor goes

6      back to consider those arguments, we strongly disagree

7      with a stay of this case.   And we're happy to give more

8      argument on that or --

9          THE COURT:   I mean, you know --

10         MR. SLOVENSKY:   I just didn't want you to go back

11     and not hear from us on that because we -- we

12     absolutely oppose a stay for the reasons we said in our

13     filing that we understand was kind of mooted by what

14     your Honor ruled.

15         THE COURT:   I mean, as far as I understand, yes.

16     Filing for bankruptcy does result in a automatic stay

17     with the initial filing.   But once that is closed,

18     there's no stay.   Like it opened -- you know, anything

19     else that was previously stayed can reopen.   And just

20     because she's asked for permission to open it again

21     does not mean it has in fact opened, correct?

22         MR. SLOVENSKY:   I think that's a hundred percent

23     right.

24         THE COURT:   Okay.

25         MR. SLOVENSKY:   I think what she's asking for is a

43

1           discretionary stay from your Honor, which we strongly

2           oppose. And that's -- and again, I'm not trying to

3           press my luck. I just want you to understand the Delta

4           defendants strongly oppose that. And there's one other

5           point I'd love to make after or --

6                THE COURT: Could I have a Code 83 first?

7                MR. SLOVENSKY: Sure. Thank you, your Honor.

8                THE COURT: Thank you.

9                (Brief recess taken.)

10               THE COURT: Okay. Ms. Copeland, I think you had

11          something you'd like to add.

12               MS. COPELAND: Yes, your Honor. Thank you.

13               THE COURT: Okay.

14               MS. COPELAND: I wanted -- okay, I'm gone start off

15          with the development of Crew Live and Alexander

16          (inaudible) and it showed where we have standing, okay.

17          The creation of Crew Live was independently created by

18          Mrs. Ross sometime in 2009. It was later incorporated

19          as Skyvia in 2016 when she incorporated it. She did

20          enter a professional service agreement, which was the

21          PSA in 2014. And what that Shock Theory -- and did --

22          and she was the COO -- was limited to a UX Design

23          Service, and explicitly it did not confer any ownership

24          of Crew Live to Alexander. It was never conferred.

25          That's the only thing that contract did, the one that's

44

1    showing.

2        Then of course she filed a series of bankruptcies.

3    She filed for bankruptcy and Chapter 7 in 2019 and she

4    listed Skyvia, Inc., but -- then the trustee abandoned

5    it to her back on August 26, 2021, which gave her

6    standing.  But the important part is this here:

7    Alexander actually filed this complaint prior to their

8    abandoning it back to her, and he never filed anything

9    claiming any ownership in Crew Live at that time in

10   bankruptcy.  And that's one of the reasons we filed the

11   motion for stay.  I think that should be a form of

12   clarification there with -- as it relates to that.

13       Because he filed his lawsuit on July 13th, 2021.

14   And he never went to -- he never went to bankruptcy

15   court in order to file automatic -- to be lifted from

16   that stay when he filed that complaint.  So we think

17   that give us -- we think that he's in violation of

18   Chapter 11 Bankruptcy Code 362 by doing -- just by

19   filing during that time without getting any release

20   from automatic stay.  Because the automatic stay was in

21   place at the time of this initial filing.

22       And -- and, again, I still think that Mrs. Ross

23   have standing based on the fact that she entered as a

24   permissive -- as -- not permissive -- as a intervener

25   as a matter of right; and therefore, the statute rocks

45

1      along with Mr. Alexander case.

2          And I understand that Mr. Ellis can get up and he

3      can quote and stand and talk for a whole hour.  The

4      points are very simple.  Rather not -- rather not the

5      Court should let the federal court do what they're

6      going to do and at the point rather not Mrs. Ross had

7      standing at the time that she intervened in this case,

8      and since it was abandoned back to her in 2021, she is

9      properly before the Court.

10         And when she intervened before this Court, she

11     intervened as a matter of right and the statute is the

12     same as the statute with Mr. Alexander.

13         Thank you, your Honor.

14         THE COURT:  All right.  I think we're good on that.

15         Mr. Slovensky, is there anything else you want to

16     -- or anything related to the motion to dismiss?

17         MR. ELLIS:  I don't think -- no, your Honor.

18         THE COURT:  All right.  At this point I'm going to

19     grant the motion to dismiss and I will provide an order

20     shortly.

21         Mr. Slovensky, there anything else you need to

22     handle?

23         MR. SLOVENSKY:  Yes, one very brief point, your

24     Honor.

25         THE COURT:  Okay.

1             MS. COPELAND: Thank you, your Honor.

2             MR. SLOVENSKY: Your Honor, I'm here with Kamal

3    Patel from the Delta in-house legal department, as well

4    as two of my colleagues. It's only a procedural point,

5    but we want to make sure that the Court understands we

6    filed a motion to dismiss the entirety of the amended

7    complaint. We filed that on November 22nd. That was

8    in response to your Honor's clarification order that

9    gave intervener five calendar days to respond. We did

10    not get a response to that, so we viewed the motion to

11    dismiss the amended complaint as unopposed and we think

12    you ought to grant that.

13             We did receive of course this week a motion for

14    reconsideration of both the November 19th and the

15    November 21st order. The last thing in the world I

16    wanted to do was throw more paper at you, but we -- we

17    oppose that. We think it's not proper. The issues

18    that are raised in the motion for reconsideration are

19    issues that have been briefed previously, except for

20    one, which is the relation back issue. But I want to

21    make sure the Court understands that's not a new issue

22    either. It was actually raised at the October 3rd

23    hearing on our motion to dismiss.

24             You may not remember it, but your Honor raised a

25    question about relation back. Mr. Balser responded --

1        and there's not a lot on it, it's Page 17 and 18 of the

2        transcript.  Our point is that Mr. Anozie, Ms. -- who

3        was intervener's prior counsel was here and chose for

4        good or bad not to respond on that issue or not to kind

5        of press the issue, so we don't think there's anything

6        new in the motion for reconsideration.  We don't think

7        it works for many reasons.

8             We're happy to provide a brief if you -- if your

9        Honor wants, but I don't want to -- again, wanted --

10       that's literally all I wanted to clarify is whether

11       your Honor would like us to brief that issue or not.

12            THE COURT:  No, I don't think so.

13            MS. HEIT:  Yeah, we talked about it.

14            THE COURT:  Yeah.  No briefs.

15            MR. SLOVENSKY:  Thank you, Judge.

16            THE COURT:  Thank you.  I'm sure I'll see guys

17       soon.

18            MR. ELLIS:  Excuse me, your Honor.

19            THE COURT:  Yes, sir.

20            MR. ELLIS:  For a matter of clarification, the

21       motion to dismiss, your order will pertain to all three

22       of the defendants I represent?

23            THE COURT:  Yep.

24            MR. ELLIS:  Thank you.

25                 (Proceedings concluded.)

1    C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    COUNTY OF DEKALB:

5            I, Tina D. Harris, Certified Court Reporter for the

6    State of Georgia, do hereby certify that the foregoing

7    transcript is a true and correct record of the proceedings of

8    the aforementioned case in DeKalb County, Georgia.

9            This certification is expressly withdrawn and

10   denied upon the disassembly or photocopying of the foregoing

11   transcript, unless said disassembly or photocopying is done by

12   the undersigned official court reporter and original signature

13   and seal is attached thereto, this the 18th day of JANUARY,

14   2025.

15

16

17                    _/s/Tina D. Harris_____
                       TINA D. HARRIS, CCR-B-2128
18                    State Court of DeKalb County
                       Stone Mountain Judicial Circuit
19

20

21

22

23

24

25

49